**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................... 1

II.  STATEMENT OF UNDISPUTED FACTS ............................................................ 2

III. STANDARD OF REVIEW ..................................................................................... 10

IV. ARGUMENT ........................................................................................................... 10

   A.  The Individual Defendants are Entitled to Qualified Immunity ................................ 11

     1.  *Plaintiff's Speech Exceeded Matters of Public Concern* ............................................. 12

     2.  *The Value of Plaintiff's Speech is Outweighed by the County's Interests* ..................... 16

     3.  *Plaintiff's Termination was Constitutional* .................................................................. 18

   B.  No *Monell* Liability ........................................................................................... 20

V.  CONCLUSION ....................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95 (3d Cir. 2022) ........................................................................................................................... 1

*Anderson v. Creighton*, 483 U.S. 635 (1987) ................................................................ 11

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................................... 11

*Aspinall v. Thomas*, 118 F. Supp. 3d 664 (M.D. Pa. 2015) ............................................ 11

*Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742 (3d Cir. 2019) .................................... 12

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997) ................................ 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 10

*Connick v. Myers*, 461 U.S. 138 (1983) ........................................................................... 2

*Corbin v. Bucks County, et al.*, No. 2:23-cv-02784-WB (E.D. Pa. 2024) ...................................... 7

*De Ritis v. McGarrigle*, 861 F.3d 444 (3d Cir. 2017) ....................................... 13, 14, 17

*Dennison v. Pennsylvania Dept. of Corr.*, 268 F. Supp.2d 387 (M.D. Pa. 2003) .............. 14, 15, 17

*Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979 (3d Cir. 2014) .................................... 16

*Fenico v. City of Phila.*, 70 F. 4th 151 (3d Cir. 2023) ............................................... 1, 16

*Flora v. Cnty. of Luzerne*, 776 F.3d 169 (3d Cir. 2015) ............................................... 10

*Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231 (3d Cir. 2016) ................. 13

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ...................................................................... 1

*Gorum v. Sessoms*, 561 F.3d 179 (3d Cir. 2009) ............................................................ 10

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016) ...................................................... 15

*Henderson v. Matthews*, 556 F. Supp. 3d 531 (E.D. Pa. 2020) ...................................... 21

*Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006) ............................................. 2

*Kimbrough v. Bucks County, et al.*, 763 F. Supp.3d 700 (E.D. Pa. 2025) ............................ passim

*Lahovski v. Rush Twp.*, 441 F. Supp. 3d 43 (M.D. Pa. 2020) .......................................................... 20

*Lane v. Franks*, 573 U.S. 228 (2014) ...................................................................................... 12, 13

*Miller v. Goggin*, 672 F. Supp.3d 14 (E.D. Pa. 2023) ..................................................................11

*Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978) ................................................ 20

*MRO Corp. v. Humana Inc.*, 383 F. Supp.3d 417 (E.D. Pa. 2019) .............................................. 10

*Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454 (3d Cir. 2015) as amended, No. 14-3509 (3d Cir.

    Oct. 25, 2019) ...................................................................................................................... 1, 16

*Reichle v. Howards*, 566 U.S. 658 (2012) ....................................................................................11

*Swineford v. Snyder Cnty*, 15 F.3d 1258 (3d Cir. 1994) ............................................................ 1, 14

*Versage v. Twp. Of Clinton N.J.*, 984 F.2d 1359, 1366 (3d Cir. 1993) ....................................... 17

*Waters v. Churchill*, 511 U.S. 661 (1994) ...................................................................... 16, 18, 19

*Watters v. City of Phila.*, 55 F.3d 886 (3d Cir. 1995) ............................................................ 12, 14

**STATUTES**

42 U.S.C. § 1983 .................................................................................................................... 2, 10, 20

43 P.S. § 1421 ................................................................................................................................. 14

**RULES**

Fed. R. Civ. P 56(a) ..................................................................................................................... 2, 10

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amend. 1.............................................................................................................. 1, 10, 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ARA KIMBROUGH | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 24-04470-KSM |
| | : | |
| BUCKS COUNTY, et al. | : | |
| | : | |
| | : | |
| Defendants. | : | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Lauren Smith, Margaret McKevitt, David Kratz (collectively the "Individual Defendants"), and the County of Bucks (the "County"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment.

## I.    INTRODUCTION

"The First Amendment . . . will not shield [public employees] from reprisals brought on by [their] own personal vendettas." U.S. Const. Amend. 1; *Swineford v. Snyder Cnty*, 15 F.3d 1258, 1274 (3d Cir. 1994). It is well-settled that public employees do not surrender all free speech rights merely because of their employment status. *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 465 (3d Cir. 2015). But "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see also Fenico v. City of Phila.*, 70 F. 4th 151, 161 (3d Cir. 2023) (citing *Amalgamated Transit Union Loc. 85 v. Port  Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3d Cir. 2022)).

After vindictively leaking confidential information in violation of the Pennsylvania Criminal History Record Information Act ("CHRIA") as well as, several County policies, Ara

1

Kimbrough ("Plaintiff" or "Lt. Kimbrough"), was justifiably terminated from his position as a lieutenant at Bucks County Correctional Facility ("BCCF"). Plaintiff has now sued the County and several of its stakeholders, claiming First Amendment retaliation under 42 U.S.C. § 1983. As controlling precedent makes unequivocally clear, Plaintiff's speech is not entitled to First Amendment protection and cannot support a retaliation claim.

The inquiry into the protected status of speech is a question of law, not fact. *Connick v. Myers*, 461 U.S. 138, 148 n. 7 (1983); *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). Therefore, summary judgment is the appropriate stage for this Court to resolve the case. Fed. R. Civ. P 56(a). As detailed herein, not only did Plaintiff's speech irrevocably impair working relationships with his supervisors, his violation of personnel policies and CHRIA also jeopardized his ability to maintain the certifications necessary to perform his job. The expressive interest—if any—Plaintiff had in disclosing the County's confidential information cannot overcome the County's interest in addressing the disruption Plaintiff caused.

## II.    STATEMENT OF UNDISPUTED FACTS

1. Lieutenant Ara Kimbrough ("Lt. Kimbrough" or "Plaintiff") was employed by the County of Bucks (the "County") at the Bucks County Correctional Facility ("BCCF") "[a]bout five days short of sixteen years." Pl. Dep. 7:10, Feb. 18, 2025 (attached hereto as **Exhibit L**).

2. Prior to his employment with the County, Lt. Kimbrough served in the Navy, where he held a "Top Secret" level security clearance. Sweeney's Expert Report  at 1 (attached hereto as "**Exhibit D**"); **Exhibit L** 7:14–15.

3. Once hired as a corrections officer in 2008, Lt. Kimbrough spent "just under two years" as a module officer, staffing the facility's inmate-housing modules before being "promoted into the records office," where he worked for three years. **Exhibit L** 7:20–23.

2

4.   Lt. Kimbrough then spent five years as BCCF's administrative hearing officer, but notably, he never held the rank of sergeant—a foundational position for understanding staffing and operational dynamics within the facility. **Exhibit L** 8:5–6; Randolph Dep.  15:2–25, 16:1–25, 17:1–8, March 19, 2025 (attached hereto as "**Exhibit P**"). Regardless, Lt. Kimbrough was well-versed in BCCF's policies and procedures while serving as a hearing officer. **Exhibit L** 13:4–7; Kratz Dep. 164:2–3, Feb. 17, 2025 (attached hereto as "**Exhibit M**").[1]

5.   Lt. Kimbrough was made Administrative Lieutenant ("Admin. Lt.") of BCCF's records and reception department in February of 2018  (**Exhibit L** 8:3–4), where he supervised roughly a dozen employees (**Exhibit L** 10:1–3) and was responsible for "all new commitments, all discharges, court movement, transfers, bail acceptances, sexual offender registrations, sentencing computation orders," in addition to handling property and cash. **Exhibit L** 10:7–16.

6.   Through both his roles as hearing officer and Admin. Lt., Lt. Kimbrough was "exposed to a lot of confidential information." **Exhibit M** 163:24–25. In addition to managing sensitive inmate records, Lt. Kimbrough "had access to employee files. . . . [and] everybody's disciplines." **Exhibit M** I 164:1–7.

7.   Due to his job responsibilities, Lt. Kimbrough maintained a Commonwealth Law Enforcement Assistance Network[2] ("CLEAN") certification to allow him access to criminal records considered confidential under the Pennsylvania Criminal History Record Information Act ("CHRIA"). Defs. Ex. 10 (attached hereto as "**Exhibit F**"); **Exhibit L** 94:19–23.

---

[1] The deposition of Bucks County Department of Corrections Director, Dave Kratz, took place over the course of two days. As such, the transcripts of his deposition are separated into parts I (Feb. 17) and II (Feb. 18).

[2] Pennsylvania's conduit to the National Crime Information Center (NCIC), the FBI's National Crime Information Center, and to the International Justice and Public Safety Information Sharing Network.

8.  Experienced, knowledgeable, and possessing meticulously high standards of professionalism, Lt. Kimbrough received positive feedback from his supervisors throughout his career (**Exhibit L** 12:12–14) and enjoyed the confidences of the current Director of the Department of Corrections, Dave Kratz ("Dir. Kratz"). **Exhibit M** 55:1–9; Defs. Ex. 12, at 13 (attached hereto as "**Exhibit H**"). Indeed, Dir. Kratz testified that "if there was ever an issue, [Lt. Kimbrough] would come to me directly," partially because Dir. Kratz himself previously held the position of Lt. of Records. Kratz Dep. II 15:2–3, Feb. 18, 2025 (attached hereto as "**Exhibit N**").

9.  As a supervisor, Lt. Kimbrough was acutely aware of BCCF's ongoing struggles with staffing shortages—a ubiquitous issue for correctional facilities nationwide—as well as the adjustments made to the facility's staffing procedures to account for those shortages. **Exhibit M** 71:5–21.

10. The issue of understaffing at BCCF has been discussed by both Dir. Kratz during public meetings of the Prison Oversight Board, and by the media. **Exhibit L** 73:7–9; Pl. Ex. 11 (attached hereto as "**Exhibit C**").

11. According to Dir. Kratz, staffing at BCCF is "dynamic . . . not static. We had to make changes. The old days of saying, you know, you have three people on this unit, four people in this unit, five people in this unit, one person on that unit, are over with staffing." **Exhibit M** 71:12–18. Now, "[y]ou need to move your staff to where the acuity is." **Exhibit M** 71:21–21.

12. In the records and reception departments specifically, the number of correctional officers assigned on a given day depends on the number of inmates being admitted, discharged, transported, etc. **Exhibit M** 71: 22–25. And "if there's a high number of watches for suicide or medical . . . we have to move some staffing from areas that are very quiet with not a lot of activity to areas of higher acuity. And reception is one of those areas." **Exhibit M** 72:5–12.

4

13. Despite his favorable reputation amongst his supervisors, on February 29, 2024, an anonymous complaint was received by the County's Human Resources ("HR") department, alleging that Lt. Kimbrough was creating a toxic and hostile work environment, chiefly by targeting sergeants with verbal attacks and public threats. Defs. Ex. 11 (attached hereto as "**Exhibit G**").

14. Though anonymous, the complaint detailed specific incidents where Lt. Kimbrough used abusive language towards sergeants and interfered with sergeants' ability to efficiently run their shifts. **Exhibit G**.

15. A thorough investigation was thereafter conducted by the County's Law Department and HR, which included extensive document collection and interviews with all relevant parties. **Exhibit H**.

16. The investigation revealed that most of Lt. Kimbrough's alleged conduct was related to either (a) perceived delays in sergeants staffing the records and reception departments, or (b) sergeants reassigning reception staff to higher acuity areas in the facility. **Exhibit H**. Despite the need for personnel flexibility to deploy to the areas of highest acuity, Lt. Kimbrough, testified that he specifically "previously complained to DOC administration about [sergeants] pulling staff out of the reception unit." **Exhibit L** 29:15–18.

17. Even though the investigation confirmed the allegations of bullying and harassment by Lt. Kimbrough were true, Dir. Kratz remained adamant that he "wanted to get [Lt. Kimbrough] back on track, get him mentored" because "he's been a great employee and ran my records office. He had my trust." **Exhibit M** 54:22–25.

18. Some form of discipline was, nevertheless, deemed necessary. Defs. Ex. 12. So, with the planned mentorship in mind, on May 30, 2024, the County sent Lt. Kimbrough notice of a pre-disciplinary meeting. **Exhibit H**; **Exhibit L** 28:16–19.

19. The notice simply stated that the meeting was scheduled for Monday, June 4, without providing any indication of what discipline, if any, BCCF administration or HR was considering. Defs. Ex. 13 (attached hereto as "**Exhibit I**"); **Exhibit L** 28:20–23.

20. But rather than waiting to use the June 4 pre-disciplinary meeting as his opportunity to be heard, Lt. Kimbrough chose instead to contact Mr. Brian Zeiger, Esq. ("Attorney Zieger") on the evening of May 30, just hours after receiving the notice. **Exhibit L** 29:8–10.

21. At that time, Attorney Zeiger represented the Estate of Joshua Patterson, a former inmate, in a wrongful death lawsuit against the County (hereinafter referred to as the "Patterson Case"). Zeiger Dep. 9:8–11 (attached hereto as "**Exhibit O**"). Mr. Patterson unfortunately overdosed in July of 2022 after another inmate ("Inmate Rhoades") smuggled narcotics into BCCF and distributed them to Mr. Patterson. **Exhibit O** 10:6–24.

22. On the May 30 call, Lt. Kimbrough identified himself to Attorney Zeiger as a "supervisor at [BCCF] during the time period that Mr. Patterson passed away."[3] **Exhibit O** 22:6–9.

23. For his part, Attorney Zeiger "immediately told [Lt. Kimbrough] about the protective order in the case," explaining that he "would not respond to anything" he told him. **Exhibit O**

---

[3] Notably, however, Lt. Kimbrough, was not working at the time Inmate Rhoades was processed, and in the nearly two years between Mr. Patterson's death and his phone call to Attorney Zeiger, never sought to provide any statements regarding Inmate Rhoades' admission to BCCF. As such, Attorney Zeiger understandably did not request to depose him as part of discovery in the Patterson Case. Zeiger Dep. 13:1–22.

24:17–19. But because Attorney Zeiger had a duty to his clients to do his best for them, he told Lt. Kimbrough he "would be happy to listen to anything he had to say." **Exhibit O** 24:19–22.

24. According to Attorney Zeiger, "[t]he conversation was about [officers] Ulmer and Atiles screwing up and the Bucks County Jail not having adequate staff at intake." **Exhibit O** 27:9–12. Attorney Zeiger was "already aware" of almost all the information disclosed by Lt. Kimbrough, but he "did not tell him that because . . . [of the] . . . protective order." **Exhibit O** 30:7–10. Importantly, Attorney Zeiger was only aware of the information through the course of litigation subject to that protective order. **Exhibit O** 30:20–24.

25. The following morning, May 31, Attorney Zeiger contacted Tyler Burns, Esq., counsel representing the County in the Patterson Case, to disclose his conversation with Lt. Kimbrough. **Exhibit O** 30:20–24.

26. While the information provided by Lt. Kimbrough was not necessarily new to him, Attorney Zeiger filed an emergency motion to reopen discovery in the Patterson Case on May 31, 2024.[4] Pl. Ex. 4 (attached here as "**Exhibit B**"); **Exhibit O** 19:4–18.

27. After learning of Lt. Kimbrough's unauthorized contact with Attorney Zeiger, BCCF management was extremely concerned with his decision-making and overall judgment, especially given the timing of the disclosure and considering that part of the information Lt. Kimbrough disclosed to Attorney Zeiger was "false information." **Exhibit M** 88:8; 58:24–25.

---

[4] Attorney Zeiger's emergency motion (Pl. Ex. 4) was later denied by the Hon. Wendy Beetlestone of the Eastern District of Pennsylvania on June 13, 2024, in the same order in which the County's Motion for Summary Judgment was granted. *See* Order Granting Defendants' Motion for Summary Judgement, *Corbin v. Bucks County, et al.*, No. 2:23-cv-02784-WB (E.D. Pa. 2024), ECF No. 56.

28. According to Director Kratz, Lt. Kimbrough's unauthorized disclosure of confidential information caused significant operational disruption. The breach of trust forced him and other administrators to divert time and resources to increased oversight of the records department—an intrusion necessitated solely by Kimbrough's actions. **Exhibit M** 177:8–12. But for Director Kratz personally, the fallout was even more profound. As he explained:

> This is a guy that I had higher aspirations for. This is a guy that's part of my secession plan. And then this happened. And I got to tell you, it was big. It hurt on a professional and personal level. It hurt professionally amongst the staff, the administrative staff, because, you know, we rely on a lot of trust. And even some of the lower-level staff were shaken by this.

**Exhibit M** 164:14–25.

29. A second investigation was conducted by the County's Law Department and HR, this time regarding Lt. Kimbrough's unauthorized disclosure of confidential information to Attorney Zeiger. Defs. Ex. 16 (attached hereto as "**Exhibit J**"). Deputy County Solicitor, Dan Grieser, testified that he was tasked with reviewing Attorney Zeiger's emergency motion Plaintiff's disclosures, and formally interviewing Plaintiff on  June 12, 2024, in conjunction with Chief Human Resources Officer ("CHRO"), Lauren Smith. Grieser Dep. 28:7–14; 57:17–25 (attached hereto as "**Exhibit R**"); **Exhibit D**; Defs. Ex. 19 (attached hereto as "**Exhibit K**"). Mr. Grieser has over twenty years of relevant military investigative experience. **Exhibit R** 17:13–25

30. During the June 12 interview, Lt. Kimbrough admitted to disclosing details about BCCF's staffing procedures and specific information regarding Inmate Rhoades (**Exhibit D**, at 1). He claimed, however, that he believed he was authorized to share this information with Attorney Zeiger, asserting—without any prior clearance—that his May 30 phone call should be considered "testimony" in the Patterson Case. **Exhibit D**, at 10.

31. In his subsequent deposition, however, Lt. Kimbrough acknowledged that the information he disclosed to Attorney Zeiger was considered confidential not only by BCCF per policies, but also under CHRIA. **Exhibit L** 93:9–25.

32. Following the interview on June 12, it was apparent that Lt. Kimbrough violated BCCF policy by "[d]ivulging [] information of a confidential or sensitive nature concerning the operations of the Department, the security of the institution, inmates, and/or residents," and HR policy by "[g]iving confidential information to other individuals/organizations." **Exhibit K**, at 4.

33. But more importantly, "[Lt.] Kimbrough's sharing of details associated with the then pending criminal investigation of the inmate who smuggled the drugs into BCCF was a direct violation of the PA Criminal History Record Information Act (CHRIA), Title 18, Chapter 91." **Exhibit D**, at 7.

34. Given that Lt. Kimbrough had extensive access to confidential information as Admin. Lt. of Records, it was equally apparent that he could not remain in his position at BCCF, as there was now a "lack of trust from the administrative team down to the officers." **Exhibit M** 88:14–17.

35. Director Kratz strongly objected to the retaliatory and vindictive nature of Lt. Kimbrough's conduct, pointing out that within 24 hours of receiving a pre-disciplinary notice for bullying and harassment, Kimbrough was making calls to individuals involved in litigation against the County—something Kratz noted had "never happened in 15 years." **Exhibit M** 163:15–23.

36. Lt. Kimbrough was placed on unpaid administrative leave on June 21, 2024 (Smith Dep. 85:16–23 (attached hereto as "**Exhibit Q**")),[5] and was later given the opportunity to voluntarily resign with a standardized payout of approximately $17,700—representing his unused

_____

[5] Between interviewing with Dept. Solicitor Grieser and Ms. Smith on June 12, and being placed on unpaid administrative leave on June 21, Lt. Kimbrough was out-of-the office on pre-planned vacation.

sick and vacation time—in exchange for releasing any/all legal claims against the County. **Exhibit Q** 87:4–20, 88:8–14, 90:4–12.[6]

37. After declining to voluntarily resign per the terms of the separation agreement, Lt. Kimbrough was ultimately terminated from his County employment on July 29, 2024, for disclosing confidential information leading to the disruption of BCCF's operations. Pl. Ex. 1 (attached here as "**Exhibit A**").

### III.    STANDARD OF REVIEW

Summary judgment should be granted if the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). In deciding summary judgment, "a court must view the facts in the light most favorable to the non-moving party and make every reasonable inference in that party's favor." *MRO Corp. v. Humana Inc.*, 383 F. Supp.3d 417, 421 (E.D. Pa. 2019) (internal quotations omitted). Once the moving party has met its initial burden, the non-moving party must then designate facts that show there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### IV.    ARGUMENT

Both Counts I and II of the Amended Complaint allege First Amendment retaliation pursuant to § 1983. To succeed on such claims, "a public employee must show that his speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." U.S. Const. Amend. 1; *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015) (citing *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)).

---

[6] Ms. Smith testified that these types of agreements are offered to longer term employees as "standard practice." **Exhibit Q** 90:4–7.

### A.  The Individual Defendants are Entitled to Qualified Immunity

In denying the availability of qualified immunity for the Individual Defendants at the motion to dismiss stage, this Court provided that "[i]f appropriate, Defendants may raise this defense again at summary judgment." *Kimbrough v. Bucks County, et al.*, 763 F. Supp.3d 700, 714 n. 11 (E.D. Pa. 2025). But as the Court emphasized, "qualified immunity is not a talismanic phrase that relieves Defendants of their burden to show that their actions did not violate Plaintiff's clearly established constitutional rights." *Id.* (quoting *Miller v. Goggin*, 672 F. Supp.3d 14, 57 (E.D. Pa. 2023)). Accordingly, "the defendant bears the burden of demonstrating qualified immunity, as it is a defense." *Aspinall v. Thomas*, 118 F. Supp. 3d 664, 678–79 (M.D. Pa. 2015).

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 663 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle*, 566 U.S. at 664 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle*, 566 U.S. at 664. This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "reasonably anticipate when their conduct may give rise to liability for damages." *Anderson*, 483 U.S. at 639 (cleaned up).

After development of the record, the "clearly established" standard is not satisfied here. *See De Ritis*, 861 F.3d at 452.  "A public employee's speech is constitutionally protected when (1)

the employee spoke as a citizen;[7] (2) the statement involved a matter of public concern; and (3) the government employer lacked an adequate justification for treating the employee differently from any other member of the general public based on its needs as an employer." U.S. Const. Amend. 1; *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 753 (3d Cir. 2019) (cleaned up). The final element—the *Pickering* balancing test—involves the need for a "careful" balancing "between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (cleaned up).

In this case, Plaintiff's speech was not protected for several reasons. As an initial matter, only portions of Plaintiff's speech relate to a matter of public concern. And to the extent his speech violated clearly established County policies and CHRIA, the First Amendment does not apply. But more importantly, under the *Pickering* test, the County was amply justified in its treatment of Plaintiff because of his speech. For these reasons, the Individual Defendants are entitled to qualified immunity, and the Court should grant Defendants' Motion for Summary Judgment with respect to Count I of the Amended Complaint.

### 1. *Plaintiff's Speech Exceeded Matters of Public Concern*

A "discrete unit of speech addresses a matter of public concern if it discusses fundamental problems" reaching beyond the employee's "day-to-day minutiae." *Watters v. City of Phila.*, 55 F.3d 886, 894 (3d Cir. 1995). In other words, "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the

---

[7] The County concedes that Plaintiff was speaking as a private citizen at the time of the May 30 phone call to Attorney Zeiger. *See Kimbrough*, 763 F. Supp.3d at 708–09.

community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (internal quotations omitted).

Matters of public concern may, however, "overlap" with matters that do not receive First Amendment protection, such as "personal grievances." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 243 (3d Cir. 2016). For example, when speech "addresses only the employee's own problems," it is "merely a personal grievance;" this is so even if "those problems brush against a matter of public concern by virtue of that employee's public employment." *De Ritis v. McGarrigle*, 861 F.3d 444, 455 (3d Cir. 2017) (internal quotations omitted). To decide which end of the public-private spectrum the contested speech falls on, courts look at the speech's "content, form, and context." *Lane*, 573 U.S. at 241.

While it is undeniable that chronic understaffing at BCCF is a legitimate matter of public concern (**Exhibit M** 73:7–9; **Exhibit G**)—and part of a broader, well-documented national crisis in corrections—the internal methods and operational decisions by which the administration addresses those staffing challenges are not. As explained by Dir. Kratz, staffing at BCCF is "dynamic," involving the frequent reassignment of corrections officers from areas of low activity to areas with greater staffing needs. **Exhibit M** 71:12–21. By telling Attorney Zeiger that "Ulmer and Atiles screwed up" and that "not having adequate staff at intake" led to Mr. Patterson's fatal overdose, Plaintiff mischaracterized BCCF's staffing procedures based on his own opinions. **Exhibit O** 27:9–12. But what matters is his casual willingness to disclose specific details about staff deployment—information that is inherently law enforcement-sensitive. Notwithstanding the inaccuracy of the derails disclosed, Plaintiff's eagerness to divulge them based solely on his own narrative wasn't whistleblowing; it was a breach of institutional trust and policies. **Exhibit K**.

13

Regardless of Plaintiff's portrayal to Attorney Zeiger, in practice, BCCF's staffing procedures are designed to prioritize high-acuity areas to mitigate the impact of understaffing across the facility. **Exhibit M** 71:21–21. So, at best, Plaintiff's speech indicates that he was ignorant of those institutional needs. But such a blatant mischaracterization by Plaintiff, suggests that rather than a matter of public concern, his speech reflected "a personal grievance" with the "day-to-day minutia" of corrections officers being pulled from his department to accommodate for understaffing in *other* areas of BCCF. *See De Ritis*, 861 F.3d at 455; *Watters*, 55 F.3d at 894. Indeed, the record is strikingly devoid of any evidence that Plaintiff's statements to Attorney Zeiger were even true. To the contrary, the timing of his disclosure—immediately after receiving notice of a pre-disciplinary hearing—strongly indicates that his actions were *retaliatory* in nature and, not motivated by any genuine concern for institutional integrity. *See Swineford*, 15 F.3d at 1274 (noting that a public employee's inability or refusal to substantiate their allegations "is a strong indication of self-interest, not public spirit").

But even more than the self-interested and retaliatory nature of his speech, Plaintiff's ability to claim that his speech is a matter of public concern is further subverted by his inclusion of "details associated with the then pending criminal investigation of the inmate who smuggled the drugs into BCCF" (**Exhibit D**, at 7; **Exhibit L** 93:9–25)—in direct violation of both BCCF and County policies and CHRIA. *See Dennison v. Pennsylvania Dept. of Corr.*, 268 F. Supp.2d 387, 398 (M.D. Pa. 2003). Particularly considering Plaintiff "had an approved avenue for disclosing his concerns" regarding understaffing at BCCF under Pennsylvania's Whistleblower Law, which permits public employees to make good faith reports of wrongdoing to the appropriate authorities. 43 P.S. § 1421. Appropriate authorities, however, include those with jurisdiction over regulatory violations—not an attorney engaged in active litigation against a public employer, regarding an *incident that*

14

*occurred over two years earlier. See Dennison*, 268 F. Supp.2d at 398.  Plaintiff's decision to bypass established reporting channels and disclose security sensitive information to opposing counsel in active litigation not only flouts statutory safeguards and institutional policies—it decisively removes his speech from the realm of protected public concern.

Finally, Plaintiff's First Amendment retaliation claim is undermined by the fact that the information he purportedly disclosed to Attorney Zeiger in the Patterson case was not new. Under *Heffernan v. City of Paterson*, a successful retaliation claim requires that the employer acted with a retaliatory motive against the employee for engaging in protected speech. 578 U.S. 266, 273–74 (2016). Where, as here, the speech at issue was duplicative of information already disclosed, the causal connection between the speech and the alleged adverse employment action is significantly weakened. *Id.* As Plaintiff acknowledges, Attorney Zeiger had already obtained that information during discovery in the Patterson Case pursuant to a court-issued protective order. Thus, Plaintiff's belief that he was revealing new or impactful information was mistaken.

This conclusion is further bolstered by the timing and context of Plaintiff's termination. On June 13, 2024, before Plaintiff was terminated, Judge Beetlestone granted summary judgment in favor of the County in the Patterson Case. Plaintiff's disclosure therefore had no discernible effect on the outcome of the litigation, making it even less plausible that the County's decision to terminate him was motivated by retaliation. Instead, the record shows that Plaintiff was terminated for violating policies regarding confidential information and for causing a total breakdown in trust within his department. These policy violations, not any purported "whistleblowing," were the direct cause of his termination. Accordingly, the absence of both motive and causation further supports summary judgment in favor of the County on Plaintiff's First Amendment claim.

2.  *The Value of Plaintiff's Speech is Outweighed by the County's Interests*

The final element, the *Pickering* balancing test, requires courts to weigh the interests of a public employee in commenting on matters of public concern against the interest of the public employers in promoting workplace efficiency and avoiding workplace disruption. *Munroe*, 805 F.3d at 474 (citing *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 991 (3d Cir. 2014)). While the inquiry varies given the nature of the speech at issue, courts typically consider whether the speech impairs discipline or employee harmony, has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the enterprise's regular operations. *Munroe*, 905 F.3d at 474.

In short, the inquiry "involves a sliding scale," in which "the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." *Munroe*, 905 F.3d at 472 (internal quotations omitted). But the existence of actual disruption need not be shown; rather a public employer need only establish that disruption is *likely* to occur because of the speech. *See, e.g.*, *Dougherty*, 772 F.3d at 992 & n. 7 (emphasis added). As the Third Circuit recently noted, "the Supreme Court has deferred heavily to employers' reasonable interpretations of employee speech and predictions of disruption." *Fenico*, at 167–68 (citing *Waters v. Churchill*, 511 U.S. 661,676 (1994)).

Here, the Court need not rely on the County's prediction of disruption alone. *Kimbrough*, 768 F. Supp.3d at 712 (citing *Doughtery*, 772 F.3d at 991–92). After the close of discovery, the County can now persuasively demonstrate that trust and confidence are essential to BCCF's effective operation—and that Plaintiff's speech significantly undermined both. The damage to his working relationships is well documented in the record, and that harm was only magnified by Plaintiff's rank and the nature of his position, which demanded an even higher level of trust,

discretion, and leadership. "[T]he administrative staff . . . we rely on a lot of trust" (**Exhibit M** 164:14–25) but because of Plaintiff's speech, there was "a lack of trust from the administrative team down to the officers." **Exhibit M** 88:14–17. And lacking trust, BCCF supervisors could not in good faith continue to allow Plaintiff unrestricted access to criminal records. *See Dennison*, 268 F. Supp.2d at 398 (in regard to the dissemination of inmate medical records, "common sense dictates that such records contain highly personal and sensitive information that is designated confidential for a number of valid reasons"). But as Admin Lt. of the *records* department, access *to records* was essential to nearly every aspect of his position. **Exhibit F Exhibit L** 10:7–16; 94:19–23. So, in addition to the negative effects on his close working relationships, Plaintiff's speech likewise interfered with his ability to perform his job duties. *See Doughtery*, 772 F.3d at 991–92.

Furthermore, in light of the questionable "public spirit" of Plaintiff's speech, when balanced against the interests of the County, Plaintiff's interests should be "accord[ed] little weight." *Dennison*, 268 F. Supp.2d at 398 (citing *Versage v. Twp. Of Clinton N.J.*, 984 F.2d 1359, 1366 (3d Cir. 1993)). Altogether, while Plaintiff expressed his personal dissatisfaction with staffing procedures during the intake of Inmate Rhoades, he did so by disclosing confidential, security-sensitive information to Attorney Zeiger in connection with his intent to provide adverse testimony in the Patterson Case (**Exhibit D**, at 10). Under the *Pickering* balancing test, any interest Plaintiff may have had in voicing his opinion "pales in comparison to the government's interest in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).*De Ritis*, 861 F.3d at 458; *see, e.g.*, *Dennison*, 268 F. Supp.2d at 398 (holding that a public employee's "interest in distributing inmate psychological

records in an effort to reveal racial discrimination in parole determinations does not outweigh SCI–Mahanoy's interest in keeping such records confidential").

### 3. *Plaintiff's Termination was Constitutional*

Even assuming, arguendo, that Plaintiff's statements constitute protected speech under the First Amendment, summary judgment remains appropriate because the County's decision to terminate Plaintiff's employment was based on a reasonable belief, formed after a reasonable investigation, that Plaintiff violated clear County policies by disclosing confidential operational information. As held in *Waters*, a public employer does not violate the First Amendment when it acts upon a reasonable belief, supported by a reasonable investigation that Plaintiff's conduct violated workplace policy and was disruptive to agency operations. The Court emphasized that employers must make employment decisions "in good faith and based on reasonable grounds," and not necessarily on the actual truth of the underlying statements. Justice O'Connor, writing for the plurality, explained:

> We think the government employer does not violate the First Amendment when it makes an employment decision based on what it reasonably believed to be an employee's speech, and when it takes action based on a reasonable investigation.

*Id.* at 677. The Court further acknowledged that public employers have an interest in ensuring the efficiency and integrity of their operations and are not held to a standard of perfect factual accuracy, but rather procedural reasonableness in determining the facts before acting. *Id.* at 678.

The facts of this case fall squarely within the framework established in *Waters*. The Plaintiff, a County lieutenant, was investigated for allegedly disclosing confidential staffing and procedural information to an attorney involved in unrelated litigation against the County. Upon receiving notice of this allegation, the County initiated an investigation wherein Plaintiff admitted to having the conversation and did not deny the details attributed to him in Attorney Zeiger's

emergency motion. **Exhibit R** 28:7–14; 57:17–25. During that interview, Plaintiff confirmed that he had discussed with Attorney Zeiger, among other things, the removal of staff from his unit during a critical incident, the conduct of a body search, and the ability of an inmate to retrieve contraband from a "dirty cell" due to staffing lapses. **Exhibit R** 30:1–17.

Based on the content of Plaintiff's disclosures, Mr. Grieser reasonably concluded that Plaintiff had violated several County policies, including:

- HR Policy 1.0, Work Rule #59: Giving confidential County information to unauthorized individuals.
- HR Policy 1.0, Work Rule #63: Failure to abide by the Code of Conduct.
- HR Policy 32: Code of Conduct governing confidentiality and professionalism.
- BCDOC Table of Offenses #15 and #17: Prohibiting divulgence of confidential operational information and conduct unbecoming an employee.

**Exhibit R** 42:4-9; 59:5-17; **Exhibit K**. Mr. Grieser further testified that the staffing and procedural details disclosed by Plaintiff could be operationally harmful if made known outside the institution, potentially undermining institutional security and exposing officers or inmates to danger. **Exhibit R** 42:8–43:9; 66:18–67:21. He articulated a clear security rationale consistent with the employer interest identified in *Waters*, where the Court recognized that employers must be able to respond to potential disruptions even when speech touches on matters of public concern.

Most critically, the County did not act on speculation or rumor, but on the findings of a direct interview with Plaintiff, coupled with a document review and a determination of policy violations. As in *Waters*, this satisfies the Court's requirement for a "reasonable investigation" and a "reasonable belief" about the nature and impact of the employee's speech. The fact that the employer may not have verified every element of the disclosure with perfect certainty is irrelevant under *Waters*, which explicitly rejected such a standard in favor of reasonableness. 511 U.S. at 678–79).

Under the reasoning in *Waters*, the Plaintiff's termination did not violate the First Amendment. The County conducted a reasonable, good faith investigation into reports of unauthorized speech, relied on direct admissions from the Plaintiff, and concluded he had violated clearly established workplace rules regarding confidentiality and professionalism. Because the County acted based on a reasonable belief that Plaintiff engaged in speech that was disruptive and in violation of policy, and because this belief was grounded in a reasonable investigation, *Waters* dictates that even assuming Plaintiff's speech was protected by the First Amendment, his termination was constitutional.

### B.  No *Monell* Liability

In Count II of his Amended Complaint, Plaintiff sues the County under § 1983 for First Amendment retaliation. ECF No. 17, ¶¶ 41–61. Because he alleges that the County violated his constitutional rights, "the standards annunciated in *Monell* apply to his claim." *Kimbrough*, 763 F. Supp.3d at 713 (quoting *Lahovski v. Rush Twp.*, 441 F. Supp. 3d 43, 60 (M.D. Pa. 2020)). In *Monell*, the Supreme Court held that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978). "Instead, for municipal liability to attach, Kimbrough must point to a Bucks County policy or custom that caused his constitutional injury." *Kimbrough*, 763 F. Supp.3d at 713–14 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997)).

In his Amended Complaint, Plaintiff states he "was discharged for allegedly violating numerous written policies promulgated and enforced by Defendant County." ECF No. 17 ¶ 57. But Plaintiff notably fails to allege—much less establish in the record—that the County maintains a practice or custom of disciplining or discharging employees in violation of the First Amendment. Notwithstanding the lack of First Amendment protection for his speech, Plaintiff's argument that

the County's Chief Operating Officer, Defendant McKevitt, "was endowed with final policy-making authority" and "exercised that authority by authorizing and approving his discharge," (*id.* at ¶ 58) is insufficient to establish municipal liability under *Monell*. It can be assumed that Plaintiff intends for the Court to "infer the existence of a custom from a single incident of unconstitutional misconduct," but such an assumption "threatens to circumvent the limitations of *Monell*."[8] *Kimbrough*, 763 F. Supp.3d at 714 n. 10 (quoting *Henderson v. Matthews*, 556 F. Supp.3d 531, 535 (E.D. Pa. 2020)) (internal quotations omitted). Accordingly, the Court should decline to find the County liable under *Monell* and the Court should grant the Defendant's motion for summary judgment with respect to Count II of the Amended Complaint.

## V.    <u>CONCLUSION</u>

For the reasons set forth herein, the County respectfully requests that the Court grant its Motion for Summary Judgment in full.

Dated: May 16, 2025                           **BUCKS COUNTY LAW DEPARTMENT**

BY:    <u>*/s/ Jaclyn C. Grieser*</u>
Jaclyn C. Grieser, Esquire
Deputy County Solicitor
Attorney I.D. No.  93358

BY:    <u>*/s/ Shae L. Randolph*</u>
Shae L. Randolph, Esquire
Assistant County Solicitor
Attorney I.D. No. 333311

*Attorneys for Defendants*

---

[8] If Plaintiff intended to bring claims against the County for vagueness and overbreadth in addition to his First amendment retaliation claim, he needed to bring each of those claims as separate Count in his Amended Complaint. *Kimbrough*, 763 F. Supp.3d at 714 n. 11.

21