Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVA

**EXHIBIT**

tabbies®

L

ARA KIMBROUGH                    :
                                 :
                                 :
-v.-                             : NO. 24-CV-044
                                 :
BUCKS COUNTY, LAUREN SMITH       :
SHAE RANDOLPH AND DAVID KRATZ    :


                    **DEPOSITION**


            DEPONENT:   Ara Kimbrough

            DATE:       Tuesday, February 18, 2025

            TIME:       11:44 a.m.

            PLACE:      55 East Court Street, Room 432
                        Doylestown, PA

            REPORTER:   Ted Allen

            SOLICITOR:  Jaclyn C. Grieser

Ara Kimbrough
02/18/2025

Page 2

A P P E A R A N C E S:


           MANSOUR LAW, LLC.
           BY: WILLIAM P. MANSOUR, ESQ.
           961 Marcon Blvd, Suite 425
           Allentown, PA 18109
           (610) 936-6863
           wpm@themannsourfirm.com
                Representing the Plaintiff,
                Ara Kimbrough


           BUCKS COUNTY LAW DEPARTMENT
           BY: JACLYN C. GRIESER, ESQ.
           DARA BURNS, ESQ.
           55 East Court Street
           Doylestown, PA 18901
           (215) 348-6140
           jgrieser@buckscounty.org
                Representing the Defendant,
                Bucks County, David Kratz, et al.

Ara Kimbrough
02/18/2025

I N D E X

WITNESS:                                      PAGE

ARA KIMBROUGH

By Ms. Grieser                                  4

By Mr. Mansour                                 96

By Ms. Grieser                                104

By Mr. Mansour                                108

E X H I B I T S

MARKED              DESCRIPTION              PAGE

D-1    Doc, Records officer                  16

D-2    Doc, Reception and records unit       17
       supervisor

D-3    Staff training                        20

D-4    Table of organization                 38

D-5    Guidelines and policy review          54

D-6    Employee discipline and table of      55
       offenses

D-7    Release of past offender              65
       incarceration dates

D-8    Department vision, mission, values    69
       and code of ethics

D-9    Public information and education      81

D-10   Certificate of CLEAN completion       94

(Exhibits marked and attached to transcript.)

Ara Kimbrough
02/18/2025

1           (It is stipulated and agreed by and among counsel for

2      the respective parties that the reading, signing, sealing

3      and filing of the transcript is waived, and that all

4      objections, except as to the form of the questions, are

5      reserved until the time of the trial.)

6                                   ---

7           ARA KIMBROUGH was called as a witness and after

8      having been first duly sworn, according to law, was examined

9      and testified as follows:

10                      --- EXAMINATION ---

11     BY MS. GRIESER:

12          Q.   Can you please state your full name for

13     the record.

14          A.   It's Ara J. Kimbrough.

15          Q.   And how do you spell your last name?

16          A.   K-I-M-B-R-O-U-G-H.

17          Q.   Have you ever given a deposition before?

18          A.   I believe once.

19          Q.   Once, okay.  There's just a few ground

20     rules that I'm going to go over with you to start --

21          A.   Okay.

22          Q.   -- just so we're both on the same page.

23               MS. GRIESER:  First I guess usual stipula-

24          tions, Mr. Mansour?

25               MR. MANSOUR:  Yes, objections only as to

Ara Kimbrough
02/18/2025

Page 5

1        form and privilege, the remainder being re-

2        served for trial.

3    BY MS. GRIESER:

4        Q.    So you understand this is as if we were in

5    court, right?

6        A.    Yes, ma'am.

7        Q.    The testimony that you've giving today?

8        A.    Yes, ma'am.

9        Q.    And your testimony is being recorded, so

10   all of your answers need to be verbal.  You don't

11   want to shake your head or nod or anything like

12   that.  You want to be able to say it out loud so

13   that our court reporter can accurately transcribe

14   everything that we talk about today.

15       A.    Yes, ma'am.

16       Q.    If you don't understand one of my ques-

17   tions, please ask me to rephrase it, okay.  We don't

18   want you to guess.  If you don't know, you don't

19   know and that's a perfectly fine answer.

20       A.    Yes, ma'am.

21       Q.    If you need a break at any time to, you

22   know, use the restroom, talk to your attorney that's

23   fine.  The only thing I ask is that you -- If I have

24   posed a question to you, that you go ahead and fin-

25   ish answering that question before we take that

Ara Kimbrough
02/18/2025

Page 6

1  break.

2        A.    Yes, ma'am.

3        Q.    You understand that if you are -- I went

4  over that one already, okay.  Do you understand that

5  if you answer a question, I'm going to assume that

6  you understood that question as I said it?

7        A.    Yes, ma'am.

8        Q.    Are you taking any medication today?

9        A.    No, ma'am.

10       Q.    Are you experiencing any condition today

11  that might affect your ability to give accurate tes-

12  timony?

13       A.    No, ma'am.

14       Q.    Have you spoken with anybody about this

15  deposition today besides your attorney?

16       A.    No, ma'am.

17       Q.    I'm going to -- I'm going to be asking you

18  to look at a couple of documents throughout the, our

19  deposition here.  And I just want you to know we're

20  going to have to mark it first, and then I'm hand --

21  I'm going to go ahead and hand it to you, okay?

22       A.    Yes, ma'am.

23       Q.    All right.  And Mr. Mansour has the right

24  to object, and he will cue you as to -- You have,

25  you still have to answer the question unless it gets

Page 7

1  into privileged information, okay.  So Mr. Mansour

2  will say you can go ahead and answer the question or

3  don't answer that question, okay?

4          A.   Yes, ma'am.

5          Q.   All right.  Do you have any questions be-

6  fore we get into the meat of it?

7          A.   No, ma'am.

8          Q.   All right.  How long were you employed at

9  the Bucks County Confinement Facility?

10         A.   About five days short of sixteen years.

11         Q.   How did you -- Did you start off as a cor-

12  rectional officer?

13         A.   Yes, ma'am.

14         Q.   And we were just talking about before off

15  the record, you were in the Navy for four years?

16         A.   Yes, ma'am.

17         Q.   Tell me about how you worked your way up

18  through the ranks in the Bucks County Confinement

19  Facility.

20         A.   I applied as an officer.  I was selected

21  and just under two years, I was promoted into the

22  records office.  I worked approximately three years

23  in the records office, and I was promoted to admini-

24  strate -- administrative hearing officer.  I was the

25  administrative hearing officer for approximately

Ara Kimbrough
02/18/2025

Page 8

1  five years, and then in February of 2018 I was pro-

2  moted to administrative lieutenant.

3        Q.   When did you make lieutenant?

4        A.   February 2018.

5        Q.   Were you a sergeant --

6        A.   No, ma'am.

7        Q.   -- in between here at all, no?  What do

8  you have to do to become a lieutenant?

9        A.   For what I had to do to become a lieuten-

10  ant was I had to take a test, and I had to inter-

11  view.

12        Q.   What does the test test you on?

13        A.   A range of things, a lot pertaining to the

14  records department.

15        Q.   Was it a specific test for the records,

16  for the admin lieutenant records or is part, part of

17  the records -- at least part of it for every LT?

18        A.   I believe there is a records piece for

19  everybody, but I believe this was a specific test.

20        Q.   Okay.  Before you become a records officer

21  is there any specialized training that you need to,

22  to undertake?

23        A.   To become a records officer or to promote

24  to records officer?

25        Q.   To be to work in records.  So when you

Ara Kimbrough
02/18/2025

Page 9

1  started as a CO for two years, and then you went

2  into records for three years, were you still a CO

3  when you went into records?

4      A.   Yes, I was a CO, but I was a records CO.

5      Q.   What made you a records CO?

6      A.   I'm sorry?

7      Q.   What made you a records CO?

8      A.   Again I took a test and I did an inter-

9  view.

10      Q.   But that's not usual for every position at

11  the confinement facility is it?

12      A.   No, ma'am.

13      Q.   Having to test, okay.  Do you have to take

14  a test to become a sergeant?

15      A.   Yes, ma'am.

16      Q.   Do you interview to become a sergeant?

17      A.   Yes, ma'am.

18      Q.   Approximately so you became the admin lie-

19  utenant of the records department, that put you in a

20  supervisory role; is that right?

21      A.   Yes, ma'am.

22      Q.   So all in all you were in the records dep-

23  artment for -- help me out with my math here.

24      A.   Roughly eight years.

25      Q.   Eight years, okay.  And at any given time

Ara Kimbrough
02/18/2025

Page 10

1  how many records officers were there under you?  It

2  probably ebbed and flowed but --

3      A.    Eight to ten.

4      Q.    And tell us a little bit about your res-

5  ponsibilities as the admin lieutenant of the records

6  department.

7      A.    Um, all new commitments, all discharges,

8  court movement, transfers, bail acceptance, sexual

9  offender registrations, sentencing computation, ord-

10 ers, that all went through records.  I also oversaw

11 the reception department so again any, any new com-

12 mitments coming in, any discharges going out, any

13 court movement, any transfers they went through that

14 unit.  Obviously in that unit we were, you know we

15 would do the booking process.  We handled property,

16 money, uh, again court movements.

17          And then I also oversaw the actual intake,

18 uh, module where all the new commitments go would be

19 housed for a kind of isolation period.  It's probab-

20 ly not the right word but it's -- I'm drawing a

21 blank on it -- a quarantine period if you will.  Um,

22 and there were, there could be approximately ninety

23 inmates on that block and staff and then they have,

24 there is also a nurse's office in that unit.

25      Q.    And correct me if I'm wrong, but actually

Ara Kimbrough
02/18/2025

Page 11

1   the physical records office is across the hall

2   from --

3        A.   The reception, yes.

4        Q.   Reception, okay.  So a constable would

5   come in with a new commitment, give you, you or

6   somebody in your office paperwork?

7        A.   First day we give it to the main control,

8   then they would give it to us, and then if every --

9   If everything was acceptable then we would allow

10  him, them, excuse me.  Then a nurse would come

11  screen him, and then if everything was acceptable

12  then we would -- then we would send him into the

13  reception unit.

14       Q.   And at the time of your termination what

15  was your typical shift?  Were you --

16       A.   Uh, generally 8 to 4.

17       Q.   So is it fair to say that you, you train

18  and mentor people who are under you?

19       A.   Yes, training was part of the position.

20       Q.   It sounds like you're one of the most ex-

21  perienced officers in the confinement facility; is

22  that fair to say?

23       A.   There are people that are there thirty,

24  thirty-five years.

25       Q.   And not all of them are records officers,

Ara Kimbrough
02/18/2025

Page 12

1  correct?

2       A.   No, that's yes, that's correct.

3       Q.   Out of the records and intake unit you

4  were the most experienced; is that right?

5       A.   No, there were people that were there lon-

6  ger than me as well.

7       Q.   They just happen to be COs, happen to stay

8  COs?

9       A.   Mm-hmm.

10      Q.   Okay.

11      A.   That's correct.

12      Q.   You received a lot of positive feedback,

13  right, throughout your career?

14      A.   Yes.

15      Q.   And you know the facility's policies and

16  procedures well?

17      A.   Yes.

18      Q.   You follow those policies and procedures?

19      A.   Yes, ma'am.

20      Q.   Would you say you're confident in your ab-

21  ility to carry out your duties?

22      A.   Yes, ma'am.

23      Q.   Would you say you hold yourself to a high

24  standard of professionalism?

25      A.   Yes, ma'am.

Ara Kimbrough
02/18/2025

Page 13

1        Q.    You don't cut corners, take shortcuts in

2    any of your duties?

3        A.    No, ma'am.

4        Q.    You're also responsible for reporting any

5    violations that you believe happened that that you

6    saw occur?

7        A.    Yes, ma'am.

8        Q.    By other COs and that type of thing?

9        A.    Yes, ma'am.

10       Q.    All right.  What happens if you, if you

11   catch, catch a violation from another CO?  Or ano-

12   ther CO, excuse me, another CO breaking the rules or

13   doing something that they shouldn't do?

14       A.    They, well, it depends on the violation.

15       Q.    Okay.  Give me an example of a violation

16   that you might notice and report, it can be totally

17   hypothetical.

18       A.    Uh --

19       Q.    What about somebody failing to do their

20   rounds?

21       A.    Yeah, that could be a violation.

22       Q.    Okay.  Let's say you caught somebody fail-

23   ing to do their rounds, what would you do if you

24   were there, if that person was your subordinate?

25   Like say at an intake unit somebody forgot to do

Page 14

1  their rounds or just didn't do their rounds and you

2  found out about it, what's the process after that?

3      A.   Well, there isn't a standardized process.

4  I would probably talk to the individual, find out

5  you know what happened the, you know the reasoning

6  or circumstances on why they didn't do it.  I'd pro-

7  bably counsel them to make sure they complete their

8  rounds, and then I'd document it in the shift report

9  to let the administration know that it happened and,

10  um, I addressed it by counseling.

11      Q.   Now, you said that you were the hearing

12  officer for a number of years?

13      A.   Yes, ma'am.

14      Q.   What is a hearing officer?

15      A.   Um, they conduct hearings for institutio-

16  nal misconducts of inmates, they also hear adminis-

17  trative appeals of employee discipline.  They re-

18  ceive the attendance and points policy, and they're

19  the PREA compliance manager.

20      Q.   And just for the benefit of the record,

21  what does PREA stand for?

22      A.   Prison Rape Elimination Act.

23      Q.   So essentially you're a type of judge; is

24  that fair to say?

25      A.   I, I don't think it's judge is accurate.

Ara Kimbrough
02/18/2025

Page 15

1      Q.    Yeah.

2      A.    I was, I would just make a determination

3   on again you know inmate misconducts, um, and then

4   the appeals.  I guess it's more, it's more of ap-

5   peals 'cause they're the -- The punishment's already

6   been decided and you're just, um, making a decision

7   on whether it's, it was justified or not.

8      Q.    Now the disciplinary appeals, is that

9   available for all correctional officers or only

10  those?  I know you have at least two unions down

11  there at the confinement facility; is it just union-

12  ized?

13     A.    Yes, that's correct.

14     Q.    So mainly unionized employees get the ben-

15  efit of an appeal?

16     A.    Yes, ma'am.

17     Q.    All right.  I'm going to show you a couple

18  of these policies here, and I'm showing these to

19  you.  We have an outstanding protective order, a

20  motion for a protective order in this case, but Mr.

21  Mansour was good enough to agree to a confidentiali-

22  ty agreement regarding these policies and SOPs.

23     A.    Okay.

24          MS. GRIESER:  Okay, all right.  This is

25          fifteen?

Ara Kimbrough
02/18/2025

Page 16

 1              MR. MANSOUR:  Fourteen I think.

 2              MS. BURNS:  Did you mark them?

 3              MS. GRIESER:  Can we go off the record one

 4       second.

 5              (Discussion off the record.)

 6  BY MS. GRIESER:

 7       Q.   I'm handing you D-1 which is Bates stamped

 8  COB0727 to COB0728, so it's a two-page document the

 9  title of which is records officer, and it is Policy

10  No. Bravo Tec 3.15.  Can you go ahead and take a

11  look at that and read through it.

12              (Whereupon Exhibit No. D-1 was so marked for

13  identification being a document, Records Officer.)

14  BY MS. GRIESER:

15       Q.   When you're done you can give it back.

16  Did you have enough time, I didn't -- I didn't mean

17  to cut you short there.

18       A.   Nope.

19       Q.   Okay.  Does this document fairly and accu-

20  rately reflect the duties of a records officer as

21  you know them?

22       A.   Yes, ma'am.

23       Q.   You'd agree with me that number -- Para-

24  graph No. 15 states that, "The records officer

25  should ensure that confidential information regard-

Ara Kimbrough
02/18/2025

Page 17

1   ing inmates is not released to the public or media"?

2        A.   Yes.

3        Q.   And then I'm going to hand you D-2.  This

4   is what happens when your paralegal doesn't come in.

5   We can mark this D-2, thank you.  You can go ahead

6   and hand it back the other one, thank you.  And the

7   same thing, you can go ahead and read through that.

8   This is COB0727 to COB07 -- no, I beg your pardon.

9   It's COB0725 to COB0726 -- again another two-page

10  document -- entitled Reception and Records Unit Sup-

11  ervisor, Section B3.14.

12       A.   Okay.

13            (Whereupon Exhibit No. D-2 was so marked for

14  identification being a document, Reception and Records Unit

15  Supervisor.)

16  BY MS. GRIESER:

17       Q.   You'd agree with me that Paragraph 1 char-

18  ges you with having a thorough and working knowledge

19  of all post orders, policies, procedures and depart-

20  mental directives?

21       A.   Yes.

22       Q.   And Paragraph 5 reflects that you should

23  be prepared to assume any reception or records offi-

24  cer duty?

25       A.   Yes.

Ara Kimbrough
02/18/2025

Page 18

1      Q.   Why is that; why should you be prepared to

2  assume any reception or records officer's duties?

3      A.   I think all supervisors are required to

4  assume duties.

5      Q.   I'm sorry, I didn't --

6      A.   I think all supervisors are required to

7  assume duties if there's a need.

8      Q.   So you or any of your records officers --

9  Well, you or any of your records officers, if they

10  were short in intake across -- reception across the

11  hall, you could step in there and fill that, fill an

12  extra role?

13      A.   Yes, I could.

14      Q.   What type of information did you have?

15  And I can go ahead and take that back from you,

16  thank you.  What type of information like national

17  databases did you have access to as the records off-

18  icer supervisor and admin supervisor?

19      A.   We had the JNET and NCIC.

20      Q.   What's JNET?

21      A.   Um, I, um --

22      Q.   You don't have to tell me what the acronym

23  is.

24      A.   Yes.

25      Q.   But just generally what kind of informa-

Ara Kimbrough
02/18/2025

Page 19

1  tion is contained there?

2       A.    Um, if you're going to check for a release

3  on somebody, or if somebody comes in you could run

4  their pedigree information and see if they have a

5  warrant or see their criminal history.

6       Q.    And what about NCIC?

7       A.    It's the same thing.

8       Q.    What's the difference between the two?

9       A.    Um, one the JNET is you access it on a

10  computer by just putting in information.  NCIC you

11  physically fingerprint somebody in their informa-

12  tion.

13       Q.    Okay.  So you fingerprint somebody and you

14  run, you put that in NCIC?

15       A.    Yeah, it yeah, it makes sense.  The NCIC

16  yes.

17       Q.    Okay, so anything -- Had that person, had

18  that inmate come in or had been arrested before, his

19  fingerprints would theoretically match up with his

20  prior arrest in NCIC?

21       A.    Yes.

22       Q.    Am I understanding that correctly?  Okay,

23  thank you.  What type of files and servers were, did

24  you have access to in the BCCF system?

25       A.    We have access to the OMS, the offender

Ara Kimbrough
02/18/2025

Page 20

1  management system.

2      Q.    What about like investigations?

3      A.    No.

4      Q.    Would you still have had access to the

5  hearing officer information?

6      A.    No, ma'am.

7      Q.    Did you have any -- I assume you kept some

8  files somewhere related to records and reception; is

9  that fair?

10     A.    We kept the records files, yes, ma'am.

11     Q.    Did you keep any training materials any-

12 where?

13     A.    No, not really.

14     Q.    I'm going to show you another document

15 it's towards the top.  I'll mark this as Delta-3,

16 you can go ahead and take a look at that.  This is

17 COB0425 to COB0427 titled Staff Training, Section

18 A-2.6.

19          (Whereupon Exhibit No. D-3 was so marked for

20 identification being staff training.)

21 BY MS. GRIESER:

22     Q.    Just so we can speed things up a little

23 bit can you -- I'm going to draw your attention to

24 Paragraph 3 on page 2.

25          You would've been considered more in the

Ara Kimbrough
02/18/2025

Page 21

1  facility as administrative or managerial staff; is

2  that right?

3      A.    Yes, ma'am.

4      Q.    And beyond your forty years or forty

5  years -- forty hours or orientation, if you were new

6  to the facility obviously you went through -- You

7  don't call it basic, what do you -- what do you,

8  what do you call it where you first --

9      A.    Um, I don't know.

10      Q.    Cadet?

11      A.    Yeah.

12      Q.    Like academy?

13      A.    Yeah.

14      Q.    Okay, like the academy?

15      A.    Yeah.

16      Q.    Beyond the academy this paragraph requires

17  that you take an additional forty hours of manage-

18  ment training each year; is that right?

19      A.    That's what it, yeah, that's what it said.

20  We didn't have management training.

21      Q.    You never did any management training?

22      A.    No.

23      Q.    Were you aware that you were required to

24  do the management training forty hours?

25      A.    No, I was not.

Ara Kimbrough
02/18/2025

Page 22

1      Q.   No, okay.

2      A.   I don't, I don't believe any of the mana-

3  gers did forty hours of managing, manage -- manage-

4  ment specific training there, I'm sorry.

5      Q.   And I'm going to draw your attention to

6  the third page, this is Paragraph 3 Charlie.

7      A.   Okay.

8      Q.   And you'd agree with me that this charges

9  you as supervisory staff to provide training to your

10 subordinates?

11     A.   Yes.

12     Q.   And did you do that?

13     A.   Yes.

14     Q.   How?

15     A.   Um, like it said we have the roll call,

16 roll call training.  We go over any, anything new,

17 any updates.  Um, we work with the clerk of courts,

18 we did training with them as well.

19     Q.   All right.  I'm going to go ahead and take

20 that back from you, thank you.  Do you know what the

21 CLEAN system is?

22     A.   That's NCIC.

23     Q.   NCIC?

24     A.   Yeah, it's NCIC CLEAN.

25     Q.   Did you have to do training for to keep

Ara Kimbrough
02/18/2025

Page 23

1  access to NCIC or JNET?

2      A.   Yes.

3      Q.   What kind of training?

4      A.   It was internet based training.

5      Q.   And did you perform that training?

6      A.   Yes, ma'am.

7      Q.   What sort of training was it; what did it

8  go over?

9      A.   I don't remember specifically.

10      Q.   Generally?

11      A.   It was the rules of using the CLEAN sys-

12  tem.

13      Q.   Do you re -- Do you recall any of those

14  rules?

15      A.   Not off the top of my head, no, ma'am.

16      Q.   And at the time of your termination you

17  had an up-to-date CLEAN certificate; is that what

18  you're saying?

19      A.   No, that's not correct.

20      Q.   No.  So you were, it's required that you

21  do this training in order to continue access to

22  NCIC; is that right?

23      A.   That's correct.

24      Q.   And so you didn't have ac -- you didn't

25  have --

Page 24

1      A.   There is an issue with my account.   There

2  are two people that served as a liaison for JNET

3  CLEAN, and that was Dir. Kratz and one of the inves-

4  tigators, Dan Onisick.  Dan couldn't fix my account,

5  and I emailed Dir. Kratz a few times about it, but I

6  didn't -- I didn't get that, it didn't get resolved.

7            THE REPORTER:  Excuse me, is that Dan

8       what's his last name, Osnick?

9            THE WITNESS:  Onisick, O-N-I-S-I-C-K.

10  BY MS. GRIESER:

11      Q.   We'll come back to that, okay.  I'm going

12  to move on to the investigation that HR conducted

13  between like February/May of 2024.

14      A.   Okay.

15      Q.   Do you recall that?

16      A.   Yes, ma'am.

17      Q.   And that was an investigation into there

18  was an anonymous complaint made regarding your be-

19  havior at work; is that correct?

20      A.   Yes, ma'am.

21      Q.   And the complaint was that you were creat-

22  ing a hostile work environment?

23      A.   Yes, ma'am.

24      Q.   And you're aware that that was founded,

25  that that investigation was founded?

Ara Kimbrough
02/18/2025

Page 25

1    A.    That they said it was founded, yes, ma'am.

2          MS. GRIESER:  Okay.  I don't believe we

3    marked the employment investigation document,

4    correct?  I think it was just the fact finding?

5          MR. MANSOUR:  The notice yeah.

6          MS. GRIESER:  Yeah, okay.

7          MR. MANSOUR:  No, I think we did.

8          MS. GRIESER:  We did?  We can go off the

9    record for a second.

10         (Discussion off the record.)

11         MS. BURNS:  Go back on the record.

12   BY MS. GRIESER:

13     Q.   I'm handing you what's been pre -- Well,

14   marked as P-7 it begins at COB1085 and goes to

15   COB1088.  Whenever you feel you've had sufficient

16   time to take a look at it, just indicate you're

17   ready.

18     A.   Okay.

19     Q.   Have you seen that document before?

20     A.   No, ma'am.

21     Q.   And you've had enough time to read through

22   it?

23     A.   Yes, ma'am.

24     Q.   So you'd agree with me that it was found

25   that that you created a hostile work environment

Ara Kimbrough
02/18/2025

Page 26

1  particularly for the sergeants and other lieuten-

2  ants?

3      A.   I don't agree it's founded, but I agree

4  that you're saying it's founded.

5      Q.   That's what's reflected in this document?

6      A.   That you're saying it's founded, yes, I

7  understand that.

8      Q.   And when you say you, you mean the county?

9      A.   Yes, ma'am.

10     Q.   Okay.  And that many sergeants felt like

11  they were walking on eggshells around you?

12     A.   That's what the document says.

13     Q.   And that you had a tendency to question

14  the sergeant's decision making and threatened to

15  watch them on the cameras?

16     A.   That never happened.

17     Q.   But that's what the, that's what the --

18     A.   That's what the document says, yes.

19     Q.   That's what's reflected in this document

20  P-7, okay.  I want you to hold on to that for a sec-

21  ond.  I'm going to show you what's previously marked

22  as P-8 and I'll hand that to you, take a look at

23  that.

24          Do you recognize that document?

25     A.   Yes, ma'am.

Ara Kimbrough
02/18/2025

Page 27

```
 1      Q.   And that document indicates that you were
 2  to have a fact finding hearing on May 30th?
 3           MR. MANSOUR:  Objection to form.
 4  BY MS. GRIESER:
 5      Q.   What day were you supposed to have your --
 6           MR. MANSOUR:  You can answer the question.
 7           THE WITNESS:  Yes, ma'am.
 8  BY MS. GRIESER:
 9      Q.   And did you indeed have your fact finding
10  hearing on the 30th of May, 2024?
11      A.   I don't believe so.
12           MR. MANSOUR:  Can we go off the record for
13      a second.
14           MS. GRIESER:  Sure.
15           (Discussion off the record.)
16  BY MS. GRIESER:
17      Q.   All right.  I'm going to hand you P-10
18  which has, is also a notice of fact finding meeting
19  and with a different date on it, and it is COB2785
20  and 2786.
21      A.   Okay.
22      Q.   Do you recall getting one or both of
23  those?
24      A.   Yes, ma'am.
25      Q.   And did you -- Did the fact finding hear-
```

Ara Kimbrough
02/18/2025

Page 28

1   ing that occurred happen in May or June to the best

2   of your recollection?

3        A.   I don't, I don't recall.  I spoke with HR

4   and legal twice.

5        Q.   Okay.

6        A.   I don't remember the specific dates.

7        Q.   Do you recall asking for some more time to

8   get your materials together?

9        A.   Yes.

10       Q.   Do you believe that it was the earlier of

11  the two dates, or it was the later of the two dates?

12       A.   I don't recall.

13       Q.   You don't recall, okay.  I'll take those

14  back from you.

15       A.   All of them?

16       Q.   Yes, okay.  So around May 30th you were

17  informed of a fact finding meeting was going to

18  occur, correct?

19       A.   Yes.

20       Q.   And at that time you had no indication as

21  to what leadership or HR felt would be the appropri-

22  ate discipline for you; is that right?

23       A.   Correct.

24       Q.   I'm going to hand you back P-7 which is

25  the investigative report, and ask you to flip to the

Ara Kimbrough
02/18/2025

Page 29

1  last page.

2         So on or about May 30th at that time, you

3  didn't realize that that the chain of command, HR

4  and the COO, they were leaning towards giving you a

5  step one and a mentorship program; is that right?

6         A.    That's correct.

7         Q.    I'll go ahead and take that back, okay.

8  So around, around May 30th you called Attny. Brian

9  Zeiger; is that right?

10        A.    Yes, ma'am.

11        Q.    Why did you call him around the 30th of

12 May?

13        A.    I believe right before that, one of the

14 officer, officers posted in reception he had to

15 fight an inmate who attacked him all by himself.  I

16 had previously complained to DOC administration

17 about them pulling, about other supervisors pulling

18 staff out of the reception unit.  And I also told,

19 um, human resources and the law department and it

20 was still continuing.

21        Q.    You didn't tell the law department or HR

22 until you were interviewed for the bullying investi-

23 gation; is that right?

24        A.    That's correct.

25        Q.    So you're notified of a fact finding hear-

Ara Kimbrough
02/18/2025

Page 30

1  ing regarding this bullying investigation, and you

2  decide that's the right time to call Attny. Brian

3  Zeiger?

4          A.   Yes.

5          Q.   And why did you call Attny. Brian Zeiger?

6          A.   Again because I felt there was a very dan-

7  gerous situation that wasn't being addressed.

8          Q.   Do you recall having, having an interview

9  with Attny. Dan Grieser here at the county along

10  with the director of human resources, Lauren Smith?

11          A.   Yes, ma'am.

12          Q.   Do you recall telling them at the time

13  that you were just venting to Brian Zeiger?

14          A.   No, I don't re -- I don't recall that.

15          Q.   So if Lauren Smith had taken notes and

16  said that you said in that meeting that you were

17  just venting, that would be incorrect?

18          A.   I don't, I don't recall saying that.

19          Q.   Why Attny. Zeiger?

20          A.   He was representing the Estate of Inmate

21  Patterson.

22          Q.   How did you know that?

23          A.   I, I saw it in an article online.

24          Q.   How did you get his phone number?

25          A.   I looked it up.

Ara Kimbrough
02/18/2025

Page 31

1        Q.    You called his cellphone?

2        A.    I called his office phone.

3        Q.    You called in the evening, correct?

4        A.    Yes, ma'am.

5        Q.    From your home?

6        A.    From my cellphone.

7        Q.    From your cellphone?

8        A.    Yes, ma'am.

9        Q.    From your home?

10       A.    I don't remember if I was specifically at

11   home, but I was not at work.

12       Q.    I'm sorry, what was the last part?

13       A.    But I was not at work.

14       Q.    You were, okay, you were not work.  So

15   you're saying that you were able to look up Attny.

16   Zeiger's cellphone number?

17            MR. MANSOUR:  Objection to form.

18            THE WITNESS:  No, I believe I called his

19       office.

20   BY MS. GRIESER:

21       Q.    You got off work at 1600, 4 p.m.?

22       A.    That's correct.

23       Q.    And how long does it take for you to get

24   home?

25       A.    Ten minutes.

Ara Kimbrough
02/18/2025

Page 32

1        Q.    And you happened to catch Attny. Zeiger in

2   his office?

3        A.    I believe I left a message.

4        Q.    And do you believe you left a message

5   or --

6        A.    Yes, I believe I left a message.

7        Q.    Okay.  And then did you call him again a

8   second time?

9        A.    No, not that I recall.

10        Q.    He called you back?

11        A.    Yes.

12        Q.    Do you recall speaking again in the same

13   interview with Attny. Dan Grieser and Lauren Smith

14   that you were friends with Brian Zeiger?

15        A.    I don't know.  I can't say friends, I

16   think I said I knew him from working in records.

17        Q.    Do you recall telling Lauren Smith and

18   Attny. Dan Grieser that you were just venting?

19        A.    No, no, I don't recall saying that.

20        Q.    So if Lauren Smith took notes indicating

21   that you knew him from your work, correct, that

22   would be right?

23        A.    I believe so, yes.

24        Q.    That she writ -- she wrote you were just

25   venting, you're telling me that that would be a lie?

Ara Kimbrough
02/18/2025

Page 33

1        A.   I never said it was a lie, I said I don't

2   recall saying that.

3        Q.   You don't recall saying that?

4        A.   I don't recall saying venting, no.

5        Q.   Okay.  And telling Lauren Smith and Attny.

6   Dan Grieser that you had his number from knowing him

7   previously?

8        A.   Yeah, I did, I did have a Zeiger in my

9   phone.  When I tried it, it did not go to anybody

10  name Zeiger.

11       Q.   I'm sorry?

12       A.   It didn't go to any, it didn't go to Mr.

13  Zeiger.  I had to then look it up.

14       Q.   So you had a Zeiger as a contact in your

15  phone?

16       A.   Mm-hmm.

17       Q.   I'm sorry, you have to say yes.

18       A.   Yes, ma'am, sorry.

19       Q.   And you tried that contact?

20       A.   Mm-hmm.

21       Q.   And I'm sorry --

22       A.   Yes, ma'am, I'm sorry.

23       Q.   That's okay, it can be hard to remember.

24  And somebody picked up?

25       A.   I believe so.

Ara Kimbrough
02/18/2025

Page 34

1      Q.   And it wasn't --

2      A.   They had no idea who I was talking about,

3  so I just figured it was an old number.

4      Q.   What would make you look for his number in

5  your contacts on your personal cellphone?

6      A.    'Cause I, I had his number, or I believed

7  I had his number.

8      Q.   Why would you have had his number on your

9  personal cellphone?

10      A.   I have a bunch of attorneys' phone numbers

11  from when we were when working in records.  I didn't

12  have a company phone, so I just stored them in my

13  personal phone.

14      Q.   So you used your personal phone regularly

15  to contact attorneys for work?

16      A.   I wouldn't say regularly, I'd say occa-

17  sionally.

18      Q.   Did you also use your personal cell to ac-

19  cess email?

20      A.   Yes.

21      Q.   County email?

22      A.   Yes, ma'am.

23      Q.   And I don't know, did you ever work from

24  home from a computer?

25      A.   Yes, ma'am.

Ara Kimbrough
02/18/2025

Page 35

 1    Q.   Did you use your phone for the, to factor

 2  authentication in order to --

 3    A.   Yes, ma'am.

 4    Q.   Did you have Teams on your cellphone?

 5    A.   I don't recall ever using Teams.

 6    Q.   You don't regularly use Teams for work?

 7    A.   No.

 8    Q.   But you would get emails on your personal

 9  phone?

10    A.   Yes, ma'am.

11    Q.   And you sometimes make phone calls to at-

12  torneys for work?

13    A.   We'd get phone calls from attorneys for

14  work.

15    Q.   And that's because you sometimes have to

16  contact them outside of work hours?

17    A.   Yes, or they would contact me during work

18  hours on my cellphone if I wasn't at my desk, judges

19  would, other departments.

20    Q.   And you're aware that in the -- I'm sorry,

21  for lack of a better title for it, the bullying in-

22  vestigation?

23    A.   Mm-hmm.

24    Q.   Say yes.

25    A.   Sorry, yes.

Ara Kimbrough
02/18/2025

Page 36

1        Q.   You're aware that it was reported that you

2   would call in to move personnel around even when you

3   were off duty?

4        A.   I understand that's what it was reported

5   in the report, yes.

6        Q.   Did you do that?

7        A.   No.

8        Q.   You never called to move people around

9   when off duty?

10        A.   I didn't, I didn't call in to move them

11   around, again I was essentially on the clock twenty-

12   four hours.  If there's a records or reception

13   issue, I would get a phone call about it.  In this

14   particular instance an officer emailed about the one

15   that's referred to in the -- in the investigation.

16   Is an officer emailed me that she had, against the

17   DOC administration orders that she had been double

18   blocked on a high acuity post, and this was the sec-

19   ond or third day in a row --

20        Q.   And what --

21        A.   -- that this, this has been happening.

22        Q.   And what CO was that?

23        A.   Um, I'm sorry, I'm terrible with names.

24   Um, gosh, I'm sorry.  I'm drawing a blank, I'm

25   not --

Ara Kimbrough
02/18/2025

Page 37

```
 1        Q.   Female/male?

 2        A.   It's a female.

 3        Q.   Female, was she black/white?

 4        A.   Black.

 5        Q.   Do you recall her working at BCCF for a

 6   long time or short?

 7        A.   No, she was a probationary employee.

 8        Q.   Okay.  And probationary means within the

 9   first year?

10        A.   The first year, yes, ma'am.

11        Q.   So this CO called you while you were off

12   duty?

13        A.   No, ma'am, she emailed me.

14        Q.   Oh, I'm sorry, I'm sorry.  She emailed you

15   and you got that on your phone --

16        A.   Yes.

17        Q.   -- presumably, yes?  Okay.  And what did

18   you do at that point?

19        A.   I called in to -- I first tried to get

20   ahold of the lieutenant and he wasn't at his sta-

21   tion, so then I called into a sergeant and I spoke

22   with him.  And I said are you aware of that we're

23   not supposed to double block people on high acuity

24   modules, and he said yes.  And I said okay, well, I

25   got an email from this officer and she's been double
```

Ara Kimbrough
02/18/2025

Page 38

1  blocked, and this is the second day in a row it's

2  happened.  He said okay, I'll take care of it.

3      Q.   I'm going to show you what will be marked

4  as D-4.

5           THE REPORTER:  I have a question, how do

6      you spell Brian Zeiger?  Is his last name Z --

7           MS. GRIESER:  Z --

8           THE WITNESS:  Z-I-G-E-R.

9           MS. GRIESER:  I believe it's Z-I-E --

10          THE WITNESS:  It's excuse me, yeah.

11          MS. GRIESER:  Yeah, Z-I-E-G-E-R.

12          MR. MANSOUR:  No, I think it's Z-E-I.  No,

13     I'm serious it's Z-E-I, yeah.

14          MS. GRIESER:  Yeah, I think you're right,

15     he pronounces it the non-German way.

16          MS. BURNS:  E-I-G --

17          MS. GRIESER:  E-I-G-E-R.

18          (Whereupon Exhibit No. D-4 was so marked for

19  identification being the table of organization.)

20  BY MS. GRIESER:

21      Q.   Do you recognize that?

22      A.   Yes.

23      Q.   I'm showing you COB0287 entitled Table of

24  Organization, Section A-1.2, and this shows the

25  Bucks County Department of Corrections organizatio-

Ara Kimbrough
02/18/2025

Page 39

1  nal chart?

2      A.    Mm-hmm.

3      Q.    I'm sorry, you have to --

4      A.    I'm sorry, yes, ma'am.

5      Q.    All right.  And if we follow this down

6  with the director, deputy director then superinten-

7  dent at the correctional facility, correct?

8      A.    Yes, ma'am.

9      Q.    And then going to the left there's deputy

10  superintendent of security which -- Is that post

11  fulfilled or not to the best of your knowledge?

12      A.    I don't know.

13      Q.    You don't know, okay.  And then kind of

14  branching off from there there's a hearing officer,

15  right, which you were previously?

16      A.    Yes, ma'am.

17      Q.    And then administrative lieutenant there's

18  two administrative lieutenants on the left and

19  right?

20      A.    Mm-hmm, yes, ma'am.

21      Q.    And you would be the administrative lieu-

22  tenant on the right, correct?

23      A.    Yes, ma'am.

24      Q.    In charge of records, reception staff?

25      A.    That's yes.  However, when, when I got

Ara Kimbrough
02/18/2025

Page 40

1  promoted to the position it was explicitly told to

2  me that both lieutenants should be able to do each

3  other's jobs.

4      Q.   Okay.  But you're the person, you're the

5  -- Your position was the administrative lieutenant

6  on, on the right over records/reception staff, corr-

7  ect?

8      A.   Yes.

9      Q.   And who fulfilled the administrative

10  lieutenant position to the, to the left?

11      A.   Lt. Sherman.

12      Q.   And it looks as if he had responsibility

13  for operations, secretaries, lieutenants, sergeants,

14  corrections and kitchen officers?

15      A.   Yes.

16      Q.   And I'm going to go ahead and take that

17  back from you, P-4, okay.  So you didn't call Brian

18  Zeiger when this CO that you called in about having

19  been double, double booked; is that what you call

20  it?

21      A.   Yeah, double blocked.

22      Q.   Double blocked on the high acuity unit,

23  you didn't call Brian Zeiger then did you?

24      A.   No, ma'am.

25      Q.   And you said that you called Mr. Zeiger

Ara Kimbrough
02/18/2025

Page 41

1   because there had been a fight; is that what you

2   said?

3       A.   No, I said it was a continuing issue of,

4   of staff being pulled from reception leaving a dan-

5   gerous work environment.

6       Q.   And when I asked you about the timing of

7   it, why did you call him when you did you --

8            Correct me if I'm wrong, but you said that

9   there was a fight with an inmate?

10      A.   Yeah, yeah, one officer, yes.  Again I, as

11  I said the -- I brought it up to DOC administration,

12  and then I was able to let them know about it during

13  this investigation and nothing had changed.

14      Q.   Okay.  You told the DO, DO, ugh, sorry --

15  The DOC administrative staff about this fight with

16  an inmate pulling people from staff and reception?

17      A.   Yeah, yes, yes, I told them.

18      Q.   And so when in relation to you getting

19  your notification for the -- for the fact finding

20  hearing --

21           When in relation to that time period was

22  this fight, was it before/after?

23      A.   I don't, I don't recall.

24      Q.   And if Mr. Zeiger said that you called him

25  on May 30th, that would be correct?

Ara Kimbrough
02/18/2025

Page 42

1          A.    It probably, I don't know for sure.

2          Q.    You have no reason to doubt that Mr. Zei-

3     ger would make up a date, correct?

4          A.    No, ma'am.

5          Q.    So if he said May 30th, you tend to trust

6     that date?

7          A.    Yes, ma'am.

8          Q.    All right.  So what did you divulge to Mr.

9     Zeiger on or about the 30th of May?

10         A.    I told him about the, how Ofcr. Ulmer had

11    been pulled, about how I had previously told the

12    lieutenant who did that and DOC administration about

13    that.  It was a chronic problem that I reported sev-

14    eral times.

15         Q.    And what else did you tell him?

16         A.    That's essentially that, again that I had

17    done everything I could to stop it from happening

18    before and after the incident, and it still wasn't

19    changing.

20         Q.    But again you, you only let HR and legal

21    know about the perceived dangerous situation during

22    the bullying investigation?

23         A.    Correct.

24               MS. GRIESER:  So let's mark as the motion

25         the -- (inaudible.)  What are we on?

Ara Kimbrough
02/18/2025

Page 43

1              MS. BURNS:  P-4.

2              MS. GRIESER:  Thanks.

3    BY MS. GRIESER:

4         Q.   So I'm looking at P-4, however it's been a

5    redacted version of P-4.  This pen is dying.  And I

6    submit to you that your, your attorney marked this

7    as P-4 it's the emergency motion of a previous dep-

8    osition.  It's the emergency motion to reopen disco-

9    very filed by Mr. Zeiger the day after you called

10   him, okay?

11             You would agree that you told him that the

12   intake area was grossly understaffed?

13        A.   Yes, ma'am.

14        Q.   That there were supposed to be three offi-

15   cers stationed in the area at all times, and I, I

16   imagine that area means reception?

17        A.   Reception.

18        Q.   But routinely only two were, were staff

19   there?

20        A.   Yes, ma'am.

21        Q.   And defendant Ulmer should never have been

22   called away from intake?

23        A.   That's correct.

24        Q.   Leaving only one officer on duty?

25        A.   Yes, ma'am.

Ara Kimbrough
02/18/2025

Page 44

```
 1        Q.   And that Ofcr. Ulmer should have locked

 2   the, quote, "dirty cell"?

 3        A.   Yes, ma'am.

 4        Q.   After Rhoades was taken to be searched?

 5        A.   Yes.

 6        Q.   Does that sound right?

 7        A.   Yes.

 8        Q.   And by her not locking the door, she was

 9   in violation of BCCF policy?

10        A.   Yes.

11        Q.   And that you mentioned various other facts

12   pertaining to staffing the incident, I imagine that

13   means to be --

14             I take that to mean the Rhoades incident;

15   is that fair?

16        A.   Yes, ma'am.

17        Q.   The investigation, I imagine that's the

18   investigation into inmate Patterson's death, would

19   you agree with that?

20        A.   I believe so.

21        Q.   And your complaints to your supervisors?

22        A.   Yes, ma'am.

23        Q.   So you did not tell Mr. Zeiger that you

24   had just recently reported it to HR and legal, corr-

25   ect?
```

Ara Kimbrough
02/18/2025

Page 45

1      A.   No or yeah, I believe I did actually.   I

2   believe I did tell them that.

3      Q.   So what were you hoping would happen when

4   you called Mr. Zeiger?

5      A.   I was hoping that the situation, these

6   situations would stop happening.

7      Q.   Prior to this investigation you, you knew

8   of HR's existence, correct?

9      A.   Yes, ma'am.

10      Q.   And you could've called them at any time?

11      A.   Yes, I could've, but I would believe I

12   would've been retaliated upon if I did then so.

13      Q.   So you did not tell HR because you're

14   afraid that you'd be retaliated against?

15      A.   Yes, ma'am.

16      Q.   Are you aware that the county has an anti-

17   retaliation policy?

18      A.   Yes, ma'am.

19      Q.   And you didn't tell them that you had just

20   recently told legal; is that right?

21      A.   Yes, I believe I did tell them that.

22      Q.   And that you knew how to get in touch with

23   the solicitor's office?

24      A.   I did not tell them that, no.

25      Q.   I'm asking you, do you know how to get in

Ara Kimbrough
02/18/2025

Page 46

1   touch with --

2        A.   Yes.

3        Q.   -- the solicitor's office?

4        A.   Yes, ma'am.

5        Q.   But you didn't tell the solicitor's office

6   before at this point in your investigation?

7        A.   No, ma'am.

8        Q.   Okay.  So ultimately after your conversa-

9   tion with Mr. Zeiger and I -- before I leave that,

10  that topic.

11            When you had a conversation with Mr. Zei-

12  ger he, he says that he told you that he was under a

13  protective order and could not discuss the case but

14  could listen to you, do you recall him saying that?

15       A.   No, ma'am.

16       Q.   You don't recall him saying at all that

17  that he disclosed there was an active protective

18  order?

19       A.   I don't remember that.

20       Q.   So just to be clear, you don't remember

21  him saying that or he didn't?

22       A.   I don't remember him saying that, no.

23       Q.   Prior to this had you contacted any other

24  attorneys regarding stuff that you had seen in the

25  facility, anything that that caused you concern in

Ara Kimbrough
02/18/2025

Page 47

1  the Bucks County Confinement Facility?

2      A.    No, ma'am.

3      Q.    This is the first time?

4      A.    Yes, ma'am.

5      Q.    And you thought by telling Mr. Zeiger, an

6  outside attorney this information, that you wouldn't

7  be retaliated against?

8      A.    I probably thought I would, would be re-

9  taliated against, but the situation again with some-

10 body dying and then officers potentially getting

11 hurt at that point, it meant more to me than getting

12 retaliated against.

13     Q.    So why didn't you call the solicitor's

14 office instead?

15     A.    I talked to the solicitor, I talked to a

16 member of the solicitor's department.

17     Q.    During the bullying investigation?

18     A.    That's correct.

19     Q.    So by necessity that would've been shortly

20 before, and the timing it would've been shortly be-

21 fore you called Mr. Zeiger?

22     A.    It would probably have been about a month

23 before, yeah.

24     Q.    And you didn't contact HR prior to the

25 bullying investigation because you thought that

Ara Kimbrough
02/18/2025

Page 48

1    you'd be retaliated against?

2         A.    Correct.

3         Q.    And Joshua Patterson, he died in on I bel-

4    ieve July 6, 2022, correct?

5         A.    I believe around that time, yes.

6         Q.    And your phone call to Mr. Zeiger was on

7    or about May 30th, 2024?

8         A.    Yes.

9         Q.    And you got notice of a fact finding meet-

10   ing on or about May 30th, 2024.  Why didn't you call

11   him during the intervening two years since this was

12   an ongoing situation as you said?

13        A.    I tried to, again I tried to keep letting

14   my -- letting the administration know what happened,

15   um, it wasn't addressed.  Finally when it got out to

16   people outside of my administration, I thought it

17   would be then be addressed and it wasn't.  And at

18   that point I felt I, I, there would be no remedy

19   through the DOC administration legal or HR.

20        Q.    Is it fair to say that you were upset by

21   this bullying investigation?

22        A.    I wasn't happy about it.

23        Q.    Is it fair to say that you let people know

24   that you weren't happy about it?

25        A.    I don't, I don't -- I don't believe I let

Ara Kimbrough
02/18/2025

Page 49

1  anybody know, no, I don't.  I believe I -- You know

2  the, the whole topic is kind of embarrassing, so I

3  don't think I actively spoke about it.

4        Q.   At your fact finding investigation did you

5  produce any witnesses?

6        A.   Yes.

7        Q.   About how many?

8        A.   Thirteen.

9        Q.   So at least thirteen of your -- I imagine

10  they were colleagues, coworkers?

11        A.   Some were supervisors.

12        Q.   Out of the thirteen witnesses they had a

13  good idea of how you felt about the investigation;

14  is that right?

15        A.   I don't know, probably.

16        Q.   Is it fair to say that you were, you were

17  frustrated?

18        A.   Um, I was more confused.

19        Q.   So you were -- When, when you found out

20  that it had been founded by HR, the bullying invest-

21  igation I'm referring to, what was your reaction?

22        A.   Um, again it was, it was confusion.  Again

23  out of the thirteen, thirteen witnesses I produced

24  they only heard from three of them, um, so again I

25  was confused.

Ara Kimbrough
02/18/2025

Page 50

1    Q.   What were you confused about?

2    A.   Most of it, it didn't really say how I

3  created a toxic and hostile work environment, it

4  just said that I did.  So I, you know I would have

5  liked to know specifics so if there was that behav-

6  ior, I could correct it.  And again they didn't lis-

7  ten, they didn't -- They spent months as you said

8  interviewing several, several people but the three

9  that -- I had brought thirteen and they only heard

10  three, and then they said it was time to go for the

11  day.  So I don't understand how that's a complete

12  and thorough investigation, or how you come to that

13  conclusion.

14    Q.   Were you told that the remaining witnesses

15  could produce affidavits instead of live testimony?

16    A.   Yes.

17    Q.   Did you get affidavits and submit them?

18    A.   I was given a couple days' time limits,

19  some people were off away.  I didn't have a lot of

20  time to do it, but yes, I did get some.

21    Q.   So you were told that they could submit

22  affidavits?

23    A.   Yes.

24    Q.   So the timing of you calling Mr. Zeiger on

25  or about the exact same day that you're notified of

Ara Kimbrough
02/18/2025

Page 51

1  a fact finding meeting regarding a bullying investi-

2  gation is totally coincidental?

3      A.   Again I was at the point where I don't

4  think anybody was listening to me about this issue

5  and, um, I wanted it to stop.

6      Q.   So at that point even though you knew that

7  you had a fact finding meeting coming up, you prior-

8  itized calling Attny. Zeiger about something unrela-

9  ted to the bullying investigation?

10     A.   Yes.

11     Q.   And this was at the same time you were

12  gathering thirteen witnesses to testify on your be-

13  half?

14     A.   Yes.

15     Q.   Did you submit any other evidence?

16     A.   I believe I did.

17     Q.   Do you recall anything generally?

18     A.   I think a statement and maybe some emails.

19     Q.   And as a result of you calling Mr. Zeiger

20  there was a second investigation; is that right?

21     A.   Yes, ma'am.

22     Q.   And that is when you talked to attorney

23  Dan Grieser and Lauren Smith?

24     A.   Yes, ma'am.

25     Q.   And ultimately you were terminated, let me

Ara Kimbrough
02/18/2025

Page 52

1  get what's marked as P-2 the letter of termination.

2            MR. MANSOUR:  P-1.

3            MS. GRIESER:  P-1, okay, I'll get there.

4        Could we go off the record for a second.

5            (Documents searched off the record.)

6  BY MS. GRIESER:

7        Q.   Now, I'm handing you what's previously

8  been entered as P-1, go ahead and take a look at

9  that.

10       A.   Okay.

11       Q.   Do you recognize that document?

12       A.   Yes, ma'am.

13       Q.   And what is it?

14       A.   A disciplinary action form.

15       Q.   And this is, this is the ultimate disci-

16  plinary action form used for your termination?

17       A.   Yes, ma'am.

18       Q.   And you're under violation of the follow-

19  ing policies and procedures.  It states that you're

20  being terminated for each of the following listed

21  violations separately and independently, and that

22  means that each violation listed below -- indepen-

23  dent of any of the others -- constitutes a wholly

24  separate ground for your termination.

25            Do you understand that?

Ara Kimbrough
02/18/2025

Page 53

1      A.    Yes.

2      Q.    So you were terminated for violating Human

3  Resources Policy 1.0, Work Rules 59:  Giving confi-

4  dential and company information to other individu-

5  als, organizations or to unauthorized county emplo-

6  yees and, Number 63, failure to abide by the county

7  established code of conduct.  And then also Human

8  Resources Policy 32 which is the code of conduct,

9  and in addition it says BCDOC (that's Bucks County

10  Department of Corrections) table of offenses.  Num-

11  ber 15, divulging any information of a confidential

12  and/or sensitive nature concerning the operations of

13  the department.  And it goes on, security institu-

14  tions, inmates and/or residents and, at Number 17,

15  conduct unbecoming an employee.

16         Do you agree with me that these are the

17  bases for which you were terminated, at least what's

18  listed here?

19      A.    Yes, ma'am.

20      Q.    Okay.  Let me go ahead and take it back,

21  thank you.  And I'll, I'll mark this as Defense

22  Exhibit D-5.  Take a look at that, that is COB0288,

23  Standard Operating Procedures and Guidelines and

24  Policy Review, Section A-1.3.

25      A.    Okay.

Ara Kimbrough
02/18/2025

Page 54

1          (Whereupon Exhibit No. D-5 was so marked for

2   identification being guidelines and policy review.)

3   BY MS. GRIESER:

4        Q.   And you would agree with me that this pol-

5   icy for guideline, SOP guidelines requires that all

6   staff be issued a full manual?

7        A.   Yes, ma'am.

8        Q.   And that it's your responsibility to keep

9   the manual in good maintenance and to return it once

10  you are terminated?

11       A.   Yes, ma'am.

12       Q.   And Paragraph 2 charges all staff with

13  being responsible for close and detailed knowledge

14  of all policies and procedures including revisions

15  and updates, do you agree with that?

16       A.   Yes, ma'am.

17       Q.   Would you also agree as a supervisor it's

18  especially important for you to have a detailed

19  knowledge of all policies and perfe -- procedures?

20       A.   Yes.

21       Q.   And you believe that you do have, or did

22  at the time, a detailed knowledge of all policies

23  and procedures?

24       A.   Yes.  To the best of my ability, yes.

25          MS. GRIESER:  And I'm going to go ahead

Ara Kimbrough
02/18/2025

Page 55

1    and take that back.  Did we do the table of,

2    table of offenses?

3         MR. MANSOUR:  It hasn't been marked be-

4    fore.

5         MS. GRIESER:  That --

6         MR. MANSOUR:  I don't think so.

7         MS. GRIESER:  We're going to mark this as

8    Delta-5 or --

9         MR. MANSOUR:  Six.

10        MS. GRIESER:  Delta-6, here's 5.

11        (Whereupon Exhibit No. D-6 was so marked for

12   identification being employee discipline and table of

13   offenses.)

14  BY MS. GRIESER:

15      Q.  It's a nine, that's a nine-page document

16  from COB0416 to COB424:  Employee Disciplinary Table

17  of Offenses, Section A-2.5.

18          You are familiar with this document; is

19  that correct?

20      A.  Yes, ma'am.

21      Q.  And you need to be familiar with this doc-

22  ument as a supervisor, right?

23      A.  Yes, ma'am.

24      Q.  And I'd imagine that as a hearing officer

25  you would also be closely acquainted with this docu-

Ara Kimbrough
02/18/2025

Page 56

1  ment; is that fair to say?

2      A.   Yes, ma'am.

3      Q.   And on page 3 of 9 this says, "To illus-

4  trate the types of conduct that will not be tolera-

5  ted under the code of ethics, the department has

6  prepared the following table of offenses even though

7  it's not an exhaustive list," right?  "And the dep-

8  artment reserves the right to determine an appropri-

9  ate level of discipline."

10          It's in the policy, do you see that?

11      A.   Yes, ma'am.

12      Q.   And if you flip to page 5, you'll see

13  BCDOC15, which you'll agree is one of the bases for

14  which your termination was listed on your disciplin-

15  ary form?

16      A.   Yes.

17      Q.   Your personal action form.  And this says,

18  "Divulging any information of a confidential and/or

19  sensitive nature concerning the operations of the

20  department, the security of the institution, inmates

21  and/or residents," do you agree with that?

22      A.   Yes, if that's what it says.

23      Q.   Do you believe that divulging the details

24  of an incoming inmate's alleged misconduct would

25  qualify as information of a confident -- confiden-

Ara Kimbrough
02/18/2025

Page 57

1  tial and/or sensitive nature?

2      A.   It depends.

3      Q.   Well, you told Mr. Zeiger how Mr. Rhoades

4  was back getting an unclothed search, correct?

5      A.   That's correct.

6      Q.   And that Ofcr. Atiles told him to go to

7  the front, correct?

8      A.   That's correct.

9      Q.   And I believe she was -- She's a CO or

10 sergeant, Sgt. Ulmer?

11     A.   A CO.

12     Q.   CO Ulmer got called away so she wasn't at

13 the front, correct?

14     A.   That's correct.

15     Q.   And you also told Mr. Zeiger how CO Ulmer

16 failed to close the door to the dirty cell?

17     A.   Yes, ma'am.

18     Q.   And that inmate Rhoades went into the

19 dirty cell to retrieve his sack lunch, correct?

20     A.   That's correct.

21     Q.   And in his sack lunch he had put a number

22 of narcotics including Fentanyl and methampheta-

23 mines?

24     A.   I don't, I didn't tell him that.  I didn't

25 know what was in there.

Ara Kimbrough
02/18/2025

Page 58

1    Q.    But you understood it to be --

2    A.    Drugs, correct.

3    Q.    You'd agree that that's what I just ex-

4  plained is a crime that Mr. Rhoades committed; is

5  that right?

6    A.    That's correct.

7    Q.    So and it relates to an inmate, correct?

8    A.    Yes.

9    Q.    And it relates to the procedures of recep-

10  tion, correct?

11    A.    Correct.

12    Q.    And the procedures of reception relates to

13  the security of the institution as a whole, right?

14    A.    Yes.

15    Q.    So you would agree that divulging that

16  type of information about inmates and about the sec-

17  urity of the institution in the way that you did by

18  describing the, not only the intake procedures but

19  also -- but also an alleged crime committed by in-

20  mate Rhoades, that that would be confidential and/or

21  sensitive information?

22    A.    No.

23    Q.    Why not?

24    A.    Because like you said it's a crime, I mean

25  there were articles in the newspaper about that hap-

Ara Kimbrough
02/18/2025

Page 59

 1  pening and about the inmate and how it happened.

 2      Q.   Did any, none of the articles mentioned

 3  any COs by name, right?

 4      A.   That's correct.

 5      Q.   And they certainly didn't specifically

 6  name the inmate, correct, inmate Rhoades?

 7      A.   Yeah, yes they did.  There are, there are

 8  articles that -- So in fact when Rhoades got sen-

 9  tenced there, and they mentioned my name and again

10  recounted what happened.

11      Q.   So that was when he was sentenced which

12  was many months later?

13      A.   Correct.

14      Q.   And at the time that you divulged this to

15  Mr. Zeiger, it was an alleged offense committed by

16  Mr. Rhoades?

17      A.   Correct.

18      Q.   And that information wasn't public?

19      A.   Not at that time.

20      Q.   Did the newspaper articles also didn't

21  mention that a door was left ajar?

22      A.   I believe they did, that he was able to go

23  back into his cell.  I mean into the cell and re-

24  trieve it, and the only way he could do that was if

25  the door was open.

Ara Kimbrough
02/18/2025

Page 60

```
 1        Q.   You're aware that the Patterson, Corbin is

 2   the individual who brought suit against the county

 3   of, on behalf of the Estate of Inmate Patterson,

 4   okay?  So --

 5        A.   Yes.

 6        Q.   I'll just refer to it as the Patterson --

 7        A.   Okay.

 8        Q.   -- case, really it's Corbin, okay.  So

 9   with the Patterson case, you're aware that there was

10   a protective order over the case?

11        A.   No, I was not aware.

12        Q.   If there were a protective order or -- I'm

13   sorry, let me back up.  Are you aware that there was

14   a motion to seal the majority of documents in this

15   case?

16        A.   No, I was not.

17        Q.   Do you know what a motion to seal is?

18        A.   Correct, yes, I do.

19        Q.   What's, what's your understanding?

20        A.   Basically it's confidential, you can't

21   talk about it.

22        Q.   So if this information was sealed by the

23   Court, how would -- How would a newspaper have found

24   out such details since you said that these details

25   exist in the newspaper?
```

Ara Kimbrough
02/18/2025

Page 61

1      A.   I don't know if it was sealed by the Court

2   or not.

3      Q.   If it were sealed --

4      A.   Okay.

5      Q.   Okay, let's assume it was sealed.

6      A.   Mm-hmm.

7      Q.   In what way would the newspaper get such

8   detailed information as you said?

9      A.   I don't know.

10      Q.   And your understanding of something being

11   sealed and being under a protective order is that

12   you can't talk about it?

13      A.   That's correct.

14      Q.   But you don't remember Mr. Zeiger telling

15   you that --

16      A.   I don't.

17      Q.   -- he was bound by, by a protective order?

18      A.   No, no, I don't.

19      Q.   Did he, did you guys have an exchange, or

20   did he just let you talk when you called him?

21      A.   Um, I know he said that they weren't ask-

22   ing for much, so there was a little bit of an ex-

23   change but, um, he mostly listened to me.

24      Q.   So in your opinion the details of the

25   order, the details of the order of how we intake

Ara Kimbrough
02/18/2025

Page 62

1   inmates, to you that's not sensitive or confiden-

2   tial?

3        A.   I'm sorry, can you --

4        Q.   The details of how inmates are being pro-

5   cessed, the order in which they're being processed

6   as well, you don't believe that that is information

7   of a sensitive or confidential nature?

8        A.   No.

9        Q.   Do you believe that if the general public

10  knew these details of how inmate Rhoades was able to

11  smuggle in contraband, do you believe that that

12  would inform someone else on how to smuggle in con-

13  traband?

14       A.   No.

15       Q.   Why not?

16       A.   Because I believe inmates are going to try

17  and smuggle in contraband whether they hear about a

18  case of Mr. Rhoades or not.

19       Q.   Inmates try to smuggle in contraband all

20  the time, right?

21       A.   That's correct.

22       Q.   And fortunately we catch the vast, the

23  vast majority of those individuals, correct?

24       A.   I would disagree with that.

25       Q.   You would disagree with that?

Ara Kimbrough
02/18/2025

Page 63

```
 1      A.   That's correct.

 2      Q.   Are you aware that there's only been, be-

 3 fore Mr. Rhoades, two times in the past ten years

 4 that contraband was not caught during the intake

 5 process?

 6      A.   That is not true.

 7      Q.   So like you said and I agree with the fact

 8 that individuals/inmates try to smuggle in contra-

 9 band all the time.

10           Would it not be valuable for an incoming

11 inmate to know how somebody else successfully smug-

12 gled in contraband?

13      A.   I'm sorry, can you repeat that.

14      Q.   Would it not be an advantage for an in-

15 coming inmate to know how someone successfully smug-

16 gled in contraband?

17      A.   An advantage like, I'm sorry.

18      Q.   Wouldn't that be basically a how-to smug-

19 gle in contraband --

20      A.   No.

21      Q.   -- successfully?

22      A.   No.

23      Q.   Why not?

24      A.   Because there's only a few ways you can

25 smuggle in contraband.  It's not like they invented
```

Ara Kimbrough
02/18/2025

Page 64

1  this, this person invented a new way, it was be-

2  cause we didn't have staff there to prevent this

3  from happening.

4      Q.   If there is staff, well -- I'll wait, I'll

5  wait for that.  So basically a how-to smuggle in

6  contraband into our intake processes in your opin-

7  ion are not sensitive?

8      A.   No.

9      Q.   So you believe that we could just take one

10 of these, take the SOP that describes our intake

11 process and publish it?

12     A.   I, I'm, I'm sure it's probably out there

13 already, but we have seven thousand inmates come in

14 the facility a year, they know the process.

15     Q.   Okay.  My question was, do you think that

16 that is something that we could do and have no, no

17 issues with, just publish our intake procedures?

18     A.   We, we kind of do publish it in the inmate

19 handbook.

20     Q.   You say that we publish it in the intake

21 handbook?

22     A.   Yeah, we describe what's going to, what's

23 going to happen to them.

24     Q.   Let me start in the back, I'm going to

25 hand you -- I'm going to mark this as --

Ara Kimbrough
02/18/2025

Page 65

```
 1              MS. GRIESER:  What are we up to, we're up

 2        to seven, correct?

 3              THE REPORTER:  Yeah.

 4              MS. GRIESER:  You have that in front of

 5        you, okay.  I'm going to take back Delta-6,

 6        thank you, we'll mark this as Delta-7.

 7              (Whereupon Exhibit No. D-7 was so marked for

 8   identification being a release of past offender

 9   incarceration dates.)

10   BY MS. GRIESER:

11        Q.   Take a look, take a look at that document.

12   This is COB0611 to COB0614 it's a four-page docu-

13   ment, do you recognize that?

14        A.   Yes.

15        Q.   And this is the release of past offender

16   incarceration dates, correct?

17        A.   Yes.

18        Q.   And actually it's the records officer who,

19   or the records office that is in charge of releasing

20   past incarceration dates?

21        A.   Yes.

22        Q.   And it says that the DOC cannot respond to

23   requests by anyone other than the individual who has

24   been incarcerated?

25        A.   Yes.
```

Ara Kimbrough
02/18/2025

Page 66

1      Q.   Why is that?

2      A.   I don't know.

3      Q.   You, you're in charge of this program?

4      A.   Mm-hmm.

5      Q.   You have to say yes.

6      A.   Yes, I'm sorry.

7      Q.   And any time somebody wants the dates of

8    their past incarceration they send -- either come to

9    the window personally, correct?

10     A.   Yes.

11     Q.   Or mail a request; is that right?

12     A.   Yes, that's correct.

13     Q.   But as long as you've been in the records

14   department, you don't know why you can't give past

15   incarceration dates to anyone other than the inmate

16   him or herself?

17     A.   I don't know why in this, when the inmate

18   requests them why we go through this, this process.

19   If you call up the records office and you say is

20   John Smith there, and they say yes -- We have to say

21   yes if he's here, and if he's sentenced we have to

22   let them know when he's getting out.

23     Q.   Right.  I believe, and you can correct me

24   if I'm wrong, that this policy contemplates somebody

25   who is looking for past incarceration dates?

Ara Kimbrough
02/18/2025

Page 67

1        A.    Mm-hmm.

2        Q.    Yes?

3        A.    Correct.

4        Q.    And it says that the DOC cannot respond to

5   requests by anyone other than the individual who's

6   been incarcerated.

7              And you're in charge of this program, and

8   you don't know why you can't release that informa-

9   tion to anybody but that individual?

10       A.    But we do release it to other -- If their

11  attorneys or if other agencies ask, we do release it

12  to --

13       Q.    I'm going to draw your attention to page 3

14  of the same document.

15       A.    Mm-hmm.

16       Q.    And yes?

17       A.    Yes, sorry.

18       Q.    It's the, this is actually a sample re-

19  quest for release of past incarceration dates isn't

20  it?

21       A.    Yes.

22       Q.    And if somebody requests a form to request

23  their past incarceration dates, you would give this

24  page 3 and page 4 to him or her; is that right?

25       A.    Yes.

Ara Kimbrough
02/18/2025

Page 68

1      Q.   And Paragraph 1 says, "The DOC cannot res-

2  pond to a request by anyone other than the individ-

3  ual who has been or is incarcerated."

4      A.   Yes.

5      Q.   Is that right, okay.  And you're saying

6  you don't know why that's in there?

7      A.   No, I don't.

8           MS. BURNS:  Can we just go off the record

9      for a second.

10          (Discussion off the record.)

11  BY MS. GRIESER:

12      Q.   You recall telling me that you had a de-

13  tailed knowledge of these policies, right?

14      A.   Mm-hmm.

15      Q.   Yes?

16      A.   Yes.

17      Q.   And this specific policy is directed 100

18  percent to your office, right?

19      A.   Yes.

20      Q.   And yet you don't know why you can't re-

21  lease past incarceration dates to anyone other than

22  the individual themselves?

23      A.   But we, we do release past incarceration

24  dates to people other than their -- other than the

25  person themselves.

Ara Kimbrough
02/18/2025

Page 69

1      Q.   So you violate this when you were -- When

2  you were employed you violated this policy on a reg-

3  ular basis?

4      A.   I don't know if it's a -- I don't know if

5  that's specifically a violation, but yes, we release

6  it to other people.  If probation and parole wants

7  incarceration dates, we give them to them.

8      Q.   And you --

9      A.   If a judge calls me up and says we want, I

10  want to know when he was, I have to tell the judge.

11      Q.   And you never asked anybody why the policy

12  is that you can't respond to a request for past in-

13  carceration dates to anybody but the individual?

14      A.   No.

15      Q.   I'm going to take that back from you.

16      A.   Sure.

17      Q.   I'm going to hand you what's marked as

18  Delta-7.

19           MR. MANSOUR:  Eight.

20           MS. GRIESER:  Eight, sorry, I'm always

21      lagging behind these things.

22           (Whereupon Exhibit No. D-8 was so marked for

23  identification being the department vision, mission, values

24  and code of ethics.)

25  BY MS. GRIESER:

Ara Kimbrough
02/18/2025

Page 70

 1        Q.   I want you to take a look at that and that

 2    is COB0283 to COB0286 it's A-1.1, Department Vision,

 3    Mission, Values and Code of Ethics.

 4             Are you familiar with this document?

 5        A.   I'm not completely familiar with it.

 6        Q.   This is the mission of vision of, of

 7    the --

 8        A.   Yes, I --

 9        Q.   -- Bucks County Department of Corrections,

10    right?

11        A.   Yes.

12        Q.   And A-1.1, this is the very first one,

13    correct?

14        A.   Yes.

15        Q.   And earlier you told me that you were

16    aware that you had to keep, make yourself familiar

17    with this, with all the policies, right?

18        A.   Yes.

19        Q.   And that is especially important because

20    you're a supervisor?

21        A.   Yes.

22        Q.   But you're not familiar with A-1.1?

23        A.   Not in this form.

24        Q.   You know, you know it in another form?

25        A.   Yes.

Ara Kimbrough
02/18/2025

Page 71

1    Q.   What's that form?

2    A.   This form was just updated in, in January

3    of 2004 or it's -- yeah, January 2024.

4    Q.   Okay.

5    A.   So I remember the old one.

6    Q.   Okay.  And just this looks substantially

7    the same as the one you're familiar with?

8    A.   Mostly yes.

9    Q.   Turning your attention to page 2 of that

10   document, it talks about core values of public ser-

11   vice, professionalism, ethics and state of the art

12   services.

13        And it says, "To maintain these values all

14   staff are required to maintain institutional securi-

15   ty," correct?

16   A.   Yes.

17   Q.   And it's your testimony that outlining how

18   somebody successfully exploited the intake system

19   was not in any way a threat to institutional securi-

20   ty?

21   A.   I'm sorry?

22   Q.   And it's your testimony that telling a

23   third party, an outside third party, how somebody

24   was able to successfully exploit the Bucks County

25   Confinement Facility's intake system in smuggling

Ara Kimbrough
02/18/2025

Page 72

1   contraband, you do not believe that that threatens

2   institutional security?

3          MR. MANSOUR:  Objection to form, but you

4      can answer.

5          THE WITNESS:  Not if the outcome would've

6      been the unit to be properly staffed, no, I

7      don't.  I don't think so.

8   BY MS. GRIESER:

9      Q.   And then going down to the fourth para-

10  graph and it's not marked.  You agree that it says,

11  "Report any conduct which threatens the institutio-

12  nal security or the professional operations of the

13  facility," do you see that?

14     A.   Yes.

15     Q.   And you were CO Ulmer's supervisor; is

16  that right?

17     A.   Yes.

18     Q.   And you told Mr. Zeiger that you believed

19  that she violated policy when she failed to lock the

20  dirty cell door, correct?

21     A.   Yes.

22     Q.   But you never reported that conduct to

23  anybody, did you?

24     A.   No, that's incorrect, I did.

25     Q.   To who?

Ara Kimbrough
02/18/2025

Page 73

1      A.   To I believe I put out an email to, um, to

2   the captain, the sup -- The deputy superintendents,

3   the superintendent --

4      Q.   Nottingham?

5      A.   -- to any -- Nottingham, Contino, Reed,

6   Matellus, Coyne, Kratz.

7      Q.   And that, that email says that you believe

8   CO Ulmer violated -- whoops, sorry -- violated poli-

9   cy by leaving the dirty cell unlocked?

10     A.   Yes, ma'am.

11     Q.   It's your responsibility to discipline

12  her; is that correct?

13     A.   Uh, not necessarily.

14     Q.   Okay.  And we talked earlier about how and

15  you would agree with me, that it would be your res-

16  ponsibility if you saw somebody do violate a policy,

17  that depending on what that infraction was that you

18  would counsel them along those lines?

19     A.   Correct.

20     Q.   And you believe that CO Ulmer violated

21  policy, yet you did not do any counseling or --

22     A.   Oh, I did counsel her and I reported it to

23  the administration.  Um, basically discipline goes

24  that you -- I would report it and then the adminis

25  -- the administration would decide if they want to

Page 74

1    pursue it or not.

2         Q.   And you didn't mention that before when we

3    were talking about your responsibility to discipline

4    subordinates?

5         A.   I did say depending on the circumstances.

6         Q.   Did you counsel her in writing?

7         A.   No, I did it verbally.

8         Q.   Why didn't you put it in writing?

9         A.   Because I was wait, 'cause I was waiting

10   to see what the administration wanted to do with it.

11        Q.   And again this happened in July 2022?

12        A.   Yes, ma'am.

13        Q.   At some point you became aware that the

14   administration wasn't going to discipline her; is

15   that right?

16        A.   That's correct.

17        Q.   But you still did nothing more than verb-

18   ally counsel her?

19        A.   I, I, yes, that's correct.

20        Q.   And then the one, two, three, four, fifth

21   dot down.  It says, "Never become personally in-

22   volved with an inmate or those who are involved in

23   the lives of inmates," do you see that?

24        A.   Yes.

25        Q.   Do you agree with me that Mr. Zeiger who

Ara Kimbrough
02/18/2025

Page 75

1  represented, represented Patterson's estate is some-

2  body who is involved in the lives of inmates?

3        A.    No.

4        Q.    Why not?

5        A.    'Cause Patterson is dead.

6        Q.    What about Rhoades?

7        A.    I'm sorry, what are you asking about

8  Rhoades?

9        Q.    Well, you told Mr. Zeiger a bunch of de-

10  tailed information regarding how Rhoades was able to

11  smuggle in the drugs that ultimately Pat -- Mr. Pat-

12  terson ingested and unfortunately passed away from.

13        A.    Mm-hmm.

14        Q.    So would you say that Mr. Zeiger was some-

15  body involved in the life of Mr. Rhoades?

16        A.    No.

17        Q.    Even though he was the supposed cause of

18  his client's death?

19        A.    Correct.

20        Q.    So it's your, it's your testimony that

21  once an inmate dies, you can talk to whoever you

22  want about that inmate?

23        A.    No, it's my testimony that I don't believe

24  that he was personally involved within the lives of

25  these individuals.

Ara Kimbrough
02/18/2025

Page 76

1      Q.    Correct me if I'm wrong, but you said be-
2    cause Patterson is dead?
3      A.    Yeah, I mean he's not involved in his
4    life.
5      Q.    You don't consider his estate to be part
6    of Patterson?
7      A.    He's not personally.  The way I'm reading
8    this, personally involved with an inmate or those
9    who are involved in the lives of inmates, I mean I
10    don't -- I don't, I don't see the correlation.
11      Q.    You don't see the correlation there?  I'm
12    going to have you flip the page to the next page.
13      A.    Okay, yes, yes.
14      Q.    Paragraph 7 it states, "Staff members will
15    never discuss the charges, criminal records, cases
16    or any information about one inmate with another in-
17    mate or with any outside group or organization, with
18    a single exception of those staff specifically auth-
19    orized to do so as part of their job description."
20            Do you see that?
21      A.    Yes, ma'am.
22      Q.    Do you agree that providing the informa-
23    tion, the detailed information that you did to Mr.
24    Zeiger, that was you discussing charges, criminal
25    records, cases of Mr. Rhoades?

Ara Kimbrough
02/18/2025

Page 77

1      A.   I don't believe, no.  I didn't discuss any

2   charges or criminal, criminal records with him.

3      Q.   You did explain to him how Mr. Rhoades

4   successfully exploited the system and was able to

5   smuggle in contraband, correct?

6           MR. MANSOUR:  Objection to form, you can

7       answer.

8           THE WITNESS:  Yes.

9   BY MS. GRIESER:

10      Q.   And you're aware that he was later charged

11   with that?

12      A.   Yeah, but not at this time, not when I

13   talked to him.

14      Q.   But you did know that that was an alleged

15   crime?

16      A.   Yes.

17      Q.   You see the part where it says, "or any

18   information about one inmate" --

19      A.   Yes.

20      Q.   -- "to any outside group"?

21      A.   Yes.

22      Q.   Would you agree with me that you did dis-

23   close information, any information regarding inmate

24   Rhoades to Mr. Zeiger?

25      A.   Yes.

Ara Kimbrough
02/18/2025

Page 78

 1      Q.   Okay.  And then down to Paragraph 11 it

 2   states, "Employees will not provide inmates or those

 3   associated with inmates any institutional or policy

 4   information."

 5           You'd agree that there is a policy on in-

 6   take procedures?

 7      A.   Yes.

 8      Q.   And again you shared that with an outside

 9   party, correct?

10      A.   Yes.

11      Q.   Who was bringing a case on behalf of the

12   estate of a former inmate, correct?

13      A.   Yes.

14      Q.   Whose death was allegedly caused by Mr.

15   Rhoades, another inmate, correct?

16      A.   I don't think it's allegedly, but yes.

17      Q.   He did plead guilty to it so?

18      A.   Yes.

19      Q.   So you still maintain that that's not in-

20   formation associated with a policy?

21      A.   I'm sorry, what, what are you referring

22   to?

23      Q.   I'm sorry.  So we established that there

24   is a policy regarding intake procedures?

25      A.   Yes.

Page 79

1      Q.   Okay.  And you're not to provide that, any

2  information to inmates or those associated with in-

3  mates, correct?

4      A.   Yes.

5      Q.   All right.  And you don't believe that Mr.

6  Zeiger was bringing, bringing a case on behalf of

7  the estate of a former inmate, Patterson, that invol

8  -- his death was caused by inmate Rhoades' success-

9  ful smuggling of contraband into the facility?  You

10  still don't believe that Mr. Zeiger is somebody as-

11  sociated with inmates?

12           MR. MANSOUR:  Objection to form, you can

13      answer if you understand.

14           THE WITNESS:  Um, I'm sorry, he's what

15      with inmates?

16  BY MS. GRIESER:

17      Q.   Mr. Zeiger.

18      A.   Yeah, is --

19      Q.   Is he associated or a person associated

20  with inmates?

21      A.   Well, again I don't, I don't believe that.

22  I mean he's associated with the estate, but not with

23  the inmates.

24      Q.   So then why call him?

25      A.   Because I believe he could effect the

Ara Kimbrough
02/18/2025

Page 80

1  change of -- He was in the best position to effect

2  the change of the pulling staff, the undermanning of

3  the unit.

4       Q.   Why?

5       A.   Excuse me?

6       Q.   Why?

7       A.   Because as you said he had a lawsuit with

8  the, with the county.  I went through it, um, the

9  administration like I said, HR and legal and, um,

10  nobody listened.

11       Q.   Why did you think based off of his bring-

12  ing us to against the county; why was he in the best

13  position?

14       A.   Again it was it's a lawsuit, uh, you know.

15  It would, it would be brought to light for people

16  outside the DOC to see.

17       Q.   And it was a lawsuit regarding intake that

18  involved intake procedures?

19            MR. MANSOUR:  Objection to the form, you

20       can answer if you understand.

21            THE WITNESS:  Yes.

22  BY MS. GRIESER:

23       Q.   And it was a lawsuit that involved the

24  death of a former inmate, inmate Patterson?

25       A.   Yes.

Page 81

```
 1      Q.   Caused by -- I don't know if he's still an
 2  inmate but another inmate, Rhoades, who was able to
 3  successfully bring contraband into the facility?
 4      A.   That's one of the factors, yes.
 5      Q.   What other factors?
 6      A.   Again, if Ulmer hadn't been pulled and she
 7  doesn't let him go back into the dirty cell, he
 8  never retrieves his drugs.
 9      Q.   And you told Mr. Zeiger that her being
10  pulled was a, you believed a violation of instituti-
11  onal policy?
12      A.   Correct.
13      Q.   All right.  I'm going to show you, and
14  I'll take that back from you.  We'll label this as
15  D-9, you can take a quick glance through the entire
16  thing.  I'll tell you, I want to draw your attention
17  to Paragraph 1 back up.  Let me know when you're
18  ready.
19           (Whereupon Exhibit No. D-9 was so marked for
20  identification being public information and education.)
21  BY MS. GRIESER:
22      Q.   This is this policy it's Policy A-1.8,
23  Public Information and Education beginning, begin-
24  ning at COB093 it's a three-page document.
25      A.   Okay.
```

Ara Kimbrough
02/18/2025

Page 82

1        Q.   You see in Paragraph 1 Echo where it says,

2   "State and federal confidentiality guidelines will

3   always be followed"?

4        A.   Yes.

5        Q.   And it also states that, "Staff who are

6   designated to, to speak on behalf of who are -- who

7   are allowed to speak on behalf of the Bucks County

8   Confinement Facility may not provide any specific

9   information about a particular prisoner," do you see

10  that?

11       A.   Designated by the director to speak to the

12  press?

13       Q.   Mm-hmm.

14       A.   Yes, yes, I see that.

15       Q.   And it states, "This will ensure that our

16  confidentiality responsibilities are adhered to"?

17       A.   Yes.

18       Q.   So even if the director of the prison al-

19  lowed you to speak to the press, even then you are

20  not allowed to give out any specific information

21  about a particular prisoner, correct?

22       A.   Yes.

23       Q.   "The state and federal confidentiality

24  guidelines will always be followed."  Are you fami-

25  liar with CHRIA the Criminal History Record Infor-

Ara Kimbrough
02/18/2025

Page 83

1   mation Act?

2        A.   Yes.

3        Q.   And why are you familiar with that?

4        A.   Because we've been trained in CHRIA.

5        Q.   And you'd agree with me that CHRIA cur-

6   tails a lot of information that may be released to

7   third parties, right?

8        A.   Yes.

9        Q.   And that would include specific informa-

10  tion especially -- hold on, let me, let me correct

11  that.

12            CHRIA outlines what information can be

13  released to other law enforcement agencies in part,

14  correct?

15       A.   Correct.

16       Q.   And it also outlines what if any informa-

17  tion can be given out to any non-law enforcement

18  agencies, correct?

19       A.   Correct.

20       Q.   And you'd agree with me that specific in-

21  formation regarding a named individual committing a

22  crime, that should -- that should be forbidden from

23  being disseminated per CHRIA, correct?

24       A.   I disagree.

25       Q.   Okay, why?

Ara Kimbrough
02/18/2025

Page 84

1      A.    It's, it's in the title, it's Criminal

2  History Records Information Act.  You have to have

3  been charged with a crime, it has to be on your cri-

4  minal history for you not to be allowed to talk

5  about it.

6      Q.    Okay.  And you'd agree with me that he,

7  that Mr. Rhoades was charged with a crime?

8      A.    I did not talk about the crime he was

9  charged with, and he was not charged with the crime

10  in relation to Patterson at the time.

11      Q.    So it's your testimony that somebody has

12  to be -- That it's okay to give, give out informa-

13  tion of a potential charge of a crime; is that

14  right?

15      A.    I'm saying it doesn't fall under CHRIA.

16      Q.    So it's not okay to give out information

17  about a potential crime?

18          MR. MANSOUR:  Objection to form.

19          THE WITNESS:  Is this in relation to

20      CHRIA, or are you talking in general?

21  BY MS. GRIESER:

22      Q.    To CHRIA right now.

23      A.    CHRIA is Criminal History Records Informa-

24  tion, right, he was not charged with a crime in re-

25  lation to this at the time.

Ara Kimbrough
02/18/2025

Page 85

1        Q.   Okay.  And it's your, your testimony that

2   it is okay to give out per CHRIA, you can divulge

3   information related to a potential charge?

4        A.   I'm saying CHRIA doesn't address that.

5        Q.   All right, I can take that back from you.

6   And you were also charged with -- I'm sorry, your

7   termination was partially based off of some HR poli-

8   cies as well, correct?

9        A.   Yes.

10            MS. GRIESER:  This should be the last.

11            (Discussion off the record.)

12            MS. GRIESER:  All of them, were all of the

13       policies already entered?

14            MR. MANSOUR:  We did it the last time,

15       right, so --

16            MS. BURNS:  I, I can tell you, hold on one

17       second.

18            MR. MANSOUR:  P-8?

19            MS. BURNS:  P-6.

20            MS. GRIESER:  P-6?

21            MS. BURNS:  P-6, the entire HR policy.

22            MS. GRIESER:  I'm sorry, one more time it

23       was P --

24            MR. MANSOUR:  Six.

25   BY MS. GRIESER:

Ara Kimbrough
02/18/2025

Page 86

1     Q.   P-6, all right.  I'm showing you a portion

2  of the human resource, the Bucks County Confinement

3  Facility's human resources policy there now, and I'm

4  looking for the record what portion.  COB0306, 0307,

5  0308, 0309 and 0310; go ahead and take a look at

6  that.

7     A.   Okay.

8     Q.   And you were in part terminated for viola-

9  ting Number 59, giving confidential county informa-

10 tion to other individuals, organizations or to auth-

11 orized or -- excuse me, to unauthorized county emp-

12 loyees, do you see that?

13    A.   Yes.

14    Q.   And do you believe that the information

15 that you gave to Mr. Zeiger was not confidential?

16    A.   No.

17    Q.   Why not?

18    A.   I mean he saw the video, he had the infor-

19 mation.

20    Q.   Okay.  And then also failure to abide by

21 the county established code of conduct at Number 63?

22    A.   Yes.

23    Q.   And here's, I'm also going to hand you

24 this as well.  So if you can read part of that exhi-

25 bit Bates stamped 0245, and can you read that por-

Ara Kimbrough
02/18/2025

Page 87

1  tion of that.

2           MR. MANSOUR:  Yeah, I think he's already

3       got it, he's already here.

4           THE WITNESS:  Yeah.

5           MS. GRIESER:  Oh, he does, oh, okay.

6           THE WITNESS:  Yeah.

7  BY MS. GRIESER:

8       Q.   I'm sorry, I don't remember seeing forty-

9  five, thank you.  Okay.  Do you see confidentiality?

10      A.   Yes.

11      Q.   Number 1 that's the --

12      A.   Yes.

13      Q.   -- under the code of conduct for all emp-

14  loyees of the county, correct?

15      A.   Yes, ma'am.

16      Q.   And it states, "Respect and to maintain

17  the confidentiality of information gained as an emp-

18  loyee including but not limited to computer software

19  files, county related documents, printouts that con-

20  tain confidential information."

21           And you agree that you learned this in-

22  formation as part of your job?

23           MR. MANSOUR:  Objection to form, you can

24       answer.

25           THE WITNESS:  Yes.

Ara Kimbrough
02/18/2025

Page 88

1  BY MS. GRIESER:

2      Q.   You mentioned that Mr. Zeiger had seen the

3  video?

4      A.   Yes.

5      Q.   How do you know that?

6      A.   I believe he said he did.

7      Q.   Were you present when Mr. Rhoades came

8  through intake?

9      A.   I don't know.

10     Q.   You don't know?

11     A.   I don't know.

12     Q.   So how did you learn of the details of

13  this that you shared with Mr. Zeiger?

14     A.   Well, any time there's contraband in the

15  facility I check, there was a reception unit to make

16  sure proper procedures were followed.

17     Q.   You check what, I'm sorry?

18     A.   To, to make sure proper procedures were

19  followed.

20     Q.   So what do you check to find out if proper

21  procedures were followed?

22     A.   I'm sorry?

23     Q.   What do you -- How, how do you look up

24  whether proper procedures were followed or not?

25     A.   I review video, um, look at documents,

Ara Kimbrough
02/18/2025

Page 89

1  whatever, whatever's involved.

2      Q.   So this you reviewed the video and docu-

3  ments, this was part of an ongoing investigation,

4  correct?

5      A.   I believe so.

6      Q.   Between the special investigations unit at

7  the jail --

8      A.   Yes.

9      Q.   -- and the county detectives as well?

10     A.   I don't know if the county detectives were

11  involved, but they could've been.

12     Q.   How would you have gotten access to this

13  information?  'Cause if the video and the docu-

14  ments --

15     A.   All of the lieutenants have access to

16  that.

17     Q.   Would, this would have been kept in the

18  investigative files, correct?

19     A.   No, not necessarily, no.

20     Q.   So what did you access to find the video?

21     A.   The, our video system, like I said all

22  lieutenants have access to that.

23     Q.   And what about your review of documents?

24     A.   That was just to make sure that you know,

25  the inmates were committed properly, we, we had eve-

Ara Kimbrough
02/18/2025

Page 90

1  rything.  You know they were, uh, they were supposed

2  to be held there legally.

3      Q.   So those were the documents you reviewed,

4  Mr. Rhoade's intake documents?

5      A.   I believe so.

6      Q.   What other documents?

7      A.   Inmate Patterson, any, any memos that were

8  written about the incident.

9      Q.   Where did you access those from?

10     A.   Um, they were on -- I'm not sure if they

11 were on the X drive.

12     Q.   We, we talked about what servers or drives

13 that you had access to report, and you told me that

14 you don't have --

15         You don't keep any training materials or

16 documents --

17     A.   I was going to --

18     Q.   -- in the filing system?

19     A.   Yeah, I get -- I don't, no.

20     Q.   So you have access to the X drive?

21     A.   Yes.

22     Q.   And what's kept on the X-drive?

23     A.   Of various items I don't, I don't remember

24 specifically now.

25     Q.   Like so what other drives did you have

Ara Kimbrough
02/18/2025

Page 91

1  access to?

2      A.   The H drive that's your personal drive.

3      Q.   What, what do you keep in there?

4      A.   Any memos I wrote the, the documents that

5  were important.

6      Q.   So earlier you said that you didn't keep

7  anything?

8      A.   I said I didn't keep training.

9      Q.   Or any other materials?  I specifically

10  asked about training and other materials.

11      A.   I thought you just said training.  I

12  thought you were just referring to training, 'cause

13  that's what we were talking about was training.

14      Q.   You're aware that there, there was an on-

15  going investigation in this case, yes?

16      A.   I'm sorry?

17      Q.   You're aware that there was an ongoing in-

18  vestigation in this case?

19      A.   Yes.

20      Q.   Are you familiar with the Right to Know

21  Act?

22      A.   Not particularly.

23      Q.   You as the records officer, I'd imagine

24  that you would get requests for records on occasion?

25      A.   That those go to the administration build-

Ara Kimbrough
02/18/2025

Page 92

1    ing.

2        Q.    So have you ever been asked to pull docu-

3    ments for a right to know request?

4        A.    Sure.

5        Q.    Do you believe the details of an ongoing

6    investigation would be confidential or sensitive?

7        A.    Yes, potentially.

8        Q.    What about at the time you contacted Mr.

9    Zeiger, there was an ongoing investigation, corr-

10   ect, or there had been?

11       A.    There had been, I don't think there was an

12   ongoing one now.

13       Q.    In that case do you believe that the in-

14   vestigation would've been confidential or sensitive?

15       A.    No, I do, I do not.

16       Q.    You don't, all right.  No investigatory

17   materials would be confident or sensitive?

18       A.    I believe at the time he was charged, I

19   think the facts of the case were out there.

20       Q.    Okay.  Well, earlier you said that you

21   didn't believe CHRIA applied because it was history.

22            Now you're saying that this, that this in-

23   vestigation was in the past, correct?

24       A.    Yes.

25       Q.    Okay.  So is it your testimony now that

Ara Kimbrough
02/18/2025

Page 93

1  CHRIA does apply?

2        A.   I don't, I -- okay, let me think.  I'm

3  trying to remember when he got -- Do you know when

4  he got charged?

5        Q.   I do not.

6        A.   Okay.  I don't either.

7        Q.   So if there was an ongoing investiga-

8  tion --

9        A.   Yes.

10        Q.   -- at the time into, into Mr. Patterson's

11  death --

12        A.   Yes.

13        Q.   -- at the time you contacted Mr. Zeiger --

14        A.   Mm-hmm.

15        Q.   Yes?

16        A.   Yes.

17        Q.   That would be confidential or sensitive

18  information, correct?

19        A.   Yes.

20        Q.   And if the investigation was in the past,

21  that would fall under CHRIA, correct?

22        A.   Yes.

23        Q.   So either way you know that you were vio-

24  lating a policy or a law?

25        A.   Yes.

Ara Kimbrough
02/18/2025

Page 94

1          MS. GRIESER:  Just give me one second, can

2     we go off the record.

3          (Break off the record.)

4          MS. GRIESER:  I just have a few quick ad-

5     ditions, we're going to mark this as Delta-10,

6     11 --

7          THE REPORTER:  Ten yes.

8  BY MS. GRIESER:

9     Q.  Which one do you have there in front of

10 you?

11    A.  I'm sorry, 6, this is P-6.

12         MR. MANSOUR:  P-6, but we're up to D-10.

13         MS. GRIESER:  D-10.

14         THE WITNESS:  Do you want this back?

15         MS. GRIESER:  Yes, I'll --

16         (Whereupon Exhibit No. D-10 was so marked for

17 identification being a certificate of CLEAN completion.)

18 BY MS. GRIESER:

19    Q.  Go ahead and take a look at that, what is

20 that?

21    A.  It's the CLEAN certificate.

22    Q.  And you said that the investigator Onisick

23 was in charge of that certification; is that right?

24    A.  Mm-hmm.

25    Q.  Yes?

Ara Kimbrough
02/18/2025

Page 95

1      A.   Yes, ma'am.

2      Q.   And this allows you to run inmates through

3  NCIC to get their criminal history records?

4      A.   Yes.

5      Q.   And to use CLEAN and JNET, correct?

6      A.   Yes.

7      Q.   And in this certification it does cover

8  security awareness, right?

9      A.   Yes.

10      Q.   As what is security sensitive and what's

11  not?

12      A.   Yes.

13      Q.   And this is separate from your CJIS certi-

14  fication that you and other, that lieutenants and

15  sergeants complete yearly?

16      A.   I don't know about the CJIS one, yes, but

17  this is separate.

18      Q.   Okay, that's separate.  So you did have a

19  valid certificate saying that you were trained to,

20  trained to be authorized to go through CLEAN and

21  JNET, NCIC, correct?

22      A.   Uh, yes, but here's the distinction it's I

23  never had a CLEAN login.  I never got a -- Like I

24  said CLEAN is a physical system, my JNET I couldn't

25  -- My JNET was issued so I never used CLEAN 'cause

Ara Kimbrough
02/18/2025

Page 96

1  you had to have a -- You had to have a CLEAN login,

2  I never got a CLEAN login.

3      Q.   Okay.  But this certification allows you

4  to use JNET?

5      A.   Yeah, it allows me it doesn't -- yes, yes,

6  it does.

7      Q.   And NCIC?

8      A.   CLEAN yes.

9          MS. GRIESER:  Okay, all right.  Thank you,

10      I have nothing further.

11                  --- EXAMINATION ---

12  BY MR. MANSOUR:

13      Q.   I have just a few questions for you, Mr.

14  Kimbrough.  In terms of the discipline that you re-

15  ceived following the bullying investigation that was

16  discussed, did you learn about the discipline you

17  were receiving before or after your call with Attny.

18  Zeiger?

19      A.   After my call.

20      Q.   Besides, you referenced on your direct

21  testimony that you had made a number of complaints

22  to human resources, to the DOC and to the law dep-

23  artment about understaffing in the jail; is that

24  correct?

25      A.   Yes, sir.

Ara Kimbrough
02/18/2025

Page 97

1    Q.   Did you complain to any of those parties

2  about anything else?

3    A.   Yes, sir, I did.

4    Q.   What specifically?

5    A.   Um, I believe, um, especially with newer

6  employees, people of color, um, foreign born people

7  and women were being given undesirable posts on a

8  frequent basis not consistent with our procedures

9  and, and not consistent with other newer employees.

10 I complained about, uh, inappropriate relationships

11 with sergeants and female staff members, um, and I

12 com -- I complained about laundry issues where peo-

13 ple weren't having towels, socks or underwears for

14 weeks at a time.

15   Q.   Do you recall anybody specifically that

16 you made those complaints to?

17   A.   Yes, to Capt. Nottingham, to Dep. Supt.

18 Contino, uh, and Supt. Metellus on a frequent basis.

19 And then I also, I went in Dep. Supt. Reed and then

20 also -- I had also reported to Dep. Dir. Coyne and

21 Dir. Kratz as well.

22   Q.   Did you make those complaints before the

23 county began investigating you for alleged bullying?

24   A.   Yes, sir.

25   Q.   Do you recall any of the particular -- You

Ara Kimbrough
02/18/2025

Page 98

1  referenced before about inappropriate relationships

2  that sergeants were having with subordinates?

3      A.   Yes.

4      Q.   Do you recall specifically who those serg-

5  eants were that you complained about?

6      A.   Yes, sir.

7      Q.   Who were they?

8      A.   Sgt. Jurgelewicz, Sgt. Beck, Sgt. Patel,

9  those were at least a few of them and Sgt. Bueller.

10         MR. MANSOUR:  The investigative report was

11     that P-8, P-7, which one is that?

12         MS. GRIESER:  The bullying investigative

13     report?

14         MR. MANSOUR:  Yes.

15         MS. GRIESER:  That's P-7.

16         MR. MANSOUR:  P-7, can I, can I see that.

17  Do you have --

18  BY MR. MANSOUR:

19     Q.   So I just want to make sure 'cause you

20  said one of the sergeants that you complained about

21  in terms of having inappropriate relationships with

22  subordinates was Sgt. Jurgelewicz?

23     A.   That's correct.

24     Q.   I want to turn your attention to the sec-

25  ond page here of P-7, this is the again the investi-

Ara Kimbrough
02/18/2025

Page 99

1  gative report regarding the bullying and hostile

2  work environment complaint against you.  Could you

3  just begin reading starting on this paragraph here

4  on the end of the second page into the third page.

5        A.    Sure.   "It was determined that Sgt. Jurge-

6  lewicz was the sergeant running shift during the

7  first incident referenced in the anonymous comp-

8  laint.   In his interview Lt. Kimbrough admitted say-

9  ing" --

10            THE REPORTER:   I'm sorry, could you just

11       slow down.

12            THE WITNESS:   I'm sorry, I'm sorry.   I'll

13       start over it was --

14            THE REPORTER:   You don't have to start

15       over, you can just continue.

16            THE WITNESS:   Okay.   "Lt. Kimbrough admit-

17       ted saying 'Are you fucking with me'.   However,

18       he denied saying 'because I will fuck with

19       you'.   From the various sergeant interviews Lt.

20       Kimbrough's outbursts occurred in the serg-

21       eant's office, was directed towards Sgt. Jurge-

22       lewicz and was witnessed by multiple other ser-

23       geants including Sgt. Murphy.   Witnesses con-

24       firmed that Lt. Kimbrough did say 'because I

25       will fuck with you'.   Given the number of wit-

Ara Kimbrough
02/18/2025

1      nesses who corroborate Lt. Kimbrough's remark

2      that he would, quote, 'fuck with Sgt. Jurgele-

3      wicz', the majority report was deemed more cre-

4      dible than Lt. Kimbrough's general denial."

5  BY MR. MANSOUR:

6      Q.   Based on that is it your understanding

7  that Sgt. Jurgelewicz was one of the individuals who

8  complained about bullying from you?

9      A.   Yes, sir.

10      Q.   Sgt. Patel was another person you indica-

11  ted you had complained about?

12      A.   Yes, sir.

13      Q.   And Sgt. Patel was another person you had

14  claimed was having inappropriate relationships with

15  subordinates?

16      A.   Yes, sir.

17      Q.   Could you continue reading that, please.

18      A.   Sure.  "Sgt. Patel reported in his inter-

19  view that Lt. Kimbrough recently verbally attacked

20  him when he was running shift.  On that specific day

21  a use of force incident occurred, and Sgt. Patel

22  made the judgment call to pull one of the officers

23  assigned to reception to respond specifically be-

24  cause they were SRT certified.  Afterwards Lt. Kim-

25  brough called the sergeant's office and asked Sgt.

Ara Kimbrough
02/18/2025

Page 101

1  Patel if he was fucking" -- excuse me -- quote,

2  "fucking stupid".

3          "Sgt. Patel expressed that this comment

4  was particularly troubling as he was compelled to

5  make a tough choice in the heat of an emergency, but

6  still believed he made the correct decision in the

7  end.  This type of Monday morning quarterbacking is

8  dangerous because it prompts the decision maker to

9  doubt their choices in critical moments potentially

10  resulting in crucial seconds being lost, seconds

11  that could make the difference between life and

12  death."

13      Q.   Based on the, what you just read is it

14  your understanding that Sgt. Patel was another indi-

15  vidual who had complained about bullying behavior by

16  you?

17      A.   Yes, sir.

18      Q.   Do you believe that their complaints to HR

19  and HR's subsequent investigation of their comp-

20  laints was retaliatory?

21      A.   Yes, sir.

22      Q.   Why do you believe that?

23      A.   Because I was -- Again I was making these,

24  um, making these complaints to my supervisors, and

25  I'm sure it got back to them that this was going on,

Ara Kimbrough
02/18/2025

Page 102

1  and this was their way to get at me.

2      Q.    And just to be clear, Sgt. Jurgelewicz and

3  Sgt. Patel were two individuals that you specifical-

4  ly named and complained about to your supervisors?

5      A.    Yes, sir.

6      Q.    During your conver -- Did, besides the May

7  30th telephone conversation that you had with Attny.

8  Zeiger, did you have any other conversations with

9  Attny. Zeiger regarding the Rhoades incident?

10      A.    No, sir.

11      Q.    During that single telephone conversation

12  that you had with Attny. Zeiger, did you divulge to

13  him the details of Bucks County DOC intake proced-

14  ures?

15      A.    No, sir.

16      Q.    Did you disclose to him Bucks County SOPs?

17      A.    No, sir.

18      Q.    Did you give him any documents?

19      A.    No, sir.

20      Q.    Did you, you had referenced that you bel-

21  ieved Ofcr. Ulmer had violated policy by not secur-

22  ing the dirty cell, correct?

23      A.    Yes, sir.

24      Q.    Did you disclose to him the policy that

25  you believe he violated?

Ara Kimbrough
02/18/2025

Page 103

 1      A.   No, sir.

 2      Q.   Did you give him a copy of that policy to

 3  the extent it was written?

 4      A.   No, sir.

 5      Q.   Did you disclose to Attny. Zeiger any in-

 6  formation about the investigation into Mr. Rhoades?

 7      A.   No, sir.

 8      Q.   Did you disclose to Zeiger Rhoades' past

 9  incarceration dates?

10      A.   No, sir.

11           MR. MANSOUR:  D-8, what was D-8?  283?

12           MS. GRIESER:  Department vision, mission

13      and values, code of ethics.

14           MR. MANSOUR:  Yes.

15  BY MR. MANSOUR:

16      Q.   Okay.  So you were asked on examination by

17  Attny. Grieser about some questions about D-8 which

18  is the department of corrections' vision, mission,

19  values and code of ethics?

20      A.   Yes, sir, yes, sir.

21      Q.   And she directed your attention to the

22  second page under the core values list, and it looks

23  like there are six different bullet points that are

24  listed there?

25      A.   Yes, sir.

Ara Kimbrough
02/18/2025

Page 104

1     Q.   Do you believe that institutional security

2  of the jail was maintained on the day Rhoades snuck

3  contraband into the prison?

4     A.   No, sir.

5     Q.   Did you believe that Rhoades' conduct

6  threatened the institutional security of the priva

7  -- of the prison?

8     A.   Yes, sir, absolutely.

9          MR. MANSOUR:  I have no further questions.

10         MS. GRIESER:  I just have a few I'll ask,

11     okay.

12                    --- EXAMINATION ---

13  BY MS. GRIESER:

14     Q.   Okay.  So Attny. Mansour was talking to

15  you about other stuff that you had reported up the

16  chain?  Some issues --

17     A.   Yes.

18     Q.   -- about people of color or foreign, for-

19  eign born; is that what you said?

20     A.   Yes, foreign born.

21     Q.   Were getting undesirable posts frequently

22  and --

23     A.   Yes, ma'am.

24     Q.   And you complained about inappropriate re-

25  lationships?

Ara Kimbrough
02/18/2025

Page 105

1    A.   Yes, ma'am.

2    Q.   And laundry issues?

3    A.   Yes, ma'am.

4    Q.   You didn't have any fear of retaliation

5  from, from reporting those issues?

6    A.   Again, I didn't go outside the chain of

7  command when reporting those.

8    Q.   Now, you said that you believe that

9  Rhoades' conduct threatened institutional security;

10  is that correct?

11    A.   Yes, ma'am.

12    Q.   And you described Rhoades' conduct to Mr.

13  Zeiger; is that right?

14    A.   I, I gave a general overview of what hap-

15  pened.  I don't, I don't know if I described his --

16    Q.   His what?

17    A.   His, his, his conduct.  I just said he was

18  able to go back in and retrieve the, the contraband.

19    Q.   But you did report to Mr. Zeiger that you

20  believed Ulmer violated policy?

21    A.   Yes.

22    Q.   And you said you watched the video?

23    A.   Yes.

24    Q.   So in watching the vul -- the video you

25  see, you see Ulmer, correct?

Ara Kimbrough
02/18/2025

Page 106

1       A.   Yes, ma'am.

2       Q.   Atiles?

3       A.   You, he's not really visible but yes,

4   he's, he's there.

5            THE REPORTER:  Excuse me, you said Patil-

6       les?

7            MS. GRIESER:  Atiles.

8            THE WITNESS:  Atiles, A-T-I-L-E-S.

9   BY MS. GRIESER:

10      Q.   And CO Fabian, Fabiani was also there?

11      A.   I don't recall him being there, he is not

12  a reception officer, though.

13      Q.   And you saw when CO Ulmer was pulled away,

14  correct?

15      A.   Yes.

16      Q.   And she was responding to a Code 99?

17      A.   That's not correct.

18      Q.   She doesn't pick up the phone right before

19  she leaves, does she?

20      A.   Yes.

21      Q.   So since you watched the video, you also

22  saw Timothy Travis talking to CO Ulmer right before

23  she left?

24      A.   Yes.

25      Q.   And he works in records?

Ara Kimbrough
02/18/2025

Page 107

1       A.   Yes, he was at -- I believe he was at the

2   door, and he left before she left.

3       Q.   They left at the same time?

4       A.   Yes.

5       Q.   You agree that CO, CO, CO Travis --

6       A.   Mm-hmm.

7       Q.   That CO Travis should've stayed since

8   Ulmer got pulled?

9       A.   No, no, he doesn't make that, that --

10  Well, one, he didn't know, I don't think he knew she

11  got pulled.  She didn't tell him she got pulled, she

12  got the order and she just left.

13      Q.   But he's a records officer?

14      A.   Yes.

15      Q.   And we talked about how the policy states

16  that records officers should be ready and able to

17  take on any role in reception, correct?

18      A.   No, that's not true.  Records officers

19  should be if they're cleared in reception, yes.

20      Q.   And CO Travis was cleared in reception?

21      A.   Yes.

22      Q.   So he should've been prepared to take

23  over --

24      A.   He, he wasn't --

25      Q.   -- the front; is that right?

Ara Kimbrough
02/18/2025

Page 108

1    A.   He wasn't, no, he was not informed that

2  that there was a need for him to be there.

3    Q.   But you described what you saw on the vid-

4  eotape as accurately as you could remember to Mr.

5  Zeiger?

6    A.   Yes.

7         MS. GRIESER:  I have nothing more.

8         MR. MANSOUR:  I just have one followup.

9              --- EXAMINATION ---

10  BY MR. MANSOUR:

11    Q.   Did you disclose to Attny. Zeiger why

12  Ulmer had been pulled from the records unit?

13    A.   No.

14         MR. MANSOUR:  No further questions.

15                  ---

16         (Witness excused.)

17         (Deposition ended at 2:27 p.m.)

18         (Transcript ordered by Ms. Grieser and Mr.

19  Mansour.)

20

21

22

23

24

25              C E R T I F I C A T E

Ara Kimbrough
02/18/2025

Page 109

    I, Ted Allen, Certified Reporter, Notary Public, Montgomery County, Pennsylvania, do hereby certify that ARA KIMBROUGH was first duly sworn to testify to the whole truth, and that the above deposition was recorded stenographically by me and was transcribed by means of computer-aided transcription under my personal direction, and that the said deposition constitutes a true record of the testimony given by said witness.

    I further certify that I am not a relative or employee or attorney of any of the parties, or a relative or employee of such attorney, or financially interested directly or indirectly in this action.

TED ALLEN, CERTIFIED
REPORTER, NOTARY PUBLIC
MY COMMISSION EXPIRES 9/4/2027

**Exhibits**

**D-1**
  3:0
  16:7,12
**D-2**
  3:0
  17:3,5,
  13
**D-3**
  3:0
  20:19
**D-4**
  3:0
  38:4,18
**D-5**
  3:0
  53:22
  54:1
**D-6**
  3:0
  55:11
**D-7**
  3:0
  65:7
**D-8**
  3:0
  69:22
  103:11,
  17
**D-9**
  3:0
  81:15,
  19
**D-10**
  3:0
  94:12,
  13,16

**0**

**0245**
  86:25
**0307**
  86:4
**0308**
  86:5
**0309**
  86:5
**0310**
  86:5

**1**

**1**
  17:17
  68:1
  81:17
  82:1
  87:11
**1.0**
  53:3
**100**
  68:17
**11**
  78:1
  94:6
**15**
  16:24
  53:11
**1600**
  31:21
**17**
  53:14

**2**

**2**
  20:24

54:12
71:9
**2004**
71:3
**2018**
  8:1,4
**2022**
  48:4
  74:11
**2024**
  24:13
  27:10
  48:7,10
  71:3
**2786**
  27:20
**283**
  103:11

**3**

**3**
  20:24
  22:6
  56:3
  67:13,
  24
**3.15**
  16:10
**30th**
  27:2,10
  28:16
  29:2,8,
  11
  41:25
  42:5,9
  48:7,10
  102:7
**32**
  53:8

**4**

**4**
  11:16
  31:21
  67:24

**5**

**5**
  17:22
  55:10
  56:12
**59**
  53:3
  86:9

**6**

**6**
  48:4
  94:11
**63**
  53:6
  86:21

**7**

**7**
  76:14

**8**

**8**
  11:16

**9**

**9**
  56:3
**99**
  106:16

**A**

**A-1.1**
  70:2,
  12,22
**A-1.2**
  38:24
**A-1.3.**
  53:24
**A-1.8**
  81:22
**A-2.5.**
  55:17
**A-2.6.**
  20:18
**A-T-I-L-
E-S**
  106:8
**ab-**
  12:20
**abide**
  53:6
  86:20
**ability**
  6:11
  54:24
**absolute
ly**
  104:8
**ac**
  23:24
**ac-**
  34:18
**academy**
  21:12,
  14,16

**acceptab
le**
  11:9,11
**acceptan
ce**
  10:8
**access**
  18:17
  19:9,
  24,25
  20:4
  23:1,21
  89:12,
  15,20,
  22
  90:9,
  13,20
  91:1
**account**
  24:1,4
**accu-**
  16:19
**accurate**
  6:11
  14:25
**accurate
ly**
  5:13
**acquaint
ed**
  55:25
**acronym**
  18:22
**Act**
  14:22
  83:1
  84:2
  91:21

action
52:14, 16
56:17
active
46:17
actively
49:3
actual
10:17
acuity
36:18
37:23
40:22
ad-
94:4
addition
53:9
additional
21:17
address
85:4
addressed
14:10
30:7
48:15, 17
adhered
82:16
admin
8:16
9:18
10:5
18:18
admini-
7:23

adminis
73:24
adminis-
14:16
administ
ration
14:9
29:16
36:17
41:11
42:12
48:14, 16,19
73:23, 25
74:10, 14  80:9
91:25
administ
rative
7:24,25
8:2
21:1
39:17, 18,21
40:5,9
41:15
admit-
99:16
admitted
99:8
advantag
e
63:14, 17
affect
6:11
affidavi
ts

50:15, 17,22
afraid
45:14
agencies
67:11
83:13, 18
agree
15:21
16:23
17:17
22:8
25:24
26:3
43:11
44:19
53:16
54:4, 15,17
56:13, 21
58:3,15
63:7
72:10
73:15
74:25
76:22
77:22
78:5
83:5,20
84:6
87:21
agreed
4:1
agreement
15:22
ahead
5:24

6:21
7:2
16:10
17:5,7
18:15
20:16
22:19
29:7
40:16
52:8
53:20
54:25
86:5
94:19
ahold
37:20
ajar
59:21
al-
82:18
alleged
56:24
58:19
59:15
77:14
97:23
allegedl
y
78:14, 16
allowed
82:7,20
84:4
ally
74:18
als
53:5
and/or
53:12,

14
56:18, 21  57:1
58:20
ano-
13:11
anonymous
24:18
99:7
answering
5:25
answers
5:10
ant
8:10
anti-
45:16
ants
26:2
any-
20:11
ap-
15:4
appeal
15:15
appeals
14:17
15:4,8
applied
7:20
92:21
apply
93:1
appropri-
28:21

56:8
approxim
ately
7:22,25
9:18
10:22
Ara
4:7,14
area
43:12, 15,16
arrest
19:20
arrested
19:18
art
71:11
article
30:23
articles
58:25
59:2,8, 20
artment
9:23
56:8
96:23
ary
56:15
as-
79:10
ask-
61:21
assigned
100:23
assume
6:5
17:23

18:2,4,
7 20:7
61:5
at-
35:11
ate
28:22
56:9
Atiles
57:6
106:2,
7,8
attacked
29:15
100:19
attendance
14:18
attention
20:23
22:5
67:13
71:9
81:16
98:24
103:21
Attny
29:8
30:2,5,
9,19
31:15
32:1,
13,18
33:5
51:8
96:17
102:7,
9,12
103:5,

17
104:14
attorney
5:22
6:15
43:6
47:6
51:22
attorneys
34:15
35:13
46:24
67:11
attorneys'
34:10
auth-
76:18
86:10
authentication
35:2
authorized
95:20
aware
21:23
24:24
35:20
36:1
37:22
45:16
60:1,9,
11,13
63:2
70:16
74:13
77:10
91:14,

17
awareness
95:8

---

**B**
B3.14.
17:11
bably
14:7
back
16:15
17:6
18:15
22:20
24:11
25:11
28:14,
24 29:7
32:10
40:17
53:20
55:1
57:4
59:23
60:13
64:24
65:5
69:15
81:7,
14,17
85:5
94:14
101:25
105:18
bail
10:8
band
63:9

based
23:4
80:11
85:7
100:6
101:13
bases
53:17
56:13
basic
21:7
basically
60:20
63:18
64:5
73:23
basis
69:3
97:8,18
Bates
16:7
86:25
BCCF
19:24
37:5
44:9
BCDOC
53:9
BCDOC15
56:13
be-
7:5
24:18
47:20
51:12
55:3
63:2
64:1

76:1
100:23
Beck
98:8
before/
after
41:22
beg
17:8
began
97:23
begin
99:3
begin-
81:23
beginning
81:23
begins
25:14
behalf
60:3
78:11
79:6
82:6,7
behav-
50:5
behavior
101:15
bel-
48:3
102:20
believed
34:6
72:18
81:10
101:6
105:20

ben-
15:14
benefit
14:20
ber
53:11
bit
10:4
20:23
61:22
86:25
Black
37:4
black/
white
37:3
blank
10:21
36:24
block
10:23
37:23
blocked
36:18
38:1
40:21,
22
body
47:10
75:2,15
booked
40:19
booking
10:15
born
97:6
104:19,
20

bound
61:17
branching
39:14
Bravo
16:10
break
5:21
6:1
94:3
breaking
13:12
Brian
29:8
30:2,5,
13
32:14
38:6
40:17,
23
bring
81:3
bring-
80:11
bringing
78:11
79:6
brough
100:25
brought
41:11
50:9
60:2
80:15
Bucks
7:9,18
38:25
47:1

53:9
70:9
71:24
82:7
86:2
102:13,
16
Bueller
98:9
build-
91:25
bullet
103:23
bullying
29:22
30:1
35:21
42:22
47:17,
25
48:21
49:20
51:1,9
96:15
97:23
98:12
99:1
100:8
101:15
bunch
34:10
75:9
BURNS
16:2
25:11
38:16
43:1
68:8
85:16,
19,21

———————
C
Cadet
21:10
call
21:7,8
22:15,
16
29:11
30:2,5
32:7
36:2,
10,13
40:17,
19,23
41:7
47:13
48:6,10
66:19
79:24
96:17,
19
100:22
called
4:7
29:8
31:1,2,
3,18
32:10
36:8
37:11,
19,21
40:18,
25
41:24
43:9,22
45:4,10
47:21
57:12
61:20
100:25

calling
50:24
51:8,19
calls
35:11,
13 69:9
cameras
26:15
Capt
97:17
captain
73:2
carceration
69:13
care
38:2
career
12:13
carry
12:21
case
15:20
46:13
60:8,9,
10,15
62:18
78:11
79:6
91:15,
18
92:13,
19
cases
76:15,
25
catch
13:11
32:1

62:22
caught
13:22
63:4
caused
46:25
78:14
79:8
81:1
ceive
14:18
ceived
96:15
cell
34:18
44:2
57:16,
19
59:23
72:20
73:9
81:7
102:22
cellphone
31:1,6,
7,16
34:5,9
35:4,18
cer
17:24
cers
43:15
certi-
95:13
certificate
23:17
94:17,

21
95:19
certification
94:23
95:7
96:3
certified
100:24
cess
34:19
cessed
62:5
chain
29:3
104:16
105:6
change
61:23
80:1,2
changed
41:13
changing
42:19
char-
17:17
charge
39:24
65:19
66:3
67:7
84:13
85:3
94:23
charged
77:10
84:3,7,
9,24

85:6
92:18
93:4

charges
22:8
54:12
76:15,
24 77:2

Charlie
22:6

chart
39:1

check
19:2
88:15,
17,20

choice
101:5

choices
101:9

CHRIA
82:25
83:4,5,
12,23
84:15,
20,22,
23
85:2,4
92:21
93:1,21

chronic
42:13

cies
85:8

circumst
ances
14:6
74:5

CJIS
95:13,
16

claimed
100:14

CLEAN
22:21,
24
23:11,
17 24:3
94:17,
21
95:5,
20,23,
24,25
96:1,2,
8

clear
46:20
102:2

clerk
22:17

client's
75:18

clock
36:11

close
54:13
57:16
77:23

closely
55:25

COB0283
70:2

COB0286
70:2

COB0287
38:23

COB0288
53:22

COB0306
86:4

COB0416
55:16

COB0425
20:17

COB0427
20:17

COB0611
65:12

COB0614
65:12

COB07
17:8

COB0725
17:9

COB0726
17:9

COB0727
16:8
17:8

COB0728
16:8

COB093
81:24

COB1085
25:14

COB1088
25:15

COB2785
27:19

COB424
55:16

code
53:7,8

56:5
69:24
70:3
86:21
87:13
103:13,
19
106:16

coincide
ntal
51:2

colleagu
es
49:10

color
97:6
104:18

com-
10:11

command
29:3
105:7

comment
101:3

commitme
nt
11:5

commitme
nts
10:7,18

committe
d
58:4,19
59:15
89:25

committi
ng
83:21

comply-
99:7
101:19

company
34:12
53:4

compelle
d
101:4

complain
97:1

complain
ed
29:16
97:10,
12
98:5,20
100:8,
11
101:15
102:4
104:24

complain
t
24:18,
21 99:2

complain
ts
44:21
96:21
97:16,
22
101:18,
24

complete
14:7
50:11
95:15

complete
ly
70:5

completi
on
94:17

complian
ce
14:19

computat
ion
10:9

computer
19:10
34:24
87:18

con-
62:12
87:19
99:23

concern
46:25

conclusi
on
50:13

conditio
n
6:10

conduct
14:15
53:7,8,
15 56:4
72:11,
22
86:21
87:13
104:5
105:9,
12,17

conducted
24:12

confi-
53:3

confiden-
56:25
62:1

confident
12:20
56:25
92:17

confidential
16:25
53:11
56:18
58:20
60:20
62:7
86:9,15
87:20
92:6,14
93:17

confidentiali-
15:21

confidentiality
82:2,
16,23
87:9,17

confinement
7:9,18
9:11
11:21

15:11
47:1
71:25
82:8
86:2

confused
49:18,
25 50:1

confusion
49:22

considered
20:25

consistent
97:8,9

constable
11:4

constitutes
52:23

contact
33:14,
19
34:15
35:16,
17
47:24

contacted
46:23
92:8
93:13

contacts
34:5

contained
19:1

contemplates
66:24

Contino
73:5
97:18

continue
23:21
99:15
100:17

continuing
29:20
41:3

contra-
63:8

contraband
62:11,
17,19
63:4,
12,16,
19,25
64:6
72:1
77:5
79:9
81:3
88:14
104:3
105:18

control
11:7

conver
102:6

conversa-
46:8

conversation
46:11
102:7,
11

conversations
102:8

COO
29:4

copy
103:2

cor-
7:11

Corbin
60:1,8

core
71:10
103:22

corners
13:1

corr-
40:6
44:24
92:9

correct
10:25
12:1,2,
11
15:13
23:19,
23
24:19
25:4
28:18,
23

29:6,24
31:3,22
32:21
39:7,22
41:8,25
42:3,23
43:23
45:8
47:18
48:2,4
50:6
55:19
57:4,5,
7,8,13,
14,19,
20
58:2,6,
7,10,11
59:4,6,
13,17
60:18
61:13
62:21,
23 63:1
65:2,16
66:9,
12,23
67:3
70:13
71:15
72:20
73:12,
19
74:16,
19
75:19
76:1
77:5
78:9,
12,15
79:3
81:12

82:21
83:10,
14,15,
18,19,
23 85:8
87:14
89:4,18
92:23
93:18,
21
95:5,21
96:24
98:23
101:6
102:22
105:10,
25
106:14,
17

correctional
15:9
39:7

corrections
38:25
40:14
53:10
70:9

corrections'
103:18

correctly
19:22

correlation
76:10,
11

corroborate
100:1

COS
12:7,8
13:8
59:3

could've
45:10,11
89:11

counsel
4:1
14:7
73:18,22
74:6,18

counseling
14:10
73:21

county
7:9,18
26:8
30:9
34:21
38:25
45:16
47:1
53:5,6,9 60:2
70:9
71:24
80:8,12
82:7
86:2,9,11,21
87:14,19
89:9,10

97:23
102:13,16

couple
6:18
15:17
50:18

court
5:5,13
10:8,13,16
60:23
61:1

courts
22:17

cover
95:7

coworkers
49:10

Coyne
73:6
97:20

cre-
100:3

creat-
24:21

created
25:25
50:3

cri-
84:3

crime
58:4,19,24
77:15
83:22
84:3,7,8,9,13,

17,24

criminal
19:5
76:15,24 77:2
82:25
84:1,23
95:3

critical
101:9

crucial
101:10

cue
6:24

cur-
83:5

cut
13:1
16:17

cy
73:9

———————
D

D-1
16:7,12

D-10
94:12,13,16

D-2
17:3,5,13

D-3
20:19

D-4
38:4,18

D-5
53:22
54:1

D-6
55:11

D-7
65:7

D-8
69:22
103:11,17

D-9
81:15,19

Dan
24:4,7
30:9
32:13,18 33:6
51:23

dan-
30:6
41:4

dangerous
42:21
101:8

databases
18:17

date
27:19
42:3,6

dates
28:6,11
65:9,16,20
66:7,15,25
67:19,23
68:21,

24
69:7,13
103:9

day
11:7
27:5
36:19
38:1
43:9
50:11,25
100:20
104:2

days
7:10

days'
50:18

de-
68:12
75:9

dead
75:5
76:2

death
44:18
75:18
78:14
79:8
80:24
93:11
101:12

decide
30:2
73:25

decided
15:6

decision
15:6
26:14

101:6,8

deemed
100:3

defendant
43:21

Defense
53:21

Delta-10
94:5

Delta-3
20:15

Delta-5
55:8

Delta-6
55:10
65:5

Delta-7
65:6
69:18

denial
100:4

denied
99:18

dent
39:7
52:23

dential
53:4

Dep
97:17,19,20

dep-
9:22
43:7
56:7
96:22

| | | | | | |
|---|---|---|---|---|---|
| depart-<br>17:19 | describes<br>64:10 | determined<br>99:5 | dis-<br>77:22 | discuss<br>46:13<br>76:15<br>77:1 | 36:17<br>41:11,<br>15<br>42:12 |
| department<br>8:14<br>9:19<br>10:6,11<br>29:19,<br>21<br>38:25<br>47:16<br>53:10,<br>13<br>56:5,20<br>66:14<br>69:23<br>70:2,9<br>103:12,<br>18 | describing<br>58:18<br>description<br>76:19<br>designated<br>82:6,11<br>desk<br>35:18<br>detailed<br>54:13,<br>18,22<br>61:8<br>76:23 | dible<br>100:4<br>died<br>48:3<br>dies<br>75:21<br>difference<br>19:8<br>101:11<br>Dir<br>24:3,5<br>97:20,<br>21 | disagree<br>62:24,<br>25<br>83:24<br>discharges<br>10:7,12<br>disci-<br>52:15<br>disciplin-<br>56:14<br>disciplinary<br>15:8<br>52:14<br>55:16 | discussed<br>96:16<br>discussing<br>76:24<br>discussion<br>16:5<br>25:10<br>27:15<br>68:10<br>85:11<br>disseminated<br>83:23 | 48:19<br>65:22<br>67:4<br>68:1<br>80:16<br>96:22<br>102:13<br>doc-<br>55:21<br>docu-<br>55:25<br>65:12<br>89:2,13<br>92:2 |
| departments<br>35:19<br>depending<br>73:17<br>74:5<br>depends<br>13:14<br>57:2 | details<br>56:23<br>60:24<br>61:24,<br>25<br>62:4,10<br>88:12<br>92:5<br>102:13 | direct<br>96:20<br>directed<br>68:17<br>99:21<br>103:21<br>directives<br>17:20 | discipline<br>14:17<br>28:22<br>55:12<br>56:9<br>73:11,<br>23<br>74:3,14<br>96:14,<br>16 | distinction<br>95:22<br>ditions<br>94:5<br>divulge<br>42:8<br>85:2<br>102:12 | document<br>14:8<br>16:8,<br>13,19<br>17:10,<br>14<br>20:14<br>25:3,19<br>26:5, |
| deposition<br>4:17<br>6:15,19 | detectives<br>89:9,10 | director<br>30:10<br>39:6<br>82:11,<br>18 | disclose<br>102:16,<br>24<br>103:5,8 | divulged<br>59:14 | 12,18,<br>19,24<br>27:1<br>52:11<br>55:15,<br>18 |
| deputy<br>39:6,9<br>73:2 | determination<br>15:2<br>determine<br>56:8 | dirty<br>44:2<br>57:16,<br>19<br>72:20<br>73:9<br>81:7<br>102:22 | disclosed<br>46:17<br>disco-<br>43:8 | divulging<br>53:11<br>56:18,<br>23<br>58:15<br>DOC<br>29:16 | 65:11<br>67:14<br>70:4<br>71:10<br>81:24<br>documents |
| describe<br>64:22 | | | | | |

6:18
52:5
60:14
87:19
88:25
89:23
90:3,4,
6,16
91:4
102:18

**door**
44:8
57:16
59:21,
25
72:20

**dot**
74:21

**double**
36:17
37:23,
25
40:19,
21,22

**doubt**
42:2
101:9

**draw**
20:23
22:5
67:13
81:16

**drawing**
10:20
36:24

**drive**
90:11,
20 91:2

**drives**
90:12,

25

**drugs**
58:2
75:11
81:8

**duly**
4:8

**duties**
12:21
13:2
16:20
18:2,4,
7

**duty**
17:24
36:3,9
37:12
43:24

**dying**
43:5
47:10

———————

**E**
E-I-G
38:16

E-I-G-E-
R
38:17

**eant's**
99:21

**eants**
98:5

**earlier**
28:10
70:15
73:14
91:6
92:20

**ebbed**
10:2

**Echo**
82:1

**ect**
40:7
44:25
92:10

**education**
81:20,
23

**effect**
79:25
80:1

**efit**
15:15

**eggshells**
26:11

**eign**
104:19

**Elimination**
14:22

**email**
34:19,
21
37:25
73:1,7

**emailed**
24:5
36:14,
16
37:13,
14

**emails**
35:8
51:18

**embarrassing**
49:2

**emergency**
43:7,8
101:5

**emp-**
86:11
87:13,
17

**emplo-**
53:5

**employed**
7:8
69:2

**employee**
14:17
37:7
53:15
55:12,
16

**employees**
15:14
78:2
97:6,9

**employment**
25:3

**end**
99:4
101:7

**enforcement**
83:13,
17

**ensure**
16:25

82:15

**entered**
52:8
85:13

**entire**
81:15
85:21

**entitled**
17:10
38:23

**environment**
24:22
25:25
41:5
50:3
99:2

**eral**
42:14

**ers**
10:10

**ervisor**
17:11

**essentially**
14:23
36:11
42:16

**established**
53:7
78:23
86:21

**estate**
30:20
60:3
75:1
76:5
78:12

79:7,22

**ethics**
56:5
69:24
70:3
71:11
103:13,
19

**eve-**
89:25

**evening**
31:3

**evidence**
51:15

**ex-**
11:20
58:3
61:22

**exact**
50:25

**examination**
4:10
96:11
103:16
104:12

**examined**
4:8

**exception**
76:18

**exchange**
61:19

**excuse**
11:10
13:12
24:7
38:10
80:5

86:11
101:1
106:5
**exhaustive**
56:7
**exhi-**
86:24
**Exhibit**
16:12
17:13
20:19
38:18
53:22
54:1
55:11
65:7
69:22
81:19
94:16
**exist**
60:25
**existence**
45:8
**experienced**
12:4
**experiencing**
6:10
**explain**
77:3
**explicitly**
40:1
**exploit**
71:24

**exploited**
71:18
77:4
**expressed**
101:3
**extent**
103:3
**extra**
18:12

**F**

**Fabian**
106:10
**Fabiani**
106:10
**facility**
7:9,19
9:11
11:21
15:11
21:1,6
39:7
46:25
47:1
64:14
72:13
79:9
81:3
82:8
88:15
**facility's**
12:15
71:25
86:3
**fact**
25:4

27:2,9,
18,25
28:17
29:25
41:19
48:9
49:4
51:1,7
59:8
63:7
**factor**
35:1
**factors**
81:4,5
**facts**
44:11
92:19
**fail-**
13:22
**failed**
57:16
72:19
**failing**
13:19
**failure**
53:6
86:20
**fair**
11:17,
22
14:24
20:9
44:15
48:20,
23
49:16
56:1
**fairly**
16:19

**fall**
84:15
93:21
**fami-**
82:24
**familiar**
55:18,
21
70:4,5,
16,22
71:7
83:3
91:20
**fear**
105:4
**February**
8:1,4
**February/may**
24:13
**federal**
82:2,23
**feedback**
12:12
**feel**
25:15
**felt**
26:10
28:21
30:6
48:18
49:13
**female**
37:2,3
97:11
**Female/male**
37:1

**Fentanyl**
57:22
**fication**
95:14
**fifteen**
15:25
**fight**
29:15
41:1,9,
15,22
**figured**
34:3
**filed**
43:9
**files**
19:23
20:8,10
87:19
89:18
**filing**
4:3
90:18
**fill**
18:11
**fin-**
5:24
**Finally**
48:15
**find**
14:4
88:20
89:20
**finding**
25:4
27:2,9,
18,25
28:17
29:25
41:19

48:9
49:4
51:1,7
**fine**
5:19,23
**fingerprint**
19:11,
13
**fingerprints**
19:19
**firmed**
99:24
**fix**
24:4
**flip**
28:25
56:12
76:12
**flowed**
10:2
**follow**
12:18
39:5
**follow-**
52:18
**for-**
104:18
**forbidden**
83:22
**force**
100:21
**fore**
7:6
47:21
55:4

63:3

**foreign**

97:6

104:18,
20

**forgot**

13:25

**form**

4:4 5:1

27:3

31:17

52:14,
16

56:15,
17

67:22

70:23,
24

71:1,2

72:3

77:6

79:12

80:19

84:18

87:23

**formation**

78:20

83:21

87:22

103:6

**fortunately**

62:22

**forty**

21:4,5,
17,24

22:3

**forty-**

87:8

**found**

14:2

25:24

49:19

60:23

**founded**

24:24,
25 25:1

26:3,4,
6 49:20

**four-page**

65:12

**Fourteen**

16:1

**fourth**

72:9

**frequent**

97:8,18

**frequently**

104:21

**friends**

32:14,
15

**front**

57:7,13

65:4

94:9

**frustrated**

49:17

**fuck**

99:18,
25

100:2

**fucking**

99:17

101:1,2

**ful**

79:9

**fulfilled**

39:11

40:9

**full**

4:12

54:6

_____

**G**

**gained**

87:17

**gathering**

51:12

**gation**

29:23

51:2

**gative**

99:1

**gave**

86:15

105:14

**geants**

99:23

**general**

62:9

84:20

100:4

105:14

**generally**

11:16

18:25

23:10

51:17

**ger**

12:6

42:3

46:12

**gerous**

30:7

41:5

**gers**

22:3

**ges**

17:18

**give**

6:11

11:5,7,
8 13:15

16:15

66:14

67:23

69:7

82:20

84:12,
16 85:2

94:1

102:18

103:2

**giving**

5:7

29:4

53:3

86:9

**glance**

81:15

**gle**

63:19

**gled**

63:12,
16

**good**

15:21

49:13

54:9

**gosh**

36:24

**graph**

16:24

72:10

**Grieser**

4:11,23

5:3

15:24

16:3,6,
14

17:16

20:21

24:10

25:2,6,
8,12

27:4,8,
14,16

30:9

31:20

32:13,
18 33:6

38:7,9,
11,14,
17,20

42:24

43:2,3

51:23

52:3,6

54:3,25

55:5,7,
10,14

65:1,4,
10

68:11

69:20,
25 72:8

77:9

79:16

80:22

81:21

84:21

85:10,
12,20,
22,25

87:5,7

88:1

94:1,4,
8,13,
15,18

96:9

98:12,
15

103:12,
17

104:10,
13

106:7,9

**grossly**

43:12

**ground**

4:19

52:24

**group**

76:17

77:20

**guess**

4:23

5:18

15:4

**guideline**

54:5

**guidelines**

53:23

54:2,5

82:2,24

**guilty**

78:17

guys
  61:19

**H**
half
  51:13
hall
  11:1
  18:11
hand
  6:20,21
  17:3,6
  26:22
  27:17
  28:24
  64:25
  69:17
  86:23
handbook
  64:19,
  21
handing
  16:7
  25:13
  52:7
handled
  10:15
hap-
  58:25
  105:14
happen
  12:7
  28:1
  45:3
  64:23
happened
  13:5
  14:5,9
  26:16

32:1
38:2
48:14
59:1,10
74:11
happening
  36:21
  42:17
  45:6
  64:3
happy
  48:22,
  24
hard
  33:23
havior
  24:19
head
  5:11
  23:15
hear
  14:16
  62:17
hear-
  27:25
  29:25
heard
  49:24
  50:9
hearing
  7:24,25
  14:11,
  14  20:5
  27:2,10
  39:14
  41:20
  55:24

hearings
  14:15
heat
  101:5
held
  90:2
high
  12:23
  36:18
  37:23
  40:22
history
  19:5
  82:25
  84:2,4,
  23
  92:21
  95:3
hold
  12:23
  26:20
  83:10
  85:16
home
  31:5,9,
  11,24
  34:24
hoping
  45:3,5
hostile
  24:22
  25:25
  50:3
  99:1
hours
  21:5,
  17,24
  22:3
  35:16,

18
  36:12
housed
  10:19
how-to
  63:18
  64:5
HR
  24:12
  28:3,21
  29:3,21
  42:20
  44:24
  45:13
  47:24
  48:19
  49:20
  80:9
  85:7,21
  101:18
HR's
  45:8
  101:19
human
  29:19
  30:10
  53:2,7
  86:2,3
  96:22
hurt
  47:11
hypothetical
  13:17

**I**
icer
  18:18

icy
  54:5
idea
  34:2
  49:13
identification
  16:13
  17:14
  20:20
  38:19
  54:2
  55:12
  65:8
  69:23
  81:20
  94:17
ieve
  48:4
ieved
  102:21
igation
  49:21
ility
  12:21
illus-
  56:3
imagine
  43:16
  44:12,
  17  49:9
  55:24
  91:23
important
  54:18
  70:19
  91:5

in-
  35:21
  58:19
  63:14
  69:12
  74:21
  76:16
  78:5,19
  79:2
  83:20
  87:21
  91:17
  92:13,
  22
  103:5
inappropriate
  97:10
  98:1,21
  100:14
  104:24
inaudible
  42:25
incarcerated
  65:24
  67:6
  68:3
incarceration
  65:9,
  16,20
  66:8,
  15,25
  67:19,
  23
  68:21,
  23  69:7
  103:9

Ara Kimbrough
02/18/2025

13

incident
42:18
44:12,
14 90:8
99:7
100:21
102:9
include
83:9
including
54:14
57:22
87:18
99:23
incoming
56:24
63:10
incorrect
30:17
72:24
indepen-
52:22
independ
ently
52:21
indi-
101:14
indica-
100:10
indicating
32:20
indication
28:20
individ-
68:2

individu-
53:4
individu
al
14:4
60:2
65:23
67:5,9
68:22
69:13
83:21
individu
als
62:23
75:25
86:10
100:7
102:3
individu
als/
inmates
63:8
infor-
82:25
86:18
inform
62:12
informa-
18:25
19:11
67:8
76:22
83:9,16
84:12,
23 86:9
informat
ion
7:1

16:25
18:14,
16
19:4,10
20:5
47:6
53:4,11
56:18,
25
58:16,
21
59:18
60:22
61:8
62:6
75:10
76:16,
23
77:18,
23 78:4
79:2
81:20,
23
82:9,20
83:6,12
84:2,16
85:3
86:14
87:17,
20
89:13
93:18
informed
28:17
infraction
73:17
ing
13:23
17:1
24:22

28:1
30:1
48:10
52:19
61:22
80:12
92:1
99:9
102:22
ingested
75:12
inmate
15:3
19:18
29:15
30:20
41:9,16
44:18
57:18
58:7
59:1,6
60:3
62:10
63:11,
15
64:18
66:15,
17
74:22
75:21,
22
76:8,16
77:18,
23
78:12,
15
79:7,8
80:24
81:2
90:7

inmate's
56:24
inmates
10:23
14:16
17:1
53:14
56:20
58:16
62:1,4,
16,19
64:13
74:23
75:2
76:9
78:2,3
79:2,
11,15,
20,23
89:25
95:2
instance
36:14
institu-
53:13
instituti
i-
81:10
institut
io-
14:15
72:11
institut
ion
56:20
58:13,
17
institut
ional
71:14,

19 72:2
78:3
104:1,6
105:9
intake
10:17
12:3
13:25
18:10
43:12,
22
58:18
61:25
63:4
64:6,
10,17,
20
71:18,
25
78:24
80:17,
18 88:8
90:4
102:13
inter-
8:10
9:8
100:18
internet
23:4
interven
ing
48:11
intervie
w
9:16
30:8
32:13
99:8

interviewed
29:22
interviewing
50:8
interviews
99:19
invented
63:25
64:1
inves-
24:3
invest-
49:20
investi-
29:22
51:1
98:25
investiga-
93:7
investigating
97:23
investigation
24:12,
17,25
25:3
30:1
36:15
41:13
42:22
44:17,
18 45:7
46:6
47:17,

25
48:21
49:4,13
50:12
51:9,20
89:3
91:15
92:6,9
93:20
96:15
101:19
103:6
investigations
20:2
89:6
investigative
28:25
89:18
98:10,
12
investigator
94:22
investigatory
92:16
invol
79:7
involved
74:22
75:2,
15,24
76:3,8,
9
80:18,
23
89:1,11

ion
64:7
ior
50:6
ish
5:25
isolation
10:19
issue
24:1
36:13
41:3
51:4
issued
54:6
95:25
issues
64:17
97:12
104:16
105:2,5
items
90:23
itized
51:8
ized
15:12

___

**J**

jail
89:7
96:23
104:2
January
71:2,3
JNET
18:19,

20 19:9
23:1
24:2
95:5,
21,24,
25 96:4
job
76:19
87:22
jobs
40:3
John
66:20
Joshua
48:3
judge
14:23,
25
69:9,10
judges
35:18
judgment
100:22
July
48:4
74:11
June
28:1
Jurge-
99:5,21
Jurgele-
100:2
Jurgelewicz
98:8,22
100:7
102:2

justified
15:7

___

**K**

K-I-M-B-R-O-U-G-H
4:16
Kim-
100:24
Kimbrough
4:7,14
96:14
99:8,
16,24
100:19
Kimbrough's
99:20
100:1,4
kind
10:19
18:25
23:3
39:13
49:2
64:18
kitchen
40:14
knew
32:16,
21
45:7,22
51:6
62:10
knowing
33:6

knowledge
17:18
39:11
54:13,
19,22
68:13
Kratz
24:3,5
73:6
97:21

___

**L**

label
81:14
lack
35:21
lagging
69:21
laint
99:8
laints
101:20
lating
93:24
lation
84:25
lationships
104:25
laundry
97:12
105:2
Lauren
30:10,
15
32:13,
17,20

33:5
51:23
**law**
4:8
29:19,
21
83:13
93:24
96:22
**lawsuit**
80:7,
14,17,
23
**leadership**
28:21
**leaning**
29:4
**learn**
88:12
96:16
**learned**
87:21
**lease**
68:21
**leave**
46:9
**leaves**
106:19
**leaving**
41:4
43:24
73:9
**left**
32:3,4,
6 39:9,
18
40:10
59:21

106:23
**legal**
28:4
42:20
44:24
45:20
48:19
80:9
**legally**
90:2
**les**
106:6
**letter**
52:1
**letting**
48:13,
14
**level**
56:9
**lewicz**
99:6,22
**liaison**
24:2
**liar**
82:25
**lie**
32:25
33:1
**lie-**
9:18
**lieu-**
39:21
**lieuten-**
8:9
26:1
**lieutenant**
8:2,3,

8,16
10:5
37:20
39:17
40:5,10
42:12
**lieutenants**
39:18
40:2,13
89:15,
22
95:14
**life**
75:15
76:4
101:11
**light**
80:15
**limited**
87:18
**limits**
50:18
**lines**
73:18
**lis-**
50:6
**list**
56:7
103:22
**listed**
52:20,
22
53:18
56:14
103:24
**listen**
46:14

**listened**
61:23
80:10
**listening**
51:4
**live**
50:15
**lives**
74:23
75:2,24
76:9
**lock**
72:19
**locked**
44:1
**locking**
44:8
**login**
95:23
96:1,2
**lon-**
12:5
**long**
7:8
31:23
37:6
66:13
**looked**
30:25
**lost**
101:10
**lot**
8:13
12:12
50:19
83:6
**loud**

5:12
**lowed**
82:19
**loyee**
87:18
**loyees**
86:12
87:14
**Lt**
8:17
40:11
99:8,
16,19,
24
100:1,
4,19,24
**lunch**
57:19,
21
**ly**
10:20
102:4

---

**M**
**made**
9:5,7
24:18
96:21
97:16
100:22
101:6
**mail**
66:11
**main**
11:7
**maintain**
71:13,
14
78:19

87:16
**maintained**
104:2
**maintenance**
54:9
**majority**
60:14
62:23
100:3
**make**
8:3
14:7
15:2
34:4
35:11
42:3
70:16
88:15,
18
89:24
97:22
98:19
101:5,
11
**maker**
101:8
**makes**
19:15
**making**
15:6
26:14
101:23,
24
**mana-**
22:2
**manage**
22:3

manage-
21:17
22:3
management
20:1
21:20,
21,24
manager
14:19
managerial
21:1
managing
22:3
Mansour
4:24,25
6:23
7:1
15:21
16:1
25:5,7
27:3,6,
12
31:17
38:12
52:2
55:3,6,
9 69:19
72:3
77:6
79:12
80:19
84:18
85:14,
18,24
87:2,23
94:12
96:12
98:10,

14,16,
18
100:5
103:11,
14,15
104:9,
14
manual
54:6,9
mark
6:20
16:2
17:5
20:15
42:24
53:21
55:7
64:25
65:6
94:5
marked
16:12
17:13
20:19
25:3,14
26:21
38:3,18
43:6
52:1
54:1
55:3,11
65:7
69:17,
22
72:10
81:19
94:16
match
19:19
mate

58:20
76:17
Matellus
73:6
materials
20:11
28:8
90:15
91:9,10
92:17
mates
79:3
math
9:23
mation
83:1
86:19
me'
99:17
means
37:8
43:16
44:13
52:22
meant
47:11
meat
7:6
media
17:1
medication
6:8
meet-
48:9
meeting
27:18

28:17
30:16
51:1,7
member
47:16
members
76:14
97:11
memos
90:7
91:4
ment
21:18
22:4
56:1
65:13
mental
17:20
mention
59:21
74:2
mentioned
44:11
59:2,9
88:2
mentor
11:18
mentorship
29:5
ments
89:3,14
92:3
message
32:3,4,
6
Metellus
97:18

methampheta-
57:22
minal
84:4
mines
57:23
minutes
31:25
misconduct
56:24
misconducts
14:16
15:3
mission
69:23
70:3,6
103:12,
18
mitments
10:12
Mm-hmm
12:9
33:16,
20
35:23
39:2,20
61:6
66:4
67:1,15
68:14
75:13
82:13
93:14
94:24
module
10:18

modules
37:24
moments
101:9
Monday
101:7
money
10:16
month
47:22
months
50:7
59:12
morning
101:7
moted
8:2
motion
15:20
42:24
43:7,8
60:14,
17
move
24:12
36:2,8,
10
movement
10:8,13
movements
10:16
multiple
99:22
Murphy
99:23

**N**

nal
 14:16
 39:1
 72:12
named
 83:21
 102:4
names
 36:23
narcotics
 57:22
national
 18:16
nature
 53:12
 56:19
 57:1
 62:7
Navy
 7:15
NCIC
 18:19
 19:6,
 10,14,
 15,20
 22:22,
 23,24
 23:1,22
 95:3,21
 96:7
necessarily
 73:13
 89:19

necessity
 47:19
nesses
 100:1
newer
 97:5,9
newspaper
 58:25
 59:20
 60:23,
 25 61:7
nine-
page
 55:15
ninety
 10:22
ning
 81:24
nod
 5:11
non-
german
 38:15
non-law
 83:17
notes
 30:15
 32:20
notice
 13:16
 25:5
 27:18
 48:9
notification
 41:19

notified
 29:25
 50:25
Nottingham
 73:4,5
 97:17
Num-
 53:10
number
 14:12
 16:23
 30:24
 31:16
 33:6
 34:3,4,
 6,7,8
 53:6,14
 57:21
 86:9,21
 87:11
 96:21
 99:25
numbers
 34:10
nurse
 11:10
nurse's
 10:24

**O**

O-N-I-S-
I-C-K
 24:9
object
 6:24
Objection
 27:3

31:17
 72:3
 77:6
 79:12
 80:19
 84:18
 87:23
objections
 4:4,25
occa-
 34:16
occasion
 91:24
occur
 13:6
 28:18
occurred
 28:1
 99:20
 100:21
Ofcr
 42:10
 44:1
 57:6
 102:21
off-
 18:17
offender
 10:9
 19:25
 65:8,15
offense
 59:15
offenses
 53:10
 55:2,
 13,17
 56:6

offi-
 17:23
 43:14
office
 7:22,23
 10:24
 11:1,6
 31:2,19
 32:2
 45:23
 46:3,5
 47:14
 65:19
 66:19
 68:18
 99:21
 100:25
officer
 7:12,
 20,24,
 25
 8:20,
 23,24
 14:12,
 14
 16:9,
 13,20,
 24 20:5
 29:14
 36:14,
 16
 37:25
 39:14
 41:10
 43:24
 55:24
 65:18
 91:23
 106:12

officer's
 18:2
officers
 10:1
 11:21,
 25 15:9
 18:8,9
 29:14
 40:14
 47:10
 100:22
OMS
 19:25
on-
 91:14
onal
 81:11
ond
 26:21
 36:19
 98:25
ongoing
 48:12
 89:3
 91:17
 92:5,9,
 12 93:7
Onisick
 24:4,9
 94:22
online
 30:23
open
 59:25
Operating
 53:23

operations
40:13
53:12
56:19
72:12

opin-
64:6

opinion
61:24

ord-
10:9

order
15:19, 20
23:21
35:2
46:13, 18
60:10, 12
61:11, 17,25
62:5

orders
17:19
36:17

organizatio-
38:25

organization
38:19, 24
76:17

organizations
53:5
86:10

orientation
21:5

orized
76:19
86:11

osition
43:8

Osnick
24:8

other's
40:3

outbursts
99:20

outcome
72:5

outlines
83:12, 16

outlining
71:17

outstanding
15:19

oversaw
10:10, 17

overview
105:14

_____

P

P-1
52:2,3, 8

P-10
27:17

P-2
52:1

P-4
40:17
43:1,4, 5,7

P-6
85:19, 20,21
86:1
94:11, 12

P-7
25:14
26:20
28:24
98:11, 15,16, 25

P-8
26:22
85:18
98:11

p.m.
31:21

paperwork
11:6

para-
16:23
72:9

paragraph
17:17, 22
20:24
21:16
22:6
54:12

68:1
76:14
78:1
81:17
82:1
99:3

paralegal
17:4

pardon
17:8

parole
69:6

part
8:16,17
11:19
31:12
76:5,19
77:17
83:13
86:8,24
87:22
89:3

partially
85:7

parties
4:2
83:7
97:1

party
71:23
78:9

passed
75:12

past
63:3
65:8, 15,20

66:8, 14,25
67:19, 23
68:21, 23
69:12
92:23
93:20
103:8

Pat
75:11

Pat-
75:11

Patel
98:8
100:10, 13,18, 21
101:1, 3,14
102:3

Patil-
106:5

Patterson
30:21
48:3
60:1,3, 6,9
75:5
76:2,6
79:7
80:24
84:10
90:7

Patterson's
44:18
75:1

93:10

peals
15:5

pedigree
19:4

pen
43:5

pened
105:15

pening
59:1

peo-
97:12

people
11:18, 23 12:5
24:2
36:8
37:23
41:16
48:16, 23
50:8,19
68:24
69:6
80:15
97:6
104:18

perceived
42:21

percent
68:18

perfe
54:19

perfectly
5:19

perform
  23:5
perienced
  11:21
period
  10:19,
  21
  41:21
person
  13:24
  19:17
  40:4
  64:1
  68:25
  79:19
  100:10,
  13
personal
  34:5,9,
  13,14,
  18 35:8
  56:17
  91:2
personally
  66:9
  74:21
  75:24
  76:7,8
personnel
  36:2
pertaining
  8:13
  44:12
phone
  30:24

31:2
33:9,15
34:10,
12,13,
14
35:1,9,
11,13
36:13
37:15
48:6
106:18
physical
  11:1
  95:24
physically
  19:11
pick
  106:18
picked
  33:24
piece
  8:18
plained
  58:4
ple
  97:13
plead
  78:17
plinary
  52:16
point
  37:18
  46:6
  47:11
  48:18
  51:3,6
  74:13

points
  14:18
  103:23
pol-
  54:4
poli-
  73:8
  85:7
policies
  12:15,
  18
  15:18,
  22
  17:19
  52:19
  54:14,
  19,22
  68:13
  70:17
  85:13
policy
  14:18
  16:9
  44:9
  45:17
  53:3,8,
  24 54:2
  56:10
  66:24
  68:17
  69:2,11
  72:19
  73:16,
  21
  78:3,5,
  20,24
  81:11,
  22
  85:21
  86:3
  93:24

102:21,
24
103:2
105:20
pond
  68:2
ponsibil
ities
  10:5
ponsibil
ity
  73:16
por-
  86:25
portion
  86:1,4
posed
  5:24
position
  9:10
  11:19
  40:1,5,
  10
  80:1,13
positive
  12:12
post
  17:19
  36:18
  39:10
posted
  29:14
posts
  97:7
  104:21
potentia
l
  84:13,

17 85:3
potentia
lly
  47:10
  92:7
  101:9
pre
  25:13
PREA
  14:19,
  21
prepared
  17:23
  18:1
  56:6
present
  88:7
press
  82:12,
  19
prevent
  64:2
previous
  43:7
previous
ly
  26:21
  29:16
  33:7
  39:15
  42:11
  52:7
printouts
  87:19
prior
  19:20
  45:7
  46:23

47:24
prior-
  51:7
prison
  14:22
  82:18
  104:3,7
prisoner
  82:9,21
priva
  104:6
privilege
  5:1
privileged
  7:1
pro-
  8:1
  14:6
  62:4
probab-
  10:19
probation
  69:6
probationary
  37:7,8
problem
  42:13
proced-
  102:13
procedures
  12:16,
  18
  17:19

52:19
53:23
54:14,
19,23
58:9,
12,18
64:17
78:6,24
80:18
88:16,
18,21,
24 97:8
**process**
10:15
14:2,3
63:5
64:11,
14
66:18
**processed**
62:5
**processes**
64:6
**produce**
49:5
50:15
**produced**
49:23
**professional**
72:12
**professionalism**
12:24
71:11
**program**
29:5

66:3
67:7
**promote**
8:23
**promoted**
7:21,23
40:1
**prompts**
101:8
**pronounces**
38:15
**proper**
88:16,
18,20,
24
**properly**
72:6
89:25
**property**
10:15
**protective**
15:19,
20
46:13,
17
60:10,
12
61:11,
17
**provide**
22:9
78:2
79:1
82:8
**providing**
76:22

**public**
17:1
59:18
62:9
71:10
81:20,
23
**publish**
64:11,
17,18,
20
**pull**
92:2
100:22
**pulled**
41:4
42:11
81:6,10
106:13
**pulling**
29:17
41:16
80:2
**punishment's**
15:5
**pursue**
74:1
**put**
9:19
19:14
57:21
73:1
74:8
**putting**
19:10

---

**Q**

**qualify**
56:25
**quarantine**
10:21
**quarterbacking**
101:7
**ques-**
5:16
**quest**
67:19
**question**
5:24,25
6:5,6,
25 7:2,
3 26:13
27:6
38:5
64:15
**questions**
4:4 7:5
96:13
103:17
104:9
**quick**
81:15
94:4
**quote**
44:2
100:2
101:1

---

**R**

**range**

8:13
**ranks**
7:18
**Rape**
14:22
**rately**
16:20
**re-**
5:1
14:17
47:8
59:23
67:18
68:20
84:24
96:14
104:24
**reaction**
49:21
**read**
16:11
17:7
25:21
86:24,
25
101:13
**reading**
4:2
76:7
99:3
100:17
**ready**
25:17
81:18
**realize**
29:3
**reason**
42:2

**reasoning**
14:5
**recall**
23:13
24:15
27:22
28:3,7,
12,13
30:8,
12,14,
18
32:9,
12,17,
19
33:2,3,
4 35:5
37:5
41:23
46:14,
16
51:17
68:12
97:15,
25 98:4
106:11
**received**
12:12
**receiving**
96:17
**recently**
44:24
45:20
100:19
**recep-**
58:9
**reception**
10:11

Ara Kimbrough
02/18/2025

21

| | | | | | |
|---|---|---|---|---|---|
| 11:3,4, 13 | recorded | 40:6 | registrations | remainder | 105:19 |
| 17:10, 14,23 | 5:9 | recounted | 10:9 | 5:1 | reported |
| 18:2,10 | records | | regularly | remaining | 36:1,4 |
| 20:8 | 7:22,23 | 59:10 | | | 42:13 |
| 29:14, 18 | 8:14, 15,16, | rectional | 34:14, 16 35:6 | 50:14 | 44:24 72:22 |
| 36:12 | 17,18, | 7:12 | related | remark | 73:22 |
| 39:24 | 20,23, 24,25 | redacted | 20:8 | 100:1 | 97:20 |
| 41:4,16 | 9:2,3, | 43:5 | 85:3 | remedy | 100:18 |
| 43:16, 17 | 4,5,7, 19,22 | Reed | 87:19 | 48:18 | 104:15 |
| 58:12 | 10:1,5, | 73:5 | relates | remember | reporter |
| 88:15 | 10 | 97:19 | 58:7,9, 12 | 23:9 | 5:13 |
| 100:23 | 11:1,25 | refer | relation | 28:6 | 24:7 |
| 106:12 | 12:3 16:9, | 60:6 | 41:18, | 31:10 | 38:5 |
| recognize | 13,20, 24 | referenced | 21 | 33:23 46:19, | 65:3 94:7 |
| 26:24 | 17:10, 14,23 | 96:20 | 84:10, 19 | 20,22 | 99:10, 14 |
| 38:21 | 18:2,8, | 98:1 | relationships | 61:14 | 106:5 |
| 52:11 | 9,17 | 99:7 | 97:10 | 71:5 | reporting |
| 65:13 | 20:8,10 | 102:20 | 98:1,21 | 87:8 | 13:4 |
| recollection | 32:16 | referred | 100:14 | 90:23 | 105:5,7 |
| 28:2 | 34:11 36:12 | 36:15 | release | 93:3 | represented |
| record | 39:24 | referring | 19:2 | reopen | 75:1 |
| 4:13 | 65:18, 19 | 49:21 | 65:8,15 | 43:8 | representing |
| 7:15 | 66:13, | 78:21 | 67:8, 10,11, | repeat | 30:20 |
| 14:20 | 19 | 91:12 | 19 | 63:13 | request |
| 16:3,5 | 76:15, 25 77:2 | reflect | 68:23 | rephrase | 66:11 |
| 25:9, 10,11 | 84:2,23 | 16:20 | 69:5 | 5:17 | 67:22 |
| 27:12, 15 | 91:23, 24 95:3 | reflected | released | report | 68:2 69:12 |
| 52:4,5 | 106:25 | 26:5,19 | 17:1 | 13:16 14:8 | 92:3 |
| 68:8,10 | records/ | reflects | 83:6,13 | 28:25 | requests |
| 82:25 | reception | 17:22 | releasing | 36:5 | 65:23 |
| 85:11 | | reg- | 65:19 | 72:11 | 66:18 |
| 86:4 | | 69:2 | | 73:24 | 67:5,22 |
| 94:2,3 | | regard- | | 90:13 | 91:24 |
| | | 16:25 | | 98:10, 13 99:1 | |
| | | | | 100:3 | |

required
18:3,6
21:23
23:20
71:14
requires
21:16
54:5
res-
10:4
68:1
73:15
reserved
4:5
reserves
56:8
residents
53:14
56:21
resolved
24:6
resource
86:2
resources
29:19
30:10
53:3,8
86:3
96:22
Respect
87:16
respective
4:2
respond
65:22
67:4

69:12
100:23
responding
106:16
responsibilities
82:16
responsibility
40:12
54:8
73:11
74:3
responsible
13:4
54:13
restroom
5:22
result
51:19
resulting
101:10
retaliated
45:12,
14
47:7,12
48:1
retaliation
45:17
105:4
retaliatory
101:20

retrieve
57:19
105:18
retrieves
81:8
return
54:9
review
53:24
54:2
88:25
89:23
reviewed
89:2
90:3
revisions
54:14
Rhoade's
90:4
Rhoades
44:4,14
57:3,18
58:4,20
59:6,8,
16
62:10,
18 63:3
75:6,8,
10,15
76:25
77:3,24
78:15
81:2
84:7
88:7
102:9
103:6
104:2

Rhoades'
79:8
103:8
104:5
105:9,
12
role
9:20
18:12
roll
22:15,
16
Roughly
9:24
rounds
13:20,
23
14:1,8
routinely
43:18
row
36:19
38:1
rules
4:20
13:12
23:11,
14 53:3
run
19:3,14
95:2
running
99:6
100:20
rything
90:1

—————
S
sack
57:19,
21
sample
67:18
say-
99:8
screen
11:11
seal
60:14,
17
sealed
60:22
61:1,3,
5,11
sealing
4:2
search
57:4
searched
44:4
52:5
sec-
26:12
36:18
58:16
98:24
seconds
101:10
secretaries
40:13
Section
17:11
20:17

38:24
53:24
55:17
secur-
102:21
securi-
71:14,
19
security
39:10
53:13
56:20
58:13
72:2,12
95:8,10
104:1,6
105:9
selected
7:20
sen-
59:8
send
11:12
66:8
sense
19:15
sensitive
53:12
56:19
57:1
58:21
62:1,7
64:7
92:6,
14,17
93:17
95:10

| | | | | | |
|---|---|---|---|---|---|
| sentenced | 24:2 | 37:6 | 4,7,10, | 79:9 | special |
| 59:11 | servers | shortcuts | 20,25 | snuck | 89:6 |
| 66:21 | 19:23 | 13:1 | 104:4,8 | 104:2 | specialized |
| sentencing | 90:12 | shortly | situation | sociated | 8:21 |
| 10:9 | services | 47:19, | 30:7 | 79:11 | specific |
| separate | 71:12 | 20 | 42:21 | socks | 8:15,19 |
| 52:24 | sev- | show | 45:5 | 97:13 | 22:4 |
| 95:13, | 42:13 | 15:17 | 47:9 | software | 28:6 |
| 17,18 | sexual | 20:14 | 48:12 | 87:18 | 68:17 |
| separately | 10:8 | 26:21 | situations | solicitor | 82:8,20 |
| 52:21 | Sgt | 38:3 | 45:6 | 47:15 | 83:9,20 |
| ser- | 57:10 | 81:13 | sixteen | solicitor's | 100:20 |
| 71:10 | 98:8,9, | showing | 7:10 | 45:23 | specifical- |
| 99:22 | 22 | 15:18 | slow | 46:3,5 | 102:3 |
| serg- | 99:5, | 38:23 | 99:11 | 47:13, | specifically |
| 98:4 | 21,23 | 86:1 | Smith | 16 | 23:9 |
| 99:20 | 100:2, | shows | 30:10, | some- | 31:10 |
| sergeant | 7,10, | 38:24 | 15 | 47:9 | 59:5 |
| 8:5 | 13,18, | signing | 32:13, | 75:1,14 | 69:5 |
| 9:14,16 | 21,25 | 4:2 | 17,20 | SOP | 76:18 |
| 37:21 | 101:3, | single | 33:5 | 54:5 | 90:24 |
| 57:10 | 14 | 76:18 | 51:23 | 64:10 | 91:9 |
| 99:6,19 | 102:2,3 | 102:11 | 66:20 | SOPS | 97:4,15 |
| sergeant's | shake | sionally | smug- | 15:22 | 98:4 |
| 26:14 | 5:11 | 34:17 | 63:11, | 102:16 | 100:23 |
| 100:25 | shared | sir | 15,18 | sort | specifics |
| sergeants | 78:8 | 96:25 | smuggle | 23:7 | 50:5 |
| 26:1,10 | 88:13 | 97:3,24 | 62:11, | sound | speed |
| 40:13 | Sherman | 98:6 | 12,17, | 44:6 | 20:22 |
| 95:15 | 40:11 | 100:9, | 19 | sounds | spell |
| 97:11 | shift | 12,16 | 63:8,25 | 11:20 | 4:15 |
| 98:2,20 | 11:15 | 101:17, | 64:5 | speak | 38:6 |
| served | 14:8 | 21 | 75:11 | 82:6,7, | spent |
| 5:2 | 99:6 | 102:5, | 77:5 | 11,19 | 50:7 |
| | 100:20 | 10,15, | smuggling | speaking | |
| | short | 17,19, | 71:25 | 32:12 | |
| | 7:10 | 23 | | | |
| | 16:17 | 103:1, | | | |
| | 18:10 | | | | |

spoke
  28:3
  37:21
  49:3
spoken
  6:14
SRT
  100:24
sta-
  37:20
staff
  10:23
  20:17,
  20 21:1
  22:9
  29:18
  39:24
  40:6
  41:4,
  15,16
  43:18
  54:6,12
  64:2,4
  71:14
  76:14,
  18 80:2
  82:5
  97:11
staffed
  72:6
staffing
  44:12
stamped
  16:7
  86:25
stand
  14:21
standard
  12:24

53:23
standard
ized
  14:3
start
  4:20
  7:11
  64:24
  99:13,
  14
started
  9:1
starting
  99:3
state
  4:12
  71:11
  82:2,23
statemen
t
  51:18
states
  16:24
  52:19
  76:14
  78:2
  82:5,15
  87:16
statione
d
  43:15
stay
  12:7
step
  18:11
  29:5
stipula-
  4:23

stipulat
ed
  4:1
stop
  42:17
  45:6
  51:5
stored
  34:12
strate
  7:24
stuff
  46:24
  104:15
stupid
  101:2
submit
  43:6
  50:17,
  21
  51:15
subordin
ate
  13:24
subordin
ates
  22:10
  74:4
  98:2,22
  100:15
subsequent
  101:19
substant
ially
  71:6
success-
  79:8

successf
ully
  63:11,
  15,21
  71:18,
  24 77:4
  81:3
sufficie
nt
  25:15
suit
  60:2
Sup-
  17:10
superint
en-
  39:6
superint
endent
  39:10
  73:3
superint
endents
  73:2
supervis
or
  17:15
  18:18
  54:17
  55:22
  70:20
  72:15
supervis
ors
  18:3,6
  29:17
  44:21
  49:11
  101:24

102:4
supervis
ory
  9:20
  22:9
supposed
  27:5
  37:23
  43:14
  75:17
  90:1
Supt
  97:17,
  18,19
sworn
  4:8
sys-
  23:11
system
  19:24
  20:1
  22:21
  71:18,
  25 77:4
  89:21
  90:18
  95:24

———————
      T
table
  38:19,
  23
  53:10
  55:1,2,
  12,16
  56:6
tailed
  68:13
  75:10

tails
  83:6
tain
  87:20
taking
  6:8
taliated
  47:9
talk
  5:14,22
  14:4
  60:21
  61:12,
  20
  75:21
  84:4,8
talked
  47:15
  51:22
  73:14
  77:13
  90:12
talking
  7:14
  34:2
  74:3
  84:20
  91:13
  104:14
  106:22
talks
  71:10
Teams
  35:4,5,
  6
Tec
  16:10
ted
  51:9

56:5
99:17
100:11

**telephone**

102:7,
11

**telling**

30:12
32:17,
25 33:5
47:5
61:14
68:12
71:22

**tem**

23:12

**ten**

10:3
31:25
50:7
63:3
94:7

**tenant**

39:22

**tenced**

59:9

**tend**

42:5

**tendency**

26:13

**terminat
ed**

51:25
52:20
53:2,17
54:10
86:8

**terminat
ion**

11:14
23:16
52:1,
16,24
56:14
85:7

**terms**

96:14
98:21

**terrible**

36:23

**terson**

75:12

**tes-**

6:11

**test**

8:10,
12,15,
19 9:8,
13,14

**testifie
d**

4:9

**testify**

51:12

**testimon
y**

5:7,9
50:15
71:17,
22
75:20,
23
84:11
85:1
92:25
96:21

**theoreti
cally**

19:19

**ther**

13:12

**thing**

5:23
13:8
17:7
19:7
81:16

**things**

8:13
20:22
69:21

**thirteen**

49:8,9,
12,23
50:9
51:12

**thirty**

11:23

**thirty-
five**

11:24

**thought**

47:5,8,
25
48:16
91:11,
12

**thousand**

64:13

**threat**

71:19

**threaten
ed**

26:14
104:6

105:9

**threatens**

72:1,11

**three-
page**

81:24

**tial**

57:1
62:2

**tigators**

24:4

**time**

4:5
5:21
9:25
11:14
16:16
23:16
25:16,
21
28:7,20
29:2
30:2,12
32:8
37:6
41:21
45:10
47:3
48:5
50:10,
18,20
51:11
54:22
59:14,
19
62:20
63:9
66:7
77:12

84:10,
25
85:14,
22
88:14
92:8,18
93:10,
13
97:14

**times**

24:5
42:14
43:15
63:3

**timing**

41:6
47:20
50:24

**timony**

6:12

**Timothy**

106:22

**ting**

86:9

**tion**

19:1,12
37:21
46:9
58:10
67:9
76:23
83:10,
17
84:13,
24
86:10
87:1
93:8

**tions**

4:24

5:17
53:14

**title**

16:9
35:21
84:1

**titled**

20:17

**today**

5:7,14
6:8,10,
15

**told**

29:18
40:1
41:14,
17
42:10,
11
43:11
45:20
46:12
50:14,
21
57:3,6,
15
70:15
72:18
75:9
81:9
90:13

**tolera-**

56:4

**top**

20:15
23:15

**topic**

46:10
49:2

torneys
35:12
totally
13:16
51:2
touch
45:22
46:1
tough
101:5
towels
97:13
toxic
50:3
traband
62:13
train
11:17
trained
83:4
95:19,
20
training
8:21
11:19
20:11,
17,20
21:18,
20,21,
24
22:4,9,
16,18,
25
23:3,4,
5,7,21
90:15
91:8,
10,11,
12,13

transcri
be
5:13
transcri
pt
4:3
transfer
s
10:8,13
trate
56:4
trative
14:17
Travis
106:22
trial
4:5 5:2
trieve
59:24
troublin
g
101:4
true
63:6
trust
42:5
turn
98:24
Turning
71:9
twenty-
36:11
two-page
16:8
17:9
ty
15:22
71:15,

20
type
13:8
14:23
18:14,
16
19:23
58:16
101:7
types
56:4
typical
11:15

___

**U**

ual
68:3
ugh
41:14
ular
69:3
Ulmer
42:10
43:21
44:1
57:10,
12,15
73:8,20
81:6
102:21
105:20,
25
106:13,
22
Ulmer's
72:15
ultimate
52:15

ultimate
ly
46:8
51:25
75:11
ument
55:22
unauthor
ized
53:5
86:11
unbecomi
ng
53:15
unclothe
d
57:4
undermann
ning
80:2
understa
ffed
43:12
understa
ffing
96:23
understa
nd
5:4,16
6:3,4
26:7
36:4
50:11
52:25
79:13
80:20
understa
nding
19:22

60:19
61:10
100:6
101:14
understo
od
6:6
58:1
undertak
e
8:22
underwea
rs
97:13
undesira
ble
97:7
104:21
union-
15:11
unionize
d
15:14
unions
15:10
unit
10:14,
24
11:13
12:3
13:25
17:10,
14
29:18
40:22
72:6
80:3
88:15
89:6

unlocked
73:9
unrela-
51:8
up-to-
date
23:17
updated
71:2
updates
22:17
54:15
upset
48:20
ures
102:14
urity
58:17
usual
4:23
9:10
utenant
9:19

___

**V**

valid
95:19
valuable
63:10
values
69:23
70:3
71:10,
13
103:13,
19,22
vast
62:22,

23
venting 30:13, 17 32:18, 25 33:4
verb- 74:17
verbal 5:10
verbally 74:7 100:19
version 43:5
vestigation 35:22 91:18 92:14, 23
vice 71:11
video 86:18 88:3,25 89:2, 13,20, 21 105:22, 24 106:21
vidual 101:15
view 8:11 9:9 100:19

vio- 93:23
viola- 86:8
violate 69:1 73:16
violated 69:2 72:19 73:8,20 102:21, 25 105:20
violating 53:2
violation 13:11, 14,15, 21 44:9 52:18, 22 69:5 81:10
violations 13:5 52:21
visible 106:3
vision 69:23 70:2,6 103:12, 18
volved 74:22

vul 105:24

———

W

wait 64:4,5 74:9
waiting 74:9
waived 4:3
walking 26:11
wanted 51:5 74:10
warrant 19:5
watch 26:15
watched 105:22 106:21
watching 105:24
ways 63:24
weeks 97:14
whatever 's 89:1
wholly 52:23
whoops 73:8
wicz'

100:3
window 66:9
wit- 99:25
witnessed 99:22
witnesses 49:5, 12,23 50:14 51:12 99:23
women 97:7
word 10:20
work 8:25 22:17 24:19, 22 25:25 31:11, 13,14, 21 32:21 34:15, 23 35:6, 12,14, 16,17 41:5 50:3 53:3 99:2
worked

7:17,22
working 17:18 32:16 34:11 37:5
works 106:25
would've 20:25 45:12 47:19, 20 72:5 92:14
writ 32:24
writing 74:6,8
written 90:8 103:3
wrong 10:25 41:8 66:24 76:1
wrote 32:24 91:4

———

X

X-DRIVE 90:22

———

Y

year 21:18 37:9,10

64:14
yearly 95:15
years 7:10, 15,21, 22 8:1 9:1,2, 24,25 11:24 14:12 21:4,5 48:11 63:3
yees 53:6
you' 99:19, 25

———

Z

Z-E-I 38:12, 13
Z-I-E 38:9
Z-I-E-G-E-R 38:11
Z-I-G-E-R 38:8
Zei- 42:2 46:11
Zeiger 29:9 30:3,5, 13,19

Ara Kimbrough
02/18/2025

28

```
32:1,14
33:8,
10,13,
14 38:6
40:18,
23,25
41:24
42:9
43:9
44:23
45:4
46:9
47:5,21
48:6
50:24
51:8,19
57:3,15
59:15
61:14
72:18
74:25
75:9,14
76:24
77:24
79:6,
10,17
81:9
86:15
88:2,13
92:9
93:13
96:18
102:8,
9,12
103:5,8
105:13,
19
```

**Zeiger's**
```
31:16
```