**EXHIBIT 4**

Shae Randolph
03/19/2025

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

ARA KIMBROUGH,                    :
                                  :  NO. 24-CV-04470
        Plaintiff                 :
                                  :
        -VS-                      :
                                  :
BUCKS COUNTY, LAUREN SMITH,        :
SHAE RANDOLPH and DAVID KRATZ,    :
                                  :
        Defendants                :
_____

                * * * * *

          WEDNESDAY, MARCH 19, 2025

                * * * * *

        Oral deposition of SHAE RANDOLPH, ESQUIRE,
was taken at the Bucks County Administration
Building, 55 E. Court Street, Doylestown,
Pennsylvania, before Renee Schumann, a Notary Public
of the State of New Jersey and Notary Public of the
Commonwealth of Pennsylvania, on the above date,
commencing at 1:09 p.m.

Shae Randolph
03/19/2025

Page 2

A P P E A R A N C E S:


        THE MANSOUR FIRM
        BY: WILLIAM P. MANSOUR, ESQUIRE
            961 Marcon Boulevard, Suite 425
            Allentown, Pennsylvania 18109
            (610) 936-6863
            Wpm@themansourfirm.com
            Representing the Plaintiff


        COUNTY OF BUCKS LAW DEPARTMENT
        BY: JACLYN C. GRIESER, DEPUTY SOLICITOR
            DARA BURNS, ASSISTANT COUNTY SOLICITOR
            ASHLEY DAYOUB, LITIGATION PARALEGAL
            55 East Court Street
            Doylestown, Pennsylvania 18901
            (215) 348-6140
            Jgrieser@buckscounty.org
            Representing the Defendants

Shae Randolph
03/19/2025

1                      I N D E X

2

3    WITNESS                                    PAGE

4    SHAE RANDOLPH, ESQUIRE,

5           (Witness Sworn.)

6

7           DIRECT EXAMINATION BY MS. GRIESER      5

8           CROSS-EXAMINATION BY MR. MANSOUR       40

9           REDIRECT EXAMINATION BY MS. GRIESER    76

10          RECROSS-EXAMINATION BY MR. MANSOUR     80

11

12                   E X H I B I T S

13

14    NUMBER              DESCRIPTION              PAGE

15    D-11                March 5, 2024 E-mail        9

16    D-12                Investigation Report       13

17    D-13                May 30, 2024 E-mail        20

18    D-14                June 7, 2024 E-mail        30

19    D-15                Disciplinary Action Form   31

20    D-16                June 11, 2024 E-mail       31

21    D-17                Interview                  32

22    D-18                Outline                    33

23    D-19                Memorandum                 33

24    D-20                Notice of Fact-Finding Meeting
                                                     35
25

Shae Randolph
03/19/2025

Page 4

1
                        E X H I B I T S
2

3    NUMBER                  DESCRIPTION              REFERENCED

4
     P-7                     Employment Investigation Document
5
     P-8                     March 5, 2024 E-mail
6
     P-9                     Disciplinary Action Form
7

8

9

10   REQUESTS FOR PRODUCTION:

11   BY MR. MANSOUR: Page 60 Line 23
                           75       20
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Shae Randolph
03/19/2025

Page 5

```
 1                         * * * * *
 2                 (It is agreed by and between counsel
 3         that reading, signing, sealing, filing, and
 4         certification are hereby waived and all
 5         objections, except as to the form of the
 6         questions, are reserved until the time of
 7         trial.)
 8                         * * * * *
 9                 SHAE RANDOLPH, ESQUIRE, having been
10         duly sworn according to law, was examined and
11         testified as follows:
12                         * * * * *
13                 DIRECT EXAMINATION
14                         * * * * *
15  BY MS. GRIESER:
16         Q.    Good afternoon.  Can you please state
17  your full name and spell it for the record.
18         A.    Shae Randolph, S-h-a-e R-a-n-d-o-l-p-h.
19         Q.    And have you ever been deposed before?
20         A.    No, I have not.
21         Q.    But you are an attorney?
22         A.    I am.
23         Q.    So you're taken part in depositions
24  before?
25         A.    Yes.
```

Shae Randolph
03/19/2025

Page 6

1          Q.     I'm just going to go over the basic

2    stuff.  Have you consumed any mind or mood altering

3    substances within the past 24 hours that would affect

4    your testimony or your ability to testify truthfully?

5          A.     No, I have not.

6          Q.     Are you suffering from any medical

7    conditions that could interfere with your ability to

8    testify truthfully?

9          A.     No, I am not.

10          Q.     Of course, we need verbal answers so

11    that our court reporter here can get it on the

12    record.  Remember I don't know is a perfectly fine

13    answer.  If you need me to clarify, please don't

14    hesitate to ask me to clarify.  If you need a break,

15    just let us know.  We just ask that you answer any

16    question that is pending prior to the break, before

17    we take that break.

18               And I may object to questions or if

19    Mr. Mansour has some objections -- or when he asks

20    you some questions I may have some objections, he may

21    have some objections, but we'll instruct you whether

22    you can answer or not.  We're going to watch out for

23    attorney-client privilege and attorney work product.

24               Do you have any questions about

25    anything that I just went over?

Shae Randolph
03/19/2025

Page 7

1    A.    Not at this time.

2    Q.    Okay.  Tell us what is your general

3  position at the county.  What is your title?

4    A.    I am an assistant county solicitor.

5    Q.    How long have you been with the county?

6    A.    Since November of 2023.

7    Q.    Where did you work prior to coming to

8  the county?

9    A.    I worked a law firm called Ballard

10  Spahr in Philadelphia.

11    Q.    Did you work anywhere else prior to

12  that?

13    A.    That was my first job out of law

14  school.

15    Q.    Now you're an assistant county

16  solicitor.  Do you have a specialty or do you

17  specialize with any duties or responsibilities here

18  at the county?

19    A.    I specialize in labor and employment,

20  so I work a lot with the human resources department.

21    Q.    And -- as part of the law department --

22  to be clear, I am your supervisor, correct?

23    A.    Correct.

24    Q.    So as far as the law department goes,

25  you are a member of the litigation section; is that

Shae Randolph
03/19/2025

Page 8

 1    accurate?

 2         A.    Yes, that's accurate.

 3         Q.    So give us a little bit of an idea as

 4    to what you do in your position as an employment and

 5    labor attorney?

 6         A.    I provide legal advice on various

 7    employment issues including hiring, firing,

 8    promotions, human resources policies, and other

 9    questions that come up.

10         Q.    Do you handle or do you ever deal with

11    grievances from employees per their CBA?

12         A.    Yes.  Depending on the department, they

13    will consult with HR who will often consult with me

14    about employees' CBA grievance.

15         Q.    Now, you mentioned that you advised

16    potentially on firings or terminations?

17         A.    Correct.

18         Q.    Are you the decision maker for those

19    terminations?  Do you decide who to fire, who to

20    hire, anything like that?

21         A.    No.  I just provide legal advice.

22         Q.    As your role as a labor and employment

23    attorney, do you make any operational decisions?

24         A.    No.

25         Q.    Again, you advise only?

Shae Randolph
03/19/2025

Page 9

```
 1          A.      Advise only.

 2          Q.      Is your advice always followed?

 3          A.      No.

 4          Q.      You know Ara Kimbrough, correct?

 5          A.      Yes.

 6          Q.      How did you come to know that name?

 7          A.      I first learned that name around

 8   February or early March of 2024.  We received an

 9   anonymous e-mail alleging harassing and bullying at

10   the jail.

11          Q.      I'm going to hand you what will be

12   marked as D-11 for identification.

13                      * * * * *

14                  (Whereupon, Exhibit D-11 was marked for

15          identification.)

16                      * * * * *

17   BY MS. GRIESER:

18          Q.      Do you recognize that document?

19          A.      Yes.

20          Q.      What is that document?

21          A.      This is the e-mail that we received

22   anonymously.  It looks like it was sent to Diane Otto

23   who works in human resources.

24          Q.      Is there a date on that as to when it

25   was received?
```

Shae Randolph
03/19/2025

Page 10

```
 1        A.      It was sent on February 29th of 2024.

 2        Q.      You said it was sent to Diane Otto on

 3   what date?

 4        A.      February 29, 2024.

 5        Q.      Who else received that e-mail?

 6        A.      Commissioner Marseglia, Commissioner

 7   Harvie, and Commissioner --

 8        Q.      DiGirolamo?

 9        A.      -- DiGirolamo.  Amy Fitzpatrick, Rich

10   Vona, Pam Van Blunk, Fred Harran, Diane Gibbons, Rea

11   Boylan.

12        Q.      And those are all employees of the

13   county?

14        A.      Correct.

15        Q.      When did you become aware of this

16   anonymous complaint?

17        A.      I don't remember the exact date, but it

18   would have been shortly thereafter this, there was

19   discussion about it.

20        Q.      Does HR do investigations into

21   complaints like this typically?

22        A.      I think this is an atypical complaint,

23   but HR does investigate complaints of bullying or

24   harassment in the workplace.

25        Q.      What makes it atypical?
```

Shae Randolph
03/19/2025

Page 11

1        A.      Generally, HR doesn't receive anonymous

2    complaints, nor do they receive complaints that are

3    as detailed or specific.

4        Q.      But they have received anonymous

5    complaints in the past; is that right?

6        A.      Yes.

7        Q.      But do they investigate every anonymous

8    complaint?

9        A.      They evaluate every anonymous complaint

10   and will investigate ones or any that have substance

11   or merit.

12       Q.      What about this complaint lent itself

13   to an investigation?

14       A.      This complaint included specific

15   examples as well as names.  I don't know if there was

16   dates, but there was enough detail that HR felt that

17   there was merit to the complaint.

18       Q.      Okay.  Now, was legal asked to

19   participate in the investigation?

20       A.      Legal was.

21       Q.      And are you always asked to participate

22   in investigations with HR?

23       A.      No, I am not.

24       Q.      Why was this one different?

25       A.      In addition to it being anonymous, it

Shae Randolph
03/19/2025

Page 12

1  also involved a supervisor -- a second level

2  supervisor and a subordinate, so HR felt that the

3  support from legal would be helpful.

4          Q.      And who took lead on the investigation?

5          A.      HR was always the lead of the

6  investigation.

7          Q.      Who from HR did you partner with for

8  this investigation?

9          A.      Diane Otto.

10         Q.      And her role in HR is what?

11         A.      I believe she's an HR manager.  She

12  works specifically with corrections.

13         Q.      I think they call them business

14  partners; is that right?

15         A.      Yes.

16         Q.      When did you begin this investigation,

17  to the best of your knowledge?

18         A.      We didn't start interviewing people

19  until the end of March, but for a week or two before

20  that, we were gathering information and looking at

21  documents and evaluating who we should be

22  interviewing.

23         Q.      What was the scope of the

24  investigation?  Did you interview a few people, many?

25         A.      We interviewed all the sergeants that

Shae Randolph
03/19/2025

Page 13

1    would have had shifts that overlapped with Lieutenant

2    Kimbrough.

3            Q.    So the jail is a 24-hour operation,

4    right?

5            A.    Correct.

6            Q.    And typically COs and other employees

7    of the jail tend to stay on the same shift; is that

8    right?

9            A.    Yes.

10           Q.    Okay.  Showing you what will be marked

11   as Defense Exhibit-12.

12                          * * * * *

13               (Whereupon, Exhibit D-12 was marked for

14           identification.)

15                          * * * * *

16   BY MS. GRIESER:

17           Q.    And do you recognize this?

18           A.    I do.

19           Q.    What is it?

20           A.    This is the investigation report that I

21   drafted at the conclusion of the investigation into

22   Lieutenant Kimbrough.

23           Q.    Who received this report?

24           A.    You did as my supervisor.

25           Q.    And HR never received this report; is

Page 14

1   that correct?

2          A.      Correct.   This was an internal law

3   department document.

4          Q.      Why did you do this investigative

5   report?   Why did you do this write up?

6          A.      For one, it was to show my work.

7   Because the law department does not always partner

8   with human resources, I wanted to document the law

9   department's participation.   And to the extent that

10  any part of the investigation were to be later

11  contested, I wanted to have it fairly documented our

12  findings, our method and what our recommendations

13  were.

14         Q.      Okay.   And is this -- is this dated?

15  Yeah, it's dated on the first page; do you see that?

16         A.      Yes.

17         Q.      May 17, 2024?

18         A.      Correct.

19         Q.      So it's fair to conclude that your

20  investigation took from March to May-something?

21         A.      Yes.

22         Q.      While you did the investigation while

23  you participated in the interviews and whatnot, what

24  was your impression that you got from those you

25  interviewed as to Lieutenant Kimbrough's leadership

Shae Randolph
03/19/2025

Page 15

1    style?

2         A.    I got the impression that a lot of the

3    sergeants in particular didn't love working for him

4    because he did not work as a sergeant himself.  I

5    also got the impression that he would sometimes have

6    outbursts at the sergeants for various reasons and

7    then it would settle down and then something else

8    would happen a couple of months later and the

9    behavior would become cyclical or repeat itself.

10        Q.    Let me back you up to the fact that

11   Lieutenant Kimbrough has never worked as a sergeant

12   himself.  What did you come to learn regarding his

13   career at the department of corrections here at Bucks

14   County?

15        A.    I learned that he was originally hired

16   as a correction officer, most people are, but unlike

17   most people, he then moved into the hearing officer

18   position.  So they hear employee grievances, but my

19   understanding is the bulk of it is hearing inmate

20   grievances.  And from there he was promoted to the

21   administrative lieutenant position.

22        Q.    And is that a typical trajectory for

23   somebody's career at the DOC?

24        A.    From what I learned during the

25   investigation, no.  For example, the other

Shae Randolph
03/19/2025

Page 16

1   administrative lieutenants have all worked as

2   corrections officers, sergeants, floor lieutenants,

3   and then administrative lieutenants.

4        Q.    Okay.  So Lieutenant Kimbrough never

5   worked as a floor lieutenant or a sergeant.  What are

6   their roles mainly?

7        A.    Which one.

8        Q.    The sergeant?

9        A.    Sergeants, they use the phrase of

10  running shift.  So they ensure that officers are in

11  the correct staffing locations and that each location

12  has the correct number of officers and that the

13  facility plan of the day is followed.

14       Q.    Okay.  So is it the sergeants who

15  assign posts?

16       A.    No. I believe that is a floor

17  lieutenant's position.

18       Q.    And Lieutenant Kimbrough had not done

19  either of those positions?

20       A.    My understanding is that he was able to

21  pick up overtime shifts, so he may have worked as a

22  floor lieutenant, but he was never -- that was never

23  his official role.

24       Q.    Okay.  Did Lieutenant Kimbrough's lack

25  of experience as a sergeant or a shift lieutenant,

Shae Randolph
03/19/2025

Page 17

1  did that come in to your findings at all in this

2  investigation?

3          A.     It did in the sense that his reaction

4  to the sergeants over things, they often felt that it

5  wasn't -- he wasn't able to see their point of view

6  or be understanding to the situation.  And because he

7  was in a management and leadership role, that did

8  come in to the investigation.

9          Q.     Okay.  And what was the general

10  complaint from the sergeants?

11          A.     The general complaint was that he

12  created a hostile work environment, not so much in

13  the legal term of art way, but that they often

14  referred to walking on eggshells, feeling the need to

15  make sure his unit was staffed maybe before other

16  units were staffed to avoid a reaction from him.

17          Q.     We have a section here, subsection D,

18  interfering with sergeants running shift.  What do

19  you mean by that?

20          A.     Specifically, I believe this is

21  referencing when he would call into the jail and he

22  was offsite to have officers moved.  So in that sense

23  he was interfering with the sergeant's ability to

24  staff the jail.

25          Q.     Now, during the course of your

Shae Randolph
03/19/2025

Page 18

1    investigation, did it come to your attention that

2    Lieutenant Kimbrough often felt like he -- let me ask

3    you this first.  I'll back up.

4              What was Lieutenant Kimbrough's

5    section?

6         A.    He worked in the records and reception

7    unit.

8         Q.    And what did you come to learn about

9    his opinion regarding the staffing of that unit?

10        A.    Eventually, when I spoke to --

11   throughout the investigation, I learned he would be

12   concerned that there would be safety issues if there

13   was a lot of people coming from jail -- or I'm

14   sorry -- court and needing to be processed that there

15   would be a safety issue if there wasn't enough

16   officers to process them correctly.

17        Q.    Did you ever come across evidence that

18   Lieutenant Kimbrough's unit was ever so understaffed

19   as to not be in compliance with staffing policies?

20        A.    No.  I found that there were times when

21   an officer was working a double shift and they might

22   have been at the armory or they might have been at

23   the women's center and it took them an additional 10

24   or 15 minutes to return their equipment or get to

25   their next post.  So there would sometimes be a gap.

Page 19

1    I did not find that to be out of compliance with the

2    jail's standard operating procedures.

3         Q.    What was his reaction when those types

4    of situations would arise?

5         A.    We had several people that we

6    interviewed tell us that he would sometimes make

7    calls to the -- call the sergeant's office, but it's

8    in the center of the facility.  He would call and ask

9    them if they were stupid, yelling at them to the

10   point where other people in the office could hear

11   them.  There was also an instance when he came down

12   there himself.  People relayed that he got in their

13   face to yell at them and it was very demeaning.

14        Q.    Okay.  So was your opinion that

15   Lieutenant Kimbrough was unhappy with how his unit

16   was staffed on occasion?

17        A.    It was my opinion that he was unhappy

18   with the sergeants either not making sure there was

19   no gap or no delay or not communicating that to him.

20        Q.    And I'm going to show you what was

21   marked previously in Lauren Smith's deposition as

22   P-7.  This is COB 1085 to 1088.

23              Do you recognize that document?

24        A.    I do.

25        Q.    What is that?

Shae Randolph
03/19/2025

Page 20

    1          A.      This is the human resources

    2     investigative report.

    3          Q.      Okay.  And this is the official's

    4     report, the one that would end up in Lieutenant

    5     Kimbrough's personnel file?

    6          A.      Correct.

    7          Q.      Can you confirm the timeline for us of

    8     the investigation using that document?

    9          A.      Yes.  We began the investigation

   10     officially on March 5th of 2024, and then it was

   11     officially wrapped up on May 13th of 2024.

   12          Q.      Thank you.  I'll take that back.  I'll

   13     show you what we'll mark as Exhibit D-13.

   14                          *  *  *  *  *

   15                  (Whereupon, Exhibit D-13 was marked for

   16          identification.)

   17                          *  *  *  *  *

   18     BY MS. GRIESER:

   19          Q.      Do you recognize that?

   20          A.      I do.

   21          Q.      What is that?

   22          A.      This is the e-mail that I sent to

   23     Lieutenant Kimbrough notifying him of his

   24     fact-finding meeting.

   25          Q.      What was that fact-finding meeting?

Shae Randolph
03/19/2025

Page 21

1      A.      Public employees are entitled to a

2  pre-disciplinary meeting or hearing where they are

3  able to speak for themselves.

4      Q.      What is the date of that notification

5  or that e-mail?

6      A.      The e-mail was sent on May 30, 2024.

7      Q.      What is the time that it was sent?

8      A.      2:46 p.m.

9      Q.      Okay.  And the purpose of this

10 fact-finding meeting was what?

11     A.      To allow him an opportunity to speak

12 for himself before any disciplinary action that would

13 be as a result of the investigation.

14     Q.      Okay.  So what were the general

15 findings of HR for this investigation?

16     A.      Well --

17     Q.      I'm sorry, I'm handing you back P-7.

18     A.      The general findings were that

19 Lieutenant Kimbrough's behavior did create a hostile

20 work environment not based on a protected

21 characteristic, particularly for the sergeants and

22 the other lieutenants.

23     Q.      Okay.  Was there any determinations

24 made whether it was his own personal grievance

25 regarding the sergeants or was there anything more

Shae Randolph
03/19/2025

Page 22

1    than that?

2         A.    This focuses on his grievance with the

3    sergeants getting officers to records and reception

4    in a timely manner.

5         Q.    Were there any findings regarding the

6    abuse of his position of authority?

7         A.    Yes.

8         Q.    Which was what?

9         A.    That he tended to think that because he

10   had the word administrative in front of his position

11   that he outranked the other lieutenant at the

12   facility.

13        Q.    Is that true?

14        A.    Not to my understanding.

15        Q.    I believe -- I saw somewhere as well

16   that it was noted that he was a favorite of the DOC

17   administration?

18        A.    Yes.  I noted that in my report that he

19   was definitely spoken of very highly by DOC

20   administration and they were looking to keep him

21   because he was a good employee.

22        Q.    According to --

23        A.    According to them.

24        Q.    Okay.  But again, there was no finding

25   of a staffing policy, just Lieutenant Kimbrough's own

Page 23

1    preference as to how staffing should be completed?

2          A.    Yes.

3          Q.    And again, throughout your

4    participation in this investigation, your role was

5    not as a decision maker; is that right?

6          A.    Correct.

7          Q.    Okay.  When you said earlier that

8    you're part of the litigation section of the law

9    department here at the county --

10         A.    Yes.

11         Q.    -- do you take part in regular

12   litigation meetings with the rest of the litigation

13   section?

14         A.    Yes.

15         Q.    So is it fair to say that you're

16   generally aware of all litigation going on to some

17   degree?

18         A.    Yes.

19         Q.    Were you aware that there was

20   litigation underway regarding a prisoner Patterson

21   who passed away as a result of an overdose at the

22   jail?

23         A.    Yes, I was aware of that.

24         Q.    At some point you became aware that

25   Lieutenant Kimbrough had made a phone call to a third

Shae Randolph
03/19/2025

Page 24

1   party?

2          A.      I did.

3          Q.      Okay.  When did you become aware of

4   that?

5          A.      I believe it was the morning of May

6   31st.

7          Q.      Do you recall how you became aware of

8   it?

9          A.      We had an unscheduled meeting with the

10  litigation team to discuss the call.

11         Q.      Did you find the timing of that phone

12  call from Lieutenant Kimbrough odd?

13         A.      I found it odd.

14         Q.      Okay.

15         A.      It would have been hours after I sent

16  him the notice of the fact-finding meeting.

17         Q.      Okay.  And at this time -- and if you

18  don't know, that's fine.  But do you know at what

19  stage the Patterson litigation was at when -- around

20  May 31st when you found out about Lieutenant

21  Kimbrough's phone call?

22         A.      I know our former co-worker Tyler

23  Branchet (ph.) had already filed a motion for summary

24  judgment.

25         Q.      And we were just waiting for a decision

Shae Randolph
03/19/2025

Page 25

1    from the judge?

2           A.      Right.

3           Q.      And to the best of your knowledge and

4    belief, did the county produce any witnesses that

5    were requested by the plaintiff's attorney in that

6    case Brian Ziegler?

7           A.      Yes.

8           Q.      Let's be clear, you did not participate

9    in that litigation yourself?

10          A.      No.

11          Q.      Do you know whether plaintiff's

12   attorney in the Patterson case, Mr. Ziegler, did he

13   ever request to depose Ara Kimbrough?

14          A.      Not that I'm aware, but I would not

15   have been involved in those.

16          Q.      What is your understanding -- what was

17   your general understanding of what Ara Kimbrough

18   relayed to Brian Ziegler during that phone call?

19          A.      At what point?

20          Q.      At the point when you first became

21   aware of the phone call?

22          A.      When I first learned of the phone call,

23   all I knew was that he contacted Brian Ziegler the

24   night before and wanted to discuss the case.

25          Q.      I guess, given your answer, at some

Shae Randolph
03/19/2025

Page 26

1    point you learned more details about what was

2    relayed?

3              A.      Yes.

4              Q.      How did you become aware of those

5    details?

6              A.      I was provided with a copy of Dan

7    Grieser's report after he met with Ara Kimbrough to

8    discuss his conversation with Brian Ziegler.

9              Q.      Was anybody else present during that

10   interview?

11             A.      I also received notes from Lauren

12   Smith.

13             Q.      And Lauren Smith is the director of HR,

14   that's her title?

15             A.      Chief human resources officer.

16             Q.      What was your role in that

17   investigation, if any?

18             A.      Beyond that first phone call on May

19   31st, my role was limited.  I was still trying to

20   wrap up the investigation into the alleged harassment

21   and bullying.  And I wanted to make sure that was

22   cleaned up and I also know there was a conscious

23   decision to keep things separate.

24             Q.      Okay.  And what's your understanding --

25   at some point did you come to understand that what

Shae Randolph
03/19/2025

Page 27

1  Lieutenant Kimbrough had relayed to Attorney Ziegler

2  was confidential in some way?

3          A.      What is the question?  At what point or

4  did I?

5          Q.      Did you.

6          A.      After reading Dan's report and Lauren's

7  notes, it became clear that he disclosed information

8  about the jail security operations.

9          Q.      Tell us a little bit more about that.

10         A.      From reading the reports and the notes,

11  he relayed the events leading up to -- I believe it

12  was Rhoades, an inmate that snuck drugs into the

13  facility.  And he mentioned Officer Ulmire (ph.)

14  being pulled away and, you know, codes and other

15  things like that.

16         Q.      Code 99?

17         A.      Yes.

18         Q.      At this point were you concerned with

19  any possible first amendment issues?

20         A.      At that point I was primarily concerned

21  with whistleblower issues.  We do have a

22  whistleblower policy.  So that was my first thought.

23         Q.      Okay.  Now, what did the county do

24  immediately upon learning that Lieutenant Kimbrough

25  had contacted an outside party regarding events in

Page 28

1    the Patterson matter?

2            A.      In the Patterson matter we immediately

3    have to respond to emergency motion.  Do you mean

4    beyond that?

5            Q.      Yes.

6            A.      The county didn't take necessarily

7    immediate action because we were considering a

8    potential whistleblower issue.  So Dan reached out to

9    Lieutenant Kimbrough to schedule a meeting to find

10   out exactly what was said.

11           Q.      Okay.  Do you recall on or about June

12   1st that the county began pulling Lieutenant

13   Kimbrough's e-mail, work e-mail?

14           A.      I was aware that was happening.

15           Q.      Do you know or were you aware that

16   Lieutenant Kimbrough was not notified of this

17   investigation right away?

18           A.      I was aware of that.

19           Q.      What was the purpose of not making him

20   aware?

21           A.      The purpose was to be able to determine

22   what information was leaked and if that was still

23   happening.

24           Q.      So going back to your e-mail D-13 where

25   you notify Lieutenant Kimbrough of the fact-finding

Shae Randolph
03/19/2025

Page 29

 1   hearing, it says that you expect to hold a hearing on

 2   June 3rd.  Was that hearing held on June 3rd?

 3        A.    It was.

 4        Q.    Okay.  And that fact-finding meeting

 5   was only in regard to the -- for lack of a better

 6   term, I'm going to refer to the first investigation

 7   as the bullying investigation.  That fact-finding

 8   meeting was solely focused on the bullying

 9   investigation; is that right?

10        A.    That is correct.

11        Q.    I'm going to show you what has been

12   previously marked in Lauren Smith's deposition as

13   P-8.

14              Do you recognize that document?

15        A.    I do.

16        Q.    And what is it?

17        A.    This is the actual fact-finding notice.

18        Q.    For the --

19        A.    For the June 3rd, the bullying

20   investigation.

21        Q.    Is that what is attached to D-13?  It's

22   the same one that's attached to D-13?

23        A.    Yes.

24        Q.    Okay.  And that did occur on June 3rd?

25        A.    Correct.

Shae Randolph
03/19/2025

Page 30

1          Q.     I'm going to show you what we can mark

2     as D-14.  And this is COB 2388 through COB 2390.

3                        * * * * *

4                 (Whereupon, Exhibit D-14 was marked for

5          identification.)

6                        * * * * *

7                 THE WITNESS:  I recognize this

8          document.

9     BY MS. GRIESER:

10         Q.     What is that document?

11         A.     This is an e-mail from Ara Kimbrough

12    from June 7th of 2024.  He was following up on the

13    investigation.  For context, he did have some

14    witnesses, character witnesses, that participated in

15    the fact-finding on June 3rd, but for the sake of

16    time, we had some of them just submit statements so

17    he was following up on that in this e-mail.

18         Q.     So it's fair to say in between June 4th

19    through the 7th that the county was attempting to

20    wrap up the bullying investigation?

21         A.     Yes.  We were waiting -- we wanted to

22    be able to receive any statements that he wanted to

23    submit.

24         Q.     Okay.  And this will be D-15.

25                        * * * * *

Page 31

```
 1                    (Whereupon, Exhibit D-15 was marked for

 2          identification.)

 3                         * * * * *

 4    BY MS. GRIESER:

 5          Q.    And what is that?

 6          A.    This is Ara Kimbrough's step one

 7    discipline from June 10th.

 8          Q.    And, again, that's in relation to the

 9    bullying investigation?

10          A.    Correct.

11          Q.    And this will be D-16.

12                         * * * * *

13                    (Whereupon, Exhibit D-16 was marked for

14          identification.)

15                         * * * * *

16    BY MS. GRIESER:

17          Q.    Do you recognize that?

18          A.    I do.

19          Q.    What is that?

20          A.    This was the e-mail that Dan sent to

21    Ara Kimbrough to schedule a meeting.

22          Q.    And Dan Grieser, to be clear, is

23    another deputy solicitor here in the law department?

24          A.    Yes.

25          Q.    And that was sent on what date?
```

Shae Randolph
03/19/2025

Page 32

1          A.     He sent the initial e-mail on June 10,

2    2024, and a second on June 11th.

3          Q.     I'm handing you what will be marked as

4    D-17.

5                        * * * * *

6                 (Whereupon, Exhibit D-17 was marked for

7          identification.)

8                        * * * * *

9    BY MS. GRIESER:

10          Q.     Do you recognize that?

11          A.     I do.

12          Q.     And what is that?

13          A.     These are the notes from Lauren Smith

14    from that June 12th meeting of Ara Kimbrough.

15          Q.     So it did take place on June 12th?

16          A.     Correct.

17          Q.     All right.

18                 MR. MANSOUR:  What is the Bates on

19          that?

20                 MS. GRIESER:  COB 1106 to 1111.

21                 MR. MANSOUR:  Thank you.

22    BY MS. GRIESER:

23          Q.     I am going to hand you what will be

24    marked as D-18.

25                        * * * * *

Shae Randolph
03/19/2025

Page 33

1              (Whereupon, Exhibit D-18 was marked for

2         identification.)

3                    * * * * *

4    BY MS. GRIESER:

5         Q.    Do you recognize that?

6         A.    I do.

7         Q.    What is that?

8         A.    These are updates, I believe, from

9    Diane Otto to Lauren Smith.

10        Q.    And according to that document, when

11   was the last day that Lieutenant Kimbrough worked?

12        A.    June 12, 2024.

13        Q.    And to be clear, that's the same day of

14   the interview that he had with Dan Grieser and Lauren

15   Smith?

16        A.    Yes.

17        Q.    And after that what is your

18   understanding as to why he was not at work?

19        A.    My understanding was that he used

20   either vacation or sick time.

21        Q.    I'll mark this as D-19.

22                   * * * * *

23             (Whereupon, Exhibit D-19 was marked for

24        identification.)

25                   * * * * *

Shae Randolph
03/19/2025

Page 34

1   BY MS. GRIESER:

2          Q.      Do you recognize that?

3          A.      Yes.

4          Q.      What is that?

5          A.      This is the report that Dan Grieser

6   wrote on his meeting with Ara Kimbrough.

7          Q.      What is the date on that document?

8          A.      June 13, 2024.

9          Q.      Okay.  To your best recollection, when

10  was the separation in general release of Lieutenant

11  Kimbrough sent to him?

12         A.      June 20th or 21st.

13         Q.      Do you recall whether Dave Kratz

14  informed Lieutenant Kimbrough that he was suspended

15  without pay at some point?

16         A.      I know that David Kratz reached out to

17  Lieutenant Kimbrough first to let him know that and

18  then followed-up with the separation agreement.

19         Q.      At some point did Lieutenant

20  Kimbrough -- was he put out on paid leave pending

21  investigation?

22         A.      Yes.

23         Q.      And that was the investigation into the

24  possible disclosure of confidential information?

25         A.      Yes.

Shae Randolph
03/19/2025

Page 35

1          Q.    And then tab O -- no, not tab O.  It

2    says COB 168 and 169.  It will be D-20.

3                      * * * * *

4                (Whereupon, Exhibit D-20 was marked for

5          identification.)

6                      * * * * *

7    BY MS. GRIESER:

8          Q.    Do you recognize that?

9          A.    I do.

10         Q.    What is that?

11         A.    This was the fact-finding notice that

12   was sent on July 25th I think.

13         Q.    July 25th.  And this was the

14   fact-finding meeting regarding --

15         A.    Possible confidential information leak.

16         Q.    And then I'll hand you what was

17   previously marked in Lauren Smith's deposition as

18   P-1.  What is that document?

19         A.    This is the termination discipline.

20         Q.    What is the date on that document?

21         A.    July 29, 2024.

22         Q.    And that was the day that Lieutenant

23   Kimbrough was terminated from employment here at the

24   county?

25         A.    Yes.

Shae Randolph
03/19/2025

Page 36

```
 1          Q.      Moving on, you spoke earlier about the
 2   law department having to reply to an emergency
 3   motion.  Do you recall that?
 4          A.      I do.
 5          Q.      Would you say that's a typical
 6   occurrence in the law department that -- the need to
 7   respond to emergency motions?
 8          A.      I've only seen that once since I've
 9   been here.
10          Q.      How about in your previous position?
11   If you recall.  If you don't, that's fine.
12          A.      Preliminary injunctions are different,
13   so none.
14          Q.      And the county had to investigate this
15   alleged leak of confidential information.  Who all
16   did that entail?
17          A.      It entailed mostly the law department.
18   I know that we had to contact IT to get the e-mails.
19   I know that we were in touch with at least two or
20   three of the jail's administrators to get
21   information.  HR was involved.
22          Q.      Would it be fair to say that the
23   response was somewhat disruptive to the workings of
24   the county, those departments specifically that you
25   mentioned?
```

Shae Randolph
03/19/2025

Page 37

1          A.     Yes.  Because it affected not just

2     litigation but then also the operations at the jail.

3     And because of his position and the ongoing

4     litigation, we recognize that we had to be deliberate

5     with what we were doing.

6          Q.     Did the county have to investigate

7     whether any other information had been leaked?

8          A.     Yes.  It was brought to our attention

9     early on that Lieutenant Kimbrough in his position

10    had access to a lot of information about inmates'

11    criminal records, medical information and we wanted

12    to ensure that that information was not also being

13    leaked.

14         Q.     And you mentioned earlier that

15    Lieutenant Kimbrough tended to be -- or was, in your

16    opinion, a favorite of the administration at the DOC.

17    What was the administration's response to learning of

18    Lieutenant Kimbrough's actions?

19         A.     Disappointment, I guess, would be the

20    first word.  And then stressed out because of his

21    position.  It was going to be difficult to fill that

22    in if he wasn't there.  And they had really --

23    because he had access to all this information, they

24    felt like he was really in a position of trust.

25         Q.     And he was in a position of trust and

Shae Randolph
03/19/2025

Page 38

1  is it fair to say that there was a breakdown in trust

2  by the supervisors in him?

3          A.     Yes.  I think another characterization

4  of their response would have been very surprised.  I

5  think they weren't expecting this from him.

6          Q.     Okay.  Are there other -- if there are

7  employees who are concerned about a certain situation

8  or that you believe that something might pose a

9  safety issue, are there avenues for them to bring

10  their concerns to light or to people who could

11  possibly make a policy change in order to correct the

12  situation?

13          A.     Yes.  As public employees we can always

14  go to the commissioner's meetings.  Those are public.

15  Specifically, for someone that works at the jail,

16  there's also prison oversight board meetings that

17  they can go to.  We've even had people come straight

18  to the law department with their concerns, multiple

19  ways.

20          Q.     Even an anonymous e-mail?

21          A.     Even an anonymous e-mail, yes.

22          Q.     Are you aware or did you become aware

23  that there are procedures that are in place for DOC

24  employees communicating to the public regarding

25  matters in the jail?

Page 39

1          A.     Yes, I am aware of that.

2          Q.     Okay.  Did it seem to you that Ara

3    was airing his only personal grievances of how the

4    jail was staffed as opposed to altering --

5          A.     Yes.

6          Q.     -- the public regarding -- or alerting

7    the public to safety concerns?

8          A.     The way he phases things in his meeting

9    with Dan and Lauren, it's a lot of people were told

10   without my knowledge.  My unit was not staffed

11   correctly.  It felt much more like he wanted things

12   to go a certain way in his unit and he would be upset

13   when they weren't.

14         Q.     Did you become aware at any point that

15   Lieutenant Kimbrough alerted some people that he

16   wanted to grieve his termination?

17         A.     I did become aware of that in August.

18         Q.     And who did he contact?

19         A.     I believe he contacted the

20   commissioners directly.

21              MS. GRIESER:  Can we go off the record.

22                   * * * * *

23              (Whereupon a discussion was held off

24         the record.)

25                   * * * * *

Shae Randolph
03/19/2025

Page 40

```
 1              MS. GRIESER:  I have no further
 2        questions for you.
 3              MR. MANSOUR:  I have a few questions.
 4                    * * * * *
 5              CROSS-EXAMINATION
 6                    * * * * *
 7   BY MR. MANSOUR:
 8        Q.    So D-17.  The notes from -- Lauren
 9   Smith's notes from her and Dan Grieser's meeting with
10   Ara Kimbrough on June 12, 2024.
11              You said this was one of the -- by
12   reading these notes it was one of the ways that you
13   learned about the details of my client's conversation
14   with Attorney Ziegler; is that correct?
15        A.    That's correct.
16        Q.    And I think you had just testified a
17   few moments ago that your perception of my client's
18   complaints was that he was more -- they were more
19   personal, that he was -- complained about how his
20   unit was understaffed and how his request for more
21   staffing were being ignored; is that right?
22        A.    That's right.
23        Q.    Did he express more general concerns
24   about the safety of the unit?
25        A.    He expressed -- just to clarify, do you
```

Shae Randolph
03/19/2025

Page 41

1    mean here or do you mean ever?

2        Q.      I mean specifically with respect to

3    Patterson?

4        A.      In this specific meeting?

5        Q.      In that specific meeting?

6        A.      He does reference general concerns

7    about the Patterson case.

8        Q.      Maybe three-quarters of the way down on

9    that first page, where it says AK says yeah, I talked

10   to him about the Patterson case and then it says DG,

11   what did you tell him?  And then Kimbrough says

12   essentially that I felt some responsibility because

13   drugs were able to get through my unit and Patterson

14   died.  I feel bad about that.  It was a hundred

15   percent preventable and we failed on that.

16              Do you view that as a personal

17   grievance?

18       A.      Considering he wasn't there, I think

19   it's him having some personal grievance that, yeah,

20   when I'm not there people do other things.

21       Q.      You don't view that at all as him

22   having any concern about the fact that an inmate died

23   in the county jail as a result of drugs being

24   smuggled into the jail when he wasn't there?

25       A.      I don't think that is his chief

Page 42

1    concern.

2            Q.      What is his chief concern?

3            A.      I don't know what his chief concern is.

4    My understanding from the investigation that I did on

5    the bullying was he needed a reason for the way he

6    acted.

7            Q.      The way he acted when?

8            A.      Toward the sergeants during the

9    bullying investigation.

10           Q.      Can you elaborate more on that?  He

11   needed a reason for what?  I'm not sure what you mean

12   by that.

13           A.      So he would lash out for -- on the

14   sergeants for not getting officers to his unit timely

15   or not having the number of officers that he wanted.

16   And the reason he gave me when I asked him was

17   because he felt bad that Patterson died.

18           Q.      Mr. Kimbrough's position was that he

19   believed he was disciplined or accused of bullying

20   because he was holding his staff accountable.  Isn't

21   that what he thought?

22           A.      I don't know what he thought.

23           Q.      You looked at that memo, right, or the

24   notes of the meeting from Lauren Smith?

25           A.      Yes.

Shae Randolph
03/19/2025

Page 43

1          Q.       Can you turn to the second page?    Can

2    you go about maybe halfway down where it says -- DG

3    says have you taken any other internal measures to

4    address this?    Do you see that?

5          A.       Yes.

6          Q.       And then Ara Kimbrough stated I have

7    told everyone in my chain of command and reported it

8    to human resources.    I have brought it up several

9    times.    I have made it a point to be hypervigilant

10   about staffing.    To be transparent, I just received a

11   step one discipline.    Are you aware?    Mr. Grieser

12   says yes, but not in detail.    You can tell me about

13   it.    Ara Kimbrough says the crux of it was me holding

14   the sergeants accountable for not staffing the units

15   and the way I did it.

16               Did you skip over that part when you

17   read through those notes?

18         A.       Of course not.

19         Q.       So Mr. Kimbrough was concerned or was

20   disciplining his subordinates for what he perceived

21   as them not correctly staffing the unit?

22         A.       There's what he said.

23         Q.       And what reason do you have to believe

24   that it was anything different than what he said?

25         A.       His actions in general.    Holding a

Shae Randolph
03/19/2025

Page 44

1   subordinate accountable generally does not include

2   screaming in my face, demeaning them, telling them

3   not to fuck with him, things like that.

4        Q.    Looking at D-12, can you turn to the

5   very last page of that report.

6        A.    Yes.

7        Q.    Now, you spoke to Director Kratz about

8   my client during the course of your investigation

9   into the bullying complaint, correct?

10       A.    Yes.

11       Q.    And Mr. Kratz characterized my client

12  as a quote hard ass; is that right?

13       A.    Yes.

14       Q.    And he also opined that the sergeants

15  who my client supervised were a young group that

16  needed consistent correction, did he not?

17       A.    Yes.

18       Q.    He also implied that the sergeants

19  probably have a negative view of my client or

20  negative relationship with him because he's a

21  tough -- quote tough supervisor, right?

22       A.    Yes.

23       Q.    But you disagree with Director Kratz?

24       A.    I did.

25       Q.    Why is that?

Shae Randolph
03/19/2025

Page 45

1          A.     After speaking with all of the

2     sergeants that routinely work with Lieutenant

3     Kimbrough, their perception, their understanding,

4     their experiences were more than just him being a

5     hard ass or him being a tough supervisor.  And I made

6     it a point to say -- and understand that I work in an

7     office and they work in a jail.  I understand that

8     the standard is different.  He crossed that line even

9     still.

10          Q.     But you never worked in the jail,

11     right?

12          A.     I did have an office in the jail for a

13     while.

14          Q.     You were never a corrections officer,

15     right?

16          A.     I was never a corrections officer, no.

17          Q.     Or a sergeant?

18          A.     Or a sergeant.

19          Q.     Or an administrative lieutenant?

20          A.     Correct.

21          Q.     Or any kind of lieutenant?

22          A.     No.

23          Q.     David Kratz was, right?

24          A.     He was.

25          Q.     He was the administrative lieutenant

Shae Randolph
03/19/2025

Page 46

1    before Ara Kimbrough was, right?

2         A.     He was.

3         Q.     Who would know more about the inner

4    workings of the jail you or David Kratz?

5         A.     Today?

6         Q.     Back then.

7                MS. GRIESER:   Objection as to form.

8    BY MR. MANSOUR:

9         Q.     Back in June of 2024.

10        A.     As far as this investigation goes, I

11   knew about more about this investigation than he did.

12        Q.     Did you know more about Ara Kimbrough

13   than he did?

14        A.     No.

15        Q.     Did you know more about how to be an

16   administrative lieutenant than he did?

17        A.     No.

18        Q.     Did you know more about the

19   interpersonal relationships between sergeants and

20   their supervisors than David Kratz did?

21        A.     That would be a closer call.

22        Q.     So you might know more than the

23   previous lieutenant and current director of

24   corrections about the inner workings of the

25   relationships between sergeants and their

Shae Randolph
03/19/2025

Page 47

1    supervisors?

2            A.      You asked about the personal

3    relationships between the lieutenants and the

4    sergeants there.  It's my understanding maybe one or

5    two of the sergeants would have overlapped with

6    Director Kratz.  His office is not in the jail.  And

7    so after the weeks of speaking with the sergeants, I

8    did feel I had a better understanding of their

9    relationship with Lieutenant Kimbrough than he did.

10           Q.      Kratz also told you in your discussions

11   with him that having reception fully staffed is

12   important, right?

13           A.      It is.

14           Q.      In your memo there in the second to

15   last paragraph, you state in the days leading up to

16   Lieutenant Kimbrough's comma -- I think you probably

17   missed a would there.  Kratz reiterated this theory

18   and also introduced a theory of why having reception

19   fully staffed is important in parenthesis i.e.

20   Patterson.  Patterson being Joshua Patterson?

21           A.      Correct.

22           Q.      And it's important that -- and the

23   implication here being that Mr. Patterson died

24   because the reception was not fully staffed?

25           A.      Could you clarify?

Shae Randolph
03/19/2025

Page 48

1        Q.      Why did you put Patterson in

2    parenthesis?

3        A.      That was what was being referenced.

4        Q.      By whom?

5        A.      By Kratz.

6        Q.      In what context?

7        A.      He was previewing for me what

8    Kimbrough's arguments were going to be.

9        Q.      How did he know what they were going to

10   be?

11       A.      Because they talk.

12       Q.      Did he say that they talked?

13       A.      Yes.

14       Q.      And what did he say Kimbrough told him?

15       A.      He told him his reasonings.

16       Q.      Which were?

17       A.      I don't remember specifically.

18       Q.      And you go on say specifically Kratz

19   said that Lieutenant Kimbrough may say some things we

20   quote don't want to hear?

21       A.      Yes.

22       Q.      What that does mean, we don't want to

23   hear?  What kind of things would he say that we don't

24   want to hear?

25       A.      He was previewing that Kimbrough was

Shae Randolph
03/19/2025

Page 49

1   going to suggest that reception was not fully staffed

2   and that was why he acted the way he did towards his

3   sergeants.

4          Q.    And why wouldn't -- and do you know by

5   we who he was referring to when you -- you use the

6   word we here.  What do you mean by we?

7          A.    When he was talking to me Kratz said he

8   might say some things you don't want to hear.  So he

9   was referring to me.  I took it to mean Diane Otto

10  and myself as we were conducting the investigation.

11         Q.    And why did he believe you wouldn't

12  want to hear those things?

13              MS. GRIESER:  Objection as to form.

14         You may answer.

15              THE WITNESS:  I don't know.

16  BY MR. MANSOUR:

17         Q.    And what were those things that -- did

18  he use specifics about what some of the things are

19  that you and Diane Otto might not want to hear?

20         A.    Only the reference to Patterson.

21         Q.    And that being that my client's opinion

22  that Patterson died and Rhoades was able to sneak

23  drugs in the jail because reception was understaffed?

24         A.    His opinion of staffing.

25         Q.    Why wouldn't you want to hear that?

Shae Randolph
03/19/2025

Page 50

1    Isn't he encouraged to report these things?

2         A.    I took the "you don't want to hear" as

3    in it's not going to support your investigation.

4    It's going to cut against what the sergeants have

5    said.  Not that we don't want to hear legitimate

6    complaints about staffing.

7         Q.    When Kratz told you that did you look

8    into that further and say, hey, you know, maybe

9    there's something to what Ara Kimbrough's been saying

10   about staffing in the reception unit?

11        A.    I actually passed that up to Amy

12   Fitzpatrick as my -- one of my supervisors.

13        Q.    What do you mean passed that up?

14        A.    I let her know that that came up in

15   the -- because when he did bring it up on June 3rd, I

16   let her know and she followed-up on it.

17        Q.    Would you say when he brought it up on

18   June 3rd, he being my client?

19        A.    Yes.

20        Q.    He brought it up to whom?

21        A.    To Diane and I when we were conducting

22   the fact-finding meeting.

23        Q.    So during that fact-finding meeting, he

24   brought up the fact that he believed Patterson

25   overdosed because of understaffing in the reception

Shae Randolph
03/19/2025

Page 51

```
 1   unit?

 2         A.     He did.

 3         Q.     When did you bring it up to Amy

 4   Fitzpatrick?

 5         A.     Immediately after the meeting.

 6         Q.     Do you know if she looked into it?

 7         A.     I do.

 8         Q.     Did she?

 9         A.     She did.

10         Q.     Okay.  What did she do?

11         A.     I don't know.

12         Q.     Did she interview any employees?

13         A.     I don't know.

14         Q.     Did she interview Ara Kimbrough?

15         A.     I don't know.

16         Q.     Did she interview David Kratz?

17         A.     I don't know.

18         Q.     So how do you know that she looked into

19   it?

20         A.     I know.

21         Q.     How do you know?

22         A.     I was told she looked into it.

23         Q.     By whom?

24         A.     By Amy Fitzpatrick.

25         Q.     But she didn't tell you what she did to
```

Shae Randolph
03/19/2025

Page 52

1    look into it?

2            A.      No.

3            Q.      Did you see any documents referencing

4    her looking into that matter?

5            A.      No.

6            Q.      Did you ever follow-up with her after

7    June 3rd to find out if she looked into it?

8            A.      Directly like no, but all of this was

9    being discussed as part of Dan's investigation and

10   Lauren, the meeting he had with Dan and Lauren.

11           Q.      Is there any anybody besides Amy

12   Fitzpatrick who would know whether his complaints

13   were investigated?

14           A.      I don't know.

15           Q.      His complaint about understaffing I

16   mean?

17           A.      Whether they were investigated?

18           Q.      By her or anybody else in the law

19   department subsequent to June 3rd?

20           A.      I don't know.

21           Q.      Would she know?

22           A.      I don't know.

23           Q.      You reference that the first time you

24   learned about my client's conversation with Attorney

25   Ziegler was in a May 31st meeting with the litigation

Shae Randolph
03/19/2025

Page 53

1    team; is that correct?

2         A.    Correct.

3         Q.    Was that an in-person meeting?

4         A.    No.

5         Q.    How did that meeting take place?

6         A.    Teams.

7         Q.    Who was present for that?

8         A.    Myself, Jaclyn Grieser, Ashley Dayoub,

9    maybe Tyler Burns.  That would have been it.

10        Q.    And what were you told during that

11   meeting?

12             MS. GRIESER:  Objection.  Privileged.

13        Don't answer.

14             MR. MANSOUR:  I mean, she brought it

15        up.

16             MS. GRIESER:  She brought up that there

17        was a meeting.

18             MR. MANSOUR:  And then that's how she

19        learned about the information.

20             MS. GRIESER:  She learned -- she said

21        that she learned about the information because

22        of that filing, which was then discussed.

23             MR. MANSOUR:  Well, she said she

24        learned about it during a meeting with the

25        litigation team on May --

Shae Randolph
03/19/2025

Page 54

```
 1                    THE WITNESS:  I learned that he made a
 2          call.  I didn't learn what was said because we
 3          didn't know.
 4  BY MR. MANSOUR:
 5          Q.    You didn't know?
 6          A.    Nobody knew.  We still don't know.
 7          Q.    You still don't know?
 8          A.    We still don't know.
 9          Q.    But you said it was confidential.  The
10  information he shared with Attorney Ziegler you
11  concluded is confidential, right?
12          A.    The information that he told us he
13  shared would be confidential, yes.
14          Q.    Okay.  So how do you know -- how can
15  you sit here and say you don't know what he shared
16  with Attorney Ziegler?
17          A.    I don't know all that he shared with
18  Attorney Ziegler.
19          Q.    What did Ara Kimbrough say that he
20  shared with Attorney Ziegler that you conclude as
21  confidential?
22          A.    That I conclude as confidential?
23          Q.    Uh-huh.
24          A.    I would conclude any movements of
25  specific officers in the jail as it pertains to where
```

Shae Randolph
03/19/2025

Page 55

1    they're staffed as confidential.

2         Q.      Can you tell me where in any of the

3    documents that we have here that information is

4    divulged?

5         A.      I believe he references staff were

6    pulled from my unit without my knowledge.

7         Q.      But he doesn't say specifically, does

8    he?

9         A.      I'm sorry, what was the question?

10        Q.      He doesn't say specifically which staff

11   were pulled, did he?  It's on the bottom of the first

12   page of the notes, just in case you're wondering.

13   That document right there, bottom of page 1.

14               How about we turn back to page 1 and

15   I'll ask you about it.  So that last paragraph, I

16   think that's the one you're referring to.

17        A.      Yes.

18        Q.      Ara Kimbrough says staff were pulled

19   from my unit without my knowledge.  Essentially what

20   had happened is a male officer was doing an unclothed

21   body search.  His partner was up front.  He told him

22   to go up front and see his partner, but his partner

23   was called elsewhere.  So the inmate was able to go

24   back into the dirty cell and retrieve the contraband

25   drugs he had on his person and put it back into his

Shae Randolph
03/19/2025

Page 56

1    county, and then the next page is redacted.

2            A.      So you mean --

3            Q.      I am not sure why the rest of that is

4    redacted.  But, nevertheless, my question is where in

5    here does he disclose the identity of people or their

6    movements?

7            A.      So I will say that the fact that he's

8    referencing partners doing the unclothed body search,

9    going up front, and then being able to be called

10   elsewhere, dirty cells, all of that is confidential

11   information and it goes to the security operations of

12   the jail.

13           Q.      In what way?  Does nobody else know

14   that people get strip searched?

15           A.      Nobody?

16           Q.      Nobody outside of the jail knows that

17   inmates may get strip searched is that what you're

18   saying?

19           A.      I'm sure there are people that know

20   that.

21           Q.      So why is that fact confidential?

22           A.      The security operations, the way that

23   they go about the unclothed body search.  The fact

24   that there's partners.  Where they are when it

25   happens is confidential.

Shae Randolph
03/19/2025

Page 57

```
 1              Q.    Okay.  Where did he say they were when
 2   it happens?  His partner was up front, told him to go
 3   up front and see his partner, but his partner was
 4   called elsewhere.  We don't know where, just
 5   elsewhere.
 6              So what about that is confidential?
 7   Like, are you telling me that nobody outside of the
 8   jail knows that corrections officers have partners
 9   they work with?
10              MS. GRIESER:  Objection as to form.
11              THE WITNESS:  I told you I concluded
12         what was confidential about it and why I think
13         it's confidential.  You might disagree with
14         that, but you asked me for my conclusion and I
15         gave it to you.
16   BY MR. MANSOUR:
17              Q.    How do you define confidential?
18              A.    I don't know that that is relevant.
19              Q.    Well, it is because you're using that
20   word.  So what does confidential mean to you such
21   that you can conclude this information is
22   confidential?
23              A.    Anything that has to really do with
24   security operations for the jail.
25              Q.    And the fact that my client said that
```

Shae Randolph
03/19/2025

Page 58

1    staff were pulled from his unit without his

2    knowledge, that's confidential information?

3              A.      Yep.

4              Q.      And that essentially what happened is a

5    male officer was doing an unclothed body search.

6    That's confidential information?

7              A.      Yes.

8              Q.      His partner that is the male officer's

9    partner was up front.  That is confidential

10   information?

11             A.      Yes.

12             Q.      And he told him to go up front and see

13   his partner but his partner was called elsewhere.

14   That's confidential information?

15             A.      Yes.

16             Q.      Did he say where the person was called?

17             A.      Not right here.

18             Q.      Whether it is a male or female officer

19   that was called?

20             A.      It does not say.

21             Q.      Who that officer was called by?

22             A.      Not here.

23             Q.      Where that officer was called to?

24             A.      Not here.

25             Q.      Were you involved at all in the

Shae Randolph
03/19/2025

Page 59

1   Patterson litigation?

2          A.      No.

3          Q.      Those notes from Lauren Smith relating

4   to her meeting -- her and Dan Grieser's meeting with

5   my client, is that the only source of information

6   that you have regarding what my client said to

7   Attorney Zeigler?

8          A.      I also have Dan's report.

9          Q.      So in addition to those notes and Dan's

10  report, is there any additional information?

11         A.      I have information that was obtained

12  during the fact-finding meeting that happened on July

13  27th, I think.

14         Q.      And what did my client say during that?

15  And you were present for that meeting, right?

16         A.      I was present, yes.

17         Q.      Along with Lauren Smith?

18         A.      Yes.

19         Q.      And that meeting lasted all of two or

20  three meetings, right?

21         A.      Right.

22         Q.      What did my client say in that meeting?

23         A.      He reiterated most of this and then

24  said that he didn't feel it was confidential

25  information.

Shae Randolph
03/19/2025

Page 60

```
 1          Q.     Now, you mentioned earlier that

 2   initially you were analyzing whether my client may be

 3   protected by the whistleblower law; is that right?

 4          A.     Uh-huh.

 5          Q.     You said that you didn't consider

 6   whether he was protected by the First Amendment,

 7   correct?

 8          A.     When?

 9          Q.     At any time.

10          A.     I did consider it.

11          Q.     When?

12          A.     Probably when I received a letter from

13   you citing that that was a potential claim that he

14   would be bringing.

15          Q.     Did you write a similar memo or any

16   sort of memo analyzing his potential First Amendment

17   claims?

18          A.     I did.

19          Q.     Who did you provide that to?

20          A.     My supervisors.

21          Q.     Who would that have been?

22          A.     Jaclyn Grieser and Amy Fitzpatrick.

23                 (REQUEST)

24                 MR. MANSOUR:  I'm going to ask for a

25          copy of that.  Whether you want to provide a
```

Shae Randolph
03/19/2025

Page 61

1           redacted copy but it wasn't produced initially

2           in the discovery.  The whistleblower memo was,

3           redacted of course.

4                MS. GRIESER:  I believe it was produced

5           redacted.

6                MR. MANSOUR:  I don't think so.  But if

7           it has been, maybe I missed it.  There's been

8           thousands of pages, many which are repetitive.

9                MS. GRIESER:  Specifically, what are we

10          talking about?

11               MR. MANSOUR:  Shae's memo about First

12          Amendment.

13     BY MR. MANSOUR:

14          Q.   You had also testified that there were

15     other avenues for my client to complain about what he

16     viewed as understaffing besides going to Attorney

17     Ziegler; is that correct?

18          A.   Yes.

19          Q.   And you had mentioned commissioners

20     meetings?

21          A.   Yes.

22          Q.   Had my client gone to a commissioners

23     meeting, would he have been in violation of county

24     policy?

25          A.   No.

Shae Randolph
03/19/2025

Page 62

1        Q.      If he shared the exact information,
2    would he have been in violation of county policy?
3        A.      The same exact information?
4        Q.      Let's say my client went to a
5    commissioners meeting and said that staff were pulled
6    from his unit without his knowledge and that there
7    was an officer who was doing an unclothed body search
8    and thought his partner was up front but his partner
9    was called elsewhere.  So the inmate was able to go
10   back into the dirty cell and retrieve the drugs that
11   he hid there.  He said all of those things at a
12   county commissioners meeting, would he have been in
13   violation of policy?
14       A.      Potentially, if it was a public
15   meeting.  Because it would have been disseminated and
16   there would have been the same concern had he simply
17   contacted the commissioners or gone to the part of
18   their meeting that was not publicly broadcasted, then
19   no.
20       Q.      Can you say for certain that he would
21   have been violating policy had it been done publicly?
22              MS. GRIESER:  Objection to form.
23   BY MR. MANSOUR:
24       Q.      Or you can't say one way or the other?
25       A.      I would say I can't say one way or the

Shae Randolph
03/19/2025

Page 63

1    other.

2          Q.     He did tell you about it, right?

3          A.     About what?

4          Q.     About what happened on that particular

5    date and that he had concerns about understaffing of

6    the reception unit, right?

7          A.     He did.

8          Q.     And he also told Lauren Smith who's

9    part of HR?

10         A.     Yes.

11         Q.     And he also told you that he had

12   complained numerous times up the chain of command to

13   his supervisors?

14         A.     Yes.

15         Q.     Did you ask any of those supervisors

16   whether he made any complaints?

17         A.     Yes.

18         Q.     Who did you talk to?

19         A.     I talked to Carl Metellus.  I talked to

20   James Coyne.  I talked to David Kratz.  I talked to

21   Kelly Reed.

22         Q.     What did they say?

23         A.     Regarding?

24         Q.     Regarding whether they received any

25   complaints from Ara Kimbrough about understaffing?

Shae Randolph
03/19/2025

Page 64

1          A.      They said he frequently complains that

2    sergeants don't get officers to his unit in a timely

3    manner.  They said he's a hard ass and that they

4    don't like his responses.  At no time was there ever

5    a violation of the staffing policies of the jail.

6          Q.      Would you characterize Ara Kimbrough as

7    middle management, in the position of administrative

8    lieutenant as middle management?

9          A.      In a corrections sense, yes.

10         Q.      And David Kratz you said doesn't have

11   an office at the prison?

12         A.      No.

13         Q.      Is David Kratz at the prison on a daily

14   basis?

15         A.      Yes.

16         Q.      Does he work closely with Ara Kimbrough

17   on a daily basis?

18         A.      Not anymore.

19         Q.      Did he when Ara Kimbrough was there?

20         A.      Yes.

21         Q.      How about the warden?

22         A.      Who's the warden?

23         Q.      The deputy warden.

24         A.      Which one?

25         Q.      How many are there?

Shae Randolph
03/19/2025

Page 65

```
 1          A.      Two or three.

 2          Q.      Did they work with Ara Kimbrough

 3   closely on a daily basis?

 4          A.      At least one of them.

 5          Q.      When you went through Ara Kimbrough --

 6   you mentioned before that there had been, I don't

 7   know, whether -- I -- you looked through Ara

 8   Kimbrough's e-mails?

 9          A.      I never looked through his e-mails.

10          Q.      Did somebody look through his e-mails?

11          A.      We looked through the recipients of his

12   e-mails, just the sender and the received e-mail.

13          Q.      Every e-mail that he sent?

14          A.      From a specific time frame.

15          Q.      What time frame?

16          A.      I believe early March until -- at the

17   time it was June 1st I think.

18          Q.      March of '24?

19          A.      Yes.

20          Q.      To early June of '24?

21          A.      Yes.

22          Q.      Did anybody look through his e-mails to

23   see if there were any complaints he made up the chain

24   of command about understaffing of his unit?

25          A.      We looked through only -- like
```

Shae Randolph
03/19/2025

Page 66

1    subject -- I think we got subject, dates, and the

2    recipient of the e-mail.

3            Q.      Okay.  Did you or anybody else -- let

4    me ask just about you specifically.  Were you

5    involved in this e-mail search that you're referring

6    to?

7            A.      I knew that it was happening.  I wasn't

8    involved.

9            Q.      Do you know who was involved?

10           A.      I believe it was Amy Fitzpatrick and

11   Jaclyn Grieser.

12           Q.      Do you know whether they looked for any

13   e-mails relating to my client's complaints of

14   understaffing of the reception unit?

15           A.      I don't know.

16           Q.      Would they know?

17           A.      I don't know.

18           Q.      So it would be fair to say that at

19   least in your opinion you didn't want -- or the

20   county didn't want anybody outside of the jail

21   knowing things that my client shared with Attorney

22   Ziegler, correct?

23               MS. GRIESER:  Objection as to form.

24           You can answer.

25               THE WITNESS:  Could you repeat the

Shae Randolph
03/19/2025

Page 67

1        question?

2    BY MR. MANSOUR:

3        Q.    Sure.  The county didn't want anybody

4    outside of the county knowing about the things that

5    my client shared with Attorney Ziegler, correct?

6        A.    The county doesn't want anyone outside

7    of the county to know anything related to the

8    security operations of the jail.

9        Q.    I'm talking specifically about the

10   details my client shared with Attorney Ziegler.

11   Those details specifically.  The county didn't want

12   anybody outside of the county to know about those,

13   right?

14       A.    It's not that they wanted them to be

15   hidden.  They didn't want it to be generally known by

16   the public.

17       Q.    But he didn't share it with the public,

18   did he?

19       A.    No.

20       Q.    He shared it with Attorney Ziegler,

21   right?

22       A.    Who's outside of the county.

23       Q.    But not part of the public?  I mean,

24   it's not like it was shared with the general public,

25   right?  He shared it with one specific person?

Shae Randolph
03/19/2025

Page 68

1         A.      What was his intent though to get it

2    out there?

3         Q.      I don't know what his intent was, but

4    he shared it with just one specific person, right?

5         A.      I don't know.

6         Q.      As far as you know, he didn't share it

7    with anybody other than Attorney Ziegler, right?

8         A.      As far as I know, right.

9         Q.      And it was especially concerning that

10   he shared it with Attorney Ziegler because Attorney

11   Ziegler was suing the county, right?

12             MS. GRIESER:  Objection as to form.

13        You may answer.

14             THE WITNESS:  Can you -- it wasn't

15        especially concerning because of that, no.

16   BY MR. MANSOUR:

17        Q.      That wasn't a factor in the county's

18   decision to suspend him and discharge my client?

19        A.      I wasn't involved in the Patterson

20   case, so that wasn't an especially concerning factor

21   to me.

22        Q.      Where's the termination letter?  Is

23   that -- here it is.  Which one is it?  This one here?

24   Yeah.  My client was discharged, according to that

25   letter, for sharing alleged confidential information

Shae Randolph
03/19/2025

Page 69

1    with the plaintiff's attorney pertaining to a lawsuit

2    against the DOC/County of Bucks, right?

3         A.    He admitted to contacting plaintiff's

4    attorney.

5         Q.    And sharing alleged confidential

6    information pertaining to a lawsuit against the DOC

7    slash County of Bucks period, correct?

8         A.    Correct.

9         Q.    So to whoever wrote that -- and that

10   was written by Lauren Smith, right?

11        A.    She signed it.

12        Q.    Did you see that before Lauren Smith

13   gave it to my client?

14        A.    I don't remember.

15        Q.    So at least according to that

16   disciplinary action form, the fact that my client

17   shared the information with Attorney Ziegler who was

18   suing the county, that was a factor in his discharge,

19   right?

20        A.    Are you asking the fact that he was

21   suing the county specifically as a factor?

22        Q.    The fact -- yes.

23        A.    Because I read this as him admitting to

24   contacting plaintiff's attorney and sharing

25   confidential information as the reason.  The fact

Shae Randolph
03/19/2025

Page 70

1    that he was suing the county, does not -- that's not

2    the reason.

3           Q.    But it says there he was contacting

4    plaintiff's counsel, right --

5           A.    Yeah, that's what it says.

6           Q.    It doesn't say that he was sharing

7    confidential information with a third party, right?

8           A.    Well, that is a third party.

9           Q.    It doesn't say third party, right?

10          A.    No.  But it --

11          Q.    No, it says plaintiff's counsel

12   pertaining to a lawsuit against the county?

13          A.    Yeah, a third party.

14          Q.    It doesn't say there pertaining to

15   security, the jail security, does it?

16          A.    No.

17          Q.    It says pertaining to a lawsuit against

18   the county, right?

19          A.    Uh-huh.

20          Q.    It doesn't say pertaining to internal

21   operating procedures of the county, right?

22          A.    No.  It says lawsuit against DOC/County

23   of Bucks.

24          Q.    So that was the information that he

25   shared.  It pertained to a lawsuit against the

Shae Randolph
03/19/2025

Page 71

1    DOC/County of Bucks --

2                    MS. GRIESER:  Objection as to the form.

3                    MR. MANSOUR:  -- right?

4                    THE WITNESS:  I already answered the

5            question.

6    BY MR. MANSOUR:

7            Q.    So it doesn't say anything about

8    sharing confidential information pertaining to jail

9    security, does it?

10                    MS. GRIESER:  Objection.  Asked and

11            answered as to form.

12                    THE WITNESS:  Right.

13    BY MR. MANSOUR:

14            Q.    It doesn't say for sharing confidential

15    information pertaining to jail operating procedures,

16    does it?

17                    MS. GRIESER:  Objection.  Asked and

18            answered.  Object to form.

19                    THE WITNESS:  Right.

20    BY MR. MANSOUR:

21            Q.    Were you asked about your -- were you

22    asked by any of the decision makers your opinion as

23    to whether Ara Kimbrough should be fired?

24                    MS. GRIESER:  Objection.  Privileged.

25            Don't answer.

Shae Randolph
03/19/2025

Page 72

```
 1                    MR. MANSOUR:  It's not privileged.
 2          It's a personnel decision.  I'm not asking
 3          about any legal opinions or legal advice.
 4                    THE WITNESS:  You asked whether I was
 5          asked?
 6   BY MR. MANSOUR:
 7          Q.    Whether you were asked, should the
 8   county fire Ara Kimbrough?
 9          A.    No.
10          Q.    You were not?
11          A.    No.
12          Q.    Did you ever give that opinion?
13          A.    Did I ever give --
14                    MS. GRIESER:  Objection.  Privileged.
15                    THE WITNESS:  What opinion?
16   BY MR. MANSOUR:
17          Q.    That Ara Kimbrough should be fired?
18          A.    No.
19          Q.    Did you have any conversations with
20   Lauren Smith after your fact-finding meeting with Ara
21   Kimbrough on July 25th, I think it was?
22                    MS. GRIESER:  Objection.  You can
23          answer as long as it doesn't break the
24          attorney/client privilege.
25                    THE WITNESS:  I honestly don't remember
```

Shae Randolph
03/19/2025

Page 73

```
 1          if we had a specific conversation after the

 2          fact finding.

 3   BY MR. MANSOUR:

 4          Q.    Did you take notes during that

 5   fact-finding meeting?

 6          A.    No.  I never do.

 7          Q.    Did Lauren Smith?

 8          A.    Yes.  You know what, can I correct

 9   that?  I might have taken notes, but I can't remember

10   for sure.

11          Q.    Would you still have those notes if you

12   did take them?

13          A.    If I took them, there's a good chance I

14   still have them.

15          Q.    Would you be able to look for them

16   after this deposition is over?

17          A.    Yeah.

18          Q.    Okay.  During the investigation into

19   the alleged bullying, my client brought up what he

20   believed to be discriminatory conduct by certain

21   employees; is that correct?

22          A.    That is correct.

23          Q.    And two of those employees were

24   Sergeant Dierdelowitz (ph) and Sergeant Patel,

25   correct?
```

Shae Randolph
03/19/2025

Page 74

1          A.      Correct.

2          Q.      And those two employees were the ones

3   who were allegedly the subject of his bullying

4   behavior?

5          A.      Uh-huh.

6          Q.      Did you ever personally investigate my

7   client's complaints of discrimination?

8          A.      I did.

9          Q.      What did you do?

10         A.      I interviewed employees at the jail.  I

11  spoke with management at the jail.

12         Q.      Who did you speak to?  What employees?

13         A.      I don't remember all of them.  I know I

14  spoke with Lieutenant Sherman, Captain Nottingham,

15  Carl Metellus.

16         Q.      Zachary Sherman has had his own

17  complaints against him, correct?

18               MS. GRIESER:  Objection to the form.

19  BY MR. MANSOUR:

20         Q.      Complaints of discrimination, sexual

21  harassment in particular?

22               MS. GRIESER:  Object to the form.

23               THE WITNESS:  Not that I'm aware of.

24  BY MR. MANSOUR:

25         Q.      Did you take notes as part of that

Shae Randolph
03/19/2025

Page 75

1  investigation?

2          A.      Probably.

3          Q.      Did you prepare a report similar to the

4  one you did for my client's investigation regarding

5  bullying?

6          A.      No.

7          Q.      Do you still have those notes from that

8  investigation?

9          A.      I don't know.

10         Q.      Did you talk to Sergeant Dierdelowitz

11  about my client's allegations?

12         A.      I did.

13         Q.      Did you talk to Sergeant Patel about my

14  client's allegations?

15         A.      I did.

16         Q.      If you have notes, would those notes

17  reflect your conversation with Sergeant Dierdelowitz

18  and Sergeant Patel?

19         A.      They would.

20                 (REQUEST)

21                 MR. MANSOUR:  I would ask that you,

22         after this deposition, take a look and see if

23         you could find any of those notes.

24  BY MR. MANSOUR:

25         Q.      Did you ever reach any findings as a

Shae Randolph
03/19/2025

Page 76

1    result of that investigation?

2         A.    I did not.

3         Q.    Did you ever report to either Jaclyn

4    Grieser or Amy Fitzpatrick about your findings from

5    that investigation?

6         A.    We have, as I mentioned, regular

7    litigation meetings where I would relay all of my

8    findings or non-findings to my supervisors.

9         Q.    So in any one of those meetings, did

10   you rely to them your findings from your

11   investigation into my client's complaints of

12   discrimination?

13        A.    I can't recall when, but if I would

14   have had something, then yes.

15             MR. MANSOUR:  I have no further

16        questions.

17             MS. GRIESER:  I just have a few

18        follow-ups.

19                  * * * * *

20             REDIRECT EXAMINATION

21                  * * * * *

22   BY MS. GRIESER:

23        Q.    Mr. Mansour asked you about people

24   looking into Lieutenant Kimbrough's complaints about

25   staffing.  And you mentioned that you spoke to

Shae Randolph
03/19/2025

Page 77

1    several wardens, Kelly Reed, Carl Metellus, Jeff

2    Contino; is that right?

3         A.    I think I said James Coyne.

4         Q.    Okay.  And after talking with them, was

5    -- did any of them have any opinion that there was a

6    legitimate safety concern of which Lieutenant

7    Kimbrough was complaining of?

8         A.    None of them had the opinion that there

9    was a legitimate safety concern.

10        Q.    Was it their opinion that it was just

11   Lieutenant Kimbrough's personal preference to have

12   people report to his unit quicker?

13        A.    Yes.

14        Q.    And Mr. Mansour asked you about whether

15   Lieutenant Kimbrough had brought up staffing concerns

16   with HR, Lauren Smith, and the law department?

17        A.    Uh-huh.

18        Q.    Do you recall that?

19        A.    Uh-huh.

20        Q.    Do you recall when he brought those up?

21        A.    It would have been in the June 3rd

22   fact-finding meeting.

23        Q.    And I believe at the end of Lauren

24   Smith's notes from the meeting with Dan Grieser, she

25   makes a notation at the very bottom I believe.

Shae Randolph
03/19/2025

Page 78

1    A.    Uh-huh.

2    Q.    Is -- what is that notation?

3    A.    After Ara left the room Lauren Smith

4    told Dan Grieser that Ara did not make a report to HR

5    about a safety concern.  He mentioned it while he was

6    being interviewed by Diane and Shae regarding the

7    bullying and accusations against him.  They

8    rightfully did not engage.  They kept their

9    conversation related to the accusations against him.

10   Q.    So it wasn't until he was being

11   investigated for bullying that he brought up any

12   alleged issues with staffing with HR and the law

13   department?

14   A.    Right.

15   Q.    Are you aware -- have there ever been

16   any findings that the unfortunate death of

17   Mr. Patterson due to the overdose was because of a

18   lack of staffing in the intake unit?

19   A.    Not to my knowledge.

20   Q.    And to be clear, Lieutenant Kimbrough

21   was not terminated for the bullying investigation?

22   A.    Right.

23   Q.    And this is D-20.  And Mr. Mansour had

24   talked to you at length about information being

25   disclosed to plaintiff's counsel.  Do you recall

Shae Randolph
03/19/2025

Page 79

1    that?

2              A.      Yes.

3              Q.      Does the county have a general rule

4    that no one is to comment on ongoing litigation?

5              A.      I believe they do, yes.

6              Q.      And, in fact, Lieutenant Kimbrough was

7    terminated for violating several DOC and HR policies;

8    is that correct?

9              A.      Yes.

10             Q.      And those policies are noted on D-20?

11             A.      Yes, they are.

12             Q.      To the best of your knowledge, none of

13   those policies relate in any way to communicating

14   with plaintiff's counsel; is that right?

15             A.      Right, not specifically.

16             Q.      And -- again, to be clear, you have

17   absolutely no decision making authority for

18   terminations, correct?

19             A.      Correct.

20             Q.      You have just an advisory role only?

21             A.      Right.  Legal advice.

22                     MS. GRIESER:  One moment.  I have

23             nothing further.  Thank you.

24                     MR. MANSOUR:  Two more follow-up

25             questions.

Shae Randolph
03/19/2025

Page 80

```
 1                      * * * * *

 2              RECROSS-EXAMINATION

 3                      * * * * *

 4   BY MR. MANSOUR:

 5         Q.    Ms. Randolph, you're a lawyer, right?

 6         A.    I am.

 7         Q.    You're specifically -- have experience

 8   in employment and labor law, right?

 9         A.    I do.

10         Q.    In your legal opinion you would agree

11   that workplace policies do not trump the First

12   Amendment to the United States Constitution, right?

13              MS. GRIESER:  Objection as to form.

14         You can answer.

15              THE WITNESS:  May I?  In this specific

16         case or in general?

17              MR. MANSOUR:  In general.  If there's a

18         conflict between a workplace rule and the

19         First Amendment, which one prevails?

20              THE WITNESS:  The First Amendment.

21   BY MR. MANSOUR:

22         Q.    I want to refer you to the

23   investigative report again too.  If you can turn to

24   page 10.  Under section C you write in reviewing the

25   incident report from BCCF on the night of the inmate
```

Shae Randolph
03/19/2025

Page 81

1  overdose referenced by Lieutenant Kimbrough in his

2  interview, what interview?

3       A.     The interview that was part of this

4  investigation.

5       Q.     And that must have been before May 17th

6  when this --

7       A.     Yes.

8       Q.     So you interviewed him prior to May

9  17th?

10      A.     As part of the investigation, yes.

11      Q.     And during that interview did he tell

12 you that he believed understaffing was what led to

13 the death of Joshua Patterson?

14      A.     I don't recall him telling me that in

15 that interview, no.

16      Q.     Did he complain to you during that

17 interview about discriminatory activity by other

18 employees?

19      A.     Not that I recall.

20      Q.     Can you go to the second paragraph?

21 Right there.  Now, this memo that is dated May 17th,

22 you said additionally there is a notable lack of

23 documentation that the discriminatory activity

24 suggested by Lieutenant Kimbrough was taking place.

25 So, obviously, at least as of May 17th, you were

Shae Randolph
03/19/2025

Page 82

1    aware of complaints that my client made regarding

2    discriminatory conduct, right?

3         A.    He didn't make them to me though.

4         Q.    He made them to somebody, right?

5         A.    Yeah.

6         Q.    Do you know who?

7         A.    Yes.  He made them to David Kratz who

8    then told me about them.

9         Q.    So you were aware of them as early as

10   May 17th, probably earlier?

11        A.    Definitely earlier.

12        Q.    You were also aware that he had been

13   making complaints about understaffing of the

14   reception unit at least as early as May 17th,

15   probably earlier?

16        A.    His complaints -- at that time my

17   understanding was his complaint was specific to

18   certain instances, not in general.

19        Q.    Certain instances of what he believed

20   was understaffing in the reception unit?

21        A.    Right.  When he had his reaction to

22   Sergeant Patel or Sergeant Dierdelowitz.

23             MR. MANSOUR:  No further questions.

24             THE COURT REPORTER:  Normal delivery

25        for everyone?

Shae Randolph
03/19/2025

Page 83

1        MR. MANSOUR:  Yes.  And I just need an

2   electronic copy, please.

3        MS. GRIESER:  Yes.

4            * * * * *

5        (This concludes the deposition of Shae

6   Randolph, Esquire at 2:57 p.m.)

7            * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Shae Randolph
03/19/2025

Page 84

1           C E R T I F I C A T I O N

2

3

4           I hereby certify that the proceedings and

5   evidence noted are contained fully and accurately in

6   the stenographic notes taken by me upon the foregoing

7   matter dated _____2025, and that this is a

8   correct transcript of the same.

9

10

11

12          _____
            RENEE  SCHUMANN
13          COURT REPORTER

14

15

16          (The foregoing certification of this

17  transcript does not apply to any reproduction of the

18  same by any means, unless under the direct control

19  and/or supervision of the certifying reporter.)

20

21

22

23

24

25

_____

**Exhibits**

51649_
Shae_
Randolph
_031925_
Ex_D-11
  3:15
  9:14

51649_
Shae_
Randolph
_031925_
Ex_D-12
  3:16
  13:13

51649_
Shae_
Randolph
_031925_
Ex_D-13
  3:17
  20:13,
  15

51649_
Shae_
Randolph
_031925_
Ex_D-14
  3:18
  30:4

51649_
Shae_
Randolph
_031925_
Ex_D-15
  3:19
  31:1

51649_
Shae_
Randolph
_031925_
Ex_D-16
  3:20
  31:13

51649_
Shae_
Randolph
_031925_
Ex_D-17
  3:21
  32:6

51649_
Shae_
Randolph
_031925_
Ex_D-18
  3:22
  33:1

51649_
Shae_
Randolph
_031925_
Ex_D-19
  3:23
  33:23

51649_
Shae_
Randolph
_031925_
Ex_D-20
  3:24
  35:4

51649_
Shae_
Randolph
_031925_
Ex_P-7
  4:4

51649_
Shae_
Randolph
_031925_
Ex_P-8
  4:5

51649_
Shae_
Randolph
_031925_
Ex_P-9
  4:6

_____

**1**

1
  55:13,
  14
10
  18:23
  32:1
  80:24
1085
  19:22
1088
  19:22
10th
  31:7
11
  3:20
1106
  32:20

1111
  32:20
11th
  32:2
12
  33:12
  40:10
12th
  32:14,
  15
13
  3:16
  34:8
13th
  20:11
15
  18:24
168
  35:2
169
  35:2
17
  14:17
17th
  81:5,9,
  21,25
  82:10,
  14
1st
  28:12
  65:17

_____

**2**

20
  3:17
  4:11
2023
  7:6

2024
  3:15,
  17,18,
  20  4:5
  9:8
  10:1,4
  14:17
  20:10,
  11  21:6
  30:12
  32:2
  33:12
  34:8
  35:21
  40:10
  46:9
20th
  34:12
21st
  34:12
23
  4:11
2388
  30:2
2390
  30:2
24
  6:3
  65:18,
  20
24-hour
  13:3
25th
  35:12,
  13
  72:21
27th
  59:13

29
  10:4
  35:21
29th
  10:1
2:46
  21:8

_____

**3**

30
  3:17,18
  21:6
31
  3:19,20
31st
  24:6,20
  26:19
  52:25
32
  3:21
33
  3:22,23
3rd
  29:2,
  19,24
  30:15
  50:15,
  18
  52:7,19
  77:21

_____

**4**

40
  3:8
4th
  30:18

Shae Randolph
03/19/2025

2

**5**

**5**
3:7,15
4:5

**5th**
20:10

**6**

**60**
4:11

**7**

**7**
3:18

**76**
3:9

**7th**
30:12,
19

**8**

**80**
3:10

**9**

**9**
3:15

**99**
27:16

**A**

**ability**
6:4,7
17:23

**absolute
ly**
79:17

**abuse**
22:6

**access**
37:10,
23

**accounta
ble**
42:20
43:14
44:1

**accurate**
8:1,2

**accusati
ons**
78:7,9

**accused**
42:19

**acted**
42:6,7
49:2

**action**
3:19
4:6
21:12
28:7
69:16

**actions**
37:18
43:25

**activity**
81:17,
23

**actual**
29:17

**addition**

11:25
59:9

**addition
al**
18:23
59:10

**addition
ally**
81:22

**address**
43:4

**administ
ration**
22:17,
20
37:16

**administ
ration's**
37:17

**administ
rative**
15:21
16:1,3
22:10
45:19,
25
46:16
64:7

**administ
rators**
36:20

**admitted**
69:3

**admittin
g**
69:23

**advice**
8:6,21
9:2

72:3
79:21

**advise**
8:25
9:1

**advised**
8:15

**advisory**
79:20

**affect**
6:3

**affected**
37:1

**afternoo
n**
5:16

**agree**
80:10

**agreed**
5:2

**agreemen
t**
34:18

**airing**
39:3

**AK**
41:9

**alerted**
39:15

**alerting**
39:6

**allegati
ons**
75:11,
14

**alleged**
26:20
36:15

68:25
69:5
73:19
78:12

**allegedl
y**
74:3

**alleging**
9:9

**altering**
6:2
39:4

**amendmen
t**
27:19
60:6,16
61:12
80:12,
19,20

**Amy**
10:9
50:11
51:3,24
52:11
60:22
66:10
76:4

**analyzin
g**
60:2,16

**anonymou
s**
9:9
10:16
11:1,4,
7,9,25
38:20,
21

**anonymou
sly**
9:22

**answers**
6:10

**anymore**
64:18

**Ara**
9:4
25:13,
17 26:7
30:11
31:6,21
32:14
34:6
39:2
40:10
43:6,13
46:1,12
50:9
51:14
54:19
55:18
63:25
64:6,
16,19
65:2,5,
7 71:23
72:8,
17,20
78:3,4

**arguments**
48:8

**arise**
19:4

**armory**
18:22

**art**
17:13

Ashley
  53:8
asks
  6:19
ass
  44:12
  45:5
  64:3
assign
  16:15
assistant
  7:4,15
attached
  29:21,
  22
attempting
  30:19
attention
  18:1
  37:8
attorney
  5:21
  6:23
  8:5,23
  25:5,12
  27:1
  40:14
  52:24
  54:10,
  16,18,
  20 59:7
  61:16
  66:21
  67:5,
  10,20
  68:7,10

69:1,4,
  17,24
attorney
  -client
  6:23
attorney
  /client
  72:24
atypical
  10:22,
  25
August
  39:17
authorit
  y
  22:6
  79:17
avenues
  38:9
  61:15
avoid
  17:16
aware
  10:15
  23:16,
  19,23,
  24
  24:3,7
  25:14,
  21 26:4
  28:14,
  15,18,
  20
  38:22
  39:1,
  14,17
  43:11
  74:23
  78:15

82:1,9,
  12

——————

    B
back
  15:10
  18:3
  20:12
  21:17
  28:24
  46:6,9
  55:14,
  24,25
  62:10
bad
  41:14
  42:17
Ballard
  7:9
based
  21:20
basic
  6:1
basis
  64:14,
  17 65:3
Bates
  32:18
BCCF
  80:25
began
  20:9
  28:12
begin
  12:16
behavior
  15:9
  21:19
  74:4

belief
  25:4
believed
  42:19
  50:24
  73:20
  81:12
  82:19
bit
  8:3
  27:9
Blunk
  10:10
board
  38:16
body
  55:21
  56:8,23
  58:5
  62:7
bottom
  55:11,
  13
  77:25
Boylan
  10:11
Branchet
  24:23
break
  6:14,
  16,17
  72:23
breakdow
  n
  38:1
Brian
  25:6,
  18,23
  26:8

bring
  38:9
  50:15
  51:3
bringing
  60:14
broadcas
  ted
  62:18
brought
  37:8
  43:8
  50:17,
  20,24
  53:14,
  16
  73:19
  77:15,
  20
  78:11
Bucks
  15:13
  69:2,7
  70:23
  71:1
bulk
  15:19
bullying
  9:9
  10:23
  26:21
  29:7,8,
  19
  30:20
  31:9
  42:5,9,
  19 44:9
  73:19
  74:3
  75:5

78:7,
  11,21
Burns
  53:9
business
  12:13

——————

    C
call
  12:13
  17:21
  19:7,8
  23:25
  24:10,
  12,21
  25:18,
  21,22
  26:18
  46:21
  54:2
called
  7:9
  55:23
  56:9
  57:4
  58:13,
  16,19,
  21,23
  62:9
calls
  19:7
Captain
  74:14
career
  15:13,
  23
Carl
  63:19
  74:15

77:1

case
25:6,
12,24
41:7,10
55:12
68:20
80:16

CBA
8:11,14

cell
55:24
62:10

cells
56:10

center
18:23
19:8

certific
ation
5:4

chain
43:7
63:12
65:23

chance
73:13

change
38:11

characte
r
30:14

characte
ristic
21:21

characte
rization
38:3

characte
rize
64:6

characte
rized
44:11

chief
26:15
41:25
42:2,3

citing
60:13

claim
60:13

claims
60:17

clarify
6:13,14
40:25
47:25

cleaned
26:22

clear
7:22
25:8
27:7
31:22
33:13
78:20
79:16

client
44:8,
11,15,
19
50:18
57:25
59:5,6,
14,22
60:2

61:15,
22 62:4
66:21
67:5,10
68:18,
24
69:13,
16
73:19
82:1

client's
40:13,
17
49:21
52:24
66:13
74:7
75:4,
11,14
76:11

closely
64:16
65:3

closer
46:21

co-
worker
24:22

COB
19:22
30:2
32:20
35:2

Code
27:16

codes
27:14

comma
47:16

command
43:7
63:12
65:24

comment
79:4

Commissi
oner
10:6,7

commissi
oner's
38:14

commissi
oners
39:20
61:19,
22
62:5,
12,17

communic
ating
19:19
38:24
79:13

complain
61:15
81:16

complain
ed
40:19
63:12

complain
ing
77:7

complain
s
64:1

command
complain
t
10:16,
22
11:8,9,
12,14,
17
17:10,
11 44:9
52:15
82:17

complain
ts
10:21,
23
11:2,5
40:18
50:6
52:12
63:16,
25
65:23
66:13
74:7,
17,20
76:11,
24
82:1,
13,16

complete
d
23:1

complian
ce
18:19
19:1

concern
41:22
42:1,2,
3 62:16

77:6,9
78:5

concerne
d
18:12
27:18,
20 38:7
43:19

concerns
38:10,
18 39:7
40:23
41:6
63:5
77:15

conclude
14:19
54:20,
22,24
57:21

conclude
d
54:11
57:11

conclusi
on
13:21
57:14

conditio
ns
6:7

conduct
73:20
82:2

conducti
ng
49:10
50:21

| | | | | | |
|---|---|---|---|---|---|
| confidential | contact | correct | 45:14, | 69:7, | ———— |
| 27:2 | 36:18 | 7:22,23 | 16 | 18,21 | D |
| 34:24 | 39:18 | 8:17 | 46:24 | 70:1, | D-11 |
| 35:15 | contacted | 9:4 | 57:8 | 12,18, | 3:15 |
| 36:15 | 25:23 | 10:14 | 64:9 | 21 72:8 | 9:12,14 |
| 54:9, | 27:25 | 13:5 | correctly | 79:3 | D-12 |
| 11,13, | 39:19 | 14:1,2, | 18:16 | county's | 3:16 |
| 21,22 | 62:17 | 18 | 39:11 | 68:17 | 13:13 |
| 55:1 | contacting | 16:11, | 43:21 | couple | 44:4 |
| 56:10, | 69:3,24 | 12 20:6 | COS | 15:8 | D-13 |
| 21,25 | 70:3 | 23:6 | 13:6 | court | 3:17 |
| 57:6, | contested | 29:10, | counsel | 6:11 | 20:13, |
| 12,13, | 14:11 | 25 | 5:2 | 18:14 | 15 |
| 17,20, | context | 31:10 | 70:4,11 | 82:24 | 28:24 |
| 22 | 30:13 | 32:16 | 78:25 | Coyne | 29:21, |
| 58:2,6, | 48:6 | 38:11 | 79:14 | 63:20 | 22 |
| 9,14 | Contino | 40:14, | county | 77:3 | D-14 |
| 59:24 | 77:2 | 15 44:9 | 7:3,4, | create | 3:18 |
| 68:25 | contraband | 45:20 | 5,8,15, | 21:19 | 30:2,4 |
| 69:5,25 | 55:24 | 47:21 | 18 | created | D-15 |
| 70:7 | conversation | 53:1,2 | 10:13 | 17:12 | 3:19 |
| 71:8,14 | 26:8 | 60:7 | 15:14 | criminal | 30:24 |
| confirm | 40:13 | 61:17 | 23:9 | 37:11 | 31:1 |
| 20:7 | 52:24 | 66:22 | 25:4 | CROSS- | D-16 |
| conflict | 73:1 | 67:5 | 27:23 | EXAMINAT | 3:20 |
| 80:18 | 75:17 | 69:7,8 | 28:6,12 | ION | 31:11, |
| conscious | 78:9 | 73:8, | 30:19 | 3:8 | 13 |
| 26:22 | conversations | 21,22, | 35:24 | 40:5 | D-17 |
| consistent | 72:19 | 25 | 36:14, | crossed | 3:21 |
| 44:16 | copy | 74:1,17 | 24 37:6 | 45:8 | 32:4,6 |
| Constitution | 26:6 | 79:8, | 41:23 | crux | 40:8 |
| 80:12 | 60:25 | 18,19 | 56:1 | 43:13 | D-18 |
| consult | 61:1 | correction | 61:23 | current | 3:22 |
| 8:13 | | 15:16 | 62:2,12 | 46:23 | 32:24 |
| consumed | | 44:16 | 66:20 | cut | 33:1 |
| 6:2 | | corrections | 67:3,4, | 50:4 | D-19 |
| | | 12:12 | 6,7,11, | cyclical | 3:23 |
| | | 15:13 | 12,22 | 15:9 | 33:21, |
| | | 16:2 | 68:11 | | 23 |

D-20
  3:24
  35:2,4
  78:23
  79:10
daily
  64:13,
  17 65:3
Dan
  26:6
  28:8
  31:20,
  22
  33:14
  34:5
  39:9
  40:9
  52:10
  59:4
  77:24
  78:4
Dan's
  27:6
  52:9
  59:8,9
date
  9:24
  10:3,17
  21:4
  31:25
  34:7
  35:20
  63:5
dated
  14:14,
  15
  81:21
dates
  11:16
  66:1

Dave
  34:13
David
  34:16
  45:23
  46:4,20
  51:16
  63:20
  64:10,
  13 82:7
day
  16:13
  33:11,
  13
  35:22
Dayoub
  53:8
days
  47:15
deal
  8:10
death
  78:16
  81:13
decide
  8:19
decision
  8:18
  23:5
  24:25
  26:23
  68:18
  71:22
  72:2
  79:17
decisions
  8:23

Defense
  13:11
define
  57:17
degree
  23:17
delay
  19:19
deliberate
  37:4
delivery
  82:24
demeaning
  19:13
  44:2
department
  7:20,
  21,24
  8:12
  14:3,7
  15:13
  23:9
  31:23
  36:2,6,
  17
  38:18
  52:19
  77:16
  78:13
department's
  14:9
departments
  36:24

Depending
  8:12
depose
  25:13
deposed
  5:19
deposition
  19:21
  29:12
  35:17
  73:16
  75:22
depositions
  5:23
deputy
  31:23
  64:23
DESCRIPTION
  3:14
  4:3
detail
  11:16
  43:12
detailed
  11:3
details
  26:1,5
  40:13
  67:10,
  11
determinations
  21:23

determine
  28:21
DG
  41:10
  43:2
Diane
  9:22
  10:2,10
  12:9
  33:9
  49:9,19
  50:21
  78:6
died
  41:14,
  22
  42:17
  47:23
  49:22
Dierdelowitz
  73:24
  75:10,
  17
  82:22
difficult
  37:21
Digirolamo
  10:8,9
DIRECT
  3:7
  5:13
directly
  39:20
  52:8

director
  26:13
  44:7,23
  46:23
  47:6
dirty
  55:24
  56:10
  62:10
disagree
  44:23
  57:13
Disappointment
  37:19
discharge
  68:18
  69:18
discharged
  68:24
disciplinary
  3:19
  4:6
  21:12
  69:16
discipline
  31:7
  35:19
  43:11
disciplined
  42:19
disciplining
  43:20

disclose
56:5

disclosed
27:7
78:25

disclosure
34:24

discovery
61:2

discrimination
74:7,20
76:12

discriminatory
73:20
81:17,
23 82:2

discuss
24:10
25:24
26:8

discussed
52:9
53:22

discussion
10:19
39:23

discussions
47:10

disruptive
36:23

disseminated
62:15

divulged
55:4

DOC
15:23
22:16,
19
37:16
38:23
69:6
79:7

DOC/
COUNTY
69:2
70:22
71:1

document
4:4
9:18,20
14:3,8
19:23
20:8
29:14
30:8,10
33:10
34:7
35:18,
20
55:13

documentation
81:23

documented
14:11

documents

12:21
52:3
55:3

double
18:21

drafted
13:21

drugs
27:12
41:13,
23
49:23
55:25
62:10

due
78:17

duly
5:10

duties
7:17

———

E

e-mail
3:15,
17,18,
20 4:5
9:9,21
10:5
20:22
21:5,6
28:13,
24
30:11,
17
31:20
32:1
38:20,
21
65:12,

13
66:2,5

e-mails
36:18
65:8,9,
10,12,
22
66:13

earlier
23:7
36:1
37:14
60:1
82:10,
11,15

early
9:8
37:9
65:16,
20
82:9,14

eggshells
17:14

elaborate
42:10

emergency
28:3
36:2,7

employee
15:18
22:21

employees
8:11
10:12
13:6

21:1
38:7,
13,24
51:12
73:21,
23
74:2,
10,12
81:18

employees'
8:14

employment
4:4
7:19
8:4,7,
22
35:23
80:8

encouraged
50:1

end
12:19
20:4
77:23

engage
78:8

ensure
16:10
37:12

entail
36:16

entailed
36:17

entitled
21:1

environment
17:12
21:20

equipment
18:24

ESQUIRE
3:4 5:9

essentially
41:12
55:19
58:4

evaluate
11:9

evaluating
12:21

events
27:11,
25

Eventually
18:10

evidence
18:17

exact
10:17
62:1,3

EXAMINATION
3:7,9
5:13
76:20

examined
5:10

examples

Shae Randolph
03/19/2025

8

11:15
**Exhibit**
9:14
13:13
20:13,
15 30:4
31:1,13
32:6
33:1,23
35:4
**Exhibit-12**
13:11
**expect**
29:1
**expecting**
38:5
**experience**
16:25
80:7
**experiences**
45:4
**express**
40:23
**expressed**
40:25
**extent**
14:9

———————
**F**
**face**
19:13
44:2
**facility**

16:13
19:8
22:12
27:13
**fact**
15:10
41:22
50:24
56:7,
21,23
57:25
69:16,
20,22,
25 73:2
79:6
**fact-finding**
3:24
20:24,
25
21:10
24:16
28:25
29:4,7,
17
30:15
35:11,
14
50:22,
23
59:12
72:20
73:5
77:22
**factor**
68:17,
20
69:18,
21
**failed**

41:15
**fair**
14:19
23:15
30:18
36:22
38:1
66:18
**fairly**
14:11
**favorite**
22:16
37:16
**February**
9:8
10:1,4
**feel**
41:14
47:8
59:24
**feeling**
17:14
**felt**
11:16
12:2
17:4
18:2
37:24
39:11
41:12
42:17
**female**
58:18
**file**
20:5
**filed**
24:23
**filing**
5:3

53:22
**fill**
37:21
**find**
19:1
24:11
28:9
52:7
75:23
**finding**
22:24
73:2
**findings**
14:12
17:1
21:15,
18 22:5
75:25
76:4,8,
10
78:16
**fine**
6:12
24:18
36:11
**fire**
8:19
72:8
**fired**
71:23
72:17
**firing**
8:7
**firings**
8:16
**firm**
7:9

**Fitzpatrick**
10:9
50:12
51:4,24
52:12
60:22
66:10
76:4
**floor**
16:2,5,
16,22
**focused**
29:8
**focuses**
22:2
**follow-up**
52:6
79:24
**follow-ups**
76:18
**followed-up**
34:18
50:16
**form**
3:19
4:6 5:5
46:7
49:13
57:10
62:22
66:23
68:12
69:16
71:2,
11,18
74:18,

22
80:13
**found**
18:20
24:13,
20
**frame**
65:14,
15
**Fred**
10:10
**frequently**
64:1
**front**
22:10
55:21,
22 56:9
57:2,3
58:9,12
62:8
**fuck**
44:3
**full**
5:17
**fully**
47:11,
19,24
49:1

———————
**G**
**gap**
18:25
19:19
**gathering**
12:20
**gave**

42:16
57:15
69:13
**general**
7:2
17:9,11
21:14,
18
25:17
34:10
40:23
41:6
43:25
67:24
79:3
80:16,
17
82:18
**generally**
11:1
23:16
44:1
67:15
**Gibbons**
10:10
**give**
8:3
72:12,
13
**good**
5:16
22:21
73:13
**Grieser**
3:7,9
5:15
9:17
13:16
20:18

30:9
31:4,
16,22
32:9,
20,22
33:4,14
34:1,5
35:7
39:21
40:1
43:11
46:7
49:13
53:8,
12,16,
20
57:10
60:22
61:4,9
62:22
66:11,
23
68:12
71:2,
10,17,
24
72:14,
22
74:18,
22
76:4,
17,22
77:24
78:4
79:22
80:13
**Grieser's**

26:7
40:9
59:4

**grievance**
8:14
21:24
22:2
41:17,
19
**grievances**
8:11
15:18,
20 39:3
**grieve**
39:16
**group**
44:15
**guess**
25:25
37:19

——————
**H**
**halfway**
43:2
**hand**
9:11
32:23
35:16
**handing**
21:17
32:3
**handle**
8:10
**happen**
15:8
**happened**
55:20
58:4
59:12
63:4

**happening**
28:14,
23 66:7
**harassing**
9:9
**harassment**
10:24
26:20
74:21
**hard**
44:12
45:5
64:3
**Harran**
10:10
**Harvie**
10:7
**hear**
15:18
19:10
48:20,
23,24
49:8,
12,19,
25
50:2,5
**hearing**
15:17,
19 21:2
29:1,2
**held**
29:2
39:23
**helpful**
12:3

**hesitate**
6:14
**hey**
50:8
**hid**
62:11
**hidden**
67:15
**highly**
22:19
**hire**
8:20
**hired**
15:15
**hiring**
8:7
**hold**
29:1
**holding**
42:20
43:13,
25
**honestly**
72:25
**hostile**
17:12
21:19
**hours**
6:3
24:15
**HR**
8:13
10:20,
23
11:1,
16,22
12:2,5,
7,10,11

13:25
21:15
26:13
36:21
63:9
77:16
78:4,12
79:7
**human**
7:20
8:8
9:23
14:8
20:1
26:15
43:8
**hundred**
41:14
**hypervigilant**
43:9

——————
**I**
**i.e.**
47:19
**idea**
8:3
**identification**
9:12,15
13:14
20:16
30:5
31:2,14
32:7
33:2,24
35:5
**identity**
56:5

immediately
27:24
28:2
51:5
implication
47:23
implied
44:18
important
47:12,
19,22
impression
14:24
15:2,5
in-person
53:3
incident
80:25
include
44:1
included
11:14
including
8:7
information
12:20
27:7
28:22
34:24
35:15
36:15,
21

37:7,
10,11,
12,23
53:19,
21
54:10,
12 55:3
56:11
57:21
58:2,6,
10,14
59:5,
10,11,
25
62:1,3
68:25
69:6,
17,25
70:7,24
71:8,15
78:24
informed
34:14
initial
32:1
initially
60:2
61:1
injunctions
36:12
inmate
15:19
27:12
41:22
55:23
62:9
80:25

inmates
56:17
inmates'
37:10
instance
19:11
instances
82:18,
19
instruct
6:21
intake
78:18
intent
68:1,3
interfere
6:7
interfering
17:18,
23
internal
14:2
43:3
70:20
interpersonal
46:19
interview
3:21
12:24
26:10
33:14
51:12,
14,16
81:2,3,

11,15,
17
interviewed
12:25
14:25
19:6
74:10
78:6
81:8
interviewing
12:18,
22
interviews
14:23
introduced
47:18
investigate
10:23
11:7,10
36:14
37:6
74:6
investigated
52:13,
17
78:11
investigation
3:16
4:4
11:13,
19
12:4,6,

8,16,24
13:20,
21
14:10,
20,22
15:25
17:2,8
18:1,11
20:8,9
21:13,
15 23:4
26:17,
20
28:17
29:6,7,
9,20
30:13,
20 31:9
34:21,
23
42:4,9
44:8
46:10,
11
49:10
50:3
52:9
73:18
75:1,4,
8 76:1,
5,11
78:21
81:4,10
investigations
10:20
11:22
investigative
14:4
20:2

80:23
involved
12:1
25:15
36:21
58:25
66:5,8,
9 68:19
issue
18:15
28:8
38:9
issues
8:7
18:12
27:19,
21
78:12

———

J
Jaclyn
53:8
60:22
66:11
76:3
jail
9:10
13:3,7
17:21,
24
18:13
23:22
27:8
37:2
38:15,
25 39:4
41:23,
24
45:7,
10,12

| | | | | | |
|---|---|---|---|---|---|
| 46:4 | 29:2, | 33:11 | 37:18 | 50:7 | **Lauren's** |
| 47:6 | 19,24 | 34:6, | 42:18 | 51:16 | 27:6 |
| 49:23 | 30:12, | 11,14, | 47:16 | 63:20 | **law** |
| 54:25 | 15,18 | 17,20 | 48:8 | 64:10, | 5:10 |
| 56:12, | 31:7 | 35:23 | 50:9 | 13 82:7 | 7:9,13, |
| 16 | 32:1,2, | 37:9,15 | 65:8 | | 21,24 |
| 57:8,24 | 14,15 | 39:15 | 76:24 | _____ | 14:2,7, |
| 64:5 | 33:12 | 40:10 | 77:11 | **L** | 8 23:8 |
| 66:20 | 34:8,12 | 41:11 | **kind** | **labor** | 31:23 |
| 67:8 | 40:10 | 43:6, | 45:21 | 7:19 | 36:2,6, |
| 70:15 | 46:9 | 13,19 | 48:23 | 8:5,22 | 17 |
| 71:8,15 | 50:15, | 45:3 | **knew** | 80:8 | 38:18 |
| 74:10, | 18 | 46:1,12 | 25:23 | **lack** | 52:18 |
| 11 | 52:7,19 | 47:9 | 46:11 | 16:24 | 60:3 |
| **jail's** | 65:17, | 48:14, | 54:6 | 29:5 | 77:16 |
| 19:2 | 20 | 19,25 | 66:7 | 78:18 | 78:12 |
| 36:20 | 77:21 | 51:14 | **knowing** | 81:22 | 80:8 |
| **James** | _____ | 54:19 | 66:21 | **lash** | **lawsuit** |
| 63:20 | **K** | 55:18 | 67:4 | 42:13 | 69:1,6 |
| 77:3 | **Kelly** | 63:25 | **knowledge** | **lasted** | 70:12, |
| **Jeff** | 63:21 | 64:6, | 12:17 | 59:19 | 17,22, |
| 77:1 | 77:1 | 16,19 | 25:3 | **Lauren** | 25 |
| **job** | **Kimbrough** | 65:2,5 | 39:10 | 19:21 | **lawyer** |
| 7:13 | 9:4 | 71:23 | 55:6,19 | 26:11, | 80:5 |
| **Joshua** | 13:2,22 | 72:8, | 58:2 | 13 | **lead** |
| 47:20 | 15:11 | 17,21 | 62:6 | 29:12 | 12:4,5 |
| 81:13 | 16:4,18 | 77:7,15 | 78:19 | 32:13 | **leadership** |
| **judge** | 18:2 | 78:20 | 79:12 | 33:9,14 | 14:25 |
| 25:1 | 19:15 | 79:6 | **Kratz** | 35:17 | 17:7 |
| **judgment** | 20:23 | 81:1,24 | 34:13, | 39:9 | **leading** |
| 24:24 | 23:25 | **Kimbrough's** | 16 | 40:8 | 27:11 |
| **July** | 24:12 | 14:25 | 44:7, | 42:24 | 47:15 |
| 35:12, | 25:13, | 16:24 | 11,23 | 52:10 | **leak** |
| 13,21 | 17 26:7 | 18:4,18 | 45:23 | 59:3,17 | 35:15 |
| 59:12 | 27:1,24 | 20:5 | 46:4,20 | 63:8 | 36:15 |
| 72:21 | 28:9, | 21:19 | 47:6, | 69:10, | **leaked** |
| **June** | 16,25 | 22:25 | 10,17 | 12 | 28:22 |
| 3:18,20 | 30:11 | 24:21 | 48:5,18 | 72:20 | 37:7,13 |
| 28:11 | 31:21 | 28:13 | 49:7 | 73:7 | |
| | 32:14 | 31:6 | | 77:16, | |
| | | | | 23 78:3 | |

learn
  15:12
  18:8
  54:2
learned
  9:7
  15:15,
  24
  18:11
  25:22
  26:1
  40:13
  52:24
  53:19,
  20,21,
  24 54:1
learning
  27:24
  37:17
leave
  34:20
led
  81:12
left
  78:3
legal
  8:6,21
  11:18,
  20 12:3
  17:13
  72:3
  79:21
  80:10
legitimate
  50:5
  77:6,9
length
  78:24

lent
  11:12
letter
  60:12
  68:22,
  25
level
  12:1
lieutenant
  13:1,22
  14:25
  15:11,
  21
  16:4,5,
  18,22,
  24,25
  18:2,4,
  18
  19:15
  20:4,23
  21:19
  22:11,
  25
  23:25
  24:12,
  20
  27:1,24
  28:9,
  12,16,
  25
  33:11
  34:10,
  14,17,
  19
  35:22
  37:9,
  15,18
  39:15
  45:2,
  19,21,

25
  46:16,
  23
  47:9,16
  48:19
  64:8
  74:14
  76:24
  77:6,
  11,15
  78:20
  79:6
  81:1,24
lieutenant's
  16:17
lieutenants
  16:1,2,
  3 21:22
  47:3
light
  38:10
limited
  26:19

litigation
  7:25
  23:8,
  12,16,
  20
  24:10,
  19 25:9
  37:2,4
  52:25
  53:25
  59:1
  76:7
  79:4

location
  16:11
locations
  16:11
long
  7:5
  72:23
looked
  42:23
  51:6,
  18,22
  52:7
  65:7,9,
  11,25
  66:12
lot
  7:20
  15:2
  18:13
  37:10
  39:9
love
  15:3

———

M
made
  21:24
  23:25
  43:9
  45:5
  54:1
  63:16
  65:23
  82:1,4,
  7
make
  8:23
  17:15

19:6
  26:21
  38:11
  78:4
  82:3
maker
  8:18
  23:5
makers
  71:22
makes
  10:25
  77:25
making
  19:18
  28:19
  79:17
  82:13
male
  55:20
  58:5,8,
  18
management
  17:7
  64:7,8
  74:11
manager
  12:11
manner
  22:4
  64:3
Mansour
  3:8,10
  4:11
  6:19
  32:18,
  21
  40:3,7

46:8
  49:16
  53:14,
  18,23
  54:4
  57:16
  60:24
  61:6,
  11,13
  62:23
  67:2
  68:16
  71:3,6,
  13,20
  72:1,6,
  16 73:3
  74:19,
  24
  75:21,
  24
  76:15,
  23
  77:14
  78:23
  79:24
  80:4,
  17,21
  82:23
March
  3:15
  4:5 9:8
  12:19
  14:20
  20:10
  65:16,
  18
mark
  20:13
  30:1
  33:21

**marked**
9:12,14
13:10,
13
19:21
20:15
29:12
30:4
31:1,13
32:3,6,
24
33:1,23
35:4,17

**Marseglia**
10:6

**matter**
28:1,2
52:4

**matters**
38:25

**May-something**
14:20

**measures**
43:3

**medical**
6:6
37:11

**meeting**
3:24
20:24,
25
21:2,10
24:9,16
28:9
29:4,8
31:21
32:14

34:6
35:14
39:8
40:9
41:4,5
42:24
50:22,
23  51:5
52:10,
25
53:3,5,
11,17,
24
59:4,
12,15,
19,22
61:23
62:5,
12,15,
18
72:20
73:5
77:22,
24

**meetings**
23:12
38:14,
16
59:20
61:20
76:7,9

**member**
7:25

**memo**
42:23
47:14
60:15,
16
61:2,11
81:21

**Memorandum**
3:23

**mentioned**
8:15
27:13
36:25
37:14
60:1
61:19
65:6
76:6,25
78:5

**merit**
11:11,
17

**met**
26:7

**Metellus**
63:19
74:15
77:1

**method**
14:12

**middle**
64:7,8

**mind**
6:2

**minutes**
18:24

**missed**
47:17
61:7

**moment**
79:22

**moments**
40:17

**months**
15:8

**mood**
6:2

**morning**
24:5

**motion**
24:23
28:3
36:3

**motions**
36:7

**moved**
15:17
17:22

**movements**
54:24
56:6

**Moving**
36:1

**multiple**
38:18

———

**N**

**names**
11:15

**necessarily**
28:6

**needed**
42:5,11
44:16

**needing**
18:14

**negative**
44:19,
20

**night**
25:24
80:25

**non-findings**
76:8

**Normal**
82:24

**notable**
81:22

**notation**
77:25
78:2

**noted**
22:16,
18
79:10

**notes**
26:11
27:7,10
32:13
40:8,9,
12
42:24
43:17
55:12
59:3,9
73:4,9,
11
74:25
75:7,
16,23
77:24

**notice**
3:24
24:16
29:17
35:11

**notification**
21:4

**notified**
28:16

**notify**
28:25

**notifying**
20:23

**Nottingham**
74:14

**November**
7:6

**number**
3:14
4:3
16:12
42:15

**numerous**
63:12

———

**O**

**object**
6:18
71:18
74:22

**Objection**
46:7
49:13
53:12
57:10
62:22
66:23
68:12
71:2,
10,17,

24
72:14, 22
74:18
80:13

**objections**
5:5
6:19, 20,21

**obtained**
59:11

**occasion**
19:16

**occur**
29:24

**occurrence**
36:6

**odd**
24:12, 13

**office**
19:7,10
45:7,12
47:6
64:11

**officer**
15:16, 17
18:21
26:15
27:13
45:14, 16
55:20
58:5, 18,21, 23 62:7

**officer's**
58:8

**officers**
16:2, 10,12
17:22
18:16
22:3
42:14, 15
54:25
57:8
64:2

**official**
16:23

**official's**
20:3

**officially**
20:10, 11

**offsite**
17:22

**ongoing**
37:3
79:4

**operating**
19:2
70:21
71:15

**operation**
13:3

**operational**
8:23

**operations**
27:8
37:2
56:11, 22
57:24
67:8

**opined**
44:14

**opinion**
18:9
19:14, 17
37:16
49:21, 24
66:19
71:22
72:12, 15
77:5,8, 10
80:10

**opinions**
72:3

**opportunity**
21:11

**opposed**
39:4

**order**
38:11

**originally**
15:15

**Otto**
9:22
10:2

12:9
33:9
49:9,19

**outbursts**
15:6

**Outline**
3:22

**outranked**
22:11

**overdose**
23:21
78:17
81:1

**overdosed**
50:25

**overlapped**
13:1
47:5

**oversight**
38:16

**overtime**
16:21

———————
**P**
**P-1**
35:18

**P-7**
4:4
19:22
21:17

**P-8**
4:5
29:13

**P-9**
4:6

**p.m.**
21:8

**pages**
61:8

**paid**
34:20

**Pam**
10:10

**paragraph**
47:15
55:15
81:20

**parenthesis**
47:19
48:2

**part**
5:23
7:21
14:10
23:8,11
43:16
52:9
62:17
63:9
67:23
74:25
81:3,10

**participate**
11:19, 21 25:8

**participated**
14:23
30:14

**participation**
14:9
23:4

**partner**
12:7
14:7
55:21, 22
57:2,3
58:8,9, 13 62:8

**partners**
12:14
56:8,24
57:8

**party**
24:1
27:25
70:7,8, 9,13

**passed**
23:21
50:11, 13

**past**
6:3
11:5

**Patel**
73:24
75:13, 18
82:22

**Patterson**
23:20
24:19
25:12
28:1,2
41:3,7,

Shae Randolph
03/19/2025

15

| | | | | | |
|---|---|---|---|---|---|
| 10,13 | 45:3 | 27:13 | 26:1,25 | **possibly** | **previewing** |
| 42:17 | **perfectly** | 73:24 | 27:3, | 38:11 | 48:7,25 |
| 47:20, | 6:12 | **phases** | 18,20 | **post** | **previous** |
| 23 48:1 | **period** | 39:8 | 34:15, | 18:25 | 36:10 |
| 49:20, | 69:7 | **Philadelphia** | 19 | **posts** | 46:23 |
| 22 | **person** | 7:10 | 39:14 | 16:15 | **previously** |
| 50:24 | 55:25 | **phone** | 43:9 | **potential** | 19:21 |
| 59:1 | 58:16 | 23:25 | 45:6 | 28:8 | 29:12 |
| 68:19 | 67:25 | 24:11, | **policies** | 60:13, | 35:17 |
| 78:17 | 68:4 | 21 | 8:8 | 16 | **primarily** |
| 81:13 | **personal** | 25:18, | 18:19 | **potentially** | 27:20 |
| **pay** | 21:24 | 21,22 | 64:5 | 8:16 | **prior** |
| 34:15 | 39:3 | 26:18 | 79:7, | 62:14 | 6:16 |
| **pending** | 40:19 | **phrase** | 10,13 | **pre-disciplinary** | 7:7,11 |
| 6:16 | 41:16, | 16:9 | 80:11 | 21:2 | 81:8 |
| 34:20 | 19 47:2 | **pick** | **policy** | **preference** | **prison** |
| **people** | 77:11 | 16:21 | 22:25 | 23:1 | 38:16 |
| 12:18, | **personally** | **place** | 27:22 | 77:11 | 64:11, |
| 24 | 74:6 | 32:15 | 38:11 | **Preliminary** | 13 |
| 15:16, | **personnel** | 38:23 | 61:24 | 36:12 | **prisoner** |
| 17 | 20:5 | 53:5 | 62:2, | **prepare** | 23:20 |
| 18:13 | 72:2 | 81:24 | 13,21 | 75:3 | **privilege** |
| 19:5, | **pertained** | **plaintiff's** | **pose** | **present** | 6:23 |
| 10,12 | 70:25 | 25:5,11 | 38:8 | 26:9 | 72:24 |
| 38:10, | **pertaining** | 69:1,3, | **position** | 53:7 | **privileged** |
| 17 | 69:1,6 | 24 | 7:3 8:4 | 59:15, | 53:12 |
| 39:9,15 | 70:12, | 70:4,11 | 15:18, | 16 | 71:24 |
| 41:20 | 14,17, | 78:25 | 21 | **prevails** | 72:1,14 |
| 56:5, | 20 | 79:14 | 16:17 | 80:19 | **procedures** |
| 14,19 | 71:8,15 | **plan** | 22:6,10 | **preventable** | 19:2 |
| 76:23 | **pertains** | 16:13 | 36:10 | 41:15 | 38:23 |
| 77:12 | 54:25 | **point** | 37:3,9, | | 70:21 |
| **perceived** | **ph** | 17:5 | 21,24, | | 71:15 |
| 43:20 | 24:23 | 19:10 | 25 | | |
| **percent** | | 23:24 | 42:18 | | |
| 41:15 | | 25:19, | 64:7 | | |
| **perception** | | 20 | **positions** | | |
| 40:17 | | | 16:19 | | |

Shae Randolph
03/19/2025

16

process
18:16

processe
d
18:14

produce
25:4

produced
61:1,4

product
6:23

PRODUCTI
ON
4:10

promoted
15:20

promotio
ns
8:8

protecte
d
21:20
60:3,6

provide
8:6,21
60:19,
25

provided
26:6

public
21:1
38:13,
14,24
39:6,7
62:14
67:16,
17,23,
24

publicly
62:18,
21

pulled
27:14
55:6,
11,18
58:1
62:5

pulling
28:12

purpose
21:9
28:19,
21

put
34:20
48:1
55:25

———

Q

question
6:16
27:3
55:9
56:4
67:1
71:5

questions
5:6
6:18,
20,24
8:9
40:2,3
76:16
79:25
82:23

quicker

77:12

quote
44:12,
21
48:20

———

R

R-A-N-D-
O-L-P-H
5:18

Randolph
3:4
5:9,18
80:5

Rea
10:10

reach
75:25

reached
28:8
34:16

reaction
17:3,16
19:3
82:21

read
43:17
69:23

reading
5:3
27:6,10
40:12

reason
42:5,
11,16
43:23
69:25
70:2

reasonin
gs
48:15

reasons
15:6

recall
24:7
28:11
34:13
36:3,11
76:13
77:18,
20
78:25
81:14,
19

receive
11:1,2
30:22

received
9:8,21,
25 10:5
11:4
13:23,
25
26:11
43:10
60:12
63:24
65:12

reception
18:6
22:3
47:11,
18,24
49:1,23
50:10,
25 63:6
66:14

82:14,
20

recipien
t
66:2

recipien
ts
65:11

recognize
9:18
13:17
19:23
20:19
29:14
30:7
31:17
32:10
33:5
34:2
35:8
37:4

recollec
tion
34:9

recommen
dations
14:12

record
5:17
6:12
39:21,
24

records
18:6
22:3
37:11

RECROSS-
EXAMINAT
ION
3:10
80:2

redacted
56:1,4
61:1,3,
5

REDIRECT
3:9
76:20

Reed
63:21
77:1

refer
29:6
80:22

reference
41:6
49:20
52:23

referenc
ed
4:3
48:3
81:1

referenc
es
55:5

referenc
ing
17:21
52:3
56:8

referred
17:14

Shae Randolph
03/19/2025

17

referring
49:5,9
55:16
66:5
reflect
75:17
regard
29:5
regular
23:11
76:6
reiterated
47:17
59:23
relate
79:13
related
67:7
78:9
relating
59:3
66:13
relation
31:8
relationship
44:20
47:9
relationships
46:19,
25 47:3
relay
76:7
relayed
19:12

25:18
26:2
27:1,11
release
34:10
relevant
57:18
rely
76:10
remember
6:12
10:17
48:17
69:14
72:25
73:9
74:13
repeat
15:9
66:25
repetitive
61:8
reply
36:2
report
3:16
13:20,
23,25
14:5
20:2,4
22:18
26:7
27:6
34:5
44:5
50:1
59:8,10
75:3
76:3

77:12
78:4
80:23,
25
reported
43:7
reporter
6:11
82:24
reports
27:10
request
25:13
40:20
60:23
75:20
requested
25:5
REQUESTS
4:10
reserved
5:6
resources
7:20
8:8
9:23
14:8
20:1
26:15
43:8
respect
41:2
respond
28:3
36:7
response
36:23

37:17
38:4
responses
64:4
responsibilities
7:17
responsibility
41:12
rest
23:12
56:3
result
21:13
23:21
41:23
76:1
retrieve
55:24
62:10
return
18:24
reviewing
80:24
Rhoades
27:12
49:22
Rich
10:9
rightfully
78:8
role
8:22
12:10

16:23
17:7
23:4
26:16,
19
79:20
roles
16:6
room
78:3
routinely
45:2
rule
79:3
80:18
running
16:10
17:18

─────────
S

S-H-A-E
5:18
safety
18:12,
15 38:9
39:7
40:24
77:6,9
78:5
sake
30:15
schedule
28:9
31:21
school
7:14
scope

12:23
screaming
44:2
sealing
5:3
search
55:21
56:8,23
58:5
62:7
66:5
searched
56:14,
17
section
7:25
17:17
18:5
23:8,13
80:24
security
27:8
56:11,
22
57:24
67:8
70:15
71:9
sender
65:12
sense
17:3,22
64:9
separate
26:23
separation
34:10,

18

sergeant
15:4,11
16:5,8,
25
45:17,
18
73:24
75:10,
13,17,
18
82:22

sergeant
's
17:23
19:7

sergeant
s
12:25
15:3,6
16:2,9,
14
17:4,
10,18
19:18
21:21,
25 22:3
42:8,14
43:14
44:14,
18 45:2
46:19,
25
47:4,5,
7 49:3
50:4
64:2

settle
15:7

sexual

74:20

Shae
3:4
5:9,18
78:6

Shae's
61:11

share
67:17
68:6

shared
54:10,
13,15,
17,20
62:1
66:21
67:5,
10,20,
24,25
68:4,10
69:17
70:25

sharing
68:25
69:5,24
70:6
71:8,14

Sherman
74:14,
16

shift
13:7
16:10,
25
17:18
18:21

shifts
13:1
16:21

shortly
10:18

show
14:6
19:20
20:13
29:11
30:1

Showing
13:10

sick
33:20

signed
69:11

signing
5:3

similar
60:15
75:3

simply
62:16

sit
54:15

situatio
n
17:6
38:7,12

situatio
ns
19:4

skip
43:16

slash
69:7

Smith
26:12,
13
32:13

33:9,15
42:24
59:3,17
63:8
69:10,
12
72:20
73:7
77:16
78:3

Smith's
19:21
29:12
35:17
40:9
77:24

smuggled
41:24

sneak
49:22

snuck
27:12

solely
29:8

solicito
r
7:4,16
31:23

somebody
's
15:23

sort
60:16

source
59:5

Spahr
7:10

speak
21:3,11

74:12

speaking
45:1
47:7

speciali
ze
7:17,19

specialt
y
7:16

specific
11:3,14
41:4,5
54:25
65:14
67:25
68:4
73:1
80:15
82:17

specific
ally
12:12
17:20
36:24
38:15
41:2
48:17,
18
55:7,10
61:9
66:4
67:9,11
69:21
79:15
80:7

specific
s
49:18

spell
5:17

spoke
18:10
36:1
44:7
74:11,
14
76:25

spoken
22:19

staff
17:24
42:20
55:5,
10,18
58:1
62:5

staffed
17:15,
16
19:16
39:4,10
47:11,
19,24
49:1
55:1

staffing
16:11
18:9,19
22:25
23:1
40:21
43:10,
14,21
49:24
50:6,10
64:5
76:25
77:15

78:12,
18

**stage**

24:19

**standard**

19:2

45:8

**start**

12:18

**state**

5:16

47:15

**stated**

43:6

**statemen
ts**

30:16,
22

**States**

80:12

**stay**

13:7

**step**

31:6

43:11

**straight**

38:17

**stressed**

37:20

**strip**

56:14,
17

**stuff**

6:2

**stupid**

19:9

**style**

15:1

**subject**

66:1

74:3

**submit**

30:16,
23

**subordin
ate**

12:2

44:1

**subordin
ates**

43:20

**subsecti
on**

17:17

**subseque
nt**

52:19

**substanc
e**

11:10

**substanc
es**

6:3

**sufferin
g**

6:6

**suggest**

49:1

**suggeste
d**

81:24

**suing**

68:11

69:18,
21 70:1

**summary**

24:23

**supervis
ed**

44:15

**supervis
or**

7:22

12:1,2

13:24

44:21

45:5

**supervis
ors**

38:2

46:20

47:1

50:12

60:20

63:13,
15 76:8

**support**

12:3

50:3

**surprise
d**

38:4

**suspend**

68:18

**suspende
d**

34:14

**sworn**

3:5

5:10

———

**T**

**tab**

35:1

**taking**

81:24

**talk**

48:11

63:18

75:10,
13

**talked**

41:9

48:12

63:19,
20

78:24

**talking**

49:7

61:10

67:9

77:4

**team**

24:10

53:1,25

**Teams**

53:6

**telling**

44:2

57:7

81:14

**tend**

13:7

**tended**

22:9

37:15

**term**

17:13

29:6

**terminat
ed**

35:23

78:21

79:7

**terminat
ion**

35:19

39:16

68:22

**terminat
ions**

8:16,19

79:18

**testifie
d**

5:11

40:16

61:14

**testify**

6:4,8

**testimon
y**

6:4

**theory**

47:17,
18

**things**

17:4

26:23

27:15

39:8,11

41:20

44:3

48:19,
23

49:8,
12,17,
18 50:1

62:11

66:21

67:4

**thought**

27:22

42:21,
22 62:8

**thousand
s**

61:8

**three-
quarters**

41:8

**time**

5:6 7:1

21:7

24:17

30:16

33:20

52:23

60:9

64:4

65:14,
15,17

82:16

**timeline**

20:7

**timely**

22:4

42:14

64:2

**times**

18:20

43:9

63:12

**timing**

24:11

**title**

7:3

26:14

**Today**

46:5

Shae Randolph
03/19/2025

20

told
39:9
43:7
47:10
48:14,
15 50:7
51:22
53:10
54:12
55:21
57:2,11
58:12
63:8,11
78:4
82:8
touch
36:19
tough
44:21
45:5
trajectory
15:22
transparent
43:10
trial
5:7
true
22:13
trump
80:11
trust
37:24,
25 38:1
truthfully
6:4,8

turn
43:1
44:4
55:14
80:23
Tyler
24:22
53:9
types
19:3
typical
15:22
36:5
typically
10:21
13:6

_____

U

Uh-huh
54:23
60:4
70:19
74:5
77:17,
19 78:1
Ulmire
27:13
unclothed
55:20
56:8,23
58:5
62:7
understaffed
18:18
40:20
49:23

understaffing
50:25
52:15
61:16
63:5,25
65:24
66:14
81:12
82:13,
20
understand
26:25
45:6,7
understanding
15:19
16:20
17:6
22:14
25:16,
17
26:24
33:18,
19 42:4
45:3
47:4,8
82:17
underway
23:20
unfortunate
78:16
unhappy
19:15,
17
unit
17:15
18:7,9,

18
19:15
39:10,
12
40:20,
24
41:13
42:14
43:21
50:10
51:1
55:6,19
58:1
62:6
63:6
64:2
65:24
66:14
77:12
78:18
82:14,
20
United
80:12
units
17:16
43:14
unlike
15:16
unscheduled
24:9
updates
33:8
upset
39:12

_____

V

vacation

33:20
Van
10:10
verbal
6:10
view
17:5
41:16,
21
44:19
viewed
61:16
violating
62:21
79:7
violation
61:23
62:2,13
64:5
Vona
10:10

_____

W

waiting
24:25
30:21
waived
5:4
walking
17:14
wanted
14:8,11
25:24
26:21
30:21,
22

37:11
39:11,
16
42:15
67:14
warden
64:21,
22,23
wardens
77:1
watch
6:22
ways
38:19
40:12
week
12:19
weeks
47:7
whatnot
14:23
whistleblower
27:21,
22 28:8
60:3
61:2
witnesses
25:4
30:14
women's
18:23
wondering
55:12
word
22:10

Shae Randolph
03/19/2025

21

37:20
49:6
57:20

**work**
6:23
7:7,11,
20 14:6
15:4
17:12
21:20
28:13
33:18
45:2,6,
7 57:9
64:16
65:2

**worked**
7:9
15:11
16:1,5,
21 18:6
33:11
45:10

**working**
15:3
18:21

**workings**
36:23
46:4,24

**workplac
e**
10:24
80:11,
18

**works**
9:23
12:12
38:15

**wrap**
26:20

30:20

**wrapped**
20:11

**write**
14:5
60:15
80:24

**written**
69:10

**wrote**
34:6
69:9

──────

**Y**

**yell**
19:13

**yelling**
19:9

**young**
44:15

──────

**Z**

**Zachary**
74:16

**Zeigler**
59:7

**Ziegler**
25:6,
12,18,
23 26:8
27:1
40:14
52:25
54:10,
16,18,
20
61:17
66:22

67:5,
10,20
68:7,
10,11
69:17