**EXHIBIT 8**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


ARA KIMBROUGH                    :
                                 :
                                 :
-v.-                             : NO. 24-CV-04470
                                 :
BUCKS COUNTY, LAUREN SMITH       :
SHAE RANDOLPH AND DAVID KRATZ    :


**DEPOSITION**


DEPONENT:   David Kratz

DATE:       Tuesday, February 18, 2025

TIME:       3:15 p.m.

PLACE:      55 East Court Street, Room 432
            Doylestown, PA

REPORTER:   Ted Allen

SOLICITOR:  Jaclyn C. Grieser

David Kratz
02/18/2025

Page 2

A P P E A R A N C E S:


            MANSOUR LAW, LLC.
            BY: WILLIAM P. MANSOUR, ESQ.
            961 Marcon Blvd, Suite 425
            Allentown, PA 18109
            (610) 936-6863
            wpm@themannsourfirm.com
                    Representing the Plaintiff,
                    Ara Kimbrough


            BUCKS COUNTY LAW DEPARTMENT
            BY: JACLYN C. GRIESER, ESQ.
            DARA BURNS, ESQ.
            55 East Court Street
            Doylestown, PA 18901
            (215) 348-6140
            jgrieser@buckscounty.org
                    Representing the Defendant,
                    Bucks County, David Kratz, et al.

David Kratz
02/18/2025

I N D E X

WITNESS:                                PAGE

DAVID KRATZ

By Ms. Grieser                              4

By Mr. Mansour                             48

E X H I B I T S

MARKED            DESCRIPTION            PAGE

D-5   Guidelines and policy review        28

D-8   Department vision, mission, values and   31
      code of ethics

D-7   Release of past offender incarceration   35
      dates

D-9   Public information and education     36

(Exhibits marked and attached to transcript.)

David Kratz
02/18/2025

1          (It is stipulated and agreed by and among counsel for

2   the respective parties that the reading, signing, sealing

3   and filing of the transcript is waived, and that all

4   objections, except as to the form of the questions, are

5   reserved until the time of the trial.)

6                                    ---

7          DAVID KRATZ was called as a witness and after having

8   been first duly sworn, according to law, was examined and

9   testified as follows:

10                      --- EXAMINATION ---

11  BY MS. GRIESER:

12      Q.    Thank you.  State your full name for the

13  record.

14      A.    David Kratz, D-A-V-I-D, K-A -- K-R-A-T-Z.

15      Q.    And what is your position here with the

16  county?

17      A.    Director of corrections.

18      Q.    Mr. Kratz, if you recall, you had done the

19  deposition with plaintiff's counsel on was it Fri-

20  day, Thursday maybe?

21          MR. MANSOUR:  Wednesday.

22          THE WITNESS:  Wednesday.

23  BY MS. GRIESER:

24      Q.    Wednesday, okay, last week.  And for a va-

25  riety of reasons I didn't get around to following up

David Kratz
02/18/2025

Page 5

1  with you, so that's what we're doing now.  I'm not

2  going to go through the list of usual 'don't talk

3  over me', your -- all of your responses need to be

4  verbal.  I will ask you, though, if you are -- and I

5  know you won't take offense to this 'cause you just

6  won't.

7          But are you under the influence of any al-

8  cohol or medication that would affect your testimony

9  here today?

10      A.   I am not.

11      Q.   Great, okay, all right.  It's, I'm just

12  going -- It's going to seem weird that I'm starting

13  off kind of in the middle, but that's where we kind

14  of left off, okay.  So the first thing I wanted to

15  ask you about was required staff training.

16          If you're in a managerial or supervisory

17  position, is there any ongoing training require-

18  ments?

19      A.   So there are forty hours of in-service

20  training requirements in addition to messages of the

21  week and micro trainings.  Management is also permi-

22  tted to pick and choose other trainings that may not

23  be offered by the department of corrections.  County

24  corrections they can choose seminars, webinars,

25  there's all kinds of free trainings out there

David Kratz
02/18/2025

Page 6

1  through Corrections 1, Lexapol, et cetera.

2      Q.    And are there trainings -- The number of

3  hours of this in-service training, are they tracked?

4      A.    They are.

5      Q.    So Lt. Kimbrough, at the time he would've

6  been required to do forty in-service hours of train-

7  ing?

8      A.    Correct.

9      Q.    Would he have also been responsible to

10  train his subordinates?

11      A.    In any new records/reception or any type

12  of changes, it may happen in the areas that he, he

13  supervised, yes.

14      Q.    And in addition to that forty hours of in-

15  service training, is there anything extra that Lt.

16  Kimbrough or anybody that works as a supervisor in

17  the records office would need clearance for in order

18  to use some of the national databases?

19      A.    So records is one of our, well, it is our

20  most secure area it is.  We are, we have what's

21  called CLEAN Term -- Terminal Commonwealth Law, Law

22  Enforcement Network.  A terminal similar to what

23  other police, police departments and other correc-

24  tions departments have, essentially off of a biomet-

25  ric which a fingerprint returns information about a

David Kratz
02/18/2025

Page 7

1   prisoner, very sensitive and protected information.

2   Wants and warrants, FBI number, state identification

3   number, crook -- a complete criminal history.  I'm

4   trying to think of what else we have in there.  In

5   addition to that, interfaces that they have in that

6   office include PennDOT, CPIN which is a photogra-

7   phic database of mug shots.

8        Q.   What is it, CPIN?

9        A.   CPIN.

10        Q.   C-P-I --

11        A.   Commonwealth Photographic Information Net-

12   work, and I may have missed a letter on that acro-

13   nym.

14        Q.   That's --

15        A.   But CPIN, yeah.

16        Q.   Okay.

17        A.   So it is one of our more specialized and

18   highly confidential areas, there's regulations that

19   go along with that.  There's an audit by the state

20   police every year who maintain that system, we just

21   had another one in the past about a month ago.

22   There's secure access to the doors not, not just

23   anyone's permitted into that area because of the

24   physical, physical proximity to that information.

25        Q.   Okay.

David Kratz
02/18/2025

1    A.    There's also CLEAN training and criminal

2  history training to operate those systems and JNET

3  training.   JNET is the Justice Network which inter-

4  faces with CLEAN and various other Pennsylvania and

5  out-of-state systems.  So there's a lot of privacy

6  concerns and a lot of training for, for privacy and

7  protected information.

8    Q.    Now, if somebody is promoted to a lieuten-

9  ant that involves -- and correct me if I'm wrong --

10  an exam and an interview; is that right?

11    A.    Generally speaking, yes.  Again we've had

12  different types of, of promotions throughout the

13  years since COVID hit.  But yeah, there's generally

14  an interview discussion, conversation, expectations

15  are laid out about what the new position is.

16    Q.    What do you look for in, in a lieutenant

17  who is going to supervise the records and recep-

18  tion?

19    A.    So we have two, we have two administrative

20  lieutenants.  We have one that supervises record and

21  reception, the other that is deals with some other

22  sensitive information.  So for the records and re-

23  ception lieutenant, again experience in records,

24  knowledge of policies and procedures, the ability to

25  make common sense decisions, to not overreact, to

David Kratz
02/18/2025

Page 9

1  keep information private and confidential.  And to

2  actually run a staff of, I believe we have seven or

3  eight individuals in that office right now.  Make

4  sure that we adhere to the Title 37 Standards for

5  that office, and make sure we're in compliance with

6  Pennsylvania State Police.  Again I try not to use

7  the acronym PSP, Pennsylvania State Police.  Common-

8  wealth Law Enforcement Network --

9        Q.    Okay.

10       A.    -- policies and procedures as well as JNET

11  policies and procedures.

12       Q.    And as the supervisor of the records and

13  reception department, the majority if not all of

14  what you just listed would have been the responsibi-

15  lity of Lt. Kimbrough?

16       A.    Correct.

17       Q.    Now, I'm going to refer to the first in-

18  vestigation done by HR which, for lack of a better

19  term, I'm calling it the bullying investigation.

20             You were aware that there was an investi-

21  gation into Lt. Kimbrough?

22       A.    I was.

23       Q.    And you knew the general nature of the al-

24  legations?

25       A.    Yes, I knew there was an anonymous comp-

David Kratz
02/18/2025

1  laint with some things spelled out regarding some

2  behaviors that were alleged.

3      Q.   Did you ever speak personally to Lt. Kim-

4  brough about this investigation?

5      A.   We had some general conversations about

6  it, again I would -- I was not privy to the investi-

7  gation.  It wasn't a department of corrections in-

8  vestigation, it was I guess a human resources maybe,

9  maybe law department -- I don't know -- that were

10  looking into the allegations.  So we had some con-

11  versations about what, you know what the content was

12  which essentially was probably not talking to people

13  as nicely as he could've, and I guess there was some

14  accusations.  I used the word "bullying", I don't

15  know that it was you know up to that.

16          But yeah, so I was generally aware of it,

17  we had some conversations.  I did speak with Lt.

18  Kimbrough probably every, at least every two weeks

19  about operations.  He would call with a question,

20  you know this came up, he was very upset about it

21  and, you know, I tried to calm him down a little bit

22  about it.

23      Q.   He was upset about the bullying investiga-

24  tion?

25      A.   He was.

David Kratz
02/18/2025

Page 11

1      Q.    How could you tell that?

2      A.    He told me as such he had, it was very --

3  It was just something that he felt was unfair and

4  that, you know, it was an anonymous complaint at

5  that point in time but --

6      Q.    At some point did you learn that HR had

7  founded the bullying investigation?

8      A.    Yeah, you know when, when the investiga-

9  tion was completed I learned that.  You know, they

10  did do some interviews and they founded that there

11  were some issues.  I don't know if it rose to the

12  level of bullying, but there were some issues espec-

13  ially with communication with subordinates and, and

14  others.

15      Q.    And did you get an opportunity to review

16  the findings and recommendations from that investi-

17  gation?

18      A.    I did.

19      Q.    After you had reviewed that, did you have

20  any feeling as to punishment?  What, what appropri-

21  ate punishment might be if ultimately he was found

22  to have committed these acts?

23      A.    So I believe we, we decided.  We decided

24  on a step one of the -- of the disciplinary process,

25  it's just one small step above a counseling.  Um,

David Kratz
02/18/2025

Page 12

1  knowing Lt. Kimbrough for, for many, many years, I

2  know this is a guy that takes things to heart, and

3  but I knew that he was salvageable.  I knew this was

4  something, that it was just a small bump in the road

5  and we basically we -- We're going to go back and

6  we're going to talk about IBC skills and communica-

7  tion with, with subordinates and then try to put

8  that behind us.

9       Q.   Okay.  And IPC stands for?

10      A.   Interpersonal communication skills.

11      Q.   Is that something that your COs get speci-

12  fically trained on?

13      A.   Everybody does yeah.

14      Q.   If you know, do you know what date Lt.

15  Kimbrough was notified that he would be attending a

16  fact finding hearing?

17      A.   Yeah, I believe it was May 30th or there-

18  about.

19      Q.   And if you know or came to know what date

20  Lt. Kimbrough called Attny. Zeiger?

21      A.   I believe it was actually the same day, if

22  not maybe the very next day.

23      Q.   What did you think of that timing?

24      A.   I thought it was reactionary to the disci-

25  pline.  Again, having known Lt. Kimbrough for a long

David Kratz
02/18/2025

1  time, I know this investigation rocked him a little

2  bit.  But I definitely felt it was sort of retalia-

3  tory against the county to just line up right after

4  that notice of fact finding was given, and then all

5  of a sudden make that call.

6       Q.  So you thought it was more than just a co-

7  incidence?

8       A.  Yes.

9       Q.  Do you recall any -- I know that there are

10  fights between inmates and that officers have to get

11  involved in, but do you recall there being a speci-

12  fic fight around this time prior to May 30th, actu-

13  ally, where somebody got pulled from reception to

14  help break it up?

15      A.  Are we talking about on May 30th?

16      Q.  No, it would be sometime before May

17  30th --

18      A.  Right.

19      Q.  -- or shortly before.

20      A.  Shortly before, are we speaking about the

21  incident in reception the day that that happened, or

22  are we talking --

23      Q.  No.

24      A.  -- about prior?

25      Q.  We're talking about prior.

Page 14

1        A.   Yeah, again I would have to go over rec-

2   ords, I don't -- We have lots of altercations we

3   document, anyway documentation's key.  So you know,

4   in our world just putting hands in handcuffs on an

5   inmate can result in documentation.  So again

6   there's different levels of, of, of issues that we

7   have.  It could've been a medical issue, it could be

8   anything, we have a -- we have a lot of different

9   things going on.

10       Q.   Okay.  But there is nothing that --

11       A.   Nothing that jumps --

12       Q.   -- to you that stood out?

13       A.   Nothing that jumps out, right.

14       Q.   Did Lt. Kimbrough, was he hesitant at all

15  to let his chain of command know when he felt that

16  there was something wrong in his reception unit, I

17  guess the reception unit?

18       A.   So again I don't, I didn't -- I never had

19  any direct contact with Lt. Kimbrough on that.  You

20  know we, I've had discussions with his bosses about

21  the area in reception as I do with every other sec-

22  tion of the jail.  Um, you know anything that he may

23  have brought forward, they would bring to me if

24  there was a concern.

25       Q.   But he didn't hesitate to talk to you dir-

Page 15

1  ectly?

2      A.   No, if there was an issue he would come to

3  me directly, and part of that was because I did that

4  job.

5      Q.   You did?

6      A.   So I, I was -- When I was a sergeant I was

7  put into that area to, to help improve it, and we

8  made a lot of changes and things.  Um, when I was

9  promoted to captain from lieutenant, I needed a re-

10  placement and Lt. Kimbrough was the replacement, he

11  had extensive experience in there.  So that was the

12  reason you know we selected him, so we would -- we

13  would absolutely talk if there was a major issue.

14  As with all the lieutenants, my door is always open

15  if there's something that needs to be discussed.

16      Q.   Now, we've talked a lot with Mr. Mansour

17  last time regarding staffing within, within the pri-

18  son and specifically in the reception, record and

19  reception unit.

20           Did you have any conversations with Lt.

21  Kimbrough regarding staffing?

22      A.   So we've had general conversations.  Again

23  when we talk staffing, staffing is, is dynamic it's

24  not static.  And unfortunately you know as I would

25  say, you know as I reported there are staffing vac-

David Kratz
02/18/2025

Page 16

1  ancies, right.  We talk about that openly it's na-

2  tionwide, there are staffing vacancies in every pri-

3  son known to mankind right now, state/federal/local.

4  What we drill down is the specifics of staffing

5  which again would expose us to safety and security

6  of the building, the inmates and the staff.  So you

7  know there's, there's a general knowledge out there.

8  I mean if you google prison staffing, you're going

9  to find everybody's sort of saying, hey, recruitment

10 retention is a big thing.

11         Um, however, you know the days of when it,

12 when I was an officer -- When I was a sergeant sup-

13 ervising that, I mean you know, you have to get in

14 your way-back machine twelve, fifteen years.  You

15 know, we would have two to three officers down there

16 sitting there doing nothing.  When you get into a

17 mode where again or dynamic with staffing, we're not

18 going to have three officers sitting there doing no-

19 thing, we're going to deploy those officers to other

20 acute areas, and then when inmates come in we'll

21 move people back.  So it's, it's a little bit diff-

22 erent than it was and, and again we all have to

23 adapt to the hand we're dealt whatever day that the,

24 you know, the staffing levels are so.

25         Q.   So if I'm understanding you correctly, the

David Kratz
02/18/2025

1  fact that confinement facilities nationwide are

2  largely understaffed, is that's different than what

3  Lt. Kimbrough told Attny. Zeiger to your knowledge?

4      A.    To my knowledge, yes.

5      Q.    How is it different?

6      A.    Again he, I believe he was trying to draw

7  dots between staffing and, and the death which I

8  don't see the dots there.  I think again exposing

9  information of a confidential nature such as staff-

10  ing numbers he was deployed with there is, is very

11  different.  You know again we, we speak to our pri-

12  son board in general terms about staffing numbers

13  and vacancies and things like that.  The press will,

14  from time to time, do stories on that but you know

15  the, that is a general.  The entire world knows that

16  staffing and retention is a big thing.  How we dep-

17  loy our staffing and move our people around, again

18  that is very security sensitive and confidential and

19  that can create risks, we don't put that out.

20      Q.    So would you agree with me that describing

21  a clothed pat down procedure, is that dictated by

22  jail policies and SOPs?

23      A.    Yes.

24      Q.    And getting taken back for an unclothed

25  body search, is that dictated by policies and SOPs?

David Kratz
02/18/2025

Page 18

1      A.   It is.

2      Q.   Even the fact that somebody was given a

3 sack lunch, is that guided by policies and SOPs?

4      A.   It is.

5      Q.   And what is your understanding of what was

6 shared with Attny. Zeiger?

7      A.   I believe staffing levels amongst other

8 things were shared.  I believe there was some alle-

9 gations that were shared that again, I believe, are

10 untrue that people were pulled from the unit.  I

11 don't really fully know all that was disclosed, just

12 what was in the printed, printed document that Mr.

13 Mansour showed us -- showed me at my deposition

14 prior where it was spelled out that these things

15 were, were told.  And that the attorney had men --

16 had told him it was a confidentiality agreement, and

17 there was a little back and forth in some specific

18 stuff.

19      Q.   Do you know, are you aware if Lt. Kim-

20 brough divulged correctional officers' names?

21      A.   Yes, I believe he did.

22      Q.   How about the names of the inmate that was

23 able to smuggle in contraband?

24      A.   Yes, I believe that was in there.

25      Q.   We talked -- I don't know if we talked

David Kratz
02/18/2025

Page 19

1  about the video on Mr. Mansour's direct to view, but

2  there is a video of a portion of the -- of these

3  events; is that right?

4         A.   Correct.

5         Q.   Were you able to watch that?

6         A.   I was.

7         Q.   And who was, to your knowledge who was

8  staffed in the reception unit?

9         A.   So I believe Ofcr. Atiles and Ofcr. Ulmer

10 were both in there, and I believe there was -- there

11 may have been a third officer that was staffed in

12 there.

13        Q.   Is there a point in the video where Ofcr.

14 Ulmer leaves the reception unit?

15        A.   There is.

16        Q.   What's your understanding of why she left

17 the reception unit?

18        A.   I believe she was responding to a code,

19 there was an issue an emergency somewhere that she,

20 she left the, the reception unit.

21        Q.   If there is a code that goes out, how does

22 that go out?  How, how are other correctional offi-

23 cers alerted to that fact?

24        A.   So it would go out over the radio, and it

25 would also go out over the intercom.

David Kratz
02/18/2025

Page 20

1    Q.   So if somebody was in the records depart-

2   ment, they would have heard the code?

3    A.   They would have, yeah.

4    Q.   And if somebody was in the hallway between

5   the records and reception unit, would they have

6   heard the code?

7    A.   They would've and incidentally looking at

8   that video, there was actually a records officer

9   over in that unit when the code was called.

10    Q.   Tell me a little bit more about that.

11    A.   So again I don't know why I believe it was

12   Ofcr. Travis it looked like to me, why he was over

13   there from records.  I mean again they interface so

14   that we would often see a records officer over in

15   the reception area back and forth.  I see from the

16   video Ofcr. Ulmer leave it looks like responding to

17   the emergency situation, and then Ofcr. Travis

18   leaves like right behind her.  Which again you know

19   safety, take a look around.  If you're, you're leav-

20   ing an area vacant and he was there, there was no

21   reason for him to go back to records, he could've

22   stayed in that area.

23         When I was -- When I was the sergeant and

24   lieutenant in that office, again you can see direct-

25   ly through the window towards the reception area.

David Kratz
02/18/2025

1   Um, I would -- You know, if I was at my desk at the

2   time and there was a code, I would get up from my

3   desk and walk out into the hallway as a supervi-

4   sor.  Ask the lieutenant in main control if there's

5   anything I can do, and take a walk over into the re-

6   ception area just to make sure, you know, common

7   sense staffing is adequate.

8        Q.   So to be clear if you're in the records

9   department, you can see through to the reception

10  across the hall?

11       A.   Yes, there's a big glass window.  I'm not

12  saying it's an unobstructed view, but you can see

13  into the parts of the reception area from, from the

14  supervisor's desk and from the main officer's desk.

15       Q.   To the best of your knowledge, do you know

16  if Lt. Kimbrough was working at this time or in the

17  records department at this time?

18       A.   I don't know if he was in the records dep-

19  artment.  I do believe we did check staffing that

20  day, and he was marked as in attendance that day.

21       Q.   And to be clear, he does not show up on

22  the -- on the video?

23       A.   I do not see him on the video in any, any

24  way.

25       Q.   So there have been several instances where

David Kratz
02/18/2025

Page 22

1  third parties have sought to, have sought to get

2  certain things from the -- from the jail such as

3  video, use of force regulations; is that right?

4        A.   Correct, and policy and procedure.

5        Q.   And policies and procedure, and you've

6  been involved with some of those legal issues; is

7  that right?

8        A.   Many.

9        Q.   You mentioned, I think before, right to

10  know?

11        A.   Yes.

12        Q.   And why is it; have you testified regard-

13  ing right to know in court as well?

14        A.   Yes, many times.

15        Q.   And to the best of your knowledge, has any

16  judge required you to turn over those sensitive --

17             Well, hold on, are those sensitive things,

18  sensitive policies --

19        A.   Yes.

20        Q.   -- that you use?

21        A.   Yes.

22        Q.   Why?

23        A.   Again it's just a balance test with safety

24  and security in the institution, so we've had seve-

25  ral cases where I've had to take the stand.  I bel-

Page 23

1    ieve we went to the Commonwealth Court, and I actu-

2    ally won on an appeal from a case.  We, again judges

3    have done in camera reviews of these things, they

4    have spoken to the fact that the security risk out-

5    weighs the release of this information pretty con-

6    sistently.  We, we do release policy and procedure.

7              We have a lot of forward facing policies.

8    For instance, I always use the mail policy, that

9    does not harm anyone to know our mail policy.  Our

10   use of force, our tactics, daily operations of cer-

11   tain areas are, are confidential and guarded.  And

12   the few times that we do have to release those

13   things they are heavily, heavily, heavily redacted.

14        Q.   In the Patterson case specifically, are

15   you aware if there was a protective order in place

16   during discovery?

17        A.   I believe there was, yes.

18        Q.   And if you know, are you aware that the,

19   the Court sealed the majority of the filings in that

20   case?

21        A.   I, that's my understanding, yes.

22        Q.   And we've had other civil litigation with

23   the same result?

24        A.   Yes.

25        Q.   Why is what Lt. Kimbrough disclosed to

Page 24

1  Attny. Zeiger the sort of information that we fight

2  to protect disclosure from --

3       A.   So --

4       Q.   -- from disclosure?

5       A.   Again it's, it's a pol -- it's a safety

6  issue.  So we, we, when we talk in general terms

7  again about, about staffing that's one thing.  When

8  we drill down into other information, we can try to

9  make a connection that I don't believe exists be-

10 tween staffing deployment and the death.  I think

11 it's false information on top of that, but it is

12 confidential information and -- You know, again we,

13 we fight to protect that and we have in the -- in

14 the courts as well.

15      Q.   Should a, should a person who is coming in

16 as a -- as a new inmate in intake, should they know

17 if they knew of the details regarding how inmate

18 Rhoades was able to successfully smuggle contraband

19 into the jail?  Have you seen issues like that be

20 taken advantage of by --

21      A.   Yeah.

22      Q.   -- other inmates?

23      A.   So one of the reasons that you know this

24 is, this is something that happens nationwide, di-

25 versions can be created by inmates and that's a big

David Kratz
02/18/2025

Page 25

1  thing.  I think some of our testimony in court in

2  front of several judges were that an inmate will

3  create a diversion, will create a fake medical emer-

4  gency.  Will create a small fight or something like

5  that to draw staff to an area, so that another in-

6  mate can do something that they shouldn't be doing.

7  Again, they don't need to know how many staff we de-

8  ploy, what we deploy where, what our policies are

9  for searches, what our restricted housing policies

10  are, things like that.  The more that they know, the

11  more that that can be used against us.

12           And I know that might sound crazy to some

13  people, but it happens.  This is jail you know, so

14  it's happened more than a few times.  And almost

15  every escape that you look at or every injury or, or

16  something that's the form of an assault, a high

17  level assault, you'll see diversions created in

18  order to make that happen.

19      Q.   And knowing the details of intake proced-

20  ure, that would make it easier for other, other in-

21  mates or other people to take advantage of the in-

22  take procedure itself?

23      A.   Correct.

24      Q.   And you've personally seen inmates exploit

25  information that, that they've learned such as di-

David Kratz
02/18/2025

Page 26

1  versions in order to do something nefarious?

2        A.    Correct.

3        Q.    Just give me one second, okay.  And you

4  believe what was shared with Attny. Zeiger by Lt.

5  Kimbrough was security sensitive?

6        A.    Absolutely.

7        Q.    And again, how is that different than just

8  general understaffing?

9        A.    So, so again the numbers, the deployment

10  of the staff and again trying to link emergency res-

11  ponse to you know, a death.

12        Q.    At some point you realized or you were,

13  you came to know that Lt. Kimbrough had disclosed

14  this information to Attny. Zeiger; how did that make

15  you feel?

16        A.    I felt I really was -- It really was a

17  throw punch to me, it was I was very surprised.  You

18  know, he's always been good about guarding informa-

19  tion like that to, to the degree where you know

20  we've had -- I'm sure we've had discussions over,

21  you know, somebody's calling about this information,

22  what should we do.  We reach out to the law depart-

23  ment quite frequently when we have some questions

24  about those things.  So yeah, personally it was a

25  real kick, I've invested a lot in Lt. Kimbrough's

David Kratz
02/18/2025

Page 27

1  career.  He's been you know great, great taking over

2  that office and he's done well for us, so I person-

3  ally felt it was a big, a big betrayal kind of.

4       Q.   Now, in his ultimate disciplinary or per-

5  sonnel action where Lt. Kimbrough was terminated, he

6  was terminated for divulging sensitive information;

7  is that right?

8       A.   Correct, I believe there were a number of

9  policies that were on the fact finding notice.

10      Q.   And conduct unbecoming which is --

11      A.   I believe that was one of them, yes.

12      Q.   Now this manual of policies, does every-

13  body get this manual?

14      A.   So yes, so our standard -- our standard

15  operating procedures are available to every officer

16  when they first start at the academy till every day.

17  Right, right now on there there is two systems avai-

18  lable.  Some, some folks are on a system called

19  Power DMS, DMS which is a system where we keep our,

20  our, our operating procedures.  And then some do not

21  have access to that, and they are on a shared drive

22  amongst everybody read-only that anybody can access

23  at any time.  Supervisors have access to it, ques-

24  tions can be looked at.

25      Q.   So Lt. Kimbrough would have constant acc-

David Kratz
02/18/2025

Page 28

1  ess to the policies?

2       A.    Absolutely.

3       Q.    The SOPs?

4       A.    And he, he more than anybody should,

5  should know them.  He, he was our hearing officer

6  for quite a bit which deposition involved when we,

7  we disciplined people.  He, he was the person that

8  actually held the administrative hearings and looked

9  at the evidence and looked at the policies that were

10  violated and actually rendered -- It wasn't a bind-

11  ing decision, but a decision through our, our -- Ba-

12  sically our collective bargaining agreement folks

13  have, have, have that in our contract that they have

14  an appeals hearing, so that was one of his duties

15  and responsibilities prior, prior to coming back

16  into records.

17       Q.    So I just lost my train of thought, hear-

18  ing officer.  I'm going to show you what's been pre-

19  viously marked as Delta-5 and hand that to you, do

20  you recognize this?

21       A.    Yep, yes.

22            (Whereupon Exhibit No. D-5 was so marked for

23  identification being guidelines and policy review.)

24  BY MS. GRIESER:

25       Q.    And this is the standard operating proced-

David Kratz
02/18/2025

Page 29

1  ures and guidelines and policy review, correct?

2      A.    Correct.

3      Q.    And you'd agree with me that staff are re-

4  sponsible for a close and detailed knowledge of all

5  policies and procedures?

6      A.    Correct.

7      Q.    Including revisions and updates?

8      A.    That's number two, correct.

9      Q.    And that staff are all issued this manual?

10     A.    Correct.

11     Q.    And you'd expect Lt. Kimbrough to be fami-

12  liar with this?

13     A.    I would, yes.

14     Q.    I'll go ahead and take that back from you,

15  hope I put it back in the right place.

16         THE REPORTER:  I should've brought a whole

17     bunch of paperclips.

18         MS. GRIESER:  Sorry, I could've, I

19     could've too.

20  BY MS. GRIESER:

21     Q.    There you go.  What would you say if Lt.

22  Kimbrough said that he didn't know that the informa-

23  tion that he disclosed was confidential and/or secu-

24  rity sensitive?

25     A.    I would find that very hard to believe.

David Kratz
02/18/2025

Page 30

1      Q.    Why?

2      A.    Well, just the length of time that he's

3   been with us, I believe it's probably sixteen/seven-

4   teen years.  His experience as a records officer

5   prior to being a hearing officer, his experience as

6   a hearing officer and then again as a -- as a lieu-

7   tenant in that records department.

8      Q.    I'm going to show you what's been previ-

9   ously marked as D-7.  Is this the -- oh, sorry, I

10  don't want to go there yet.  I want the department

11  vision, mission, values and something like that.

12            MS. BURNS:  That was the ethics.

13            MS. GRIESER:  Yes.

14            MR. MANSOUR:  I think it was six.

15            MS. GRIESER:  Six?

16            MR. MANSOUR:  It's either six or eight.

17            MS. GRIESER:  I just had eight, right?

18            MS. BURNS:  Six is the table of offenses,

19       D-8 was the code of ethics, 0282COB.

20            MS. GRIESER:  D-8?

21            MS. BURNS:  D-8.

22            THE WITNESS:  Would it be okay for me to

23       take a two-second break so I can look at my

24       phone, everybody fine with that?

25            MS. GRIESER:  Sure, yeah.

David Kratz
02/18/2025

Page 31

 1              THE WITNESS:  All right.

 2              MR. MANSOUR:  We'll go off.

 3              (Break off the record.)

 4              (Whereupon Exhibit No. D-8 was so marked for

 5    identification being the department vision, mission, values

 6    and code of ethics.)

 7    BY MS. GRIESER:

 8       Q.   All right.  So I am going to hand you

 9    what's previously marked as D-8 which is the dep-

10    artment vision, mission, values and code of ethics,

11    and I'm going to draw your attention to the second

12    page where it says core values.

13       A.   Got you.

14       Q.   And then in order to maintain these val-

15    ues, all staff are required to -- and it has a coup-

16    le lines there -- they're required to maintain ins-

17    titutional security?

18       A.   Yes.

19       Q.   Do you believe that Lt. Kimbrough risked

20    or endangered institutional security by divulging

21    what he did to Attny. Zeiger?

22       A.   I do, I think -- I think that again the

23    consequences of that really created a disarray and a

24    disturbance too on top of the security.

25       Q.   How about report any conduct which threat-

David Kratz
02/18/2025

1  ens the institutional security or the professional

2  operations of the facility?  Did, to the best of

3  your knowledge did Lt. Zeiger ever say that he wan-

4  ted to discipline CO Ulmer?

5          MR. MANSOUR:  Objection to form.

6          THE WITNESS:  Lt. Kimbrough -- I'm sorry,

7      I did correct you, you said Zeiger.

8  BY MS. GRIESER:

9      Q.   Oh, I'm sorry.

10     A.   That's okay.

11     Q.   Lt. Kim -- I beg your pardon, Lt. Kim-

12 brough.  What was it, what was your answer?

13     A.   I didn't, I was just waiting.  I know the

14 objection, can I answer?

15     Q.   Yes, you can answer.

16     A.   Okay, all right.  I always wait for that.

17 So your question was again say again.

18     Q.   Were you ever made aware that Lt. Kim-

19 brough believed that CO Ulmer violated policy, and

20 that he wanted to discipline her in some way?

21     A.   I, I was never made aware of that, and I

22 don't recall seeing anything in any of the documen-

23 tation that crossed my desk that there was anything

24 done with CO Ulmer.

25     Q.   Would he have to run it past the chain of

David Kratz
02/18/2025

Page 33

1  command in order to discipline CO Ulmer?

2      A.   If, if he were going -- Again we just

3  don't go ahead and discipline folks, we discuss, we

4  look at evidence and then we decide on what was vio-

5  lated.  He certainly can initiate that, it wouldn't

6  be -- that's how discipline's initiated usually from

7  a supervisor.  We would, we'd sit down to talk about

8  it, look at the evidence, and then when we decide if

9  we're going to move forward with any kind of disci-

10  pline.

11      Q.   And you don't recall doing that with Lt.

12  Kimbrough in relation to CO Ulmer?

13      A.   I do not.

14      Q.   The one, two, three, four, fifth line

15  down:  "Never become personally involved with an in-

16  mate, or those who are involved in the lives of in-

17  mates."

18          Would you consider Attny. Zeiger a person

19  who is involved in the lives of inmates?

20      A.   I would say most definitely.

21      Q.   And why is that?

22      A.   Well, he was litigating for a family bas-

23  ically and they're, they're all involved in the

24  lives of inmates.  So I mean I think that's a dir-

25  ect, to me that's, that's pretty direct.

David Kratz
02/18/2025

Page 34

1    Q.   And then I'm going to have you flip the

2  page and look at Paragraph 7.

3    A.   Okay.

4    Q.   "Staff members will never discuss the

5  charges, criminal records, cases or any information

6  about when inmate with another inmate or with any

7  outside group or organization with the single excep-

8  tion of those staff specifically authorized to do so

9  as part of their job description."

10        Do you believe Lt. Kimbrough violated that

11  seven -- Paragraph 7 when he disclosed what he did

12  to Attny. Zeiger?

13    A.   I do.

14    Q.   And does this relate to the violation of

15  BCDOC15 which is the confidentiality self-dis --

16    A.   Yes.

17    Q.   -- 12-step offense?  Does it also go to

18  the conduct unbecoming?

19    A.   Yes.

20    Q.   Then I'm going to draw your attention to

21  Paragraph 11, "Employee will not provide inmates or

22  those associated with inmates any institutional or

23  policy information."

24        By describing how -- By describing how an

25  inmate was able to successfully exploit the intake

David Kratz
02/18/2025

Page 35

1  system and be able to secrete in contraband, do you

2  believe that that disclosure in detail is institu-

3  tional or policy information that shouldn't be dis-

4  closed?

5      A.   Abs --

6           MR. MANSOUR:  Objection to form.

7  BY MS. GRIESER:

8      Q.   You can go ahead and answer.

9      A.   Absolutely institutional, and again I

10  think we're treading into the policy arena as well.

11     Q.   All right, thank you.  That's all the

12  questions I have for you on that, thank you.  And

13  I'm showing you Delta-7 marked as Delta-7, you can

14  just go ahead and look at that.

15          (Whereupon Exhibit No. D-7 was so marked for

16  identification being a release of past offender

17  incarceration dates.)

18  BY MS. GRIESER:

19     Q.   Do you recognize that?

20     A.   I do.

21     Q.   Do you agree with me that there's a re-

22  quirement that the person requesting, or I'm sorry,

23  that is what --

24          Can you just read out the title?

25     A.   Yes, Release of Past Offender Incarcera-

David Kratz
02/18/2025

Page 36

1  tion Dates.

2       Q.   And is there a requirement that the person

3  requesting the past confinement dates be the person

4  who served the time?

5       A.   Correct.

6       Q.   Why is that?

7       A.   Again to protect PII and create informa-

8  tion, personal identifying information.  And inmates

9  have rights, just because someone wants to know when

10  a certain person was incarcerated doesn't mean that

11  we're going to give that information out.

12       Q.   So inmates have a right to privacy?

13       A.   They do, they have a little bit of a right

14  to privacy.

15       Q.   And you mentioned CHRIA as well, that is

16  the Criminal History --

17       A.   Records and Information Act.

18       Q.   I'm going to go ahead and take that back

19  from you.  And then I'm going to hand you D-9 which

20  is public information and education, so just take a

21  quick look at that.

22            (Whereupon Exhibit No. D-9 was so marked for

23  identification being public information and education.)

24  BY MS. GRIESER:

25       Q.   Specifically I'd like to draw your atten-

David Kratz
02/18/2025

1  tion to Paragraph 1 Echo, it's on the second page.

2  It says, "Date and federal confidential -- confiden-

3  tiality guidelines will always be followed."

4          Do you believe that Lt. Kimbrough failed

5  to follow state and federal confidentiality guide-

6  lines when he -- when he told Attny. Zeiger what he

7  did?

8      A.    I do.

9      Q.    And it goes on to say that staff who are

10  designated by the director -- you, to speak to the

11  press specifically -- it says "will not provide any

12  specific information about a particular prisoner;"

13  is that right?

14      A.    Correct.

15      Q.    So even if you tell somebody that they can

16  speak to the press, there's still a requirement that

17  they not mention specific information about a par --

18  particular prisoner?

19      A.    Correct.

20      Q.    And to the best of your knowledge did Lt.

21  Kimbrough give information specifically about inmate

22  Rhoades?

23      A.    He did.

24      Q.    And it goes on to say, "This will ensure

25  that our confidentiality and responsibilities are

David Kratz
02/18/2025

Page 38

1    adhered to," correct?

2        A.    Correct.

3        Q.    I'm going to take that back from you too.

4    Do you believe that Lt. Kimbrough violated this, and

5    this is the policy when he disclosed to Attny. Zei-

6    ger what he did.

7        A.    I do.

8        Q.    During, during the Mr. Mansour's question-

9    ing of you, there were a lot of hypotheticals that

10   he posed to you, do you recall that?

11       A.    I do.

12       Q.    There's one or two hypotheticals regarding

13   reporters, correct, if --

14       A.    Yes, I believe so.

15       Q.    Are reporters subject to county policies?

16       A.    Reporters are not.

17       Q.    What about the spouses of officers?

18       A.    They're not subject to county policies.

19       Q.    What about chiefs of police; are they sub-

20   ject to county policies or BCCF policies or SOPs?

21       A.    They are not.

22       Q.    Do you have any control over what they

23   share?

24       A.    None.

25       Q.    But you do have control over what your own

David Kratz
02/18/2025

Page 39

1  officers share, correct?

2      A.   Correct.

3      Q.   Rather control you can --

4      A.   I may not be able to control it, but there

5  are policies and procedures in place that need to be

6  followed.

7      Q.   All right, I think we already went through

8  this.  Okay, all right.  Once, once this investiga-

9  tion, the second investigation regarding Lt. Kim-

10  brough's disclosure to Attny. Zeiger began, you did

11  not suspend Lt. Kimbrough right away, do you recall

12  that?

13      A.   I do.

14      Q.   Do you remember why?

15      A.   I think we were waiting for more concrete

16  information, again I was not part of that investiga-

17  tion and it went on for a little bit.  And I believe

18  he had some time off that he had taken at that point

19  in time, so there was no, no harm to the, the rec-

20  ords office while he was away at that point.

21      Q.   Was there any concern regarding whether

22  Lt. Kimbrough had disclosed any other information to

23  other people?

24      A.   So absolutely, I mean again we only know

25  what Attny. Zeiger put in, in his filing or whatever

David Kratz
02/18/2025

Page 40

1  what he wrote down.  I have no idea what other dis-

2  cussions occurred or what happened with, with who or

3  anyone else, but there was concern.

4      Q.    Did, did Lt. Kimbrough's suspension and

5  termination, did that impact the records and recep-

6  tion, records and reception area?

7      A.    Yeah, absolutely it did you know, once he

8  was no longer permitted to come into the facility

9  and work.  Again, this is a position with a lot of

10  responsibility and a lot of skills, it's not like we

11  can just take one lieutenant and swap another lieu-

12  tenant in.  Which you know you can do with we call

13  them floor lieutenants that run the jail, everybo-

14  dy's interchangeable by shift.  The special know-

15  ledge, skills and clearances that you need to func-

16  tion in that office are pretty extensive.  So you

17  know, one of the things I had to do was I had to go

18  in there and spend some time supervising.  My warden

19  had to go in there and assist, or deputy warden had

20  to go in there and assist, so three of us really had

21  to take up some slack.

22          In addition, you know there's a structure

23  in there and a person who directs some of the work

24  flow.  So officers without a supervisor in there

25  tend to, you know, go the way they want to go.  So

David Kratz
02/18/2025

Page 41

1  it was a, it still is actually quite a -- quite a

2  hardship.  A lot of -- A lot of disruption, a lot of

3  disharmony between the staff, and a lot of extra

4  work for, for us.

5      Q.   Talk to me about the disharmony between

6  the, the staff.  Do people, to the best of your

7  knowledge did others learn that Lt. Kimbrough had

8  divulged the information he did to Attny. Zeiger?

9      A.   Again management did not put that out

10 there where that, wherever that came from had to be

11 from -- I would think Lt. Kimbrough kept in contact

12 with some of those officers.  The reason I say that

13 is I know that, you know, during his disciplinary

14 hearing a lot of officers from that office spoke

15 and, you know, they would have to know what they

16 were speaking about in order to go up there and

17 talk.  So I don't know what he conveyed to those

18 folks, but everybody knew that there was an issue

19 with, with confidentiality and contacting an attor-

20 ney that was representing somebody who was in active

21 litigation with us.

22      Q.   Now, you mentioned that you had to go down

23 to the records unit for, for some time.  You're the

24 director of the Bucks County Confinement Facility;

25 what are your usual duties?

David Kratz
02/18/2025

Page 42

1        A.   Not that, my, my usual duties lately is

2   spending a lot of time with the law department on

3   cases like this.  Yeah, and again policy and proced-

4   ure, grants, money, budgets, recruitment and re-

5   tention.  I mean I have deputies and wardens that I

6   oversee, treatment, medications, assisted treatment,

7   I could go on and on.  Psychiatric facilities, re-

8   structuring and re -- reorganization modules to ac-

9   commodate the needs of the inmates' safety.  There's

10  a lot of higher level things that go on in my world.

11  Not that I'm not available to do anything, I'll

12  stand on a block and turn a key if I have to.  But

13  yes, generally speaking my plate is pretty full with

14  those type of things.

15       Q.   How, what number of employees do you emp-

16  loy?

17       A.   I think we have about 320 total between

18  treatment staff, and we also have contracts for med-

19  ical and mental health that I have to oversee which

20  is quite extensive in itself.  Commissary, telecom-

21  munications, there's a whole slew of things across

22  my desk.  Food service is one that we're working on

23  right now, you know we serve a million meals a year

24  so it's a big contract.

25       Q.   You mentioned medical staff, I assume that

David Kratz
02/18/2025

Page 43

1  medical staff administers medications?

2      A.    Yes, among other things.

3      Q.    So how they actually deliver the medica-

4  tions, is that something that you'd be concerned

5  with?

6      A.    Absolutely, information on, on that yes.

7      Q.    If you know approximately, how many doses

8  of medication are given out?

9      A.    I do yeah.  So the low end is 95,000 doses

10  of information -- of medication a month, and I bel-

11  ieve we just did 103,000 last month that I reported

12  to the prison board.  So again we report the num-

13  bers, but we don't report the, the method, the type

14  of medication, who's receiving what.

15      Q.    And has the population of the, of the pri-

16  son changed much in the last ten, fifteen years?

17      A.    Absolutely.

18      Q.    How so?

19      A.    Um, you know for example, probably a quar-

20  ter of the nursing staff that we have now.  I mean

21  the need for a nursing staff is high because the

22  people coming into our jail are extremely drug aff-

23  ected, extremely high detox, extreme health condi-

24  tions.  The drugs today in, in Bucks County, "trank"

25  which is commonly is the street name for Xylazine,

David Kratz
02/18/2025

Page 44

1  has really impacted the folks coming into our jail.

2  It's, it's become a lot more of a medical and mental

3  health facility as well because the people from the

4  streets are coming in with mental health issues.

5  There's just no place to put them in, so jail is the

6  last stop.  So definitely a different, a different

7  jail than it was fifteen years ago, even ten years

8  ago, even pre, pre-COVID.  Things have changed.

9      Q.   And I think you mentioned before medical

10  as well, but do you have a MAT program or an MHB

11  program?

12      A.   We have a very extensive MAT program, med-

13  ication assisted treatment where MOUD (medications

14  for opiate use disorder) are dispensed.  We have

15  probably one of the most successful and highest num-

16  ber of MAT recipients of anybody in the commonwealth

17  by far very.

18      Q.   So when you had to go down and fill in in

19  the records department, did that take your focus

20  away from these issues that we were just talking

21  about, your responsibilities we were just talking

22  about?

23      A.   Yeah, it deserves some game.  I only have

24  about sixty hours a week, seventy hours a week that

25  I can put into it, so where those hours go depends

David Kratz
02/18/2025

Page 45

1  upon what's going on there, absolutely.

2       Q.   And did you also say the deputy director

3  had to fill in?

4       A.   Yes, so yes, so the warden --

5       Q.   The warden?

6       A.   The super, the superintendent of the faci-

7  lity had to assist with quite a few things.  And our

8  deputy warden, our deputy superintendent who had

9  some experience and background used to run a house

10  arrest in a restrict -- in a home confinement pro-

11  gram, so the three of us.  Basically since I did the

12  job, I haven't had the most knowledge, so I would

13  have to problem solve and deal with that.  And then

14  we tried to bring in some folks to, to work with the

15  day-to-day operations and work with the staffing

16  conflicts that were in there without, without a sup-

17  ervisor or a leader in that, in that office.

18       Q.   So how would you qualify the disruption

19  to, excuse me, the disruption to the facility's fun-

20  ctioning as a whole?

21       A.   It would create a lot of chaos up front, a

22  lot of chaos up front in those areas, records/recep-

23  tion especially.  And then again having to task

24  folks who normally don't do that with spending time

25  in that area it, it was a big impact and it's still

David Kratz
02/18/2025

Page 46

1  ongoing.

2      Q.   Why is it still ongoing?

3      A.   We just don't have somebody to really jump

4  in at this, at this point in time with that level of

5  expertise.  I mean Lt. Kimbrough was brought up

6  through that, through that rank structure and

7  there's not -- There's not like a backup, it's not

8  something you can have a backup for.

9      Q.   So is it fair to say it was, it was a big

10 deal that that he was terminated?

11     A.   Absolutely.

12     Q.   What is good order and discipline?

13     A.   So that that's how a facility like ours it

14 runs well, we have good order and discipline.  So

15 people need structure, officers need to know their

16 expectation of what they're supposed to do and that

17 works up the chain of command.  Again discipline,

18 consequences for things that are either willfully or

19 sometimes unwillfully happen, so you know that is

20 really the key and cornerstone of running a facility

21 like ours.  You have to have it.

22     Q.   And how if at all was good order and dis-

23 cipline affected by Lt. Kimbrough's --

24     A.   So, so again we have the records office

25 and the reception area that both needed -- You know,

David Kratz
02/18/2025

Page 47

1  people when left to their own devices will tend to

2  do what they are comfortable doing.  Some people

3  tend to go on and move into a leadership role as an

4  officer which is you know not what we, what we want.

5  Some people tried things and failed, but not having

6  that person supervising those two areas, very impor-

7  tant areas really led to an erosion of "goad", as we

8  say good order and discipline.

9       Q.   And would it be fair to say that having a

10  position like that vacant, it has ripple effects

11  throughout the facility?

12       A.   Absolutely, so implementing new machinery

13  that we're doing, new, new processes, dealing with

14  outside law enforcement.  Simple, simple as being

15  able to instruct and triage prisoners that are com-

16  ing into the jail during high volume events.  Daily

17  functioning of sentenced inmates moving prisoners

18  along, people getting sent to the state correctional

19  facilities who receive state sentences.  Psychiatric

20  treatment at Norristown, that department has a hand

21  in that as well.

22          MS. GRIESER:   Okay.  Just give me one sec-

23       ond, hold on just one second.  We can go off

24       the record real quick.

25          (Break off the record.)

Page 48

1           MS. GRIESER:  Thank you, Dir. Kratz.  I

2      don't have any further questions for you at

3      this time.

4                --- EXAMINATION ---

5  BY MR. MANSOUR:

6      Q.   I, I have some questions for you, Dir.

7  Kratz.  So you used the words "chaos" and "disrup-

8  tion" to describe some of the effects of what's been

9  going on in the jail, correct?

10     A.   Correct.

11     Q.   I think you also talked about harmony

12 among employees, correct?

13     A.   Correct.

14     Q.   Now, that chaos and disruption and dishar-

15 mony was caused by the county wasn't it?

16     A.   I would say it was caused by the county

17 having to terminate Lt. Kimbrough for his actions.

18     Q.   Sure, so if the county didn't suspend him

19 and discharge Lt. Kimbrough, there would be no

20 chaos, disruption and disharmony, right?

21     A.   Well, I think, I think there might be.

22 There'd be less but again, you know if that informa-

23 tion got out there, there's people that have strong

24 feelings about, about what was done.

25     Q.   How would that information have gotten out

David Kratz
02/18/2025

Page 49

1  there?

2      A.   Again Lt. Kimbrough could've told people,

3  I mean I'm not telling people who had, you know.

4      Q.   You don't know if he told anybody or not,

5  do you?

6      A.   I, the only -- The only thing I really

7  know is that he brought people to his fact finding

8  hearings, and I'm assuming that they testified too,

9  they had to know what he was terminated for.

10     Q.   This fact finding hearing regarding his

11  conversation with Attny. Zeiger?

12     A.   Yes.

13     Q.   He brought people to that hearing?

14     A.   I believe he did, yes.

15     Q.   Who?

16     A.   I don't know, I know --

17     Q.   Are you sure you're not confusing that

18  with, with the --

19     A.   Oh, you know what, you're right, sir.  I'm

20  sorry, my apologies.  I'm confusing it with the

21  first hearing, correct.

22     Q.   So as far as you know, at least with re-

23  gard to the fact finding hearing concerning his con-

24  versations with Attny. Zeiger --

25     A.   Yes.

David Kratz
02/18/2025

Page 50

1    Q.   -- he didn't bring any witnesses?

2    A.   I, I have no knowledge of that, again ex-

3  cuse my, my confusion.

4    Q.   Now, you testified that you were aware

5  that Attny. Zeiger was subject to a protective

6  order, right?

7    A.   Correct.

8    Q.   Which means that he couldn't disclose any

9  of the information that he learned from Attny. Kim-

10  brough, correct?

11    A.   Correct.

12    Q.   And you're not aware of Attny. Kimbrough

13  disclosing that information to anybody else, are

14  you?

15    A.   I am not, I have no knowledge.

16    Q.   So tell me, how can there what -- How

17  could his conversation with Attny. Zeiger have com-

18  promised the security of the jail if Attny. Zeiger

19  was subject to a protective order?

20    A.   So, so again he, he violated I think six

21  policies that we talked about today so, so that is

22  the basis of termination.  I don't know if the basis

23  of the termination is what he disclosed specifical-

24  ly.  I don't know again what he disclosed, I just

25  know what Attny. Zeiger put in that document so.

David Kratz
02/18/2025

Page 51

1      Q.   Okay, and that's fair enough, and I und-

2   erstand that.  But my question is, you had talked

3   about how his conversation --

4           You had been asked a number of questions

5   with regard to policies about whether my client's

6   conversation with Attny. Zeiger compromised jail

7   security, for example?

8      A.   Right.

9      Q.   And you answered in the affirmative.  But

10   given what we know about this case, that he spoke

11   with Attny. Zeiger and Attny. Zeiger was subject to

12   a protective order, how could that have led to a

13   compromise in jail security?

14      A.   I don't know.

15      Q.   As far as you're aware, my client did not

16   disclose the use of force policies to Attny. Zeiger

17   did he?

18      A.   I don't believe there was a use of force

19   on that case.

20      Q.   Do you know whether he just -- As far as

21   you're aware, he did not disclose the SOP, the jail

22   SOP to Attny. Zeiger did he?

23      A.   I don't believe he did, he may have.

24      Q.   There was --

25      A.   I can't really, you know, speculate on

David Kratz
02/18/2025

Page 52

1  what he told him other than what was in print.

2      Q.   There was surveillance video you, you des-

3  cribed of the incident regarding Mr. Rhoades and him

4  smuggling drugs into the jail, correct?

5      A.   Correct.

6      Q.   And as far as you're aware, my client

7  didn't disclose that video to Attny. Zeiger did he?

8      A.   As far as I'm aware he did not, he may

9  have disclosed the existence of it.

10      Q.   Now, in terms of any policies regarding

11  the movement of personnel around the facility, any

12  written policies to that effect?  As far as you're

13  aware, Mr. Kimbrough did not disclose any of those

14  policies to Attny. Zeiger did he?

15      A.   I believe that -- And again I don't have

16  the document in front of me, but I believe he tried

17  to draw a link between staffing numbers and an in-

18  mate death.

19      Q.   Sure.

20      A.   So I'm assuming he had to talk about num-

21  bers; specifically where people were, what the num-

22  bers were that day, and who were the staff in that

23  section.

24      Q.   But you don't know that for sure, right?

25      A.   I don't.

David Kratz
02/18/2025

Page 53

1      Q.   In fact the only --

2      A.   I don't think any of us do.

3      Q.   Your only knowledge of that information

4   came from the filing Attny. Zeiger filed with the

5   Court that I asked you about in the last deposition,

6   right?

7      A.   Correct.

8      Q.   So and that was, that's the extent of your

9   knowledge of my client's conversation with Attny.

10  Zeiger?

11     A.   Correct.

12     Q.   And so it would be fair to say that when

13  my client was first suspended in June and then term-

14  inated in July of 2024, you didn't really know the

15  details of his conversation with Attny. Zeiger did

16  you?

17     A.   I don't think any of us do, just what was

18  presented, presented in that -- in that attempt to

19  reopening it.  And correct me if I'm wrong, legally

20  trying to reopen the case or add witnesses to that

21  case.

22     Q.   You spoke to my client after he was termi-

23  nated, didn't you?

24     A.   Yes.

25     Q.   And that was when he came to return his

Page 54

1  uniform and other equipment?

2      A.   Yes, he did, he did return them to me,

3  correct.

4      Q.   And you told him that you disagreed with

5  his termination, didn't you?

6      A.   No.

7      Q.   You didn't?

8      A.   No.

9      Q.   You didn't tell him that you thought he

10  should keep fighting his termination?

11     A.   No.

12     Q.   Would he, if he said something to the con-

13  trary, would that be lying?

14     A.   Yes, I was very careful to not discuss the

15  case itself.  I probably did say I feel, feel bad

16  for the situation you put yourself in but that's,

17  that's where we're at.

18     Q.   So prior to Mr. Kimbrough's terminate,

19  discharge in June 2021, there was no disharmony

20  among county employees because of his conversation

21  with Attny. Zeiger was there?

22     A.   I don't believe there was, but I don't be-

23  lieve anybody really knew unless he, again unless he

24  put that forward.  It was very not to besmirch him.

25  And when the investigation was going on, we didn't

David Kratz
02/18/2025

Page 55

1  know where it was going to go, so you don't want to

2  put that information out there.

3      Q.    And prior to his suspension in June of

4  2021 and his discharge a month later, you would

5  agree there was no chaos or disruption in the jail

6  was there?

7      A.    No, not, not related to that.  Again that

8  information wasn't widely known in the jail, and he

9  was at his desk for the most part supervising.  How-

10 ever, again I'd have to look at the, the vacation

11 slots.  He had a lot of planned time off, and I

12 think he supplemented some of that after this star-

13 ted.  So again, I don't know how much time he was in

14 the building at that point in time.

15     Q.    This, do inmates receive a handbook?

16     A.    They do.

17     Q.    And does that in -- And does that handbook

18 detail the intake procedure?

19     A.    Not in detail, just what they're legally

20 required to get, yeah.

21     Q.    Do you believe that my client was trying

22 to, for lack of a better term, make trouble for the

23 county by having his conversation with Attny. Zei-

24 ger?

25          MS. GRIESER:  Objection as to form, but

David Kratz
02/18/2025

Page 56

```
 1       you can answer.
 2            THE WITNESS:  Yeah, again I'm basing this
 3       off of my personal opinion and relationship
 4       with him.  I find the timing concerning.  I
 5       know he was really shaken by this initial in-
 6       vestigation, not the Attny. Zeiger one but the
 7       we'll call it the bullying investigation.  I
 8       had several conversations with him about that.
 9       It, it flipped, it really threw him for a loop
10       and he was very concerned about it, and I was
11       trying to -- I was very reassuring with him
12       about it once I got information that, hey, this
13       is not something that you're going to be termi-
14       nated for.  But we're going to fix this and
15       we're going to move on.
16  BY MR. MANSOUR:
17       Q.   You had discussed in your first deposi-
18  tion, or you had mentioned in your first deposition
19  that the decision to suspend and then ultimately
20  discharge Mr. Kimbrough was discussed among you,
21  Lauren Smith, Marge McEvitt, and a number of indi-
22  viduals from the law department; is that accurate?
23       A.   Correct, I may -- Again the law department
24  I can't quite remember, I'm sure we had somebody
25  represented it there.
```

David Kratz
02/18/2025

Page 57

```
 1        Q.   Did any of them express a belief to you
 2   that they thought my client was trying to make trou-
 3   ble for the county in their, in the -- in the law-
 4   suit by the Patterson Estate?
 5            MS. GRIESER:   Objection as to form, you
 6        may answer.
 7            THE WITNESS:   Yeah, there was discussion
 8        that it could've been linked abso -- absolute-
 9        ly.  I mean to, to say that there's -- It's ei-
10        ther a giant coincidence or it's linked, you
11        know.
12   BY MR. MANSOUR:
13        Q.   And in based on your recollection, was
14   that a factor that went into the decision to suspend
15   and then ultimately discharge him?
16        A.   Was what?  I'm sorry, what was --
17        Q.   The fact that he was potentially trying to
18   make trouble or retaliate against the county.
19        A.   I'm sure, I'm sure it was a factor.  I
20   mean the main factor was the policy violations that
21   we, we just went over today, and the fact that depo-
22   sition requires a lot of trials and it was -- When
23   you violate these policies, you know you got to --
24   you got to look at that on the face.  That's really
25   what the termination was about, the policy viola-
```

David Kratz
02/18/2025

Page 58

1    tions.  It wasn't an emotional thing or people you

2    know feeling that they were retaliated against, but

3    obviously it was discussed.

4        Q.    A few more questions about my client's job

5    duties.  Was calling Attny. Zeiger and sharing the

6    information that he shared part of his job duties as

7    administrative lieutenant?

8        A.    No.

9        Q.    Was he directed by you to call Attny.

10   Zeiger and share the information that he shared?

11       A.    No.

12       Q.    Are you aware of whether he was directed

13   by any of his other superiors to call Attny. Zeiger

14   and share that information?

15       A.    To my knowledge no.

16           MR. MANSOUR:  I have no questions, no more

17       questions, thank you.

18           THE WITNESS:  You're welcome.

19           MS. GRIESER:  I have nothing further,

20       again thank you so much for attending.

21           THE WITNESS:  Are we done?

22           MR. MANSOUR:  You're done.

23                           ---

24           (Witness excused.)

25           (Deposition ended at 4:42 p.m.)

David Kratz
02/18/2025

Page 59

 1              (Transcript ordered by Ms. Grieser and Mr.

 2  Mansour.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David Kratz
02/18/2025

Page 60

C E R T I F I C A T E

I, Ted Allen, Certified Reporter, Notary Public,

Montgomery County, Pennsylvania, do hereby certify that

DAVID KRATZ was first duly sworn to testify to the whole

truth, and that the above deposition was recorded

stenographically by me and was transcribed by means of

computer-aided transcription under my personal direction,

and that the said deposition constitutes a true record of

the testimony given by said witness.

I further certify that I am not a relative or

employee or attorney of any of the parties, or a relative or

employee of such attorney, or financially interested

directly or indirectly in this action.

_____

TED ALLEN, CERTIFIED

REPORTER, NOTARY PUBLIC

MY COMMISSION EXPIRES 9/4/2027

David Kratz
02/18/2025

1

---

**Exhibits**

D-5
3:0
28:22
D-7
3:0
30:9
35:15
D-8
3:0
30:19,
20,21
31:4,9
D-9
3:0
36:19,
22

---

**0**

0282COB
30:19

---

**1**

1
6:1
37:1
**103,000**
43:11
**11**
34:21
**12-step**
34:17

---

**2**

2021
54:19
55:4

**2024**
53:14

---

**3**

**30th**
12:17
13:12,
15,17
**320**
42:17
**37**
9:4

---

**4**

**4:42**
58:25

---

**7**

7
34:2,11

---

**9**

**95,000**
43:9

---

**A**

**ability**
8:24
**Abs**
35:5
**abso**
57:8
**absolute-**
57:8

**absolutely**
15:13
26:6
28:2
35:9
39:24
40:7
43:6,17
45:1
46:11
47:12
**ac-**
42:8
**academy**
27:16
**acc-**
27:25
**access**
7:22
27:21,
22,23
**accurate**
56:22
**accusations**
10:14
**acro-**
7:12
**acronym**
9:7
**Act**
36:17
**action**
27:5
**actions**
48:17
**active**
41:20

**acts**
11:22
**actu-**
13:12
23:1
**acute**
16:20
**adapt**
16:23
**add**
53:20
**addition**
5:20
6:14
7:5
40:22
**adequate**
21:7
**adhere**
9:4
**adhered**
38:1
**administers**
43:1
**administrative**
8:19
28:8
58:7
**advantage**
24:20
25:21
**aff-**
43:22
**affect**
5:8

**affected**
46:23
**affirmative**
51:9
**agree**
17:20
29:3
35:21
55:5
**agreed**
4:1
**agreement**
18:16
28:12
**ahead**
29:14
33:3
35:8,14
36:18
**al-**
5:7
9:23
**alerted**
19:23
**alle-**
18:8
**allegations**
10:10
**alleged**
10:2
**ally**
13:13
23:2
27:3

**altercations**
14:2
**ancies**
16:1
**and/or**
29:23
**anonymous**
9:25
11:4
**ant**
8:9
**anyone's**
7:23
**apologies**
49:20
**appeal**
23:2
**appeals**
28:14
**appropri-**
11:20
**approximately**
43:7
**area**
6:20
7:23
14:21
15:7
20:15,
20,22,
25
21:6,13
25:5
40:6

---

David Kratz
02/18/2025

2

45:25
46:25

**areas**
6:12
7:18
16:20
23:11
45:22
47:6,7

**arena**
35:10

**arrest**
45:10

**artment**
21:19
31:10

**assault**
25:16,
17

**assist**
40:19,
20 45:7

**assisted**
42:6
44:13

**assume**
42:25

**assuming**
49:8
52:20

**ate**
11:21

**Atiles**
19:9

**attempt**
53:18

**atten-**
36:25

**attendance**
21:20

**attending**
12:15
58:20

**attention**
31:11
34:20

**Attny**
12:20
17:3
18:6
24:1
26:4,14
31:21
33:18
34:12
37:6
38:5
39:10,
25 41:8
49:11,
24
50:5,9,
12,17,
18,25
51:6,
11,16,
22
52:7,14
53:4,9,
15
54:21
55:23
56:6
58:5,9,
13

**attor-**
41:19

**attorney**
18:15

**audit**
7:19

**authorized**
34:8

**avai-**
27:17

**aware**
9:20
10:16
18:19
23:15,
18
32:18,
21
50:4,12
51:15,
21
52:6,8,
13
58:12

———————

**B**

**Ba-**
28:11

**back**
12:5
16:21
17:24
18:17
20:15,
21
28:15
29:14,
15

36:18
38:3

**background**
45:9

**backup**
46:7,8

**bad**
54:15

**balance**
22:23

**bargaining**
28:12

**bas-**
33:22

**based**
57:13

**basically**
12:5
45:11

**basing**
56:2

**basis**
50:22

**BCCF**
38:20

**BCDOC15**
34:15

**be-**
24:9
54:22

**beg**
32:11

**began**
39:10

**behaviors**
10:2

**bel-**
22:25
43:10

**belief**
57:1

**believed**
32:19

**ber**
44:16

**bers**
43:13
52:21,
22

**besmirch**
54:24

**betrayal**
27:3

**big**
16:10
17:16
21:11
24:25
27:3
42:24
45:25
46:9

**bind-**
28:10

**biomet-**
6:24

**bit**
10:21
13:2
16:21
20:10
28:6

36:13
39:17

**ble**
57:3

**block**
42:12

**board**
17:12
43:12

**body**
17:25
27:13

**bosses**
14:20

**break**
13:14
30:23
31:3
47:25

**bring**
14:23
45:14
50:1

**brough**
10:4
18:20
32:12,
19
50:10

**brough's**
39:10

**brought**
14:23
29:16
46:5
49:7,13

**Bucks**
41:24
43:24

David Kratz
02/18/2025

3

budgets
42:4

building
16:6
55:14

bullying
9:19
10:14,
23
11:7,12
56:7

bump
12:4

bunch
29:17

BURNS
30:12,
18,21

———————

C

C-P-I
7:10

call
10:19
13:5
40:12
56:7
58:9,13

called
4:7
6:21
12:20
20:9
27:18

calling
9:19
26:21
58:5

calm
10:21

camera
23:3

captain
15:9

career
27:1

careful
54:14

case
23:2,
14,20
51:10,
19
53:20,
21
54:15

cases
22:25
34:5
42:3

caused
48:15,
16

ception
8:23
21:6

cer-
23:10

cers
19:23

cetera
6:1

chain
14:15
32:25
46:17

changed
43:16
44:8

chaos
45:21,
22
48:7,
14,20
55:5

charges
34:5

check
21:19

chiefs
38:19

choose
5:22,24

CHRIA
36:15

cipline
46:23

civil
23:22

CLEAN
6:21
8:1,4

clear
21:8,21

clearance
6:17

clearances
40:15

client
51:15
52:6
53:13,

22
55:21
57:2

client's
51:5
53:9
58:4

close
29:4

closed
35:4

clothed
17:21

co-
13:6

code
19:18,
21
20:2,6,
9 21:2
30:19
31:6,10

cohol
5:8

coincidence
57:10

collective
28:12

com-
47:15
50:17

comfortable
47:2

command
14:15

33:1
46:17

Commissary
42:20

committed
11:22

commodate
42:9

common
8:25
21:6

Common-
9:7

commonly
43:25

commonwealth
6:21
7:11
23:1
44:16

communica-
12:6

communication
11:13
12:10

comp-
9:25

complaint
11:4

complete
7:3

completed
11:9

compliance
9:5

compromise
51:13

compromised
51:6

con-
10:10
23:5
49:23
54:12

concern
14:24
39:21
40:3

concerned
43:4
56:10

concerns
8:6

concrete
39:15

condi-
43:23

conduct
27:10
31:25
34:18

confiden-
37:2

David Kratz
02/18/2025

4

confidential
7:18
9:1
17:9,18
23:11
24:12
29:23
37:2
confidentiality
18:16
34:15
37:5,25
41:19
confinement
17:1
36:3
41:24
45:10
conflicts
45:16
confusing
49:17,20
confusion
50:3
connection
24:9
consequences
31:23
46:18

constant
27:25
contact
14:19
41:11
contacting
41:19
content
10:11
contraband
18:23
24:18
35:1
contract
28:13
42:24
contracts
42:18
control
21:4
38:22,25
39:3,4
conversation
8:14
49:11
50:17
51:3,6
53:9,15
54:20
55:23
conversations
10:5,17
15:20,

22 56:8
conveyed
41:17
core
31:12
cornerstone
46:20
correc-
6:23
correct
6:8 8:9
9:16
19:4
22:4
25:23
26:2
27:8
29:1,2,6,8,10
32:7
36:5
37:14,19
38:1,2,13
39:1,2
48:9,10,12,13
49:21
50:7,10,11
52:4,5
53:7,11,19
54:3
56:23
correctional

18:20
19:22
47:18
corrections
4:17
5:23,24
6:1
10:7
correctly
16:25
COS
12:11
could've
10:13
14:7
20:21
29:18,19 49:2
57:8
counsel
4:1,19
counseling
11:25
county
4:16
5:23
13:3
38:15,18,20
41:24
43:24
48:15,16,18
54:20
55:23
57:3,18

coup-
31:15
court
22:13
23:1,19
25:1
53:5
courts
24:14
COVID
8:13
CPIN
7:6,8,9,15
crazy
25:12
create
17:19
25:3,4
36:7
45:21
created
24:25
25:17
31:23
cribed
52:3
criminal
7:3 8:1
34:5
36:16
crook
7:3
crossed
32:23
ctioning
45:20
cuse

50:3
cussions
40:2

_____

D
D-5
28:22
D-7
30:9
35:15
D-8
30:19,20,21
31:4,9
D-9
36:19,22
D-A-V-I-D
4:14
daily
23:10
47:16
database
7:7
databases
6:18
date
12:14,19 37:2
dates
35:17
36:1,3
David
4:7,14
day
4:20

12:21,
22
13:21
16:23
21:20
27:16
52:22
**day-to-day**
45:15
**days**
16:11
**de-**
25:7
**deal**
45:13
46:10
**dealing**
47:13
**deals**
8:21
**dealt**
16:23
**death**
17:7
24:10
26:11
52:18
**decide**
33:4,8
**decided**
11:23
**decision**
28:11
56:19
57:14
**decisions**
8:25

**degree**
26:19
**deliver**
43:3
**Delta-5**
28:19
**Delta-7**
35:13
**dep-**
17:16
21:18
31:9
**depart-**
20:1
26:22
**department**
5:23
9:13
10:7,9
21:9,17
30:7,10
31:5
42:2
44:19
47:20
56:22,
23
**departments**
6:23,24
**depends**
44:25
**deploy**
16:19
25:8
**deployed**
17:10

**deployment**
24:10
26:9
**depo-**
57:21
**deposi-**
56:17
**deposition**
4:19
18:13
28:6
53:5
56:18
58:25
**deputies**
42:5
**deputy**
40:19
45:2,8
**des-**
52:2
**describe**
48:8
**describing**
17:20
34:24
**description**
34:9
**deserves**
44:23
**designated**
37:10
**desk**

21:1,3,
14
32:23
42:22
55:9
**detail**
35:2
55:18,
19
**detailed**
29:4
**details**
24:17
25:19
53:15
**detox**
43:23
**devices**
47:1
**di-**
24:24
25:25
**dictated**
17:21,
25
**diff-**
16:21
**Dir**
48:1,6
**dir-**
14:25
33:24
**direct**
14:19
19:1
33:25
**direct-**
20:24

**directed**
58:9,12
**directly**
15:3
**director**
4:17
37:10
41:24
45:2
**directs**
40:23
**dis-**
35:3
40:1
46:22
**disagreed**
54:4
**disarray**
31:23
**discharge**
48:19
54:19
55:4
56:20
57:15
**disci-**
12:24
33:9
**disciplinary**
11:24
27:4
41:13
**discipline**
32:4,20
33:1,3

46:12,
14,17
47:8
**discipline's**
33:6
**disciplined**
28:7
**disclose**
50:8
51:16,
21
52:7,13
**disclosed**
18:11
23:25
26:13
29:23
34:11
38:5
39:22
50:23,
24 52:9
**disclosing**
50:13
**disclosure**
24:2,4
35:2
39:10
**discovery**
23:16
**discuss**
33:3
34:4

54:14

**discusse
d**

15:15

56:17,

20 58:3

**discussi
on**

8:14

57:7

**discussi
ons**

14:20

26:20

**dishar-**

48:14

**disharmo
ny**

41:3,5

48:20

54:19

**disorder**

44:14

**dispense
d**

44:14

**disrup-**

48:7

**disrupti
on**

41:2

45:18,

19

48:14,

20 55:5

**disturba
nce**

31:24

**diversio
n**

25:3

**diversio
ns**

25:17

**divulged**

18:20

41:8

**divulgin
g**

27:6

31:20

**DMS**

27:19

**documen-**

32:22

**document**

14:3

18:12

50:25

52:16

**document
ation**

14:5

**document
ation's**

14:3

**door**

15:14

**doors**

7:22

**doses**

43:7,9

**dots**

17:7,8

**draw**

17:6

25:5

31:11

34:20

36:25

52:17

**drill**

16:4

24:8

**drive**

27:21

**drug**

43:22

**drugs**

43:24

52:4

**duly**

4:8

**duties**

28:14

41:25

42:1

58:5,6

**dy's**

40:14

**dynamic**

15:23

16:17

————————

**E**

**easier**

25:20

**Echo**

37:1

**ect**

33:25

**ected**

43:23

**ectly**

15:1

**educatio
n**

36:20,

23

**effect**

52:12

**effects**

47:10

48:8

**ei-**

57:9

**emer-**

25:3

**emergenc
y**

19:19

20:17

26:10

**emotiona
l**

58:1

**emp-**

42:15

**Employee**

34:21

**employee
s**

42:15

48:12

54:20

**end**

43:9

**endanger
ed**

31:20

**ended**

58:25

**enforcem
ent**

6:22

9:8

47:14

**ens**

32:1

**ensure**

37:24

**entire**

17:15

**equipmen
t**

54:1

**erent**

16:22

**erosion**

47:7

**erstand**

51:2

**ervising**

16:13

**ervisor**

45:17

**escape**

25:15

**espec-**

11:12

**ess**

28:1

**essentia
lly**

6:24

10:12

**Estate**

57:4

**ethics**

30:12,
19

31:6,10

**events**

19:3

47:16

**every-**

27:12

**everybo-**

40:13

**everybod
y's**

16:9

**evidence**

28:9

33:4,8

**ex-**

50:2

**exam**

8:10

**EXAMINAT
ION**

4:10

48:4

**examined**

4:8

**excep-**

34:7

**excuse**

45:19

**excused**

58:24

**Exhibit**

28:22

31:4

35:15

36:22

existence
52:9
exists
24:9
expect
29:11
expectation
46:16
expectations
8:14
experience
8:23
15:11
30:4,5
45:9
expertise
46:5
exploit
25:24
34:25
expose
16:5
exposing
17:8
express
57:1
extensive
15:11
40:16
42:20
44:12
extent

53:8
extra
6:15
41:3
extreme
43:23
extremely
43:22,
23

———————

F
face
57:24
faces
8:4
faci-
45:6
facilities
17:1
42:7
47:19
facility
32:2
40:8
41:24
44:3
46:13,
20
47:11
52:11
facility's
45:19
facing
23:7
fact

12:16
13:4
17:1
18:2
19:23
23:4
27:9
49:7,
10,23
53:1
57:17,
21
factor
57:14,
19,20
failed
37:4
47:5
fair
46:9
47:9
51:1
53:12
fake
25:3
false
24:11
fami-
29:11
family
33:22
FBI
7:2
federal
37:2,5
feel
26:15
54:15

feeling
11:20
58:2
feelings
48:24
felt
11:3
13:2
14:15
26:16
27:3
fic
13:12
fically
12:12
fifteen
16:14
43:16
44:7
fight
13:12
24:1,13
25:4
fighting
54:10
fights
13:10
filed
53:4
filing
4:3
39:25
53:4
filings
23:19
fill
44:18
45:3

find
16:9
29:25
56:4
finding
12:16
13:4
27:9
49:7,
10,23
findings
11:16
fine
30:24
fingerprint
6:25
fix
56:14
flip
34:1
flipped
56:9
floor
40:13
flow
40:24
focus
44:19
folks
27:18
28:12
33:3
41:18
44:1
45:14,
24
follow
37:5

Food
42:22
force
22:3
23:10
51:16,
18
form
4:4
25:16
32:5
35:6
55:25
57:5
forty
5:19
6:6,14
forward
14:23
23:7
33:9
54:24
found
11:21
founded
11:7,10
free
5:25
frequently
26:23
Fri-
4:19
front
25:2
45:21,
22
52:16

David Kratz
02/18/2025

8

| | | | | | |
|---|---|---|---|---|---|
| full | 42:13 | 35:7,18 | 31:8 | 28:5,14 | hold |
| 4:12 | ger | 36:24 | 36:19 | 30:5,6 | 22:17 |
| 42:13 | 38:6 | 47:22 | 47:20 | 41:14 | 47:23 |
| fully | 55:24 | 48:1 | handbook | 49:10, | home |
| 18:11 | giant | 55:25 | 55:15, | 13,21, | 45:10 |
| fun- | 57:10 | 57:5 | 17 | 23 | hope |
| 45:19 | give | 58:19 | handcuff | hearings | 29:15 |
| func- | 26:3 | 59:1 | s | 28:8 | hours |
| 40:15 | 36:11 | group | 14:4 | 49:8 | 5:19 |
| functioning | 37:21 | 34:7 | hands | heart | 6:3,6, |
| | 47:22 | guarded | 14:4 | 12:2 | 14 |
| 47:17 | glass | 23:11 | happen | heavily | 44:24, |
| | 21:11 | guarding | 6:12 | 23:13 | 25 |
| **G** | goad | 26:18 | 25:18 | held | house |
| game | 47:7 | guess | 46:19 | 28:8 | 45:9 |
| 44:23 | good | 10:8,13 | happened | hesitant | housing |
| gard | 26:18 | 14:17 | 13:21 | 14:14 | 25:9 |
| 49:23 | 46:12, | guide- | 25:14 | hesitate | How- |
| gation | 14,22 | 37:5 | 40:2 | 14:25 | 55:9 |
| 9:21 | 47:8 | guided | hard | hey | HR |
| 10:7 | google | 18:3 | 29:25 | 16:9 | 9:18 |
| 11:17 | 16:8 | guidelines | hardship | 56:12 | 11:6 |
| gations | gram | | 41:2 | high | human |
| 18:9 | 45:11 | 28:23 | harm | 25:16 | 10:8 |
| gency | grants | 29:1 | 23:9 | 43:21, | hypothet |
| 25:4 | 42:4 | 37:3 | 39:19 | 23 | icals |
| general | great | guy | harmony | 47:16 | 38:9,12 |
| 9:23 | 5:11 | 12:2 | 48:11 | higher | |
| 10:5 | 27:1 | | health | 42:10 | **I** |
| 15:22 | Grieser | **H** | 42:19 | highest | ially |
| 16:7 | 4:11,23 | hall | 43:23 | 44:15 | 11:13 |
| 17:12, | 28:24 | 21:10 | 44:3,4 | highly | IBC |
| 15 24:6 | 29:18, | hallway | hear- | 7:18 | 12:6 |
| 26:8 | 20 | 20:4 | 28:17 | history | ical |
| generally | 30:13, | 21:3 | heard | 7:3 8:2 | 42:19 |
| y | 15,17, | hand | 20:2,6 | 36:16 | ically |
| 8:11,13 | 20,25 | 16:23 | hearing | hit | 33:23 |
| 10:16 | 31:7 | 28:19 | 12:16 | 8:13 | |
| | 32:8 | | | | |

ication
  44:13
idea
  40:1
identifi
cation
  7:2
  28:23
  31:5
  35:16
  36:23
identify
ing
  36:8
ieve
  23:1
  43:11
impact
  40:5
  45:25
impacted
  44:1
implemen
ting
  47:12
impor-
  47:6
improve
  15:7
in-
  6:14
  9:17
  10:7
  25:5,
  20,21
  33:15,
  16
  52:17
  56:5

in-
service
  5:19
  6:3,6
inated
  53:14
Incarcer
a-
  35:25
incarcer
ated
  36:10
incarcer
ation
  35:17
incidenc
e
  13:7
incident
  13:21
  52:3
incident
ally
  20:7
include
  7:6
Includin
g
  29:7
indi-
  56:21
individu
als
  9:3
influenc
e
  5:7

informa-
  26:18
  29:22
  36:7
  48:22
informat
ion
  6:25
  7:1,11,
  24 8:7,
  22 9:1
  17:9
  23:5
  24:1,8,
  11,12
  25:25
  26:14,
  21 27:6
  34:5,23
  35:3
  36:8,
  11,17,
  20,23
  37:12,
  17,21
  39:16,
  22 41:8
  43:6,10
  48:25
  50:9,13
  53:3
  55:2,8
  56:12
  58:6,
  10,14
ing
  6:7
  17:10
  20:20
  22:13
  28:11,

  18 38:9
  47:16
initial
  56:5
initiate
  33:5
initiate
d
  33:6
injury
  25:15
inmate
  14:5
  18:22
  24:16,
  17 25:2
  34:6,25
  37:21
inmates
  13:10
  16:6,20
  24:22,
  25
  25:24
  33:19,
  24
  34:21,
  22
  36:8,12
  47:17
  55:15
inmates'
  42:9
ins-
  31:16
instance
  23:8
instance
s

  21:25
institu-
  35:2
institut
ion
  22:24
institut
ional
  31:20
  32:1
  34:22
  35:9
instruct
  47:15
intake
  24:16
  25:19
  34:25
  55:18
inter-
  8:3
intercha
ngeable
  40:14
intercom
  19:25
interfac
e
  20:13
interfac
es
  7:5
Interper
sonal
  12:10
intervie
w
  8:10,14

intervie
ws
  11:10
invested
  26:25
investi-
  9:20
  10:6
  11:16
investig
a-
  10:23
  11:8
  39:8,16
investig
ation
  9:19
  10:4
  11:7
  13:1
  39:9
  54:25
  56:7
involved
  13:11
  22:6
  28:6
  33:15,
  16,19,
  23
involves
  8:9
IPC
  12:9
issue
  14:7
  15:2,13
  19:19
  24:6

41:18

**issued**
29:9

**issues**
11:11,
12 14:6
22:6
24:19
44:4,20

---

**J**

**jail**
14:22
17:22
22:2
24:19
25:13
40:13
43:22
44:1,5,
7 47:16
48:9
50:18
51:6,
13,21
52:4
55:5,8

**ject**
38:20

**JNET**
8:2,3
9:10

**job**
15:4
34:9
45:12
58:4,6

**judge**
22:16

**judges**
23:2
25:2

**July**
53:14

**jump**
46:3

**jumps**
14:11,
13

**June**
53:13
54:19
55:3

**Justice**
8:3

---

**K**

**K-A**
4:14

**K-R-A-T-Z**
4:14

**key**
14:3
42:12
46:20

**kick**
26:25

**Kim**
32:11

**Kim-**
10:3
18:19
32:11,
18 39:9
50:9

**Kimbrough**
6:5,16
9:15,21
10:18
12:1,
15,20,
25
14:14,
19
15:10,
21 17:3
21:16
23:25
26:5,13
27:5,25
29:11,
22
31:19
32:6
33:12
34:10
37:4,21
38:4
39:11,
22
41:7,11
46:5
48:17,
19 49:2
50:12
52:13
56:20

**Kimbrough's**
26:25
40:4
46:23
54:18

**kind**
5:13

27:3
33:9

**kinds**
5:25

**knew**
9:23,25
12:3
24:17
41:18
54:23

**know-**
40:14

**knowing**
12:1
25:19

**knowledge**
8:24
16:7
17:3,4
19:7
21:15
22:15
29:4
32:3
37:20
41:7
45:12
50:2,15
53:3,9
58:15

**Kratz**
4:7,14,
18
48:1,7

---

**L**

**lable**
27:18

**lack**
9:18
55:22

**laid**
8:15

**laint**
10:1

**largely**
17:2

**lated**
33:5

**Lauren**
56:21

**law**
4:8
6:21
9:8
10:9
26:22
42:2
47:14
56:22,
23

**law-**
57:3

**le**
31:16

**leader**
45:17

**leadership**
47:3

**learn**
11:6
41:7

**learned**
11:9
25:25
50:9

**leav-**
20:19

**leave**
20:16

**leaves**
19:14
20:18

**led**
47:7
51:12

**ledge**
40:15

**left**
5:14
19:16,
20 47:1

**legal**
22:6

**legally**
53:19
55:19

**legations**
9:24

**length**
30:2

**letter**
7:12

**level**
11:12
25:17
42:10
46:4

**levels**
14:6
16:24
18:7

**Lexapol**

6:1

**liar**
29:12

**lieu-**
30:6
40:11

**lieuten-**
8:8

**lieutenant**
8:16,23
15:9
20:24
21:4
40:11
58:7

**lieutenants**
8:20
15:14
40:13

**lieve**
54:23

**lines**
31:16
37:6

**link**
26:10
52:17

**linked**
57:8,10

**list**
5:2

**listed**
9:14

**litigating**
33:22

**litigation**
23:22
41:21

**lity**
9:15
45:7

**lives**
33:16,
19,24

**long**
12:25

**longer**
40:8

**looked**
20:12
27:24
28:8,9

**loop**
56:9

**lost**
28:17

**lot**
8:5,6
14:8
15:8,16
23:7
26:25
38:9
40:9,10
41:2,3,
14
42:2,10
44:2
45:21,
22
55:11
57:22

**lots**

14:2

**low**
43:9

**loy**
17:17
42:16

**Lt**
6:5,15
9:15,21
10:3,17
12:1,
14,20,
25
14:14,
19
15:10,
20 17:3
18:19
21:16
23:25
26:4,
13,25
27:5,25
29:11,
21
31:19
32:3,6,
11,18
33:11
34:10
37:4,20
38:4
39:9,
11,22
40:4
41:7,11
46:5,23
48:17,
19 49:2

**lunch**
18:3

**ly**
20:25
50:24
57:9

**lying**
54:13

———————

**M**

**machine**
16:14

**machinery**
47:12

**made**
15:8
32:18,
21

**mail**
23:8,9

**main**
21:4,14
57:20

**maintain**
7:20
31:14,
16

**major**
15:13

**majority**
9:13
23:19

**make**
8:25
9:3,5
13:5
21:6
24:9
25:18,
20

26:14
55:22
57:2,18

**management**
5:21
41:9

**managerial**
5:16

**mankind**
16:3

**Mansour**
4:21
15:16
18:13
30:14,
16 31:2
32:5
35:6
48:5
56:16
57:12
58:16,
22 59:2

**Mansour's**
19:1
38:8

**manual**
27:12,
13 29:9

**Marge**
56:21

**marked**
21:20
28:19,
22 30:9
31:4,9

35:13,
15
36:22

**MAT**
44:10,
12,16

**mate**
25:6
33:16
52:18

**mates**
25:21
33:17

**Mcevitt**
56:21

**me'**
5:3

**meals**
42:23

**means**
50:8

**med-**
42:18
44:12

**medica-**
43:3

**medical**
14:7
25:3
42:25
43:1
44:2,9

**medication**
5:8
43:8,
10,14

medications
42:6
43:1
44:13
members
34:4
men
18:15
ment
20:2
26:23
mental
42:19
44:2,4
mention
37:17
mentioned
22:9
36:15
41:22
42:25
44:9
56:18
ments
5:18
messages
5:20
method
43:13
MHB
44:10
micro
5:21
middle
5:13
million

42:23
missed
7:12
mission
30:11
31:5,10
mode
16:17
modules
42:8
money
42:4
month
7:21
43:10,
11 55:4
mony
48:15
MOUD
44:13
move
16:21
17:17
33:9
47:3
56:15
movement
52:11
moving
47:17
mug
7:7
municati
ons
42:21

——————
N
na-
16:1
names
18:20,
22
nated
53:23
56:14
national
6:18
nationwi
de
17:1
24:24
nature
9:23
17:9
needed
15:9
46:25
nefariou
s
26:1
Net-
7:11
Network
6:22
8:3 9:8
ney
41:20
nicely
10:13
no-
16:18

Norristo
wn
47:20
notice
13:4
27:9
notified
12:15
num-
43:12
44:15
52:20,
21
number
6:2
7:2,3
27:8
29:8
42:15
51:4
56:21
numbers
17:10,
12 26:9
52:17
nursing
43:20,
21
nym
7:13
——————
O
objectio
n
32:5,14
35:6
55:25
57:5

objectio
ns
4:4
occurred
40:2
Ofcr
19:9,13
20:12,
16,17
offender
35:16,
25
offense
5:5
34:17
offenses
30:18
offered
5:23
offi-
19:22
office
6:17
7:6
9:3,5
20:24
27:2
39:20
40:16
41:14
45:17
46:24
officer
16:12
19:11
20:8,14
27:15
28:5,18
30:4,5,

6 47:4
officer'
s
21:14
officers
13:10
16:15,
18,19
38:17
39:1
40:24
41:12,
14
46:15
officers
'
18:20
ond
47:23
ongoing
5:17
46:1,2
open
15:14
openly
16:1
operate
8:2
operatin
g
27:15,
20
28:25
operatio
ns
10:19
23:10
32:2
45:15

David Kratz
02/18/2025

13

| | | | | | |
|---|---|---|---|---|---|
| opiate | oversee | 23:14 | 36:2,3, | 44:5 | 28:1,9 |
| 44:14 | 42:6,19 | 57:4 | 10 | placemen | 29:5 |
| opinion | ———— | Penndot | 40:23 | t | 38:15, |
| 56:3 | P | 7:6 | 47:6 | 15:10 | 18,20 |
| opportun | p.m. | Pennsylv | person- | plaintif | 39:5 |
| ity | 58:25 | ania | 27:2 | f's | 50:21 |
| 11:15 | papercli | 8:4 | personal | 4:19 | 51:5,16 |
| order | ps | 9:6,7 | 36:8 | planned | 52:10, |
| 6:17 | 29:17 | people | 56:3 | 55:11 | 12,14 |
| 23:15 | par | 10:12 | personal | plate | 57:23 |
| 25:18 | 37:17 | 16:21 | ly | 42:13 | policy |
| 26:1 | Paragrap | 17:17 | 10:3 | pline | 22:4 |
| 31:14 | h | 18:10 | 25:24 | 12:25 | 23:6,8, |
| 33:1 | 34:2, | 25:13, | 26:24 | 33:10 | 9 28:23 |
| 41:16 | 11,21 | 21 28:7 | 33:15 | ploy | 29:1 |
| 46:12, | 37:1 | 39:23 | personne | 25:8 | 32:19 |
| 14,22 | pardon | 41:6 | l | point | 34:23 |
| 47:8 | 32:11 | 43:22 | 52:11 | 11:5,6 | 35:3,10 |
| 50:6,19 | part | 44:3 | phic | 19:13 | 38:5 |
| 51:12 | 15:3 | 46:15 | 7:7 | 26:12 | 42:3 |
| ordered | 34:9 | 47:1,2, | phone | 39:18, | 57:20, |
| 59:1 | 39:16 | 5,18 | 30:24 | 20 46:4 | 25 |
| ords | 55:9 | 48:23 | photogra | 55:14 | ponse |
| 14:2 | 58:6 | 49:2,3, | - | pol | 26:11 |
| 39:20 | parties | 7,13 | 7:6 | 24:5 | populati |
| organiza | 4:2 | 52:21 | Photogra | police | on |
| tion | 22:1 | 58:1 | phic | 6:23 | 43:15 |
| 34:7 | parts | per- | 7:11 | 7:20 | portion |
| ously | 21:13 | 27:4 | physical | 9:6,7 | 19:2 |
| 30:9 | past | permi- | 7:24 | 38:19 | posed |
| out- | 7:21 | 5:21 | pick | policies | 38:10 |
| 23:4 | 32:25 | permitte | 5:22 | 8:24 | position |
| out-of- | 35:16, | d | PII | 9:10,11 | 4:15 |
| state | 25 36:3 | 7:23 | 36:7 | 17:22, | 5:17 |
| 8:5 | pat | 40:8 | place | 25 18:3 | 8:15 |
| overreac | 17:21 | person | 23:15 | 22:5,18 | 40:9 |
| t | Patterso | 24:15 | 29:15 | 23:7 | 47:10 |
| 8:25 | n | 28:7 | 39:5 | 25:8,9 | potentia |
| | | 33:18 | | 27:9,12 | lly |
| | | 35:22 | | | 57:17 |

Power
  27:19
pre
  44:8
pre-
  28:18
pre-
covid
  44:8
presented
  53:18
press
  17:13
  37:11,
  16
pretty
  23:5
  33:25
  40:16
  42:13
previ-
  30:8
previous
ly
  31:9
pri-
  15:17
  16:2
  17:11
  43:15
print
  52:1
printed
  18:12
prior
  13:12,
  24,25

18:14
28:15
30:5
54:18
55:3
prison
  16:8
  43:12
prisoner
  7:1
  37:12,
  18
prisoner
s
  47:15,
  17
privacy
  8:5,6
  36:12,
  14
private
  9:1
privy
  10:6
pro-
  45:10
problem
  45:13
proced-
  25:19
  28:25
  42:3
procedure
  17:21
  22:4,5
  23:6
  25:22
  55:18

procedur
es
  8:24
  9:10,11
  27:15,
  20 29:5
  39:5
process
  11:24
processe
s
  47:13
professi
onal
  32:1
program
  44:10,
  11,12
promised
  50:18
promoted
  8:8
  15:9
promotio
ns
  8:12
protect
  24:2,13
  36:7
protecte
d
  7:1 8:7
protecti
ve
  23:15
  50:5,19
  51:12
provide

34:21
37:11
proximit
y
  7:24
PSP
  9:7
Psychiat
ric
  42:7
  47:19
public
  36:20,
  23
pulled
  13:13
  18:10
punch
  26:17
punishme
nt
  11:20,
  21
put
  12:7
  15:7
  17:19
  29:15
  39:25
  41:9
  44:5,25
  50:25
  54:16,
  24 55:2
putting
  14:4

———————

Q

qualify
  45:18
quar-
  43:19
ques-
  27:23
question
  10:19
  32:17
  51:2
question
-
  38:8
question
s
  4:4
  26:23
  35:12
  48:2,6
  51:4
  58:4,
  16,17
quick
  36:21
  47:24
quiremen
t
  35:22

———————

R

radio
  19:24
ral
  22:25
rank
  46:6

re-
  8:22
  15:9
  21:5
  29:3
  35:21
  42:4,7
  49:22
reach
  26:22
reaction
ary
  12:24
read
  35:24
read-
only
  27:22
reading
  4:2
real
  26:25
  47:24
realized
  26:12
reason
  15:12
  20:21
  41:12
reasons
  4:25
  24:23
reassuri
ng
  56:11
rec-
  14:1
  39:19

recall
    4:18
    13:9,11
    32:22
    33:11
    38:10
    39:11
receive
    47:19
    55:15
receiving
    43:14
recep-
    8:17
    40:5
reception
    8:21
    9:13
    13:13,
    21
    14:16,
    17,21
    15:18,
    19
    19:8,
    14,17,
    20
    20:5,
    15,25
    21:9,13
    40:6
    46:25
recipients
    44:16
recognize
    28:20

35:19
recollection
    57:13
recommendations
    11:16
record
    4:13
    8:20
    15:18
    31:3
    47:24,
    25
records
    6:17,19
    8:17,
    22,23
    9:12
    20:1,5,
    8,13,
    14,21
    21:8,
    17,18
    28:16
    30:4,7
    34:5
    36:17
    40:5,6
    41:23
    44:19
    46:24
records/
    recep-
    45:22
records/
    reception
    6:11

recruitment
    16:9
    42:4
redacted
    23:13
refer
    9:17
regard
    51:5
regard-
    22:12
regulations
    7:18
    22:3
relate
    34:14
related
    55:7
relation
    33:12
relationship
    56:3
release
    23:5,6,
    12
    35:16,
    25
remember
    39:14
    56:24
rendered
    28:10
reopen
    53:20

reopening
    53:19
reorganization
    42:8
replacement
    15:10
report
    31:25
    43:12,
    13
reported
    15:25
    43:11
REPORTER
    29:16
reporters
    38:13,
    15,16
represented
    56:25
representing
    41:20
requesting
    35:22
    36:3
require-
    5:17
required
    5:15
    6:6
    22:16

31:15,
    16
    55:20
requirement
    36:2
    37:16
requirements
    5:20
requires
    57:22
res-
    26:10
reserved
    4:5
resources
    10:8
respective
    4:2
responding
    19:18
    20:16
responses
    5:3
responsibi-
    9:14
responsibilities
    28:15
    37:25
    44:21

responsibility
    40:10
responsible
    6:9
restrict
    45:10
restricted
    25:9
result
    14:5
    23:23
retalia-
    13:2
retaliate
    57:18
retaliated
    58:2
retention
    16:10
    17:16
return
    53:25
    54:2
returns
    6:25
review
    11:15
    28:23
    29:1
reviewed
    11:19

David Kratz
02/18/2025

16

| | | | | | |
|---|---|---|---|---|---|
| reviews | running | security | 20:23 | 28:18 | skills |
| 23:3 | 46:20 | 16:5 | serve | 30:8 | 12:6,10 |
| revision | runs | 17:18 | 42:23 | showed | 40:10, |
| s | 46:14 | 22:24 | served | 18:13 | 15 |
| 29:7 | | 23:4 | 36:4 | showing | slack |
| Rhoades | ——— | 26:5 | service | 35:13 | 40:21 |
| 24:18 | S | 31:17, | 6:15 | sically | slew |
| 37:22 | sack | 20,24 | 42:22 | 28:12 | 42:21 |
| 52:3 | 18:3 | 32:1 | seve- | signing | slots |
| ric | safety | 50:18 | 22:24 | 4:2 | 55:11 |
| 6:25 | 16:5 | 51:7,13 | seventy | similar | small |
| riety | 20:19 | selected | 44:24 | 6:22 | 11:25 |
| 4:25 | 22:23 | 15:12 | shaken | simple | 12:4 |
| rights | 24:5 | self-dis | 56:5 | 47:14 | 25:4 |
| 36:9 | 42:9 | 34:15 | share | single | Smith |
| ripple | salvagea | seminars | 38:23 | 34:7 | 56:21 |
| 47:10 | ble | 5:24 | 39:1 | sir | smuggle |
| risk | 12:3 | sense | 58:10, | 49:19 | 18:23 |
| 23:4 | sealed | 8:25 | 14 | sistentl | 24:18 |
| risked | 23:19 | 21:7 | shared | y | smugglin |
| 31:19 | sealing | sensitiv | 18:6,8, | 23:6 | g |
| risks | 4:2 | e | 9 26:4 | sit | 52:4 |
| 17:19 | search | 7:1 | 27:21 | 33:7 | solve |
| rity | 17:25 | 8:22 | 58:6,10 | sition | 45:13 |
| 29:24 | searches | 17:18 | sharing | 57:22 | somebody |
| road | 25:9 | 22:16, | 58:5 | sitting | 's |
| 12:4 | sec- | 17,18 | shift | 16:16, | 26:21 |
| rocked | 14:21 | 26:5 | 40:14 | 18 | son |
| 13:1 | 47:22 | 27:6 | shortly | situatio | 15:18 |
| role | secrete | 29:24 | 13:19, | n | 16:3 |
| 47:3 | 35:1 | sentence | 20 | 20:17 | 17:12 |
| rose | section | d | shots | 54:16 | 43:16 |
| 11:11 | 52:23 | 47:17 | 7:7 | sixteen/ | sonnel |
| run | secu- | sentence | should' | seven- | 27:5 |
| 9:2 | 29:23 | s | ve | 30:3 | SOP |
| 32:25 | secure | 47:19 | 29:16 | sixty | 51:21, |
| 40:13 | 6:20 | sergeant | show | 44:24 | 22 |
| 45:9 | 7:22 | 15:6 | 21:21 | | SOPS |
| | | 16:12 | | | |

David Kratz
02/18/2025

17

17:22,
25 18:3
28:3
38:20

**sor**
21:4

**sort**
13:2
16:9
24:1

**sought**
22:1

**sound**
25:12

**speak**
10:3,17
17:11
37:10,
16

**speaking**
8:11
13:20
41:16
42:13

**speci-**
12:11
13:11

**special**
40:14

**specialized**
7:17

**specific**
18:17
37:12,
17

**specifical-**
50:23

**specifically**
15:18
23:14
34:8
36:25
37:11,
21
52:21

**specifics**
16:4

**speculate**
51:25

**spelled**
10:1
18:14

**spend**
40:18

**spending**
42:2
45:24

**spoke**
41:14
51:10
53:22

**spoken**
23:4

**sponsible**
29:4

**spouses**
38:17

**staff**
5:15
9:2
16:6
25:5,7

26:10
29:3,9
31:15
34:4,8
37:9
41:3,6
42:18,
25
43:1,
20,21
52:22

**staff-**
17:9

**staffed**
19:8,11

**staffing**
15:17,
21,23,
25
16:2,4,
8,17,24
17:7,
12,16,
17 18:7
21:7,19
24:7,10
45:15
52:17

**stand**
22:25
42:12

**standard**
27:14
28:25

**Standards**
9:4

**stands**
12:9

**star-**
55:12

**start**
27:16

**starting**
5:12

**state**
4:12
7:2,19
9:6,7
37:5
47:18,
19

**state/
federal/
local**
16:3

**static**
15:24

**stayed**
20:22

**step**
11:24,
25

**stipulated**
4:1

**stood**
14:12

**stop**
44:6

**stories**
17:14

**street**
43:25

**streets**
44:4

**strong**
48:23

**structure**
40:22
46:6,15

**structuring**
42:8

**stuff**
18:18

**sub-**
38:19

**subject**
38:15,
18
50:5,19
51:11

**subordinates**
6:10
11:13
12:7

**successful**
44:15

**successfully**
24:18
34:25

**sudden**
13:5

**suit**
57:4

**sup-**
16:12
45:16

**super**

45:6

**superintendent**
45:6,8

**superiors**
58:13

**supervi-**
21:3

**supervise**
8:17

**supervised**
6:13

**supervises**
8:20

**supervising**
40:18
47:6
55:9

**supervisor**
6:16
9:12
33:7
40:24

**supervisor's**
21:14

**Supervisors**
27:23

**supervisory**
5:16

David Kratz
02/18/2025

18

| | | | | | |
|---|---|---|---|---|---|
| **suppleme nted** | **tactics** | **teen** | 49:9 | **things** | 13:1,12 |
| 55:12 | 23:10 | 30:4 | **terminat ion** | 10:1 | 15:17 |
| **supposed** | **tain** | **telecom-** | 40:5 | 12:2 | 17:14 |
| 46:16 | 23:11 | 42:20 | 50:22, | 14:9 | 21:2, |
| **surprise d** | **takes** | **telling** | 23 | 15:8 | 16,17 |
| | 12:2 | 49:3 | 54:5,10 | 17:13 | 27:23 |
| 26:17 | **taking** | **ten** | 57:25 | 18:8,14 | 30:2 |
| **surveill ance** | 27:1 | 43:16 | **terms** | 22:2,17 | 36:4 |
| | **talk** | 44:7 | 17:12 | 23:3,13 | 39:18, |
| 52:2 | 5:2 | **tenant** | 24:6 | 25:10 | 19 |
| **suspend** | 12:6 | 30:7 | 52:10 | 26:24 | 40:18 |
| 39:11 | 14:25 | 40:12 | **test** | 40:17 | 41:23 |
| 48:18 | 15:13, | **tend** | 22:23 | 42:10, | 42:2 |
| 56:19 | 23 16:1 | 40:25 | **testifie d** | 14,21 | 45:24 |
| 57:14 | 24:6 | 47:1,3 | | 43:2 | 46:4 |
| **suspende d** | 33:7 | **tention** | 4:9 | 44:8 | 48:3 |
| | 41:5,17 | 42:5 | 22:12 | 45:7 | 55:11, |
| 53:13 | 52:20 | **ter** | 49:8 | 46:18 | 13,14 |
| **suspensi on** | **talked** | 43:20 | 50:4 | 47:5 | **times** |
| | 15:16 | **term** | **testimon y** | **thought** | 22:14 |
| 40:4 | 18:25 | 6:21 | | 12:24 | 23:12 |
| 55:3 | 48:11 | 9:19 | 5:8 | 13:6 | 25:14 |
| **swap** | 50:21 | 55:22 | 25:1 | 28:17 | **timing** |
| 40:11 | 51:2 | **term-** | **ther** | 54:9 | 12:23 |
| **sworn** | **talking** | 53:13 | 57:10 | 57:2 | 56:4 |
| 4:8 | 10:12 | **termi-** | **There'd** | **threat-** | **tion** |
| **system** | 13:15, | 53:22 | 48:22 | 31:25 | 8:18 |
| 7:20 | 22,25 | 56:13 | **there-** | **threw** | 10:24 |
| 27:18, | 44:20, | **terminal** | 12:17 | 56:9 | 11:9 |
| 19 35:1 | 21 | 6:21,22 | **thing** | **throw** | 12:7 |
| **systems** | **tant** | **terminat e** | 5:14 | 26:17 | 14:22 |
| 8:2,5 | 47:7 | | 16:10, | **Thursday** | 26:19 |
| 27:17 | **task** | 48:17 | 19 | 4:20 | 29:23 |
| | 45:23 | 54:18 | 17:16 | **tiality** | 34:8 |
| ――――― | **tation** | **terminat ed** | 24:7 | 37:3 | 36:1,8 |
| **T** | 32:23 | | 25:1 | **till** | 37:1 |
| **table** | **ted** | 27:5,6 | 49:6 | 27:16 | 39:9,17 |
| 30:18 | 32:4 | 46:10 | 58:1 | **time** | 40:6,16 |
| | 55:13 | | | 4:5 6:5 | 45:23 |
| | | | | 11:5 | 48:8,23 |
| | | | | | 56:18 |

tional
35:3
tions
6:24
27:24
43:4,24
58:1
tionwide
16:2
title
9:4
35:24
titutional
31:17
today
5:9
43:24
50:21
57:21
told
11:2
17:3
18:15,
16 37:6
49:2,4
52:1
54:4
top
24:11
31:24
tory
13:3
total
42:17
tracked
6:3
train
6:10

28:17
train-
6:6
trained
12:12
training
5:15,
17,20
6:3,15
8:1,2,
3,6
trainings
5:21,
22,25
6:2
trank
43:24
transcript
4:3
59:1
trary
54:13
Travis
20:12,
17
treading
35:10
treatment
42:6,18
44:13
47:20
triage
47:15
trial
4:5

trials
57:22
trou-
57:2
trouble
55:22
57:18
tted
5:22
turn
22:16
42:12
tween
24:10
twelve
16:14
two-
second
30:23
type
6:11
42:14
43:13
types
8:12

———

**U**

ues
31:15
Ulmer
19:9,14
20:16
32:4,
19,24
33:1,12
ultimate
27:4

ultimately
11:21
56:19
57:15
unbecoming
27:10
34:18
unclothed
17:24
und-
51:1
understaffed
17:2
understaffing
26:8
understanding
16:25
18:5
19:16
23:21
unfair
11:3
uniform
54:1
unit
14:16,
17
15:19
18:10
19:8,
14,17,
20
20:5,9

41:23
unobstructed
21:12
untrue
18:10
unwillfully
46:19
updates
29:7
upset
10:20,
23
ure
25:20
42:4
ures
29:1
usual
5:2
41:25
42:1

———

**V**

va-
4:24
vac-
15:25
vacancies
16:2
17:13
vacant
20:20
47:10
vacation
55:10

val-
31:14
values
30:11
31:5,
10,12
verbal
5:4
versations
10:11
49:24
versions
24:25
26:1
vestigation
9:18
10:8
56:6
video
19:1,2,
13
20:8,16
21:22,
23 22:3
52:2,7
viduals
56:22
view
19:1
21:12
vio-
33:4
viola-
57:25
violate
57:23

David Kratz
02/18/2025

20

| | | | | |
|---|---|---|---|---|
| **violated** | 45:4,5, | **witnesses** | ———— | 51:6, |
| 28:10 | 8 | 50:1 | **X** | 11,16, |
| 32:19 | **wardens** | 53:20 | **Xylazine** | 22 |
| 34:10 | 42:5 | **won** | 43:25 | 52:7,14 |
| 38:4 | **warrants** | 23:2 | | 53:4, |
| 50:20 | 7:2 | **word** | ———— | 10,15 |
| **violation** | **watch** | 10:14 | **Y** | 54:21 |
| 34:14 | 19:5 | **words** | **year** | 56:6 |
| **violations** | **way-back** | 48:7 | 7:20 | 58:5, |
| 57:20 | 16:14 | **work** | 42:23 | 10,13 |
| **viously** | **wealth** | 7:12 | **years** | |
| 28:19 | 9:8 | 40:9,23 | 8:13 | |
| **vision** | **webinars** | 41:4 | 12:1 | |
| 30:11 | 5:24 | 45:14, | 16:14 | |
| 31:5,10 | **Wednesday** | 15 | 30:4 | |
| **volume** | 4:21, | **working** | 43:16 | |
| 47:16 | 22,24 | 21:16 | 44:7 | |
| | **week** | 42:22 | | |
| ———— | 4:24 | **works** | ———— | |
| **W** | 5:21 | 6:16 | **Z** | |
| **wait** | 44:24 | 46:17 | **Zei-** | |
| 32:16 | **weeks** | **world** | 38:5 | |
| **waiting** | 10:18 | 14:4 | 55:23 | |
| 32:13 | **weighs** | 17:15 | **Zeiger** | |
| 39:15 | 23:5 | 42:10 | 12:20 | |
| **waived** | **weird** | **would've** | 17:3 | |
| 4:3 | 5:12 | 6:5 | 18:6 | |
| **walk** | **widely** | 20:7 | 24:1 | |
| 21:3,5 | 55:8 | **written** | 26:4,14 | |
| **wan-** | **willfully** | 52:12 | 31:21 | |
| 32:3 | 46:18 | **wrong** | 32:3,7 | |
| **wanted** | **window** | 8:9 | 33:18 | |
| 5:14 | 20:25 | 14:16 | 34:12 | |
| 32:20 | 21:11 | 53:19 | 37:6 | |
| **warden** | | **wrote** | 39:10, | |
| 40:18, | | 40:1 | 25 41:8 | |
| 19 | | | 49:11, | |
| | | | 24 | |
| | | | 50:5, | |
| | | | 17,18, | |
| | | | 25 | |