**EXHIBIT ;**

Brian J. Zeiger, Esquire
03/19/2025

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                       -  -  -

 4    ARA KIMBROUGH              :
                                 :
 5           v.                  : NO. 24-CV-04470
                                 :
 6    BUCKS COUNTY, LAUREN       :
      SMITH, SHAE RANDOLPH       :
 7    and DAVID KRATZ            :

 8
                             -  -  -
 9
                      MARCH 19, 2025
10
                             -  -  -
11
                      Oral deposition of BRIAN J.
12    ZEIGER, ESQUIRE, taken pursuant to notice, was
      held remotely via Zoom, commencing at 9:59
13    a.m., on the above date, before Maura B.
      Doyle, a Registered Professional Reporter,
14    Certified Court Reporter and Notary Public in
      and for the Commonwealth of Pennsylvania.
15

16                       -  -  -

17

18

19

20

21

22

23

24
```

Brian J. Zeiger, Esquire
03/19/2025

Page 2

```
 1   REMOTE APPEARANCES:

 2
             MANSOUR LAW, LLC
 3           BY:  WILLIAM P. MANSOUR, ESQUIRE
             961 Marcon Boulevard
 4           Suite 425
             Allentown, Pennsylvania 18109
 5           610-362-5412
             Wpm@themansourfirm.com
 6           Representing the Plaintiff

 7
             BUCKS COUNTY LAW DEPARTMENT
 8           BY:  DARA BURNS, ESQUIRE
                  JACLYN GRIESER, ESQUIRE
 9           Bucks County Administration Building
             55 East Court Street, 5th Floor
10           Doylestown, Pennsylvania 18901
             215-348-6464
11           Dburns@buckscounty.org
             Representing the Defendants
12

13

14
     ALSO PRESENT REMOTELY:
15
                     ASHLEY DAYOUB
16
                       -  -  -
17

18

19

20

21

22

23

24
```

Brian J. Zeiger, Esquire
03/19/2025

Page 3

```
1                         -  -  -

2                    I N D E X

3                         -  -  -

4
   BRIAN J. ZEIGER, ESQUIRE              PAGE
5
6      BY MS. BURNS                     5, 58

7      BY MR. MANSOUR                    35

8

9

10

11
                         -  -  -
12
               E X H I B I T S
13
                         -  -  -
14

15   NO.              DESCRIPTION        PAGE

16   D-10     Email chain Bates stamped
             COB 1100                    17
17
     P-14     Amended Complaint          39
18

19

20

21

22

23

24
```

Brian J. Zeiger, Esquire
03/19/2025

Page 4

```
 1                       -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                       -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page Line       Page Line    Page Line

 7   None

 8

 9

10   Request for Production of Documents

11   Page Line       Page Line    Page Line

12   None

13

14

15   Stipulations

16   Page Line       Page Line    Page Line

17    5     2

18

19

20   Question Marked

21   Page Line       Page Line    Page Line

22   None

23

24
```

Brian J. Zeiger, Esquire
03/19/2025

Page 5

```
1                         -  -  -

2                 (It is hereby stipulated and

3         agreed by and among counsel for the

4         respective parties that reading,

5         signing, sealing, filing and

6         certification are waived; and that all

7         objections, except as to the form of

8         questions, be reserved until the time

9         of trial.)

10                        -  -  -

11                 BRIAN J. ZEIGER, ESQUIRE, after

12        having been duly sworn, was examined

13        and testified as follows:

14                        -  -  -

15                 EXAMINATION

16                        -  -  -

17  BY MS. BURNS:

18        Q.    Good morning, Mr. Zeiger.  My

19  name is Dara Burns.  I'm assistant county

20  solicitor here with the County of Bucks.  As

21  you heard, in the room with me is Jaclyn

22  Grieser.  She's the deputy counselor

23  solicitor.  And, also, we have Ashley Dayoub,

24  who is here as well.
```

Brian J. Zeiger, Esquire
03/19/2025

Page 6

1                     Can you please state your name

2    and spell it for the record?

3             A.     Brian Zeiger, Z-E-I-G-E-R.

4             Q.     Okay.  Now, you are an attorney;

5    correct?

6             A.     Yes.

7             Q.     So I know you've taken and

8    defended plenty of depositions.  But have you

9    ever given your deposition personally before?

10            A.     Yes.

11            Q.     About how many times?

12            A.     Once.

13            Q.     Do you recall when?

14            A.     Yes.  I was like 16 or 17 years

15   old.  It was at the Arbitration Center in

16   Philadelphia.  It was a personal injury matter

17   that happened at Veterans Stadium and I was

18   called as a witness in the personal injury

19   matter at the Philly Arb Center.  I remember

20   it vividly.

21            Q.     Okay.  Thank you.

22                   MS. BURNS:  Before I go on,

23            Bill, usual stipulations with regard

24            to the objections?

Brian J. Zeiger, Esquire
03/19/2025

Page 7

```
 1                    MR. MANSOUR:  Yes.

 2                    MS. BURNS:  Okay.  Thank you.

 3    BY MS. BURNS:

 4         Q.    All right.  So, Mr. Zeiger, as

 5    you know all of your answers to these

 6    questions must be verbal so that Maura can

 7    accurately transcribe what we're talking about

 8    today.

 9               If you don't understand a

10    question, I would ask that you just ask me to

11    clarify it or rephrase it.  Otherwise, I'm

12    going to assume that you understood my

13    question.  Do you understand that?

14         A.    Yes.

15         Q.    And are you under the influence

16    of any substances or suffering from any

17    condition today that might affect your ability

18    to give accurate testimony?

19         A.    No.

20         Q.    Okay.  And as we discussed

21    before, you are an attorney; correct?

22         A.    Yes.

23         Q.    And where do you currently

24    practice law?
```

Brian J. Zeiger, Esquire
03/19/2025

Page 8

1           A.      In many jurisdictions.  My

2     office is located in Philadelphia County in

3     Pennsylvania.

4           Q.      And what is the name of your

5     office?

6           A.      Levin & Zeiger, LLP.

7           Q.      And what type of law do you

8     practice?

9           A.      My firm does personal injury

10    cases, but I've never done a personal injury

11    case in my career.  I do some criminal

12    defense.  A very small amount.  And I do the

13    majority of civil rights cases generally in

14    federal court.

15          Q.      And what year were you licensed

16    in whatever state you were first licensed in?

17          A.      2001 in Pennsylvania.

18          Q.      And what other states are you

19    currently licensed in?

20          A.      New Jersey.

21          Q.      Now, in your capacity as an

22    attorney, have you ever sued Bucks County or

23    any entities or employees of Bucks County?

24          A.      Yes.  Multiple times.

Brian J. Zeiger, Esquire
03/19/2025

Page 9

```
 1          Q.     Do you know how many times?

 2          A.     I don't recall.

 3          Q.     Okay.  Now, in July of 2023, did

 4   you file suit in the Eastern District of

 5   Pennsylvania against the county and employees

 6   on behalf of the Estate of Joshua Patterson?

 7          A.     I don't remember the date, but

 8   everything else you said, yes, I definitely

 9   initiated a lawsuit against Bucks County and

10   all the other parties on behalf of the Estate

11   of Joshua Patterson, yes.

12          Q.     Okay.  And just for ease of

13   reference, I'm going to refer to that today as

14   the Patterson matter.  Okay?

15          A.     Yes.

16          Q.     Now, just in summary -- and if

17   you don't agree with me, you can clarify.  But

18   that lawsuit alleged that an inmate named

19   Rhoades smuggled trucks into the Bucks County

20   Correctional Facility during his intake into

21   the facility in approximately July of 2022.

22   Is that your recollection?

23          A.     I don't -- I'm not very good

24   with dates --
```

Brian J. Zeiger, Esquire
03/19/2025

Page 10

```
 1          Q.     Okay.

 2          A.     -- or names, but I'm very good

 3    with the facts.  And that sounds accurate to

 4    me except I don't recall the dates and the

 5    names.

 6          Q.     Okay.  And then after that

 7    incident, allegedly Mr. Patterson then came

 8    into possession of some of those drugs and he

 9    overdosed and, unfortunately, passed away.  Do

10    you recall that?

11          A.     Yes.  But I believe... if my

12    memory serves me, Ms. Burns, there was a

13    nuanced issue regarding whether he died at the

14    prison or whether he died at the Doylestown

15    Hospital and I believe -- again, it's a

16    nuanced issue that was of no moment to me, but

17    I think it is of a moment to Ms. Grieser who I

18    believe is also here today and I don't want to

19    offend anyone.  I think there might have been

20    a small difference in term of art as to where

21    he died.  So I don't -- the phrasing of your

22    question I agree with it, but I just want to

23    make that point.  So the answer to your

24    question is yes.
```

Brian J. Zeiger, Esquire
03/19/2025

Page 11

1          Q.     Okay.  So I understand -- and,

2    again, you said you're not good with dates,

3    but if I told you that Mr. Patterson was

4    declared dead in August of 2022, is that your

5    recollection?

6          A.     Yes.

7          Q.     Okay.

8          A.     Yes.

9          Q.     And I will represent just, for

10    the record, that the lawsuit was filed in July

11    of 2023.

12          A.     I --

13          Q.     During the -- go ahead.  I'm

14    sorry.

15          A.     I said I believe you.

16          Q.     Okay.  During the pendency of

17    that matter, did the parties engage in

18    discovery?

19          A.     Yes.

20          Q.     And did the County produce

21    documents in response to Request for

22    Production?

23          A.     Yes.

24          Q.     And did the County produce

Brian J. Zeiger, Esquire
03/19/2025

Page 12

1    videos in response to Request for Production?

2            A.      Yes.

3            Q.      And did you review those

4    documents and those videos that were produced

5    by the County?

6            A.      Yes.

7            Q.      Did you also notice the

8    depositions any of current or former employees

9    of the Bucks County Correctional Facility?

10           A.      I don't recall if I sent formal

11   notices or if it was just via email.  But I

12   understand your question to mean did we have

13   depositions and schedule them by agreement of

14   counsel and all that type of stuff and the

15   answer is yes.

16           Q.      Do you recall how many people

17   you deposed?

18           A.      No.

19           Q.      Now, generally, how did you

20   determine who you were going to depose in that

21   matter?

22           A.      Without reviewing any secret

23   sauce as to my, you know, general strategy for

24   prosecuting civil rights cases, once I have

Brian J. Zeiger, Esquire
03/19/2025

Page 13

1   the documents in my possession, I believe that

2   every document has to be authenticated so that

3   no defense attorney can somehow -- or some

4   witness at trial can never say that that isn't

5   their document.  I don't have any time for

6   that nonsense.  And so every person who signs

7   a document that's related to anything I

8   receive back in the Request for Production of

9   Documents will be deposed so that they can

10  adopt the document so that none of those are

11  trial issues.  So however many people were

12  mentioned in the documents I would have asked

13  to depose all of them.

14          Q.      Okay.  Do you recall at that

15  time if you were aware of an employee of the

16  Bucks County Correctional Facility named Ara

17  Kimbrough?

18          A.      I believe I was not.

19          Q.      So then it's fair to say that

20  you did not request to depose Mr. Kimbrough

21  during the course of that litigation.

22          A.      Correct.  But I want to say,

23  though, that it's possible that in the initial

24  disclosures Mr. Burns listed -- and just for

Brian J. Zeiger, Esquire
03/19/2025

Page 14

1    the record, Mr. Burns was the attorney I was

2    dealing with regularly.  No disrespect to Ms.

3    Grieser.  But Mr. Burns may have put that

4    person's name in the initial disclosure list.

5    But if their name did not appear in any

6    paperwork with signatures or anywhere in the

7    documents that I -- that I received, then I

8    probably would not have asked to depose the

9    person because there wouldn't really be

10   relevance.

11           Q.     Thank you.  That's fair.

12           A.     Yeah.

13           Q.     Now, do you recall that during

14   the course of the litigation -- and I'll

15   represent to you it was in October of 2023 --

16   the parties entered -- the parties in the

17   Patterson matter to be specific -- couldn't

18   get it out -- it's one of those mornings --

19   entered into a stipulated protective order?

20           A.     Yes.

21           Q.     And it's your understanding that

22   that protective order was in place during the

23   course of the litigation.

24           A.     Yes.

Brian J. Zeiger, Esquire
03/19/2025

Page 15

```
 1            Q.      And do you also recall that the
 2    County filed a motion for summary judgment?
 3    And I will represent that was in April of
 4    2024.
 5            A.      Yes.
 6            Q.      And is it your understanding
 7    that the pleadings in the Patterson matter
 8    were filed under seal?
 9            A.      Yes.
10            Q.      Okay.  So now, sitting here
11    today, do you know who Mr. Kimbrough is?
12            A.      I mean, yes and no.  I mean, I
13    don't know him personally.
14            Q.      Okay.
15            A.      I've never met with him
16    personally.  You know, I only know of him as
17    representations as to who he is or was in
18    regard to the Patterson case.  I don't -- you
19    know, sometimes I have witnesses in cases
20    where I've done prison visits where I know the
21    guards.  That's not the case here.  I don't
22    know Mr. Kimbrough at all other than the
23    context of this matter.
24            Q.      Okay.  And that answers my
```

Brian J. Zeiger, Esquire
03/19/2025

Page 16

1    question.  I was going to ask you whether you

2    knew him personally and you've clarified that.

3            A.      Right.

4            Q.      All right.  Just give me one

5    second.

6                    I have previously emailed you

7    some documents.  Do you recall that?

8            A.      Yes.

9            Q.      Okay.  So those documents -- I'm

10   going to identify them.  The first one had

11   been previously marked during the deposition

12   of another employee in this matter and that

13   was previously marked as P-4.  And that is the

14   unredacted version of an emergency motion that

15   you signed and filed with the Eastern District

16   of PA.

17                   Do you have that document, Mr.

18   Zeiger?

19           A.      I have it, yes.

20           Q.      Okay.

21                   MR. BURNS:  And, Bill, you have

22           that -- 'cause I emailed it to you

23           earlier -- correct?

24                   MR. MANSOUR:  Yes, I have it.

Brian J. Zeiger, Esquire
03/19/2025

Page 17

```
 1                    MS. BURNS:  Okay.  And then the

 2          other document I'm going to mark -- I

 3          believe we were up to D-10.  I did

 4          check my files.  But, Bill, you'll

 5          correct that if I'm wrong.

 6                    MR. MANSOUR:  I think it's

 7          right.

 8                    MS. BURNS:  Okay.

 9  BY MS. BURNS:

10          Q.    And that document in front of

11  you, Mr. Zeiger, is labeled COB1100.

12          A.    Yes.  I have that.

13          Q.    Okay.  All right.  Now that we

14  all have --

15                    MS. BURNS:  And, Bill, you have

16          that document too, correct?

17                    MR. MANSOUR:  I do.

18                    MS. BURNS:  Okay.

19  BY MS. BURNS:

20          Q.    So looking at what we've marked

21  now as D-10 --

22                    MS. BURNS:  And, Maura, you

23          received those documents as well?

24                    THE STENOGRAPHER:  Can we go off
```

Brian J. Zeiger, Esquire
03/19/2025

Page 18

```
 1          the record?

 2                    MS. BURNS:  Yes.

 3                      -  -  -

 4                    (Whereupon, a discussion was

 5          held off the record.)

 6                      -  -  -

 7  BY MS. BURNS:

 8          Q.    So looking at what we are going

 9  to mark as D-10 -- as I said, it's labeled

10  COB1100 -- just moving down to the middle of

11  that document, Mr. Zeiger, I'm just going to

12  ask you to look at that.  It is an email from

13  you to Tyler Burns who you referenced before.

14  And I will state for the record there is no

15  relation between myself and Mr. Burns.  And

16  you sent that on Friday, May 31st, at 7:23

17  a.m.

18                    Do you see that?

19          A.    Yes.

20          Q.    Okay.  And then looking at what

21  was previously marked as P-4, again, that's

22  basically the unredacted version of what was

23  attached to D-10.

24          A.    Right.
```

Brian J. Zeiger, Esquire
03/19/2025

Page 19

1          Q.     Okay.  So do you recall sending

2    D-10 to Mr. Burns on May 31st, 2024?

3          A.     Yes.

4          Q.     Okay.  And is P-4 the motion

5    that you filed in the Eastern District of

6    Pennsylvania?

7          A.     Yes.

8          Q.     Okay.  Now, looking at D-10 -- I

9    don't want to make any assumption, so I'm just

10   going to ask you.  Who is the witness that you

11   referred to in the email?

12         A.     Kimbrough.

13         Q.     So based on D-10, Mr. Kimbrough

14   called you in the evening on May 30.  Would

15   that be correct?

16         A.     I don't have firsthand

17   recollection of the date, but that does seem

18   reasonable based on the email.

19         Q.     So when you say a witness called

20   me last night on this case who works as BCCF,

21   not thinking of the specific date, but do you

22   have a recollection as to when you would say

23   last night, do you remember if it was 5:00

24   p.m., 6:00 p.m., 11:00 p.m.?

Brian J. Zeiger, Esquire
03/19/2025

Page 20

1          A.      I'm not very good with dates.  I

2    believe it was dark outside and I was sitting

3    in my home office when I spoke with him.  And

4    this was in May.  So for it to be dark

5    outside, it would have had to be at least 7:30

6    p.m.  I go to bed early and I wake up early.

7    I'm usually in bed by 9:00 or 9:30 and up by

8    5:00.  So, therefore, I think it would be

9    reasonable to say that the time I spoke with

10   him would be sometime between 7:30 p.m. and

11   9:00 p.m., but I don't have a recollection, a

12   firsthand recollection.

13          Q.      That's fine.  That's all I was

14   asking, just to clarify your recollection.

15              Do you remember if he called you

16   on your work phone number?

17          A.      I don't have a recollection.  I

18   have two work phone numbers and two cell phone

19   numbers.  One cell phone for work and one cell

20   phone personal.  I somehow think it's my work

21   cell phone that he called me on, but I don't

22   have a firsthand recollection.  But that's

23   sort of what I think.

24          Q.      That's fair.  So then I'd ask

Brian J. Zeiger, Esquire
03/19/2025

Page 21

1    this question.  If the call came up on your

2    personal cell phone, would you think that that

3    was odd?

4           A.    Ms. Burns, nothing surprises me

5    anymore.  There's no -- I mean, I'm not moved

6    by any of this stuff.  It's like, okay, you

7    know, next -- next case.

8           Q.    Let me ask it a different way.

9                 Do you have any reason to

10   believe that Mr. Kimbrough would have your

11   personal cell phone number?

12          A.    No.

13          Q.    Okay.

14          A.    I'm happy to put the last four

15   numbers of all my phone numbers on the record

16   if that makes the record tighter for you all.

17          Q.    Sure.  Go ahead.

18          A.    My one office number, the last

19   four numbers are 0340.  The other one, other

20   office number, is 5183.  My personal cell

21   phone, the last four numbers are 3456.  And my

22   work cell phone number, the last four numbers

23   are 1776.

24          Q.    Thank you.

Brian J. Zeiger, Esquire
03/19/2025

Page 22

```
 1          A.      You're welcome.

 2          Q.      Now, when Mr. Kimbrough first

 3   called you and identified himself, can you

 4   recall how he identified himself?

 5          A.      I mean, he told me his name and

 6   he told me -- I believe he told me he was a

 7   supervisor at the Bucks County Prison.  During

 8   the time period that Mr. Patterson passed

 9   away.  I don't remember if he told me anything

10   about his current station at the time of the

11   phone call.

12          Q.      Do you recall if you informed

13   Mr. Kimbrough that the information that you

14   had learned during the course of the Patterson

15   litigation was subject to a protective order?

16          A.      So just for the record here, so

17   this case, the protective order was unique in

18   my opinion.  All of these cases have

19   protective orders.  But we had a situation

20   where we had -- Tyler Burns wanted what in my

21   opinion was a greater protective order than

22   what I'm normally accustomed to.  And Tyler

23   and I got along very well in this case, but he

24   was very sort of -- and I mean this as a
```

Brian J. Zeiger, Esquire
03/19/2025

Page 23

1    compliment to him -- sort of aggressive about

2    this protective order.  And to me it's of no

3    moment because I'm not disseminating any of

4    this information anyway, so I just agree to

5    whatever the defense counsel wants.  But Tyler

6    wanted, like, greater than I normally see.

7                    On the other hand, we had a

8    judge who -- she has a lot more rules than

9    most judges have.  And it's very friendly with

10   her in my opinion.  So she has more rules than

11   other judges.  So every time I have a case

12   with her, I'm very cognizant of the idea of

13   pulling her rules and reading it to make sure

14   that I don't offend her in some way because

15   it's not my intention.  So her rules regarding

16   protective orders in my opinion are a lot and

17   they're actually less than most other judges.

18   The protection she offers is less than other

19   judges because I think -- and I don't know,

20   but I sense that she thinks that some things

21   that are of public information should be able

22   to be disseminated to the public 'cause

23   they're, like, taxpayers.  So she's not trying

24   to seal things that shouldn't be sealed.  So

Brian J. Zeiger, Esquire
03/19/2025

Page 24

1    I've got this judge who has sort of a less

2    stringent protective order and a lawyer who

3    wants a much greater protective order.  So I'm

4    like -- I said to Tyler, I'm not stipulating

5    or agreeing to anything in a protective order

6    that's against Judge Beetlestone's rules

7    because if you get yelled at by her for this

8    protective order, I'm not getting yelled at

9    with you.  But I'll agree to whatever you

10   want, but I'm not getting involved with her

11   with this.  And Tyler understood that, but he

12   was forceful in what he wanted.

13            So in this case I distinctly

14   remember the protective order because it was

15   unique.  And as a result of that, when

16   Kimbrough called me on the phone, I

17   immediately told him about the protective

18   order in the case and that I would not respond

19   to anything he told me, but I would be happy

20   to listen to anything he had to say because of

21   course I have a duty to my client to do the

22   best that I can for them.

23            Q.    Thank you.

24            A.    You're welcome.

Brian J. Zeiger, Esquire
03/19/2025

Page 25

1          Q.      We'll get into the details of

2    what's in that motion, but I just wanted to

3    ask some questions that you might or might not

4    remember.  But when Mr. Kimbrough called you,

5    did he specifically ask you to do anything?

6    Did he ask you, for example, to subpoena him

7    for a deposition in the Patterson matter?

8          A.      I have no memory of that.  See,

9    discovery was closed in the Patterson matter.

10   The county had already filed their motion for

11   summary judgment and I had already responded.

12   So it wasn't like discovery was open and I

13   could just send him a notice for a deposition.

14   We would need to have the judge give us more

15   time to do that.  Hence, why I filed the

16   motion.  So I would have -- I would have said

17   something to him along those lines.

18          Q.      Did he ask you to take any

19   specific action?

20          A.      I don't recall.

21          Q.      Okay.  So looking at the motion

22   if you need to use it to refresh your

23   recollection, did he specifically identify

24   Rhoades as the inmate who smuggled the drugs

Brian J. Zeiger, Esquire
03/19/2025

Page 26

1    into the prison allegedly?

2         A.    I don't recall.

3         Q.    Okay.  Now, I know you're not

4    good with dates, but just thinking about that

5    time frame in general and what was going on

6    with regard to that case, do you know if there

7    was a criminal investigation pending regarding

8    Rhoades' actions with regard to Mr.

9    Patterson's death?

10        A.    Well, there was, for sure.  A

11   hundred percent.  But whether it was past

12   tense or present tense at the time I spoke to

13   Kimbrough on the phone, I don't know where Mr.

14   Rhoades' case was as far as the docket goes in

15   the Court of Common Pleas of Bucks County in

16   criminal court.  It might have been already

17   over.  It might have already been -- you know,

18   because the civil case is years later.  So I

19   don't know where Mr. Rhoades' case was.  But,

20   yes, I do recall that there was a significant

21   criminal investigation into Mr. Rhoades.

22        Q.    Okay.  So if the criminal

23   investigation was open and had not been closed

24   yet, then it's fair to say that Mr. Kimbrough

Brian J. Zeiger, Esquire
03/19/2025

Page 27

1    disclosed details to you about an incident

2    that was under criminal investigation.

3         A.    I believe that the contents of

4    the phone call with Kimbrough surrounded

5    Atiles and Ulmer and staffing of Bucks County

6    and it was far less in regards to Mr. Rhoades.

7    If I recall.  I don't recall having much

8    conversation, if any at all, about Mr.

9    Rhoades.  The conversation was about Ulmer and

10   Atiles screwing up and the Bucks County Jail

11   not having adequate staff at intake.  If I

12   recall.

13        Q.    Okay.  So going with that and

14   with that answer, it would be fair to say then

15   that he disclosed information regarding Bucks

16   County Correctional Facility employees and

17   their alleged role in an incident that could

18   have possibly been under criminal

19   investigation.

20        A.    Yes.

21        Q.    Okay.  Looking at P-4 which is

22   the motion, I'm assuming since you wrote this

23   motion -- I'm not going to assume, though.  Is

24   this a fair and accurate representation as to

Brian J. Zeiger, Esquire
03/19/2025

Page 28

1    what Mr. Kimbrough told you that day?

2           A.     Yes.   I wrote the motion myself.

3    It wasn't -- it was not assigned to an

4    associate.

5           Q.     Okay.   So in Number 4 of that

6    motion, it says -- the last sentence says:  AK

7    also mentioned various other facts pertaining

8    to staffing, the incident, the investigation

9    and his complaints to his supervisors.

10          A.     Yes.

11          Q.     Do you have any specific

12   recollection as to what that would be or do

13   you think you would have put most of those

14   details in the motion?

15          A.     I think it was just about the

16   idea that, you know, there wasn't a -- there

17   wasn't proper supervision in staffing of that

18   intake area and that this idea of this dirty

19   cell and clean cell idea is the correct way to

20   go -- I beg your pardon.   Pardon me.   That

21   that's the correct way to go if it's done

22   correctly and supervised right and there's

23   adequate staffing.   But when one of the guards

24   makes a mistake or two of the guards make a

Brian J. Zeiger, Esquire
03/19/2025

Page 29

 1   mistake and there's only one or two guards on

 2   duty at that time and there's inadequate

 3   staffing and inadequate supervision of the

 4   intake area, that that's how the clean and

 5   dirty cell issue can get messed up and not

 6   worked correctly and it can lead to something

 7   like an inmate being able to smuggle something

 8   in from the outside to the inside.  So the

 9   focus of the conversation was just about the

10   deficiencies and the practice and the policy

11   at the Bucks County Jail and intake and far

12   less about a specific inmate, if that makes

13   any sense.

14          Q.     I think so.

15          A.     Like, I don't think it was

16   focused so much on Mr. Rhoades is the point.

17   I think the conversation was more focused on

18   the deficiency and what was going on at intake

19   was the phone call.  And I think that's what

20   I'm referring to in that sentence.  I mean,

21   obviously -- well, I don't want to say

22   obviously.

23          Q.     So much of the information --

24   since he wasn't focusing on Rhoades and he was

Brian J. Zeiger, Esquire
03/19/2025

Page 30

1    focusing on the employees and the staffing,

2    specific details that you put in your motion

3    -- separately from whether the jail was

4    allegedly understaffed or how it was staffed,

5    the details that he described, much of it you

6    already were aware of.  Is that fair to say?

7            A.    I would say almost all of it I

8    was already aware of and I did not tell him

9    that because Tyler was so uptight about this

10    -- this protective order that -- I respect

11    Tyler -- you know, I like Tyler and I respect

12    his position.  I thought it was too much.  But

13    I get it.  I understand.  Bucks County is

14    Bucks County.  And so he has a job to do and

15    that was his marching orders or whatever.  And

16    so I specifically did not respond to anything

17    Mr. Kimbrough said because I didn't want Tyler

18    to get angry at me or get in trouble with

19    Tyler somehow.

20            Q.    Because the information -- you

21    were aware of the information solely through

22    the information that was provided to you

23    through the course of this litigation subject

24    to the protective order.

Brian J. Zeiger, Esquire
03/19/2025

Page 31

1          A.     Right.  And, also, I have no

2    idea who Kimbrough is.  He may not be a guard

3    at the Bucks County Jail.  He could be a

4    newspaper reporter.  I have no idea who anyone

5    is.  Right?  And nothing surprises me.  So the

6    fact that this guy is calling me on the phone

7    and telling me who he is and what he does and

8    all that, great, but I don't -- I don't

9    actually know who he is.  Right?  So it's like

10   -- my duty is just to say I want to depose the

11   guy, you know, and help my client.

12          Q.     And the specific level of detail

13   that he disclosed, is it your understanding

14   that that information was not publicly

15   disclosed at that time?  It was not -- yes,

16   there were news articles about Mr. Patterson's

17   death, but that level of detail was not out in

18   the public.

19          A.     Well, I think that's true, but

20   there's a but.  So having done criminal cases

21   for many years, perhaps some of that could

22   have been in Mr. Rhoades' discovery.  And a

23   lot of criminal guys want copies of their

24   discovery now and Mr. Rhoades could have

Brian J. Zeiger, Esquire
03/19/2025

Page 32

1  requested a copy of his discovery from his

2  criminal defense attorney.  There's usually no

3  protective orders in criminal cases.  So it's

4  possible that Mr. Rhoades had that information

5  and disseminated it to someone else.  So I

6  have no idea what's going on when there's an

7  open criminal case and I don't care.  So this

8  guy calls me on the phone, he tells me this, I

9  keep my mouth shut.  I'm in compliance with

10  the protective order.  I'm not going to get in

11  trouble with Tyler.  And so I just listen to

12  what the guy has to say.  And if he is who he

13  says he is and he can make this out, I should

14  do what I can do to have discovery reopened

15  and try to depose him.

16               I have no idea whether that was

17  in the public knowledge or not at that time

18  and I don't really care 'cause you guys are --

19  I shouldn't say you guys, but it's Bucks

20  County that wants it not disseminated to the

21  public.  To me -- it's irrelevant to me.

22  Right?

23         Q.    But just to be clear, you don't

24  have any specific recollection that that's

Brian J. Zeiger, Esquire
03/19/2025

Page 33

1    what happened with Mr. Rhoades requesting

2    records or anything like that?

3          A.    Oh.  No, of course not.  I'm

4    just saying in answer to your question of

5    whether I knew it was disseminated to the

6    public or not.  I don't know.  There's no way

7    for me -- anything is possible in criminal

8    cases.  So it's like who knows.

9          Q.    And I only have --

10         A.    But when I got it, it was

11   subject to the protective order.  When I got

12   it from Tyler, that was part of the stuff that

13   was protected for sure, which is why I didn't

14   respond to anything that Mr. Kimbrough said.

15   Right?

16         Q.    And that makes sense.

17         A.    Right.

18         Q.    And I just have a few more

19   questions and I think --

20         A.    Sure.

21         Q.    -- we're going to be done.

22               So just to clarify, you did file

23   P-4 with the court.

24         A.    Yes.

Brian J. Zeiger, Esquire
03/19/2025

Page 34

```
 1          Q.     The court did not grant your

 2    motion to reopen discovery; correct?

 3          A.     Correct.

 4          Q.     You did not appeal that ruling;

 5    correct?

 6          A.     Correct.

 7          Q.     And then just a few -- a short

 8    time after that, the court granted the

 9    County's motion for summary judgment.  Is that

10    correct?

11          A.     Correct.

12          Q.     And you did not appeal that;

13    correct?

14          A.     Correct.

15          Q.     And so there was no recovery of

16    any damages in that matter; correct?

17          A.     Correct.

18                 MS. BURNS:  Just give me one

19          second.  Let's go off the record.

20                      -  -  -

21                 (Whereupon, a discussion was

22          held off the record.)

23                      -  -  -

24                 MS. BURNS:  All right.  I do not
```

Brian J. Zeiger, Esquire
03/19/2025

Page 35

```
 1              have any other questions.  Thank you,

 2              Mr. Zeiger.

 3                   THE WITNESS:  Great.

 4    BY MR. MANSOUR:

 5              Q.    Good morning, Mr. Zeiger.  How

 6    are you?

 7              A.    Hi.  Good morning.

 8              Q.    Thank you for your time today.

 9    So I do have a few questions for you.  I

10    expect to be wrapped up before you've got to

11    get out of here so --

12              A.    No problem.  Ask away.

13              Q.    -- don't worry about it.

14                   Okay.  Did you have any

15    conversations with the attorneys -- any of the

16    attorneys from Bucks County about this matter,

17    the Kimbrough matter --

18              A.    Yes.

19              Q.    -- prior to this deposition?

20              A.    Yes.

21              Q.    Do you recall when?

22              A.    No.

23              Q.    Do you recall whom -- to whom

24    you spoke?
```

Brian J. Zeiger, Esquire
03/19/2025

Page 36

```
1          A.      Dara Burns.

2          Q.      And what was the substance of

3   that conversation?

4          A.      Would I voluntarily be deposed

5   or did I need a subpoena.

6          Q.      Did anybody from Bucks County

7   reach out to you prior to that conversation

8   with Ms. Burns and ask you about what

9   information you knew regarding this case?

10         A.      No.  Not that I recall.

11         Q.      Now, I'm going to share my

12  screen --

13         A.      As you know -- I mean, as an

14  attorney -- I mean, you know.  You get a

15  million phone calls a day.  I don't remember,

16  man.

17         Q.      Okay.  Fair enough.

18         A.      Yeah.

19         Q.      You testified on direct that the

20  pleadings in the Patterson matter were placed

21  under seal.  Was that your recollection?

22         A.      Not -- again, Judge Beetlestone

23  has unique rules for sealing.  So not

24  everything is under seal with her.  And,
```

Brian J. Zeiger, Esquire
03/19/2025

Page 37

1   again, Tyler wanted more than what normal

2   judges give and Judge Beetlestone gives less.

3   And it was just an issue I didn't want to

4   engage in.  I just don't care.

5          Q.     Understood.

6          A.     Whatever the judge says we'll

7   do.  But I don't -- or whatever the defense

8   attorney wants we'll do.  'Cause I'm not

9   disseminating it.  You know, it doesn't matter

10  to me.  And I get why the prisons don't want

11  their inner policies and workings out there

12  for the public.  So it's reasonable.  So from

13  Tyler -- I thought Tyler was asking reasonable

14  requests of me.

15              So, anyway, I don't recall

16  exactly if everything was sealed, but I do

17  believe that there was a lot of things that

18  were sealed in this case.

19         Q.     Okay.  And I just want to make

20  sure we're not conflating two different issues

21  of the protective order and documents being

22  filed under seal.  So those are two separate

23  matters; right?  Whether a document --

24         A.     Not really.  Not really.

Brian J. Zeiger, Esquire
03/19/2025

Page 38

1    Because it's all what the defense attorney

2    wants.  Right?  Like, I do plaintiff's cases

3    and so do you and so you understand.  It's

4    like they have all these things they come up

5    with that are nonsense, that are irrelevant to

6    the final disposition of the case that I'm not

7    going to engage them with.  And so, like, if

8    they're going to stand on a hill about getting

9    things sealed with protective orders and all

10   that nonsense, then my answer is I consent to

11   all of it.  So to me it's all the same thing.

12   I am conflating them together because in my

13   mind it's one thing.  So I'm intentionally

14   conflating them.

15          Q.    When the Complaint, the original

16   Complaint that you filed in the Patterson

17   matter -- did you file that under seal?

18          A.    No.

19          Q.    How about the Amended Complaint

20   that was filed?

21          A.    I don't recall, but I would

22   imagine no.

23          Q.    So I do want to share my screen

24   with you.

Brian J. Zeiger, Esquire
03/19/2025

Page 39

1          A.      Sure.

2          Q.      I'm going to show you a document

3    that I've marked as P-14, which is I think the

4    number that we're up to.  This is a document

5    I'll represent to you that I retrieved from

6    the public docket.

7          A.      Yep.

8          Q.      It's Document Number 16 in the

9    Patterson matter and it is the First Amended

10   Complaint that you filed.

11         A.      Right.

12         Q.      I'm going to just kind of scroll

13   through it real quick.  Does that look like

14   the First Amended Complaint that you filed?

15         A.      Yes.  And I authored this

16   myself.  I did not assign it to an associate.

17         Q.      Okay.  Excellent.  So the fact

18   that I was able to obtain it from the public

19   docket would imply that it was not filed under

20   seal; correct?

21         A.      Correct.

22         Q.      Okay.  I want to go through some

23   of the allegations in here and ask you about

24   them.

Brian J. Zeiger, Esquire
03/19/2025

Page 40

1                      So I'd like to focus your

2      attention here, Paragraph 13.  You alleged:

3      At the time Mr. Rhoades entered the prison,

4      defendants Atiles, Ulmer and Fabiani were

5      working as intake officers and failed to

6      properly search Mr. Rhoades upon intake.

7                      Did I read that correctly?

8           A.     Yes.

9           Q.     How did you know that?

10          A.     My guess -- I don't have a

11     firsthand memory of how I know it.  But my

12     estimate is that I filed a Complaint.  After I

13     filed the Complaint, I requested some

14     documents from the other side, either

15     informally or formally, and the other side

16     gave me some documents that I was able to

17     review.  And based on that, I was able to

18     write an Amended Complaint and substitute John

19     Doe defendants for named defendants.  And

20     that's my normal practice.  And so that's what

21     I would have done in this case.

22          Q.     Prior to filing your First

23     Amended Complaint, did you also request and

24     receive copies of the surveillance video of

Page 41

1    the date in question?

2            A.      I don't recall.

3            Q.      I'm going to ask you the same

4    question about Paragraph 14, which says:

5    Defendants Atiles, Ulmer and Fabiani made a

6    cursory pat-down of the Rhoades at the time he

7    entered a holding cell at the Bucks County

8    Prison.

9                    Is that also something you would

10   have learned from documents that were

11   previously disclosed to you?

12           A.      Yes.  Same answer.

13           Q.      Paragraph 15:  Defendants

14   Atiles, Ulmer and Fabiani failed to find a

15   substantial amount of illegal narcotics in Mr.

16   Rhoades' pants area.

17                   Same answer?

18           A.      Yes.  Same answer.

19           Q.      Paragraph 16 -- I'm sorry.

20   Paragraph 17:  Based upon information and

21   belief, defendants Bucks County, David Kratz,

22   a number of other individuals -- I'm not going

23   to read them out -- had a policy and procedure

24   for intake search and pat-down of incoming

Brian J. Zeiger, Esquire
03/19/2025

Page 42

1    inmates at the Bucks County Prison during the

2    time of the instant matter.

3                    Is that the same answer?

4         A.    No.  That is something I write

5    in every case.  I would hope that all prisons

6    have an intake policy to search and pat down

7    inmates.  I think that's, like, public

8    knowledge.  I don't think that's in paperwork.

9    You know?

10        Q.    Paragraph 20:  On two different

11   occasions while in the holding cell under the

12   supervision of defendants Atiles, Ulmer and

13   Fabiani, Mr. Rhoades reached for his pants

14   area and retrieved wax bags containing

15   fentanyl which he ingested.

16                    How did you learn that

17   information?

18        A.    I'm not sure.  I think that's

19   factually wrong.

20        Q.    Okay.

21        A.    So I don't -- I'm not sure where

22   I came up with that from.  I think that's a

23   mistake.

24        Q.    What's -- what's wrong about it?

Brian J. Zeiger, Esquire
03/19/2025

Page 43

1    What's incorrect about it?

2         A.      The word ingested.

3         Q.      Okay.

4         A.      He secreted them in a brown bag,

5    I believe.

6         Q.      The part about Mr. Rhoades

7    reaching for his pants area and retrieving wax

8    bags of fentanyl, is that accurate?

9         A.      I thought it was in a -- more

10   like a bundle.  But not a bundle like

11   criminal, like a street term bundle.  I mean a

12   bundle like it was bundled.

13        Q.      Okay.  So let's look at

14   Paragraph 21.  Later, Mr. Rhoades was given

15   lunch by prison staff in a brown paper bag.

16               How did you learn about that?

17        A.      I don't recall.

18        Q.      Paragraph 22:  Mr. Rhoades

19   emptied the brown paper bag and transferred

20   fentanyl and methamphetamine from his pants

21   into the brown paper bag.

22               Do you remember how you learned

23   about that?

24        A.      I think that would have been

Brian J. Zeiger, Esquire
03/19/2025

Page 44

1    from documents I received.  The same as my

2    earlier answer.

3           Q.     Paragraph 23:  Later that day,

4    Mr. Rhoades was given a prison-issued clothing

5    bag by prison staff.  Mr. Rhoades transferred

6    the brown lunch bag containing the narcotics

7    into the prison-issued clothing bag.

8                  Do you recall how you learned

9    about that information?

10          A.     Same answer.  I believe it was

11   in the documents that I received.

12          Q.     Did -- during your conversation

13   with Ara Kimbrough, did he share with you any

14   of the details we just went over?

15          A.     Can you scroll back up, please?

16          Q.     Sure.  To this page here?

17          A.     Yeah.  Thank you.  So I have a

18   two-part answer here.  The first part is that

19   I learned later that Officer Fabiani was sort

20   of in a different sort of section of intake.

21   So even though he was on duty and he was -- in

22   intake at the time, he was not in the area

23   where the inmate is actually searched where

24   Atiles was or at that big desk where Ulmer was

Page 45

1    sitting.  Fabiani was in a room to the right

2    if you're looking at the video pointing

3    towards the -- towards where Ulmer was

4    sitting.  And so I learned later that Fabiani

5    was not necessarily a part of the search

6    process of Rhoades.  Now, whether Fabiani was

7    supposed to be or not, I don't know.  I didn't

8    know then and I still don't know today because

9    I believe Officer Fabiani had fallen ill and I

10   was unable to depose him.  So I was not able

11   to ask him questions.  And out of respect for

12   Mr. Fabiani, I didn't notice his deposition

13   'cause I thought that was in poor taste.  So

14   -- I would never do that.  So, therefore, I

15   don't recall whether I ever knew or I know

16   today that Fabiani was actually standing in

17   the wrong place and not doing his job or if he

18   was actually in the appropriate place.  Okay?

19              That being said, part-two answer

20   to your question is in regard to Atiles and

21   Ulmer, I did discuss with Kimbrough over the

22   phone Paragraphs 12, 13, 14, 16.  That was the

23   substance of the phone call with Kimbrough.

24          Q.    So it would be fair to say that

Page 46

1    that information that Kimbrough shared with

2    you, you already knew.

3            A.        That information.  But other --

4    well, first of all, I knew everything that

5    Kimbrough told me on the phone call.  There

6    was nothing new that he told me.  Okay?  I

7    mean, except his opinion that they were

8    understaffed.  But other than that, everything

9    Kimbrough told me I already knew.  But he told

10   me additional things that are not included in

11   the paragraphs that I just mentioned as

12   numbered.  So yes is the answer to your

13   question.  He told me everything that's in

14   those paragraphs, but he also told me other

15   things.

16           Q.        Do you recall what those other

17   things were?

18           A.        About the manner in which Atiles

19   got duped by Mr. Rhoades.  Right?  That he

20   knew that Ulmer had abandoned her post.

21   Right?  That's -- those two things are not

22   contained in these paragraphs.

23           Q.        But you did already know them.

24           A.        Yes.  I definitely already knew

Brian J. Zeiger, Esquire
03/19/2025

Page 47

1    them.  I had deposed both Atiles and I had

2    deposed Ulmer.  And in my facts section of my

3    summary judgment response, I believe they were

4    contained in there.  So there's things I

5    already knew because I had already filed that

6    previously to speaking to Kimbrough on the

7    phone.  So there's nothing new.

8                    As far as, you know, some sort

9    of gross understaffing of the intake area

10   goes, that I did not receive any information

11   in discovery from Mr. Burns regarding, you

12   know, how many people were supposed to be on

13   duty versus how many people actually showed up

14   for work that day or whatever.  Or how many

15   people were scheduled for work that day I

16   should say.  You know, the prison

17   understaffing issue does come up in other

18   jurisdictions, but it's not something -- it's

19   not -- it would not have been in my mind in

20   Bucks County.  That's an issue for other

21   counties, frankly.

22        Q.     Understood.  Thank you for that

23   response.

24        A.     Yeah.

Brian J. Zeiger, Esquire
03/19/2025

Page 48

```
 1            Q.      Now, you did mention earlier

 2    that you were aware that you were subject to a

 3    protective order regarding the information in

 4    the Patterson case; correct?

 5            A.      Right.  Correct.

 6            Q.      After your conversation with Ara

 7    Kimbrough --

 8            A.      Uh-huh.  Yes.

 9            Q.      -- and outside of the emergency

10    motion that you filed, did you disseminate any

11    of the information Mr. Kimbrough shared with

12    you to anybody outside of the court or

13    opposing counsel?

14            A.      Well, I mean, I have a full

15    staff.  I mean, I work at a law firm with a

16    full staff --

17            Q.      Anybody outside of your office

18    or to the public --

19            A.      I definitely spoke to another

20    lawyer at my office about the disclosure

21    because asking Judge Beetlestone to reopen

22    discovery is not a... is not a normal move.

23    So I wanted to conference that with the rest

24    of the lawyers in my office to make sure we
```

Brian J. Zeiger, Esquire
03/19/2025

Page 49

 1   weren't going to do something to cause Judge

 2   Beetlestone to get angry at me.  Because we

 3   have a very good relationship with Judge

 4   Beetlestone.

 5           Q.      Understood.  And I can

 6   appreciate that.

 7           A.      And we like her, frankly.  I

 8   know we're on the record, but I like her.  I'm

 9   not trying to -- like I do.  I like her

10   genuinely.  I'm not trying to anger her in any

11   way.  I enjoy working with her.  So it's like

12   I'm not filing something to make her angry at

13   us, but I've got to represent the client and

14   you have to balance those things.  So I

15   definitely spoke with the other lawyers in my

16   office before I filed the motion.

17           Q.      Okay.  Did you share any

18   information that Mr. Kimbrough disclosed to

19   you with anybody outside of your firm other

20   than the court and the attorneys representing

21   Bucks County?

22           A.      No.

23           Q.      Did Mr. Kimbrough share with you

24   any documents?

Brian J. Zeiger, Esquire
03/19/2025

Page 50

```
 1          A.    No.

 2          Q.    Did he give you any details

 3   about the County's intake procedures?  So

 4   internal operating procedures regarding

 5   intake.

 6          A.    The parts we've already

 7   discussed.  You know, the clean room, the

 8   dirty room, what's supposed to happen, that

 9   Ulmer's supposed to watch, you know, that the

10   -- so the inmate's not alone.  All the things

11   that are contained in my response to the

12   County's motion for summary judgment on the

13   policy and procedure for how that intake goes,

14   it was all that sort of stuff.

15          Q.    You were asked earlier about

16   these emails --

17          A.    Right.

18          Q.    -- in D-10 --

19          A.    Right.

20          Q.    -- which are on your screen now.

21   And there's the email from you on May 31st to

22   Tyler Burns disclosing the fact that Mr.

23   Kimbrough reached out to you and you planned

24   on moving to reopen discovery, et cetera.
```

Page 51

 1                    Besides that email, did you have

 2    any other written or verbal conversations with

 3    any of the attorneys representing the County

 4    regarding the substance of Mr. Kimbrough's

 5    conversation with you?

 6            A.    I don't recall.

 7            Q.    Did you have any other

 8    conversations with Ara Kimbrough after the one

 9    that occurred on or about May 30th, '24?

10            A.    I don't recall.

11            Q.    I want to go through what has

12    been previously marked as P-2.  These are Mr.

13    Kimbrough's Responses to Defendant's

14    Interrogatories.  And I want to go through his

15    response here in detail and ask you some

16    questions about it.  So, particularly, I'm

17    looking at Interrogatory Number 9 wherein my

18    client was asked to identify and describe with

19    specificity the information disclosed by him

20    during his May 29th, 2024 telephone

21    conversation with you.  And I'm going to read

22    this line by line and ask you some questions

23    as we go along.  Okay?  Can you see it okay?

24            A.    Can you scroll down a little

Brian J. Zeiger, Esquire
03/19/2025

Page 52

1    bit?

2          Q.      Sure.

3          A.      Yeah.  Uh-huh.  That's much

4    better.  Thank you.

5          Q.      Very good.  So his response was

6    this:  On May 30th, 2024, plaintiff spoke with

7    Attorney Zeiger on the telephone.

8                  That happened; correct?

9          A.      Yes.  I don't recall the date,

10   but yes.

11         Q.      Plaintiff told Attorney Zeiger

12   that he is an administrative lieutenant at the

13   BCCF and works in the records and reception

14   unit.

15                 Did he tell you that?

16         A.      Yes.

17         Q.      Plaintiff stated that he wanted

18   to share information regarding the death of

19   Joshua Patterson.

20                 Did he tell you that?

21         A.      Yes.

22         Q.      Plaintiff then relayed to

23   Attorney Zeiger that he believed Inmate

24   Rhoades was able to smuggle drugs into the

Brian J. Zeiger, Esquire
03/19/2025

Page 53

1  jail because a supervisor pulled Officer Ulmer

2  out of reception to complete another task,

3  leaving the intake unit understaffed.

4              Did my client tell you that?

5        A.    I don't recall the specifics

6  about what he told me regarding that a

7  supervisor pulled her.  I'm sorry.  That a

8  supervisor pulled Ulmer.  But the answer to

9  your question is yes.  In other words, yes, he

10  did tell me that, but what the reason was, why

11  he thought Ulmer left her post, I don't

12  remember that.  But I knew why Ulmer left her

13  post.  So maybe I wasn't focused on that when

14  he said it to me 'cause I already knew the

15  answer.  And I had written the response to the

16  summary motion judgment myself.  I didn't

17  assign it to an associate.  So I was

18  intimately familiar with the facts of this

19  case.

20        Q.    The next sentence:  Plaintiff

21  told Attorney Zeiger this issue of pulling

22  staff from reception was something that he had

23  ordered other supervisors not to do in the

24  past and had warned management about in the

Brian J. Zeiger, Esquire
03/19/2025

Page 54

1    years prior to August of '22.

2                    Did he tell you that?

3            A.      I believe so, but I don't have a

4    firsthand memory of it.

5            Q.      Plaintiff also told Attorney

6    Zeiger that he felt bad about Joshua

7    Patterson's death and how he believed it was

8    likely to happen again since other supervisors

9    continued to pull staff from reception for

10   other posts.

11                   Did he say that to you?

12           A.      I don't have a firsthand memory,

13   but I believe so.

14           Q.      Plaintiff told Attorney Zeiger

15   he would do anything to avoid another similar

16   death.

17                   Did he say that to you?

18           A.      Yes.  For sure.

19           Q.      Plaintiff also said it was

20   standard practice for the person conducting

21   the strip search to send the inmate up to the

22   front of reception so that the other officers

23   can finish the booking process if necessary

24   and place them in a holding cell.

Brian J. Zeiger, Esquire
03/19/2025

Page 55

```
 1                    Did he say that to you?
 2          A.      I believe so, yes.
 3          Q.      Plaintiff recalled for Attorney
 4   Zeiger that Officer Ulmer received a telephone
 5   call and was directed by another lieutenant to
 6   leave her reception post and report to another
 7   area of the jail to help with a different
 8   assignment.
 9                    Do you recall my client saying
10   that to you?
11          A.      Again, that part I don't
12   remember him saying the reason why she left
13   her post.  But I do remember having that
14   discussion with him, yes.
15          Q.      Officer Atiles didn't know
16   Officer Ulmer left and sent Rhoades up to see
17   her following his strip search.
18                    Do you recall --
19          A.      Yes.
20          Q.      Do you recall him saying that?
21          A.      Yes.
22          Q.      Not only was Officer Ulmer not
23   present when Rhoades returned to the front,
24   but Officer Ulmer also failed to secure the
```

Brian J. Zeiger, Esquire
03/19/2025

Page 56

1    holding cell in which Rhoades had previously

2    stashed his drugs because she had been pulled

3    off the unit.

4                  Did he --

5          A.     Yes.

6          Q.     -- tell you that?

7                  The phone call ended with

8    Attorney Zeiger saying that he would contact

9    plaintiff if he needed anything further, but

10   he never contacted plaintiff again.

11                 Is that correct?

12         A.     I don't -- I don't recall, but I

13   believe so, yes.

14         Q.     Is there anything that you can

15   recall my client telling you during that

16   conversation that isn't contained in this

17   response to Interrogatory Number 9?

18         A.     No.

19         Q.     Is there anything in this

20   response to Interrogatory Number 9 that you

21   did not already know?

22         A.     Just -- I do not really have a

23   foundation to know who Officer Kimbrough was

24   or that he actually was a correctional officer

Brian J. Zeiger, Esquire
03/19/2025

Page 57

1    at the Bucks County Jail at the time.  So the

2    first -- or the second sentence where it says

3    plaintiff told Attorney Zeiger that he is an

4    administrative lieutenant at the BCCF and

5    works in the record and reception unit, I do

6    not think that I knew that.  Again, I'm sure

7    that Tyler put it in his initial disclosures.

8    Tyler was a super thorough guy, but I don't

9    think I -- I would not have known that.

10                 When someone calls me on the

11   phone like this on a case, I just have no idea

12   who they are and I don't believe anything

13   anyone tells me.  So if they're telling me

14   they're an eyewitness to a case, criminal or

15   civil, I just listen to what they have to say.

16                 So I don't think I knew that

17   part at the time I was on the call with them.

18   Maybe when I looked at my notes later I saw

19   his name somewhere and recognized his name and

20   then I believed he was who he said he was.

21   But I don't believe I recognized his name at

22   the time we initially got on the call.  So

23   that sentence, no.  The rest of it, yes.

24                 MR. MANSOUR:  Those are all the

Brian J. Zeiger, Esquire
03/19/2025

Page 58

```
 1          questions I have for you, Attorney

 2          Zeiger.  I appreciate your time today.

 3          Thank you.

 4               THE WITNESS:  Thank you, sir.

 5               MR. MANSOUR:  I don't know if

 6          Dara has any follow-up, but if not --

 7               MS. BURNS:  I just have one

 8          quick follow-up while we're on that

 9          paragraph, only because we just said

10          it.

11  BY MS. BURNS:

12          Q.    Mr. Zeiger, why do you believe

13  Ulmer was pulled?

14          A.     There was some type of emergency

15  somewhere else in the prison and for whatever

16  reason she was the appropriate person to back

17  up the response to the emergency.  I don't...

18  I don't recall the reason why, but perhaps

19  it's because she was female.  But I don't

20  remember that.  I don't know why that's

21  sticking out in my head.  Perhaps it was an

22  incident where the inmates that were having

23  the incident were female and she was called to

24  back it up because she's female and they're
```

Brian J. Zeiger, Esquire
03/19/2025

Page 59

1   supposed to have female guards deal with

2   female inmates.  But I don't remember that.

3   Maybe I'm making that up.  I just don't

4   remember, Ms. Burns.  I'm sorry.

5               MS. BURNS:  That's okay.  It's

6        fine.  It was just a follow-up

7        question.  I don't have anything else.

8               MR. MANSOUR:  Thank you, Mr.

9        Zeiger.

10              THE WITNESS:  Thank you.  May I

11       be excused?

12              MR. MANSOUR:  Yes, sir.

13              MS. BURNS:  Yes.  Thank you, Mr.

14       Zeiger.

15              THE STENOGRAPHER:  Bill, do you

16       want a copy?

17              MR. MANSOUR:  Yes, please.  Just

18       electronic.

19              MS. BURNS:  Same for the County.

20                   -  -  -

21              (Whereupon, the witness was

22       excused.)

23                   -  -  -

24              (Whereupon, the deposition

Brian J. Zeiger, Esquire
03/19/2025

Page 60

1   concluded at approximately 10:55 a.m.)

2              -   -   -

3         (Whereupon, Exhibits D-10 and

4   P-14 were marked for identification.)

5              -   -   -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Brian J. Zeiger, Esquire
03/19/2025

Page 61

1                     CERTIFICATE

2

3

4               I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the testimony

7    given by the witness.

8

9

10   _____

     Maura B. Doyle
11   Registered Professional Reporter
     Certified Court Reporter
12   and
     Notary Public
13   Date:  March 31, 2025

14

15

16

17

18

19               (The foregoing certification of

20   this transcript does not apply to any

21   reproduction of the same by any means, unless

22   under the direct control and/or supervision of

23   the certifying reporter.)

24

Brian J. Zeiger, Esquire
03/19/2025

Page 62

1                        LAWYER'S NOTES

2    PAGE     LINE

3    _____    _____    _____

4    _____    _____    _____

5    _____    _____    _____

6    _____    _____    _____

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23   _____    _____    _____

24   _____    _____    _____

Exhibits

**D-10**
3:16
17:3,21
18:9,23
19:2,8,
13
50:18
60:3

**P-14**
3:17
39:3
60:4

**0**

**0340**
21:19

**1**

**11:00**
19:24

**12**
45:22

**13**
40:2
45:22

**14**
41:4
45:22

**15**
41:13

**16**
6:14
39:8
41:19
45:22

**17**

6:14
41:20

**1776**
21:23

**2**

**20**
42:10

**2001**
8:17

**2022**
9:21
11:4

**2023**
9:3
11:11
14:15

**2024**
15:4
19:2
51:20
52:6

**21**
43:14

**22**
43:18
54:1

**23**
44:3

**24**
51:9

**29th**
51:20

**3**

**30**
19:14

**30th**
51:9
52:6

**31st**
18:16
19:2
50:21

**3456**
21:21

**4**

**4**
28:5

**5**

**5183**
21:20

**5:00**
19:23
20:8

**6**

**6:00**
19:24

**7**

**7:23**
18:16

**7:30**
20:5,10

**9**

**9**
51:17
56:17,
20

**9:00**

20:7,11

**9:30**
20:7

**A**

**a.m.**
18:17

**abandoned**
46:20

**ability**
7:17

**accurate**
7:18
10:3
27:24
43:8

**accurately**
7:7

**accustomed**
22:22

**action**
25:19

**actions**
26:8

**additional**
46:10

**adequate**
27:11
28:23

**administrative**
52:12
57:4

adopt
13:10

**affect**
7:17

**aggressive**
23:1

**agree**
9:17
10:22
23:4
24:9

**agreed**
5:3

**agreeing**
24:5

**agreement**
12:13

**ahead**
11:13
21:17

**AK**
28:6

**allegations**
39:23

**alleged**
9:18
27:17
40:2

**allegedly**
10:7
26:1
30:4

**Amended**
38:19

39:9,14
40:18,
23

**amount**
8:12
41:15

**anger**
49:10

**angry**
30:18
49:2,12

**answers**
7:5
15:24

**anymore**
21:5

**appeal**
34:4,12

**approximately**
9:21

**April**
15:3

**Ara**
13:16
44:13
48:6
51:8

**Arb**
6:19

**Arbitration**
6:15

**area**
28:18
29:4
41:16
42:14
43:7

44:22
47:9
55:7

**art**
10:20

**articles**
31:16

**Ashley**
5:23

**assign**
39:16
53:17

**assigned**
28:3

**assignment**
55:8

**assistant**
5:19

**associate**
28:4
39:16
53:17

**assume**
7:12
27:23

**assuming**
27:22

**assumption**
19:9

**Atiles**
27:5,10
40:4
41:5,14
42:12

44:24
45:20
46:18
47:1
55:15

**attached**
18:23

**attention**
40:2

**attorney**
6:4
7:21
8:22
13:3
14:1
32:2
36:14
37:8
38:1
52:7,
11,23
53:21
54:5,14
55:3
56:8
57:3
58:1

**attorneys**
35:15,
16
49:20
51:3

**August**
11:4
54:1

**authenticated**
13:2

**authored**
39:15

**avoid**
54:15

**aware**
13:15
30:6,8,
21 48:2

_____

**B**

**back**
13:8
44:15
58:16,
24

**bad**
54:6

**bag**
43:4,
15,19,
21
44:5,6,
7

**bags**
42:14
43:8

**balance**
49:14

**based**
19:13,
18
40:17
41:20

**basically**
18:22

**BCCF**
19:20
52:13

57:4

**bed**
20:6,7

**Beetlestone**
36:22
37:2
48:21
49:2,4

**Beetlestone's**
24:6

**beg**
28:20

**behalf**
9:6,10

**belief**
41:21

**believed**
52:23
54:7
57:20

**big**
44:24

**Bill**
6:23
16:21
17:4,15
59:15

**bit**
52:1

**booking**
54:23

**Brian**
5:11
6:3

**brown**
43:4,

15,19,
21 44:6

**Bucks**
5:20
8:22,23
9:9,19
12:9
13:16
22:7
26:15
27:5,
10,15
29:11
30:13,
14 31:3
32:19
35:16
36:6
41:7,21
42:1
47:20
49:21
57:1

**bundle**
43:10,
11,12

**bundled**
43:12

**Burns**
5:17,19
6:22
7:2,3
10:12
13:24
14:1,3
16:21
17:1,8,
9,15,
18,19,
22
18:2,7,

13,15
19:2
21:4
22:20
34:18,
24
36:1,8
47:11
50:22
58:7,11
59:4,5,
13,19

_____

**C**

**call**
21:1
22:11
27:4
29:19
45:23
46:5
55:5
56:7
57:17,
22

**called**
6:18
19:14,
19
20:15,
21 22:3
24:16
25:4
58:23

**calling**
31:6

**calls**
32:8
36:15
57:10

Brian J. Zeiger, Esquire
03/19/2025

3

| | | | | | |
|---|---|---|---|---|---|
| **capacity** | 20:18, | **client** | **compliment** | **conversation** | 9:20 |
| 8:21 | 19,21 | 24:21 | 23:1 | 27:8,9 | 12:9 |
| **care** | 21:2, | 31:11 | **condition** | 29:9,17 | 13:16 |
| 32:7,18 | 11,20, | 49:13 | 7:17 | 36:3,7 | 27:16 |
| 37:4 | 22 | 51:18 | **conducting** | 44:12 | 56:24 |
| **career** | 28:19 | 53:4 | 54:20 | 48:6 | **correctly** |
| 8:11 | 29:5 | 55:9 | **conference** | 51:5,21 | 28:22 |
| **case** | 41:7 | 56:15 | 48:23 | 56:16 | 29:6 |
| 8:11 | 42:11 | **closed** | **conflating** | **conversations** | 40:7 |
| 15:18, | 54:24 | 25:9 | 37:20 | 35:15 | **counsel** |
| 21 | 56:1 | 26:23 | 38:12, | 51:2,8 | 5:3 |
| 19:20 | **Center** | **clothing** | 14 | **copies** | 12:14 |
| 21:7 | 6:15,19 | 44:4,7 | **consent** | 31:23 | 23:5 |
| 22:17, | **certification** | **COB1100** | 38:10 | 40:24 | 48:13 |
| 23 | 5:6 | 17:11 | **contact** | **copy** | **counselor** |
| 23:11 | **cetera** | 18:10 | 56:8 | 32:1 | 5:22 |
| 24:13, | 50:24 | **cognizant** | **contacted** | 59:16 | **counties** |
| 18 | **check** | 23:12 | 56:10 | **correct** | 47:21 |
| 26:6, | 17:4 | **Common** | **contained** | 6:5 | **county** |
| 14,18, | **civil** | 26:15 | 46:22 | 7:21 | 5:19,20 |
| 19 32:7 | 8:13 | **Complaint** | 47:4 | 13:22 | 8:2,22, |
| 36:9 | 12:24 | 38:15, | 50:11 | 16:23 | 23 9:5, |
| 37:18 | 26:18 | 16,19 | 56:16 | 17:5,16 | 9,19 |
| 38:6 | 57:15 | 39:10, | **contents** | 19:15 | 11:20, |
| 40:21 | **clarified** | 14 | 27:3 | 28:19, | 24 |
| 42:5 | 16:2 | 40:12, | **context** | 21 | 12:5,9 |
| 48:4 | **clarify** | 13,18, | 15:23 | 34:2,3, | 13:16 |
| 53:19 | 7:11 | 23 | **continued** | 5,6,10, | 15:2 |
| 57:11, | 9:17 | **complaints** | 54:9 | 11,13, | 22:7 |
| 14 | 20:14 | 28:9 | | 14,16, | 25:10 |
| **cases** | 33:22 | **complete** | | 17 | 26:15 |
| 8:10,13 | **clean** | 53:2 | | 39:20, | 27:5, |
| 12:24 | 28:19 | **compliance** | | 21 | 10,16 |
| 15:19 | 29:4 | 32:9 | | 48:4,5 | 29:11 |
| 22:18 | 50:7 | | | 52:8 | 30:13, |
| 31:20 | **clear** | | | 56:11 | 14 31:3 |
| 32:3 | 32:23 | | | **correctional** | 32:20 |
| 33:8 | | | | | 35:16 |
| 38:2 | | | | | |
| **cell** | | | | | |

36:6
41:7,21
42:1
47:20
49:21
51:3
57:1
59:19
**County's**
34:9
50:3,12
**court**
8:14
26:15,
16
33:23
34:1,8
48:12
49:20
**criminal**
8:11
26:7,
16,21,
22
27:2,18
31:20,
23
32:2,3,
7 33:7
43:11
57:14
**current**
12:8
22:10
**cursory**
41:6

———————

**D**

**D-10**
17:3,21

18:9,23
19:2,8,
13
50:18
**damages**
34:16
**Dara**
5:19
36:1
58:6
**dark**
20:2,4
**date**
9:7
19:17,
21 41:1
52:9
**dates**
9:24
10:4
11:2
20:1
26:4
**David**
41:21
**day**
28:1
36:15
44:3
47:14,
15
**Dayoub**
5:23
**dead**
11:4
**deal**
59:1
**dealing**
14:2

**death**
26:9
31:17
52:18
54:7,16
**declared**
11:4
**Defendant's**
51:13
**defendants**
40:4,19
41:5,
13,21
42:12
**defended**
6:8
**defense**
8:12
13:3
23:5
32:2
37:7
38:1
**deficiencies**
29:10
**deficiency**
29:18
**depose**
12:20
13:13,
20 14:8
31:10
32:15
45:10

**deposed**
12:17
13:9
36:4
47:1,2
**deposition**
6:9
16:11
25:7,13
35:19
45:12
59:24
**depositions**
6:8
12:8,13
**deputy**
5:22
**describe**
51:18
**desk**
44:24
**detail**
31:12,
17
51:15
**details**
25:1
27:1
28:14
30:2,5
44:14
50:2
**determine**
12:20
**died**
10:13,

14,21
**difference**
10:20
**direct**
36:19
**directed**
55:5
**dirty**
28:18
29:5
50:8
**disclosed**
27:1,15
31:13,
15
41:11
49:18
51:19
**disclosing**
50:22
**disclosure**
14:4
48:20
**disclosures**
13:24
57:7
**discovery**
11:18
25:9,12
31:22,
24
32:1,14
34:2

47:11
48:22
50:24
**discuss**
45:21
**discussed**
7:20
50:7
**discussion**
18:4
34:21
55:14
**disposition**
38:6
**disrespect**
14:2
**disseminate**
48:10
**disseminated**
23:22
32:5,20
33:5
**disseminating**
23:3
37:9
**distinctly**
24:13
**District**
9:4
16:15
19:5

**docket**
26:14
39:6,19

**document**
13:2,5,
7,10
16:17
17:2,
10,16
18:11
37:23
39:2,4,
8

**documents**
11:21
12:4
13:1,9,
12 14:7
16:7,9
17:23
37:21
40:14,
16
41:10
44:1,11
49:24

**Doe**
40:19

**Doylestown**
10:14

**drugs**
10:8
25:24
52:24
56:2

**duly**
5:12

**duped**
46:19

**duty**
24:21
29:2
31:10
44:21
47:13

———————

**E**

**earlier**
16:23
44:2
48:1
50:15

**early**
20:6

**ease**
9:12

**Eastern**
9:4
16:15
19:5

**electronic**
59:18

**email**
12:11
18:12
19:11,
18
50:21
51:1

**emailed**
16:6,22

**emails**
50:16

**emergency**
16:14
48:9
58:14,
17

**employee**
13:15
16:12

**employees**
8:23
9:5
12:8
27:16
30:1

**emptied**
43:19

**ended**
56:7

**engage**
11:17
37:4
38:7

**enjoy**
49:11

**entered**
14:16,
19 40:3
41:7

**entities**
8:23

**ESQUIRE**
5:11

**Estate**
9:6,10

**estimate**
40:12

**evening**
19:14

**EXAMINATION**
5:15

**examined**
5:12

**Excellent**
39:17

**excused**
59:11,
22

**expect**
35:10

**eyewitness**
57:14

———————

**F**

**Fabiani**
40:4
41:5,14
42:13
44:19
45:1,4,
6,9,12,
16

**facility**
9:20,21
12:9
13:16
27:16

**fact**
31:6
39:17
50:22

**facts**
10:3

**28:7**
47:2
53:18

**factually**
42:19

**failed**
40:5
41:14
55:24

**fair**
13:19
14:11
20:24
26:24
27:14,
24 30:6
36:17
45:24

**fallen**
45:9

**familiar**
53:18

**federal**
8:14

**felt**
54:6

**female**
58:19,
23,24
59:1,2

**fentanyl**
42:15
43:8,20

**file**
9:4
33:22
38:17

**filed**
11:10
15:2,8
16:15
19:5
25:10,
15
37:22
38:16,
20
39:10,
14,19
40:12,
13 47:5
48:10
49:16

**files**
17:4

**filing**
5:5
40:22
49:12

**final**
38:6

**find**
41:14

**fine**
20:13
59:6

**finish**
54:23

**firm**
8:9
48:15
49:19

**firsthand**
19:16
20:12,
22

40:11
54:4,12

**focus**
29:9
40:1

**focused**
29:16,
17
53:13

**focusing**
29:24
30:1

**follow-up**
58:6,8
59:6

**forceful**
24:12

**form**
5:7

**formal**
12:10

**formally**
40:15

**foundation**
56:23

**frame**
26:5

**frankly**
47:21
49:7

**Friday**
18:16

**friendly**
23:9

**front**
17:10

54:22
55:23

**full**
48:14,
16

———

**G**

**gave**
40:16

**general**
12:23
26:5

**generally**
8:13
12:19

**genuinely**
49:10

**give**
7:18
16:4
25:14
34:18
37:2
50:2

**good**
5:18
9:23
10:2
11:2
20:1
26:4
35:5,7
49:3
52:5

**grant**
34:1

**granted**
34:8

**great**
31:8
35:3

**greater**
22:21
23:6
24:3

**Grieser**
5:22
10:17
14:3

**gross**
47:9

**guard**
31:2

**guards**
15:21
28:23,
24 29:1
59:1

**guess**
40:10

**guy**
31:6,11
32:8,12
57:8

**guys**
31:23
32:18,
19

———

**H**

**hand**
23:7

**happen**
50:8
54:8

**happened**
6:17
33:1
52:8

**happy**
21:14
24:19

**head**
58:21

**heard**
5:21

**held**
18:5
34:22

**hill**
38:8

**holding**
41:7
42:11
54:24
56:1

**home**
20:3

**hope**
42:5

**Hospital**
10:15

**hundred**
26:11

———

**I**

**idea**
23:12
28:16,
18,19
31:2,4
32:6,16
57:11

**identified**
22:3,4

**identify**
16:10
25:23
51:18

**ill**
45:9

**illegal**
41:15

**imagine**
38:22

**immediately**
24:17

**imply**
39:19

**inadequate**
29:2,3

**incident**
10:7
27:1,17
28:8
58:22,
23

**included**
46:10

**incoming**
41:24

**incorrect**
43:1

**individuals**
41:22

**influence**
7:15

**informally**
40:15

**information**
22:13
23:4,21
27:15
29:23
30:20,
21,22
31:14
32:4
36:9
41:20
42:17
44:9
46:1,3
47:10
48:3,11
49:18
51:19
52:18

**informed**
22:12

**ingested**
42:15
43:2

**initial**
13:23
14:4
57:7

**initially**
57:22

| | | | | | |
|---|---|---|---|---|---|
| initiated | intentionally | | 47:3 | 51:8 | lawyers |
| 9:9 | 38:13 | _____ | 50:12 | 56:23 | 48:24 |
| injury | internal | **J** | 53:16 | **Kimbrough's** | 49:15 |
| 6:16,18 | 50:4 | Jaclyn | July | 51:4,13 | lead |
| 8:9,10 | Interrogatories | 5:21 | 9:3,21 | kind | 29:6 |
| inmate | 51:14 | jail | 11:10 | 39:12 | learn |
| 9:18 | Interrogatory | 27:10 | jurisdictions | knew | 42:16 |
| 25:24 | 51:17 | 29:11 | 8:1 | 16:2 | 43:16 |
| 29:7,12 | 56:17,20 | 30:3 | 47:18 | 33:5 | learned |
| 44:23 | intimately | 31:3 | | 36:9 | 22:14 |
| 52:23 | 53:18 | 53:1 | _____ | 45:15 | 41:10 |
| 54:21 | investigation | 55:7 | **K** | 46:2,4,9,20,24 | 43:22 |
| inmate's | 26:7,21,23 | 57:1 | Kimbrough | 47:5 | 44:8,19 |
| 50:10 | 27:2,19 | Jersey | 13:17,20 | 53:12,14 | 45:4 |
| inmates | 28:8 | 8:20 | 15:11,22 | 57:6,16 | leave |
| 42:1,7 | involved | job | 19:12,13 | knowledge | 55:6 |
| 58:22 | 24:10 | 30:14 | 21:10 | 32:17 | leaving |
| 59:2 | irrelevant | 45:17 | 22:2,13 | 42:8 | 53:3 |
| inside | 32:21 | John | 24:16 | Kratz | left |
| 29:8 | 38:5 | 40:18 | 25:4 | 41:21 | 53:11,12 |
| instant | issue | Joshua | 26:13,24  27:4 | | 55:12,16 |
| 42:2 | 10:13,16  29:5 | 9:6,11 | 28:1 | _____ | level |
| intake | 37:3 | 52:19 | 30:17 | **L** | 31:12,17 |
| 9:20 | 47:17,20 | 54:6 | 31:2 | labeled | Levin |
| 27:11 | 53:21 | judge | 33:14 | 17:11 | 8:6 |
| 28:18 | issues | 23:8 | 35:17 | 18:9 | licensed |
| 29:4,11,18 | 13:11 | 24:1,6 | 44:13 | law | 8:15,16,19 |
| 40:5,6 | 37:20 | 25:14 | 45:21,23 | 7:24 | lieutenant |
| 41:24 | | 36:22 | 46:1,5,9  47:6 | 8:7 | 52:12 |
| 42:6 | | 37:2,6 | 48:7,11 | 48:15 | 55:5 |
| 44:20,22  47:9 | | 48:21 | 49:18,23 | lawsuit | 57:4 |
| 50:3,5,13  53:3 | | 49:1,3 | 50:23 | 9:9,18 | lines |
| intention | | judges | | 11:10 | 25:17 |
| 23:15 | | 23:9,11,17,19  37:2 | | lawyer | |
| | | judgment | | 24:2 | |
| | | 15:2 | | 48:20 | |
| | | 25:11 | | | |
| | | 34:9 | | | |

list
  14:4
listed
  13:24
listen
  24:20
  32:11
  57:15
litigati
on
  13:21
  14:14,
  23
  22:15
  30:23
LLP
  8:6
located
  8:2
looked
  57:18
lot
  23:8,16
  31:23
  37:17
lunch
  43:15
  44:6

———————

        M
made
  41:5
majority
  8:13
make
  10:23
  19:9
  23:13

28:24
32:13
37:19
48:24
49:12
makes
  21:16
  28:24
  29:12
  33:16
making
  59:3
man
  36:16
manageme
nt
  53:24
manner
  46:18
MANSOUR
  7:1
  16:24
  17:6,17
  35:4
  57:24
  58:5
  59:8,
  12,17
marching
  30:15
mark
  17:2
  18:9
marked
  16:11,
  13
  17:20
  18:21
  39:3

51:12
matter
  6:16,19
  9:14
  11:17
  12:21
  14:17
  15:7,23
  16:12
  25:7,9
  34:16
  35:16,
  17
  36:20
  37:9
  38:17
  39:9
  42:2
matters
  37:23
Maura
  7:6
  17:22
memory
  10:12
  25:8
  40:11
  54:4,12
mention
  48:1
mentione
d
  13:12
  28:7
  46:11
messed
  29:5
met
  15:15

methamph
etamine
  43:20
middle
  18:10
million
  36:15
mind
  38:13
  47:19
mistake
  28:24
  29:1
  42:23
moment
  10:16,
  17 23:3
morning
  5:18
  35:5,7
mornings
  14:18
motion
  15:2
  16:14
  19:4
  25:2,
  10,16,
  21
  27:22,
  23
  28:2,6,
  14 30:2
  34:2,9
  48:10
  49:16
  50:12
  53:16
mouth

32:9
move
  48:22
moved
  21:5
moving
  18:10
  50:24
Multiple
  8:24

———————

        N
named
  9:18
  13:16
  40:19
names
  10:2,5
narcotic
s
  41:15
  44:6
necessar
ily
  45:5
needed
  56:9
news
  31:16
newspape
r
  31:4
night
  19:20,
  23
nonsense
  13:6
  38:5,10

normal
  37:1
  40:20
  48:22
notes
  57:18
notice
  12:7
  25:13
  45:12
notices
  12:11
nuanced
  10:13,
  16
number
  20:16
  21:11,
  18,20,
  22 28:5
  39:4,8
  41:22
  51:17
  56:17,
  20
numbered
  46:12
numbers
  20:18,
  19
  21:15,
  19,21,
  22

———————

        O
objectio
ns
  5:7
  6:24

Brian J. Zeiger, Esquire
03/19/2025

9

obtain
39:18

occasions
42:11

occurred
51:9

October
14:15

odd
21:3

offend
10:19
23:14

offers
23:18

office
8:2,5
20:3
21:18,
20
48:17,
20,24
49:16

officer
44:19
45:9
53:1
55:4,
15,16,
22,24
56:23,
24

officers
40:5
54:22

open
25:12
26:23

32:7

operating
50:4

opinion
22:18,
21
23:10,
16 46:7

opposing
48:13

order
14:19,
22
22:15,
17,21
23:2
24:2,3,
5,8,14,
18
30:10,
24
32:10
33:11
37:21
48:3

ordered
53:23

orders
22:19
23:16
30:15
32:3
38:9

original
38:15

overdosed
10:9

————————

P

P-14
39:3

P-2
51:12

P-4
16:13
18:21
19:4
27:21
33:23

p.m.
19:24
20:6,
10,11

PA
16:16

pants
41:16
42:13
43:7,20

paper
43:15,
19,21

paperwork
14:6
42:8

paragraph
40:2
41:4,
13,19,
20
42:10
43:14,
18 44:3
58:9

paragraphs
45:22
46:11,
14,22

pardon
28:20

part
33:12
43:6
44:18
45:5
55:11
57:17

part-two
45:19

parties
5:4
9:10
11:17
14:16

parts
50:6

passed
10:9
22:8

past
26:11
53:24

pat
42:6

pat-down
41:6,24

Patterson
9:6,11,
14 10:7
11:3
14:17

15:7,18
22:8,14
25:7,9
36:20
38:16
39:9
48:4
52:19

Patterson's
26:9
31:16
54:7

pendency
11:16

pending
26:7

Pennsylvania
8:3,17
9:5
19:6

people
12:16
13:11
47:12,
13,15

percent
26:11

period
22:8

person
13:6
14:9
54:20
58:16

person's
14:4

personal
6:16,18
8:9,10
20:20
21:2,
11,20

personally
6:9
15:13,
16 16:2

pertaining
28:7

Philadelphia
6:16
8:2

Philly
6:19

phone
20:16,
18,19,
20,21
21:2,
11,15,
21,22
22:11
24:16
26:13
27:4
29:19
31:6
32:8
36:15
45:22,
23 46:5
47:7
56:7
57:11

phrasing
10:21
place
14:22
45:17,
18
54:24
plaintif
f
52:6,
11,17,
22
53:20
54:5,
14,19
55:3
56:9,10
57:3
plaintif
f's
38:2
planned
50:23
pleadings
15:7
36:20
Pleas
26:15
plenty
6:8
point
10:23
29:16
pointing
45:2
policies
37:11

policy
29:10
41:23
42:6
50:13
poor
45:13
position
30:12
possessi
on
10:8
13:1
possibly
27:18
post
46:20
53:11,
13
55:6,13
posts
54:10
practice
7:24
8:8
29:10
40:20
54:20
present
26:12
55:23
previous
ly
16:6,
11,13
18:21
41:11
47:6
51:12

56:1
prior
35:19
36:7
40:22
54:1
prison
10:14
15:20
22:7
26:1
40:3
41:8
42:1
43:15
44:5
47:16
58:15
prison-
issued
44:4,7
prisons
37:10
42:5
problem
35:12
procedur
e
41:23
50:13
procedur
es
50:3,4
process
45:6
54:23
produce
11:20,
24

produced
12:4
Producti
on
11:22
12:1
13:8
proper
28:17
properly
40:6
prosecut
ing
12:24
protecte
d
33:13
protecti
on
23:18
protecti
ve
14:19,
22
22:15,
17,19,
21
23:2,16
24:2,3,
5,8,14,
17
30:10,
24
32:3,10
33:11
37:21
38:9
48:3
provided

30:22
public
23:21,
22
31:18
32:17,
21 33:6
37:12
39:6,18
42:7
48:18
publicly
31:14
pull
54:9
pulled
53:1,7,
8 56:2
58:13
pulling
23:13
53:21
put
14:3
21:14
28:13
30:2
57:7

————
Q
————
question
7:10,13
10:22,
24
12:12
16:1
21:1
33:4
41:1,4

45:20
46:13
53:9
59:7
questions
5:8 7:6
25:3
33:19
35:1,9
45:11
51:16,
22 58:1
quick
39:13
58:8

————
R
————
reach
36:7
reached
42:13
50:23
reaching
43:7
read
40:7
41:23
51:21
reading
5:4
23:13
real
39:13
reason
21:9
53:10
55:12
58:16,

Brian J. Zeiger, Esquire
03/19/2025

11

| | | | | | |
|---|---|---|---|---|---|
| 18 | recalled | 14 | 18:15 | 14:15 | 24:18 |
| reasonab | 55:3 | 21:15, | relation | 15:3 | 30:16 |
| le | receive | 16 | ship | 39:5 | 33:14 |
| 19:18 | 13:8 | 22:16 | 49:3 | 49:13 | responde |
| 20:9 | 40:24 | 34:19, | relayed | represen | d |
| 37:12, | 47:10 | 22 49:8 | 52:22 | tation | 25:11 |
| 13 | received | 57:5 | relevanc | 27:24 | response |
| recall | 14:7 | records | e | represen | 11:21 |
| 6:13 | 17:23 | 33:2 | 14:10 | tations | 12:1 |
| 9:2 | 44:1,11 | 52:13 | remember | 15:17 | 47:3,23 |
| 10:4,10 | 55:4 | recovery | 6:19 | represen | 50:11 |
| 12:10, | receptio | 34:15 | 9:7 | ting | 51:15 |
| 16 | n | refer | 19:23 | 49:20 | 52:5 |
| 13:14 | 52:13 | 9:13 | 20:15 | 51:3 | 53:15 |
| 14:13 | 53:2,22 | referenc | 22:9 | request | 56:17, |
| 15:1 | 54:9,22 | e | 24:14 | 11:21 | 20 |
| 16:7 | 55:6 | 9:13 | 25:4 | 12:1 | 58:17 |
| 19:1 | 57:5 | referenc | 36:15 | 13:8,20 | Response |
| 22:4,12 | recogniz | ed | 43:22 | 40:23 | s |
| 25:20 | ed | 18:13 | 53:12 | requeste | 51:13 |
| 26:2,20 | 57:19, | referred | 55:12, | d | rest |
| 27:7,12 | 21 | 19:11 | 13 | 32:1 | 48:23 |
| 35:21, | recollec | referrin | 58:20 | 40:13 | 57:23 |
| 23 | tion | g | 59:2,4 | requesti | result |
| 36:10 | 9:22 | 29:20 | reopen | ng | 24:15 |
| 37:15 | 11:5 | refresh | 34:2 | 33:1 | retrieve |
| 38:21 | 19:17, | 25:22 | 48:21 | requests | d |
| 41:2 | 22 | regard | 50:24 | 37:14 | 39:5 |
| 43:17 | 20:11, | 6:23 | reopened | reserved | 42:14 |
| 44:8 | 12,14, | 15:18 | 32:14 | 5:8 | retrievi |
| 45:15 | 17,22 | 26:6,8 | rephrase | respect | ng |
| 46:16 | 25:23 | 45:20 | 7:11 | 30:10, | 43:7 |
| 51:6,10 | 28:12 | regularl | report | 11 | returned |
| 52:9 | 32:24 | y | 55:6 | 45:11 | 55:23 |
| 53:5 | 36:21 | 14:2 | reporter | respecti | review |
| 55:9, | record | related | 31:4 | ve | 12:3 |
| 18,20 | 6:2 | 13:7 | represen | 5:4 | 40:17 |
| 56:12, | 11:10 | relation | t | respond | |
| 15 | 14:1 | | 11:9 | | |
| 58:18 | 18:1,5, | | | | |

Brian J. Zeiger, Esquire
03/19/2025

12

reviewing
  12:22
Rhoades
  9:19
  25:24
  26:21
  27:6,9
  29:16,
  24
  31:24
  32:4
  33:1
  40:3,6
  41:6
  42:13
  43:6,
  14,18
  44:4,5
  45:6
  46:19
  52:24
  55:16,
  23 56:1
Rhoades'
  26:8,
  14,19
  31:22
  41:16
rights
  8:13
  12:24
role
  27:17
room
  5:21
  45:1
  50:7,8
rules
  23:8,

10,13,
15 24:6
36:23
ruling
  34:4

——————

S

sauce
  12:23
schedule
  12:13
scheduled
  47:15
screen
  36:12
  38:23
  50:20
screwing
  27:10
scroll
  39:12
  44:15
  51:24
seal
  15:8
  23:24
  36:21,
  24
  37:22
  38:17
  39:20
sealed
  23:24
  37:16,
  18 38:9
sealing
  5:5
  36:23

search
  40:6
  41:24
  42:6
  45:5
  54:21
  55:17
searched
  44:23
secret
  12:22
secreted
  43:4
section
  44:20
  47:2
secure
  55:24
send
  25:13
  54:21
sending
  19:1
sense
  23:20
  29:13
  33:16
sentence
  28:6
  29:20
  53:20
  57:2,23
separate
  37:22
separately
  30:3
serves
  10:12

share
  36:11
  38:23
  44:13
  49:17,
  23
  52:18
shared
  46:1
  48:11
short
  34:7
show
  39:2
showed
  47:13
shut
  32:9
side
  40:14,
  15
signatures
  14:6
signed
  16:15
significant
  26:20
signing
  5:5
signs
  13:6
similar
  54:15
sir
  58:4
  59:12

sitting
  15:10
  20:2
  45:1,4
situation
  22:19
small
  8:12
  10:20
smuggle
  29:7
  52:24
smuggled
  9:19
  25:24
solely
  30:21
solicitor
  5:20,23
sort
  20:23
  22:24
  23:1
  24:1
  44:19,
  20 47:8
  50:14
sounds
  10:3
speaking
  47:6
specific
  14:17
  19:21
  25:19
  28:11
  29:12

30:2
31:12
32:24
specifically
  25:5,23
  30:16
specificity
  51:19
specifics
  53:5
spell
  6:2
spoke
  20:3,9
  26:12
  35:24
  48:19
  49:15
  52:6
Stadium
  6:17
staff
  27:11
  43:15
  44:5
  48:15,
  16
  53:22
  54:9
staffed
  30:4
staffing
  27:5
  28:8,
  17,23
  29:3

| | | | | | |
|---|---|---|---|---|---|
| 30:1 | street | suffering | surprises | term | 20:9 |
| stand | 43:11 | 7:16 | 21:4 | 10:20 | 22:8,10 |
| 38:8 | stringent | suit | 31:5 | 43:11 | 23:11 |
| standard | 24:2 | 9:4 | surrounded | testified | 25:15 |
| 54:20 | strip | summary | 27:4 | 5:13 | 26:5,12 |
| standing | 54:21 | 9:16 | surveillance | 36:19 | 29:2 |
| 45:16 | 55:17 | 15:2 | 40:24 | testimony | 31:15 |
| stashed | stuff | 25:11 | sworn | 7:18 | 32:17 |
| 56:2 | 12:14 | 34:9 | 5:12 | thing | 34:8 |
| state | 21:6 | 47:3 | | 38:11, 13 | 35:8 |
| 6:1 | 33:12 | 50:12 | **T** | things | 40:3 |
| 8:16 | 50:14 | 53:16 | talking | 23:20, 24 | 41:6 |
| 18:14 | subject | super | 7:7 | 37:17 | 42:2 |
| stated | 22:15 | 57:8 | task | 38:4,9 | 44:22 |
| 52:17 | 30:23 | supervised | 53:2 | 46:10, 15,17, | 57:1, 17,22 |
| states | 33:11 | 28:22 | taste | 21 47:4 | 58:2 |
| 8:18 | 48:2 | supervision | 45:13 | 49:14 | times |
| station | subpoena | 28:17 | taxpayers | 50:10 | 6:11 |
| 22:10 | 25:6 | 29:3 | 23:23 | thinking | 8:24 |
| STENOGRAPHER | 36:5 | 42:12 | telephone | 19:21 | 9:1 |
| 17:24 | substance | supervisor | 51:20 | 26:4 | today |
| 59:15 | 36:2 | 22:7 | 52:7 | thinks | 7:8,17 |
| sticking | 45:23 | 53:1,7, 8 | 55:4 | 23:20 | 9:13 |
| 58:21 | 51:4 | supervisors | telling | thought | 10:18 |
| stipulated | substances | 28:9 | 31:7 | 30:12 | 15:11 |
| 5:2 | 7:16 | 53:23 | 56:15 | 37:13 | 35:8 |
| 14:19 | substantial | 54:8 | 57:13 | 43:9 | 45:8,16 |
| stipulating | 41:15 | supposed | tells | 45:13 | 58:2 |
| 24:4 | substitute | 45:7 | 32:8 | 53:11 | told |
| stipulations | 40:18 | 47:12 | 57:13 | tighter | 11:3 |
| 6:23 | sued | 50:8,9 | tense | 21:16 | 22:5,6, 9 |
| strategy | 8:22 | 59:1 | 26:12 | time | 24:17, 19 28:1 |
| 12:23 | | | | 5:8 | 46:5,6, 9,13,14 |
| | | | | 13:5,15 | 52:11 |
| | | | | | 53:6,21 |
| | | | | | 54:5,14 |
| | | | | | 57:3 |

transcribe
  7:7
transferred
  43:19
  44:5
trial
  5:9
  13:4,11
trouble
  30:18
  32:11
trucks
  9:19
true
  31:19
two-part
  44:18
Tyler
  18:13
  22:20,
  22 23:5
  24:4,11
  30:9,
  11,17,
  19
  32:11
  33:12
  37:1,13
  50:22
  57:7,8
type
  8:7
  12:14
  58:14

——————
    U
Uh-huh
  48:8
  52:3
Ulmer
  27:5,9
  40:4
  41:5,14
  42:12
  44:24
  45:3,21
  46:20
  47:2
  53:1,8,
  11,12
  55:4,
  16,22,
  24
  58:13
Ulmer's
  50:9
unable
  45:10
understa
ffed
  30:4
  46:8
  53:3
understa
ffing
  47:9,17
understa
nd
  7:9,13
  11:1
  12:12
  30:13
  38:3

understa
nding
  14:21
  15:6
  31:13
understo
od
  7:12
  24:11
  37:5
  47:22
  49:5
unique
  22:17
  24:15
  36:23
unit
  52:14
  53:3
  56:3
  57:5
unredact
ed
  16:14
  18:22
uptight
  30:9
usual
  6:23

——————
    V
verbal
  7:6
  51:2
version
  16:14
  18:22
versus
  47:13

Veterans
  6:17
video
  40:24
  45:2
videos
  12:1,4
visits
  15:20
vividly
  6:20
voluntar
ily
  36:4

——————
    W
waived
  5:6
wake
  20:6
wanted
  22:20
  23:6
  24:12
  25:2
  37:1
  48:23
  52:17
warned
  53:24
watch
  50:9
wax
  42:14
  43:7
witnesse
s
  15:19

word
  43:2
words
  53:9
work
  20:16,
  18,19,
  20
  21:22
  47:14,
  15
  48:15
worked
  29:6
working
  40:5
  49:11
workings
  37:11
works
  19:20
  52:13
  57:5
worry
  35:13
wrapped
  35:10
write
  40:18
  42:4
written
  51:2
  53:15
wrong
  17:5
  42:19,
  24
  45:17

wrote
  27:22
  28:2

——————
    Y
year
  8:15
years
  6:14
  26:18
  31:21
  54:1
yelled
  24:7,8

——————
    Z
Z-E-I-G-
E-R
  6:3
Zeiger
  5:11,18
  6:3 7:4
  8:6
  16:18
  17:11
  18:11
  35:2,5
  52:7,
  11,23
  53:21
  54:6,14
  55:4
  56:8
  57:3
  58:2,12
  59:9,14