**EXHIBIT 39**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

ARA KIMBROUGH,          *

    Plaintiff          *    Case No.

    vs.                *    2:24-cv-04470-KSM

BUCKS COUNTY,           *

et al.,                 *

    Defendant          *

* * * * * * * *

DEPOSITION OF

DANIEL GRIESER

April 1, 2025

Any reproduction of this transcript is
prohibited without authorization by
the certifying agency.

2

1                        D E P O S I T I O N

2                              O F

3       DANIEL GRIESER, taken on behalf of the

4       Plaintiff herein, pursuant to the

5       Rules of Civil Procedure, taken before

6       me, the undersigned, Ethan Reese, a

7       Court Reporter and Notary Public in

8       and for the Commonwealth of

9       Pennsylvania, at the offices of Bucks

10      County Human Services Department, 55

11      East Court Street, Doylestown, PA

12      18901, on Tuesday, April 1, 2025,

13      beginning at 10:43 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

3

1                 A P P E A R A N C E S

2

3    WILLIAM MANSOUR, ESQUIRE

4    Mansour Law, LLC

5    961 Marcon Boulevard, Suite 425

6    Allentown, PA 18109

7        COUNSEL FOR PLAINTIFF

8

9    DARA BURNS, ESQUIRE

10   Bucks County Law Department

11   55 East Court Street

12   Doylestown, PA 18901

13       COUNSEL FOR DEFENDANT

14

15

16

17

18

19

20

21

22

23

24

25

4

1                      I N D E X

2

3    WITNESS: DANIEL GRIESER

4    DISCUSSION AMONG PARTIES            7-14

5    EXAMINATION

6        By Attorney Mansour            14-141

7    CERTIFICATE                        143

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

<u>E X H I B I T   P A G E</u>

1

2

3                                                           P A G E

4          <u>N U M B E R</u>      <u>D E S C R I P T I O N</u>              <u>I D E N T I F I E D</u>

5          P - 1 5       Interview Notes                        2 6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1              O B J E C T I O N   P A G E

2

3      A T T O R N E Y                                P A G E

4      B u r n s    3 5 , 3 8 , 3 9 , 4 5 , 5 0 , 5 4 , 5 4 , 5 6 , 6 5 , 6 6 ,

5      6 8 , 6 9 , 7 2 , 7 4 , 7 8 , 7 9 , 8 1 , 8 6 , 8 7 , 8 8 , 9 8 , 1 0 3 ,

6      1 0 7 , 1 1 1 , 1 1 2 , 1 2 5 , 1 2 5 , 1 2 8 , 1 3 0 , 1 3 1 , 1 3 3 ,

7      1 3 3 , 1 3 4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

```
1           S T I P U L A T I O N
2    ----------------------------------------
3    (It is hereby stipulated and agreed by
4    and between counsel for the respective
5    parties that reading, signing,
6    sealing, certification and filing are
7    not waived.)
8    ----------------------------------------
9              P R O C E E D I N G S
10   ----------------------------------------
11             DANIEL GRIESER,
12   CALLED AS A WITNESS IN THE FOLLOWING
13   PROCEEDING, AND HAVING FIRST BEEN DULY
14   SWORN, TESTIFIED AND SAID AS FOLLOWS:
15
16             ATTORNEY MANSOUR:
17             I'm ready if everyone
18        else is.
19             THE COURT REPORTER:
20             Usual stipulation?
21             ATTORNEY BURNS:
22             Usual stipulations, yes.
23             I do ask that he be
24        allowed to review the transcript.
25             THE COURT REPORTER:
```

8

1                    Yes.

2                    Do you want the read and

3      sign sent to your email?

4                    ATTORNEY BURNS:

5                    Yes, please.

6                    THE COURT REPORTER:

7                    And Counsel, do you want

8         to copy the transcript from today?

9                    ATTORNEY MANSOUR:

10                   Yes, please.

11                   THE COURT REPORTER:

12                   Sure.

13                   ATTORNEY MANSOUR:

14                   Just --- just an

15     electronic copy.

16                   ATTORNEY BURNS:

17                   Same for the County.

18                   THE COURT REPORTER:

19                   Can I get an email

20     that's good for you?

21                   ATTORNEY MANSOUR:

22                   Sure.

23                   wpm@themansourfirm.com,

24     M A N S O U R.

25                   THE COURT REPORTER:

9

1              Thank you.

2              And can you raise your

3      right hand?

4              MR. GRIESER:

5              Yeah.

6              THE COURT REPORTER:

7              Do you swear the

8      testimony you'll give is true and

9      correct to the best of your

10     knowledge and belief?

11             MR. GRIESER:

12             I do.

13             ATTORNEY MANSOUR:

14             Good morning, Mr.

15     Grieser.  How are you?

16             THE WITNESS:

17             Hey, good, very good.

18             ATTORNEY MANSOUR:

19             Just before we get

20     started, can you state your full

21     name for the record?

22             THE WITNESS:

23             Sure, Daniel Donovan

24     Grieser.

25             ATTORNEY MANSOUR:

10

1                    Okay.  Very good.

2                    Thank you for being here

3       this morning.  My name is William

4       Mansour.  I am the attorney who is

5       representing Ara Kimbrough in the

6       lawsuit that he has filed against

7       Bucks County, plus a number of

8       other individual defendants in the

9       Eastern District of Pennsylvania.

10      We're here this morning to take

11      your deposition in that case.  Are

12      you aware if that's the reason for

13      your presence today?

14                    THE WITNESS:

15                    Yes.

16                    ATTORNEY MANSOUR:

17                    Okay.

18                    Before I get started, I

19      want to go over just a couple

20      ground rules about how the

21      deposition is going to proceed.

22      The first rule I want to emphasize

23      is that, as you can see, we have a

24      court reporter here who is creating

25      a transcript of everything that's

11

1     said today.  And so, for that

2     reason, it's important that all

3     your answers to my questions be

4     verbal.  Yes, no, I don't know,

5     things of that nature.  I don't

6     want you to shake your head, nod

7     your head, shrug your shoulders,

8     things like, mm-hm, uh-huh, don't

9     come across very well on the

10    record.

11              Do you understand that?

12              THE WITNESS:

13              Yes.

14              ATTORNEY MANSOUR:

15              Okay.

16              For the same reason,

17    just for the clarity of the

18    transcript and for the benefit of

19    the court reporter, if I ask a

20    question, even if you know where

21    it's going or what my question is

22    going to be, I'm just going to ask

23    that you wait for me to complete

24    the question before you give your

25    response and I'll afford the same

12

1    courtesy of waiting for you to

2    complete your response before I ask

3    my next question.

4              Do you understand that?

5              THE WITNESS:

6              Yes.

7              ATTORNEY MANSOUR:

8              Okay.  Very good.

9              If I do ask you a

10   question and you don't understand

11   it, feel free to tell me that you

12   don't understand it.  I'd be happy

13   to rephrase it for you.  If I ask

14   you a question and you do answer

15   it, I'm going to assume both that

16   you heard it and understood it.

17             Do you understand that?

18             THE WITNESS:

19             Yes.

20             ATTORNEY MANSOUR:

21             I don't want you to

22   speculate or guess.  Your testimony

23   here today is supposed to be based

24   on personal knowledge.  And so, "I

25   don't know," is a perfectly

13

1    acceptable answer if it is, in

2    fact, the truth and you don't know.

3    But if there is a question that I

4    asked that maybe calls for an

5    estimation, just do your best to

6    estimate and just let us know that

7    it's an estimation.

8         Okay?

9         THE WITNESS:

10        Okay.

11        ATTORNEY MANSOUR:

12        Very good.

13        If at any time you need

14   to take a break, just let us know

15   and we'll be happy to do so. The

16   only thing I ask is that if I have

17   a pending question, that you answer

18   it completely before we take a

19   break.

20        THE WITNESS:

21        Okay.

22        ATTORNEY MANSOUR:

23        Very good.

24        You understand you were

25   just placed under oath. That is

14

```
1    the same oath that you would give

2    if you were testifying at trial in

3    this matter.

4              Do you understand that?

5              THE WITNESS:

6              Yes.

7              ATTORNEY MANSOUR:

8              And you understand that

9    both obligates you to tell the

10   truth?

11             THE WITNESS:

12             Yes.

13             ATTORNEY MANSOUR:

14             And you understand that

15   there are criminal penalties if you

16   knowingly fail to testify

17   truthfully here today?

18             THE WITNESS:

19             Yes.

20

21                   - - -

22             EXAMINATION

23                   - - -

24

25   BY ATTORNEY MANSOUR:
```

15

1    Q.    Are you under the influence of

2    any drugs or alcohol that would impair

3    your ability to testify truthfully

4    here today?

5    A.    No.

6    Q.    Do you have any medical

7    conditions that would impair your

8    ability to recall any of the events in

9    question?

10   A.    No.

11   Q.    Do you have any medical

12   conditions that would impair your

13   ability to hear or understand any of

14   the questions that I ask?

15   A.    No.

16   Q.    Do you have any medical

17   conditions that would impair your

18   ability to read any documents I might

19   show you?

20   A.    No.

21   Q.    Have you ever been deposed

22   before?

23   A.    Yes.

24   Q.    Okay.

25   A.    I should clarify.  I've been a

16

1   witness before.  I don't know if I've

2   been deposed before.

3   Q.      Okay.

4           You've been a witness, by that,

5   you mean you've testified at, like, an

6   arbitration or a trial?

7   A.      Yes.

8   Q.      Okay.

9           Roughly how many times?

10  A.      Once, I believe.

11  Q.      Did you spend any time

12  preparing for your deposition today?

13  A.      Yes.

14  Q.      About how much time?

15  A.      Maybe a couple hours.

16  Q.      Did you review any documents in

17  preparation for your deposition?

18  A.      I did.

19  Q.      Do you recall what documents

20  you reviewed?

21  A.      I reviewed the memo I put

22  together as part of my interview of

23  your client.  I reviewed some emails

24  that were sent in regards to that.

25  That's it.

17

1    Q.    Did you discuss ---

2    A.    Oh, I'm sorry.  I reviewed the

3    policies that I referenced in the mem

4    --- in my memo that I prepared, as

5    well.

6    Q.    Okay, very good.

7        Other than the attorneys who

8    are representing the County in this

9    case, did you discuss your deposition

10    here today with anybody else?

11    A.    No.

12    Q.    Okay.

13        You are currently a deputy

14    solicitor with the County of Bucks.

15        Is that correct?

16    A.    Yes.

17    Q.    And how long have you been in

18    that position?

19    A.    As a deputy?  I think two

20    years.  I initially started with the

21    County as an Assistant County

22    Solicitor and that was in December of

23    '21.

24    Q.    So, in around May, June, July

25    of 2024, the relevant time frame in

18

1    this case, you were a deputy County
2    solicitor?
3    A.    Yes.
4    Q.    And you are married to
5    Jacqueline Grieser, who's one of the
6    attorneys in this case?
7    A.    Yes, that's my wife.
8    Q.    Lieutenant Kimbrough, Ara
9    Kimbrough, he used to be an
10   administrative lieutenant for the
11   County of Bucks.
12         Correct?
13   A.    Yes.
14   Q.    And he was discharged on or
15   about July 29, 2024.
16         Is that correct?
17   A.    I'm not sure when he was
18   discharged.
19   Q.    He was discharged though,
20   right?
21   A.    Yes, that's --- that's what my
22   understanding is why we're here.
23   Q.    Are you aware of the fact that
24   he was also suspended on or about June
25   21, 2024?

19

```
1    A.    I am not aware of what happened
2    after my interview.
3    Q.    And I know you've referenced
4    your interview with him a couple of
5    times here today, and we'll get into
6    that a little bit further.  Can you
7    tell me in your own words, in as much
8    detail as you could, what role you
9    played in the County's decision to
10   discharge Ara Kimbrough?
11   A.    Sure.  I was --- I was assigned
12   the duty of interviewing him.  The
13   County had received a report and they
14   wanted me to interview him and come up
15   with a memorandum of that interview
16   with recommendations regarding his
17   employment.
18   Q.    You said you were assigned to
19   interview him.  Assigned by whom?
20   A.    My boss, Amy Fitzpatrick, the
21   County solicitor.
22   Q.    According to the records that
23   we've received in this case so far, it
24   appears that you interviewed my
25   client, on or about June 12, 2024.  Is
```

20

1    that ---

2    A.      Yes, that's right.

3    Q.      Okay.

4            So, I guess it would be fair to

5    infer that you were assigned the task

6    of interviewing him by Ms. Fitzpatrick

7    before that date?

8    A.      Yes, that's right.

9    Q.      Do you recall the date?

10   A.      June 10th.

11   Q.      And when you were given that

12   task, what was your understanding of

13   the reason you were being asked to

14   interview him?

15   A.      There was a --- there's an

16   allegation of an unauthorized

17   disclosure of confidential information

18   being released by your client.  And --

19   - and they wanted me to look into

20   that.

21   Q.      Were you told at that time that

22   the information he released was

23   confidential?

24   A.      I don't know.  I don't remember

25   if it was phrased that it was

21

1    confidential.  I'm trying to remember.
2    Yeah, I think they --- I think they
3    referenced it as confidential
4    information.  It had to do with
5    correction tactics and procedures.
6    So, if they didn't --- if they didn't
7    identify it, if they didn't label it
8    as confidential, when I saw that, I
9    would have --- my own estimation would
10   have been, that's confidential
11   information.
12   Q.     Were you aware prior to
13   interviewing my client, to whom or
14   with whom he shared that confidential
15   information?
16   A.     Yes.
17   Q.     And who, what was your
18   understanding at the time who it was
19   that he shared that information?
20   A.     It was a plaintiff's attorney
21   in another case.  And when you asked
22   me earlier, no, I didn't.  Never mind.
23   I was going to say I was going to
24   reference the complaint or the motion,
25   whatever the pleading was, that the

22

1    County became aware of.  I did review

2    that as part of my interview back

3    then.  I didn't review it as part of

4    this deposition.  But, yes, I was

5    given a copy of the motion, I think it

6    was, that had a factual basis that

7    indicated that your client had

8    contacted this, plaintiff's attorney

9    and explained some things.  That ---

10    that was the basis for the interview,

11    basically.

12    Q.    So, I just want to get some

13    facts clarified for the record.

14         So, the attorney that you're

15    referring to would be attorney Brian

16    Zeiger.

17         Is that correct?

18    A.    Yeah, that's right.  Yeah.

19    Q.    And the lawsuit that you were

20    referring to would be the Corbin/

21    Patterson versus Bucks County matter?

22    A.    That sounds right, yeah.

23    Q.    And you said you reviewed the

24    motion that Attorney Zeiger filed

25    prior to interviewing my client?

23

1    A.    I did.

2    Q.    Do you remember when you first

3    reviewed it?

4    A.    It would have been when I was

5    assigned the task, so it would have

6    been on June 10th when my boss gave me

7    the duty to do the interview.

8    Q.    And when Ms. Fitzpatrick gave

9    you the duty to interview my client,

10   did she simultaneously give you a copy

11   of the motion to review?

12   A.    Either she did, or someone, the

13   litigation paralegal in our office,

14   someone gave it to me to review.

15   Q.    Were you involved at all in any

16   capacity in the Patterson case?

17   A.    No.

18   Q.    You were not an attorney of

19   record in that case?

20   A.    No.  No.

21   Q.    Based on your recollection, do

22   you recall what the motion that

23   Attorney Zeiger filed, what

24   information was in there that prompted

25   your interview with my client?

24

1    A.     I do.  I mean, it was, there

2    was a death at the jail two years

3    prior, I think, in '22.  I think that

4    was the basis of that lawsuit.  And

5    your client had disclosed what had

6    happened during, that he believed led

7    to that death, different procedures,

8    tactics that the guards, the people,

9    the County employees that were there

10   had used at the time, that was the

11   basis.

12   Q.     Do you recall, in terms, you

13   used the word tactics.  Can you recall

14   specifically what tactics my client

15   disclosed to Attorney Zeiger?  At

16   least that's alleged in this motion.

17   A.     I remember the word dirty cell.

18          Right?

19          So, there was a dirty cell.

20   There was --- there was something

21   about how many guards were supposed to

22   be on shift at the time and how many

23   were actually there.  There were

24   descriptions of how the prisoner was

25   moved around or supervised in the

25

1    cell, if I remember right.  It's in

2    the, I know it's in the motion and ---

3    that was filed.

4    Q.    The interview that you're

5    referring to that occurred on June

6    12th, Lauren Smith was also present

7    for that?

8    A.    She was, yes.

9    Q.    And nobody else was, just you

10   and Ms. Smith on behalf of the County?

11   A.    Yes, and your client.

12   Q.    And my understanding is there

13   were some notes taken by Ms. Smith

14   during that interview.

15        Is that correct?

16   A.    Yeah, that's my understanding.

17   Q.    Okay.

18        And those notes I'll represent

19   to you were produced to us as part of

20   discovery in this case.  I actually

21   want to --- did we mark these as an

22   exhibit?

23                    ATTORNEY BURNS:

24        I was trying to remember

25   that, and ---

26

1          ATTORNEY MANSOUR:

2              I went through all of

3      them.  I don't think we did either.

4          ATTORNEY BURNS:

5              I don't think we did.

6          ATTORNEY MANSOUR:

7              Okay.  All right.  So,

8      then, I figured we're up to 15, I

9      think, P-15.  I think it's P-15,

10     yeah.

11         ATTORNEY BURNS:

12             You don't even know.

13         ATTORNEY MANSOUR:

14             Yeah, we are.

15     BY ATTORNEY MANSOUR:

16     Q.    Okay, Mr. Grieser.  So, I've

17     just handed you a document that's been

18     pre-marked as Plaintiff's Exhibit-15.

19      Just take a quick look through that

20     and just let me know when you're done

21     looking at it.

22                  - - -

23     (Whereupon, Deposition Exhibit, P-15,

24        Interview Notes, was marked for

25             identification.)

```
                                              27
 1                        - - -
 2     A.       Okay.
 3     Q.       Have you seen this document
 4     before today?
 5     A.       You know, I --- I may have.  I,
 6     if I did, I saw it back in June.  I
 7     haven't looked at it since then.  I
 8     checked, yeah, I'm not certain
 9     actually if I received it when I wrote
10     my report or not, but I probably did.
11      I just don't remember.
12     Q.       These notes read a little bit
13     like a transcript.
14     A.       Yeah.
15     Q.       Okay.
16              Was your interview of my client
17     recorded by any means?
18     A.       I didn't record it.  I'm not
19     sure if --- if Lauren recorded it or
20     not.  I don't remember her saying
21     that, so.  I think she just takes
22     notes.  I don't know if your client
23     recorded it, but.
24     Q.       So, I do want to ask you just a
25     few questions about some of the things
```

28

1    in here.

2    A.      Yeah.

3    Q.      So, during this interview, my

4    client was asked whether or not he had

5    a conversation with Attorney Zeiger.

6          Correct?

7    A.      Yeah, I asked him that.  I know

8    I asked him that.  I don't know what

9    this reflects, but I know, yeah, I

10   talked to him about that.

11   Q.      Do you recall what his response

12   was?

13   A.      Yes, he admitted he had a

14   conversation with him.

15   Q.      And did you ask him what he

16   told Attorney Zeiger during his

17   conversation?

18   A.       I showed him the motion, and I

19   believe what --- I had him confirm

20   that that is what he had told to

21   Attorney Zeiger.

22   Q.      You physically showed him a

23   copy of the motion?

24   A.      Yeah, I think I did.  That's

25   what my --- that's what I recall.  And

29

1    I had him confirm that's what he,

2    yeah, that's what --- that's what he

3    had said to him.

4    Q.    Was it a redacted or unredacted

5    copy, do you recall?

6    A.    It wasn't redacted.

7    Q.    So, I want to just point your

8    attention to the last line of the

9    transcript there.

10   A.    On the first page?

11   Q.    Yep, on the first page, which

12   is AK, AK being my client, Lieutenant

13   Kimbrough.

14   A.    Yep.

15   Q.    And he says there, well, you

16   asked just before that, "Why do you

17   feel it was 100 percent preventable?"

18   That is, being Mr. Patterson's death.

19   And his response was, "Staff were

20   pulled from my unit without my

21   knowledge.  Essentially what had

22   happened is a male officer was doing

23   an unclothed body search.  His partner

24   was up front.  He told him to go up

25   front and see his partner, but his

30

1    partner was called elsewhere.  So, the
2    inmate was able to go back into the
3    dirty cell and retrieve the contraband
4    drugs he had on his person and put it
5    back into his County." And then the
6    next sentence appears to be redacted
7    on his copies.
8         Is that, do you recall that
9    being what my client told you during
10   that interview?
11   A.     Yeah, I think that's accurate.
12    He confirmed what was listed in the
13   motion.  Yeah, I think that's what he
14   said.  I don't know what's in the
15   redacted portion either, but, yeah,
16   that's.  I remember him --- yeah, I
17   think that's fairly accurate.
18   Q.     Okay.
19         So, then it would be fair to
20   say between what Mr. Zeiger alleged in
21   his motion and what my client told you
22   here in this interview, that formed
23   the basis of your knowledge of what my
24   client told Attorney Zeiger.  That is
25   to say, besides Attorney Zeiger's

31

1    motion and his response in this

2    interview, you had no other knowledge

3    of the substance of my client's

4    conversation with Attorney Zeiger?

5    A.    That's --- that's correct.

6    Only what he told me during this

7    interview.  There may have been more

8    that came after this, I don't

9    remember.  My, yeah and the motion.

10    That's the only two sources of

11    information I had, yep.

12    Q.    Turn to the second page of this

13    document, maybe a little bit more than

14    halfway down.  Where you asked, it

15    says "DG" there, "Have you taken any

16    other internal measures to address

17    this?"

18         Do you see that?

19    A.    Yep.

20    Q.    Okay.

21         And then his response was, "I

22    have told everyone in my chain of

23    command and reported it to human

24    resources.  I have brought it up

25    several times.  I have made it a point

32

1    to be hypervigilant about staffing, to

2    be transparent.  I just received a

3    step one discipline.  Are you aware?"

4         Do you recall him telling you

5    that in the interview?

6    A.    Yeah, I remember talking to him

7    about why, you know, like, what

8    message you had taken or why did you

9    make this --- why did you make this

10   phone call, that sort of thing.  And I

11   remember him talking about staffing

12   issues, that was a big concern of his.

13    I don't remember him using these

14   exact words, but it sounds, the ---

15   what's written here sounds like what I

16   determined, right.  So ---

17   Q.    When you say it was a big

18   concern of his, is that the impression

19   you got from your interview with him,

20   that he was very concerned about

21   staffing in the intake unit of the

22   jail?

23   A.    Yeah, I got the sense that he

24   wasn't happy the way that staff was

25   utilized and he had made requests that

33

1    weren't granted at times.  Yeah, he

2    wasn't, yeah, I would say he wasn't

3    happy with staffing decisions that

4    were made.

5    Q.    And he did tell you during that

6    interview that he had reported his

7    staffing concerns up his chain of

8    command on numerous occasions?

9    A.    Yeah, his --- his concern about

10   staffing, I mean, you know, like,

11   yeah, he did mention that he was

12   concerned about it, right.

13   Q.    If you could turn to the next

14   page, please.

15   A.    Yeah.

16   Q.    So, at the very top, I guess

17   when we go back to the previous page,

18   real quick, so, you asked him, "Since

19   then, is it fair to say that you have

20   made folks aware of your concerns?"

21        And then his response was,

22   "Every time it happens, yes."

23        And then you asked him, "What

24   do you mean?"

25        And he responded, "When they

34

1  pull someone without letting me know

2  or they don't staff it properly, I

3  report it."

4          So, he had told you during that

5  interview that he had previously

6  reported every time somebody pulls

7  staff from his unit without letting

8  him know?

9  A.      That's what he said during the

10  interview, right.  That he, I mean,

11  what I took from the interview, I

12  don't remember this exact statement

13  being made, but what I took from the

14  interview is, yes, he --- he voices

15  concerns about staffing and has for

16  some time.

17  Q.      Okay.

18          Just a couple lines after that,

19  you ask him.  "You mentioned you

20  shared this with the attorney.  Have

21  you shared it with anyone else outside

22  the County?"

23          This response was, "My

24  therapist, who I see for PTSD and

25  depression.  I was managing before,

35

1    but after this incident, I had to seek

2    counseling.  I have been on medication

3    because I have had a tough time

4    functioning."

5         And you asked him, "Since the

6    Patterson incident?"

7         He said, "Correct."

8         You asked him. "Any other

9    organizations or family?"

10         He responded, "Yes, family and

11    friends."

12         You then asked him, "Online

13    media?"

14         He responded, "No."

15         So, he had told you during that

16    interview that he had shared details

17    of the Patterson matter and his

18    concerns with people outside of the

19    County, including his therapist,

20    family, and friends?

21    A.    Well, I ---

22                   ATTORNEY BURNS:

23                   Objection to form. You

24       can answer.

25                   THE WITNESS:

36

1              Yeah, can you say it

2      again?

3                   ATTORNEY MANSOUR:

4              Sure.

5              So, according to this,

6      he told you during that interview.

7                   THE WITNESS:

8              Yes.

9                   ATTORNEY MANSOUR:

10             You asked him if he

11     shared any of this information with

12     anybody outside the County, and he

13     told you he did.  He shared it with

14     his therapist, and he shared it

15     with family and friends.

16         Is that accurate?

17                  THE WITNESS:

18             What I took from the

19     interview is that he shared the

20     staffing concerns, not the specific

21     tactic, procedural failures as he

22     saw them, of the County.  What I

23     understood was, because I clarified

24     that, I think, later, where, you

25     know, are you talking about general

37

1          staffing that you've shared with

2          these folks, or are you talking

3          about specifics related to this

4          incident?  And my --- my recall is

5          that he said, no staffing issues is

6          --- is what I've shared with

7          people.

8     BY ATTORNEY MANSOUR:

9     Q.      Okay.

10          And yes, going --- going down

11     to the next lines, you said, you asked

12     him, "When you share this with family

13     members, is it the same level of

14     detail as you share with your

15     therapist?"

16          And he said just the same

17     general concern that I'm concerned

18     something will happen due to not being

19     properly staffed in such an important

20     part of the building.

21          Is that inaccurate?

22     A.      Yeah, that's my recall.  It

23     was, you know, it was a general

24     staffing kind of --- it's, what I took

25     from it, he tells a lot of people

38

1    about his concerns regarding staffing

2    --- staffing of the corrections

3    facility.

4    Q.    And it appears here, that at

5    least what he told you during that

6    interview, was that the crux of his

7    concern about understaffing is that,

8    as he said here, you know, something

9    will happen due to not being properly

10   staffed in such an important part of

11   the building.

12         So, what did you understand

13   that to mean?

14                   ATTORNEY BURNS:

15                   Objection to form.

16                   ATTORNEY MANSOUR:

17                   Where it says there, AK,

18   just the same, general concerned --

19   - concerns.

20                   THE WITNESS:

21                   Okay, let me --- I'll

22   just read it.

23                   ATTORNEY MANSOUR:

24                   Yeah, go ahead.

25                   THE WITNESS:

39

1          Okay.

2          And what's the question?

3          ATTORNEY MANSOUR:

4          So, the question was

5    where the portion of that response

6    where he says, "I'm concerned

7    something will happen due to not being

8    properly staffed in such an important

9    part of the building."

10        What did you understand that to

11    mean?

12              THE WITNESS:

13         I understood that he

14    wasn't happy with the staffing

15    decisions that his supervisors were

16    making.

17   BY ATTORNEY MANSOUR:

18   Q.    Now, he did say here that he

19   was concerned something will happen.

20        Did you understand that to mean

21   something similar to what happened in

22   the Patterson matter?

23              ATTORNEY BURNS:

24         Objection to form.

25              THE WITNESS:

40

1           Yeah, I just understood
2    it as something would happen, a
3    failure would happen.  I wouldn't -
4    -- I wouldn't say that --- no, I
5    wouldn't categorize this as the
6    same level as Patterson, right?
7    That was tragic.  That was a death.
8    But yes, something would happen.
9    BY ATTORNEY MANSOUR:
10   Q.    Okay.
11         And that--- and that's
12   something being --- well, strike that.
13         Let me ask this question.  So,
14   you would agree that Mr. Kimbrough saw
15   what he viewed as understaffing in the
16   intake unit as a problem?
17   A.    Yes, he was concerned about
18   staffing, yep, and understaffing,
19   yeah.  Yeah, I would agree with that.
20   Q.    And did you gather from your
21   interview with him that the concern
22   that he had or the problem that he
23   thought would result from
24   understaffing were lapses in security?
25   A.    I don't know, lapses of

41

1    security, I don't know what that ---
2    what you mean by that.  I think a non-
3    positive event would happen if that's
4    what you were, you know, like ---
5    Q.    So, if that, if the intake unit
6    is understaffed, at least according to
7    his view.
8    A.    Yeah.
9    Q.    Something negative or bad might
10   happen?
11   A.    Yeah, that's the way I
12   understood his, you know, if there was
13   more staff, the chances of something
14   negative happening would be less,
15   yeah.
16   Q.    If you can go down to the third
17   to last line, to "DG."  I want to talk
18   about a few policies.  And you handed
19   the policy to him, just take a look at
20   that.  Do you see that line that I'm
21   referring to?
22   A.    Yep.
23   Q.    Okay, yeah, if you just read
24   that to yourself.
25   A.    Yes.

42

1    Q.     Okay.

2           So, you stated there, at least

3    according to these notes, that you ---

4     you handed him a copy of the code of

5    conduct for confidentiality.

6    A.     Mm-hm.

7    Q.     And then you said, "Staffing

8    info could be used against the County

9    and for a lot of different things."

10          What did you mean by that?

11   What did you mean by "Staffing info

12   could be used against the County?"

13   A.     I don't know if I meant --- I

14   don't know if I used those words.  I

15   may have.  But what I meant is the

16   information regarding what happened,

17   right.  So, I may have used the word

18   staffing.  I meant the tactics, the

19   procedures, the policies the jail has

20   in conducting, you know, corrections

21   business.

22   Q.     Okay.

23          Used against the County by

24   whom?

25   A.     If --- if confidential

43

1    information is let out, right.  Their

2    employees at the corrections facility

3    could be in harm's way, right?  The

4    folks that visit there, the inmates

5    that are there, could learn

6    techniques, could learn about

7    potential weaknesses that the County

8    may have, and they may utilize that

9    and harm people, harm employees.

10   Q.     Could you be a little more

11   specific in how staffing info, as you

12   say here, could harm employees or

13   inmates or other people in the

14   facility?

15   A.     Well, I guess my reference is

16   to all of the procedures and things

17   that happened that he relayed to

18   Plaintiff's Counsel, Brian Zeiger ---

19   Zeigler?

20   Q.     Zeiger.

21   A.     That's --- that's what I'm

22   speaking about here.  And about how

23   that could be used to the detriment of

24   the County, not just the fact that the

25   County is --- the jail has less staff

44

1    than we'd like it to have.  That's

2    public knowledge.  There's been lots

3    of articles, the commissioners talk

4    about that, about how we need more

5    corrections officers.  But this is

6    more of a broader sense of what

7    actually happened in that case.  That

8    was my concern.

9    Q.      Okay.

10          So, if you wouldn't mind

11   turning back to the first page.

12   A.      Yeah.

13   Q.      The very bottom that went over

14   earlier, where he basically recounts

15   to you what he told Attorney Zeiger.

16   Where my client said staff were pulled

17   from my unit without my knowledge,

18   etc.

19          What information in that

20   response do you believe could have

21   been used against the County?

22   A.      What information?  So the ---

23   the nature, the procedures that are

24   occurring here, the --- the fact that

25   you have the --- you know, it

45

1    describes what one officer was doing,
2    what the other, where the other
3    officer or the corrections officer is
4    located, how they --- how they were
5    allowed to move into the dirty cell.
6    And I don't --- I don't know what's on
7    there. So, I mean, that --- that
8    might have been an important part of
9    it. I don't remember what was in
10   there.
11   Q.    Okay.
12         So, just going with the
13   information that we have here that's
14   unredacted, can you tell me, you know,
15   what you spoke more generally about,
16   you know, where people were and what
17   they were doing and the dirty cell.
18   Can you tell me how this information
19   could have harmed the County?
20              ATTORNEY BURNS:
21              Objection to form.
22              ATTORNEY MANSOUR:
23              So, let's --- let's
24   break it down, line by line. So,
25   "Staff were pulled from my unit

46

1      without my knowledge."

2                    Pretty general

3      statement, would you agree?

4                    THE WITNESS:

5                    "Staff were pulled from

6      my unit without my knowledge," yes.

7    BY ATTORNEY MANSOUR:

8    Q.     Okay.

9           So, he doesn't say here which

10   staff were pulled.

11          Right?

12   A.     Doesn't say which staff.

13   Q.     Doesn't say who pulled the

14   staff.

15          Right?

16   A.     No, it doesn't.

17   Q.     It doesn't say where they were

18   pulled to.

19          Right?

20   A.     No.

21   Q.     Okay.

22          The next sentence he says is

23   essentially what had happened is a

24   male officer was doing an unclothed

25   body search.  Those type of searches

47

1    are generally routine.

2         Right?

3    A.      Yes, yeah.

4    Q.      And of course, anybody who's

5    being searched would know that they're

6    being searched.

7         Right?

8    A.      I would hope so, yeah.

9    Q.      So, that's, you know, that's

10   not like --- he's not disclosing under

11   what circumstances a person would be

12   searched.

13        Right?

14   A.      He doesn't no, not here, no.

15   Q.      And you recall him, during that

16   interview, disclosing, telling you

17   that he told Attorney Zeiger

18   particulars about the circumstances

19   under which a person would be strip

20   searched?

21   A.      No.

22   Q.      Then he mentioned that he, and

23   of course, he doesn't mention here, at

24   least according to these notes, that

25   who this male officer was.

48

1          Right?

2    A.     No.

3    Q.     And then he says here, "His

4    partner was up front." So, he doesn't

5    mention the name of the partner.

6          Right?

7    A.     No.

8    Q.     And, "up front," he didn't give

9    specific locations. He just says "up

10   front," which is kind of general

11   statement, you'd agree?

12   A.     Yeah.

13   Q.     "He told him to go up front and

14   see his partner, but his partner was

15   called elsewhere." Again, doesn't

16   mention here who called the partner

17   elsewhere.

18         Right?

19   A.     No, it doesn't say who called.

20   Q.     And doesn't say where the

21   partner was called.

22         Right?

23   A.     "Elsewhere," it says, yeah.

24   Q.     Yeah, but not specifically

25   where else?

49

1    A.      No.

2    Q.      And you believe the fact that

3    he --- he had shared this information

4    with Attorney Zeiger, that a male

5    officer was doing an unclothed body

6    search.  Do you believe that could

7    have harmed either employees or

8    inmates in the jail?

9    A.      Well, I --- I guess the

10   question, right.  So, the question

11   before that I asked him was what, if

12   this is what I asked him, why do you

13   feel it was 100 percent preventable?

14   I didn't ask him what he disclosed to

15   Mr. Zeiger, right?  I asked him, why

16   do you think this is preventable?  And

17   he explained why he thought it was

18   preventable.

19   Q.      Okay, so on that point, that's

20   a good point.  Could you take a look

21   through this document?  Take as much

22   time as you need.  Can you tell me

23   where in these notes you specifically

24   asked him and he specifically told you

25   what he told Attorney Zeiger?

50

1          ATTORNEY BURNS:

2                Objection, form.

3          THE WITNESS:

4                I, right before that,

5     there's some information where I

6     asked him what he did tell him, and

7     I believe I did show him the motion

8     and the language in the motion.

9     That's not reflected in this

10    document, but that --- that's what

11    my memory is.  I believe I showed

12    it to him to have him confirm that

13    was what was reported.

14    BY ATTORNEY MANSOUR:

15    Q.     Okay.

16           So, now at least you would

17    agree with me according to these notes

18    here, and you can feel free to take a

19    look at all of them.  I don't see any

20    particular question from you asking

21    him to confirm that the information,

22    Attorney Zeiger's motion, was accurate

23    or correct.

24           Is that true?

25    A.     Let me, I'll look through it

51

1    again here.

2    Q.     Sure.

3    A.     Okay, I'm --- so your question

4    was?

5    Q.     So, is there anything in these

6    notes that reflect the fact that you

7    showed him a copy of Zeiger's motion

8    and asked him to confirm the contents

9    of his conversation with Attorney

10   Zeiger?

11   A.     I don't see that in these

12   notes.

13   Q.     Have you done similar

14   interviews like this one before with

15   other employees of the County?

16   A.     Not, no, not with the County,

17   no.

18   Q.     So, this was your first

19   investigatory interview of an employee

20   of the County.  Would that be fair to

21    say, in your capacity as deputy

22   County solicitor?

23   A.     Yeah, for the County.  In my

24   past experience, I did many

25   interviews, investigations related to

52

1    my service in the military.  Similar -

2    -- similar issues.

3    Q.    Turning to the third page,

4    third line from the bottom.

5    A.    Third page.

6    Q.    We would have gone over this

7    earlier.

8    A.    Is this 1108 at the top?

9    Q.    Yes.

10    A.    Okay.

11    Q.    The third line from the bottom,

12    where you say, "I want to talk about a

13    few policies."

14    A.    Yeah.

15    Q.    In the parentheses, it says,

16    "Hands policy to Ara." Again, These

17    are notes that were taken by Lauren

18    Smith.  So, at least in that part of

19    the interview, Ms. Smith's notes

20    reflect the fact that you handed a

21    copy of the relevant policy to Ara

22    Kimbrough.

23    A.    That's what her notes, if

24    that's what you asked me, yes, that's

25    what the notes indicate.

53

1    Q.    But she doesn't indicate

2    something similar when you were

3    referencing the motion filed by

4    Attorney Zeiger.  So, for example, it

5    doesn't say, on the first page, or

6    really anywhere else in these notes

7    that you handed a copy of the motion

8    to Ara for his review.

9          Do you agree with that?

10   A.    It doesn't make the same

11   reference.

12   Q.    Can you say with 100 percent

13   certainty that you showed him a copy

14   of the motion?

15   A.    I cannot say with 100 percent

16   certainty.  I have that memory of him

17   confirming the details in the motion,

18   but I can't say that with 100 percent

19   certainty.  And, you know, it not

20   being referenced here, when other

21   things are referenced, certainly

22   causes me to question my own memory a

23   little bit.  But --- but that's what I

24   recall.  I recall showing it to him

25   and him confirming, or at least him

54

1    admit --- agreeing that's what he had

2    told Mr. Zeiger.

3    Q.    Okay.

4          We don't see any of those

5    questions here.  So, I don't see any

6    question here from you asking him to

7    confirm what Zeiger said in his

8    motion.

9          Right?

10                    ATTORNEY BURNS:

11                    Objection, form.

12                    THE WITNESS:

13                    No, I don't see any

14    questions.

15    BY ATTORNEY MANSOUR:

16    Q.    Okay.

17          So, if you did ask it, Lauren

18    Smith must have left it out of these

19    notes.

20                    ATTORNEY BURNS:

21                    Objection, form.

22                    THE WITNESS:

23                    Yes, yeah, again, I

24    don't --- I --- yeah, I don't know

25    what Lauren --- what she was

55

1        writing at the time.
2    BY ATTORNEY MANSOUR:
3    Q.      Because she took pretty
4    detailed notes.  You would agree with
5    me.
6            Right?
7            This almost reads, like I said,
8    like a transcript, almost.
9    A.      Yeah, yeah, I'd say these are
10   detailed notes.
11   Q.      Okay.
12           So, if you --- okay, so you did
13   ask him here, he said he made a motion
14   and referred to you, I'm on the first
15   page now, he made a motion and
16   referred to you.  Ara Kimbrough says,
17   "Yeah, I talked to him about the
18   Patterson case."
19           Then you ask him, "What did you
20   tell him?"
21           And Ara said, "Essentially,
22   that I felt some responsibility
23   because drugs were able to get through
24   my unit and Patterson died.  I feel
25   bad about that.  It was 100

56

1    preventable --- preventable, and we

2    failed on that."

3            You just spent some time

4    reviewing this document line by line

5    and you would agree with me, that's

6    the only time during this interview

7    that you asked him specifically, what

8    did he tell Attorney Zeiger.

9            Correct?

10                   ATTORNEY BURNS:

11                   Objection, form.

12                   THE WITNESS:

13                   In these notes, yes,

14       that's the only time I asked him,

15       "What did you tell him," those

16       words.

17   BY ATTORNEY MANSOUR:

18   Q.    And his answer was pretty

19   general.

20            Wasn't it?

21            And his answer was that he felt

22   some response --- what he told him was

23   that he, "felt some responsibility

24   because drugs were able to get through

25   my unit, Patterson died.  I feel bad

57

1    about that.  It was 100 percent

2    preventable and we failed on that."

3    That's what he told you, he told

4    Attorney Zeiger.

5          Right?

6    A.    Well, that's what these notes

7    reflect, that, how he answered the

8    question.

9    Q.    And the follow up question you

10   asked him was, "Why do you feel it was

11   100 percent preventable?"  And that's

12   where he went into detail about staff

13   were pulled from my unit without my

14   knowledge, et cetera.

15   A.    Yeah.

16   Q.    Correct?

17   A.    Yeah, I remember having --- my

18   impression after I interviewed him is

19   he confirmed, and it could be this

20   redacted portion here, that he

21   confirmed what --- he never denied, he

22   never indicated otherwise, that the

23   verbiage that was in the motion filed

24   by Zeiger was not accurate.

25   Q.    So, going back to my earlier

58

1    question, a few minutes ago, you had
2    mentioned that you felt the
3    information that he shared with
4    Attorney Zeier could cause harm to the
5    jail, inmates in the jail, or
6    employees of the jail.
7         Is that correct?
8    A.    Yeah, I think so.
9    Q.    Okay.
10        Are you aware of the fact that
11   or didn't you --- well, at the time
12   that you interviewed my client on June
13   12, 2024, were you aware of the fact
14   that there was a protective order
15   entered in the Patterson matter?
16   A.    I know there was a protective
17   order.  I don't know if I was aware at
18   that time or not.  I remember hearing
19   about a protective order.  I'm not
20   sure if that was before or after my
21   interview.
22   Q.    And what was your
23   understanding, if any, about what the
24   protective order in that case was for?
25   A.    Well, I can generally speak to

59

1   the corrections operations, right.  I

2   do a lot of "right to know" work here

3   for the County and have done it before

4   in other positions as well.  And we

5   try to keep, you know, corrections

6   policy, procedures, especially related

7   to use of force and techniques, we try

8   to keep that information in-house to

9   protect, you know, to protect our

10  employees.  And so, generally

11  speaking, right, information like this

12  would be protected, would be

13  confidential, would be non-public

14  information, right.  It's information

15  that you don't disclose to the outside

16  to protect employees and protect the

17  correction system.

18  Q.      Okay.

19          Based on your understanding of

20  what my client shared with Attorney

21  Zeiger, whether it's from what

22  Attorney Zeiger said in his motion or

23  what my client said to you in the

24  interview, what policies did my client

25  disclose to Attorney Zeiger?

60

1   A.    What policies did he disclose?
2         I think he disclosed
3   procedures, I think he disclosed
4   tactics related, and yeah, as far as
5   policies, I don't have the reference
6   of every, I don't have the --- the
7   correction policies in front of me,
8   and I didn't, yeah, I didn't consider
9   that question, I guess ---
10  Q.    Okay.
11  A.    When I interviewed him.
12  Q.    So, you mentioned procedures
13  and tactics.  So, what procedures did
14  he disclose to Attorney Zeiger?
15  A.    I think the way that prisoners
16  are moved around the correction
17  facility, the --- the supervision, the
18  --- the number of COs that are
19  supposed to be present at certain
20  times and, you know, the general
21  factual nature of what happened with
22  this --- with this inmate while he was
23  being processed at the facility.
24  Q.    Okay.
25        So, starting with how prisoners

61

1    are moved around, what information

2    related to that did my client

3    disclose?

4    A.      What did he disclose?  He --- I

5    don't --- I don't have the information

6    in front of me, but he talked about

7    the --- I'd have to --- I'd have to

8    look at the motion to refresh my

9    memory on what --- what that --- what

10   that movement was, but there were ---

11   there were inmates in two different

12   cells, from what I remember, and they

13   were being processed.  So, that would

14   --- that would involve some movement

15   of inmates between those two cells.

16   Q.      Okay.

17          The number of COs that are, you

18   mentioned that the number of COs that

19   are on a particular unit, that's

20   information that nobody outside the

21   County knows about?

22   A.      Well, we do, we try to protect,

23   we try to keep confidential

24   information on tactics and procedures

25   that the COs have.  Do other people

62

1    know how many people work in the jail?

2    It depends, you know, like, they have

3    their own experience, right?  If

4    they're there on a certain day, they

5    might see certain people there.  But

6    we don't release that information, you

7    know, as a matter of course, as an

8    employer.

9    Q.    You mentioned earlier how, you

10   know, worked, and I think you even

11   mentioned it at some point in this

12   transcript about how you have some

13   experience dealing with "right to

14   know" requests and disclosure of

15   policies and procedures, use of force,

16   I think you mentioned specifically.

17        Correct?

18   A.    Right.

19   Q.    Okay.

20        First of all, you have no

21   reason to believe that my client

22   disclosed any use of force policies to

23   Attorney Zeiger.

24        Right?

25   A.    I don't think there was any

63

1    force used.  I'm trying to think of --

2    - I don't think there was any force

3    use during this, any use of that

4    policy.  I would have to look at the

5    use of force policy again to kind of

6    consider that, but I don't remember

7    that, no.

8    Q.    Okay.

9    A.    I would have made reference to

10   it, I think if I had.

11   Q.    And you would agree that use --

12   - the jail's use of force policies are

13   not something that inmates have access

14   to.

15         Correct?

16   A.    They shouldn't, yeah.

17   Q.    Okay.

18         Or members of the general

19   public?

20   A.    No, they shouldn't.

21   Q.    So, that type of information,

22   at least the information in the

23   County's use of force policy, that is

24   something that the County, the jail

25   specifically, takes steps to make sure

64

1    nobody outside the employee of the

2    County has access to.

3        Correct?

4    A.    We try to, yeah.

5    Q.    And that would be different

6    than, for example, where a particular

7    officer might be stationed on a

8    particular day.

9    A.    I don't --- I don't think it is

10   all that different.  I think that

11   there's information that you learn as

12   part of your employment, right,

13   especially in a correction facility,

14   that you're trusted with and you're

15   trusted to keep confidential.

16   Q.    Sure.

17   A.    So, if you're saying if there's

18   different categories of information,

19   you know, I don't know if the

20   correction policies really get into

21   that.  They just, they call it

22   confidential, right.  It's --- it's

23   work information.  It's not stuff we

24   share with the outside world.

25   Q.    Fair enough.

65

1        But what I'm asking, what I'm
2    saying is use of force policies are
3    not something that inmates would know
4    about.
5        Correct?
6                ATTORNEY BURNS:
7                Objection to form.
8                THE WITNESS:
9                Yeah, I mean, the actual
10    policies themselves?  No, I don't -
11    -- I don't think they would.  But
12    if they had seen force being used,
13    if they had it used on themselves,
14    they might understand a portion of
15    it, right?  Of what the --- what
16    the procedure was for that --- for
17    that use of force.
18    BY ATTORNEY MANSOUR:
19    Q.    Okay.
20        But they wouldn't know --- how
21    do I want to phrase this?  So, they
22    wouldn't know the circumstances that
23    would necessarily ---  or the rules
24    that would govern use of force, right?
25     They just know how it's used on them.

66

1          ATTORNEY BURNS:

2               Objection, form

3          THE WITNESS:

4               Yeah, I'm not sure.  I

5     mean, it's --- It really depends on

6     the inmate, right.  They may have

7     studied it.  They, you know, as far

8     as the County specific policies,

9     probably not.

10   BY ATTORNEY MANSOUR:

11   Q.    You mentioned the word

12   "tactics" in regards to information

13   that my client shared regarding

14   tactics.  What tactics did he --- what

15   tactics did he share with Attorney

16   Zeiger that you believe were

17   confidential?

18   A.     I think the movement of the

19   inmates, the directions, the guards

20   supervising, right.  How many guards

21   are supposed to be there, how many

22   folks are supposed to be present,

23   those sorts of things, during the

24   incident that occurred.

25   Q.     And why is that confidential?

67

1      So, like, let's say that, you know,

2      Attorney Kimbrough --- or Attorney ---

3      Lieutenant Kimbrough said there were

4      supposed to be three officers present

5      on the unit, but there were only two.

6              Why is that confidential?

7      A.      Well, I mean, if I --- I can't

8      speak for the public, but my best

9      guess is that could lead to, if --- if

10     the inmates know there's only so many

11     people available, they have a better

12     chance of overcoming those

13     individuals.  It has to do with

14     operations, right?  And it has to do

15     with internal information to the

16     correction facility.  And so, all that

17     would be kind of, it's non-public

18     information, right?  It's how we do

19     our business inside of the jail.  And

20     by its nature, its information should

21     be kept confidential.

22     Q.      Wouldn't --- you would agree

23     with me, isn't it true that any inmate

24     in the jail, particularly one that's

25     maybe been there for a while, would

68

1    know which officers are present on a

2    unit and which ones are not?

3                    ATTORNEY BURNS:

4                    Objection, form.

5                    THE WITNESS:

6                    They could, from their

7        experience.  But we certainly

8        wouldn't want our employees

9        distributing that information.

10   BY ATTORNEY MANSOUR:

11   Q.      Okay.

12   A.      Even if --- even if an inmate

13   that has spent some time there might

14   know it somewhere, right?  We don't

15   want our employees distributing that

16   confidential information.

17   Q.      Sure.

18           But that's something that the

19   inmates could observe themselves

20   without learning that information from

21   any of the officers that work in the

22   jail.

23           Right?

24   A.      They would have their own

25   experience, depending on what the

69

1    staffing was that day, sure, they

2    would.

3    Q.    And that's different from, for

4    example, the County's use of force

5    policies.

6         Right?

7         That's not something that the

8    inmates can just go read for

9    themselves if they wanted to.

10                   ATTORNEY BURNS:

11                   Objection, form.

12                   THE WITNESS:

13                   Is it different?  I

14       mean, it depends on if they've had

15       force used on them.  They might

16       have some knowledge of what that

17       escalation of force looks like, if

18       that's laid out in the policy, if

19       they've gone through.

20   BY ATTORNEY MANSOUR:

21   Q.    Well, they would know what

22   happened to them.

23         Right?

24   A.    Yeah.

25   Q.    But they wouldn't know what the

70

1   policies and procedures are regarding

2   the use of force.  They would just be

3   able to talk about what happened to

4   them.

5   A.    And I think the same would

6   apply for the, how many guards were

7   present, they don't know what the

8   policy says or how many should be

9   there, shouldn't be there.  And your

10   client had indicated that, right?  How

11   many should be there.  And that's, you

12   know, that's disclosure of

13   confidential information.  At least

14   that's what I found.

15   Q.    Now we, I asked you a few

16   moments ago about whether you knew

17   there was a protective order in the

18   Patterson matter.

19   A.    Mm-hm.

20   Q.    And you stated that you were

21   aware ---

22   A.    At some point, either before --

23   - if you were finished.

24   Q.    That's okay.

25   A.    Yeah, either before or after

71

1    this, I was aware.  I remember hearing

2    the word protective order related to

3    the, yeah, the Patterson case.

4    Q.    And I am at this point going to

5    show you what's already been pre

6    marked as P-4.

7    A.    Okay.

8    Q.    Which is a copy of the

9    emergency motion.

10   A.    Oh, okay.

11   Q.    That Attorney Zeiger filed.

12   And I want to point your attention to

13   paragraph three, and I'll read it.  It

14   says, "Plaintiff's Counsel," that is

15   Zeiger, "disclosed that there is an

16   active protective order regarding this

17   case and that Counsel would be happy

18   to listen to his story," his being Ara

19   Kimbrough's, "but would not comment

20   due to the protective order."

21         Did I read that correctly?

22   A.    Yes.

23   Q.    Okay.

24         So, the fact that Attorney

25   Zeiger was subject to a protective

72

1    order and could not discuss or

2    disclose any of the things that Ara

3    Kimbrough told him, given that fact,

4    how could inmates or other people have

5    learned about what our Kimbrough told

6    Attorney Zeiger?

7                        ATTORNEY BURNS:

8                        Objection, Form.

9                        THE WITNESS:

10                       It's --- that's not,

11       that wasn't my concern here.  My

12       concern more was the fact that this

13       confidential information was

14       disclosed.

15    BY ATTORNEY MANSOUR:

16    Q.      But it was your concern, sir,

17    wasn't it?  You mentioned earlier that

18    your concern was that this information

19    was sensitive or confidential and

20    could be used to harm inmates or

21    employees in the jail if it got into

22    the wrong hands.

23         Right?

24    A.      I did say that.  I agree with

25    that too.

73

1    Q.     And that was really the whole

2    gist of this investigation.

3          Right?

4          At least allegedly, is that he

5    disclosed information that was

6    confidential and could be used to harm

7    the jail.

8          Right?

9    A.     No, I wouldn't say that.  I

10   would say my concern here is more the

11   act of disclosing the information,

12   right.  The general nature of people

13   being harmed, sure, that's, if someone

14   was actually harmed, that would be ---

15   that would be awful.  That would be

16   terrible right.  Right now, we have in

17   the media, we have the Signal case,

18   right?  That --- where information was

19   disclosed and, you know, was anyone

20   harmed from that --- that inadvertent

21   or very advertent disclosure,

22   unauthorized disclosure, maybe it was

23   authorized, but was anyone harmed

24   there?  I would say no, nobody was

25   harmed.  But that doesn't make the

74

1    disclosure okay, right?  Same here,

2    right?  This disclosure, the fact that

3    you are sharing details, non-public

4    details with outside, with an outside

5    entity, that's --- that's what I found

6    to be a violation of the policy.

7    Q.    Okay, so if no harm could come

8    from the disclosure, what's the

9    problem with it?

10                    ATTORNEY BURNS:

11                    Objection, form.

12                    THE WITNESS:

13                    We have --- we have

14   policies that we must follow.  We ---

15   we have, we, as County employees, we

16   have information that we expect to

17   keep confidential and what we don't,

18   that's a violation of policy.  But

19   whether someone's hurt or not, it's a

20   violation of policy.  And as a

21   supervisor, as someone who's been in

22   the job for 16 years, a lieutenant, we

23   should --- we should know better than

24   to disclose information to outside.

25   And he, the general harm from

75

1    disclosing this or from other folks
2    having this information, yeah, there
3    could be some harm done.  But the fact
4    that the disclosure was made is --- is
5    the issue here.
6    Q.    Well, that's the purpose behind
7    you --- the purpose behind policies
8    against disclosure of confidential or
9    sensitive information.
10        Right?
11        Is that the disclosure of that
12   information could somehow harm the
13   interests of the jail in some way.
14        Right?
15   A.    Yeah, there's some deterrence
16   effect, right, from policies as well.
17    We don't want, if people thought, oh,
18   nobody gets hurt, I can tell, give out
19   all these Social Security numbers,
20   give birthdays out, all this private
21   information I have with people, I
22   could just give it to them as long as
23   nobody's harmed, it's okay.
24   Q.    Well, there's privacy interest
25   there.

76

1          Right?

2    A.      Yeah.

3    Q.      So, you know, you don't

4    disclose that kind of information or

5    the County wouldn't want employees

6    disclosing that kind of information

7    because it would harm the privacy

8    interests of the people who that

9    information belongs to?

10   A.      Sure.

11   Q.      Okay.

12   A.      Yeah.

13   Q.      So, there's a harm there that

14   the County is trying to prevent.

15   A.      Yeah, I would agree with that.

16   Q.      And under some circumstances

17   you would agree with me, there is some

18   confidential or sensitive information,

19   for example, use of force policies,

20   the County wouldn't want disclosed to

21   anybody outside of the County because

22   in the wrong hands, it could

23   potentially cause harm.

24          Right?

25   A.      I agree with that as well.

77

1    Q.    Okay.

2          But in this case, considering

3    that Attorney Zeiger was subject to a

4    protective order and couldn't disclose

5    that information to anybody else, the

6    possibility of harm was mitigated.

7          Right?

8    A.    I agree that the possibility of

9    harm was mitigated.  That doesn't

10   defeat the fact that he violated

11   policy.  Again, just because someone

12   wasn't harmed because it was given to

13   this attorney, doesn't defeat the

14   deterrence aspect of policy, right, to

15   not disclose information to whoever we

16   choose.  And, you know, it's

17   important, right?  Just because it

18   didn't harm someone in this case

19   doesn't make it not a violation of the

20   policy.

21   Q.    Are you aware of any

22   investigations that the County, and by

23   extension, the solicitor's office has

24   ever done into other employees who

25   have allegedly disclosed confidential

79

1    Q.    I mean, chances are if you did

2    do a thorough investigation, there'd

3    probably be a lot of people who would

4    be fired for violating

5    confidentiality.

6         Right?

7              ATTORNEY BURNS:

8              Objection, form.

9              THE WITNESS:

10             And I can't speak to why

11    this individual was fired.  I can

12    tell you why I found him in

13    violation of County policy.  But I

14    had --- I had no --- no part of

15    the, you know, the termination or

16    suspension, as you mentioned

17    earlier.

18    BY ATTORNEY MANSOUR:

19    Q.    He told you that he --- he

20    shared this information with his

21    therapist.

22         Did that violate

23    confidentiality?

24    A.    I understood that to be the,

25    kind of the staffing, general staffing

80

1    concerns from our communication.  I

2    didn't understand it to be the

3    detailed nature that he had given Mr.

4    Zeiger here.

5    Q.    Did you ask him that?

6    A.    I don't remember if I followed

7    up, but that was my understanding, is

8    that it was more of a general nature

9    and that he only gave the --- cause I

10    remember asking him about media, and

11    he said, no, I wouldn't have given

12    this to the media.  Or he said, I

13    didn't give this to the media.  I

14    remember him saying something about, I

15    have to get authorization to disclose

16    things to the media.  And him not

17    thinking he had to disclose, get

18    authorization disclosed to outside

19    attorneys, which --- which surprised

20    me that he thought that.

21    Q.    If he told you, had told you,

22    that he did share details with his

23    therapist, for example, the same level

24    of detail that he shared with Attorney

25    Zeiger, in your view, would that have

81

1    been a violation of confidentiality?

2                    ATTORNEY BURNS:

3                    Objection, form.

4                    THE WITNESS:

5                    I don't know.  I'd have

6        to --- I'd have to look at his ---

7        yeah, I don't know.

8    BY ATTORNEY MANSOUR:

9    Q.      Why don't you know?

10   A.      What's that?

11   Q.      Why don't you know?

12   A.      I'd have to look at his medical

13   situation, perhaps.  I just, there's -

14   -- there's too much there.  I think it

15   probably would be, but I'd also have

16   to look and see what his medical

17   situation is or maybe something at

18   play there.  I'm not sure.

19   Q.      Why would that be relevant,

20   what his medical situation is?

21   A.      You know, like, is he being

22   treated for this, what he observed

23   that day, right?  Is that why he's

24   seeing this therapist?  Is it marriage

25   counseling?  Is it --- it could be ---

82

1     it could be a number of things, right?

2     And so, if he's actively dealing with

3     this situation that happened two years

4     prior, you know, that would be a ---

5     that might be --- that might be

6     mitigation, I guess, as far as that

7     disclosure goes.

8     Q.     Okay.

9           So, I think what he said here

10    in his notes was, after the Patterson

11    incident, he sought counseling and

12    apparently, shared this information

13    with his therapist.  This is on page

14    three of 1108.

15    A.     Okay.

16    Q.     So, let's assume for the sake

17    of this question, that he shared this

18    information with his therapist in

19    order to seek counseling because he

20    was distraught by what happened.

21          Would that justify or would he

22    have been violating the County's

23    confidentiality policies?

24    A.     I think he would be.  I think

25    there would be some mitigation there,

83

1    though.  I would have, there'd be

2    mitigation there.  Would it be a

3    violation of policy?  Probably, yeah.

4    Q.      What would --- what do you mean

5    by mitigation?  What do you mean it

6    would be mitigation?

7    A.      Well, it's like, you know,

8    like, if you --- if you steal to feed

9    your family, right?  There's maybe

10   some mitigation or extenuating

11   circumstances surrounding it, right?

12   If --- if he had shared this

13   information with a therapist in order

14   to --- seeking medical care, right ---

15   right after the incident, then that

16   would be, you know, mitigation, right?

17   He would say, hey, I told my

18   therapist, but I told him because I

19   needed to get better.  I needed to be

20   able to handle this.  You know, I knew

21   it was wrong. I knew I shouldn't share

22   confidential information, but I shared

23   it with my therapist because I needed

24   to get healthy.  That would be

25   something that I would have referenced

84

1  in my interview as potential

2  mitigation as far as any kind of

3  punishment for that violation of

4  policy.

5  Q.    So, what's the difference

6  between that scenario, of him sharing

7  this information with his therapist in

8  order to get counseling and what

9  actually happened in terms of him

10  sharing this information with Attorney

11  Zeiger?

12  A.    I think some of it is timing.

13  Some of it is him failing to, at least

14  in my interview, right, failing to

15  acknowledge the gravity of the release

16  of confidential information.  I would

17   --- I would expect somebody with the

18  experience level that he has to have

19  more --- a better sense of why this

20  information should remain

21  confidential, right?

22  Q.    Okay.

23      But my question is, what is the

24  difference between him sharing this

25  information with his therapist versus

85

1    him sharing it with Attorney Zeiger?

2    A.    I think I answered it.  I said

3    timing, right?

4    Q.    Okay, so let's stop there.

5          Let's take a little bit, so

6    what do you mean by timing?

7    A.    I don't remember this from the

8    interview, but the notes here say that

9    he, after the incident, he sought some

10   counseling, right?  So, dealing with

11   right afterwards versus two years

12   after, when he gets notified of a

13   disciplinary action, and then he calls

14   him at home that night.

15   Q.    Okay.

16         So, he was notified of

17   disciplinary action on May 30th, he,

18   being my client, he was notified of

19   disciplinary action on May 30th.  And

20   according to Attorney Zeiger, he, my

21   client contacted Attorney Zeiger later

22   that evening on May 30th.

23         Correct?

24   A.    Yeah, that's my --- that's my

25   memory.

86

1    Q.    And that's what you're
2    referring to as the timing.
3    A.    Yeah, that and it being
4    different from that --- you asked me
5    the difference for therapist, right?
6    And it's two years after the incident.
7    Q.    So, would your analysis change?
8    Let's just say that my client told
9    his therapist also on May 30, 2024,
10   after he got notice of a disciplinary
11   hearing.
12                ATTORNEY BURNS:
13                Objection.
14                ATTORNEY MANSOUR:
15                Would that change your
16   analysis?
17                ATTORNEY BURNS:
18                Objection, form.
19                THE WITNESS:
20                I --- I don't know.
21   BY ATTORNEY MANSOUR:
22   Q.    That would make a difference?
23   A.    Yeah, it could, right.  I mean,
24   you know, like, PTSD is a weird thing,
25   a weird disease, a weird disorder.

87

1    So, if it only impacted him two years

2    later and he sought help for that, it

3    hit him because something reminded him

4    of it, right, then it could be the

5    same analysis, right.

6    Q.    So, let's kind of maybe cut

7    through the clutter.  So, the

8    implication from you and from what

9    I've gathered from a number of other

10   witnesses in this case, is that the

11   implication is that my client was

12   acting in a retaliatory manner by

13   contacting Attorney Zeiger after he

14   had received notice of his

15   disciplinary hearing.

16            Right?

17                 ATTORNEY BURNS:

18                 Objection, form.

19                 THE WITNESS:

20                 Yeah, I didn't ---

21   BY ATTORNEY MANSOUR:

22   Q.    Is that the --- was that the --

23   - the --- the gist that you got from

24   the timing?

25                 ATTORNEY BURNS:

88

1              Objection form.

2                    THE WITNESS:

3                    Was that the gist that I

4        got, that he was retaliating

5        against ---

6    BY ATTORNEY MANSOUR:

7    Q.    Yeah.

8          Why did --- why is that

9    suspicious to you that he contacted

10   Attorney Zeiger on the same day that

11   he received notice of his disciplinary

12   hearing, so what?

13                    ATTORNEY BURNS:

14                    Objection, form.

15                    THE WITNESS:

16                    So, why --- say the

17       question again.  I'm sorry.  Why is

18       it --- why is it ---

19   BY ATTORNEY MANSOUR:

20   Q.    Yeah, why does that matter?

21   A.    Why does it matter?

22   Q.    That he contacted Attorney

23   Zeiger on the same day he got notice

24   of his disciplinary hearing?  So what?

25    Why does that matter?

89

1    A.    What mattered to me is that he

2    didn't understand the --- you asked me

3    first, like, the difference between

4    therapist and the disclosure to

5    Zeiger.  Really what ---  really, what

6    I remember and what I took away from

7    this whole interview was that he

8    failed to see the gravity of releasing

9    this information, two years

10   afterwards.  He felt --

11   Q.    Or did he fail to --- I'm

12   sorry.  Go ahead.

13   A.    No, that was what bothered me.

14   And then even when we talked about it

15   for a while, he still didn't accept,

16   he didn't acknowledge that was a

17   really bad thing to do.  To disclose

18   information that is internal to the

19   County, to an outside entity, whether

20   it be media or, you know, online, or

21   in this case, a defense attorney or a

22   plaintiff's attorney.  You know, like,

23   that --- that's what bothered me,

24   right?  That's --- that's why I made

25   the findings I did.

90

1    Q.    So, the fact that he disclosed

2    this information to Attorney Zeiger,

3    who is actively suing the County, was

4    a factor in your analysis?

5    A.    That's how we became aware of

6    it.  Was it a factor that he --- it

7    was a factor.  It wasn't the greatest

8    factor.  The biggest issue I had is

9    that he didn't comprehend what he had

10    done.  He wouldn't acknowledge it,

11    even when we talked about it for a

12    while, he still was like, I don't

13    think it's a big deal kind of thing.

14    That's what --- that's what bothered

15    me about the interview.

16    Q.    Okay.

17          And clearly you thought it was

18    a big deal.

19    A.    Yeah, I think it's a big deal

20    to protect County information.

21    Q.    Okay.

22          And you thought it was a big

23    deal because he disclosed that

24    information to Plaintiff's Counsel.

25    A.    That's how we found out about

91

1    it.  But if I had heard he called the
2    newspaper and said the same thing, I
3    would have had similar findings.
4    Q.    You're an attorney, right?
5    A.    Yes.
6    Q.    Okay.
7    A.    Yeah.
8    Q.    And not only are you an
9    attorney, but you're an attorney who
10   works for a public entity.
11        Correct?
12   A.    My whole life.  Well, other
13   than about a year and a half.
14   Q.    Okay, so then I take it, based
15   on your experience, that you're aware
16   of Section 1983 of Title 42.
17        Right?
18   A.    I'm aware of it.
19   Q.    And you're aware that those are
20   the claims that are asserted in this
21   case, violations of Section 1983.
22   A.    I am not aware of the claims in
23   this case.  I --- I only am aware of
24   my part of this, and that was the
25   interview I did.

92

1    Q.    Okay, so I'll represent to you,

2    those are the two claims in this case

3    against the individual defendants and

4    the County, violation --- violations of

5    of Section 1983.

6    A.    Okay.

7    Q.    Are you --- do you know what

8    section 1983 is?

9    A.    What, I think there's several

10   parts.  Is there one part that he ---

11   I'm not, you'd have to educate me a

12   little bit.

13   Q.    Okay.

14         So, Section 1983 ---

15   A.    I don't do any employment laws.

16   Q.    That's okay, I'll summarize.

17         So, Section 1983, at least in

18   the context of --- so, generally,

19   allows individuals to sue government

20   agents when those government agents

21   violate the individual's

22   constitutional rights.

23   A.    Yep.

24   Q.    Okay.

25   A.    Yeah.

93

1          I think it's search and
2     seizure.
3     Q.     Many --- many times it comes up
4     in the context of search and seizure.
5     In the context of prisons, you often
6     see 8th Amendment claims, violations
7     of 8th Amendment rights with regards
8     to cruel and unusual punishment, 14th
9     Amendment rights.
10         Are you also aware of the fact
11    that Section 1983 protects First
12    Amendment rights?
13    A.     I believe it does.  I don't
14    doubt you when you say that.
15    Q.     Okay.
16    A.     This isn't really my area of
17    the law.
18    Q.     Okay.
19         So you, and you also understand
20    that the First Amendment, among other
21    rights, protects the right to free
22    speech?
23    A.     I do know that.
24    Q.     And are you aware of the fact
25    that public employees have certain

94

1    free speech rights in the workplace?

2    A.    I, they have some free speech

3    rights.    That's right.

4    Q.    And that when a government

5    employer violates an employee's free

6    speech rights, that employee has a

7    cause of action under Section 1983.

8         Are you aware of that?

9    A.    Wouldn't surprise me.

10   Q.    Did you consider, at any time

11   during your investigation into my

12   client, whether his speech was

13   protected by the First Amendment?

14        By his speech, I mean more

15   specifically, his conversation with

16   Attorney Zeiger.

17   A.    I did not feel it was protected

18   by the First Amendment.

19   Q.    Did you do any legal research

20   into that matter?

21   A.    I've had some experience

22   dealing with government employees and

23   confidential information.    And based

24   on my past experience, I --- I did not

25   feel like this was First Amendment

                                                    95

1    material.

2    Q.      Okay.

3            You did not do any legal

4    research?

5    A.      I didn't do separate legal

6    research in regards to this interview,

7    no.

8    Q.      Did you know, can you tell me,

9    based on your knowledge, what kind of

10   speech, public employee speech, is

11   protected by the First Amendment?

12   A.      Well, I mean, as a public

13   employee, I deal with it, with

14   elections sometimes, right?  You can

15   have some speech you can't be fired

16   for, you know, certain political

17   statements you make, especially

18   outside of your employment, right?

19   Just your status as a County employee.

20    You can still run for office.  You

21   can make certain speech --- certain

22   speech is protected there.  You know,

23   there's whistleblower information

24   that's protected by the First

25   Amendment as well, and federal

96

1    statute.  You know, those are the, I
2    guess, those are the two incidents
3    that come to mind to me.
4    Q.    Okay.
5         Do you know, and maybe you
6    don't.  That's fine if you don't.  The
7    legal standard for protected speech
8    under the First Amendment, what kind
9    of speech constitutes protective
10   speech under the First Amendment?
11   A.    I don't know off the top of my
12   head.
13   Q.    If Attorney --- or Lieutenant
14   Kimbrough had shared the same
15   information at, for example, a County
16   prison board meeting, had stood up and
17   said, I think there's lots of
18   understanding --- understaffing at the
19   jail.  This is what happened with
20   Patterson.  Officer was pulled, able
21   to sneak drugs in, everything he told
22   Zeiger, had he stood up and said that
23   at a County prison board meeting,
24   would he have been violating County
25   confidentiality policies?

97

1    A.    I'd have to look at it.  Was he
2    authorized to, is he speaking on
3    behalf of  --- is he speaking personal
4    capacity?
5    Q.    As a citizen.
6    A.    I think that one would likely
7    be a violation of County policy if he
8    wasn't authorized to release that
9    information.  I don't believe that he
10   could release it at a public meeting
11   like that.
12   Q.    Would it be protected by the
13   First Amendment?
14   A.    I don't think it would be
15   protected by the First Amendment, but
16   I haven't researched that issue
17   specifically.
18   Q.    Based on your understanding,
19   your limited understanding of First
20   Amendment law ---
21   A.    I think that's fair.
22   Q.    In the employment context, is
23   it possible for employee speech that
24   violates a County policy to still be
25   protected by the First Amendment?

98

1    A.    Yeah, I think that's possible.

2    I think policies aren't always

3    constitutional, as written, right?

4    And so, yeah, there's certainly times

5    where municipality or County may have

6    a policy that doesn't meet First

7    Amendment muster or Constitution

8    muster.

9    Q.    Or --- and I think maybe you're

10   talking about what we would typically

11   refer to as a facial challenge, right.

12   So, the law or policy or regulation,

13   on its face, is unconstitutional under

14   all circumstances.  But what about an,

15   as applied standard?  So, for example,

16   this particular policy, while in some

17   instances may be constitutional as

18   applied to one person, may be applied

19   in an unconstitutional manner.

20                ATTORNEY BURNS:

21                Objection.

22   BY ATTORNEY MANSOUR:

23   Q.    Are you --- are you ---

24   A.    I don't know what the question

25   is.

99

1    Q.    Is it possible for a --- an
2    otherwise constitutional policy to be
3    applied in a manner that violates the
4    First Amendment?
5    A.    I don't know this area of the
6    law well enough, but I suppose it's
7    possible.  I don't --- I can't say for
8    sure.
9    Q.    And again, I just want to be
10   clear, you, yourself, never did any
11   sort of legal analysis into whether my
12   client's conversation with Attorney
13   Zeiger was protected by the First
14   Amendment.
15   A.    I relied on my experience with
16   the First Amendment with government
17   employees and confidential
18   information.  I did not do any
19   additional research before I conducted
20   the interview.
21   Q.    Okay.
22         So, what's your experience with
23   government employees and confidential
24   information and the interplay between
25   that and the First Amendment?

100

1    A.    You know, throughout my, I've

2    been working for various governments

3    from federal --- I never worked for

4    the state government, federal, County,

5    local municipalities, right,

6    oftentimes government employee speech

7    is  --- is limited because of their

8    employment.  You know, the --- you

9    know, when you are trusted with

10   certain information as part of your

11   employment, you're not allowed to

12   release that information.  And that's

13   a theme that's, I've had throughout my

14   career as an attorney.  I've been

15   aware of.  I mean, there's outlets

16   for, if you have a concern about your

17   safety or about someone else's safety

18   or fraud, waste, and abuse, you have

19   whistleblower statutes.  You have

20   other ways to provide that

21   information, but you don't release

22   information unless it's authorized.

23   Q.    Can you turn to page, so it's

24   1110 of Exhibit P-15?

25   A.    Yeah.

101

1    Q.    So, maybe about two thirds of

2    the way down, you ask, it says, "DG, I

3    don't know why you felt you were

4    authorized to share the info."

5         Do you see that line?

6    A.    I don't know, yep.

7    Q.    Okay.

8         So, you had asked him, "I don't

9    know why you were you --- I don't know

10   why you felt you were authorized to

11   share the info.  Did someone tell you

12   that you could?"

13        And my client's response was,

14   "It's an ongoing issue at the jail

15   that hasn't been corrected."

16        Then you asked him, "Do you

17   feel like you're a bit of a

18   whistleblower?"

19        And he said, "I don't know."

20        My question to you is, do you

21   feel like my client was a bit of a

22   whistleblower?

23   A.    No, I don't.

24   Q.    Okay.

25        And why not?

102

1    A.    Why did I not feel like he's a

2    like he's a whistleblower?  The ---

3    his general concerns were well known

4    to the County about staffing, right.

5    It's not a, the County jail has had

6    staffing issues, at least since I've

7    been here.  So, that wasn't --- that -

8    -- and that wasn't --- folks knew

9    about that, right?  So, it wasn't

10   something that he was bringing to

11   light.  That, when I think about a

12   whistleblower, it's someone who brings

13   an issue to light that people aren't

14   aware of, right?  And that's not the

15   situation.

16   Q.    Okay.

17         So, then based on that

18   response, how did he share

19   confidential information if the issues

20   he brought to light were already known

21   by other people?

22   A.    The staffing issues were

23   certainly known to other people,

24   right?  The, as a, again, as a County

25   employee, you're trusted with

1    information, with confidential

2    information to not disclose.  And ---

3    and he did that in this case, right.

4    Not about staffing, but about what

5    actually happened in this other

6    situation.

7    Q.    Okay, but I think you just said

8    that you don't view him as a

9    whistleblower because the information

10   that he shared was already generally

11   known by other people.

12                   ATTORNEY BURNS:

13                   Objection, form.

14   BY ATTORNEY MANSOUR:

15   Q.    Is that what you said?

16   A.    Yeah, I think that's what I

17   said.

18   Q.    Okay, so that being the case,

19   how is it that he violated

20   confidentiality if the information he

21   shared was already generally known by

22   other people?

23   A.    We're talking about two

24   separate bits of information here.

25   One is the staffing issue, the other

104

1    is the events that happened to

2    Patterson.

3    Q.    Okay.

4          So --- so what you're saying

5    is, with regards to his general

6    concerns about staffing, he's not a

7    whistleblower because that information

8    was generally known by other people.

9          Right?

10   A.    Yeah.

11   Q.    Okay.

12         And your definition of

13   whistleblower, I'm taking, based on

14   your answer, correct me if I'm wrong,

15   is that a whistleblower who shares

16   information, is a person who shares

17   information that is not generally

18   known by other people.

19   A.    Yeah, and, you know, discloses

20   it to the proper channels is a big

21   part of the --- was the law or policy,

22   right?  The CO, the law department,

23   or the --- actually, law department, I

24   don't think  --- it's HR director or

25   the CO are the two people in the

105

1    policy.

2    Q.    Okay.

3          And I'm not talking

4    specifically about the County's

5    whistleblower policy or even the

6    state's whistleblower law.  You are

7    familiar with the state's

8    whistleblower law.

9          Right?

10   A.    I'm --- I'm familiar with the

11   County's policy.

12   Q.    Okay.

13         So, the County's policy is not

14   law?

15   A.    Right.

16   Q.    And my client, or nobody else

17   can sue the County for violating their

18   own policy.

19         Right?

20   A.    Well, I wouldn't say that, but.

21   Q.    I mean, anybody could sue for

22   anything, but they --- they wouldn't

23   have a viable legal claim.

24   A.    I wouldn't think they would.

25   Q.    You violated your own internal

106

1    policy.
2          Right?  Because policies are
3    not legal laws.
4    A.     Yeah.
5    Q.     Okay.
6    A.     Yeah.
7    Q.     So, with respect to staffing,
8    you're claiming that my client was not
9    a whistleblower because him sharing
10   his general concerns about staffing
11   were already known by people outside
12   the County.
13         Right?  That's what --- that's
14   what makes him not a whistleblower?
15   A.     Yeah, I think.
16   Q.     So, does it also follow from
17   that him sharing his general concerns
18   about staffing did not violate the
19   County's confidentiality policies?
20   A.     I'm sorry, you lost me.
21   Q.     Does it also, so from your
22   conclusion.
23   A.     Yeah.
24   Q.     That he is not a whistleblower,
25   because the information about staffing

107

1    that he shared was already generally

2    known.   Does it follow from that his

3    sharing of that information was not a

4    violation of the County's

5    confidentiality policies?

6                    ATTORNEY BURNS:

7                    Objection, form.

8    BY ATTORNEY MANSOUR:

9    Q.    Because it was already known.

10   A.    Yeah, if someone says the jail

11   is understaffed, I don't think that's

12   confidential, that would qualify, that

13   statement alone is confidential

14   information, like, generally speaking.

15    But if they're saying on such and

16   such a date, the jail is understaffed,

17   you know, like, we didn't have that

18   many people on shift today, then that

19   would be --- that would be a factual

20   matter that would concern me, and I

21   think that would be confidential.

22   Q.    Okay.

23         So, I just want to clarify.

24   So, you're, just going back, and I

25   want to make sure we're clear on this.

108

1    So, your definition of a
2    whistleblower be somebody who shares
3    information that is not generally
4    known by people outside of the
5    organization?
6    A.    I mean, there's, you know, when
7    --- shares information, it has to be a
8    certain type of information.  I think
9    our.  I mean, it all started with this
10   question, right?  Do I feel like
11   you're --- do I feel like you're a bit
12   of a whistleblower?  Do you feel like
13   you're a bit of a whistleblower?  I
14   was trying to get a sense of where he
15   was, right, and ---
16   Q.    I'm trying to get a sense of
17   why you would ask him that question.
18   A.    Why did I ask him that
19   question?
20   Q.    Is it because you felt like he
21   was a bit of a whistleblower?
22   A.    No, I don't --- I don't --- I
23   didn't ever feel like he was a bit of
24   a whistle --- I was trying to get all
25   the facts out, right.  To understand,

109

1    like, where he was coming from, why he
2    would have made this, release this
3    information.  That was, to me, clearly
4    confidential information.  And, you
5    know, like his denial that it was
6    information that should be kept in
7    house.  I was trying to get a sense of
8    where he was at.  That's why I asked
9    that question.
10   Q.    So, with respect to the other
11   details that he shared with Attorney
12   Zeiger, regarding one officer being
13   pulled off the unit, the inmate being
14   returned to his dirty cell, which
15   wasn't locked, all the stuff that you
16   detailed earlier.
17   A.    Yeah.
18   Q.    With respect to that
19   information, was my client a
20   whistleblower or a "bit of a
21   whistleblower," to use your words?
22   A.    I --- I don't --- I don't think
23   he was a whistleblower.  That's ---
24   no, I don't think he was.  I don't
25   think that would --- yeah, I don't ---

110

1    I don't think so.

2    Q.    Why not?

3    A.    I guess when I think about

4    whistleblower, I think about people

5    who make reports to authorized

6    individuals, right?  And that wasn't

7    what happened in this case.  So, I

8    wouldn't categorize that as

9    whistleblower that, you know, as the

10   term whistleblower as I know it.

11   Q.    So, a person who makes a report

12   to New York Times reporter would not

13   be a whistleblower?

14   A.    I don't know.  I don't --- I'd

15   have to think about that, but I don't

16   --- I don't think so.  I think in

17   order to be, you know, like there's a

18   term that is defined in County policy,

19   in state federal law, whistleblower

20   versus just kind of the general term

21   whistleblower really depends on how

22   that word is being used.  I mean, if

23   he was going to contact the New York

24   Times about this, he would have to get

25   authorization, he knows that.  That's

111

1  a different --- that's a different

2  scenario to me than what happened

3  here, right?

4  Q.    In your opinion, as a

5  practicing attorney for a public

6  entity, and especially with your

7  opinion, with your experience and in

8  the public employee context, like you

9  talked about before, had he shared

10  this information with a newspaper

11  reporter, are you saying that would

12  not have been protected by the First

13  Amendment?

14                    ATTORNEY BURNS:

15                    Objection, form.

16            THE WITNESS:

17            I think it would be a

18    violation of the County policy if

19    he shared this, unauthorized, with

20    a newspaper.

21  BY ATTORNEY MANSOUR:

22
23  Q.    Understood.

24        Would it have been protected by

25  the First Amendment?

26  A.    I don't know.  I haven't done

112

1    that research.

2    Q.    But you would agree with me, it

3    doesn't necessarily follow that just

4    because it violated policy, it's

5    therefore necessarily not protected by

6    the First Amendment.  Those are two

7    different analyses, right?

8                    ATTORNEY BURNS:

9                    Objection, form

10                   THE WITNESS:

11                   Yeah, I get your point.

12       I think there may be a time where

13       somebody violates policy when it's

14       protected.  I think that's what

15       you're getting at.  I think that's

16       probably true.

17   BY ATTORNEY MANSOUR:
18

19   Q.    But this was not one of those

20   times, where him sharing that

21   information with somebody outside of

22   the County is protected by the First

23   Amendment, is that ---

24   A.    No, not in my opinion.  That's

25   not what my findings were, when I did

26   my interview, I felt like it was a

113

1    violation of the policy.  And again,
2    like, the, my bigger concern was the
3    fact that he couldn't appreciate the
4    gravity of that after the fact.
5    Q.     Well, and I'm still trying to
6    figure out what the gravity of that
7    is.  I mean, correct me if I'm wrong,
8    but it seems to me like the County's
9    biggest problem here was that he
10   shared that information with a lawyer
11   who was suing the County.
12   A.     No, I mean, I don't know about
13   the County's biggest problem.  My
14   biggest problem is that we entrust
15   County and employees with information
16   every day as --- as County employees,
17   and for him, as a corrections
18   employee, it's what happens at the
19   jail every day.  And we're not ---
20   we're entrusted enough as government
21   employees not to go telling everyone
22   about that confidential information.
23   Q.     But he didn't tell everyone.
24          Right?
25          He told --- your evidence that

114

1    you have is that he told one person.

2    A.    That's what we know of.  Yeah,

3    that's right.  And that's my problem

4    here is, and then the fact that he

5    wasn't willing or able to acknowledge

6    the --- that that was a bad thing to

7    do afterwards.  That was my issue.

8    Q.    I just want to clarify for the

9    record, there's no, your investigation

10   did not reveal that he disclosed any

11   of this information to anybody other

12   than Attorney Zeiger.

13   A.    No.

14   Q.    Except he mentioned his

15   therapist, generally his therapist.

16   A.    But that was just staff --- the

17   way I understood, that was staffing.

18   Q.    Okay.

19         So, in terms of the

20   particulars.

21   A.    Yeah.

22   Q.    You're not aware of him

23   disclosing this information to anybody

24   other than Attorney Zeiger?

25   A.    I'm not.

115

1    Q.    All right, so this is a

2    document pre-marked as, I'm sorry, as

3    P-5.

4    A.    Okay.

5    Q.    Yeah, that one works.   Yep.

6         I want to turn your attention

7    to the third page of that document.

8    COB 1114, paragraph 8.

9         So, in --- and actually, first,

10   I just want to confirm what we're

11   looking at here.   So, this, if you

12   turn to the first page, so, this

13   memorandum is one that you wrote?

14   A.    Yes.

15   Q.    Okay.

16        It's dated June 13, 2024.

17   A.    Yep.

18   Q.    Which would be the day after

19   you interviewed my client.

20   A.    That's right.

21   Q.    And this was provided to Amy

22   Fitzpatrick, the County solicitor.

23   A.    Yes.

24   Q.    Was this written at her

25   request?

116

1    A.    Was it written --- yeah, I
2    would say it was written at her
3    request.  She gave me the job to
4    interview him, and so, I interviewed
5    him to provide a memo.
6    Q.    Did you provide this memo to
7    anybody other than Ms. Fitzpatrick?
8    A.    I sent it to her.  That's it.
9    Q.    Okay.
10         So, turning to the third page,
11   paragraph 8, you wrote "The
12   description of the Rhodes incident
13   made by Lieutenant Kimbrough to PC,"
14   PC being Plaintiff's Counsel?
15   A.    Yes, yeah.
16   Q.    That being Attorney Zeiger.
17   A.    Yes, same person.
18   Q.    So, "The description of the
19   Rhodes incident made by Lieutenant
20   Kimbrough to PC contained in the
21   motion ---"  The motion being that, P-
22   4, that emergency motion that's under
23   file.
24   A.    Yep.
25   Q.    Okay.

117

1          " --- is an accurate summary of

2     the report Lieutenant Kimbrough made

3     to PC on May 30, 2024.  I make no

4     finding regarding what actually

5     happened during the Rhodes incident.

6     This finding only confirms that

7     Lieutenant Kimbrough's report of the

8     incident to PC was accurately

9     summarized by PC in his motion."

10         What I understand from that,

11     correct me if I'm wrong, is that what

12     att --- what Ara Kimbrough told you in

13     your June 12th interview is

14     essentially the same as what Attorney

15     Zeiger said in his motion?

16     A.     Yes, that's right.

17     Q.     Okay.

18            And that would be that

19     paragraph four of ---

20     A.     Yes, that's accurate, yeah.

21     Q.     Is that P-4?

22     A.     Yeah, P-4, paragraph four.

23     Q.     Yeah.

24     A.     Yep.

25            So, what you're saying is that

118

```
 1    Attorney Zeiger, what he says there in
 2    that paragraph four is essentially the
 3    same as what Ara Kimbrough told you?
 4    A.     Yeah, he confirmed that this is
 5    what he told him.
 6    Q.     Okay.
 7           Now, you had mentioned before
 8    that you believe my client violated
 9    County policy by disclosing
10    confidential information to Attorney
11    Zeiger.
12           Correct?
13    A.     Yes.
14    Q.     Okay.
15           And you believe that
16    information was confidential because
17    it was not generally known outside of
18    the County?
19    A.     Yes, I think that's right.
20    Yeah.
21    Q.     Okay.
22    A.     It contained tactics,
23    procedures, that sort of thing.
24    Q.     Okay.
25           Now we depose Attorney Zeiger
```

119

1    in this case.

2         Are you aware of that?

3    A.    I think I am.  I think I heard

4    that he was deposed.

5    Q.    Who'd you hear that from?

6    A.    My wife.

7    Q.    Did she tell you what he said?

8    A.    No.

9    Q.    No.

10        Well, I asked him about this

11   paragraph four.  And he said that,

12   indeed, that is everything that my

13   client said.  And he also said,

14   testified, that he was already aware

15   of everything my client told him.  He

16   knew it all before my client told it

17   to him.

18        Does that change your analysis

19   of whether the information my client

20   shared was confidential?

21   A.    No.

22   Q.    Why?

23   A.    Again, it's information that he

24   received as part of his work for the

25   County.  It's information that we're

120

1   protected with every day. It ---
2   regardless of whether it's known
3   already, it doesn't authorize you to
4   disclose it.
5   Q.    But that contradicts what you
6   just testified a moment ago, that the
7   reason it's come confidential is
8   because it's not already known by
9   people outside the County.
10  A.    I don't think that's what I
11  said, if I said, I'll clarify.  The
12  reason why we protect information
13  inside the jail, maybe not this
14  specific information, but general
15  information inside the jail, right, is
16  that if it's released, there is
17  potential for harm to other
18  correctional officers.  And then also,
19  there's the deterrence aspect of it,
20  right?  We have to have policies in
21  place so people aren't sharing
22  everything they learn at work with
23  everyone outside or with people
24  outside.
25  Q.    I --- I --- and I understand,

121

1    you know, generally, and I don't want

2    to --- I don't want to --- I don't

3    care about generally.  What I want to

4    know is specifically about this case.

5    So, I understand the County's general

6    concern with sharing information that

7    could cause harm to employees or

8    inmates.  But I want to know

9    specifically about the specific

10   information my client shared with

11   Attorney Zeiger.  The fact that

12   Attorney Zeiger, or at least that he

13   testified under oath that the

14   information my client shared with him,

15   he already knew all of it.

16        How is that confidential?

17   A.    It doesn't matter to me, that

18   fact, the fact of the matter is that

19   this  --- this was information that

20   belonged to the County and your client

21   disclosed it without authorization.

22   That's --- that's what, it's

23   confidential information and he

24   disclosed it without authorization.

25   Q.    Okay.

1          So, are you then saying it
2     makes it confidential --- I'm not
3     trying to confuse you, I'm just really
4     trying to get an understanding of
5     what, in your view, makes this
6     information confidential.  So, you're
7     saying this information that he shared
8     with Attorney Zeiger was confidential
9     because he didn't have authorization
10    to disclose it?
11    A.    It's part of it, right.  In my
12    mind, confidential is non-public
13    information, right.  Things that we
14    have as part of our job, that we, you
15    know, internal to our, whatever our
16    County role is here, it's corrections,
17    it's tactics, procedures, things that
18    happen inside the jail, right.  He
19    knew he needed to go talk to one of
20    his other supervisors if he got --- if
21    he got a media request, he knew not to
22    release things to the media.  He knew,
23    other folks knew, that in order to
24    talk to outside attorneys that you
25    needed to go get authorization to do

123

1    so.  He didn't do that in this case,

2    right?  So that tells me, when I've

3    heard that, that that's confidential

4    information.  When you release things

5    that you learn about your job or learn

6    as part of your job, to the outside

7    world that's non-public.  That's

8    confidential information.

9    Q.     Okay.

10          But he didn't share it with the

11   public, my client.

12          Right?

13          He did not share this

14   information with the public.  He

15   didn't go stand on a street corner and

16   yell it out to the public or go to a

17   public prison board meeting and stand

18   up and say it there.

19          Right?

20          That's not what happened here.

21   A.     No, he didn't do that.  But he

22   disclosed it outside of the correction

23   facility.

24   Q.     To one person.

25   A.     Yes.  Well, yes.

124

1    Q.    Who testified --- who testified

2    that he already knew all of it.

3    A.    I don't --- I can't comment on

4    that.

5    Q.    Well, I'm telling you, he

6    testified.  So, I'm trying to get an

7    idea of why it's still considered

8    confidential.  Is it confidential

9    because he didn't have authorization

10    to disclose it?

11    A.    My analysis would have been

12    different if someone would have

13    authorized him to call this attorney

14    and provide this information, yes.

15    Q.    Okay.

16    A.    Like you do when you have a

17    subpoena or something of that nature.

18          He didn't have any of that in

19    this case.  He called on his own with,

20    from home, without any, you know,

21    without checking with his supervisor

22    to see if it's okay first.

23    Q.    So, then information you review

24    is confidential under the County

25    policies, only when it's disclosed

125

1    without authorization.

2              ATTORNEY BURNS:

3              Objection, form.

4         THE WITNESS:

5              The question is, can you

6    repeat it again?

7    BY ATTORNEY MANSOUR:

8
9    Q.    Information is confidential

10   under the County policies only when

11   it's disclosed without authorization.

12        Is that what you're saying?

13             ATTORNEY BURNS:

14             Objection to form.

15             THE WITNESS:

16             I mean, it's --- it's, I

17   wouldn't say only, I mean, there's, I

18   can think of scenarios where

19   attorneys, right, where you would have

20   authorization, you'd still, you might

21   disclose confidential information.

22   But generally speaking, if you're not

23   authorized by your supervisors to

24   disclose the information, I would

25   consider that confidential in nature.

26   Q.    Right.

126

1    A.      There's, you know, there's

2    information that's confidential, I

3    think, that you don't need --- in this

4    case, I mean, he has to be authorized.

5     If he's --- if the --- if he's

6    authorized to speak to someone about a

7    certain situation, then I wouldn't

8    consider that information confidential

9    any longer, in this case.

10   Q.      Even if the information he's

11   authorized to disclose is exactly the

12   same information as the information

13   that he shared?

14           So had, in other words, had his

15   supervisor or somebody higher up than

16   him, up his chain of command,

17   authorized him to make this call to

18   Attorney Zeiger and share exactly the

19   same information he shared, then that

20   information would not be confidential?

21   A.      In my understanding, yes.  That

22   would not be a violation of the policy

23   because he was authorized, like a

24   subpoena, for example, he was

25   authorized to provide that

127

1    information.  So, that --- that

2    previously confidential information

3    would lose that kind of

4    classification.

5    Q.     Okay.

6           So, and that's a similar point

7    that's been brought up at other times

8    in this case.  So, had my client been

9    subpoenaed to be deposed, for example,

10   by Attorney Zeiger, and in his

11   deposition said exactly the same stuff

12   that he told Attorney Zeiger in that

13   private conversation, that information

14   under those circumstances would not

15   have been confidential?

16   A.     Yeah, unless there's a

17   protective order or something else

18   that's at play.  I would say,

19   generally speaking, no, of you're

20   subpoenaed to provide testimony, you

21   have to truthfully answer whatever

22   questions are asked.

23   Q.     Okay.

24          So, then what makes information

25   confidential, in your view, is not so

128

1    much the substance of the information,

2    but rather the context in which it's

3    given?

4                    ATTORNEY BURNS:

5                    Objection, form.

6                    THE WITNESS:

7                    I mean, the substance is

8    a part of it, right?  So, like, if,

9    you know, if he went home and told

10   someone what his coworker had for

11   lunch, that's, you know, it certainly

12   wouldn't need authorization to do

13   that.

14   Q.    And that would be confidential.

15   I mean, because before you said, you

16   know, information that you learn in

17   the course of your employment.

18   A.    Right.

19   Q.    So, that's a good example.

20         Right?

21         If --- if Ara Kimbrough didn't

22   work at the jail, he wouldn't know

23   what his coworker ate for lunch that

24   day.

25   A.    Yeah.

129

1    Q.     But that's not confidential

2    information.

3          Right?

4    A.     Yeah, I would say that's not

5    related to, you know, tactics, jail

6    operations, things that are related to

7    the functioning of the jail, you know,

8    that's --- that's different.

9    Q.     So, then just, you know, to

10   break it down further, because like I

11   said before, we're lawyers.  So, the

12   fact that he learns the information,

13   the course of him --- of his

14   employment, that alone doesn't make

15   the information confidential.

16         Right?

17   A.     No, I wouldn't say that alone,

18   no.  Because, yeah.

19   Q.     Okay.

20         So, what I've gathered from

21   your, the colloquy that we've had here

22   so far is that whether the employee

23   learns it from the course, within the

24   course of their employment, that alone

25   doesn't make the information

130

1    confidential.

2         Right?

3    A.    No.  That alone, no.

4    Q.    Okay.

5         If an employee shares the

6    information without authorization,

7    that makes it confidential.

8              ATTORNEY BURNS:

9              Objection, form.

10             THE WITNESS:

11             It depends on what the

12        information is.  But if it has to

13        do with jail operations, tactics,

14        things like that, yes, I would say

15        that's confidential.  He would need

16        authorization before he released

17        it.

18   BY ATTORNEY MANSOUR:
19

20   Q.    And I think before, like you

21   said, had he been subpoenaed to --- to

22   testify under oath at a deposition and

23   shared the same information, I think

24   you said that --- that in --- in those

25   circumstances, it would not have been

26   confidential.

131

1          ATTORNEY BURNS:

2          Objection, form

3          THE WITNESS:

4          I mean, I think it's

5   confidential, but he's --- he's

6   authorized to release it, right?  So,

7   we, and again, this would be something

8   we might, depending on the nature of

9   the lawsuit, right, we might seek a

10  protective order, depending on, you

11  know, it could be a hundred different

12  things.  What type of lawsuit is it?

13  Is irrelevant to the lawsuit?  But if

14  he was subpoenaed in the Corbin

15  matter, yeah, I think he would have to

16  testify as to what happened.

17  Q.    And he wouldn't have been,

18  under those circumstances, fired or

19  disciplined any other way for

20  violating County confidentiality

21  policies.

22          ATTORNEY BURNS:

23          Objection, form

24          THE WITNESS:

25          I mean, I --- I --- I

132

1    wouldn't, if I was the legal advisor

2    to that, I wouldn't recommend firing

3    him in that situation.  If he was

4    subpoenaed and asked questions about

5    what happened.

6    Q.     Would you believe that it would

7    have been a violate --- under those

8    circumstances, giving testimony in a

9    deposition under oath, would you

10   believe that it would have violated

11   County policy?  Because that's what

12   you concluded here.  In that

13   situation, would you have concluded

14   the same thing?

15   A.     No, because he would have been

16   responding to a subpoena, assuming the

17   litigation team didn't quash the

18   subpoena for whatever reason.  But if

19   the subpoena is a good subpoena, then

20   yeah, I think he has to answer the

21   questions.

22   Q.     Okay, so then you would agree

23   with me, the distinction between that

24   hypothetical and what actually

25   happened here is that in this

133

1    situation, he reached out to Attorney

2    Zeiger voluntarily without

3    authorization from anybody within the

4    County?

5                        ATTORNEY BURNS:

6                        Objection, form.

7                        THE WITNESS:

8                        Yeah, that's, yeah,

9        that's the difference.

10    BY ATTORNEY MANSOUR:

11

12    Q.    And in this situation, that's

13    what makes the information

14    confidential.

15                        ATTORNEY BURNS:

16                        Objection, form.

17                        THE WITNESS:

18                        I mean, I think the

19        nature of the information is

20        confidential.  The fact that he

21        didn't have authorization to

22        release it, right, is --- is part

23        of it as well.  It's --- it's

24        almost two steps there, but it

25        doesn't, I wouldn't  --- I wouldn't

26        say it loses its confidential

134

1    status when he's authorized to

2    release it.  It's just like if it -

3    -- if came up again, the same

4    thing, he wouldn't be able to

5    release it unless he went through

6    the same process.

7    BY ATTORNEY MANSOUR:

8

9    Q.     If you can turn to page 1115 of

10   Exhibit P-5.

11   A.     Yep.

12   Q.     Paragraph 22, you write there,

13   "By his own admissions, Lieutenant

14   Kimbrough is unable to grasp or

15   unwilling to admit that there is a

16   dramatic difference between the

17   director/County commissioner, publicly

18   expressing challenges related to

19   general jail staffing, and a DOC

20   employee providing case-specific

21   information to an attorney

22   representing a former inmate."

23          Why is --- what is the dramatic

24   difference ---

25                    ATTORNEY BURNS:

26                    Objection, form.

135

1    BY ATTORNEY MANSOUR:
2
3    Q.     --- between those two
4    scenarios?
5    A.     He was, this is the gravity
6    issue, right?
7    Q.     Mm-hm.
8    A.     So, the fact that we're talking
9    generally about staffing issues, the
10   director or the County commissioner is
11   at a public meeting, because when he
12   said, they've done that before, why
13   can't I do it?  I think that's fine.
14   The issue becomes when you provide
15   specific details as far as tactics,
16   techniques.
17   Q.     You didn't write that there
18   though.
19          Right?
20          What you wrote in your memo to
21   your superior ---
22   A.     Yeah.
23   Q.     --- was that there is a
24   difference between the Director of
25   County Commissioner publicly
26   expressing challenges related to

136

1    general jail staffing and a DOC

2    employee like my client providing

3    case-specific information to an

4    attorney representing a former inmate.

5    A.    Yeah.

6    Q.    Okay.

7          You didn't say, to a DOC

8    employee providing information about

9    techniques, tactics."

10   A.    No.

11   Q.    Case-specific information to an

12   attorney representing a former inmate.

13         Why is that fact important?

14   A.    Because that's what the case

15   information was.  It was tactics,

16   techniques, that's what we're talking

17   about here.

18   Q.    Well, you said case-specific

19   information.  Is that what you meant

20   by case-specific information?

21   A.    What happened to the individual

22   who died, how he was processed, all

23   the drugs, you know, what happened in

24   the dirty cell. That's what --- that's

25   --- that's case specific information.

137

1    That's the information I'm speaking
2    about.
3    Q.    Okay.
4          And, "to an attorney
5    representing a former inmate," why is
6    that important?
7    A.    That's the --- that's what
8    happened here.  That was the facts
9    that I was presented with.
10   Q.    Okay.
11         So that was --- that was
12   important here.  I mean, why didn't
13   you just end your sentence with DOC
14   employee providing case-specific
15   information, period?
16   A.    I don't know.  When I wrote
17   this in June, that was the facts that
18   were in front of me.  That's who the
19   release occurred to, so that's what I
20   referenced.
21   Q.    My client didn't disclose to
22   Attorney Zeiger how the drugs were
23   smuggled into the jail.
24         Did he?
25   A.    I don't think so.  I have to

138

1    look at the notes, but I don't --- I
2    don't remember that being the case.
3    Q.    What role did you play, if any,
4    in the County's decision to discharge
5    my client?
6    A.    I didn't play any, that I know
7    of.  I wrote this memo and that was
8    the extent of it.  And then I, I think
9    I got an email from you in July, maybe
10   it's saying you're representing him or
11   something.  And that was the, that's
12   really the last --- the next thing
13   that I heard of after I submitted my
14   memo.
15   Q.    Were you consulted at all,
16   after --- after submitting this memo,
17   were you consulted at all by anybody
18   in the County about whether my client
19   should be discharged?
20   A.    No.
21   Q.    Were you part of any
22   conversations with anybody within the
23   County regarding the County's decision
24   to discharge my client?
25   A.    No.

139

1    Q.    Were you asked to provide any
2    sort of legal opinion about the
3    legality of discharging my client?
4    A.    No.
5    Q.    Is there a reason you, and not
6    anybody else in the solicitor's
7    office, was asked to interview my
8    client and submit this memorandum?  Do
9    you know why Ms. Fitzpatrick asked you
10   and not anybody else?
11   A.    I'm the oldest?  No, I don't --
12   - I don't know.  I mean, I get asked
13   to do a lot of different things for
14   the County because I'm old and have a
15   lot of varied experiences.
16   Q.    Because I know Shae Randolph,
17   she was a part of the fact-finding
18   meeting in July regarding this matter.
19    She and Ms. Smith held the fact-
20   finding meeting for my client before
21   he was discharged.
22        Are you aware of that?
23   A.    I --- I don't know.  I mean, I
24   don't --- I don't know if she --- I
25   wasn't involved with any of that.

140

1    Q.    You know who Shae Randolph is?

2    A.    Yeah, I do.  I know she is.  I

3    just, was I made aware of that at some

4    point?  I don't know.  I don't recall.

5    Q.    She's an assistant County

6    solicitor.

7    A.    She is, yep.

8    Q.    And we had her deposition last

9    week or two weeks ago.

10   A.    Okay.

11   Q.    And is it true that she's

12   typically involved in human resources

13   investigations?

14   A.    She, yeah, she assists.  Yeah,

15   she assists HR with investigative ---

16   I don't know.  She does some things at

17   the jail, I think, but I, yeah, I'm

18   not --- again, like, I'm a municipal

19   guy.  I do dirt and taxes and things

20   like that, but ---

21   Q.    But do you know why you were

22   asked to conduct and maybe you do,

23   maybe you don't, do you know why you

24   were asked to conduct this interview

25   but were not present for my client's

141

1    fact-finding meeting on or about July

2    24th?

3    A.    I --- I don't know. I mean, I

4    --- I'm older. This was a senior

5    person in the County, maybe. I --- I

6    don't know. I don't know why they

7    picked me. I wasn't involved in that

8    discussion.

9    So other than interviewing my client

10    on July, on June 12, 2024, and provide

11    --- drafting and writing this memo on

12    or about June 13, 2024 you had no

13    other involvement in the suspension or

14    discharge of my client?

15    A.    No, no involvement at all.

16    Yeah.

17    Q.    Okay.

18         I've got nothing further.

19              ATTORNEY BURNS:

20              Go off the record.

21                   - - -

22    (Whereupon, a discussion was held, off

23         the record.)

24                   - - -

25    DEPOSITION CONCLUDED AT 12:39 P.M.

142

1    COMMONWEALTH OF PENNSYLVANIA  )

2    COUNTY OF PHILADELPHIA        )

3                      CERTIFICATE

4            I, Ethan Reese, a Notary Public in and

5    for the Commonwealth of Pennsylvania, do

6    hereby certify:

7            That the witness, Daniel Grieser,

8    whose testimony appears in the foregoing

9    deposition, was duly sworn by me on April 1,

10   2025 and that the transcribed deposition of

11   said witness is a true record of the testimony

12   given by said witness;

13           That the proceeding is herein recorded

14   fully and accurately;

15           That I am neither attorney nor counsel

16   for, nor related to any of the parties to the

17   action in which these depositions were taken,

18   and further that I am not a relative of any

19   attorney or counsel employed by the parties

20   hereto, or financially interested in this

21   action.

22   Dated the 3 day of April, 2025

23   ┌─────────────────────────────────────┐
     │ Commonwealth of Pennsylvania - Notary Seal │
     │       Ethan Reese, Notary Public          │
     │           Philadelphia County             │
24   │ My Commission Expires February 20, 2027   │        Ethan Reese,
     │        Commission Number 1432862          │
     └─────────────────────────────────────┘
25                                              Court Reporter

Sargent's Court Reporting Service, Inc.
           (814) 536-8908