**EXHIBIT 3:**

Kimbrough v. County of Bucks, et al.                                               COB1106

6/12/24 Ara Kimbrough interview with Dan Grieser and Lauren Smith in HR

LS Notes

*Dan introduced himself and spoke of his army experience...does a lot of municipal la[w]*

DG: Tell me about your background. I know you've been with the County a little while.

AK: 16 years.

DG: What's your current position?

AK: Admin Lt.

DG: What does that entail?

AK: The responsibilities of other Lts and I receive records from reception and intake.

DG: What did you do before coming to the County?

AK: I was in the navy.

DG: How long?

AK: 4 years.

DG: What did you do?

AK: CTI.

DG: What type of clearance did you have?

AK: Top secret.

DG: How long have you been a Lt at DOC?

AK: 6+ years.

DG: I have been asked to inquire about reports in the Corbin case. There was a motion. The attorney is Brian Ziegler. Are you familiar with him?

AK: Yes.

DG: He made a motion and referred to you.

AK: Yea I talked to him about the Patterson case.

DG: What did you tell him?

AK: Essentially that I felt some responsibility b/c drugs were able to get through my unit and Patterson died. I feel bad about that. It was 100% preventable and we failed on that.

DG: Why do you feel it was 100% preventable?

AK: Staff were pulled from my unit w/o my knowledge. Essentially what had happened is a male officer was doing an unclothed body search. His partner was upfront. He told him to go upfront and see his partner but his partner was called elsewhere. So the inmate was able to go back into the dirty cell and retrieve the contraband drugs he had on his person and put it back into his County

P-15

COB1107

DG: But what did that have to do with the Corbin case? Corbin is the case where Ziegler is representing against the County.

AK: I don't know anything about Corbin.

DG: What caused you to contact that attorney?

AK: I know him.

DG: How, did you grow up with him?

AK: No, I met him in interactions with my current position.

DG: So you felt it was appropriate for him to have that info?

AK: Yea.

DG: How did you share that info with him?

AK: From home, from my phone.

DG: Personal or work?

AK: I don't have a work phone.

DG: What was your purpose – why did you share the info with this attorney?

AK: I don't remember how it came up. But I have told everyone how bad I feel about this. I think I was "just venting."

DG: Have you taken any other internal measures to address this?

AK: I have told everyone in my chain of command and reported it to human resources. I have brought it up several times. I have made it a point to be hypervigilant about staffing. To be transparent, I just received a step 1 discipline. Are you aware?

DG: Yes, but not in detail; you can tell me about it.

AK: The crux of it was me holding the Sgts accountable for not staffing units and the way I did it.

DG: Oh, I do know about this. It was the manner in which you performed the protective measures...about the way you delivered the message.

AK: If they interviewed my staff, they would see I delivered it calmly and professionally 100 times.

DG: Who did you speak to in HR?

AK: Diane Otto.

DG: When did Patterson die?

AK: July 2022.

DG: Since then, is it fair to say you have made folks aware of your concerns?

Kimbrough v. County of Bucks, et al.    COB1108

AK: Every time it happens, yes.

DG: What do you mean?

AK: When they pull someone w/o letting me know or they don't staff it properly, I report it.

DG: How many times are we talking...monthly?

AK: Several times a week.

DG: You mentioned you shared this with the attorney. Have you shared it with anyone else outside the County?

AK: My therapist, who I see for PTSD and depression. I was managing before, but after this incident I had to seek counseling. I have been on medication b/c I have had a tough time functioning.

DG: Since the Patterson incident?

AK: Correct.

DG: Any other organizations? Family?

AK: Yes, family and friends.

DG: Online? Media?

AK: No.

DG: When you share this with family members, is it the same level of detail as you share with your therapist?

AK: Just the same general concern that I am concerned something will happen due to not being properly staffed in such an important part of the building.

DG: What do you think could be done to address these issues? Staff correctly?

AK: Yes. Every time I talk to Sgts about this, I tell them to let me know before they pull someone. I will help out myself so that unit doesn't fall short. At shift change they don't send the right number of people down. Sometimes people already worked 16 hours so they have to leave.

DG: Is there anyone else at the jail that you would like me to talk to, with regard to the report you made to the outside attorney?

AK: I don't understand the question.

DG: Have you spoken to anyone at the jail about speaking to outside attorneys?

AK: No.

DG: I want to talk about a few policies (hands policy to Ara). Look at Code of Conduct for confidentiality. Staffing info could be used against the County and for a lot of different things. You understand how certain info needs to be kept internal. Did you understand that in this case?

AK: No.

DG: Why not?

Kimbrough v. County of Bucks, et al.

COB1109

AK: It's been in the newspapers. Our director has reported it to the media. It's been said at public commissioners' meetings.

DG: The general concept of having a hard time hiring people, or a detailed concern like regarding Patterson?

AK: The general concern.

DG: When we talk about specifics, I don't believe that has been in the media.

AK: His death has.

DG: But not what actually occurred. To me that is confidential to the organization. I have been involved in some litigation with Right to Know. The media wanted use of force info and we pushed back b/c it has to do with internal info. If that info gets out, inmates can know and use it against us. Does that make sense that I consider it confidential info?

AK: No.

DG: Why do you not consider the specific facts of what happened with Patterson to be confidential?

AK: Does he represent Patterson?

DG: Corbin, I believe.

AK: I think he represents Patterson. Am I not allowed to give testimony?

DG: If you're a witness. If you get a request from an attorney, you should always talk to your supervisors. Maybe that wasn't clear to you, if you're contacted by outside folks?

AK: By attorneys representing individuals, yea.

DG: What I am hearing from you is that you didn't know you couldn't provide info to attorneys.

AK: Correct.

DG: Do you have a media policy down there? Speak to media freely?

AK: We refer to the director.

DG: But you were not given similar guidance about law firms?

AK: Right.

DG: Here are the County Work Rules. I highlighted where it talks about giving out confidential info. Do you understand what that means?

AK: Yes.

DG: Similar to the last one. It sounds like you thought you were authorized to disclose that info to lawyers who represent someone.

AK: Correct.

DG: Next we have DOC's table of offenses. Familiar with that?

Kimbrough v. County of Bucks, et al.                                                          COB1110

AK: Yes.

DG: I highlighted the one about divulging info. Similar theme. Your understanding was b/c he was a lawyer representing someone, you could share the info with him?

AK: Correct.

DG: (looks through notes) Corbin is the administrator of Patterson's estate. That's where the confusion came from. Have you done previous interviews on the Patterson case?

AK: No.

DG: Did you say earlier that he had other cases at the jail? Or is this his only case?

AK: I don't know.

DG: You said you were friendly with him.

AK: Years ago.

DG: He had a case before and you were familiar with him. When he called this time, you waited until you were home and called him then.

AK: I don't remember if he called me or I called him.

DG: Why didn't you speak with him at the jail?

AK: He wasn't at the jail.

DG: When would you have given him your cell phone number?

AK: I don't remember.

DG: Have you had other attorneys contact you about other cases? Where you would apply the same?

AK: The same scenario, no.

DG: I don't know why you felt you were authorized to share the info. Did someone tell you that you could?

AK: It's an ongoing issue at the jail that hasn't been corrected.

DG: Do you feel like you're a bit of a whistleblower?

AK: I don't know.

DG: I understand it bothers you, which shows you're not a robot. Is it fair to say you took an extra step to talk with the attorney? No one told you to?

AK: Right.

DG: Do you see why the County would be concerned with this?

AK: No. It's like testimony in court.

DG: So part of this is to educate you. It is different if you are subpoenaed, if you go through the proper channels. Eventually that attorney could have gotten that and had the opportunity to talk to

Kimbrough v. County of Bucks, et al.                                                                COB1111

you. But he didn't. So it is troubling to the County. It is a terrible thing that happened but we have to follow the rules when it comes to confidential info. You can see there is a risk if the info was shared and other inmates did the same thing.

Here's the whistleblower policy. You said you have talked to HR. You can talk to the law dept, the Controller, or Margie McKevitt. She's Dave's boss. She can address issues. If you report misconduct through the right channels, you won't have any disciplinary actions.

AK: So going to HR and to the Director, I didn't go through enough proper channels?

DG: It has to do with the info being dangerous to get out. Folks will use info to their advantage. The attorney is not covered by this policy. That's what I'm getting at. Do you have any questions?

AK: No.

DG: You have my card there if you think of anything. Lauren took notes which will be reviewed with your supervisor. Sorry about your PTSD. Glad you're getting help.


After Ara left, LS told DG that Ara did not make a report to HR about any safety concerns. He mentioned it while he was being interviewed by Diane and Shae re: the bullying accusations against him. They rightfully did not engage. They kept their conversation related to the accusations against him.