**EXHIBIT 3;**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

ARA KIMBROUGH,          *

    Plaintiff          *    Case No.

    vs.                *    2:24-CV-04470-KSM

BUCKS COUNTY,           *

et al.,                 *

    Defendants          *

* * * * * * * *

DEPOSITION OF

LAUREN SMITH

February 7, 2025

Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

```
1                    D E P O S I T I O N

2                         O F

3      L A U R E N   S M I T H ,  taken  on  behalf  of  the

4      Plaintiff  herein,  pursuant  to  the

5      Rules  of  Civil  Procedure,  taken  before

6      me,  the  undersigned  Emma  Edwards,  a

7      Court  Reporter  and  Notary  Public  in

8      and  for  the  Commonwealth  of

9      Pennsylvania,  at  the  offices  of  the

10     County  of  Bucks,  55  East  Court  Street,

11     Conference  Room  432,  Doylestown,  PA

12     18901,  on  Friday,  February  7,  2025

13     beginning  at  10:03  a.m.

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1              A P P E A R A N C E S

2

3      WILLIAM P. MANSOUR, ESQUIRE

4      Mansour Law, LLC

5      961 Marcon Boulevard, Suite 425

6      Allentown, PA 18109

7          COUNSEL FOR PLAINTIFF

8

9      DARA BURNS, ESQUIRE

10     JACLYN C. GRIESER, ESQUIRE

11     County of Bucks - Deputy Solicitor

12     55 East Court Street

13     Doylestown, PA 18901

14         COUNSEL FOR DEFENDANTS

15

16

17

18

19

20

21

22

23

24

25
```

4

1                          I N D E X

2

3    WITNESS: LAUREN SMITH

4    DISCUSSION AMONG PARTIES          7 - 14

5    EXAMINATION

6        By Attorney Mansour          14 - 96

7    CROSS EXAMINATION

8        By Attorney Burns            97 - 117

9    REEXAMINATION

10       By Attorney Mansour       117 - 131

11   DISCUSSION AMONG PARTIES      131 - 134

12   CERTIFICATE                         135

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                        <u>E X H I B I T   P A G E</u>

2

3                                                P A G E

4       <u>N U M B E R</u>    <u>D E S C R I P T I O N</u>          <u>I D E N T I F I E D</u>

5       P - 1    Bucks County Email              6 2

6       P - 2    Interrogatories                 2 4

7       P - 3    Lauren Smith's Email            1 9

8       P - 4    Emergency Motion                5 9

9       P - 5    Memorandum                      6 0

10      P - 6    Bucks County HR Policies 101

11      P - 7    Employment Investigation

12               Document                        1 0 6

13      P - 8    Notice of Fact-

14               Finding Meeting                 1 1 5

15      P - 9    Defendant's First

16               Set of Requests for

17               Admissions Directed

18               to Plaintiff                    1 2 8

19      P - 10   Notice of Fact-Finding

20               Meeting (5/25/24)               1 2 8

21

22

23

24

25

6

1          O B J E C T I O N   P A G E

2

3     A T T O R N E Y                                    P A G E

4     Burns        30, 32, 34, 35, 36, 37, 39,

5     42, 44, 45, 46, 47, 49, 50, 50, 52,

6     53, 53, 56, 57, 58, 61, 65, 66, 67,

7     68, 69, 69, 70, 70, 72, 73, 73, 74,

8     75, 75, 76, 77, 77, 77, 78, 78, 79,

9     80, 80, 90, 92, 92, 117, 118, 121,

10    122, 122, 124, 125, 126

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1              S T I P U L A T I O N

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3    (It is hereby stipulated and agreed by

4    and between counsel for the respective

5    parties that reading, signing,

6    sealing, certification and filing are

7    not waived.)

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9           P R O C E E D I N G S

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11              LAUREN SMITH,

12   CALLED AS A WITNESS IN THE FOLLOWING

13   PROCEEDING, AND HAVING FIRST BEEN DULY

14   SWORN, TESTIFIED AND SAID AS FOLLOWS:

15                - - -

16              THE COURT REPORTER:

17              Miss Smith, can you

18         raise your right hand, please?

19              Do you swear or affirm

20         that your testimony today will

21         be the truth, the whole truth,

22         and nothing but the truth?

23              MS. SMITH:

24              I do.

25              THE COURT REPORTER:

8

1          Thank you.

2          ATTORNEY MANSOUR:

3          Do you want to put on

4     the record the discussion we

5     just had about objections?

6          ATTORNEY BURNS:

7          Sure.

8          ATTORNEY MANSOUR:

9          Sure.

10          Go ahead.

11          ATTORNEY BURNS:

12          Okay.

13          Before we get started,

14     Counsel and I had a discussion

15     about objections.  The only

16     objection that I will be

17     instructing her not to answer

18     will be if I make an objection

19     based on attorney-client

20     privilege, and we believe it

21     will disclose attorney-client

22     privilege.  I'm reserving my

23     right to make objections on

24     confidential information, but I

25     will always instruct her to

9

1          answer those questions.

2                    ATTORNEY MANSOUR:

3                    And all other objections

4          will be reserved for trial.

5                    ATTORNEY BURNS:

6                    I agree.

7                    ATTORNEY MANSOUR:

8                    Very good.

9                    Okay, Ms. Smith, thank

10         you for being here today.  My

11         name is William Mansour.  I am

12         the attorney who is

13         representing Ara Kimbrough in

14         the lawsuit that he has filed

15         against Bucks County, as well

16         as yourself and a number of

17         other individual defendants in

18         the Eastern District of

19         Pennsylvania.  We are here

20         today to take your deposition

21         in that case.  Do you

22         understand that?

23                    THE WITNESS:

24                    Yes.

25                    ATTORNEY MANSOUR:

10

1          Okay.

2          Before we get started, I

3     just want to go over a few

4     ground rules about how the

5     deposition is going to proceed

6     to make sure that we're both on

7     the same page.  So, the first

8     and most important rule I like

9     to emphasize at the beginning

10    is that, as you can see, we

11    have a court reporter here who

12    has taking down all of the

13    questions and answers here

14    today.  And so, it's important

15    that your responses to my

16    questions be verbal.  So,

17    things like nodding the head,

18    shaking the head, shrugging the

19    shoulders, uh-huh, mm-hm, don't

20    come across well in a

21    transcript.  So, I'm just gonna

22    ask that all of your questions

23    again to my --- or all of your

24    answers to my questions be

25    verbal.  Do you understand

11

1          that?
2                    THE WITNESS:
3                    I understand.
4                    ATTORNEY MANSOUR:
5                    Okay.
6                    If I ask you a question
7          and you don't understand it,
8          please just tell me to either
9          repeat it or rephrase it.  I'd
10         be happy to do that.  I don't
11         want you to answer a question
12         that you don't understand.
13         However, if I do ask you a
14         question and you do answer it,
15         I'm going to assume both that
16         you heard it and understood it.
17          Do you understand that?
18                    THE WITNESS:
19                    I understand.
20                    ATTORNEY MANSOUR:
21                    I don't want us, again,
22         for the benefit of the court
23         reporter, talking over each
24         other.  So, there may be
25         instances where I ask a

12

1   question and you know what my
2   question is going to be or
3   where I'm going with the
4   question.  I just ask that you
5   wait for me to finish the
6   question completely before you
7   answer it and I will afford you
8   the same courtesy of waiting
9   until you finish Your response
10  before I ask my next question.

11          Do you understand that?

12          THE WITNESS:

13          I understand.

14          ATTORNEY MANSOUR:

15          I don't want you to
16  guess or speculate about
17  anything.  So, your testimony
18  here today is supposed to be
19  based on your personal
20  knowledge.  If you don't know
21  the answer to a question, "I
22  don't know," is a perfectly
23  acceptable answer.  Do you
24  understand that?

25          THE WITNESS:

13

1                     Yes.
2                     ATTORNEY MANSOUR:
3                     Are you under the
4           influence of any drugs,
5           alcohol, medication, that would
6           impair your ability to testify
7           here today?
8                     THE WITNESS:
9                     No.
10                    ATTORNEY MANSOUR:
11                    Have you ever been
12          deposed before?
13                    THE WITNESS:
14                    Yes.
15                    ATTORNEY MANSOUR:
16                    How many times, roughly?
17                    THE WITNESS:
18                    A few.
19                    ATTORNEY MANSOUR:
20                    Okay.
21                    When was the most recent
22          time you were deposed?
23                    THE WITNESS:
24                    There was one within the
25          last year.

14

ATTORNEY MANSOUR:

Okay.

If you need to take a
break at any time, just let us
know.  We'll be happy to
accommodate you.  I don't
really anticipate being here
terribly long today, but again,
if you need to take a break for
any reason, just let us know.
The only thing that I ask is
that if I have a pending
question, that you answer it
completely before we take the
break.  Is that fair?

THE WITNESS:

Yes.

ATTORNEY MANSOUR:

Very good.

---

EXAMINATION

---

BY ATTORNEY MANSOUR:

Q.    Can you please state and spell
your full name for the record?

15

1    A.    Lauren, L A U R E N, Smith, S M

2    I T H.

3    Q.    And you, Ms. Smith, are a

4    defendant in this matter, is that

5    correct?

6    A.    Yes.

7    Q.    Okay.

8          And have you reviewed the

9    complaint that's been filed by Mr.

10   Kimbrough on this matter?

11   A.    Yes.

12   Q.    You are the Director of Human

13   Resources for Bucks County, is that

14   correct?

15   A.    Chief Human Resources Officer

16   is my title.

17   Q.    Okay.

18         And how long have you been in

19   that position?

20   A.    Since 2018.

21   Over six years.

22   Q.    And what did you do before you

23   were Chief Human Resources Officer for

24   the county?

25   A.    I was Assistant Director of

16

1     Human Resources.

2     Q.      For Bucks County?

3     A.      For Bucks County.

4     Q.      And how long were you in that

5     role?

6     A.      One year.  And before that, HR

7     Manager, before that, Senior HR

8     Generalist, and before that, HR

9     Generalist.

10    Q.      So, would it be fair to say

11    that almost all of your entire career

12    has been in a human resources role?

13    A.      Yes.

14    Q.      Mr. Kimbrough was terminated on

15    July 29, 2024, is that correct?

16    A.      Yes.

17    Q.      Okay.

18            And he was terminated for

19    sharing, allegedly, confidential

20    information with attorney Brian

21    Zeiger, who was suing the County on

22    behalf of the estate of Joshua

23    Patterson, is that correct?

24    A.      Yes.

25    Q.      And you were the person who

17

1    authored his termination letter, is

2    that correct?

3    A.    Yes.

4    Q.    As well as the final

5    disciplinary action form that went

6    along with that termination letter, is

7    that correct?

8    A.    Yes.

9    Q.    Besides yourself, were there

10   any other people that you --- that

11   were involved in the decision to

12   terminate Mr. Kimbrough?

13   A.    Yes.

14   Q.    Who were they?

15   A.    David Kratz, the director of

16   the prison, Margie McKevitt, the chief

17   operating officer, and members of the

18   law department.

19   Q.    Okay.

20         Now, in terms of Ms. McKevitt

21   my understanding, based on her limited

22   testimony we had the other day, was

23   that she was the person who made the

24   final decision to terminate Mr.

25   Kimbrough.  Is that correct?

18

1    A.     I'm not sure if it's her or if

2    it's the commissioners.  I'm not privy

3    to what she takes to the

4    commissioners.  It's part of the final

5    step of the process.

6    Q.     Okay.

7           So, my understanding is that

8    when the County decides to terminate a

9    person, that decision is made and then

10   subsequently presented to the

11   commissioners for ratification or

12   approval.  Is that correct?

13   A.     Presented to the commissioners

14   or to Margie.  I think it's her

15   discretion whether she has to get

16   commissioner approval.

17   Q.     In this particular situation,

18   was Ms. McKevitt the person who

19   recommended Mr. Kimbrough be

20   terminated?

21   A.     It was a unanimous decision.  I

22   don't know that any one person

23   recommended the termination.  There

24   was a discussion, and it was a

25   unanimous decision.

19

1    Q.    A discussion among whom?

2    A.    Director Kratz and the law

3    department, myself, and Margie

4    McKevitt.

5    Q.    So, I want to show you --- I'm

6    gonna --- so, this was already pre-

7    marked as P-3 in Ms. McKevitt's

8    deposition.  So --- So, I'll show you

9    that.

10                      ---

11                (Whereupon, Deposition

12                Exhibit, P-3, Lauren

13                Smith's Email, was

14                marked for

15                identification.)

16                      ---

17                ATTORNEY MANSOUR:

18                I'm sorry, I'm going to

19          steal these.  Okay.  You could

20          actually pass that over.  Do

21          you have that?

22                ATTORNEY BURNS:

23                Yes.

24    BY ATTORNEY MANSOUR:

25    Q.    Okay.

20

1        All right, so I'm going to just

2    switch with you real quick. This is

3    just the one with a sticker on it, so

4    it could go into the record with the

5    sticker.  I'll take that back.  Yeah,

6    take a moment to just review that

7    email and then let me know when you're

8    done reading it.

9    A.        I'm done.

10   Q.        Okay.

11        You were the author of this

12   email?

13   A.        Yes.

14   Q.        And it was sent on July 29,

15   2024?

16   A.        Yes.

17   Q.        And it looks like it was sent

18   to David Kratz, James Coyne, Margaret

19   McKevitt, Diane Otto, Frank Albanese,

20   and Shae Randolph.  Is that correct?

21   A.        Correct.

22   Q.        And the email states in the

23   first sentence, "Good afternoon.  This

24   morning, via Teams, permission was

25   granted to separate Ara Kimbrough from

21

1    employment."

2           Did I read that correctly?

3    A.    Yes.

4    Q.    Who granted permission to

5    separate Ara Kimbrough from

6    employment?

7    A.    Legal, Margie McKevitt, myself,

8    Dave Kratz.

9    Q.    Is that it?

10   A.    Mm-hm.

11   Q.    Okay.

12          And that permission, again, was

13   granted because of, because Mr.

14   Kimbrough allegedly shared

15   confidential information with Attorney

16   Brian Zeiger.  Is that correct?

17   A.    Yes.

18   Q.    Okay.

19          When did he share that

20   information?  Do you know?

21   A.    I do not know exactly when he

22   shared the information.

23   Q.    What, in your own words, if you

24   can recall, what information did Mr.

25   Kimbrough share with Attorney Zeiger?

22

1    A.    He shared internal practices

2    and procedures that occur within the

3    prison that would not be subject to

4    the media or an outside person who

5    didn't work here, knowing that

6    information.

7    Q.    Can you tell me specifically,

8    what information it was that he

9    shared?

10   A.    He talked about how the

11   procedures work inside the prison to

12   keep inmates secure.

13   Q.    Can you give me an example?

14   A.    An example of keeping inmates

15   secure?

16   Q.    Well, yeah, no.  So my question

17   is, he had a specific conversation

18   with Attorney Zeiger.  Is that our

19   understanding?

20   A.    Yes, that is our understanding.

21   Q.    What were the contents of that

22   conversation?  What did Mr. Kimbrough

23   say specifically to Mr. Zeiger?

24   A.    First of all, Mr. Kimbrough

25   reached out to Mr. Zeiger on his own,

23

1    not in course and scope of his job,

2    like one would be contacted for

3    information to participate in a case.

4    So, it was odd to learn that he

5    reached out to opposing counsel.  He

6    reached out and talked about specific

7    procedures inside the prison for

8    watching inmates and keeping them

9    secure.

10    Q.    What specific procedures?

11    A.    Relieving people from posts,

12    who is --- who is on the post, who is

13    watching --- whose responsibility it

14    is to watch the inmate.

15    Q.    Okay.

16    So, as part of this case, the

17    County served my client with

18    interrogatories, which are written

19    requests for information.  And I'm

20    going to ask you about Mr. Kimbrough's

21    responses.

22    ATTORNEY MANSOUR:

23    I'll mark these as --- I

24    don't think we marked them last

25    time, did we?

24

1           ATTORNEY BURNS:

2           I believe they are P-2.

3           ATTORNEY MANSOUR:

4           P-2, okay.

5           ATTORNEY BURNS:

6           Plaintiff's responses

7      and objections to defendant's -

8      --

9              ATTORNEY MANSOUR:

10          Yeah.  Okay.

11          Do you need a copy.

12          ATTORNEY BURNS:

13          No, go ahead.

14          ATTORNEY MANSOUR:

15          Okay.

16              ---

17          (Whereupon, Deposition

18          Exhibit, P-2,

19          Interrogatories, was

20          marked for

21          identification.)

22              ---

23   BY ATTORNEY MANSOUR:

24   Q.    So, Ms. Smith, I'd like to

25   direct your attention to page three,

25

1    interrogatory number nine, which is at

2    the bottom.  That interrogatory asked

3    Mr. Kimbrough to identify and

4    describe, with specificity, the

5    information disclosed by him during

6    his May 29, 2024, telephone

7    conversation with Attorney Brian

8    Zeiger.  If you can please take a

9    moment to just read his response in

10   bold and then let me know when you're

11   done reading.

12   A.    I'm finished.

13   Q.    Is that response, the --- the

14   information in that response, is that

15   what you recall Mr. Kimbrough telling

16   Attorney Zeiger, what you understood

17   Mr. Kimbrough to be telling attorney

18   Zeiger?

19                    ATTORNEY BURNS:

20                    And I am going to object

21           to the extent that the County

22           determines this to be

23           confidential information, but I

24           am instructing my client to

25           answer to the extent that she

26

1            can.

2                    THE WITNESS:

3                    This seems a little bit

4            more detailed, but it's

5            essentially what I was told in

6            the past.

7    BY ATTORNEY MANSOUR:

8    Q.    Okay.

9            Can you tell me specifically,

10   based on that response, what

11   information is confidential?

12                    ATTORNEY BURNS:

13                    And just, same

14           objection.  I'm instructing my

15           client to answer.

16                    THE WITNESS:

17                    He's going into detail

18           about why an officer was called

19           away from her post.

20   BY ATTORNEY MANSOUR:

21   Q.    Can you tell me exactly where

22   it says that?

23   A.    He says that, Officer Ulmer

24   received a telephone call and was

25   directed by another lieutenant to

27

1    leave her reception post and report to

2    another area of the jail to help with

3    a different assignment. And he goes on

4    to say that Officer Atiles didn't know

5    Officer Ulmer left and sent Rhoades up

6    to see her following his strip search.

7     Really, the whole rest of it after

8    that is confidential.  It contains

9    details of what took place inside the

10   prison that day, with regard to who

11   was watching the inmates.

12   Q.    Okay, so, and let's just go

13   back.  In terms of Ulmer, Officer

14   Ulmer being pulled from her from

15   reception to another post.  I believe

16   your response prior to that was that

17   he had said why, that he had told

18   Attorney Zeiger why Ulmer had been

19   pulled.  But it doesn't say that

20   there, just, it only says that she was

21   pulled, not why, right?

22   A.    She received a telephone call

23   and was directed by another lieutenant

24   to leave her reception post and report

25   to another area of the jail to help

```
                                                    28
  1    with the different assignment.
  2    Q.      But it doesn't say why.  Like,
  3    it doesn't say why she was pulled from
  4    the post, why --- what the other
  5    assignment was.  Doesn't say any of
  6    that, right?
  7    A.      Well, I meant the telephone
  8    call was why.
  9    Q.      Because she was pulled, she was
 10    pulled from that post, right?  That's
 11    what happened?
 12    A.      Right.
 13    Q.      Okay.
 14            Officer, then you said the rest
 15    of it is confidential.  Can you point
 16    out specifically what remaining
 17    portion of that response was --- is
 18    confidential information?
 19    A.      Again, I think pretty much all
 20    of it is.  He's detailing that Officer
 21    Atiles didn't know Officer Ulmer left,
 22    sent Rhoades off to see her following
 23    his strip search.  Not only was
 24    Officer Ulmer not present when Rhoades
 25    returned to the front, but Officer
```

29

1    Ulmer also failed to secure the

2    holding cell in which Rhoades had

3    previously stashed his drugs because

4    she had been pulled off the unit.

5    That level of detail was not released

6    to the media.  That level of detail

7    wouldn't be released via a right-to-

8    know request.  So why would Mr.

9    Kimbrough think that he was at liberty

10    to discuss those details with

11    Plaintiff's Counsel?

12    Q.    So maybe it's best, before we

13    keep going, for me to ask you this.

14    What's --- what's the definition of

15    confidential?  When you keep using the

16    word confidential, what do you mean by

17    that?

18    A.    Information that should be kept

19    private, that an employee learns due

20    to their job, information that they

21    wouldn't have otherwise.

22    Q.    So, any information learned by

23    an employee in the course of their job

24    is confidential?

25    A.    If it's something that could

1  cause harm to the employer, if it's
2  something that encompasses information
3  that is not otherwise public, I would
4  consider that to be confidential.
5  Q.    Now, that term, confidential,
6  that's not defined in any of the
7  County's policies, is it?
8                      ATTORNEY BURNS:
9                      Objection, form, but you
10         can answer if you're able to.
11                      THE WITNESS:
12                      I don't see why we would
13         need to.  I define a word that
14         we all learned the meaning of
15         in grade school.  I don't think
16         that we have definitions of a
17         lot of words in policies.  I
18         think that there's a certain
19         latitude given when you are in
20         a level, a position with a
21         level of authority.  I think
22         it's common sense that someone
23         would understand what the word
24         confidential means.
25  BY ATTORNEY MANSOUR:

31

1    Q.    Well, not every piece of
2    information that an employee in the
3    jail learns during the course of their
4    employment would be confidential.  You
5    would agree with that, wouldn't you?
6    A.    Yes, but I would say that an
7    employee, especially an employee in a
8    management-level position, should have
9    the critical thinking skills and the
10   common sense needed to determine what
11   is confidential and what is not.
12   Q.    Shouldn't he be trained on
13   that?
14   A.    You can't train everybody on
15   everything, especially when it comes
16   down to common sense.
17   Q.    Well, if the County has a
18   particular idea or understanding of
19   what confidential, of what information
20   is confidential, shouldn't jail
21   employees be trained on that?
22   A.    I can't speak to what jail
23   employees are trained on because
24   that's operational and that doesn't
25   get handed over to human resources.

32

1    In my own department, I train my own

2    staff on what's confidential.

3    Q.    So, if, and this is just a

4    hypothetical, say, Mr. Kimbrough saw

5    one day that John Smith was being

6    brought into the jail for booking, is

7    that confidential, that John Smith was

8    brought in on a particular date for

9    booking?

10                ATTORNEY BURNS:

11                Objection, form.  You

12        can answer if you're able to.

13                THE WITNESS:

14                I would imagine that

15        releasing the name of an

16        individual who was brought into

17        the jail would be confidential,

18        yes.

19    BY ATTORNEY MANSOUR:

20    Q.    Nobody else knows about that

21    besides people who work in the jail?

22    A.    I suppose it could be in the

23    newspaper.

24    Q.    Okay.

25        So, you would agree then that

33

1    at least that piece of information,

2    maybe the identity of a person who was

3    booked on a particular date, it's not

4    confidential.  Lots of people besides

5    employees of the County would know

6    that information, right?

7    A.    I suppose that information,

8    there --- there are other ways to get

9    that information, yes.

10   Q.    When Mr. Rhoades, and I'm not

11   sure if you know the answer to this

12   question, but when Mr. Rhoades was

13   initially brought into the jail,

14   Officer Ulmer was present, correct?

15   A.    Can you repeat that?

16   Q.    Sure.

17         When Mr. Rhoades was first

18   brought into the jail for processing,

19   Officer Ulmer was present for that?

20   A.    I'm not sure.

21   Q.    If Officer Ulmer was present

22   initially, and then was called off the

23   unit such that when Rhoades returned

24   to his holding cell, she was no longer

25   there, Rhoades would know that, right?

34

1              ATTORNEY BURNS:

2              Objection.

3              THE WITNESS:

4              I'm sorry, can you

5       repeat that?

6  BY ATTORNEY MANSOUR:

7  Q.     Sure.

8         So, assuming Officer Ulmer was

9  present when Rhoades arrived, then

10  according to this response he was

11  subsequently searched by Officer

12  Atiles, at which time during that

13  search, Officer Ulmer was pulled off

14  the unit, correct?  That's what ---

15  that's what this says, that while he

16  was being searched, Officer Ulmer was

17  pulled off the unit?

18  A.     Let me go back and look at it

19  again.

20         Now I forget the question.

21  Q.     Okay.

22         So, my question was, if Officer

23  Ulmer was initially there when Rhoades

24  arrived, but then was called off the

25  unit at some point before Rhoades went

35

1    back to his holding cell, Rhoades

2    would know that Ulmer was no longer on

3    the unit, right?

4    A.    I'm not sure.

5                   ATTORNEY BURNS:

6                   Objection, speculative,

7         but you can answer.

8                   THE WITNESS:

9                   My answer is I'm not

10        sure.

11   BY ATTORNEY MANSOUR:

12   Q.    So, let me pose a hypothetical

13   to you.  Assume Rhoades arrives and

14   sees Officer Ulmer, okay, you

15   following me?

16   A.    Mm-hm.

17   Q.    Okay.

18   A.    Yes.

19   Q.    Then he's being searched by ---

20   he gets taken out of his holding cell

21   and is searched by Officer Atiles, you

22   follow me?

23   A.    Yes.

24   Q.    And while he's being searched

25   by Officer Atiles, Officer Ulmer gets

36

1    pulled off that unit to another unit

2    by her superior, follow me?

3    A.    Yes.

4    Q.    Okay.

5          And then Rhoades is released by

6    Officer Atiles back to his holding

7    cell, follow?

8    A.    Yes.

9    Q.    And sees that Officer Ulmer is

10   no longer there, follow?

11   A.    Yes.

12   Q.    Okay.

13         Rhoades would know that Ulmer

14   got pulled off the unit, right?

15                 ATTORNEY BURNS:

16                 Objection to form, but

17         answer if you can.

18                 THE WITNESS:

19                 I don't know what

20         Rhoades would know.  He would

21         know he didn't see her at that

22         moment.

23   BY ATTORNEY MANSOUR:

24   Q.    So, he would know that she was

25   there at one point when he got there,

37

1  but wasn't there at that point when he

2  went back to his holding cell, right?

3  A.     I would agree with that last

4  sentence you said, yes.

5  Q.     So, the fact that Officer Ulmer

6  was there at one point and then not

7  there at a later point would not be

8  confidential, would it?

9  A.     Confidential in the sense that

10  someone else --- it would not be

11  confidential in the sense that Mr.

12  Kimbrough would not be the only person

13  who knew that.  But it still would be

14  a detail of internal operations within

15  the prison that Mr. Kimbrough should

16  not have felt free to discuss with

17  opposing counsel.

18  Q.     Well, it would be a detail that

19  somebody other than an employee of the

20  County might know, for example,

21  Rhoades, right?

22                    ATTORNEY BURNS:

23                    Objection, speculative.

24               You can answer if you can.

25                    THE WITNESS:

38

1          It is possible that
2      someone else besides Mr.
3      Kimbrough would know that.
4  BY ATTORNEY MANSOUR:
5  Q.    Somebody who doesn't work at
6  the jail?
7  A.    But I don't see how someone who
8  doesn't work at the jail would know
9  that.
10  Q.    Well, Rhoades doesn't work at
11  the jail, right?
12  A.    Rhoades is the inmate at the
13  jail.
14  Q.    Correct.
15      So, he doesn't work there,
16  right?
17  A.    Right.
18  Q.    Okay.
19      And he would know that.
20  A.    Right.
21  Q.    What would stop Mr. Rhoades
22  from going and telling other people
23  that Officer Ulmer was pulled from the
24  unit?  She was there when I got here,
25  but not when I went back.

39

1          ATTORNEY BURNS:

2                Objection to form.

3          THE WITNESS:

4                Can you repeat that?

5    BY ATTORNEY MANSOUR:

6    Q.       Sure.

7                What would stop Rhoades from

8    sharing what he just went through?

9    A.       We're not here because of

10   Rhoades sharing something.  We're here

11   because of Mr. Kimbrough, the

12   lieutenant, sharing the information.

13   Q.       Correct.

14               But we're also here because of

15   a dispute over what information is

16   confidential and what information

17   isn't.  So, if, according to your

18   definition, if I recall earlier,

19   confidential information is

20   information that nobody other than the

21   County and its employees should know

22   about, my question is, well, isn't it

23   true that Mr. Rhoades would know and

24   indeed, any other inmate that's

25   processed through the intake ---

40

1    through the intake unit?

2    A.    Yes, Mr. Rhoades would know.

3    But you're simplifying my previous

4    answer, my definition.

5    Q.    In what way?

6    A.    I also said that information is

7    confidential if it's private

8    information that could cause harm to

9    the employer.  And therefore, an

10   employee who is a management level

11   employee should know better than to

12   release information that reflects

13   internal processes that could be

14   harmful to the employer.

15   Q.    Okay, what --- what would be

16   the harm to the employer that would

17   have been caused by Kimbrough telling

18   Attorney Zeiger that Ulmer was pulled

19   from the unit before Rhoades returned

20   to his holding cell?

21   A.    Identifying a possible

22   breakdown in communication within the

23   prison.

24   Q.    I'm sorry, what was that?

25   A.    Identifying a possible

41

1    breakdown in communication within the

2    prison.

3    Q.      Okay.

4    A.      Breakdown in communication,

5    meaning if it happened the way Mr.

6    Kimbrough is saying, that an officer

7    was removed from her post and that

8    that led to an inmate not being

9    watched properly, that is a detail

10   that there would be no reason to share

11   with Plaintiff's Counsel.

12   Q.      Okay, you're saying that there

13   should be no reason to share, but is

14   that the same thing as confidential?

15   Like, you or the County not wanting

16   Kimbrough to share that information,

17   does that make it confidential?

18   A.      Again, what makes something

19   confidential is when it's details that

20   an employee learns through the nature

21   of their job, and that information is

22   sensitive and can be --- could be used

23   to cause harm to the employer.  I

24   would think that releasing details of

25   what took place the day of an inmate

42

1    death, knowing that there is a lawsuit
2    at hand, Lieutenant, Mr. Kimbrough
3    should have known that that could
4    cause harm to the employer.  I believe
5    he did know that that could cause harm
6    to the employer.  Again, he reached
7    out on his own to talk to Plaintiff's
8    Counsel.  He was not asked to.  He was
9    not subpoenaed to give testimony.  He
10   reached out on his own to provide
11   sensitive information to Plaintiff's
12   Counsel, to help Plaintiff and hurt
13   the employer.
14   Q.     Okay, and so when you say hurt
15   the employer, do you mean from a
16   litigation perspective, like it was
17   potentially bad for their lawsuit?
18   A.     Yes.
19                    ATTORNEY BURNS:
20                    Objection, speculation.
21            You can answer.
22   BY ATTORNEY MANSOUR:
23   Q.     Well, what do you mean by
24   harmful to the employer in this
25   context?  You know, because you ---

43

1    you --- and I'll re-ask the question.
2     So, you had said that he emphasized
3    that he reached out on his own to a
4    plaintiff's lawyer who was suing the
5    County, and because of that, that was
6    harmful to the County.  Harmful, I
7    assume you mean in the sense of
8    potentially harmful to the County's
9    defense of that lawsuit?
10   A.    Yes, that is what I meant.
11         It also could be harmful in
12   other ways.
13   Q.    What other ways?
14   A.    For safety in the prison.
15   Q.    How --- how would it have been
16   harmful for safety in the prison?
17   A.    For other people to learn of
18   Mr. Kimbrough's assertion that it ---
19   that the situation could have been
20   prevented.  And I'm not saying it
21   could have.  I'm saying that he
22   believes that the situation could have
23   been prevented if Officer Ulmer were
24   not called away to another post.
25   Q.    Okay, so that's his opinion,

44

1    right?

2    A.      Right.

3    Q.      Okay.

4           And so, his statement of

5    opinion is different from his

6    statement of the facts and what

7    actually happened, right?

8    A.      Right.

9    Q.      Okay.

10          So, two people could look at

11   the same set of facts and arrive at

12   two different opinions, right?

13   A.      Right.

14   Q.      Is it possible that Rhoades

15   could have told, once he --- once he

16   was processed and actually in the jail

17   population, that he could have told

18   other people exactly what happened and

19   how he got the drugs in?

20   A.      It's possible.

21   Q.      Is there any, are you aware of

22   any measures that the County takes or

23   --- to prevent that from happening?

24                    ATTORNEY BURNS:

25                    Objection, form.  Answer

45

1        if you're able to.

2   BY ATTORNEY MANSOUR:

3   Q.    So, I'll clarify.  Are you

4   aware of any measures that the County

5   takes to prevent inmates who are

6   processed through the intake unit from

7   sharing the details about that

8   processing with other inmates?

9   A.    No, I would not be aware of

10  that.

11  Q.    If Rhoades had, let's say, once

12  he's processed, he told somebody else

13  that he met in jail exactly what he

14  did and how he got jails --- drugs

15  into the jail, would that be

16  confidential?

17               ATTORNEY BURNS:

18               Objection to form.  You

19       can answer.

20               THE WITNESS:

21               Rhoades, the inmate.

22  BY ATTORNEY MANSOUR:

23  Q.    Rhoades, the inmate.

24  A.    If he told how he did it, would

25  that be confidential?  He's not

46

1    subject to the same standards as an

2    employee.

3    Q.    That's not what I'm asking.

4    I'm asking is, under your definition

5    of confidential, would Rhoades sharing

6    that information, would that

7    information be considered confidential

8    if it was shared by Rhoades with

9    somebody else?

10   A.    I'm not sure.

11   Q.    So, if Rhoades told a fellow

12   inmate that Officer Ulmer was pulled

13   from the unit while I was being

14   searched, then I went back into my

15   cell, retrieved the drugs I hid there,

16   and snuck them into the prison, would

17   that information be confidential?

18                    ATTORNEY BURNS:

19                    Objection to form.

20        Answer if you're able to.

21                    THE WITNESS:

22                    I'm not sure.

23   BY ATTORNEY MANSOUR:

24   Q.    What --- what makes you unsure?

25   A.    Because you're talking about an

47

1    inmate.  You're talking about an

2    inmate potentially sharing information

3    about something that he himself did.

4    Q.    Well, I'm asking about

5    information, right?  So --- so, are

6    you saying that information is only

7    confidential depending on who shares

8    it?

9                    ATTORNEY BURNS:

10                   Objection to form.  You

11        can answer if you're able to.

12                    THE WITNESS:

13                   Sometimes that would be

14        the case.

15    BY ATTORNEY MANSOUR:

16    Q.    So, if, for example, Lieutenant

17    Kimbrough shares fact A, it may be

18    confidential, but if Rhoades shares

19    with somebody else, fact A, it might

20    not be confidential?

21    A.    Yes, because Kimbrough was the

22    employee.

23    Q.    So, whether information,

24    whether facts are confidential,

25    depends on who's sharing them.

48

1    A.     I can't control what an inmate

2    shares.

3    Q.     Do inmates have --- okay, let

4    me ask you this.  Internal operating

5    procedures of the jail, okay, in terms

6    of use of force or various other

7    things, I'm aware, as part of this

8    litigation, that there are policies

9    and procedures, internal operating

10   policies and procedures of the Bucks

11   County Correctional Facility.  Is that

12   correct?

13   A.     Can you repeat the question?

14   Q.     Bucks County Correctional

15   Facility has a set of internal

16   operating procedures, correct?

17   A.     Yes.

18   Q.     And in your view, those

19   internal operating procedures would be

20   confidential, correct?

21   A.     Yes.

22   Q.     Do inmates have access to that

23   information?

24   A.     No.

25   Q.     Does anybody other than

49

1    employees of the County or the jail
2    have access to that information?
3    A.    I'm not sure.
4    Q.    Are you aware of any incidents
5    in which somebody other than an
6    employee of the County or the jail had
7    access to that information?
8    A.    No.
9    Q.    Now, obviously, because
10   Rhoades, at least according to what
11   Mr. Kimbrough said, that Rhoades hid
12   drugs in his holding cell, which he
13   then retrieved and snuck into the
14   jail.  From that, we can assume that
15   his holding cell was not searched,
16   right?
17                    ATTORNEY BURNS:
18                    Objection, form.
19                    THE WITNESS:
20                    Yeah, I cannot assume
21          that.
22   BY ATTORNEY MANSOUR:
23   Q.    If his holding cell was not
24   searched, would that be confidential?
25   A.    Yes.

50

1    Q.    Why?

2    A.    Because it would contain

3    information that was internal to the

4    prison.

5    Q.    Wouldn't Rhoades know that his

6    cell was not searched?

7    A.    I don't know.

8               ATTORNEY BURNS:

9               Objection to form.  You

10    can answer.

11               THE WITNESS:

12               My answer is I don't

13    know.

14    BY ATTORNEY MANSOUR:

15    Q.    Are you familiar with the

16    details of the lawsuit that Attorney

17    Zeiger had filed against the County?

18    The Corbin versus Bucks County matter?

19    A.    Not very much, no.

20    Q.    Are you aware of the fact that

21    Attorney Zeiger knew about the fact

22    that Officer Ulmer had been pulled

23    from the intake unit?

24               ATTORNEY BURNS:

25               Objection to form.  You can

51

1          answer if you're able to.

2                    THE WITNESS:

3                    No, I would not be privy

4          to that information.

5     BY ATTORNEY MANSOUR:

6     Q.      If you did know that Attorney

7     Zeiger was aware of that information,

8     would that change your view of the

9     fact that whether it was confidential?

10    A.      No, because Kimbrough still

11    shouldn't have sought out opposing

12    counsel and had a discussion the way

13    he did.

14    Q.      That's fine.  Whether he should

15    have or should not have is a separate

16    question from whether the information

17    he shared was confidential.  That is,

18    shouldn't have been known by anybody

19    else other than the County.  So, I'll

20    repeat the question.

21    A.      Okay.

22    Q.      If Zeiger, Attorney Zeiger,

23    knew that Officer Ulmer had been

24    pulled from the intake unit, would

25    that change your opinion about whether

52

1    that information was confidential?
2                    ATTORNEY BURNS:
3                    Objection to form.  You
4        can answer.
5                    THE WITNESS:
6                    My answer is no.
7    BY ATTORNEY MANSOUR:
8    Q.    And why --- why would it still
9    be confidential if somebody other than
10   or if somebody who doesn't work for
11   the County knew about that, like
12   attorney Zeiger?
13   A.    Whether or not the information
14   was known, it was still sensitive
15   information that had to do with
16   details of the inner workings of the
17   prison that should not have been
18   shared.
19   Q.    Okay.
20          Did it have to do with the
21   inner workings of the prison or with a
22   specific incident?  Like Mr.
23   Kimbrough, you'll agree with me,
24   shared information about what he saw
25   happened.  About an incident that

53

1    happened and what he saw, correct?

2                    ATTORNEY BURNS:

3                    Objection to form.

4              THE WITNESS:

5                    You're going to need to

6         repeat that.

7    BY ATTORNEY MANSOUR:

8    Q.    Okay.

9          You would agree with me that

10   based on this interrogatory response,

11   Mr. Kimbrough shared information about

12   what he saw on that particular date?

13   A.    I don't know if he saw it or he

14   learned of it and repeated it, but he

15   shared information that he felt

16   pertained to that incident in

17   question.

18   Q.    Who determined that the

19   information Mr. Kimbrough shared was

20   confidential?

21                   ATTORNEY BURNS:

22                   Objection. Attorney-

23        client privilege, but you can

24        answer to the extent it doesn't

25        disclose any attorney-client

54

1        privilege communications.

2              THE WITNESS:

3              Well, the issue was

4        first brought to my attention

5        by Director Kratz.

6   BY ATTORNEY MANSOUR:

7   Q.    Tell me about that

8   conversation.  How did, you know, how

9   did you first become aware of it by

10  Director Kratz?

11  A.    Director Kratz informed me, as

12  well as Chief Operating Officer Margie

13  McKevitt, that Mr. Kimbrough had

14  shared confidential information with

15  Plaintiff's Counsel.

16  Q.    Do you recall when that

17  conversation happened between you and

18  Director Kratz?

19  A.    Exactly, no.  But it would have

20  been shortly before Mr. Greaser and I

21  interviewed Mr. Kimbrough.

22  Q.    Okay.

23            So, I'll represent to you that

24  the phone call Attorney Kimbrough made

25  to Attorney Zeiger was on May 30th,

55

1    and based --- May 30, 2024.  And based

2    on the discovery responses that we've

3    gotten, the interview between Attorney

4    Greaser and Mr. Kimbrough and

5    yourself, occurred on June 12, 2024.

6    So, you're saying the conversation

7    between you and Mr. --- Director Kratz

8    occurred between May 30th and June

9    12th, 2024?

10   A.      Correct.

11   Q.      Was that an in-person

12   conversation or over the phone?

13   A.      It may have been an email, the

14   way that we were first informed, it

15   would either have been an email or

16   over the phone or a Teams meeting.

17   Q.      What do you recall Director

18   Kratz telling you?

19   A.      That Mr. Kimbrough had

20   contacted Plaintiff's Counsel and

21   released confidential information.

22   Q.      Did Director Kratz detail for

23   you the information that Mr. Kimbrough

24   shared?

25   A.      I don't recall if it was

56

1    detailed in that initial conversation

2    or if that came about later.

3    Q.    When did you first learn the

4    details about what Mr. Kimbrough

5    shared?

6    A.    I learned more details in the

7    conversation that I was part of with

8    Dan Greaser.

9    Q.    And during that conversation,

10   Mr. Kimbrough told you the contents of

11   his conversation with Attorney Zeiger?

12                ATTORNEY BURNS:

13                    Objection, form.  Can we

14        just clarify, are you talking

15        about when the three of them

16        met?

17   BY ATTORNEY MANSOUR:

18   Q.    When the three of you met, yes.

19   On or about June 12th.

20   A.    Sorry, you have to repeat the

21   question.

22   Q.    Yeah.

23        So, when the three of you met,

24   you, Director Kratz and --- or, I'm

25   sorry, you, Attorney Greaser, and Mr.

57

1    Kimbrough met on or about June 12th.
2    Does that sound correct?
3    A.      That's correct.
4    Q.      Okay.
5           And during that meeting, you're
6    saying that Mr. Kimbrough --- or that
7    was the first time you learned about
8    what Mr. Kimbrough told Attorney
9    Zeiger, the details of what he told
10   Attorney Zeiger?
11   A.    I didn't say that I was certain
12   that was the first time.  I said that
13   I learned more information in that
14   meeting with Dan Greaser.
15   Q.      Okay.
16          What do you recall Attorney
17   Kimbrough, or --- I'm sorry, Mr.
18   Kimbrough saying during that meeting?
19                  ATTORNEY BURNS:
20              I'm going to object to
21          the extent that the County
22          determined that to be
23          confidential information, but
24          you can answer.
25                  THE WITNESS:

58

1              Mr. Kimbrough talked to
2         us about having a conversation
3         with Plaintiff's Counsel about
4         that case.
5    BY ATTORNEY MANSOUR:
6    Q.    Did he --- did he tell you
7    substantially the same information
8    that's in his response to
9    interrogatory nine that you just
10   reviewed?
11                ATTORNEY BURNS:
12               Objection, form.  You
13        can answer, go ahead.
14                THE WITNESS:
15               Not in that level of
16        detail, but essentially, yes.
17   BY ATTORNEY MANSOUR:
18   Q.    Okay.
19                ATTORNEY MANSOUR:
20               So, I think we're up to
21        four, right?
22                THE COURT REPORTER:
23               We had P-3, P-2, and now
24        we're up to ---
25                ATTORNEY MANSOUR:

59

1              And I had a P-1 at the
2         prior deposition.  So, yeah,
3         we're gonna, we'll go with
4         four.  Okay, so here's a copy
5         for --- for Dara.
6                        ---
7              (Whereupon, Deposition
8              Exhibit, P-4, Emergency
9              Motion, was marked for
10             identification.)
11                       ---
12    BY ATTORNEY MANSOUR:
13    Q.    This is an emergency motion
14    that was filed by Attorney Zeiger on
15    May 31, 2024, in the Corbin matter.
16    And this was a motion to reopen
17    discovery based exclusively on
18    Attorney Zeiger's conversation with my
19    client.  I want to direct your
20    attention to paragraph four of that
21    motion.  If you could just take a
22    moment to read it to yourself and let
23    me know when you're done.
24    A.    Okay.
25    Q.    Okay.

60

1          Do you recall, actually, before

2     I ask that, let me show you another

3     document.  I want to turn your

4     attention to page three of that

5     document, paragraph eight.  Take a

6     moment to read that to yourself.

7                    - - -

8               (Whereupon, Deposition

9               Exhibit, P-5,

10              Memorandum, was marked

11              for identification.)

12                   - - -

13              THE WITNESS:

14              Okay.

15    BY ATTORNEY MANSOUR:

16    Q.     Have you seen this document

17    before?

18    A.     I'm not sure.

19    Q.     Okay, so it appears to be a

20    memorandum from Attorney Greaser to

21    County Solicitor Amy Fitzpatrick,

22    dated June 13, 2024, which is the day

23    after you, Attorney Greaser, you and

24    Attorney Greaser met with my client.

25    According to paragraph 8 of Attorney

61

1    Greaser's memorandum, you would agree

2    with me that he's saying that what Lt.

3    Kimbrough told Attorney Zeiger is

4    accurately summarized in paragraph

5    four of Attorney Zeiger's motion,

6    right?

7                    ATTORNEY BURNS:

8                    Objection to form.  You

9          can answer if you're able to.

10                    THE WITNESS:

11                    I want to reread it.

12   BY ATTORNEY MANSOUR:

13   Q.    Sure.

14   A.    What does PC stand for?

15   Q.    Plaintiff's Council.

16   A.    Repeat the question, please.

17   Q.    Sure.

18         So, according to Attorney

19   Greaser's memorandum, it's his opinion

20   that Attorney Zeiger accurately

21   summarized what my client told him in

22   their telephone conversation.

23   A.    I believe that's correct.

24   Q.    Was Lt. Kimbrough fired for any

25   reason other than sharing confidential

62

1    information, or alleged confidential

2    information with Attorney Zeiger?

3    A.    He was terminated for all of

4    the reasons listed on the discipline

5    and the termination letter.

6    Q.    I just want to make sure we're

7    on the same page with that.  I think

8    this is what was P-1 at Margaret's

9    deposition.

10    A.    I have that.

11    Q.    Okay, just take a look at that

12    document, P-1.

13                          - - -

14                    (Whereupon, Deposition

15                    Exhibit P-1, Bucks

16                    County Email, was marked

17                    for identification..)

18                          - - -

19    BY ATTORNEY MANSOUR:

20    Q.    That's the termination letter

21    that was provided to Mr. Kimbrough,

22    correct?

23    A.    Correct.

24    Q.    And that was provided to him on

25    July 29, 2024?

63

1    A.    Correct.

2    Q.    And you're the author of that

3    letter?

4    A.    I am.

5    Q.    And that's your signature at

6    the bottom?

7    A.    It is.

8    Q.    Okay.

9          And the second page, a

10   disciplinary action form, you authored

11   that as well?

12   A.    I did.

13   Q.    Did anybody review this letter,

14   the first page of this document, did

15   anybody review it before you provided

16   it to Mr. Kimbrough?

17   A.    I don't recall if they reviewed

18   the exact letter.  Everything that was

19   contained in it was reviewed and

20   agreed upon with the unanimous

21   decision made by Margie McKevitt, the

22   legal team, and David Kratz.

23   Q.    So, turning to the second page,

24   you testified just a moment ago that

25   Mr. Kimbrough was terminated for the

64

1    reasons listed in his termination

2    letter and the final disciplinary

3    action form.

4    A.    Right.

5    Q.    The final disciplinary action

6    form basically says that he was being

7    terminated because he shared

8    confidence information with

9    Plaintiff's Counsel, and that he

10   admitted to contacting Plaintiff's

11   Attorney and sharing confidential

12   information, which pertained to a

13   lawsuit against the DOC/County of

14   Bucks, correct?

15   A.    Correct.

16   Q.    So, that was the reason he was

17   fired, right?

18   A.    Yes.

19   Q.    Okay.

20         If the information didn't

21   pertain to a lawsuit, would he have

22   been fired?

23   A.    If he shared the same

24   confidential information with outside

25   counsel, but outside counsel was not

65

1    currently suing us?

2    Q.    If he shared it with anybody --

3    - any --- any person who didn't work

4    at the County.  If he shared the same

5    information with any person who didn't

6    work at the County, unrelated to any

7    lawsuit against the County, would he

8    have still been fire?  Let's say this

9    hypothetically, let's say Mr.

10   Kimbrough called a news reporter and

11   shared all this information with them.

12    Would he have been fired?

13                    ATTORNEY BURNS:

14                    Objection, form.  But

15         you can answer if you're able

16         to.

17                    THE WITNESS:

18                    We would have

19         investigated, and we would have

20         discussed whether he should be

21         fired.  I don't know that I can

22         say with 100 percent certainty

23         that he would have been fired.

24          Every situation is different.

25   BY ATTORNEY MANSOUR:

66

1    Q.    Okay, so his termination under

2    the circumstances here, the fact that

3    he called Attorney Zeiger, who was

4    suing the County, shared that

5    information, shared the information,

6    you agreed with the decision to fire

7    him for that reason, right?

8    A.    I did.

9    Q.    Would you have agreed, I'm

10   asking for your own personal opinion,

11   would you have agreed to fire him if

12   he had instead called a news reporter

13   and shared the same exact information?

14   A.    Most likely.  But I'm not going

15   to answer that with 100 percent

16   certainty because that would have

17   changed the situation and I would have

18   to review all the factors involved in

19   that.

20   Q.    Why would it have changed the

21   situation?  In what way?

22              ATTORNEY BURNS:

23              Objection form.  You can

24        answer if you're able to.

25              THE WITNESS:

67

1            Due to the level of
2        risk, due to what the media
3        would do with the information,
4        compared to what Plaintiff's
5        Counsel would do with the
6        information.
7   BY ATTORNEY MANSOUR:
8   Q.    Can you elaborate a little bit
9   more on that?  So, what do you mean by
10  that?
11                  ATTORNEY BURNS:
12            Objection, form.  You
13          can answer if you're able
14          to.
15                  THE WITNESS:
16            I mean, that you have to
17        consider all factors when
18        someone releases confidential
19        information.  You have to
20        evaluate the risks of the
21        situation and what the
22        potential harm to the employer
23        is.
24  BY ATTORNEY MANSOUR:
25  Q.    Are you saying that the

68

1    potential harm to the employer would

2    have been different had he contacted a

3    news reporter as opposed to an

4    attorney who was suing the County?

5                    ATTORNEY BURNS:

6                    Objection, form.  You

7            can answer if you're able to.

8                    THE WITNESS:

9                    I'm not sure.  I think

10           most likely, the end result

11           would still be termination

12           because he still released

13           information that should have

14           been kept confidential and was

15           not subject to public knowledge

16           to, in your example, the media,

17           it most likely would have still

18           resulted in termination.  But

19           I'm not going to say that with

20           100 percent certainty because

21           weigh all factors and take each

22           decision very seriously and

23           have a lot of discussion about

24           it.

25    BY ATTORNEY MANSOUR:

69

1  Q.     So, the fact that he contacted

2  a plaintiff's attorney who is suing

3  the County, as opposed to a news

4  reporter is an important factor that

5  you consider?

                    ATTORNEY BURNS:

6

7                   Objection, form, but you

8       can answer.

9                   THE WITNESS:

10                  It is a factor that was

11      considered.

12  BY ATTORNEY MANSOUR:

13  Q.     And then your testimony is your

14  decision might have been different if

15  he had contacted a news reporter

16  instead?

17                  ATTORNEY BURNS:

18                  Objection, form.  You

19      can answer if you're able to.

20                  THE WITNESS:

21                  It most likely would

22      have been the same answer.  I'm

23      not going to say with 100

24      percent certainty that it would

25      have been the same.

70

1    BY ATTORNEY MANSOUR:

2    Q.    Were you 100 percent certain

3    that he should be fired for contacting

4    Plaintiff's Counsel?

5                    ATTORNEY BURNS:

6                    Objection, form.

7                    THE WITNESS:

8                    For contacting

9         Plaintiff's Counsel ---

10   BY ATTORNEY MANSOUR:

11   Q.    And sharing the information ---

12   A.    And sharing confidential

13   information.  It was a unanimous

14   decision, and yes, I was 100 percent

15   certain.

16   Q.    So, the fact that he contacted

17   Plaintiff's Counsel, in your view,

18   makes it --- makes it an easier

19   decision or a clearer decision than

20   had he contacted a reporter?

21                    ATTORNEY BURNS:

22                    Objection, form,

23        argumentative, speculative

24        mischaracterization, but you

25        can answer if you can.

71

1          THE WITNESS:

2                Again, I'm not sure.

3          Had your hypothetical situation

4          actually played out, we would

5          have reviewed all of the

6          factors involved in that

7          situation.

8     BY ATTORNEY MANSOUR:

9     Q.     Well, what I'm trying to get at

10    is why --- why --- why are you so

11    certain that him sharing this

12    information with Attorney Zeiger is

13    definitely a terminable offense, but

14    you can't speak with that same level

15    of certainty had he contacted a

16    reporter?

17    A.     I think the intent is more

18    obvious, that he was trying to create

19    trouble for the employer by contacting

20    Plaintiff's Counsel in an ongoing

21    lawsuit against the employer.

22    Q.     And that was the biggest

23    problem here, right?  That he was

24    making trouble for the County in their

25    lawsuit?

72

1              ATTORNEY BURNS:

2              Objection.

3              THE WITNESS:

4              It was a factor to

5         consider his motivation and

6         that it seemed like he was

7         trying to make trouble for the

8         employer.  It seemed like he

9         was upset with the employer for

10        writing him up, just before

11        this, for bullying.

12   BY ATTORNEY MANSOUR:

13   Q.    So, his motivation was a factor

14   in the --- in the County's decision to

15   discharge him?

16   A.    I can only give my opinion on

17   his motivation.  I certainly can't say

18   that I know for a fact what Mr.

19   Kimbrough's motivation was.  But by

20   contacting Plaintiff's Counsel to give

21   information that could be damaging to

22   his employer, I can only surmise that

23   he was trying to make trouble.

24   Q.    And based on that assumption of

25   yours, that was a factor in his

73

1    discharge?

2                    ATTORNEY BURNS:

3                    Objection, form.  You

4         can answer.

5                    THE WITNESS:

6                    It was something that

7         was discussed.  It was a

8         concern.  There was concern

9         that he could not be trusted to

10        continue to carry out his

11        duties properly.  It was not

12        the reason why he was

13        terminated.  He was terminated

14        because it's a black and white

15        issue that he did not have the

16        employer's best interests at

17        heart, and he was sharing

18        information that was private.

19   BY ATTORNEY MANSOUR:

20   Q.    If Mr. Kimbrough had shared

21   this same information during a

22   deposition like this one, would he

23   have still been fired?

24                   ATTORNEY BURNS:

25                   Objection, form.  You

74

1          can answer if you know.
2                    THE WITNESS:
3                    If he was contacted
4          while he was employed, to
5          participate in a deposition for
6          a lawsuit, no, that would have
7          been different.  That would not
8          have been handled the same way.
9     BY ATTORNEY MANSOUR:
10    Q.    Well, would the information be
11    the same?
12    A.    He would be expected to tell
13    the truth.
14    Q.    Only when he's in a deposition.
15                   ATTORNEY BURNS:
16                   Objection, form.
17                   THE WITNESS:
18                   That Would not be the
19         only time that he is expected
20         to tell the truth.  That's not
21         what I said.
22    BY ATTORNEY MANSOUR:
23    Q.    Okay, so the information that
24    he shared would have been con ---
25    would not have been considered

75

```
1    confidential if he had provided it
2    during a deposition?
3                    ATTORNEY BURNS:
4                    Objection, form.  You
5           can answer if you're able.
6                    THE WITNESS:
7                    Correct.
8    BY ATTORNEY MANSOUR:
9    Q.     But because he provided it
10   voluntarily, outside of a deposition,
11   in a private phone call, that makes it
12   confidential?
13                   ATTORNEY BURNS:
14                   Objection, form.  You
15          can answer if you're able to.
16                   THE WITNESS:
17                   If he was under oath in
18          a deposition and he had to
19          answer those questions, we
20          would expect him to tell the
21          truth and answer the questions.
22           The fact that he was not in
23          that situation and went out of
24          his way to contact Plaintiff's
25          Counsel in an open lawsuit
```

76

1            definitely contributes to why

2            he was --- why the situation --

3            - why the information was

4            confidential.

5    BY ATTORNEY MANSOUR:

6    Q.     Okay, so then, and correct me

7    if I'm wrong, what you're saying is

8    that the information is confidential

9    because he provided it outside the

10   context of testimony in a lawsuit?

11   Testimony under oath in a lawsuit?

12                 ATTORNEY BURNS:

13                 Objection, form.  You

14         can answer.

15                 THE WITNESS:

16                 Repeat the question.

17   BY ATTORNEY MANSOUR:

18   Q.     Sure.

19           So, the information, assuming

20   he shared the same information, so he

21   --- the same information he told

22   attorney Zeiger in this phone call,

23   let's assume he shared that same

24   information in a deposition.  In the

25   deposition, it wouldn't have been

77

1    confidential.  Is that what you're
2    saying?
3                    ATTORNEY BURNS:
4                    Objection, form.
5    BY ATTORNEY MANSOUR:
6    Q.    I believe that's what you
7    testified to.
8                    ATTORNEY BURNS:
9                    Objection,
10           mischaracterization.  I believe
11           this was already asked and
12           answered.  Answer if you can.
13                   THE WITNESS:
14                   Yeah, it feels like
15           you're spinning my words out of
16           context.
17                   ATTORNEY BURNS:
18                   Objection, form.  You
19           can answer.
20                   THE WITNESS:
21                   Repeat the question.
22    BY ATTORNEY MANSOUR:
23    Q.    Well, what I'm trying to say is
24    the information is the same
25    information.  So, what you're saying

78

1    makes it confidential is the context

2    in which he says it?

3                    ATTORNEY BURNS:

4                    Objection.

5    BY ATTORNEY MANSOUR:

6    Q.    Is that --- is that what you're

7    saying?

8                    ATTORNEY BURNS:

9                    Objection,

10         argumentative.  Can you ask the

11         question again in a different

12         way?

13   BY ATTORNEY MANSOUR:

14   Q.    Sure.

15         Are you saying that what makes

16   the information confidential is the

17   context in which he shared it?

18   A.    No, that is not the only thing

19   that makes the information

20   confidential.

21   Q.    Okay, but you did testify

22   earlier that had he shared that

23   information during a deposition under

24   oath, it would not have been

25   confidential.

79

1    ATTORNEY BURNS:

2    Objection.

3    BY ATTORNEY MANSOUR:

4    Q.    We can ask the court reporter

5    to read back your answer to my

6    question a minute ago or so, but I'm

7    pretty sure that's what you said.

8    A.    It would not have been, again,

9    we would want him to tell the truth.

10   You are under oath, you tell the

11   truth.

12   Q.    But you also don't want him to

13   share confidential information, so ---

14   A.    He shared confidential

15   information he did not have to share.

16    He went out of his way to make

17   trouble for the employer by contacting

18   Plaintiff's Counsel in an open lawsuit

19   against the County.  He was not acting

20   in course and scope of his job.  If he

21   were in a deposition, he would be

22   acting under course and scope of his

23   job.  And he would be under oath and

24   expected to answer all the questions.

25    He wasn't answering questions.  He

80

1   was volunteering private information

2   about something that happened inside

3   the jail that was not public

4   knowledge.  That attorney did not have

5   the level of detail that Mr. Kimbrough

6   provided.

7   Q.    Okay, so going back to my

8   original question, it's the context in

9   which he shared that information that

10  made a terminable offense, correct?

11                  ATTORNEY BURNS:

12                  Objection, form.  You

13       can answer.

14                  THE WITNESS:

15                  Yes, that is a factor.

16  BY ATTORNEY MANSOUR:

17  Q.    Okay.

18        So, you were aware --- so, you

19  were aware of the information that Mr.

20  Kimbrough shared with Attorney Zeiger,

21  correct?  You were one person who was

22  aware of that?

23  A.    Not in the level of detail.

24  But you're going back to what we

25  talked about, that I was made aware of

81

1    what he did, which is what led to him

2    being interviewed.

3    Q.    Fair enough.

4         Okay, what I'm trying to get at

5    is I want to know who knew about what

6    he said.  So, you knew about his

7    conversation with Attorney Zeiger,

8    correct?

9    A.    Yes.

10   Q.    Okay.

11        David Kratz knew about his

12   conversation with Attorney Zeiger,

13   correct?

14   A.    Correct.

15   Q.    Margaret McKevitt knew about

16   his conversation with Attorney Zeiger.

17   A.    Correct.

18   Q.    Members of the law department

19   knew about his conversation with

20   Attorney Zeiger?

21   A.    Correct.

22   Q.    Attorney Zeiger knew about his

23   conversation with Attorney Zeiger,

24   correct?

25   A.    Yes.

82

1    Q.    Diane Otto, did she know about

2    Mr. Kimbrough's conversation with

3    Attorney Zeiger?  I know she was

4    copied on this, P-3.

5    A.    I don't know if she knew.  No,

6    I don't know if she knew that.

7    Q.    Okay.

8          How about Frank Albanese?

9    A.    I don't know if he knew that.

10   Q.    And how about James Coyne?

11   A.    I can't say to what he knew.

12   That --- he --- he is the deputy

13   director of the prison, so he would be

14   involved to the extent that Dave Kratz

15   would involve him.  I can't speak to

16   what that level was.

17   Q.    Fair enough.  Okay.

18          But it's, just as far as you're

19   personally aware, you knew about his

20   conversation, Mr. Kratz knew about his

21   conversation, Ms. McKevitt knew about

22   his conversation, and various members

23   of the law department knew about his

24   conversation, correct?

25   A.    Correct.

83

1    Q.    Anybody else that you know,

2    were reasonably certain knew about his

3    conversation with Attorney Zeiger, him

4    being my client?

5    A.    Not that I'm aware of.

6          Can I just clarify?  Ms. Otto

7    and Mr. Albanese work for community

8    sources.  They were copied on the

9    email for administrative reasons, for

10   processing the discipline.

11   Q.    Did you ever have any

12   substantive --- substantive

13   conversations with either of them

14   about Mr. Kimbrough's conversation

15   with Attorney Zeiger?

16   A.    I don't believe so.  Ms. Otto

17   was involved in the prior incident

18   investigating Mr. Kimbrough for

19   bullying.  She was not directly

20   involved in this investigation, nor

21   was Mr. Albanese.

22   Q.    And I apologize if you already

23   answered this question, but I just

24   want to get clarification.  So, Ms.

25   McKevitt agreed with the decision to

84

1    terminate Mr. Kimbrough?

2    A.      Yes, it was a unanimous

3    decision.

4    Q.      Okay, unanimous among you, Ms.

5    McKevitt, Mr. Kratz, and members of

6    the law department?

7    A.      Correct.

8    Q.      There was no dissent?

9    A.      Correct.

10   Q.      Did you, I'll start with you,

11   did you at any time believe that he

12   should get a lesser form of discipline

13   for this, short of termination?

14   A.      I do not recall saying any such

15   thing.

16   Q.      Did any of the other

17   individuals we mentioned ever suggest

18   that they believed he should get a

19   lesser form of punishment?

20   A.      I mean, it was probably

21   discussed.  I don't remember details

22   of who would have mentioned it or --

23   it's always, options are always

24   discussed.  When someone does

25   something egregious, progressive

85

1    discipline steps can be skipped.  Case
2    in point, Mr. Kimbrough received a
3    step one for bullying shortly before
4    this, and we didn't give him a two for
5    this.  He got termination for this.
6    It's always discussed that there are
7    other options to termination, but it
8    was a unanimous decision to terminate.
9    Q.     Mr. Kimbrough was, before he
10   was terminated, he was suspended,
11   correct?
12   A.     No.
13   Q.     He wasn't?
14   A.     Correct.
15   Q.     Okay.
16   A.     He was put out of work, unpaid,
17   pending investigation.  We don't call
18   it a suspension because no decision
19   had been made at that point.
20   Q.     And that was --- so, he was put
21   on a leave prior to being discharged,
22   is that what you're saying?
23   A.     Yes.
24   Q.     Okay.
25   A.     That is our standard protocol.

86

1    Q.    Was that a paid leave?

2    A.    No.

3    Q.    And that happened on June 21st,

4    does that sound right?  21st, 2024,

5    June 21st, 2024.

6    A.    I don't remember the exact

7    date, but that would be approximately

8    right.  It happened after we started

9    investigating this.

10    Q.    Who was involved in that

11    decision to put him on an unpaid

12    leave?

13    A.    The same individuals previously

14    mentioned who were involved in the

15    decision to terminate, the law

16    department, Margie McKevitt, David

17    Kratz, and myself.

18    Q.    Was there any dissent with

19    regards to that decision among the

20    individuals you just identified?

21    A.    No.

22    Q.    Are you aware of the fact that

23    Mr. Kimbrough was provided a

24    separation and release agreement to

25    sign?

87

1    A.    Yes.

2    Q.    Were you involved in any way in

3    drafting that agreement?

4    A.    Yes, I was involved in the

5    discussions the law department

6    drafted.  We actually have a template,

7    it's pretty commonly used, it's pretty

8    standard.  If you have a, especially

9    when you have a longer serviced

10   employee, it's considered, you know, a

11   win/win situation because the employee

12   gets to receive --- usually what goes

13   into that kind of agreement is the

14   employee gets to receive a payout of

15   unused accrued time, time off, like

16   vacation.  And obviously, it takes

17   some risk away from --- from the

18   County.  Everybody can walk away

19   quietly from an unpleasant situation.

20    We use them pretty often.

21   Q.    Why was one offered to Mr.

22   Kimbrough in this case instead of just

23   discharging him?

24   A.    For the reasons I just

25   explained, he was a longer service

88

1    employee, and it was something that

2    the group felt was appropriate to

3    offer.  We offer them frequently.

4    Q.    And I think you mentioned

5    before, you characterize it as

6    potentially a win/win situation for

7    the county and the employee, right?

8    A.    Right, as I stated, because the

9    employee receives a monetary payout,

10   usually reflecting unused accrued

11   vacation time.  And the County,

12   obviously, it's a win in the sense of

13   walking away quietly and avoiding

14   certain litigation.

15   Q.    Did the County --- well, I'll

16   ask you specifically, did you believe

17   when --- when that severance

18   separation agreement was presented to

19   Mr. Kimbrough, did you believe there

20   was risk to the County?

21                  ATTORNEY BURNS:

22                  Objection, form.  You

23        can answer.

24                  THE WITNESS:

25                  I don't know what you

89

1        mean by that.

2    BY ATTORNEY MANSOUR:

3    Q.      Well, you said there was, one

4    of the things is that the County

5    avoids risk, right?  That's the way

6    the County wins.

7    A.      Oh, there's always risk.

8    People sue all the time over the

9    smallest things.

10   Q.      And in Mr. Kimbrough's case,

11   specifically, did you believe that

12   there was an element of risk there,

13   that the County would be sued?

14   A.      Yes, there's an element of risk

15   there.  There's an element of risk

16   with everybody.  People make stuff up.

17    People sue for the dumbest reasons.

18   It's a litigious society.

19   Q.      And I think --- do you believe

20   that what Mr. Kimbrough did here was

21   egregious?

22   A.      I do.

23   Q.      Is it the County's standard

24   practice to pay employees who have

25   committed egregious violations?

90

1              ATTORNEY BURNS:

2              Objection, form.

3              THE WITNESS:

4              It is the County

5        standard practice to offer

6        separation and release

7        agreements.  And yes, they are

8        offered to employees who have

9        done egregious things so that

10       it is a way for everyone to

11       walk away quietly from an

12       unpleasant situation.

13   BY ATTORNEY MANSOUR:

14   Q.     Yourself, you and Shae Randolph

15   had a fact-finding meeting with Mr.

16   Kimbrough on or about July 24, 2024,

17   correct?

18   A.     Correct.

19   Q.     And that fact-finding meeting

20   related to this conversation he had

21   with Attorney Zeiger, correct?

22   A.     Correct.

23   Q.     Do you recall the details of

24   that meeting?

25   A.     Yes.

91

1    Q.    Can you tell me what happened
2    during that meeting?
3    A.    So, that was a follow up to the
4    preliminary interview that was
5    conducted by Dan Greaser. It was to
6    give him his due process, to give him
7    a chance to explain before we made an
8    employment decision. So, we asked him
9    the same types of questions that Mr.
10   Greaser asked him.
11   Q.    Did you learn anything new
12   during that meeting that wasn't
13   already disclosed during his initial
14   interview with Mr. Greaser?
15   A.    No.
16   Q.    Prior to July 2024, July 24,
17   2024, the fact-finding meeting, had a
18   decision been made about whether Mr.
19   Kimbrough was going to be terminated
20   or not?
21   A.    No, the decision was not made
22   yet.
23   Q.    What about the fact-finding
24   meeting confirmed that, confirmed the
25   decision to terminate him?

92

<u>ATTORNEY BURNS:</u>

1
2            Objection to form.  You
3       can answer.
4            <u>THE WITNESS:</u>
5            Like you just asked me a
6       moment ago, did I learn
7       anything new?  And I said no.
8       So, there was nothing that ---
9       there was nothing that changed
10      the situation.  It just
11      reinforced what we learned to
12      date, that he had shared
13      confidential information with
14      Plaintiff's Counsel.
15 <u>BY ATTORNEY MANSOUR:</u>
16 Q.    When you asked him, when you
17 asked Mr. Kimbrough during that
18 meeting whether he understood he
19 violated County policies, his response
20 was "no," right?  That he --- that was
21 not his understanding.  He did not
22 think he violated any policies.
23 A.    Correct.
24 Q.    And did he --- and he also told
25 you during that meeting that he had

93

1    never received any training on the

2    policies that you were referring to,

3    correct?

4                    ATTORNEY BURNS:

5                    Objection, form.  You

6        can answer.

7                    THE WITNESS:

8                    I'm not sure exactly if

9        he said that at that particular

10       time.

11   BY ATTORNEY MANSOUR:

12   Q.     Did Mr. Kimbrough --- did you

13   ever find --- find Mr. Kimbrough to be

14   dishonest during either of the

15   meetings you had with him on June 12th

16   or July 24th?

17   A.     I can't recall if there was a

18   specific example of dishonesty.

19   Q.     I mean, you would agree with

20   me, he was forthcoming about his

21   conversation with Attorney Zeiger,

22   correct?

23   A.     Correct.

24   Q.     He told you that he admitted to

25   having a conversation with Attorney

94

1    Zeiger, right?

2    A.    Right.  At first --- at first,

3    he was unclear about whether he made

4    the phone call or received the phone

5    call, but I believe that was clarified

6    later that he made the phone call.

7    Q.    Okay.

8          And when asked about what he

9    told Attorney Zeiger, he told you,

10   right?

11   A.    Yes, I believe so.

12   Q.    And according to at least

13   Attorney Greaser, we --- we saw before

14   what he told you was not inconsistent

15   with what Attorney Zeiger said

16   occurred during that conversation,

17   right?

18   A.    I believe that's correct.

19   Q.    Are you aware of any security

20   lapses in the jail that have occurred

21   as a result of my client's

22   conversation with Attorney Zeiger?

23   A.    No.

24   Q.    Are you aware of any disruption

25   in the operations of the jail as a

95

1    result of my client's conversation

2    with Attorney Zeiger?

3    A.      No, but in my capacity, I

4    wouldn't be.  Things are brought to my

5    attention if it involves employees

6    violating rules.

7    Q.      Okay.

8            And so, at least as we sit here

9    today, nobody has brought it to your

10   attention that there's been any

11   disruption in the operations of the

12   jail because of my client's

13   conversation with Attorney Zeiger?

14   A.      Yeah, I don't believe so, but I

15   don't see why I would be expected to

16   know such things.

17   Q.      Well, for example, there, as

18   far as you're aware, there have been

19   no other employees of the jail that

20   have engaged in any misconduct or done

21   anything wrong as a result of my

22   client's conversation with Attorney

23   Zeiger?

24   A.      Not to my knowledge.

25   Q.      No employees of the jail have

96

1    been disciplined in any manner, other
2    than my client, as a result of his
3    conversation with Attorney Zeiger?
4    A.    Not to my knowledge.
5    Q.    Are you aware of any complaints
6    by one employee about another, in any
7    way relating to my client's
8    conversation with Attorney Zeiger?
9    A.    No.
10   Q.    Are you aware --- and ---
11   strike that.
12        In your capacity as Chief Human
13   Resources Officer, I assume you also
14   have at least some involvement with
15   employees being injured on the job?
16   A.    Yes.
17   Q.    Are you aware of any employees
18   who have been physically injured on
19   the job because of my client's
20   conversation with Attorney Zeiger?
21   A.    No.
22                ATTORNEY MANSOUR:
23            Can we just take five
24        minutes?  Let me use your
25        restroom real quick?

97

1          ATTORNEY BURNS:

2          Did you still have more

3     questions?

4          ATTORNEY MANSOUR:

5          I don't think so.  I

6     think I'm almost done.  I just

7     need to use the restroom and

8     look over my notes.  But then I

9     think we might be wrapping up.

10          ATTORNEY BURNS:

11          We do have some, we'll

12     have some questions after that.

13          ATTORNEY MANSOUR:

14          That's fine, yeah. Okay,

15     cool.

16          ATTORNEY BURNS:

17          All right, well, I need

18     to take a break.

19          ATTORNEY MANSOUR:

20          Oh, okay.

21          - - -

22     (Whereupon, a break was taken, off the

23     record.)

24          - - -

25          CROSS EXAMINATION

98

```
1                        - - -

2       BY ATTORNEY BURNS:

3       Q.      All right, Ms. Smith, I'm going

4       to ask you to look at what's been

5       marked as Exhibit P-1.  We talked

6       about this before.  Counsel asked some

7       questions about it.  If you look at

8       page two.  So, the question was

9       whether Lt. --- Mr. Kimbrough was

10      fired for disclosing confidential

11      information that was asked before,

12      correct?

13      A.      Yes.

14      Q.      Okay.

15              But there's actually a very

16      specific violation of policies and

17      procedures contained in this

18      disciplinary action form, correct?

19      A.      Correct.

20      Q.      So, can you just read that

21      section for me?

22      A.      "I understand that this

23      termination is for each of the

24      following listed violations separately

25      and independently of each other.  In
```

99

1    other words, each violation listed

2    below, independent of the others, and

3    by itself, constitutes a wholly

4    separate ground for your termination.

5    HR Policy number one, County Work

6    Rules number 59, giving confidential

7    County information to other

8    individuals/organization or to

9    unauthorized County employees.  Number

10   63, failure to abide by the County-

11   established code of conduct policy.

12   HR policy number 32, code of conduct,

13   Bucks County Department of Corrections

14   table of offenses.  Number 15,

15   divulging any information of a

16   confidential and or sensitive nature

17   concerning the operations of the

18   department, the security of the

19   institution, inmates, and or

20   residents.  Number 17, conduct

21   unbecoming of employee."

22   Q.    Okay, so when you met with the

23   people that you listed before,

24   including yourself, Mr. Kratz, Ms.

25   Randolph, Ms. McKevitt, did you

100

1    discuss these policies and procedures?

2    A.    Yes.

3    Q.    All of the policies and

4    procedures listed here?

5    A.    I believe so.

6    Q.    Okay.

7         I'm not going to ask you

8    questions about the Department of

9    Corrections table offenses because I

10   think actually there, it explains what

11   that is here.  But we're not going to

12   talk to you about that today.  I just

13   wanted to have you clarify the human

14   resources policies that the County

15   determined that Mr. Kimbrough

16   violated, okay?

17   A.    Okay.

18              ATTORNEY BURNS:

19              So, what I'm going to do

20         now is mark as P-6, correct?

21         That's what we're at?

22              THE COURT REPORTER:

23              Yes.

24                   - - -

25              (Whereupon, Deposition

1           Exhibit, P-6, Bucks

2           County HR Policies, was

3           marked for

4           identification.)

5                  - - -

6    BY ATTORNEY BURNS:

7    Q.    Okay, so the court reporter is

8    going to hand you what's the mark P-6.

9     And is this the current human

10   resource policy for the County of

11   Bucks?

12   A.    Yes.

13   Q.    Okay.

14         Now, does this, do these

15   policies apply to all employees?

16   A.    Yes.

17   Q.    Including employees of the

18   Bucks County Correction Facility?

19   A.    Yes.

20   Q.    So they would apply to Mr.

21   Kimbrough?

22   A.    Yes.

23   Q.    Okay.

24         And when employees are hired,

25   are they instructed to review these

102

1    policies and procedures?

2    A.    Yes.  They sign off on them

3    when they're hired, and then when the

4    policies get revised, as this did back

5    in, it's effective 11/19, current

6    employees are required to sign off on

7    them as well.

8    Q.    Okay, so understanding that,

9    and understanding that Mr. Kimbrough

10   was an employee until July of 2024, is

11   it your belief that he would have read

12   these policies and procedures and

13   signed off that he had read them?

14   A.    He signed off on it.  I

15   checked, yes.

16   Q.    Okay, thank you.

17        Okay, so we are going to turn

18   to page six, which I believe is the

19   first County policy work rule that Mr.

20   Kimbrough violated at number 59.

21   A.    Okay.

22   Q.    And I just want you to turn to

23   that page and just read it for me,

24   please.

25   A.    "Number 59, giving confidential

103

1    County information to other

2    individuals/organization, or to

3    unauthorized county employees."

4    Q.    And then I believe it's, it

5    also says he violated number 63.

6    A.    "Failure to abide by the county

7    established code of conduct policy."

8    Q.    Finally, Human resources policy

9    number 32, which is code of conduct,

10   which is on page 76.  And I'm not

11   going to ask you to read the entire

12   thing, but if you can just read it to

13   yourself, please.

14   A.    Okay.

15   Q.    So, it's your understanding

16   that the people that were involved in

17   the decision to terminate Mr.

18   Kimbrough were all aware of these

19   policies and reviewed these policies?

20   A.    Yes.

21   Q.    Prior to the ultimate decision

22   to terminate him?

23   A.    Yes.

24   Q.    And sitting here today, do you

25   still agree that you believe, in your

104

```
1    opinion, that Mr. Kimbrough violated
2    these policies?
3    A.    Yes, I do.
4    Q.    Okay.
5          Now, I believe there is
6    something in here, and you can correct
7    me if I'm wrong, but since these are
8    your documents, correct?  From your
9    department, is that correct?
10   A.    Yes.
11   Q.    Is there any information in
12   there about what an employee can do if
13   they're not sure what something means
14   within these pages of this document?
15   A.    Towards the beginning.  I
16   believe it's in the introduction
17   section.  In the middle, it clearly
18   states, you are urged to read the
19   contents carefully and to maintain
20   this document for future reference.
21   In addition, you are encouraged to
22   discuss any questions you may have
23   with your supervisor and or human
24   resources.
25   Q.    And just for clarification,
```

105

1    that's on page four, correct?

2    A.      Correct.

3    Q.      Okay.

4            Earlier, Counsel asked you a

5    question and in your answer you had

6    referred to a bullying investigation.

7     Do you recall that question?

8    A.      I don't recall his exact

9    question.  I recall referencing the

10   bullying investigation.

11   Q.      Okay.

12           Do you recall when that

13   bullying investigation began?

14   A.      I recall that it resolved

15   shortly before this investigation

16   started.  I don't recall the date that

17   it began.  I want to say possibly May

18   of '24.

19   A.      Thank you.

20                   ATTORNEY BURNS:

21                   All right, this is P7.

22                       - - -

23                   (Whereupon, Deposition

24                   Exhibit, P-7, Employment

25                   Investigation Document,

106

1                      was marked for

2                      identification.)

3                         - - -

4    BY ATTORNEY BURNS:

5    Q.      And can you just tell me what

6    this document is?

7    A.      This is the employment

8    investigation document.  It's

9    completed by staff that does an

10   investigation.

11   Q.      And it says the date

12   Investigation was initiated, March 5,

13   2024.  Date investigation concluded,

14   May 13, 2024, correct?

15   A.      Correct.

16   Q.      Okay.

17          And using this document, if you

18   need to refresh your recollection, can

19   you just explain the nature of this

20   investigation?

21   A.      We received an anonymous

22   complaint pertaining to bullying

23   behavior by Lt. Kimbrough.  It turned

24   out to be from sergeants.  He was

25   accused of creating a toxic and

107

1    hostile work environment.

2    Q.    And what was the process for

3    that investigation?

4    A.    We interviewed, we as in not

5    myself personally, but the team that

6    was investigating, interviewed

7    witnesses and interviewed Mr.

8    Kimbrough and came to a conclusion

9    that he had in fact engaged in

10   bullying behavior.

11   Q.    Do you recall how many people

12   were potentially investigated?

13   A.    Investigated?  You mean

14   interviewed?

15   Q.    I'm sorry, interviewed.

16   A.    I don't recall the number

17   offhand.  I'm paging through the

18   document that you handed me to see if

19   they're listed.

20   Q.    Do you think it was more than

21   one or two?

22   A.    Yes, it was more than one or

23   two.

24   Q.    If I told you it was over 15,

25   would that surprise you?

108

1   A.    That would be a higher-than-

2   normal amount for most investigations,

3   as far as they go.

4   Q.    Okay, thank you.

5         And you mentioned that Mr.

6   Kimbrough was interviewed as well,

7   correct?

8   A.    Yes.

9   Q.    Do you remember when he was

10  interviewed?

11  A.    Well, if the --- if the

12  investigation concluded in May, it

13  probably would have been May because

14  it, you interview the person who's

15  accused of wrongdoing after you talk

16  to the witnesses and gather all your

17  information.

18  Q.    And what were the results of

19  that investigation?

20  A.    He was issued a step one

21  discipline for violating the anti-

22  bullying policy and a couple other

23  policies as well.

24  Q.    And what was the next step,

25  after it was determined that he should

109

1    be disciplined?

2    A.    He was given the discipline.

3    Q.    So, was there another meeting

4    before that happens?  Is there a fact-

5    finding meeting or anything that takes

6    place?

7    A.    He had a fact-finding meeting

8    before the discipline was issued,

9    before the decision was made.  Sorry,

10   I thought that we covered that when

11   you asked when he was spoken to.  When

12   he was spoken to was his fact-finding

13   meeting.

14   Q.    Okay.

15   A.    In May.  That's for that

16   clarification.

17   Q.    Thank you.

18          Now, on this document, on the

19   last page, it says "Date the complaint

20   notified the investigation concluded,

21   May 30th of 2023." I'm thinking that

22   should be 2024.

23   A.    I'm thinking that's a typo,

24   yes.

25   Q.    Okay.

110

1    Q.    Because it wouldn't be an

2    investigation concluded a year before

3    this investigation?

4    A.    Correct.

5          '23 contradicts the dates at

6    the top of the document.  It's a typo.

7    Q.    Okay.

8          So, does that refresh your

9    recollection that the investigation

10   would have been completed around May

11   30th of 2024?

12   A.    Well, yes, but it says date

13   investigation concluded, May 13th, at

14   the top of the document.  Sometime in

15   May.

16   Q.    Sometime in May.

17   A.    The complaint, being notified

18   that it's closed is the last step.

19   Q.    Thank you.

20         So, this document says that he

21   was notified, Lt. Kimbrough was

22   notified on May 30, 2024, correct?

23   Well, it should say May 30, 2024.

24   A.    Well, it says the date the

25   complainant was notified that the

111

1    investigation was concluded.

2    Q.      Right.

3            So, he was notified.  What was

4    he notified of on that date?  Was he

5    notified of the discipline on that

6    date?  Was he notified of another

7    meeting?  Do you know what information

8    would have been communicated to him on

9    May 30th, when it says, "complainant

10   is notified?"

11   A.      No, he was communicated with

12   via the step one discipline.  So,

13   whatever date is on the Step One

14   discipline that he received.

15   Q.      Okay.

16           So, that is July 29, 2024,

17   correct?

18   A.      No.

19   Q.      This was the --- this was the

20   termination.  I'm sorry.

21   A.      I'm talking about the Step One,

22   the Step One discipline ---

23   Q.      Sorry.

24   A.      --- earlier.

25   Q.      Sorry, the date got me all

112

1   confused.  I'm like, what was going on

2   in 2023?  But we're talking about 2024

3   here.

4          Do you recall earlier the

5   question about the call to Mr. Zeiger

6   from Mr. Kimbrough and Counsel

7   represented to you that call took

8   place on May 30, 2024?

9   A.     Yes, I recall Mr. Mansour

10  saying that it took place on May 30th.

11  Q.     Okay.

12         Do you know whether Lt.

13  Kimbrough knew what his discipline was

14  going to be for the bullying

15  investigation on May 30th of 2024?

16  A.     No, I don't believe he knew the

17  result yet.  I believe that the

18  discipline for that was issued after

19  that.

20  Q.     Okay, so on May 30, 2024, when

21  Mr. Kimbrough contacted Mr. Zeiger,

22  it's possible that Mr. Kimbrough did

23  not know whether he was going to be

24  terminated as a result of the bullying

25  investigation, correct?

113

1    A.    I believe that's correct, but I

2    believe he received the Step One

3    discipline after May 30th, but prior

4    to being interviewed for the

5    allegations that he released

6    confidential information to Mr.

7    Zeiger.

8    Q.    Okay.

9         Do you know if Mr. Kimbrough

10   exhausted his administrative remedies

11   to appeal his termination?

12   A.    In terms of, you mean, were

13   there other things he could have done

14   to try to address his concerns after

15   his termination?

16   Q.    Correct.

17   A.    He contacted me about filing a

18   grievance and it's not done very

19   often, but non-union employees do have

20   the right to file agreements.  It is

21   listed in the non-union handbook.  And

22   I responded to him.  Then I even

23   responded to him a second time and

24   reminded him that the deadline was

25   approaching, but he never followed

114

1    through and actually submitted a

2    grievance.

3    Q.    Okay.

4         Did he contact anybody within

5    the County after his termination

6    besides you?

7    A.    Well, yes, actually, I believe

8    the email was forwarded to me

9    originally.  I don't believe that he

10   addressed it to me originally.  I

11   believe it was forwarded to me.

12   Q.    Who did he contact originally,

13   do you remember?

14   A.    If I remember correctly, he had

15   sent it to the commissioners.

16   Q.    So, he was aware of an

17   administrative --- strike that.

18        So, he was aware of his ability

19   to contact the commissioners at any

20   time?  To contact you at any time

21   regarding concerns about his job or

22   anything else that he had questions

23   about?

24   A.    Yes.

25   Q.    All right, can we go off the

115

1   record?

2   A.      Okay.

3                     ---

4   (Whereupon, a discussion was held, off

5   the record.)

6                     ---

7                 ATTORNEY BURNS:

8                 Just going to mark this

9       as P---

10                THE COURT REPORTER:

11                8.

12                ATTORNEY BURNS:

13                8.

14                Thank you.

15                    ---

16                (Whereupon, Deposition

17                Exhibit, P-8, Notice of

18                Fact-Finding Meeting,

19                was marked for

20                identification.)

21                    ---

22  BY ATTORNEY BURNS:

23  Q.      All right, so can you tell me

24  what P-8 is?

25  A.      Notice of Fact-Finding Meeting,

116

1    given on May 30th, to Ara.  That was

2    his --- inviting him for an

3    opportunity to explain and answer

4    questions.

5    Q.    And can you just confirm the

6    date for me?

7    A.    May 30th.

8    Q.    Of what year?

9    A.    24.

10   Q.    I just wanted to show you this

11   to clarify that that other document

12   was a typo, that it was supposed to be

13   2024.

14   A.    Correct.  That that's the date

15   of the notice being given to him, and

16   then the meeting location is listed as

17   June 3rd, 24.

18   Q.    Okay.

19         So, does this confirm your

20   answer before, that he would not know

21   what the results of this disciplinary

22   action would have been on May 30,

23   2024?

24   A.    Correct.  He knew the

25   investigation was open.  He knew the

117

1    investigation was ongoing.  He had
2    not, it had not been resolved yet.  He
3    did not know the outcome.
4    Q.    I have no further questions.
5                    ATTORNEY MANSOUR:
6                    Okay.
7                    I have some follow up,
8        Ms. Smith.
9                    - - -
10                    RE-EXAMINATION
11                    - - -
12   BY ATTORNEY MANSOUR:
13   Q.    So, Mr. Kimbrough knew prior to
14   5/30/2024 that he was being
15   investigated for bullying?
16   A.    Yes.
17   Q.    You had testified earlier that
18   Mr. Kimbrough's conversation with
19   Attorney Zeiger on May 30, 2024 was
20   against the County's interest.  Is
21   that right?
22                    ATTORNEY BURNS:
23                    Objection to form.
24                    THE WITNESS:
25                    Something to that

118

1          effect.  That might not be my
2          exact words.
3    BY ATTORNEY MANSOUR:
4    Q.     Okay.
5          Do you believe that it was
6    against the County's interest?
7    A.     I believe that him reaching out
8    to opposing counsel in an open lawsuit
9    was against the County's interest,
10   yes.
11   Q.     And it was against the County's
12   interest because Attorney Zeiger was
13   representing a party against the
14   County in a lawsuit, right?
15   A.     Yes.
16                ATTORNEY BURNS:
17                Objection, form.  You
18        can answer.
19                THE WITNESS:
20                Yes.
21   BY ATTORNEY MANSOUR:
22   Q.     You're aware of the fact that
23   the County is subject to federal laws
24   that pro --- that prohibit it from
25   depriving people of constitutional

119

1    rights, correct?

2    A.    Correct.

3    Q.    You, have you heard of the

4    statute, Section 1983 before?

5    A.    No, I don't believe so.

6    Q.    I'll represent to you, Section

7    1983 is a federal law, that's the ---

8    two of the claims in this case, that

9    allow a person to sue government

10   actors for depriving them of their

11   constitutional rights.  Have you ever

12   heard of that before?

13   A.    Not exactly, no.

14   Q.    Are you aware of the fact that

15   the County is subject to the First

16   Amendment of the United States

17   Constitution?

18   A.    I would --- I would assume it

19   would be.

20   Q.    Have you ever received any

21   training in your role as Senior HR

22   director --- or Chief Human Resources

23   officer, excuse me, about complying

24   with the First Amendment?

25   A.    I have not received specific

120

1    training on that.

2    Q.    In the course of investigating

3    Mr. Kimbrough for his conversation

4    with Attorney Zeiger, did you at all

5    personally consider whether

6    disciplining him or discharging him

7    would comply with the First Amendment?

8    A.    No, I do not recall being

9    involved in any conversations about

10   that specifically or putting

11   consideration forth to that

12   specifically.

13   Q.    Name of the First Amendment, I

14   just want to be clear, you are aware

15   the First Amendment protects

16   individuals right to free speech,

17   right?

18   A.    Right.

19   Q.    Do you understand that public

20   employees have First Amendment rights

21   in the workplace?

22   A.    Yes, I would think everybody

23   has First Amendment rights.

24   Q.    Are you aware of the fact that

25   speech that may violate a County

121

1  policy may still be protected by the

2  First Amendment?

3                    ATTORNEY BURNS:

4                    Objection, form.  You

5         can answer if you know the

6         answer.

7                    THE WITNESS:

8                    Can you repeat the

9         question?

10  BY ATTORNEY MANSOUR:

11  Q.    I'll ask a different question,

12  actually, before I get to that one.

13        Do you know what kind of speech

14  by a public employee is protected by

15  the First Amendment?

16  A.    In general.

17  Q.    What's your understanding of

18  that?  What's your understanding of

19  the speech, of public employee speech

20  that is protected by the First

21  Amendment?

22  A.    I think in general, the First

23  Amendment protects people who --- you

24  know what?  I'm not sure.

25  Q.    Is it your understanding that

122

1    the First Amendment does not protect
2    speech that the public employer deems
3    confidential?
4                    ATTORNEY BURNS:
5                    Objection, form.
6                    THE WITNESS:
7                    I'm not sure.
8    BY ATTORNEY MANSOUR:
9    Q.    Before you and the individuals
10   we referenced earlier made the
11   decision to discharge Mr. Kimbrough,
12   did you personally assess whether or
13   not his speech was protected by the
14   First Amendment?
15   A.    No.
16   Q.    Did you ask anybody else to
17   conduct that analysis?
18   A.    No.
19   Q.    If Mr. Kimbrough told his
20   girlfriend the same things he told
21   Attorney Zeiger, would he have been
22   fired?
23                    ATTORNEY BURNS:
24                    Objection, form.
25                    THE WITNESS:

123

1            I can't answer that.

2        Again, different set of

3        circumstances, different

4        factors to be reviewed.

5  BY ATTORNEY MANSOUR:

6  Q.     There were a number of --- as a

7  result of the investigation into the

8  anonymous complaint of bullying

9  against Mr. Kimbrough, Mr. Kimbrough

10  submitted a number of supporting

11  witness statements, correct?

12  A.     I believe so.

13  Q.     Were those considered by you in

14  the course of your investigation?

15  A.     All relevant information was

16  considered in the course of the

17  investigation.

18  Q.     I think Counsel referenced

19  earlier, there were at least 15

20  individuals who were interviewed by

21  the investigators.  Does that sound

22  right?

23  A.     Yes.

24  Q.     Did all of them say the same

25  thing about Attorney Kimbrough, that

124

1    he bullied employees?

2    A.    Are you referring to, I believe

3    Mr. Kimbrough tried to introduce

4    character witnesses, people that

5    weren't even witness to the incidents

6    that happened.  They would not be ---

7    all be considered relevant to what was

8    being investigated.  I believe that

9    was one of the delays in the

10   investigation, is that Mr. Kimbrough

11   had witness, after witness, after

12   witness, that he wanted HR to talk to.

13     And not all of them, even, most of

14   them, rather, were not even privy to

15   what was being investigated.  They

16   were more speaking to his character.

17   Q.    You would agree with me that

18   the corrections team, or employees, I

19   suppose, for lack of a better term, is

20   a paramilitary organization, would you

21   put it that way?

22                ATTORNEY BURNS:

23                Objection, form.

24                THE WITNESS:

25                It's been referred to

125

1           that way.  I'm not going to say

2           I would agree with it.

3    BY ATTORNEY MANSOUR:

4    Q.    How --- how much time do you

5    spend in the correctional facility in

6    the course of your day-to-day job?

7    A.    I personally do not spend time

8    in the correctional facility.

9    Q.    Based on your experience in, as

10   an HR employee for the County, both in

11   your current role and your prior one,

12   would you say it's unusual for

13   employees to use profanity, employees

14   of the jail to use profanity in the

15   course of their work?

16                  ATTORNEY BURNS:

17                  Objection, form.

18                  THE WITNESS:

19                  I would say most likely,

20          given the culture, it is not

21          unusual to use profanity.  I

22          would say that there is a big

23          distinction between using

24          profanity in the course of a

25          sentence, and directing it at

126

1          someone and berating someone

2          and screaming at someone.  Mr.

3          Kimbrough was not disciplined

4          for using profanity.

5    BY ATTORNEY MANSOUR:

6    Q.    He was disciplined for calling

7    somebody, "fucking stupid?"

8    A.    I don't have it in front of me,

9    but I believe it was more along the

10   lines of, "Are you fucking with me?

11   Because I will fuck with you."

12   Q.    And that complaint was made by

13   a subordinate of Mr. Kimbrough, right?

14   A.    A lower ranking employee, a

15   sergeant, and he was a lieutenant.

16   Q.    Probably somebody who didn't

17   like Mr. Kimbrough being so hard on

18   him, right?

19              ATTORNEY BURNS:

20              Objection, form.

21              THE WITNESS:

22              It was investigated and

23        substantiated.  It was

24        corroborated by others.  It

25        wasn't just a he said, he said.

1  BY ATTORNEY MANSOUR:

2  Q.    Those others that corroborated

3  it, were they also lower ranking

4  employees than Mr. Kimbrough?

5  A.    Yes, other sergeants

6  experienced the same type of hostile

7  bullying behavior.

8  Q.    And that was their

9  characterization, was bullying, right?

10  A.    I don't know their exact words.

11  Those are the --- that, it fell under

12  that kind of policy violation,

13  everything that they reported to us

14  and described.

15  Q.    Was there any information you

16  gathered during the course of that

17  investigation that Mr. Kimbrough,

18  quote, bullied them outside of work?

19  A.    I don't have knowledge on

20  whether they socialized outside of

21  work.  I cannot answer.

22              ATTORNEY MANSOUR:

23              Can we go off the record

24        for a second?  I'm just looking

25        for a particular document.  I

128

1      didn't print it out, but ---

2                    - - -

3   (Whereupon, a discussion was held off

4   the record.)

5                    - - -

6   BY ATTORNEY MANSOUR:

7   Q.    So, Ms. Smith, what I just

8   handed you are two documents, one

9   marked P-9, one marked P-10.

10                    - - -

11                  (Whereupon, Deposition

12                  Exhibit, P-9,

13                  Defendant's First Set of

14                  Requests for Admissions

15                  Directed to Plaintiff,

16                  was marked for

17                  identification.)

18                  (Whereupon, Deposition

19                  Exhibit P-10, Notice of

20                  Fact-Finding Meeting,

21                  was marked for

22                  identification.)

23                    - - -

24  BY ATTORNEY MANSOUR:

25  Q.    P-9 are the defendant's request

129

1   for admissions directed to plaintiff,

2   my client, requesting that he admit

3   certain facts relevant to this case.

4          And then P-10 is an exhibit

5   that was provided along with these

6   requests, Exhibit-A, is what it was

7   referred to.

8   A.    Okay.

9   Q.    So, if you can turn to page two

10  of the --- of P-9, and I want to draw

11  your attention to request number five.

12  And in there, the defendants,

13  including the County, asked my client

14  to admit that he received a notice

15  free pre-disciplinary fact-finding

16  meeting from the County on May 28,

17  2024, attached as Exhibit-A, which is

18  P10.  Do you see that?

19  A.    Yes, I see that.

20  Q.    Okay.

21          And looking at P-10, that is a

22  notice of fact-finding meeting that is

23  dated May 28, 2024.  Do you see that?

24  A.    I see that.

25  Q.    Have you seen this before?

130

1    A.    I'm sure I've seen it before.

2    Q.    We denied that allegation.

3    I'll just represent that we denied, we

4    did not admit that he received this on

5    5/28.  My question to you is, did he

6    get a notice on 5/28?

7    A.    I believe he did.  And I

8    believe what happened was that he

9    delayed the meeting.  He wanted more

10    time to prepare, and he wanted to

11    bring in those character witnesses

12    that we previously were talking about

13    a few minutes ago.  So, I think what

14    happened was that he received the

15    notice in 5/28, did not agree to meet

16    with us on May 30th, which is what is

17    listed here on that 5/28 notice.  And

18    then I believe that it was rescheduled

19    such that he received a new notice

20    dated 5/30 for the meeting to be on

21    June 3rd.  I believe that was at his

22    request.

23    Q.    Okay, so, P10, which is the

24    5/28 notice, and then what did we mark

25    the other one?

131

1    A.      P-8.

2    Q.      P-8, the 5/30 notice.  Your ---

3    your testimony is he received both of

4    those?

5    A.      I believe he did.

6    Q.      Okay.

7            I have no further questions.

8    Thank you.  Thank you for your time.

9    A.      Welcome.

10                   THE WITNESS:

11                   All right, that

12        concludes?

13                   ATTORNEY BURNS:

14                   That concludes, yep.

15                   THE WITNESS:

16                   Okay.

17                   THE COURT REPORTER:

18                   Copy the transcript,

19        Attorney Mansour?

20                   ATTORNEY MANSOUR:

21                   Yeah.

22                   THE COURT REPORTER:

23                   And would you like the

24        full copy, the mini script, or

25        both?

132

1          ATTORNEY MANSOUR:

2          Can you both?

3          THE COURT REPORTER:

4          Sure.

5          ATTORNEY MANSOUR:

6          Yeah, full and

7     condensed, please.

8          ATTORNEY BURNS:

9          Our client also reserves

10    the right to review her ---

11         THE COURT REPORTER:

12         Read and sign?  Sure.

13         ATTORNEY BURNS:

14         I don't think that we

15    --- did we Put the usual

16    translations on there?

17         THE WITNESS:

18         We did.

19         ATTORNEY BURNS:

20         We did?

21         ATTORNEY MANSOUR:

22         We did.

23         ATTORNEY BURNS:

24         Okay.

25         THE COURT REPORTER:

133

1          Copy the transcript

2     Attorney Burns?

3               ATTORNEY BURNS:

4               Yes.

5               THE COURT REPORTER:

6               Full thing or would you

7     like a mini, or both?

8               ATTORNEY BURNS:

9               Both.

10              THE COURT REPORTER:

11              Both?  Got it.

12              ATTORNEY BURNS:

13              And so yeah, I guess we

14    need to figure out the

15    exhibits, right?  Because we're

16    going to have to try to get

17    them --- potentially doing ---

18    doing the next depositions

19    virtually, right?

20              ATTORNEY MANSOUR:

21              Yeah.

22              ATTORNEY BURNS:

23              We sort of have to

24    straighten that out, right?

25              So, P-1, I'm trying to

134

1          find the ones that have been

2          marked, make sure you have the

3          ones that are marked, right?

4                    THE COURT REPORTER:

5                    Yeah.  It should be P-1

6          through 10.  They should all be

7          marked.

8                    *  *  *  *  *  *  *

9     DEPOSITION CONCLUDED AT 12:27 P.M.

10                   *  *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

135

1    COMMONWEALTH OF PENNSYLVANIA  )

2    COUNTY OF PHILADELPHIA        )

3                    CERTIFICATE

4         I, Emma Edwards, a Notary Public in

5    and for the Commonwealth of Pennsylvania, do

6    hereby certify:

7         That the witness, Lauren Smith, whose

8    testimony appears in the foregoing deposition,

9    was duly sworn by me on February 7, 2025 and

10   that the transcribed deposition of said

11   witness is a true record of the testimony

12   given by said witness;

13        That the proceeding is herein recorded

14   fully and accurately;

15        That I am neither attorney nor counsel

16   for, nor related to any of the parties to the

17   action in which these depositions were taken,

18   and further that I am not a relative of any

19   attorney or counsel employed by the parties

20   hereto, or financially interested in this

21   action.

22   Dated the 11 day of February, 2025

23

24                          Emma Edwards,

25                            Court Reporter

Commonwealth of Pennsylvania - Notary Seal
Emma Edwards, Notary Public
Philadelphia County
My Commission Expires February 12, 2028
Commission Number 1443285