**EXHIBIT 43**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

ARA KIMBROUGH,          *

    Plaintiff          *    Case No.

    vs.                *    2:24-cv-04470-KSM

BUCKS COUNTY, et    *

al.,                     *

    Defendants     *

* * * * * * * *


DEPOSITION OF

DAVID KRATZ

February 12, 2025


Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

2

1                     D E P O S I T I O N

2                          O F

3       DAVID KRATZ, taken on behalf of the

4       Plaintiff herein, pursuant to the

5       Rules of Civil Procedure, taken before

6       me, the undersigned, Emma Edwards, a

7       Court Reporter and Notary Public in

8       and for the Commonwealth of

9       Pennsylvania, Via Zoom, on Wednesday,

10      February 12, 2025 beginning at 10:04

11      a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                A P P E A R A N C E S

2

3    WILLIAM P. MANSOUR, ESQUIRE

4    Mansour Law, LLC

5    961 Marcon Boulevard, Suite 425

6    Allentown, PA  18109

7        COUNSEL FOR PLAINTIFF

8

9    DARA BURNS, ESQUIRE

10   JACLYN C. GRIESER, ESQUIRE

11   County of Bucks - Deputy Solicitor

12   55 East Court Street

13   Doylestown, PA  18901

14       COUNSEL FOR DEFENDANTS

15

16

17

18

19

20

21

22

23

24

25

4

1                         I N D E X

2

3     DISCUSSION AMONG PARTIES            7 - 8

4     WITNESS: DAVID KRATZ

5     EXAMINATION

6          By Attorney Mansour           8 - 196

7     DISCUSSION AMONG PARTIES     196 - 197

8     CERTIFICATE                          198

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                        E X H I B I T   P A G E

2

3                                              P A G E

4       N U M B E R    D E S C R I P T I O N         I D E N T I F I E D

5       Exhibit 11   Insidesources

6                     Article                      9 6

7       Exhibit 13   Phillyburbs.com

8                     Article                      1 2 9

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                  O B J E C T I O N   P A G E

2

3    A T T O R N E Y                              P A G E

4    G r i e s e r          18, 28, 31, 33, 35, 37,

5                           38, 40, 43, 45, 48, 50,

6                           55, 60, 62, 65, 65, 67,

7              83, 86, 87, 90, 95, 107, 108,

8          111, 112, 116, 117, 120, 122,

9          123, 125, 133, 134, 138, 140,

10         148, 149, 157, 159, 162, 166,

11     171, 179, 185, 186, 191, 193, 195

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1               S T I P U L A T I O N

2        ----------------------------------------

3        (It is hereby stipulated and agreed by

4        and between counsel for the respective

5        parties that reading, signing,

6        sealing, certification and filing are

7        not waived.)

8        ----------------------------------------

9               P R O C E E D I N G S

10        ----------------------------------------

11                    ATTORNEY MANSOUR:

12                    So before we get

13             started, I guess we'll just put

14             the usual stipulations on the

15             record, that all objections,

16             except as to form a privilege,

17             will be reserved for the time

18             of trial.

19                    ATTORNEY GRIESER:

20                    That's right.  And my

21             client reserves the right to

22             review the deposition

23             transcript to make any edits he

24             thinks he needs.

25                    ATTORNEY MANSOUR:

8

1                    So whenever you're

2            ready, Ms. Court Reporter you

3            can swear in the witness.

4                        - - -

5                    DAVID KRATZ,

6    CALLED AS A WITNESS IN THE FOLLOWING

7    PROCEEDING, AND HAVING FIRST BEEN DULY

8    SWORN, TESTIFIED AND SAID AS FOLLOWS:

9                        - - -

10                   COURT REPORTER:

11                   Thank you.

12                       - - -

13                   EXAMINATION

14                       - - -

15    BY ATTORNEY MANSOUR:

16    Q.    Good morning, Mr. Kratz.  My

17    name is William Mansour.  I am the

18    attorney representing Ara Kimbrough

19    and the lawsuit that he has filed

20    against Bucks County, yourself, Lauren

21    Smith and Shea Randolph in the Eastern

22    District of Pennsylvania.

23           We are here to take your

24    deposition in that case.  Do you

25    understand that?

9

1    A.      I do.

2    Q.      Before we get started, I do

3    want to go over a few instructions

4    about how the deposition is going to

5    proceed, just to make sure that we're

6    both on the same page.

7          Okay?

8    A.      Okay.

9    Q.      So the first rule that I want

10   to emphasize, probably the most

11   important rule, is that, as you can

12   see, we have a court reporter here

13   today who is taking down everything

14   that is said during the course of this

15   deposition.  And so it is important

16   that your responses to my questions be

17   verbal.

18          Do you understand that?

19   A.      I do.

20   Q.      So no nodding of the head,

21   shaking of the head, shrugging of the

22   shoulders.  Things like uh-huh, uh-huh

23   don't come across very well on the

24   record.  So I just need you to make

25   sure that you respond to my questions

10

1   with words.

2          Okay?

3   A.     Okay.

4   Q.     If you don't understand a

5   question that I ask, please let me

6   know, and I will be happy to either

7   repeat it or rephrase it if necessary.

8   You understand that?

9   A.     Okay.

10         Yep, I do.  Thank you.

11  Q.     If I ask you a question and you

12  answer it, I'm going to assume both

13  that you heard it and understood it.

14  Fair enough?

15  A.     Fair enough.

16  Q.     I don't want us to speak over

17  each other during this deposition,

18  again, for the benefit of the court

19  reporter.  There may be moments where

20  I ask a question and you know what the

21  question is going to before I finish

22  it.  I just ask that you wait until

23  I'm done asking the question before

24  you answer it.  And I will afford you

25  the same courtesy of waiting until you

11

1    finish your response before I ask my

2    next question.

3          Okay?

4    A.    Understood.

5    Q.    Very good. I do not want you

6    to guess or speculate as to the answer

7    --- as to any of your answers. Your

8    answers must be based on your personal

9    knowledge. Do you understand that?

10   A.    I do.

11   Q.    If you don't know the answer to

12   a question, I don't know is a

13   perfectly acceptable answer if it's,

14   in fact, the truth. Do you understand

15   that?

16   A.    Understood.

17   Q.    You understand that you are

18   also just placed under oath, and that

19   oath is the same oath that you would

20   take if you were giving testimony in a

21   courtroom? Do you understand that?

22   A.    I understand.

23   Q.    And you understand that any

24   knowingly false testimony that you

25   give here today may be subject to

12

1   criminal penalties because of that

2   oath?

3   A.    I understand.

4   Q.    During your testimony, you

5   cannot consult any person or any

6   documents other than the ones that I

7   show you.  Do you understand that?

8   A.    I understand.

9   Q.    During any breaks that we take,

10  however, you may consult with your

11  attorneys or anybody else.

12        Okay?

13  A.    Understood.

14  Q.    If we need to take --- if you

15  need to take a break at any time, just

16  let us know.  We'll be happy to take a

17  break.  The only thing that I ask is

18  that if I have a pending question that

19  you answer it completely before we

20  take the break.

21        Okay?

22  A.    Understood.

23  Q.    Excellent.  Have you ever been

24  deposed before, Mr. Kratz?

25  A.    I have.

13

1    Q.    Roughly how many times?

2    A.    I'm going to say probably seven

3    or eight.

4    Q.    Can you please state your full

5    name for the record?

6    A.    Yes.  David Kratz.  D-A-V-I-D,

7    K-R-A-T-Z.

8    Q.    Mr. Kratz, I don't want you

9    take --- to take any offense to this

10   question, but are you under the

11   influence of any drugs or alcohol that

12   would impair your ability to

13   understand or hear any of my

14   questions?

15   A.    No offense taken.  And I am

16   not.

17   Q.    Are you under the influence of

18   any prescription medication that would

19   impair your ability to hear or

20   understand any of my questions?

21   A.    I am not.

22   Q.    Do you have any medical

23   conditions ---?  I see that you wear

24   glasses.  Do you have any medical

25   conditions that impair your ability to

14

1   see any documents that I might show

2   you?

3   A.    As long as I have my readers,

4   we're good to go.

5   Q.    Very good.  You are the

6   director of the Bucks County

7   Correctional Facility.

8         Is that correct?

9   A.    That's correct.

10  Q.    And how long have you been in

11  that position?

12  A.    I believe we're coming up on

13  four years, roughly.

14  Q.    Do you, as the Director of the

15  Department of Corrections, have

16  authority to discharge employees of

17  the Department of Corrections?

18  A.    I do not.

19  Q.    The person who has that

20  authority would be the chief operating

21  officer of the county, subject to

22  approval by the Board of

23  Commissioners.

24        Is that correct?

25  A.    I believe that's the process.

15

1    I don't have the authority to do it.

2    It comes from chief operating officer

3    level, commissioner level, I believe.

4    Q.    And the current chief operating

5    officer of the county is Margaret

6    McKevitt.

7          Is that correct?

8    A.    That's correct.

9    Q.    And she was the chief operating

10   officer in June and July of 2024.

11         Is that correct?

12   A.    That is correct.

13   Q.    My client, Ara Kimbrough, was

14   an employee of the county.

15         Correct?

16   A.    Correct.

17   Q.    He was at the time of his

18   discharge in July 2024 an

19   administrative lieutenant at the

20   correctional facility.

21         Correct?

22   A.    That's correct.

23   Q.    And at the time of his

24   discharge in July 2024, he had been

25   employed by the Department of

16

1    Corrections for approximately 16

2    years.

3            Is that correct?

4    A.    I believe that is correct, yes.

5    Q.    Now, in --- on March 3rd ---.

6    I'm sorry, excuse me. On May 30th,

7    2024, Mr. Kimbrough had a telephone

8    conversation with Attorney Brian

9    Zeiger.

10            Correct?

11   A.    To the best of my knowledge,

12   yes.

13   Q.    And that conversation involved

14   Mr. Kimbrough sharing certain

15   information that he had regarding the

16   overdose death of an inmate named

17   Joshua Patterson.

18            Correct?

19   A.    To the best of my knowledge,

20   yes.

21   Q.    And at the time of that

22   conversation, Attorney Zeiger was

23   representing the estate of Joshua

24   Patterson.

25            Correct?

17

1    A.    Again, to the best of my

2    knowledge, yes.

3    Q.    And on behalf of the estate,

4    Attorney Zeiger was pursuing a federal

5    lawsuit against the county and a

6    number of individuals regarding Mr.

7    Patterson's death.

8         Correct?

9    A.    That is correct.

10   Q.    And Mr. Patterson's death

11   occurred as a result of a drug

12   overdose while he was incarcerated at

13   the correctional facility.

14        Correct?

15   A.    Correct.

16   Q.    On or about June 21st, 2024,

17   Mr. Kimbrough was suspended by the

18   county.

19        Correct?

20   A.    Correct.

21   Q.    And he was suspended because of

22   the telephone conversation that he had

23   with Attorney Zeiger.

24        Correct?

25   A.    To the best of my knowledge

18

1    that's the reason for the suspension,

2    correct.

3    Q.    And according to the county,

4    Lieutenant ---.

5                  ATTORNEY GRIESER:

6                  Sorry, I was on mute

7            because my dog was barking.

8            I'm going to object as to form

9            for leading at this point.  No

10           problem with the foundational

11           questions and whatnot, but at

12           this point, objection as to

13           leading.  You can answer,

14           David.

15                  THE WITNESS:

16                  Very well.  Can you

17           repeat the last question?

18                  ATTORNEY MANSOUR:

19                  Sure.  Court Reporter,

20           can you read it back for me?

21           You're on mute, by the way.

22                  ---

23    (WHEREUPON, COURT REPORTER READS BACK

24    PREVIOUS QUESTION.)

25                  ---

Sargent's Court Reporting Service, Inc.
(814) 536-8908

19

1                    THE WITNESS:

2                    Yes, that's my ---

3          that's my understanding.

4     BY ATTORNEY MANSOUR:

5     Q.      And then Lieutenant Kimbrough

6     was subsequently discharged by the

7     county on July 29th, 2024.

8               Is that correct?

9     A.      Correct. On or about, I'm

10    guessing. I don't have the document

11    in front of me, but yes, that sounds

12    about right.

13    Q.      And he was discharged for

14    sharing confidential --- alleged

15    confidential information with Attorney

16    Zeiger during his May 30th, 2024 phone

17    call.

18               Is that correct?

19    A.      I believe that's correct, based

20    on what I read on the fact finding

21    notice.

22    Q.      And you have reviewed that fact

23    finding notice before today, sir?

24    A.      I have.

25    Q.      Do you recall when the first

20

1  time it was that you saw that fact

2  finding notice?

3  A.      I do not.

4  Q.      Margaret McKevitt, the COO, she

5  was the person who authorized the

6  discharge of Lieutenant Kimbrough.

7          Correct?

8  A.      Again, I --- the inner workings

9  of the actual final discharge, I can't

10  speak to.  I do believe it is the

11  commissioners and the chief operating

12  officer that make the final decision,

13  yes.

14  Q.      And the decision to terminate

15  Mr. Kimbrough was subsequently

16  ratified by the Board of

17  Commissioners.

18          Is that correct?

19  A.      That is correct.

20  Q.      And you were consulted about

21  the decision to terminate Mr.

22  Kimbrough.

23          Correct?

24  A.      I was.

25  Q.      You were involved in that

21

1   decision making process?

2   A.    I was involved in at least part

3   of the decision making process, yes.

4   Q.    Who else besides yourself was

5   involved in that decision making

6   process?

7   A.    Obviously, human resources.  I

8   believe there was some input from the

9   solicitor's office, Ms. McKevitt, and

10  I can't speak to the --- the

11  commissioner's participation.  I'm not

12  involved at that level.

13  Q.    Okay.

14        Thank you for that.  I'm going

15  to --- going to share my screen.  Can

16  you see the PDF document that I'm

17  sharing?

18  A.    Yeah, I do.  I just have to

19  make a quick screen adjustment here,

20  see if I can get all of it.

21        Okay.

22  Q.    Okay.

23        This is a document that in

24  prior depositions has already been

25  marked as P-1.  I will represent to

22

1    you that this is the termination

2    letter and disciplinary action form

3    that was provided to my client on or

4    about July 29th, 2024.  Take a moment

5    to just review these two documents and

6    just let me know when you're done.

7    A.     You can go to the next

8    document.  You can go to the next

9    page, please.

10    Q.     That's actually the last page.

11    A.     Okay.

12         Great.

13    Q.     So you'll agree with me, sir,

14    that this document confirms what we

15    established earlier, that Mr.

16    Kimbrough was discharged from the

17    county for sharing allegedly

18    confidential information with Attorney

19    Zeiger relating to his lawsuit against

20    the Department of Corrections and the

21    county.

22         Correct?

23    A.     I would agree that that's the

24    essence of it.  And the violation

25    that's in front of us right now spells

23

1    out the different --- different areas

2    of work, rules that were violated, but

3    essentially that would be the essence

4    of the --- of the reason for the

5    disciplinary action.

6    Q.    Can you describe for me

7    specifically what confidential

8    information Mr. Kimbrough shared with

9    Attorney Zeiger?

10   A.    Yeah, and again, I'm basing

11   this off the interviews.  I was not

12   present.  I believe that the

13   information shared was some concerns

14   that he had about the death of Mr.

15   Patterson.  I believe things that were

16   confidential were shared as far as

17   plans of the day, how we're --- how

18   the contraband may have gotten in, the

19   post --- the essence of what posts

20   are, maybe some information about how

21   searches are conducted, things ---

22   things along those lines.

23   Q.    And is there any policy that

24   classifies that information as

25   confidential?

1    A.    So, you know, again, when we

2    look at our policies, it's more of the

3    sharing of the information.  If you're

4    familiar with our --- and I don't know

5    what exhibits were already marked, but

6    our ethics policy, A1-1, I believe, it

7    talks about familiarity and being

8    involved with family members or

9    others.

10          There are sections in the code

11   of conduct with HR which is spelled

12   out in the county work rules.  And

13   also the table offenses speaks to

14   sensitive nature, disclosing of

15   information.

16   Q.    What is the definition of

17   confidential as that word is used in

18   the various county policies?

19   A.    So, you know, again, I use

20   confidential.  I use security

21   sensitive information.  You know,

22   these are things that are internal, if

23   released, could cause disorder into

24   --- in the operations of the facility.

25   It could contribute to inmates having

25

1    information that they could use to

2    escape, do harm, create divergens in

3    the facility.  We've gone to court on

4    a few of these things that are

5    actually not subject to Right to Know

6    requests or requests were denied to

7    that information.

8         There's really no list of

9    confidential information.  It would be

10   impossible to really compile a list of

11   everything that is confidential or

12   security sensitive.

13   Q.    Who determined in this case

14   that the information Mr. Kimbrough

15   shared was confidential, as that word

16   is used in the policies?

17   A.    As it's my understanding, I was

18   informed after the contact with Mr.

19   Zeiger was brought into play.  I was

20   consulted on that by the law

21   department and human resources about

22   the information that was disclosed and

23   that it was derived from actually our

24   work, not our --- you know, outside

25   the facility.

26

1          So, you know, generally
2     speaking, if you're garnering that
3     type of information at work, you know,
4     a discussion amongst administrators or
5     something like that, that would be
6     confidential or security sensitive
7     information.
8     Q.     So one of your --- and correct
9     me if I'm wrong, but one of the pieces
10    of information you're claiming was
11    confidential was, I think, referred to
12    as the movement of personnel?
13    A.     I think what I said was
14    probably the staffing matrix where we
15    --- we have to put people on posts and
16    positions.
17    Q.     If a particular employee is ---
18    of the jail is put on a particular
19    post, that information would be known
20    by everybody in the jail, wouldn't it?
21    A.     Yes.
22    Q.     Including inmates?
23    A.     Well, not all inmates.  I mean,
24    if a person were put on a module, I
25    guess the A module inmates would know

27

1    that.  Inmates on other modules may

2    not necessarily know the staffing

3    matrix that day.

4    Q.    And the same would be true with

5    the staffing of the other modules or

6    the intake unit and various other

7    units of the jail.

8         Correct?  The people who were

9    present would know who's there and

10   who's not.

11   A.    Yes, that's correct.

12   Q.    A person who is being booked

13   into the jail through the intake unit

14   would know which officers are present

15   on the intake unit and which ones are

16   not.

17        Correct?

18   A.    Assuming that they've been here

19   before and are familiar with the

20   staff, if it's a new inmate, they may

21   not know, you know, who's who or that.

22   But if an inmate's been here before,

23   spent some time here, they may have

24   knowledge of who the person is.

25   Q.    And the county doesn't have ---

28

1    or the jail, excuse me, doesn't have

2    any policies or procedures relating to

3    inmate disclosure of that information,

4    do they?

5    A.    You can't --- you can't

6    regulate inmate disclosure of

7    information.  It's just not possible.

8    We can regulate our staff, but, you

9    know, we can't regulate what an

10   inmate's going to say or do.

11   Q.    So to the extent you believe

12   that the stationing of certain

13   officers on certain units is

14   confidential, in some circumstances,

15   at least you would agree inmates have

16   access to that confidential

17   information, don't they?

18   A.    I would agree situationally

19   inmates would have access to that

20   information.

21   Q.    In terms of --- you had

22   referenced before drugs being smuggled

23   into the jail and that being

24   potentially confidential or sensitive

25   information.

29

1          Is that correct?

2                    ATTORNEY GRIESER:

3                    Objection to form.

4     BY ATTORNEY MANSOUR:

5     Q.      You can answer if you

6     understand.

7     A.      I --- I don't know that I

8     referenced specifically.  I think we

9     --- you had asked a question about

10    drugs being brought into the jail, and

11    I verified that, yes, that was part of

12    the investigation with the Patterson

13    case.  Obviously, you know,

14    information --- we're not going to

15    share that with everybody, you know,

16    the results of the investigation.  If

17    there's criminal charges being filed

18    and the district attorney is pursuing

19    something like drugs being brought

20    into the institution, you know, we're

21    not going to share that out with

22    everybody.  That's sort of a need to

23    know kind of thing.

24    Q.      You had mentioned that you were

25    aware Mr. Kimbrough had shared with

30

1    Attorney Zeiger his opinion as to how

2    Inmate Rhoades had smuggled jails in

3    --- or smuggled drugs into the jail.

4          Correct?  That's your

5    understanding of one of the things Mr.

6    Kimbrough shared?

7    A.    I believe, yeah.  I --- again,

8    I have a general overview of --- of

9    that situation.  I was not part of the

10    interview process with him.  However,

11    I believe, you know, the drugs were

12    smuggled in.  I believe that was one

13    of the things that was shared with Mr.

14    Zeiger.

15    Q.    And you believe that

16    information was confidential?

17    A.    Absolutely.

18    Q.    Did Mr. Rhoades --- Mr. Rhoades

19    knew how he smuggled drugs into the

20    jail.

21          Right?

22                 ATTORNEY GRIESER:

23          Objection.  Speculation.

24    Dave, you can go ahead and

25    answer.

31

<pre>
 1                    THE WITNESS:
 2                    Yeah, I don't --- I
 3         don't know.  I never spoke to
 4         Mr. Rhoades, and I don't recall
 5         ---.  I believe --- and again,
 6         I believe he was charged with
 7         DDRD, drug delivery resulting
 8         in death, but I'm sure he knew
 9         --- knew how he tried to or did
10         smuggle in drugs.
11  BY ATTORNEY MANSOUR:
12  Q.    I mean, that's kind of common
13  sense.
14         Right?  I mean, he's smuggled
15  in the drugs, so obviously he would
16  know how he did it.
17         Right?
18  A.    Correct.  He's the one that did
19  it, so yes.
20  Q.    Are there any policies or
21  procedures in the jail that would have
22  prevented or could have prevented Mr.
23  Rhoades from sharing that information
24  with other inmates?
25  A.    He's free to talk to any inmate
</pre>

32

1    that he chooses.

2    Q.    How about people outside of the

3    jail?  Could he have potentially

4    contacted the third parties outside of

5    the jail and told them how he smuggled

6    drugs into the jail?

7    A.    Absolutely.  As an inmate, he's

8    not subject to the county work rules,

9    so he could do what he chooses.

10   Q.    And in light of his ability to

11   share that information with outside

12   third parties, does that change your

13   opinion as to whether or not that

14   information is confidential under the

15   employment policies of the county or

16   the jail?

17   A.    No, it doesn't.  And I'm going

18   to explain.  You know, we've been

19   through litigation on this.  Again, we

20   can't control what people --- people

21   want to say, inmates want to say.

22   However, information gleaned from your

23   workplace, from, you know, our records

24   management systems, our management

25   discussions, again, that's

33

1    confidential information.  And that's

2    the person subject to --- the

3    employee, myself, everybody else is

4    subject to the employee rules and

5    regulations from both the Department

6    of Corrections and human resources.

7    Q.    Okay.

8          So you would agree with me that

9    confidential information is --- the

10   information itself is what is

11   classified as confidential.

12          Correct?

13                ATTORNEY GRIESER:

14                Objection to form.  You

15        can go ahead and answer, David,

16        if you understand the question.

17                THE WITNESS:

18                So --- so can you just

19        repeat that back?

20   BY ATTORNEY MANSOUR:

21   Q.    Sure.  So when we're talking

22   about confidential information, what's

23   confidential is the substance of the

24   information?

25          Correct?

34

1      A.      So what I like to use, you

2      know, there's confidential/security

3      sensitive information.  So certain

4      things are confidential.  Criminal

5      History Records Information Act spells

6      out a lot of things.  There are

7      expungements.  There are limited

8      access and clean slate regulations

9      which push some of that into

10     confidence areas.  Personal

11     identifiable information from an

12     inmate, confidential information.

13           You know, security sensitive

14     comes into play when you're talking

15     about things like smuggling drugs.

16     And we don't want to provide a guide

17     for other inmates to exploit maybe a

18     potential weakness or a way of --- a

19     novel way of concealing drugs or

20     bringing something into the

21     institution.

22           So, you know, again, I can't

23     control the inmate, but the staff,

24     that --- that's something I would

25     consider confidential/security

35

1    sensitive.  We want to protect that.

2    Q.    Though, the information about,

3    specifically in this case, how Rhoades

4    might have smuggled drugs into the

5    jail, that information is confidential

6    because it was shared by Attorney

7    Kimbrough --- or by Lieutenant

8    Kimbrough.  Is that your testimony?

9    A.    That ---.

10                    ATTORNEY GRIESER:

11                    Objection as to form.

12    BY ATTORNEY MANSOUR:

13    Q.    Go ahead.  Is that your --- is

14    that your testimony, that the

15    information was confidential because

16    it was shared by Attorney Kimbrough

17    (sic)?

18    A.    It's hard --- again, sharing

19    information that he gleans from his

20    position that is security sensitive is

21    absolutely confidential and security

22    sensitive.

23    Q.    And that same information would

24    have not been confidential if it was

25    shared, for example, by Mr. Rhoades?

36

1    A.    I would consider it

2    confidential, but there's nothing I

3    can do to make Mr. Rhoades not speak.

4    Q.    If Mr. Rhoades had shared that

5    information before Lieutenant

6    Kimbrough, would it have still been

7    considered confidential?

8    A.    Well, I don't know that

9    anything Mr. Rhoades would share would

10   even be accurate.  So that would be

11   the first thing I would say.  To me,

12   yes, it's still confidential.  I mean,

13   I can't control what Mr. Rhoades may

14   or may not say.  But our work policies

15   and our work rules are pretty clear on

16   sharing information that you glean

17   from your work experience.

18        Example for me that comes to my

19   mind would be sex offenders.  You

20   know, Mr. Rhoades could feel free to

21   talk to anybody he wants about how

22   many sex offenders he thinks are in

23   custody and where they're at and what

24   they may be doing.  You know, anybody

25   who works for the Department of

37

1    Corrections should not release that

2    information to anyone.

3    Q.     Okay.

4          So you would agree with me,

5    sir, that generally confidential

6    information in the eyes of the county

7    is information that the county does

8    not want people outside of the county

9    knowing about?

10                    ATTORNEY GRIESER:

11              Objection as to form.

12         Leading.  You can go ahead and

13         answer, Dave.

14                    THE WITNESS:

15              Yeah, I would say it's

16         not a --- it's not a want

17         thing. I mean, obviously, you

18         know, it's a need thing.  We're

19         not talking about the county's

20         wishes.  We're talking about

21         security and sensitive

22         information that --- that could

23         be, again, used in not a good

24         way.

25    BY ATTORNEY MANSOUR:

38

1    Q.       Okay.

2            So then confidential

3    information would be information that

4    the county believes is not necessary

5    for those working outside the county

6    to know about?

7                        ATTORNEY GRIESER:

8                Objection as to form.

9        Can you please rephrase?

10   BY ATTORNEY MANSOUR:

11   Q.       Confidential --- you used the

12   word --- you said it's not a matter of

13   want, it's a matter of need.

14           Correct?

15   A.       I believe that's what I said,

16   yes.  Not a matter of what we want,

17   it's a matter of safety and security.

18   So that's the need.  And also, again,

19   you know, disclosing information that

20   is personally identifiable or possible

21   CHRIA, we just don't --- we don't

22   distribute that information to the

23   general public.

24   Q.       So information that the county

25   determines is necessary for the

39

```
 1     security of the jail, that's the
 2     information that's confidential.
 3          Correct?
 4     A.    Feel like we're going over the
 5     same stuff.  So, yeah, obviously
 6     confidential.  Again, safety and
 7     security.  We're talking about
 8     information that can be used to create
 9     an unsafe work condition or a
10     disruption of our operations, create a
11     security risk, those type of things.
12          Or again, somebody's right to
13     have privacy.  You know, you can't
14     disclose information that, you know,
15     an inmate has a right to privacy.  I'm
16     not going to give an inmate's Social
17     Security number out to anyone.  I'm
18     not going to give an inmate's sexual
19     orientation out to anyone.  Any of
20     those things that, you know, an inmate
21     has a right to privacy as well.
22     Q.    What I'm trying to get at, sir,
23     is --- what I'm trying to understand
24     is how certain information can be
25     considered confidential if various
```

40

1    people outside of the county could or

2    do know about it?

3                    ATTORNEY GRIESER:

4                    Objection as to form.

5           This is asked and answered.

6           You can go ahead and answer,

7           Dave.

8                    THE WITNESS:

9                    Yeah.  I mean, again, I

10          can't control what an inmate

11          says.  I can't control that.

12          The county work rules don't

13          apply to an inmate.  So an

14          inmate may go out and spread

15          misinformation.  That happens

16          all the time.  They may spread

17          other information that may or

18          may not be accurate.

19                  Do I consider it

20          confidential?  Sure.  But the

21          method of the dissemination of

22          the information is beyond the

23          control of the county and the

24          jail.  If another inmate has

25          another inmate's Social

1          Security number and they want

2          to publish, that's entirely up

3          to them.  I'm not --- we're not

4          going to be the one to publish

5          that.

6                    And again, you know,

7          things that we have --- have

8          been subject to Right to Know

9          requests that have been

10         declared, information that's

11         not public knowledge or

12         security sensitive, use of

13         force, things like that have

14         been requested in a non-

15         litigation kind of way.

16                   I mean, obviously the

17         rules are different when we're

18         talking about litigation.  But

19         you know, again, we ---

20         anything security sensitive or

21         that's going to create a

22         disruption or interfere with

23         safe operations in the

24         facility, we're going to

25         consider that information

42

1          confidential and security

2          sensitive.

3   BY ATTORNEY MANSOUR:

4   Q.    If Mr. Kimbrough had been

5   subpoenaed to testify about his

6   knowledge of the incident that led to

7   Mr. Patterson's death as part of the

8   lawsuit that had been filed by Mr.

9   Patterson's estate, would his

10  testimony have been considered

11  confidential?

12  A.    So --- so my response with that

13  would be based on my --- my limited

14  experience with subpoenas and things

15  like that.  Again, I would leave that

16  up to the solicitor's office, who

17  represents us, as to whether they're

18  going to oppose the subpoena, what

19  information, you know, is going to be

20  released?  Are there fallback motions?

21  Are they going to try and seal these

22  things?  These aren't things that as

23  Director of Corrections that I, you

24  know, get involved in.

25  Q.    Okay.

43

```
1          But I'm, you know, asking you
2     for your opinion and your --- based on
3     your understanding of the county and
4     jail policies, if Mr. Kimbrough told
5     Attorney Zeiger exactly what happened
6     that day during the course of a
7     deposition, would he have been
8     disclosing confidential information to
9     Attorney Zeiger under those
10    circumstances?
11                    ATTORNEY GRIESER:
12                    Objection as to form.
13          Asked to answered.  You can go
14          ahead and answer, Dave.
15                    THE WITNESS:
16                    Again, you know, I've
17          been involved in situations
18          where I've been subpoenaed or
19          have documents that have been
20          subpoenaed.  You know, our
21          process is that, you know, we
22          go through the law department.
23          If they want to assign an
24          attorney or if I wanted to get
25          an outside counsel to represent
```

44

```
 1          me in those matters, I
 2          certainly can.  I don't fight
 3          the fight.  I let the law
 4          department, the solicitor,
 5          fight the fight.  If they're
 6          --- they'll question me as to,
 7          you know, is this security
 8          sensitive?  Is this something
 9          we can release?  Should we ---
10          what are the ramifications of
11          releasing that information?
12                  And again, the lawyers
13          for the Department of
14          Corrections and the county
15          would have to decide with the
16          judge ---.  At the end of the
17          day, the judge is going to tell
18          us what we're going to do.
19                  So that's about all I
20          can really say intelligently to
21          that.  I can't say that ---
22          what happens to that
23          information after a subpoena
24          and the person's directed to
25          answer for a deposition.
```

45

1    BY ATTORNEY MANSOUR:

2    Q.    So you can't say one way or the

3    other whether Mr. Kimbrough would have

4    breached confidentiality had he told

5    Attorney Zeiger the same information

6    during a deposition.  You're unsure

7    ---?

8              ATTORNEY GRIESER:

9              Objection as to form.

10        Asked and answered.  You can go

11        ahead and answer, Mr. Kratz.

12             THE WITNESS:

13             Yeah.  So --- so again,

14        I --- we're talking in

15        hypotheticals, and I don't know

16        the information.  If somebody

17        was asking for, you know,

18        something rather innocuous, you

19        know, we generally wouldn't

20        fight that.  If there was a big

21        security issue, let's say,

22        video, somebody wanted to view

23        video from something that

24        exposes our egresses or our

25        tactics that are used to deal

46

1    with certain issues, some of

2    our policies are security

3    sensitive, and we redact them.

4    Again, that's going to go in

5    front of the judge who's going

6    to say, okay, the redactions

7    are fine.  They --- they may

8    review that in chambers.  You

9    know, we've had that happen.

10        We've had judges uphold

11   our redactions.  We've had

12   times where the judge has

13   ordered us to remove some

14   redactions.  So, again, I can't

15   really say.  Once you get into

16   that litigation area, I am

17   pretty much just a player in

18   that, and I have my attorney

19   that will represent me.  I may

20   get asked questions about

21   what's security sensitive and

22   what's --- what we think is

23   confidential and the

24   ramifications of releasing

25   that.  But it all really comes

47

1          down to the deposition subpoena
2          and the judge and the lawyers,
3          so ---.
4    BY ATTORNEY MANSOUR:
5    Q.     So you would agree then that it
6    would not be as clear of a case, at
7    least as you believe it was here in
8    terms of my client's conversation with
9    Attorney Zeiger.
10                   ATTORNEY GRIESER:
11                   Objection as to form.
12          Speculation.  Could you please
13          rephrase?
14   BY ATTORNEY MANSOUR:
15   Q.     Sure, I'll rephrase the
16   question.  So you believe that under
17   the circumstances here, my client's
18   private conversation with Attorney
19   Zeiger, in which he disclosed the
20   disinformation, you believe was
21   clearly a breach of confidentiality?
22   A.     Yeah, I think the key
23   difference here with what we were
24   discussing about subpoenas and
25   depositions is, you know, I'm talking

48

1    to you today not because I want to,

2    but because I have to.  I'm being

3    ordered to do this by the judge.

4    Right.

5          So Mr. Kimbrough made the call

6    on his own.  There was no --- there

7    was no subpoena, there was no

8    deposition.  There was no review of

9    information.  As far as I know, it was

10   never brought to anybody's attention

11   that he wanted to disclose anything to

12   an attorney.

13         So, again, I think there's a

14   difference between me picking up the

15   phone and saying, hey, I'm calling

16   somebody who's representing somebody

17   who is suing us versus, hey, you have

18   to report for a deposition, or here's

19   a subpoena that you need to comply

20   with.  So they're two very different

21   things to that.

22   Q.     But the information would be

23   the same.

24         Right?

25   A.     Well, again, I would ---.

49

1              ATTORNEY GRIESER:

2              Objection as to form.

3        Asked and answered.  Go ahead,

4        Dave, you can answer.

5              THE WITNESS:

6              So I would say, you

7        know, with a subpoena or a

8        deposition, I'm compelled to

9        answer questions that are

10       brought to me and requests for

11       information that parties may

12       want.  Me sitting at my desk

13       saying, I'm going to call so

14       and so who's representing

15       somebody who is litigating

16       against the department and talk

17       to them, there's --- nobody's

18       being compelled to give that

19       information.  That's just

20       somebody wants to speak and

21       give that information out,

22       which I believe that, you know,

23       again, is probably --- it could

24       be, you know, probably trying

25       to retaliate or harm us a

50

1          little bit.  I mean, I don't

2          understand.  In 21 years, I've

3          never seen that happen before.

4   BY ATTORNEY MANSOUR:

5   Q.    And that was a concern of the

6   county.

7          Correct?  That --- that Ms. ---

8   the information Mr. Kimbrough shared

9   with Attorney Zeiger could potentially

10  compromise the county's interest in

11  the Patterson litigation.

12         Correct?

13              ATTORNEY GRIESER:

14              Objection as to form and

15         mischaracterization of this

16         witness' prior testimony.  You

17         can go ahead and answer, Dave.

18              THE WITNESS:

19              Yeah, I --- again, I

20         would --- I can't because I was

21         not in the room if that was

22         discussed with me.  So I --- I

23         really don't have answer for

24         you as to what the county

25         thought or what the advice was

51

1           from the solicitor's office or
2           if there was any conversations.
3    BY ATTORNEY MANSOUR:
4    Q.      But what about what you think?
5    I want to know what you think.  Do you
6    think it was --- that Mr. Kimbrough's
7    conversation with Attorney Zeiger and
8    the information that he shared could
9    have potentially compromised the
10   county's interest in the litigation
11   that was going on with the estate of
12   Mr. Patterson?
13   A.      So, again, I don't have an
14   exact list of what was discussed.  I
15   did view the motion to reopen that was
16   filed by Mr. Zeiger.  There was no big
17   specifics in there to me, but I'm sure
18   maybe more was conveyed.  And again,
19   even in that motion to open, the
20   attorney advised him, like, basically,
21   you're reaching out to me.  I'm not
22   reaching out to you.  I'm not part of
23   the process here.  It's -- yeah, I
24   mean, I--- I really can't speak to
25   that accurately.

52

1      Q.      When did you first review the
2      motion that you're referring to, the
3      motion to reopen discovery filed by
4      Attorney Zeiger?
5      A.      So I --- I went --- I first
6      gathered my documents as we were
7      leading up to the deposition and try
8      to go over the case.  And I did do a
9      little bit of a deeper read in that.
10     I was basically informed by phone that
11     that had happened, and that's kind of
12     where this whole investigation
13     started.
14            You know, you asked me what I
15     think.  You know, I --- I really don't
16     know what to say in that area.  I
17     mean, I can tell you that it coincides
18     with an HR investigation, the
19     disclosure of information.  There was
20     a complaint, I believe, filed against
21     Mr. Kimbrough, Lieutenant Kimbrough,
22     within a few --- a day or so, I
23     believe, of the discipline being
24     handed to him.
25            And again, this was not a

53

1    Department of Corrections issued

2    discipline.  This was a harassment

3    complaint.  So human resources

4    provided a fact finding notice, and,

5    you know, within a day or so, I

6    believe he reached out to Attorney

7    Zeiger, which to me is completely

8    uncharacteristic.

9    Q.    You said you reviewed the

10   motion filed by Attorney Zeiger in the

11   course of preparing for today's

12   deposition.

13         Is that correct?

14   A.    Correct.  I reviewed all the

15   documents associated with the file,

16   and when I say review, I read it.  I

17   didn't do a deep dive or study.

18   Q.    Okay.

19         Did you review it or read it at

20   any time prior to your preparation for

21   today's deposition?

22   A.    I don't --- I don't recall.  I

23   may have gotten a copy of that back

24   before this all happened and we were

25   involved in litigation and the

54

1    separation.  If I did, I glanced at

2    it.  I mean, had I known we were going

3    to end up in litigation over a

4    termination, I probably would have

5    read it a little closer.  But at that

6    point in time, you know, I was more

7    concerned with bullying investigation

8    ongoing and the discipline that was

9    coming from that.

10        So, you know, that was really

11   my focus at the time.  When you talked

12   about Kimbrough, we did not know that

13   there was going to be a termination at

14   this point in time, at least, I

15   didn't.  I was focused on the --- the

16   complaint that was lodged against him

17   and really just trying to get him

18   through that process.  Really, you

19   know, I wanted him to come out of that

20   --- that investigation that I'll call

21   bullying, harassment investigation,

22   you know, I wanted to get him back on

23   track, get him mentored.  He's ---

24   he's been a great employee and ran my

25   records office.  He had my trust.  He

55

1     had the trust of our administrators.

2     So, you know, that was really my

3     focus, this --- you know, okay, he's

4     going to get probably some discipline

5     for that.  It's not life altering.

6     And I just really wanted to get him

7     back on track in a good mental state

8     to stay part of the administrative

9     team.

10          So I wasn't thinking we'd be

11    sitting here talking today at that

12    point in time.

13    Q.     So at the time of Mr.

14    Kimbrough's discharge on July 29th,

15    2024, you at that point had not yet

16    read the motion that was filed by

17    Attorney Zeiger to reopen discovery.

18          Correct?

19    A.     Again, I ---.

20                    ATTORNEY GRIESER:

21                    Objection to form.

22          Leading.  You can answer, Dave.

23                    THE WITNESS:

24                    Yeah, I may have read

25          it, but again, I didn't review

56

1           it at that point in time when

2           --- for the termination part.

3           I was aware of it.  It was

4           explained to me what had

5           happened.  Again, I'm not a

6           lawyer, so you know, I didn't

7           even know that you could ---

8           after a case was marked for

9           closure, that you could even

10          come back with additional

11          information, even if you

12          weren't subpoenaed or deposed

13          prior to that.

14              So I was aware that the

15          contact was there.  I really

16          didn't have any specifics and

17          to this day, still don't have,

18          you know, extreme specifics.

19          But I did read over that filing

20          just to familiarize myself

21          today, because obviously,

22          that's a part of why the

23          person's --- why Mr. Kimbrough

24          was terminated.

25     BY ATTORNEY MANSOUR:

57

1    Q.    Are you saying that at the time

2    Mr. Kimbrough was terminated on July

3    29, 2024, you didn't know --- you

4    personally did not know specifically

5    what he had told Attorney Zeiger?

6    A.    Well, again, I don't know

7    specifically what he told.  I

8    generally understood that he tried to

9    relay information that's spelled out

10   in that motion to reopen, if I'm using

11   that correctly, to reopen the case

12   that Attorney Zeiger filed.

13   Q.    So I'm going to share my screen

14   with you.  Can you see the screen

15   okay, the document?

16   A.    Yes, I can.

17   Q.    Okay.

18         I'm not going to mark this as

19   an exhibit because it's already a part

20   of the record.  This is the complaint

21   that Mr. Kimbrough has filed in this

22   case.

23   A.    Yes.

24   Q.    And I want to direct your

25   attention here to paragraph 22 ---

58

1    actually 21 and 22.  If you can read

2    both of those to yourself and then

3    just let me know when you're done.

4    A.    If you could unhighlight that,

5    it's just making my screen a little

6    wonky.

7    Q.    Okay.

8         Sure.  Yeah.  And if you need

9    me to make it bigger, I can make it

10   bigger.

11   A.    No.  It's good.  It was 21 to

12   22.

13        Right?

14   Q.    Yes.

15   A.    Okay.

16   Q.    Do you believe paragraph 22

17   contains confidential information?

18   A.    I believe it's --- I believe

19   it's security sensitive.  I don't

20   agree with --- with what's being said

21   there.  After, you know, reviewing the

22   video, I think there was --- there are

23   other people in reception at the time.

24   I'm not going to agree with the as

25   usual understaffed in reception.

59

1          So --- so, again, these are,
2     again, things that he is relaying to
3     the attorney on his own person.  It's
4     his personal knowledge.  I don't agree
5     that's personal knowledge.  I agree
6     that's institution knowledge.
7          I mean, Joe Smith on the street
8     can have personal knowledge.  I
9     visited Mr. Patterson --- or visited
10    Mr. So and So today, and he told me X,
11    Y, and Z.
12         Okay.
13         But this was professional
14    knowledge.  This wasn't personal
15    knowledge.  And again, I don't
16    necessarily agree with a lot of what
17    in in 22 --- number 22.
18    Q.    And that's fair enough.  So you
19    may disagree with Lieutenant
20    Kimbrough's opinion about why this may
21    have happened.  But my question is, is
22    there anything specifically in here,
23    any tidbit of information in paragraph
24    22 that you believe is confidential
25    under the county's policies?

60

1        ATTORNEY GRIESER:

2            Objection as to form.

3        Mischaracterizing his prior

4        testimony.  I believe he used

5        the term security sensitive.

6            ATTORNEY MANSOUR:

7            I know what he said.

8        I'm asking ---.

9            ATTORNEY GRIESER:

10           There's a difference.

11       You can go ahead and ask ---

12       you can answer, Dave.

13           THE WITNESS:

14           So, you know, again, I

15       don't know what was

16       specifically shared.  It says

17       he was --- he explained the

18       inmate that snuck drugs into

19       the jail was able to do so

20       because the reception unit was,

21       as usual, understaffed.  Again,

22       I don't know what information

23       he wanted to relay to the

24       attorney.  Is there more

25       detail?  Did he have an

61

1              investigative report or

2              something from the district

3              attorney.  Again, unstaffed, I

4              would disagree with that.

5                     Putting that inaccurate

6              information out there is, you

7              know, again, from his

8              professional observations, not

9              his personal observations.

10             It's absolutely security

11             sensitive, depending on how

12             much detail he drilled down

13             into.  I don't know.  These are

14             very general statements.  So I

15             don't know what exactly he told

16             Attorney Zeiger.

17   BY ATTORNEY MANSOUR:

18   Q.    Okay.

19         Well, let's break it down line

20   by line.

21         Okay.

22   A.    Sure.

23   Q.    This is a pretty good summary

24   of what he told Attorney Zeiger.

25         Okay.

62

1          So let's start with he
2     explained that the inmate that snuck
3     drugs into the jail was able to do so
4     because the R and R unit was
5     understaffed --- as usual understaffed
6     after Officer Ulmer was pulled from
7     the R and R unit to a different unit
8     by Lieutenant Clayton.  That
9     allegation, is that, we'll start first
10    with, confidential?
11                    ATTORNEY GRIESER:
12                    Objection as to form.
13          This has been asked and
14          answered.
15                    THE WITNESS:
16                    So again, it's --- it's
17          my understanding and from my
18          --- my research and watching
19          the video, that's completely
20          inaccurate.
21    BY ATTORNEY MANSOUR:
22    Q.    Okay.
23          That's fine.  You disagree with
24    his assessment or his explanation?
25    A.    I do, yes.

63

1    Q.    Assuming that's what he said,

2    is it confidential?

3    A.    So again, confidential, are we

4    talking to a reporter?  Are we putting

5    that out at the bar on Monday night?

6    That is confidential information that

7    should not be put out there.  You

8    know, if it's --- if it's compelled by

9    a subpoena or a deposition, again,

10   different --- different area.  But

11   this is --- this is stuff that, yeah,

12   I view it as confidential and security

13   sensitive.

14   Q.    Okay.

15        So you believe his statement

16   that the R and R unit was understaffed

17   because Officer Ulmer was pulled from

18   the unit by Lieutenant Clayton --- you

19   believe that statement is confidential

20   and sensitive.

21        Correct?

22   A.    Correct.  And also inaccurate.

23   Q.    Okay.

24        Then he goes on to say Officer

25   Atiles had just completed a strip

64

1    search of this inmate and directed him

2    to return to the R and R unit where

3    Officer Atiles believed Officer Ulmer

4    would be waiting to escort him to a

5    different holding cell.

6         Do you believe that statement

7    is confidential and security

8    sensitive?

9    A.    I do.  I believe all of our

10   operational things are confidential

11   and security sensitive.  Yeah, that's

12   operational.

13   Q.    And then it proceeds, but

14   because Officer Ulmer had been pulled

15   to a different unit, the inmate

16   returned to his prior holding cell and

17   retrieved drugs that he had hidden

18   there earlier, which he then snuck

19   into his assigned module.  You believe

20   that statement is confidential and

21   sensitive.

22        Correct?

23   A.    I do.

24   Q.    And then the last line is, once

25   there, this inmate shared the drugs

65

1   with Mr. Patterson, who subsequently

2   overdosed and died.  Do you believe

3   that statement is confidential and

4   sensitive?

5   A.     I do.

6   Q.     Are you aware of this fact ---

7   are you aware of the fact that this

8   complaint, including this paragraph,

9   is part of the public record?

10  A.     I am not.

11                 ATTORNEY GRIESER:

12                 Objection as to form,

13         relevance.

14  BY ATTORNEY MANSOUR:

15  Q.     Are you aware of the fact that

16  anybody who wants to find it can go

17  online and read this complaint?

18                 ATTORNEY GRIESER:

19                 Objection as to form.

20         Again, relevance.  You can go

21         ahead and answer, Dave.

22                 THE WITNESS:

23                 Again, I assume it's

24         public, and I'm assuming if

25         they have the right program to

66

1           access it, they can.

2    BY ATTORNEY MANSOUR:

3    Q.      And you understand the judge in

4    this case has read paragraph 22?

5                    ATTORNEY GRIESER:

6                    Objection ---

7                    THE WITNESS:

8                    I do.

9                    ATTORNEY GRIESER:

10                    --- as to --- as to

11            form.  That's not relevant and

12            is assuming facts and --- not

13            in evidence.  I don't ---.  Can

14            you rephrase that, please?

15                    ATTORNEY MANSOUR:

16                    Sure.

17                    THE WITNESS:

18                    Excuse me one second.

19                    Okay.

20    BY ATTORNEY MANSOUR:

21    Q.      You understand that the judge

22    assigned to this case has read this

23    paragraph?

24                    ATTORNEY GRIESER:

25                    Objection as to form.

67

1          Leading.

2                    ATTORNEY MANSOUR:

3                    All right.

4          I just want to pause right

5    here.  So you've made a number of

6    objections as to form.  Form and

7    relevance are different objections.

8    Leading ---.

9                    ATTORNEY GRIESER:

10                   I'm making multiple

11         objections.

12                   ATTORNEY MANSOUR:

13                   I understand, but

14         leading --- I can lead him.

15         He's an adverse witness, so I'm

16         more than entitled to lead him.

17         So that's not a relevant

18         objection.  And if you're going

19         to keep doing it, it's going to

20         be a problem.

21                   So if you have a problem

22         with the way my question is

23         being asked, it's a compound

24         question or it's a confusing

25         question, that's fine.  But to

68

1          object on the basis of

2          relevance or to object on the

3          basis of leading is highly

4          inappropriate.

5                    ATTORNEY GRIESER:

6                    Thank you for explaining

7          that to me, Mr. Mansour.  I am

8          aware of what form is.  I feel

9          that you're mischaracterizing

10         the evidence here.

11                   ATTORNEY MANSOUR:

12                   I'm not

13         mischaracterizing anything.

14         I'm asking him if he's aware

15         that other people, besides

16         employees of the jail, have

17         access to this complaint.

18                   ATTORNEY GRIESER:

19                   That's fine.  You can go

20         ahead and answer, Dave.

21                   THE WITNESS:

22                   So, again, I --- I was

23         not aware.  I do understand

24         that most of these things are

25         public, but I also understand

69

1          that sometimes a judge can

2          conceal things and they don't

3          get disclosed to the public.

4                    So again, I don't know.

5          I did not know specifically

6          that this was not sealed.  I do

7          believe the judge ruled on this

8          and rejected it, I think, but I

9          don't know if it was sealed. I

10         really don't know.

11    BY ATTORNEY MANSOUR:

12    Q.    So I will represent to you that

13    it is not sealed.

14    A.    Okay.

15    Q.    Does it concern you that this

16    information that you just characterize

17    as confidential and sensitive is

18    available to the public?

19    A.    So does it concern me?  Yeah,

20    absolutely.  It's --- it's things

21    that, again, can do us some harm.  But

22    in this particular case, a judge ruled

23    on it, you know, and I'm not going to

24    disagree with the judge.  That's what

25    lawyers are for.  It wasn't --- there

70

1      we go.

2            Again, you know, the judge

3      ruled on it.  The judge decided that

4      this would be public facing.  And

5      that's the way it goes.  It's not ---

6      you know, again, a legal person ruled

7      on this.  It's not like somebody

8      picked up the phone and just started

9      to talk about it.  So the judge made

10     her decision.  I believe it's a her.

11     I don't want to mischaracterize that,

12     but --- and decided to put that out.

13           So that is not my favorite

14     thing to have out there.  I do feel

15     like it is a little bit of a security

16     risk for us, but so be it.

17     Q.     Okay.

18           So I believe you testified a

19     few moments ago, and correct me if I'm

20     wrong, that the --- Mr. Kimbrough's

21     statement that the intake unit was

22     understaffed, not only do you disagree

23     with that assessment, but you believe

24     that statement is confidential and

25     sensitive.

71

1         Is that correct?

2    A.      Well, yes, I do --- I do

3    disagree with that.  And if there are

4    --- you know, staffing's not a secret

5    in general.  We --- you know, I'm very

6    open about our staffing numbers.  It's

7    an industry wide thing throughout the

8    entire country.  I mean, just Google

9    jail, prison staffing, you're going to

10   come up with a ton of places that are

11   struggling with staffing.

12        What we do is our staffing is

13   dynamic.  It's not static.  We had to

14   make changes.  The old days of saying,

15   you know, you have three people on

16   this unit, four people in this unit,

17   five people in this unit, one person

18   on that unit, are over with staffing.

19   You need to move your staff around

20   now.  You need to move your staff to

21   where the acuity is.

22        So, you know, a good example in

23   reception, there were not many inmates

24   in reception that day.  You don't need

25   five staff down there.  If there's a

72

1    heavy court day and 70 --- 60 to 70

2    people are coming back from court,

3    yeah.  So, you know, we deploy our

4    staff where they need to go.  If ---

5    if there's a high number of watches

6    for suicide or medical, again, combine

7    them in a unit, and we have to move

8    some staffing from areas that are very

9    quiet with not a lot of activity to

10   areas of higher acuity.

11          And reception is one of those

12   areas.  It's feast or famine in there

13   a lot of times.  A lot of times there

14   could be no inmates for 6, 8, 10, 12

15   hours.  There's no point in having

16   somebody sit there at a desk when you

17   can deploy them elsewhere to be more

18   effective.  And then if new

19   commitments come in, you can move

20   those people back there.

21          So these are decisions that,

22   you know, the administrative, our

23   security team, lieutenants and above

24   have to look at and make decisions

25   every day.  You know, I've given

73

1    interviews to reporters on, you know,
2    staffing.  So it's --- listen, it's a
3    bad situation.  It's countrywide, it's
4    every facility.  There are very few
5    facilities that can get the staffing
6    in they need.  So, yeah, not a secret.
7    You know, reporters have talked about
8    it.  I've talked about it at prison
9    board meetings, which are public.  So
10    it's a daily discussion.
11           We're going to have one right
12    after we're done here today.  We've
13    got an Eagles parade tomorrow.  So,
14    you know, I anticipate that we're
15    going to have some --- some issues
16    with people coming in tomorrow, so
17    ---.
18    Q.    Okay.
19           So you just testified that
20    yourself have spoken to reporters
21    about staffing issues at the jail.
22           Correct?
23    A.    Correct.
24    Q.    Do you believe in the course of
25    doing so your discussion of staffing

74

1    issues at the jail disclosed

2    confidential information?

3    A.    I don't, because we didn't have

4    any specifics.  We talked about

5    staffing numbers, vacancy factors,

6    which are all public knowledge

7    reported at the prison board.  There

8    was one point in this --- I believe it

9    was the summer, about a year and half

10   ago, maybe it was two years ago, where

11   to ensure the safety of reception, I

12   had to ask the police departments to

13   put a quick pause on new commitments

14   coming in.  We just had a very, very

15   slim number of people showing up.

16          And again, by asking the police

17   departments to hold the inmates in

18   their holding cells for four or five

19   hours gave us a chance to attend to

20   our suicide watches, our medical

21   watches, those things.  And then we

22   were able to unpause it once we got

23   some staff in and some relief staff.

24          So I didn't go into detail on

25   that.  I didn't disclose that

75

1    information.  You know, the reporters

2    that I spoke to, I think there are

3    about two over the history of this

4    staffing vacancy issue were both very

5    general statements that --- with

6    publicly available information from

7    the prison board that, yes, we have a

8    vacancy factor.

9    Q.    One of the other facts --- or

10   opinions, rather, that Mr. Kimbrough

11   shared with Attorney Zeiger in his

12   phone call was that he believed

13   Defendant Ulmer violated policy by not

14   locking and searching the holding cell

15   where Mr. Rhoades was believed to have

16   hidden the drugs that he smuggled in.

17   Do you believe that fact is

18   confidential or sensitive?

19   A.    Well, I think his claim was she

20   was pulled from the post.  Am I

21   correct in assuming that?

22   Q.    Correct.  And one of the other

23   things that he shared with Attorney

24   Zeiger was that before being pulled

25   from her post, she also failed to

76

1    search the holding cell and to lock

2    it.

3    A.      And so I--- I don't think she

4    was pulled from her post.  My research

5    doesn't indicate that she was pulled.

6    It indicates to me that she went to

7    respond to a emergency in the

8    building.

9    Q.      Okay.

10          So she was ---.

11   A.      Yeah.  When she did so, it was

12   her.  And there was another officer

13   posted there, but there was also

14   another officer from across the hall

15   where Lieutenant Kimbrough works, who

16   happened to be on that module.  And

17   for whatever reason, again, she ---

18   she responded to that code.  I'm not

19   going to Monday morning quarterback

20   it.  We have to make decisions on

21   safety.

22          There was another officer

23   there, so there were two people there.

24   Q.      No, I --- and --- and I

25   understand all that, but in ---.  Mr.

77

1    Kimbrough shared that he believed she

2    had failed ---.  For whatever reason,

3    she was pulled off the unit or left

4    the unit, she was once there.  At one

5    point, she was no longer there.  And

6    before leaving the unit, she failed to

7    search and secure the holding cell

8    from Mr. Rhoades.

9    A.     Right.

10   Q.     Okay.

11          So that --- that opinion or

12   that belief of Mr. Kimbrough, is that

13   confidential or sensitive information?

14   A.     So again, I think ---.

15   Q.     That Officer Ulmer violated

16   policy by failing to search and secure

17   the cell?

18   A.     So again, that opinion, I ---

19   I'm hearing about this.  He's the

20   supervisor of that area.  I don't

21   believe he brought any of that

22   information forth, at least not to my

23   desk, that she violated any policies

24   and procedures at the time.  That may

25   have been an afterthought after

78

1  ruminating on it.  But I don't have

2  any, you know, indication from him

3  that there was a dereliction of duty.

4        Again, that would be a

5  personnel issue.  I don't --- I don't

6  know how that stands out for Right to

7  Know and things like that.  So I can't

8  intelligently speak to that.  It

9  should have been addressed.  If there

10  was a policy or procedure violation,

11  it would have been appropriate for him

12  to address that.

13  Q.     Okay.

14        So going back to my original

15  question, do you believe that

16  statement was confidential or

17  sensitive under your definition of

18  those terms?

19  A.     Yeah, yeah, I do.  I do.  I do

20  believe it's --- it's an internal

21  personnel matter, and I do believe

22  that's confidential and sensitive.

23  Again, the lawyers would have to work

24  that out.  It wouldn't be something

25  that I would call a friend and talk to

79

1    about.  Have --- if I were compelled
2    by subpoena or deposition, I certainly
3    would discuss it and put my opinion in
4    the record.
5    Q.    Okay.
6    A.    Can I just jump --- can I ask
7    one quick question while we have all
8    the lawyers?  I --- any idea, are we
9    about halfway through yet?  I do want
10   to take ---
11   Q.    Yeah.
12   A.    --- a two second bathroom
13   break, but I do have prison board this
14   afternoon, so ---.
15   Q.    I think we're at least halfway
16   through.
17   A.    Okay.
18         Great.  When you find a
19   convenient, I wouldn't mind just a two
20   sec --- two minute bathroom break, if
21   that's okay with you.
22   Q.    Why don't we do it right ---?
23   Yeah, that's fine.  Why don't we do it
24   right now?  Why don't we take five
25   ---?

80

1   A.     It is a good time for --- for

2   you to pause?

3   Q.     That's fine.  We can take five

4   now.

5                    ---

6   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

7                    ---

8   BY ATTORNEY MANSOUR:

9   Q.     Okay.

10        Mr. Kratz, we are back on the

11  record.  I'm going to show you another

12  document.  I'm not going to mark this

13  one again because it's already a part

14  of the record.  This is a document

15  that was filed with the court as an

16  exhibit to our response to the

17  county's motion to dismiss in this

18  case.

19        And I will represent to you

20  that this is the county's response to

21  Mr. Zeiger's motion to reopen

22  discovery in the Patterson case.

23        Okay?

24  A.     Understood.

25  Q.     And I'll also represent to you

81

1    that this document is a part of the

2    public record, not only in the

3    Patterson case, but also in our case.

4    And I want to show you a few items

5    here and ask you some questions.

6         So I want to direct your

7    attention, if you can see it ---

8    A.    I can.

9    Q.    --- to page five.  In their

10   response to Mr. Zeiger's motion, the

11   county here stated Plaintiff, that is

12   the Patterson Estate, believes

13   Lieutenant Kimbrough will offer

14   evidence that the intake unit was

15   chronically understaffed, yet fails to

16   articulate how this information makes

17   any factor at issue in the case more

18   or less likely.

19        The county's statement here

20   about what it expects Lieutenant

21   Kimbrough to testify about in terms of

22   the intake unit being chronically

23   understaffed, do you believe that the

24   county disclosed confidential

25   information by repeating that

82

1    statement?

2    A.    I do not.  Because they say ---

3    they're not saying they agree with

4    that.  They're just saying that they

5    think that's going to be entered into

6    evidence from what I'm reading.

7    Q.    Okay.

8         So Lieutenant Kimbrough, among

9    other things, told Attorney Zeiger his

10   opinion that the intake unit was

11   chronically understaffed.  And I think

12   you testified earlier, you believe

13   that that was confidential and

14   sensitive information that he should

15   not have shared.

16        Correct?

17   A.    Correct.

18   Q.    Okay.

19        Now, the county here in this

20   response is resharing that

21   information, essentially saying, this

22   is what Lieutenant Kimbrough is

23   saying, and this is why we don't think

24   it's relevant.  Do you believe the

25   county here by repeating what

83

1    Lieutenant Kimbrough told Attorney
2    Zeiger about chronic understaffing
3    violated confidentiality?
4    A.    I don't because they're ---
5    they're rebutting the claim.  They're
6    rebutting his claim saying, you know,
7    we aren't chronically understaffed.
8    That's the way I understand ---
9    Q.    So ---.
10   A.    --- those words.
11   Q.    So why is it that when
12   Lieutenant Kimbrough told Attorney
13   Zeiger his opinion about staffing
14   levels at the intake unit, it was
15   confidential, but you don't believe
16   the same about the county's opinion
17   about whether it was chronically
18   understaffed?
19                    ATTORNEY GRIESER:
20                    Objection as to form.
21        Mischaracterizing evidence.
22   BY ATTORNEY MANSOUR:
23   Q.    You can go ahead and answer,
24   sir.
25                    ATTORNEY GRIESER:

84

1           I'm sorry.  Yes.

2           THE WITNESS:

3                So, again, Lieutenant

4     Kimbrough picked up the phone.

5     He wasn't compelled to give

6     this information.  For whatever

7     reason, he injected himself

8     into a case that was, I think,

9     almost closed.  Again, I don't

10    --- I don't really know where

11    that was.

12                He put that information

13    out personally that he gleaned

14    from professional --- his work.

15    I mean, he would have not be

16    able to formulate an opinion on

17    what he thinks understaffed is

18    if, you know, he's not at work.

19    He's speaking as a lieutenant,

20    and he's representing the

21    department.  And this --- these

22    kinds of allegations, again,

23    create, you know, disorder and

24    safety issues.

25                The judge, for whatever

85

1          reason, put that out publicly,

2          as it was just pointed out.

3          And I can only assume that we

4          had to rebut that as a county

5          and try to articulate the

6          inaccuracies.  Again, I don't

7          --- not a lawyer.  Judge wants

8          to put out this --- this answer

9          is the public arena.  To me, it

10         basically spells out that

11         information should have never

12         gotten out there in the first

13         place.

14  BY ATTORNEY MANSOUR:

15  Q.     Well, I want to clarify that

16  this wasn't the judge.  This is the

17  county.

18  A.     Right.

19  Q.     I believe it was Ms. Grieser

20  ---

21  A.     Yep.

22  Q.     --- who in this is repeating

23  what Attorney Kimbrough said.  So when

24  Attorney Kimbrough said it, your

25  opinion is it's confidential.

86

1          Right?

2    A.        Correct.

3    Q.        But when Ms. Grieser says it in

4    this motion, it's not confidential.

5          Correct?

6                    ATTORNEY GRIESER:

7               Objection.  Asked and

8          answered.  You can answer,

9          Dave.

10                   THE WITNESS:

11              So again, he --- he put

12         this out --- this information

13         out, not in his official

14         capacity, using information

15         that he took from the

16         Department of Corrections and

17         formulated his opinion and put

18         it out there, which, you know,

19         requires a legal response.

20              So that information was

21         out there.  I don't know that

22         the answer to this, this

23         document put any more

24         information out there.  I think

25         it just basically said, hey, we

87

1          don't agree with that.

2     BY ATTORNEY MANSOUR:

3     Q.     If an inmate, for example,

4     happened to get their hands on this

5     document and saw, based on this

6     document, that Lieutenant Kimbrough

7     was claiming the intake unit was

8     chronically understaffed, do you that

9     compromise --- that would compromise

10    the security of the jail?

11    A.     Oh, absolutely.

12               ATTORNEY GRIESER:

13               Objection as to form.

14          Speculation.  You can go ahead

15          and answer, Dave.

16               THE WITNESS:

17               Yeah, absolutely.  I

18          mean, if an inmate gets a hold

19          of this, and I'm sure they

20          probably have it, you know,

21          people look this stuff up all

22          the time, so, you know, we'll

23          wait to see how that plays out.

24          But this really creates a lot

25          of disorder and disruption of

88

1    our facility when this kind of
2    bad information's put out
3    there.  So, you know, does ---
4    will it be used for future
5    false lawsuits?  Do other staff
6    members --- you know, do we
7    lose trust in him for putting
8    out false information?  I mean,
9    people are going to read that,
10   and they're going to know that
11   that's false information.  So
12   now you're talking about, you
13   know, disruption, the lack of
14   his authority, the lack of
15   trust from the administrative
16   team, all the way down to the
17   officer.
18          I'm sure there's some
19   officers that may agree with
20   him, but I also know that
21   there's a lot officers that
22   take a lot of pride in what
23   they do, and they realize that
24   that was not an unsafe
25   situation down there.  So,

89

1          yeah, I do believe that's ---
2          falls under the realm of
3          confidential.
4     BY ATTORNEY MANSOUR:
5     Q.    So Ms. Grieser disclosed this
6     information in the course of her job
7     duties, performing her job duties.
8          Correct?
9     A.    That's my understanding.
10    Q.    And it was information that she
11    gleaned as a result of her employment
12    with the county.
13         Correct?
14    A.    I believe it's information she
15    gleaned as a result of the allegations
16    in the filing.  I don't know that Ms.
17    Grieser is really drilling down to ---
18    to the staffing levels at reception on
19    that particular night.  I think it's
20    something that the county had to offer
21    a response to.
22         Again, not an attorney.  I
23    understand basic legal procedure, but
24    my understanding is we had to answer
25    for the judge an opinion as to why the

90

1  case shouldn't be reopened and she

2  answered that. And I believe it --- I

3  believe it wasn't reopened as a matter

4  of course.

5       So, you know, again, he put the

6  information out there. He put the

7  ball in play. Can't put the

8  toothpaste back in the tube. She had

9  to take that ball, and she had to do

10  the best she could with it to rebut

11  the false accusations.

12  Q.    So are you saying that --- so

13  Ms. Grieser repeating what Attorney

14  Kimbrough allegedly said, did that

15  cause security concerns in the jail?

16            ATTORNEY GRIESER:

17            Objection as to form.

18       Asked to answer. Speculation.

19            THE WITNESS:

20            Listen, you know,

21       people, once --- once it's out

22       there, I think it got out there

23       improperly. I think it was a

24       violation of confidentiality

25       and work rules to put that out

91

1          there.  You know, if WikiLeaks

2          publishes something and the AP

3          picks it up the next day and

4          regurgitates it or puts their

5          own little spin on it, you

6          know, what can you do?  It's

7          out there.

8                So I believe, reading

9          this section right here, again,

10          we had to answer these

11          allegations and put to rest

12          these falsehoods.  I think

13          that's what Ms. Grieser's ---

14          I'm not going to call it a

15          brief, but response was to the

16          motion.

17  BY ATTORNEY MANSOUR:

18  Q.      Okay.

19          And then I also want to direct

20  your attention to this paragraph here,

21  where, as part of their response,

22  again, the county repeats that

23  Lieutenant Kimbrough's opinion that,

24  quote, Defendant Ulmer should have

25  locked the dirty cell after Rhoades

92

1   was taken to be searched, and her not

2   locking the door is in violation of

3   BCCF policy, do you believe that's

4   confidential and sensitive

5   information?  Mr. Kimbrough's opinion

6   about what Officer Ulmer should have

7   done and whether or not it was a

8   breach of policy.

9   A.      So, again, if that was his

10  opinion and he was deposed or

11  subpoenaed, that's one thing.  But

12  again, to pick up the phone and put

13  your opinion out there, and it being,

14  again, an internal process, I think

15  confidential information was

16  disclosed.  You know, the answer's not

17  going to change the law.  The law

18  department, in my opinion, had to

19  answer this.  Again, not a lawyer, but

20  this was the response to the, you

21  know, allegations made and the trying

22  to get the case reopened.

23  Q.      Okay.

24          So Mr. Kimbrough made what you

25  believe are confidential and sensitive

93

1   comments or shared confidential and
2   sensitive information with Attorney
3   Zeiger.
4           Correct?
5   A.      I do, yes.
6   Q.      And then Ms. Grieser, in this
7   response to the Plaintiff's motion,
8   repeated some of what Attorney --- or
9   Mr. Kimbrough shared with Attorney
10  Zeiger.
11          Correct?
12  A.      Correct.  I don't know that you
13  could rebut that information without
14  repeating that information.  I mean,
15  she could have --- she can't just say,
16  he's wrong.  I think she had to
17  address each one of the claims
18  individually.  Again, not a lawyer,
19  but it sounds logical to me, and that,
20  to me, looks like what she did.
21          I don't believe she disclosed
22  any further information that already
23  wasn't put out there and, again, had
24  to answer these accusations.
25  Q.      And you don't believe sharing

94

1    this confidential information with the

2    public in the form of this filing was

3    a breach of confidentiality?

4    A.    I don't, because it's resharing

5    information.  It's not new

6    information.  As far as I can tell,

7    she didn't supplement anything with

8    any confidential information.  It

9    looks like the accusations or the

10   claims were answered and that, you

11   know, she responded in kind to

12   basically say let's not open this

13   case.  I'm sure she made many, many

14   arguments in there that I'm not aware

15   of, but to me, it's already out there.

16   Q.    You --- you said you've been

17   the director of corrections for four

18   years.

19   A.    I think it's three to four.  I

20   think we're coming up on four.

21   Q.    Okay.

22         So --- so in September of 2023,

23   you would have been the director of

24   corrections.

25   A.    Yeah, I'm horrible with dates.

95

1    I was probably acting then, if I

2    wasn't director.  I'd have to look up

3    my --- my promotional date.

4    Q.    Are you aware of an instance in

5    which emails regarding the staffing of

6    the intake unit were anonymously

7    disclosed to reporters?

8              ATTORNEY GRIESER:

9              Relevant.  You can go

10        ahead and answer, Dave, if you

11        know.

12              THE WITNESS:

13              Not --- no.  Are you ---

14        wait, wait a minute.  You know,

15        jogging my memory.  Are you

16        talking about the night that we

17        put a pause on reception

18        intakes and they were disclosed

19        by the police departments?

20   BY ATTORNEY MANSOUR:

21   Q.    Well, I'll show you what I'm

22   talking about.

23   A.    Okay.

24        That'd probably be helpful.

25   Q.    Okay.

96

1          So this is a document that I've
2   marked as P-11.
3                    ---
4          (Whereupon, Exhibit P-
5          11, Insidesources
6          Article, was marked for
7          identification.)
8                    ---
9   BY ATTORNEY MANSOUR:
10  Q.     I think I'm on the right ---.
11  A.     Yeah, yeah, that's ---.  Yep.
12  I don't even need to read it.  I
13  understand exactly ---
14  Q.     Okay.
15  A.     --- what you're talking about.
16  Q.     So you've seen this article
17  before?
18  A.     Yes.
19  Q.     Okay.
20         And this article appears to be
21  centered around an email that was
22  disclosed to a reporter regarding the
23  jail closing the intake process for
24  new inmates during a particular
25  overnight shift in August ---

97

1    A.      Uh-huh.

2    Q.      --- 2023.  Do you recall that?

3    A.      Yeah, I do.

4    Q.      According to this article, the

5    email that was disclosed indicated

6    that from August 19th, 2023 into the

7    morning of August 20th, the intake was

8    --- desk was closed because of a large

9    number of medical transfers which

10   required eight officers to be

11   relocated to off campus watches.

12   A.      Okay.

13           Understood.

14   Q.      According to an email from

15   James O'Malley.

16   A.      Yep, understood.

17   Q.      And that email apparently

18   continues an additional two officers

19   were on constant watch unable to

20   perform intake duties.  And we have no

21   awareness of anyone unable to be

22   processed through intake during that

23   time period.  Did the jail or the

24   county ever investigate who leaked

25   this email to the press?

98

1    A.    I can't say.  I think somebody

2    took credit for it in that article, if

3    I remember properly.

4    Q.    I don't think ---.

5    A.    Pollock, I think it says at the

6    next paragraph.

7    Q.    Well, that was --- that was one

8    of the authors of the email, but I

9    don't think that's the person who

10   disclosed this email.

11   A.    Okay.

12   Q.    That information, so --- that

13   the intake desk was closed overnight

14   between August 19th and August 20th

15   due to a large number of medical

16   transfers which required eight

17   officers to be relocated to an off

18   campus --- to off campus watches, is

19   that confidential and sensitive

20   information?

21   A.    Absolutely.

22   Q.    Do you know whether the county

23   ever investigated who released this

24   email to the press?

25   A.    I do not.

99

1    Q.    And that was an email

2    apparently from, like I said, James

3    O'Malley.

4    A.    So James O'Malley ---.

5    Q.    So this was on August 30th ---

6    it says here --- I'm just going to

7    highlight it quickly.  On August 30th,

8    an email was circulated widely among

9    county employees which said for

10   tonight between 10:00 p.m. and 5:00

11   a.m. the reception desk at the jail is

12   closed for intake due to significant

13   staffing shortages.  No new

14   commitments can come to the BCP during

15   the overnight hours.  High profile

16   issues should be directed to the

17   lieutenant on duty.

18        Did I read that correctly?

19   A.    Yes.

20   Q.    Okay.

21        And then an email on August

22   31st from Robert Pollock.  Who is

23   Robert Pollock?

24   A.    He's a deputy court minor

25   judiciary administrator.

100

1    Q.      Okay.

2          So according to an email from

3    him on August 31st, it says here,

4    yesterday Director Kratz from BCCF

5    contacted me to inform me about a

6    critical staffing shortage they have

7    been experiencing at the prison.

8    Approximately one week ago they had to

9    close reception from 11:00 to 5:00

10   a.m. because they did not have the

11   minimum number of staff to safely run

12   the prison.  This meant they could not

13   take any new commits during that time.

14   While it did not affect the district

15   courts, it did affect the constables

16   and police.

17          Is that information

18   confidential and sensitive?

19   A.      So again, I --- I don't --- I

20   do agree that it's confidential and

21   sesn --- and sensitive.  It creates

22   disruption.  However, again, those are

23   his words, not mine.

24   Q.      Fine.  And then it says the two

25   emails above were provided anonymously

101

1    to Broad and Liberty.

2    A.    Yep.

3    Q.    So as far as I know, this

4    article does not disclose who those

5    individuals were.  And your testimony

6    is as far as you're aware, you're not

7    --- you don't know of any

8    investigation that the county or the

9    jail did to find out who the source of

10   that --- those emails were?

11   A.    Yeah, that would not be

12   something I would be privy to.

13   Q.    Now, it says when contacted for

14   comment, the county provided a follow

15   up email not originally in Broad and

16   Liberty's possession, which showed the

17   situation the night on the 30th was

18   diffused.

19        That email says, although there

20   may be some delays in getting

21   prisoners into reception, depending on

22   the volume, medical emergencies and

23   any additional call outs, we will be

24   able to keep reception running through

25   the night, said the email from David

102

1   Kratz, director of the county's

2   Department of Corrections.  Please be

3   patient as things will likely be

4   running slowly at time, Kratz said in

5   an email about six hours after

6   Pollock.  O'Malley pointed out that

7   the new set of recruits were installed

8   last week.

9           So my question to you is that

10  disclosure of your email, does that

11  --- did that email contain

12  confidential and sensitive

13  information?

14  A.      Absolutely.  And again, my

15  communications were very different.  I

16  didn't just pick up the phone and make

17  comment.  I --- I specifically --- we

18  had issues.  We knew --- we knew it

19  was going to be a rough night.

20          I reached out to law

21  enforcement.  I reached out to the

22  people who need to know that there's

23  going to be delays and asking for a

24  little bit of wiggle room with

25  receiving prisoners that night.

103

1    Q.     Okay.

2    A.     That's purely business.  Now

3    again, I --- I did not put this out to

4    the public.  Some police officer or

5    somebody that got a copy of it put it

6    out to the public.  Again, that's on

7    them.  This is in the course of

8    business and keeping operations safe.

9         Like I said, with staffing, you

10   know, sometimes we got to move some

11   things around.  Rather than take in

12   five or ten inmates that night and not

13   be able to be safe, we asked the

14   departments to hold them in their

15   holding cells for a couple hours.

16   Luckily for us, there was no arrests

17   that night and we didn't really have

18   to do anything.

19        And again, along the line of

20   safety, any high profile cases that

21   they couldn't keep in their holding

22   cells, we would have taken in on a

23   one-for-one basis.  So again, I didn't

24   put this information out.  I didn't

25   pick up the phone and call a reporter.

104

1    I didn't call an attorney.  I put this

2    information out to the chiefs of

3    police.  What they did with it after

4    that is, you know --- yeah, they

5    disclosed confidential information, in

6    my opinion.

7    Q.    Okay.

8          Well, your email that we just

9    read was disclosed to Broad and

10   Liberty by Mr. O'Malley.

11         Okay.

12   A.    Uh-huh.

13   Q.    Did Mr. O'Malley violate county

14   policy by disclosing confidential and

15   sensitive information?

16   A.    So --- so the section that's

17   highlighted right there?

18   Q.    Correct, that's from your email

19   that was disclosed by Mr. O'Malley.

20   A.    So it's a very general

21   statement.  And again, public

22   information is not my arena.  I don't

23   --- you know, I'm not public

24   information person.  That's also a

25   good point.  I don't speak to

105

1    reporters, attorneys, public citizens.

2    I --- I push that off to the

3    communications department.  They may

4    authorize me to talk to people.  Mr.

5    O'Malley is one of the county

6    communications people.

7         In that response, again, the

8    information was already out.  Somebody

9    had already put out the original

10   email.  I don't see any specifics in

11   there saying that, you know, jobs

12   weren't getting done, people were

13   negligent in their posts, that, you

14   know, doors were open, areas were

15   understaffed.  He doesn't put anything

16   specific out there.

17        He just basically tells

18   everybody that, you know, hey, we

19   didn't need to pause on any

20   admissions.  It was a really rough

21   night.  We had a lot of people in the

22   hospital, unfortunately, took a lot of

23   staffing out of the building and be

24   patient.  You know, that's all that

25   really says to me.  We're going to be

106

1    burning a little bit slowly from where
2    we're at.  And that's good
3    communication with our law enforcement
4    partners.
5    Q.    Do you believe if inmates knew
6    that medical emergencies in the jail
7    would result in delayed processing,
8    they would be able to use that to
9    undermine jail security?
10   A.    Of course.
11   Q.    So the fact here in your emails
12   is, although there may be some delays
13   in getting prisoners into reception,
14   depending on the volume, medical
15   emergencies and any additional call
16   outs, we'll be able to keep reception
17   running through the night.  So don't
18   you think that somebody reading that,
19   who sees, for example, things like
20   volume and medical emergencies and
21   call would maybe make it easier to
22   compromise the security of the jail
23   compound?
24                 ATTORNEY GRIESER:
25                 Objection as to form.

107

1              Compound.  You can answer.

2                    THE WITNESS:

3                    So again, general

4              statement, it doesn't say that

5              there were seven people in the

6              hospital with 14 guards being

7              drawn from the post.  It

8              doesn't say that we had a high

9              volume.  Again, you never know

10             who's going to walk through the

11             door.  And it didn't say we

12             had, you know --- and again,

13             these are hypothetical --- 35

14             people called out sick.  Right.

15                   It doesn't give numbers,

16             it doesn't give specifics.

17             It's just basically a response

18             to a document that somebody who

19             --- you know, in law

20             enforcement, who has the right

21             to have that information

22             decided to share with Broad and

23             Liberty.  And I can't control

24             that.  I can't control, you

25             know --- if I knew who leaked

108

```
 1            that confidential information
 2            and I had recourse, I probably
 3            would push it, but ---.
 4  BY ATTORNEY MANSOUR:
 5  Q.     Okay.
 6            Well that information, your
 7  email that we're quoting here, right,
 8  the one that's highlighted that's
 9  quoting you, was released by Mr.
10  O'Malley?
11  A.     Okay.
12            Yep.
13  Q.     And in there he --- you know,
14  in the email that he shared, it refers
15  to, for example, any additional call
16  outs, which I assume refers to
17  employees.  Don't you think employment
18  employee call outs is confidential and
19  sensitive?
20                    ATTORNEY GRIESER:
21                    Objection as to form.
22            Asked and answered.
23                    THE WITNESS:
24                    So, so again, I know
25            we've been going down this lane
```

109

1          between inmate and staff.  So

2          if an inmate wants to talk to

3          his mother and say, hey, call a

4          reporter, I think the jail is

5          understaffed, that's their

6          business.  They don't know,

7          they don't have the

8          documentation.

9                 If one of my lieutenants

10         wants to call a reporter or

11         somebody in the public and say,

12         you know, we're drastically

13         understaffed.  I had 13 people

14         not come to work today and we

15         have 14 people in the hospital.

16         Again, that's confidential

17         information.  I can't control

18         what the inmate thinks they

19         know that they're going to tell

20         people.  However, my

21         lieutenant, my staff, my

22         officers, they should not ---

23         myself, we should not be

24         talking to non-criminal justice

25         ---.

110

1    BY ATTORNEY MANSOUR:

2    Q.    But this wasn't an inmate, sir.

3    This was the county spokesman.

4    A.    And again, in answer to

5    information that was leaked --- I

6    would say not leaked.  But somebody

7    provided confidential information,

8    somebody in law enforcement.  That

9    email went to a very small group of

10   law enforcement personnel.  Should not

11   have been sent to Broad and Liberty.

12   I can't comment as to why they might

13   do that.  I don't know why somebody

14   would jeopardize safety, especially,

15   you know, the people that got that

16   email were all law enforcement.

17        But the response, I think, is

18   appropriate because it just basically

19   acknowledges the fact that it was ---

20   it was a difficult night.  But there

21   are no specifics in there.  It doesn't

22   say anything about somebody leaving a

23   door open or the number of call outs

24   or, you know, extreme volume.  So,

25   yeah, I mean, to me, that's --- that's

111

1    an appropriate response, but that ---
2    again, just like the court documents
3    you showed me, that information was
4    already out there.  We're just
5    responding to it.  We didn't put it
6    out there.
7    Q.    So ---.
8    A.    I didn't have a press
9    conference.
10    Q.    No, you're right.  But the
11    email --- this email that's
12    highlighted here was not already out
13    there.
14                    ATTORNEY GRIESER:
15                    Objection.  Asked and
16            answered five minutes ago.
17    BY ATTORNEY MANSOUR:
18    Q.    It was --- that was provided to
19    Broad and Liberty by Mr. O'Malley in
20    response to the email that was already
21    out there.  And it provided new
22    information, for example, that there
23    may be some delays in getting
24    prisoners into reception.  Don't you
25    think that's sensitive and

112

1    confidential information?  The public

2    should not know whether or not there

3    are going to be delays in processing

4    inmates?

5                          ATTORNEY GRIESER:

6                          Objection as to form.

7                 It's getting argumentative

8                 here.  My client is more than

9                 willing to answer your

10                questions.  However, I would

11                respectfully request that you

12                use a more respectful tone when

13                speaking with Director Kratz.

14   BY ATTORNEY MANSOUR:

15   Q.     Go ahead, Mr. Kratz.  Do you

16   believe my tone was disrespectful in

17   any way?  If it is, I apologize.

18   A.     Understood.  No, I --- I feel

19   like we're going over the same ---

20   same information over and over again.

21   Again, my response would be that

22   information was put out there, should

23   not have been put out there by

24   somebody in law enforcement.  The

25   answer --- again, I would not do a

113

1   press conference on this.  The
2   information was already out there.
3   And basically what Mr. O'Malley is
4   saying is that, you know, the public
5   was safe, the jail was safe.  We got
6   through a big bump in the road.  It's
7   going to happen.  It's going to happen
8   in jails all the time.  I mean, it
9   just --- if you have a mass arrest and
10  40 people come in, I'm going to talk
11  to the chiefs of police and let them
12  know that our intake process is going
13  to be slowed down.
14       It's what I would call good
15  communication with the chiefs and the
16  law enforcement stakeholders, the
17  sheriffs.  Again, they should not have
18  put that information out there to the
19  public.  They chose to.  There was a
20  lot of questions from reporters,
21  communications.  The Department
22  decided to respond back with that
23  statement, which to me, again, is a
24  reassuring statement.  You know, there
25  might be delays, but delays happen.

114

1    Delays happen everywhere.  You know,

2    it's not a hotel, it's not an airport,

3    but they have delays.

4         Additional call outs, you know,

5    those types of things, again, it

6    doesn't say numbers, it doesn't say

7    how many people are in the hospital,

8    you know, how many officers are

9    supervising people out there.  It's

10   --- it's a very benign statement,

11   basically telling law enforcement

12   that, you know, be patient.

13   Q.    Well, isn't the number of call

14   outs something that only a person

15   employed by the county would know?

16   Isn't that information that would be

17   gained by --- through somebody's

18   employment with the county?

19   A.    Yeah, absolutely.  And that's

20   it --- that's a perfect example of

21   things that you glean from your work

22   experience that you shouldn't put out

23   there.  I can look up today how many

24   people called out.  I'm not going to

25   call a reporter or an attorney or a

115

1   friend and say, oh my gosh, you know,

2   it's a record number of call outs

3   today.  The jail's not safe.  That's

4   not my forum for that.

5          And unfortunately, you know,

6   when you run a facility, you have to

7   --- like I said, you have to be very

8   dynamic with your staffing.  You don't

9   know what's going to happen.  I use

10  the example of the Eagle's parade

11  Friday or the Super Bowl on Sunday.

12  Those are going to be days where a

13  thinking person with common sense

14  knows that a lot more people are going

15  to be calling out sick to go to those

16  events.  So that's, you know,

17  something that you would glean from

18  your --- your employment.

19          You know, if 45 people called

20  out sick tomorrow or Friday for the

21  parade, not a number I'm going to

22  share.  You know, I don't need the

23  inmates to know that number.  I don't

24  need the staff to know that number.

25  It could --- it would create an unsafe

116

1    type environment, so it, you know ---.

2    Q.    What about saying --- so what

3    about a situation where instead of

4    saying specifically there are 15 call

5    outs, somebody just told a reporter

6    there were a lot of call outs?

7    A.    Again, ---.

8    Q.    Would that ---?

9              ATTORNEY GRIESER:

10             Objection as to form and

11        asked and answered.  Vague.

12             THE WITNESS:

13             Where is that

14        information coming from?  The

15        average person on the street,

16        the average officer working for

17        the jail does not know how many

18        people are calling out.  People

19        with a higher level of

20        responsibility, my lieutenants

21        --- certain lieutenants, not

22        even every lieutenant has

23        access to that, have that

24        information.  It's part of what

25        we need to do our jobs.

117

BY ATTORNEY MANSOUR:

Q.     Correct.  And you sent an email saying that there were --- that there were delays in getting prisoners into reception.  That is something you and other people working in the jail would know.

         Right?

              ATTORNEY GRIESER:

              Objection.  Asked and answered.

              THE WITNESS:

              And again, I sent that email to law enforcement, sworn law enforcement, that had a stake in transporting and bringing prisoners into the jail.  I did not send that to Attorney Zeiger, Broad and Liberty, the local reporter. Right.

              I sent it to the people who will be bringing prisoners into my facility, letting them know that things are going to

118

1          be slower and asking them to

2          hold some folks for us for a

3          little bit of time.

4    BY ATTORNEY MANSOUR:

5    Q.    Okay.

6          And you didn't disclose that

7    information to Attorney Zeiger or

8    Broad and Liberty or anybody else,

9    because it's confidential and

10   sensitive.

11         Right?

12   A.    Correct.

13   Q.    Okay.

14         But then Mr. O'Malley disclosed

15   that email of yours to the press.

16         Right?

17   A.    Yeah, yeah.  Correct.

18   Q.    Why wasn't Mr. O'Malley fired

19   for breaching confidentiality?

20   A.    So I think, you know, I'm going

21   to go into my Latin, nunc pro tunc,

22   before rather than after.  Why?  The

23   only reason Mr. O'Malley responded to

24   that was because, again, just like

25   Kimbrough's information to Attorney

119

1    Zeiger, that information was put out

2    and it wasn't necessarily accurate,

3    you know, in the context.

4           So he's --- in my opinion, he's

5    answering the hundreds of emails that

6    probably came in on that. This was

7    given to law enforcement people.

8    Somebody violated that trust. It

9    wasn't Mr. O'Malley and it wasn't me.

10   Mr. O'Malley's statement, you know, we

11   can argue about confidentiality and

12   that all day long. He's responding to

13   information and the violation of

14   confidentiality that already happened.

15          To not respond, I think would

16   be irresponsible and probably create

17   panic throughout the public. The

18   public needs to know that we're

19   operating and we're operating safely.

20   Q.    And in order to do that, it may

21   be --- it's permissible, you're

22   saying, to disclose confidential or

23   sensitive information if it's in

24   response to other confidential or

25   sensitive information?

120

1   A.      I would say ---.

2                   ATTORNEY GRIESER:

3                   Objection as to form.

4           Asked and answered.

5                   THE WITNESS:

6                   I would say he didn't

7           disclose confidential

8           information.  I would say that

9           he took information that was

10          published that shouldn't have

11          been and regurgitated it.  I

12          don't think he added anything

13          new.

14  BY ATTORNEY MANSOUR:

15  Q.      Well, he did.  He provided your

16  email that had not previously been

17  disclosed.

18  A.      But --- but no additional

19  information.

20  Q.      Okay.

21          Do you think the public has a

22  right to know about the staffing

23  levels at the correctional facility?

24  A.      I do.  As far as vacancies, I

25  mean, I think that's public knowledge.

121

1    That's out of the prison board.

2    Q.    Well, more generally, whether

3    --- whether the jail is adequately

4    staffed for its needs.  Do you think

5    that's something the public has a

6    right to know?

7    A.    When you say adequately staffed

8    ---?

9    Q.    Adequately staffed to maintain

10   its needs in terms of security,

11   supervision, everything else, do you

12   think the public has a right to know

13   that information?

14   A.    Yeah, we do provide we are

15   adequately staffed.  We would ---.

16   Q.    What I'm saying is, if the jail

17   was understaffed and didn't have

18   enough people to maintain adequate

19   security, do you think the public has

20   a right to know that information?

21   A.    I really don't have an opinion

22   on that one.  That --- again, I have a

23   communications department that would

24   handle that information.  Not to the

25   extent that we would disclose

122

1    confidential information, but again, I

2    would have to defer to our public ---

3    or sorry, communications department on

4    that.

5    Q.    If corrections officers or

6    other jail employees were violating

7    policy, do you think the public has a

8    right to know that information?

9                    ATTORNEY GRIESER:

10                   Objection. Vague. You

11          can go ahead and answer, Dave.

12                   THE WITNESS:

13                   I was just going to say

14          you're going to have to be a

15          little more specific when you

16          say violating policy.

17   BY ATTORNEY MANSOUR:

18   Q.    Violating jail policies with

19   regard to its operations, do you think

20   the public has a right to know about

21   that information?

22   A.    Again, I don't have an opinion

23   on that. If somebody violates policy,

24   there's a disciplinary process,

25   there's coaching and counseling.

123

1    There's all kinds of things that enter
2    the HR world.  It's not my area
3    whether or not they disclose anything
4    or if they did disclose, how much they
5    would redact from disclosure, if there
6    were a Right to Know.
7    Q.    If employees were making
8    complaints about policy violations to
9    management and management was ignoring
10   those complaints, do you think the
11   public has a right to know that
12   information?

13                   ATTORNEY GRIESER:
14                   Objection.  Vague.
15                   THE WITNESS:
16                   So I would go back to my
17            same answer.  Again, you know,
18            I could tell you that I'm not
19            ignoring anything.  If
20            something were being ignored,
21            there's a process in place that
22            I'm sure human resources, the
23            law department, would get
24            involved in, and where that
25            goes wouldn't be up to me and

124

1       how that would get disclosed to

2       the public.  I don't disclose

3       things to the public.  I mean,

4       that's generally --- that's our

5       rule.  Like we have a --- we

6       have a public information --- I

7       keep saying --- I mean to say

8       communications department.

9       Things that go out to the

10      public go through the

11      communications department, not

12      --- not me.

13          So anytime that I speak

14      to the public about anything,

15      which is a rarity, I've spoken

16      to the public information

17      department and they've given me

18      permission to do an interview

19      or to speak to a reporter.

20      Because pretty much every ---

21      everything we do here is

22      confidential.  It disrupts, you

23      know, the organization when

24      things get out.  It can be a

25      safety issue.  And some of this

125

1                     is absolutely public, you know,

2                     payrolls, things like that.

3                     But again, that's not for me to

4                     decide as a director.  I have

5                     other people that weigh in

6                     that.

7    BY ATTORNEY MANSOUR:

8    Q.     If Mr. Kimbrough disclosed the

9    information that he did to Attorney

10   Zeiger --- so we went over that

11   earlier, right, the information that

12   Mr. Kimbrough disclosed to Attorney

13   Zeiger.  If he disclosed that same

14   information to his psychotherapist,

15   would that have been a breach of

16   confidentiality?

17                    ATTORNEY GRIESER:

18                    Objection.  Vague.

19                    ATTORNEY MANSOUR:

20                    In your view.

21                    ATTORNEY GRIESER:

22                    You can go ahead and

23              answer.

24                    THE WITNESS:

25                    So again, not knowing

126

```
 1            the tenets of
 2            psychotherapist's, you know,
 3            clause.  I'm assuming when you
 4            --- when you meet with a
 5            therapist, that's confidential
 6            information.  I can tell you,
 7            you know, in my short
 8            experience, unless you're a
 9            danger to yourself or other
10            people, that stuff's
11            confidential.  So can't really
12            say, you know, what you process
13            with your psychotherapist.
14  BY ATTORNEY MANSOUR:
15  Q.     So you don't have an opinion on
16  that.  You can't say ---?
17  A.     I don't have an educated
18  opinion on that.  I think, you know,
19  mental health's mental health.  And if
20  you're being treated for something and
21  you're seeing a psychotherapist, you
22  got to abide by the rules there.
23  Q.     If Mr. Kim ---.
24  A.     I can't imagine a situation
25  where a psychotherapist would divulge
```

127

1    that kind of information.  If they

2    did, I imagine they'd be subject to

3    licensure and sanctions, but not my

4    world.

5    Q.    If Mr. Kimbrough had disclosed

6    the same information to a close family

7    member of his, would that have been a

8    breach of confidentiality that would

9    have resulted in his termination?

10   A.    Yeah, I mean, it --- obviously,

11   people talk, I'm sure, but yeah,

12   that's absolutely a confidential

13   violation.  Again, it's a need to know

14   thing when it's security, when it's in

15   the jail.  I mean, it's one thing to

16   go home to your spouse or significant

17   other and say, I had a rough day

18   today, boy, it was busy.  It's another

19   thing to say, I think, you know, this,

20   and this happened, and X, Y and Z

21   happened as a result of it.  And yeah,

22   they shouldn't be discussing that kind

23   of information.

24        A general discussion with your

25   spouse is one thing, but specifics ---

128

1    yeah, and friends, family, you --- you

2    get --- in this world, you get

3    contacts, especially in that records

4    department, you know, a cousin of a

5    police officer will want information.

6    The answer's no.  The friend of a

7    judge wants information, the answer's

8    no.  I mean, we don't give that

9    information out.  There's methods for

10   people to get that information

11   legally, if they're entitled to it.

12          Excuse me.

13   Q.     There was surveillance video

14   that captured the Rhoades incident, of

15   him being processed and concealing the

16   drugs and smuggling them into the

17   jail.

18          Correct?

19   A.     Correct.

20   Q.     That surveillance video and

21   what it depicts, is that confidential

22   and sensitive information?

23   A.     Absolutely.  We've gone to

24   court to defend that successfully.

25   Q.     Okay.

129

1    So let me show you --- hold on

2    one second.

3                ATTORNEY MANSOUR:

4                What are we up to now?

5    P-13.  Is that right, Court

6    Reporter?

7                COURT REPORTER:

8                The last exhibit, P-11.

9                ATTORNEY MANSOUR:

10               P-11.  Okay.

11               Actually --- so I'm

12   going to mark this --- I have

13   another one marked P-12.  So

14   I'm going to mark this one P-

15   13.

16               ---

17               (Whereupon, Exhibit P-

18               13, Phillyburbs.com

19               Article, was marked for

20               identification.)

21               ---

22               ATTORNEY GRIESER:

23               Have you admitted P-12?

24               ATTORNEY MANSOUR:

25               Not yet, but I ---.

130

1          ATTORNEY GRIESER:

2          You want to do them out

3     of order?

4          ATTORNEY MANSOUR:

5          Yeah, I'm just doing

6     them out of order.

7  BY ATTORNEY MANSOUR:

8  Q.     Okay.

9          So, Mr. Kratz, this is a

10 document I'm marking as P-12 (sic).

11 It is Bates stamped at the bottom

12 right-hand corner here Kimbrough 0147

13 through Kimbrough 0149.  And this is a

14 news article from Phillyburbs.com also

15 known as the Bucks County Courier

16 Times from October 1st, 20234

17 regarding the sentencing of Mr.

18 Rhoades and his --- relating to the

19 smuggling of drugs into the jail.

20          And in this video --- or I'm

21 sorry, in this article, it gives a

22 pretty detailed description of the

23 surveillance video regarding his

24 smuggling drugs into the jail, the

25 area that I highlighted.  It says on

131

1   the surveillance video, Rhoades was

2   seen twice removing the drugs from his

3   underwear and concealing them first in

4   a sandwich wrapper, then a brown bag

5   that contained a prison issued meal

6   and last a prison issued clothing bag

7   before he was moved to the general

8   population area the affidavit said.

9           Did I read that correctly?

10  A.      Yes.

11  Q.      That information there

12  describing what's depicted on the

13  surveillance video, that's

14  confidential and sensitive

15  information?

16  A.      Well, you know, again, did ---

17  who viewed the surveillance video?

18  That article doesn't say that it was

19  presented to the public.  My suspicion

20  would be it was in the probable cause

21  affidavit when we affected the arrest.

22  So you know, again --- or the judge's

23  decision maybe.

24          Nobody called somebody up and

25  said hey, I have surveillance video, I

132

1    want to give you a look at.  This was
2    done through proper channels.  That
3    information in itself, you know, is
4    not necessarily as damning as a --- or
5    as security sensitive as a video where
6    it shows, you know, egresses, holding
7    cells, physical layouts, all kinds of
8    things like that.
9         But again, that information,
10   nobody picked up a phone and said hey,
11   I got --- I got a video that I want
12   you to see about somebody putting
13   drugs in their underwear.  This came
14   out as a result of an arrest and
15   litigation and a courtroom appearance
16   and a sentencing within a judge.
17        So again, I can't control that.
18   I can only control what my people can
19   do as far as releasing information.
20   If, you know, an investigator or the
21   district attorney does an
22   investigation and puts that
23   information in there, so be it.
24   Q.    So you're telling me that the
25   jail has no ability to correspond with

133

1    other law enforcement agencies to make

2    sure that confidential and sensitive

3    information is not disclosed to the

4    public?

5    A.    You know, again, we can go

6    around and around on the same --- same

7    thing, but nobody picked up a phone

8    and said I got video.  This came out

9    as a result of a criminal

10   investigation.  I'm assuming that's my

11   guess.

12   Q.    But wouldn't that be ---

13   wouldn't it be sensitive information?

14   Wouldn't this kind of information

15   compromise the security of the jail?

16                ATTORNEY GRIESER:

17                Objection.  Asked and

18          answered.  You can answer,

19          Dave.

20                THE WITNESS:

21                So again, it's sort of a

22          vanilla kind of statement based

23          on the probable cause affidavit

24          that needs to be filed to

25          uphold charges.  Any criminal

134

1              attorney will tell you that.  I

2              don't see a copy of the video

3              in this article for the public

4              to view.

5    BY ATTORNEY MANSOUR:

6    Q.      But a description of what's

7    seen in the video --- I mean, wouldn't

8    maybe a potential criminal or inmate

9    reading this know that, hey, maybe I

10   should try to sneak drugs in in my

11   underwear or in a sandwich wrapper or

12   a brown bag?

13   A.      They could think that all they

14   want.  Sure.  Yeah.

15   Q.      So did the county take any

16   steps to prevent the release of this

17   information to the press?

18                   ATTORNEY GRIESER:

19              Objection.  Vague.  You

20        can answer if you know, Dave.

21              THE WITNESS:

22              So, again, you have to

23        consult with the district

24        attorney and the county

25        detectives on why they released

135

1           that information.  I didn't

2           release it.  They released it.

3           So, again, I don't know that,

4           you know, the district attorney

5           is held to the same standard

6           that we are, but, you know,

7           again, nobody called up and

8           said, here's video.  This is

9           the result of a criminal

10          investigation by the district

11          attorney and the county

12          detectives.  And again, I don't

13          see that video anywhere in the

14          public domain.

15   BY ATTORNEY MANSOUR:

16   Q.     Well, I mean, Mr. Kimbrough

17   didn't release any video either to

18   Attorney Zeiger, did he?

19   A.     So I don't know what he

20   released.  I only know what Attorney

21   Zeiger said was released.  I don't

22   know.  Wasn't in the room.

23   Q.     Attorney Zeiger said that every

24   --- everything that he learned was

25   from the mouth of Attorney Kimber?

136

1    A.      Well, you know, again ---.

2    Q.      Or I'm sorry.

3    A.      Yeah, Lieutenant Kimberly

4    called him.  This is not a situation

5    where somebody called somebody.  This

6    was a criminal investigation.  The

7    district attorney, the judges, they're

8    the ones that control that information

9    once they have it, not me.  This

10   wasn't a release of information from

11   the Department of Corrections.  I can

12   only --- I can only address Department

13   of Corrections violations.  I can't

14   address, policy, procedure for the

15   district attorney or the courts.

16   Q.      But you would agree with me

17   that sensitive information is

18   sensitive information.

19           Right?

20   A.      I agree that that's sensitive

21   information.

22   Q.      And then it says here in the

23   next paragraph, within five minutes of

24   entering the main jail, Rhoades

25   started trading the drugs for food,

137

1    headphones, artificial sweetener, and

2    coffee. He also offered heroin to

3    other inmates, including 22-year-old

4    Joshua Patterson of Philadelphia.

5    That's sensitive information, too.

6         Right? What kind of

7    commodities can be traded for drugs in

8    the jail?

9    A.    So again, my --- my response is

10   the same as the one on the first one.

11   Nobody from the jail picked up a phone

12   and called a private citizen or an

13   attorney with this information. This

14   --- this, I'm assuming, came out

15   through the investigation, the court

16   proceedings, the trial, the plea deal.

17   You're going to have to talk to the

18   district attorney on that.

19   Q.    No, and I understand that, Mr.

20   Kratz. And I'm not --- I'm not saying

21   that you necessarily have control over

22   those individuals. But what I'm

23   asking you is, as director of

24   corrections, what do you do to make

25   sure that this kind of sensitive

138

1    information doesn't become public?

2              ATTORNEY GRIESER:

3              Objection.  Asked and

4         answered.

5              THE WITNESS:

6              So what I do is make

7         sure the people who are under

8         the Department of Corrections'

9         purview don't release that

10        information.  That's all I can

11        do.  I have no say over the

12        District Attorney or the judges

13        as much as I'd like to.  I

14        don't.

15             And again, elements of a

16        criminal case of --- not a

17        criminal lawyer, not a

18        prosecutor, but I'm assuming

19        that they needed to release

20        these facts.  They become

21        public, and it's part of the

22        record.  You know, if they

23        wanted to redact them, maybe

24        they could, maybe they

25        couldn't.  I don't know.

139

1          That's criminal procedure.

2          That's way out of my league.

3                The only thing I can

4          control is employees of the

5          Department of Corrections.  I

6          can't control chiefs of police.

7          I can't control the district

8          attorney.  I can't control the

9          county detectives.  I can only

10         control and abide by the rules

11         that we have in place at the

12         Department of Corrections in

13         the County of Bucks.

14               Incidentally, the

15         District Attorney is the row

16         office.  It's very different

17         stuff.  That's where that

18         information came from.  You'd

19         have to query the district

20         attorney as to what they're

21         allowed to release.  They don't

22         give me a call before they file

23         charges and say that this is

24         going in the PC affidavit.

25    BY ATTORNEY MANSOUR:

140

1    Q.    Mr. Rhoades's attorney here ---

2    I'm highlighting this area.  Just

3    confirm you can see it.  So Mr.

4    Rhoades' attorney, Keith Williams,

5    told the court that Joshua Patterson

6    --- Patterson would be alive today if

7    the police officers and county

8    corrections officers performed their

9    jobs correctly and found the large

10   amount of illegal drugs that Rhoades

11   concealed in his pants when he was

12   arrested.

13        I read that correctly?

14   A.    Seems to, yeah.

15   Q.    Okay.

16        Isn't that the gist of what

17   Attorney Kimbrough told Attorney

18   Zeiger, that had county --- had

19   corrections officers perform their

20   jobs correctly, Patterson's death

21   could have been avoided?

22                   ATTORNEY GRIESER:

23             Objection.  This has

24        been asked and answered.  And

25        the witness has said several

141

1          times he can only control his
2          own people, the employees
3          of ---.
4                    ATTORNEY MANSOUR:
5                    I understand, but I'm
6          asking him if what his ---.
7                    ATTORNEY GRIESER:
8                    Excuse me.  If you
9          wouldn't mind, Mr. Manser,
10         allow me to finish speaking.
11         He said several times that the
12         only people he can control are
13         those employees in the DOC who
14         are subject to the DOC
15         policies.  And we keep --- you
16         can throw a million
17         hypotheticals at him, but this
18         is asked and answered.  So can
19         we move on?
20    BY ATTORNEY MANSOUR:
21    Q.    This is not ---.  I'm asking
22    him, is if the information here
23    allegedly shared by Mr. Williams, that
24    in his opinion, if county corrections
25    officers performed their jobs

142

1    correctly, they would have found the

2    drugs and Patterson's death would have

3    been prevented.  My question to you

4    is, isn't that the gist of what Mr.

5    Kimbrough told Attorney Zeiger?  Same

6    opinion, that if county --- if

7    corrections officers had done their

8    jobs correctly, this could have been

9    avoided?

10   A.    So again, we're talking about

11   the defense attorney's opinion on this

12   case, which I would think he's

13   zealously representing the person

14   who's being charged.  He can say

15   whatever he want.  I have no ability

16   to muzzle Keith Williams or keep him

17   advised of what's confidential, what's

18   not.

19          So again, Keith Williams ---

20   nobody picked up the phone.  You know,

21   this is a case of connect --- you're

22   trying to connect the dots, it seems

23   to me, to similarities between a

24   county employee and what the judges

25   are and what the bench is doing and

143

1    what a document from a --- that was

2    transferred on to somebody that

3    shouldn't have been.  So it's really

4    my same answer.

5         I mean, the question for me is

6    what happened?  You know, all of a

7    sudden I have --- I have an employee

8    who has been great, you know, we're

9    going along.  He's maintained

10   confidentiality for 15, 16 years.  He

11   knew better.  He knew what he did when

12   he picked up the phone and called an

13   attorney who is representing ---

14   essentially suing us.

15        So I can't speak to what Keith

16   Williams did in his opening or

17   closing.

18   Q.    No, I understand that and I

19   don't want --- I don't mean to cut you

20   off, but I want to, you know, clarify

21   the issue I'm trying to get

22   clarification on.

23        That is this information about

24   what happened the day that Rhoades

25   snuck drugs into the jail, that was

144

1    already essentially public or at least

2    known by a number of people outside of

3    the jail.

4            Right?

5    A.      So again, you know, if

6    Lieutenant Kimbrough was subpoenaed by

7    the district attorney's office or

8    wanted to advocate for the defense for

9    Keith Williams, sure, there's a

10   mechanism for that as well.  You know,

11   when you're compelled to give

12   testimony, that's very different.  He

13   was not compelled to give testimony in

14   there.

15           I could --- I could not --- I

16   could not ---.  The county work rules

17   would not apply if Lieutenant

18   Kimbrough was subpoenaed by the

19   district attorney and he gave truthful

20   testimony, what he felt was truthful

21   testimony.  However, absent of that,

22   he's a lieutenant in a very sensitive

23   area.  And again, I just can't for the

24   life of me figure out why all of a

25   sudden, you know, this gross violation

145

1    of all these policies happened. He

2    definitely had to know that he can't

3    put that information out there because

4    he hadn't for 15 years. I'm sure the

5    opportunities have presented itself,

6    but I can't ---. Again, if we're

7    going to go down this article and talk

8    about defense attorneys, district

9    attorneys, the courts, judges,

10   probable cause affidavits, I can't. I

11   can't control that information. It's

12   not --- it's not for me to control.

13   Q.    That --- you made that quite

14   clear. And I --- I don't dispute

15   that. I mean, I understand as

16   director of corrections, you can't

17   control what judges and cops and

18   everybody else does, but what ---.

19   A.    And not to be disrespectful, I

20   feel like we're going over the same

21   ---.

22   Q.    No, but what I'm trying to find

23   out is since other people already knew

24   about a lot of this information, was

25   it really confidential?

146

1    A.    Is it --- because somebody

2    disclosed information, is it ---?

3    It's still confidential in the world

4    of Department of Corrections.  In our

5    world, we don't comment on that.

6    Public information communications can

7    do what they need to do.  But, you

8    know, as a lieutenant, as the director

9    of corrections, I got to tell you, if

10   I called up tomorrow and commented on

11   something like that to a reporter, I

12   imagine I'd be packing up my desk.

13   Q.    But doesn't confidential mean

14   held in confidence.

15        Right?  Like it's something

16   that other people don't or shouldn't

17   know about.  So once other people know

18   about it's no longer confidential?

19        Right?

20   A.    Or creates a disruption in our

21   facility or our safe operations, yeah.

22   Again, I ---.

23   Q.    That's different from

24   confidential, isn't it, sir?

25   A.    I can't control, you know, your

1      --- the hypotheticals.  I can't

2      control.  If somebody hacked into the

3      county system and got information they

4      shouldn't have and posted it on the

5      dark web, we can say that

6      information's out there.  It didn't

7      come from us, it didn't come from me,

8      it didn't come from one of the

9      employees.

10     Q.      Fair enough.  Fair enough.  And

11     I agree with that assessment.

12     A.      And again, trust me, there are

13     times I --- you know, listen, I would

14     love to comment on some articles with

15     inaccuracies.  I would love to call up

16     a reporter and say that's not

17     accurate.  I don't do that because

18     that's not what I'm permitted to do.

19          It's a decision for the

20     communications department and the law

21     department to decide on how they want

22     to address these things.

23     Q.      What I'm trying ---.

24     A.      And everything you showed me

25     today, to my knowledge, and critical

148

1    thinking here came out of probable

2    cause affidavits, trial transcripts,

3    opening and closing statements.  It's

4    written by a reporter.  It's not a

5    scholarly article who basically picked

6    the McNuggets out that they want to

7    put in an article to make people read

8    it, you know.

9         But it didn't come from us.  It

10   did not come from the Department of

11   Corrections.

12   Q.    What I'm trying to find out,

13   though, sir, is why information is

14   considered confidential if other

15   people outside of the jail already

16   know about it.  So ---.

17                  ATTORNEY GRIESER:

18                  Objection.  Asked and

19        answered.

20   BY ATTORNEY MANSOUR:

21   Q.    So I'll give you an example.

22   Right.

23        Your conversations with your

24   --- with the county attorneys prior

25   today are considered confidential.

149

1          Okay.

2          That is, nobody other than you

3    and the attorneys know about it.  But

4    if you or your attorneys tell other

5    people what you talked about, it's no

6    longer confidential and you can no

7    longer claim it's protected by

8    confidentiality when the public

9    already knows about it.

10          So, for example, the complaint

11   in this case that we filed is not

12   confidential, even though many of the

13   facts in there are based on things my

14   client told me.  They are in the

15   complaint.  They are part of the

16   public record.  And I could no longer

17   say, well, I can't talk about what

18   happened because it's confidential.

19   It's not confidential.  It's --- it's

20   already out there.  Now, certain

21   private communications that have not

22   been disclosed between me and my

23   client ---

24                ATTORNEY GRIESER:

25                Objection.  This is

150

1          argumentative.

2    BY ATTORNEY MANSOUR:

3    Q.      --- or that not have been ---.

4                    ATTORNEY GRIESER:

5                    It's not a closing

6          statement.

7    BY ATTORNEY MANSOUR:

8    Q.      It's not.  I'm trying to set up

9    some context for my question because

10   he seems to be having a hard time with

11   all due respect, sir, understanding

12   what I'm ---.

13   A.      I understood.

14   Q.      What I'm trying to ask is ---.

15                   ATTORNEY GRIESER:

16                   Just can I interject

17         real quick, please?  Can we ---

18         are we talking about

19         confidential, security

20         sensitive, one or the other or

21         both?  Because we've talked

22         about --- it seems like we're

23         wrapping confidential up with

24         like attorney/client

25         confidentiality,

151

1              confidentiality as it pertains

2              to SOPs at the jails, you know.

3              Can we be more specific,

4              because I think the form right

5              now is rather vague?

6                        ATTORNEY MANSOUR:

7                        Sure.

8    BY ATTORNEY MANSOUR:

9    Q.        So SOPS at the jail, those are

10   confidential.

11             Correct?

12   A.        Parts of them are.  Parts of

13   them are not.

14   Q.        Okay.

15             And the parts that are are

16   considered confidential because the

17   county does not want and thinks it's

18   --- it's not necessary for anybody

19   outside of the county to have access

20   to them.

21             Right?

22   A.        They --- they would create a

23   security or a safety issue.  So things

24   that are --- for instance, I'll give

25   you an SOP, our mail procedure.  You

152

1    can have that if you want it.  Right.

2    That's not going to hurt anybody.

3    It's not going to create a disruption.

4         Our SRT training tactics, use

5    of force, very different, right, than

6    that.  So there are parts of the SOP

7    that we release.  But I got to say, I

8    don't release them.  Communications

9    releases them or the law department

10   does, if it's a Right to Know.

11        I don't --- if a reporter calls

12   me up and says, I want your mail

13   policy, I'm not giving them my mail

14   policy.  I'm going to refer them to

15   public information or our office of

16   open records person.  Right.

17   Q.    Fine.  And as I think you

18   indicated in your response, there

19   seems to be a link between

20   confidential and sensitive.

21        Right?  Like information ---

22   A.    Yeah.

23   Q.    --- is kept confidential for

24   security purposes.

25        Right?

153

1    A.      Sure.  You want transparency.
2    I mean, with the public, you want
3    transparency.  If it's not going to
4    hurt you to release it, it's a public
5    document, the public has, you know, a
6    right to know.  Right.  There's ---
7    there are standards and checks and
8    balances on what gets released in a
9    process all the way up to the
10   Commonwealth Court, which, again,
11   we've gone there.
12          Jaclyn Grieser has taken us to
13   the Commonwealth Court on certain
14   cases that were related to use of
15   force that people wanted, and the
16   courts have upheld that that's
17   security sensitive.  I think, you
18   know, your scenario with
19   attorney/client, you know, I'll just
20   comment on that real quickly.
21          Again, you know, you've had
22   conversations with Lieutenant
23   Kimbrough.  I've had conversations
24   with my solicitor.  Their
25   attorney/client privilege.  I think we

1    can all agree that that should not be

2    disclosed. Right. You're not going

3    to go saying to a reporter what

4    Lieutenant Kimbrough told you unless

5    he gives you permission.

6           If somebody hacked your ---

7    your records or hacked my records and

8    put it out there, the logic that I'm

9    following today is because it's

10   already out there it wouldn't apply to

11   be being privileged information. So I

12   would assume that if they hacked your

13   information and the reporter got a

14   hold of it and put it out there, or a

15   judge put it out there, you might make

16   a statement about that. Right. I

17   don't --- that that's kind of like

18   where I'm going. Maybe I'm not

19   understanding ---

20   Q.     Well, that's ---.

21   A.     --- what you're asking.

22   Q.     That's --- and you might not

23   be, right, because hacking, obtaining

24   the information illegally ---

25   A.     Right.

155

1    Q.      --- is different from the

2    information being lawfully

3    disseminated to the public.  So I

4    don't think you're saying that the

5    police officers who shared the

6    surveillance video in their affidavit

7    obtained that information legally.

8         Right?

9    A.      So I don't know that they

10   shared the video.  I don't know.  I

11   know that maybe they viewed the video

12   and put those statements in there for

13   their case.  I don't know.  I really

14   don't know.

15   Q.      Regardless of whether they

16   shared the video or just described

17   what they saw in the video, they

18   didn't do that illegally.

19        Right?

20   A.      Right.  But I could tell you

21   that if the chief county detective

22   released that to the newspaper, there

23   might be different repercussions than

24   using that information to prosecute a

25   criminal.  You know, the argument that

156

1    it's already out there, that makes it

2    not confidential to me is --- again,

3    it's out there, and it's out there for

4    a legal reason, not for a reason that

5    I picked up the phone and said, you

6    know, hey, reporter, hypothetically,

7    we're down 45 guards today.  It's

8    going to be a mess in there.  It's an

9    unsafe jail.

10   Q.    Okay.

11         I want to show you --- again,

12   this is the complaint that we filed in

13   this matter, and I want to direct your

14   attention to paragraphs 23 and 20 ---

15   23, 24 and 25.  So here, if you could

16   just read them to yourself and let me

17   know when you're done.

18   A.    Okay.

19         I'm ready.

20   Q.    Okay.

21         According to this complaint,

22   Attorney Zeiger already knew

23   everything that Attorney Kim --- or

24   that Lieutenant Kimbrough shared with

25   him, except for the fact that

157

1    Lieutenant Kimbrough had made prior

2    complaints up the chain of command

3    about what he believed to be

4    understaffing in the intake unit.

5    A.      Okay.

6    Q.      Okay.

7           Does that change your opinion

8    about whether Mr. Kimbrough shared

9    confidential information with Attorney

10   Zeiger when he said, for example, that

11   Officer Ulmer was moved from the

12   intake unit to another unit?

13                    ATTORNEY GRIESER:

14                    Objection as to form.

15           This --- Dave does not know the

16           background as to whether this

17           particular piece, this

18           information was filed under

19           protective order or that it was

20           sealed.  He may.  He may know

21           that, but let's be clear that

22           this isn't just out there for

23           --- what Attorney Zeiger knew

24           isn't out there for the public

25           as far as what he said --- what

158

1          Kimbrough said to Attorney
2          Zeiger.  So go ahead, answer,
3          Dave.
4                    THE WITNESS:
5                    So again, I would say
6          Jaclyn's absolutely right.  I
7          don't know what's sealed.  I
8          don't know what information is
9          given.  You know, number 23
10         states that this information is
11         already known.  I guess my
12         question would be, well, why
13         didn't he depose Lieutenant
14         Kimbrough at the time?  You
15         know, I mean, I can't do --- do
16         his case for him.  I didn't ---
17         I don't know who's deposed.  I
18         don't know how many people ---.
19    BY ATTORNEY MANSOUR:
20    Q.    Maybe I have to provide a
21    little bit more content.  So the
22    information that was known by Attorney
23    Zeiger is the information in paragraph
24    22.
25              Right?  So in terms of what

159

1    happened that day, how Rhoades snuck

2    drugs into the jail, which officers

3    were on the post and which ones were

4    not, all of that information,

5    according to Attorney Zeiger, was

6    already known by him.

7        Okay.

8        The only thing he did not know

9    was that my client had complained

10   about understaffing in the years

11   prior.  So my question to you is,

12   accepting that as true, that Attorney

13   Zeiger already knew all of this

14   information about how Rhoades snuck

15   drugs into the jail, does that change

16   your opinion about whether Attorney

17   Kimbrough breached confidentiality by

18   repeating that information to him?

19              ATTORNEY GRIESER:

20              Objection.  It calls for

21        a legal conclusion.  You can go

22        ahead and answer, Dave.

23              THE WITNESS:

24              Yeah, So I would say it

25        does not change my opinion.  I

160

1    would say that if Attorney

2    Zeiger wanted to speak to Mr.

3    Kimbrough, I --- not a lawyer,

4    don't know the process.  I

5    would imagine there's a process

6    for him to request that.  It

7    probably would --- would have

8    been done prior to that.

9            Again, Lieutenant

10   Kimbrough picked up the phone

11   and shared his opinions, not

12   necessarily facts about

13   staffing with the attorney.

14           And I got to tell you

15   again, everybody feels like

16   their area is understaffed.

17   Everybody feels like, you know,

18   we want more staff.  The

19   reception is adequately

20   staffed.  Like I said, we move

21   people around.  Now, maybe

22   Lieutenant Kimbrough felt there

23   could have been more.  Maybe

24   Lieutenant Kimbrough could have

25   been over there and staffed it

161

1          himself during that crisis if

2          - - - .

3                   I know for a fact, you

4          know, if there's a code and you

5          look up from your desk and you

6          see Officer Ulmer leave to

7          respond to that code, and one

8          of your records officers is

9          over there, get up and walk

10         across the hall into that unit

11         and staff it yourself.  See

12         what's going on.  You have a

13         radio.  You know what's going

14         on on that.

15                  He chose to reach out to

16         this attorney.  And again, I'm

17         sure there's a legal process

18         that if the attorney wants to

19         speak to him, that they go

20         through that.  He picked up the

21         phone and made the call.  The

22         attorney didn't call him.

23         That's really where - - - that's

24         really where it comes down for

25         me.  I have no issues with any

162

1          kind of court order, any kind
2          of things that you have to
3          disclose.  You know, my
4          attorneys tell us to disclose a
5          document, we disclose a
6          document.  They fight the
7          fight, not me.  So it doesn't
8          change my opinion on that.
9   BY ATTORNEY MANSOUR:
10  Q.     And that, to you, is the
11  critical factor here.
12         Right?  That my client
13  voluntary --- voluntarily reached out
14  to Attorney Zeiger, not the other way
15  around?
16  A.     That's one of the critical
17  factors.
18                ATTORNEY GRIESER:
19         Objection.
20         Mischaracterizing his prior
21         testimony.  Go ahead.  You can
22         answer, Dave.
23                THE WITNESS:
24         Yeah, I mean, that's one
25         of the critical factors.

163

1        There's a lot of them here.  I

2        mean, here again, I have a guy

3        who I've put a lot of stock in,

4        who I've supported, who I've

5        personally promoted, put him in

6        in a position of

7        responsibility.  And up until

8        this incident, you know, and

9        the incident with the

10       harassment complaint, which I'm

11       sure you're familiar with, he's

12       been great.  He's been a great

13       employee.

14              So to me, something

15       happened.  This harassment

16       complaint just coincides ---

17       coincides with the Loudermill

18       discipline.  And then, like I

19       said, within 24 hours, we're

20       making phone calls to people

21       who are --- are litigating

22       against us that we've never

23       done in 15 years.

24              And he's been exposed to

25       a lot of confidential

164

1    information during his tenure

2    with us.  He was a hearing

3    officer for a while.  I'm sure

4    you know that.  He had access

5    to employee files.  He had

6    access to everybody's

7    disciplines.  He was great at

8    what he does.  And you know,

9    yeah, there's a little bump in

10    the road with an investigation

11    for some bullying and

12    harassment and, you know, we're

13    going to get over that.  Right.

14        This is a guy that I had

15    higher aspirations for.  This

16    is a guy that's part of my

17    secession plan.  And then this

18    happened.  And I got to tell

19    you, it was big.  It hurt on a

20    professional and personal

21    level.  It hurt professionally

22    amongst the staff, the

23    administrative staff, because,

24    you know, we rely on a lot of

25    trust.  And even some of the

1          lower level staff were shaken
2          by this, so ---.
3  BY ATTORNEY MANSOUR:
4  Q.    How did they know about this?
5  A.    Hey, listen, somebody was
6  talking, so wasn't me.  You know,
7  there's a rumor mill, there's still
8  rumors.  There's rumors about this
9  case.  You know, people talk.  So I
10 --- I don't know.  I know it's not me
11 talking.
12         There are very few other people
13 that know anything about this in any
14 level of detail, the law department,
15 myself, human resources, you and your
16 client.  That's pretty much, you know,
17 who knows what's going.
18         But yeah, it does not change my
19 opinion.  It's, again, something that
20 should have been brought forward.  If
21 there was an issue that he wanted to
22 relay some information, I don't know
23 the process for that.  But, you know,
24 he wasn't called.  Attorney Zeiger
25 probably maybe missed something.  I

166

1    don't know.  It's not for me to say.

2          But we do not pick up the phone

3    and we do not give information that's

4    not --- well, to other people, other

5    than law enforcement and people that,

6    you know, need to know those things.

7    It's kind of where I stand on most of

8    this.

9    Q.    And that would be especially

10   true for attorneys who are suing the

11   county.

12          Right?

13                ATTORNEY GRIESER:

14                Objection.

15                THE WITNESS:

16                Well, I'm not going to

17          differentiate between

18          disclosing information, but you

19          know, listen, I'm not going to

20          call my father, give him

21          information.  I'm not going to

22          call the chief of police's

23          husband or wife or cousin.  And

24          I'm certainly not going to call

25          any attorney.  We don't talk.

167

1     That's not what we do.  We run
2     a very large institution with
3     rules and regulations and a lot
4     of information crosses some
5     people's desks.  I mean, we
6     have layers of information.
7          Lieutenant Kimbrough's
8     office ---.  And you know, I'm
9     sure, you know, for the record,
10    I was the sergeant and
11    lieutenant in there for a
12    little while myself as I came
13    up the ranks.  There's a lot of
14    information that comes through
15    there.  A lot.  There's
16    criminal history information,
17    there's rap sheets,
18    fingerprints, innuendo, court
19    paperwork.
20         Some of that's public.
21    I mean, a lot of that stuff you
22    can look up a court paper.
23    You can get a transcript from a
24    trial if you want to pay.  But
25    again, that's not for me to do.

168

1          I'm not here to give you the
2          transcript.  I'm not here to
3          give information out, no matter
4          who it is, unless it's approved
5          and we're told that it's okay.
6    BY ATTORNEY MANSOUR:
7    Q.    In terms of you had referenced
8    ---.
9          Okay.
10         So you learned about my
11   client's phone call with Attorney
12   Zeiger from, I think you said, members
13   of the law department and human
14   resources.
15   A.    I believe it's the law
16   department, when the information was
17   given to them that there was a motion
18   to open the case back up again.
19   Q.    Okay.
20   A.    I do need to let everybody
21   know, it's almost 12:30 and I have to
22   be up for prison board at 1:00 today.
23   Q.    Okay.
24   A.    So if we can't wrap up, I can
25   circle back around.  I don't want to

169

1    cut it ---.

2    Q.    No, we --- we could.  I just

3    have a few more questions, so ---.

4    A.    Okay.

5    Q.    You did not disclose to anybody

6    outside of the law department or human

7    resources the substance of my client's

8    conversation with Attorney Zeiger.

9         Correct?

10   A.    So, again, I don't know the

11   entire conversation.  A couple days

12   went by to my recollection as it was

13   being looked into and the law

14   department was doing what they were

15   doing.  Human resources was informed.

16   I believe, that there were some

17   interviews and some things going on up

18   there.  I probably did not discuss it

19   with my administrative team for at

20   least three or four days, maybe a

21   little bit longer, because, again, I

22   don't want to jump the gun.  Right.

23        If it was a big nothing, then,

24   you know, I don't want to besmirch the

25   guy's reputation.  When I was told

170

1   that it was not looking favorable and

2   some procedures were violated and we

3   were possibly looking at investigating

4   him and locking him out, I spoke to my

5   deputies and let them know in very

6   general terms that there was contact

7   with an attorney who was litigating

8   with us and information was relayed,

9   but I didn't really have that much

10  detail.

11       And everybody was just shocked.

12  We were all just like, what?  You

13  know, and then that's where it came

14  --- you know, people ---.  As it

15  unfolded, people were saying, well,

16  there's a level of trust here that he

17  was a very trusted member of the team,

18  you know.

19  Q.    Okay.

20  A.    When we talk about staffing, we

21  include him in these discussions

22  because, you know, again, I don't know

23  if there's 70 people coming in today

24  on parole violations.  When we decide

25  where we're going to deploy our staff,

we talk about how we need to do that.

Q. Who specifically did you talk to and did you --- to whom specifically did you disclose the fact that my client was investigated for disclosing certain information to Attorney Zeiger?

A. So that would be my deputy ---.

ATTORNEY GRIESER:

Objection to form. And I think that mischaracterizes his testimony. I don't believe ---

THE WITNESS:

I'm sorry.

ATTORNEY GRIESER:

--- he said invest --- he told people he was investigating. You can go ahead and answer it, Dave.

BY ATTORNEY MANSOUR:

Q. I thought you used the word investigate, didn't you?

A. I could barely hear you, Jacqueline. I'm sorry.

172

1    Q.    Did you use the word

2    investigate?  You said that he was

3    being --- my client was being

4    investigated.

5          Right?  I believe you used that

6    term.

7                    ATTORNEY GRIESER:

8                    Yeah, he --- what was

9          your question?  Can you please

10         repeat that?

11   BY ATTORNEY MANSOUR:

12   Q.    So my question was, to whom

13   specifically did you disclose that my

14   client was being investigated for his

15   conversation with Attorney Zeiger?

16                   ATTORNEY GRIESER:

17                   So investigated versus

18         he's no longer part of the

19         team?

20   BY ATTORNEY MANSOUR:

21   Q.    Correct.

22                   ATTORNEY GRIESER:

23                   Okay.

24   BY ATTORNEY MANSOUR:

25   Q.    Investigate.

173

1    A.    Got you.  So that would be my

2    deputy warden --- I'm sorry, my deputy

3    director, Jim Coyne, and Carl

4    Matellus, the warden of the facility,

5    who has oversight of the facility

6    where the records department's

7    located.  And again, I advise that we

8    keep that confidential, because it was

9    just being looked into at that part

10    --- point.

11    Q.    Now, this conversation between

12    my client and Attorney Zeiger occurred

13    on May 30th, 2024.  On June 12th,

14    2024, my client was interviewed by

15    Lauren Smith and Attorney Dan Greaser.

16    And then on --- are you aware of that

17    interview between Attorney Greaser,

18    Dan Greaser and my client on June

19    12th?

20    A.    I'm aware there was an

21    interview, yes.

22    Q.    And then my client was

23    subsequently suspended or placed on

24    leave on or about June 21st, 2024.

25           Correct?

174

1    A.      Correct.

2    Q.      And you were the person who

3    communicated that leave decision to

4    him.

5    A.      Correct.

6    Q.      Up until June 20th --- and I

7    know --- I think during that time he

8    already had some pre-approved PTO

9    time.

10          Correct?  Prior to him being

11   informed of his leave?

12   A.      Yeah, I wouldn't know until I

13   looked at the --- I think --- I think

14   I do recall him saying he had some

15   approved vacation days.

16   Q.      Okay.

17          But between May 30th and June

18   21st, was there any disruption in the

19   jail as a result of my client's

20   conversation with Attorney Zeiger?

21   A.      And June 30th was the date that

22   ---.

23   Q.      May 30th.

24   A.      I'm sorry.  May --- the two ---

25   give me the two dates again and tell

175

1   me what ---.

2   A.     May 30th was the date my client

3   spoke to Attorney Zeiger.

4   A.     Okay.

5   Q.     21st was the day he was

6   suspended.  So between those two

7   dates, tell me about what disruption

8   there was, if any, in the jail

9   resulting from his conversation with

10  Attorney Zeiger

11  A.     So again, not being in the ---

12  in the pits, you know, the reception

13  area and the records area, you know, I

14  don't know who knew what.  You know,

15  rumors travel.  Your client may have

16  spoken to a few people.  You know, I

17  don't know.  Nobody from my

18  administration did.

19        Again, I'm not jumping the gun

20  on, you know, not going to pull this

21  guy out the minute we receive the

22  information.  It needs to be looked

23  into for accuracy.  And I believe

24  human resources and the law department

25  did their due diligence.

176

1          Once they determined that there
2     was some issues, you know, I was
3     brought into the discussion.  When
4     they investigate people in Bucks
5     County, typically during that
6     investigation, they're relieved of
7     their duties, which I think was a
8     prudent decision here at this point,
9     because, again, I have to say, like, I
10    don't understand ---.  There was this
11    discipline for this bullying, and
12    then, boom, very uncharacteristic
13    decision by Lieutenant Kimbrough.
14         So I had some concerns that
15    possibly there could be more
16    interactions like that.  And everybody
17    felt it was a safer decision to have
18    him out of the building while it was
19    looked into.  And that's kind of what
20    happened.
21    Q.     Okay.
22         And fair enough.  But what I'm
23    asking is, between those two dates of
24    May 30th and June 21st, approximately
25    three weeks, was there any disruption

177

1    in the operations of the jail as a
2    result of my client's conversation
3    with Attorney Zeiger?
4    A.    I really can't speak to that.
5    None that I'm aware of.
6    Q.    Did my client during those
7    three ---?
8    A.    I mean, when you say
9    disruption, I have to say that, you
10   know, we had to --- like, I had to
11   spend a lot of more time observing
12   what was going on in there.  Other
13   administrators had to just make sure
14   --- the ones that knew.  Again, we
15   didn't put this out on main street for
16   everybody to know, but, you know, we
17   had to start looking at the work
18   operations, making sure things were
19   going okay, you know.  It was very
20   ---.
21   Q.    In those three weeks between
22   May 30th and June 21st, did my client
23   continue to perform his job duties?
24   A.    Yes.
25   Q.    He continued to show up for

178

1    work?

2    A.    As far as I'm aware, yes,

3    without looking at the attendance.

4    Q.    Did he get into any sort of

5    altercations or fights with --- with

6    other employees regarding his

7    conversation with Attorney Zeiger?

8    A.    None that were reported to me

9    at that point, but I don't think the

10    word was out amongst the ranks at that

11    point.

12    Q.    Okay.

13        Was there anybody in those

14    three weeks that came to you and said

15    that they can't work with my client

16    because of his conversation with

17    Attorney Zeiger?

18    A.    No.

19    Q.    Is there anybody, any employee

20    of the jail that came to you in those

21    three weeks and told you that they

22    can't work with my client because they

23    don't trust him following his

24    conversation with Attorney Zeiger?

25    A.    There was some discussion

179

1    amongst my deputy and the warden that,
2    you know, if this is actually going to
3    be founded, that there were some trust
4    issues that we were going to have to
5    deal with.
6    Q.     In those three weeks between
7    May 30th and June 21st, were there any
8    security lapses in the jail as a
9    result of my client's conversation
10   with Attorney Zeiger?
11                   ATTORNEY GRIESER:
12                   Objection.  Vague.
13   BY ATTORNEY MANSOUR:
14   Q.     So any --- I'll rephrase the
15   question.  In those three weeks,
16   between May 30th and June 21st, were
17   there any breaches of security as a
18   result of my client's conversation
19   with Attorney Zeiger?
20   A.     So nothing jumps out.  I'd have
21   to --- I mean, I'd have to go through
22   the files just to see, but I don't
23   believe there was any --- any issues.
24   Q.     Now, when my client was placed
25   on leave on June 21st, you assigned

180

1    somebody to take over his position in

2    reception?

3    A.      No.  So once --- once he was

4    officially put out of work, I went

5    over into that office there.  Really,

6    it's a very limited --- it's pretty

7    much me because I did that job for

8    many years.  It's a very specialized

9    job.  So there really is nobody to

10   just put in there.  Right.  It's a ---

11   it's a very ---.

12        We still have not filled it.

13   Right.  We have a bunch of people that

14   are --- there's three of us that are

15   basically taking over those duties at

16   this point while we get to the

17   position of having to promote somebody

18   into that --- that position.

19        But, yeah, so it's been, you

20   know, if you want to talk disruption,

21   yeah, it's --- it's taken up my time.

22   It's taken up the word's time.  We

23   have a deputy warden who is somewhat

24   knowledgeable in records procedures.

25   I have tasked him over there for a

181

1    couple hours a day just to guide the
2    staff.  But we're still in a position
3    where we have not filled that.  That's
4    typically a position where you grow
5    into through experience.
6    Q.    That disruption that you just
7    mentioned --- you talk about
8    disruption.  So the fact that that
9    position remains unfilled and has
10   resulted in you and a number of other
11   individuals having to jump in and kind
12   of take over those duties, that was
13   because the county suspended him and
14   them fired him, him being my client.
15        Right?
16   A.    Oh, yeah, sure.  I mean, if he
17   were still at his desk, I probably
18   wouldn't have to do ---.
19   Q     It wouldn't be that disruptive?
20   A.    That goes without saying.
21   Yeah.
22   Q.    Okay.
23        So had he not been suspended
24   and then fired, there wouldn't have
25   been that kind of disruption that

182

1    you're referring to.

2         Right?

3    A.    Yes.  Correct.  I can't say

4    that he wouldn't have done more of

5    reaching out to people or creating

6    strife.  Because again, I have to

7    question why that was done in the

8    first place.  Was it a result of the

9    discipline that was coming his way?

10   He was --- you know, was it a way to

11   basically sort of retaliate to that?

12   I don't know.

13        Again, it's very

14   uncharacteristic of Lieutenant

15   Kimbrough to do something like that.

16   He's been a great employee, and again,

17   we're going to get him over this hump

18   with this --- you know, with this

19   bullying and harassment discipline.

20   It wasn't a --- it wasn't a game

21   ending thing.  We were going to, you

22   know, work on that, communication

23   skills and some of the things that

24   people were complaining about, but

25   ---.

183

1     Q.     And I don't mean to rush along,

2     but I do know you're --- you're on a

3     time constraint.

4     A.     Yeah, actually, I think ---.

5     Q.     I want to wrap up.

6     A.     --- that they pushed the

7     meeting back to 1:00, so I got to ---

8     I do have to start ---

9     Q.     Okay.

10    A.     --- down.  And I will make

11    myself available later today or

12    tomorrow, whatever, if you ---.

13    Q.     Fair enough.  But besides

14    essentially his role remaining vacant

15    to this day, or at least without a

16    permanent replacement, okay, and his

17    job responsibilities --- former job

18    responsibilities being juggled by

19    yourself and a couple of other

20    individuals, has there been any other

21    disruptions to the workplace in the

22    jail not as a result --- and I want to

23    be clear on this, not as a result of

24    my client being fired, but as a result

25    of my client's conversation with

184

1     Attorney Zeiger?

2     A.     So directly I can tell you

3     that, you know, again, the lack of ---

4     the lack of trust, the worry.

5     Everybody's worried about that, you

6     know, going out, violating

7     confidentiality, violating that.  So

8     that --- that's your higher level.

9          You're asking me to speculate

10    on, you know, tone.  I can do that

11    with the guards.  There are certain

12    guards that are very supportive of

13    this because, again, they're not happy

14    and they want him to get millions of

15    dollars.  There are a lot of people

16    that are shaking, and were like why

17    did this happen?  What's going on?

18    Because nobody knows the facts.

19          Everybody thinks they know the

20    facts.  They get the McNuggets out of

21    the paper.  They hear things.  So, you

22    know --- and some of it might be true.

23    A lot of it probably isn't.

24          So there are a lot of people,

25    you know, were quite shaken by that

185

1    and, you know, felt a loss, but you
2    don't have that supervision in that
3    office the way we had it before.  So,
4    you know, it's an issue.
5    Q.    There were --- based on your
6    knowledge, there were no news articles
7    about my client's conversation with
8    Attorney Zeiger until after he filed
9    this lawsuit.
10          Right?
11   A.    To my knowledge, that's
12   correct.
13                ATTORNEY GRIESER:
14                Objection.  Vague.
15          Yeah.  You can answer if you
16          know.
17                THE WITNESS:
18                Yeah, I'm not aware of
19          anything.  Maybe there was.  I
20          tend not to read the news
21          articles unless somebody sends
22          them to me.
23   BY ATTORNEY MANSOUR:
24   Q.    Okay.
25          And then just my last line of

186

1   questioning.  Are you familiar with

2   the Federal Statute, Title 42, U.S.

3   Code 1983, more commonly known as

4   Section 1983?

5   A.     Give me the bullet.  Give me

6   the McNugget on it.

7   Q.     Okay.

8          So Section 1983 is a federal

9   law that allows individuals to sue

10  public government agents and

11  government employees for violations of

12  their constitutional rights.  Are you

13  aware of that?

14  A.     Vaguely.  You know, just

15  through ---

16  Q.     I'm sure you ----.

17  A.     --- trade journals and things

18  like that, but ---.

19  Q.     I would expect that you've

20  probably come across that in the

21  prison context.  So, for example,

22  prisoners many times file 1983

23  lawsuits against jails for violations

24  of their Fourth Amendment rights or

25  violations of their Eighth Amendment

187

1    rights.  Does that --- any of that

2    ring a bell?

3    A.     It does.

4    Q.     Okay.

5          Are you aware of the fact that

6    Section 1983 also protects the rights

7    of public employees in certain

8    circumstances?

9                    ATTORNEY GRIESER:

10                    Objection.  This is

11          outside the scope of this

12          witness' knowledge.  You can go

13          ahead and answer, David, if you

14          know.

15                    THE WITNESS:

16                    Yeah, I mean, you're

17          talking --- no, I can't --- not

18          with any certainty or ---.  You

19          know, I have to do my research,

20          read the statute, do all that

21          kind of stuff, but talk to my

22          lawyer.

23    BY ATTORNEY MANSOUR:

24    Q.     Well, I mean, you run the jail.

25          Right?

188

1     A.     Right.

2     Q.     Okay.

3          So are you aware of the fact

4     that Section 1983 allows people ---

5     allows public employees to sue their

6     public employers when their First

7     Amendment rights are violated?

8     A.     So yeah, yeah.  I mean, sure,

9     there's been suits.  I'm assuming

10    that's the statute number.  I don't

11    know the statute number, but yes.

12    Q.     Yes.  And I'll represent you

13    that that is, that is, you know, ---

14    A.     I believe you.

15    Q.     The main claims in this case

16    are brought under Section 1983.  And

17    my client is claiming that the county

18    violated his First Amendment rights by

19    firing him for engaging in protected

20    speech.  That's the crux of his claim.

21         Do you understand that?

22    A.     Yes.

23    Q.     Okay.

24         Are you aware the fact ---

25    prior to me telling you now, were you

189

1    aware of the fact that public
2    employees have certain First Amendment
3    rights in the workplace?
4    A.     Sure, we all do.  We all enjoy
5    that.
6    Q.     Are you aware of the fact that
7    public employers cannot retaliate
8    against public employees for engaging
9    in constitutionally protected speech?
10   A.     Again, not having read the
11   statute, but it does sound reasonable
12   to me.
13   Q.     Did you ever receive any
14   training on that as director of the
15   Department of Corrections about what
16   kind of rights are protected under
17   1983?
18   A.     Nothing specific that pops into
19   mind.  And obviously, you know, that's
20   more of an HR kind of thing than my
21   purview.  Right.  I would expect our
22   HR folks to be more on top of that,
23   because again, one of the first
24   questions you asked me is can I fire
25   someone.  And the answer is no, I

190

1    don't have that authority.  So I would

2    assume that if there was retaliation

3    or constitutional violations, which

4    again, I don't agree with a

5    constitutional violation, I think you

6    have the right to go speak and do

7    things that you want to do.  And I

8    think I could walk out here today and

9    express my opinion on a multitude of

10   things that are corrections related.

11       What I can't do is talk about

12   information that I glean from my work.

13   I should not go out there --- I can

14   talk about sex offenders as probably

15   one of the experts in that area for

16   incarceration.  But I shouldn't be

17   able to go out there and say here's

18   three people that are registered sex

19   offenders in the Department of

20   Corrections and here's their charges

21   and their probable cause affidavit.

22   That --- that's stuff that, you know,

23   from a First Amendment standpoint, I

24   shouldn't disclose.  Right.

25       It's --- it's created some

191

1    issues for him.  There's again, a lot

2    of discourse, a lot of disruption and

3    it's impacted the operations of the

4    facility.  I mean, we --- you know,

5    when all this went on.

6    Q.    And that's true, but only since

7    he's been fired.

8         Right?

9    A.    Well, no, I think when he made

10   contact right off the bat, that made

11   us less safe and secure.

12   Q.    Okay.

13        Well, and that's your opinion.

14        Right?  But in terms of the

15   disruption to the jail, right, you're

16   talking about --- you had mentioned

17   before how it's a topic of

18   conversation and rumors have spread,

19   all of that happened only after he was

20   fired.

21        Right?  He being Mr. Kimbrough?

22   A.    Well, no, I mean ---.

23                  ATTORNEY GRIESER:

24             Objection.  Asked and

25        answered and it

192

1          mischaracterizes his prior

2          testimony.

3                  Is this a good time to

4          stop?  Because I know that

5          Director Kratz is not co-

6          located with the prison office

7          ---.

8                  THE WITNESS:

9                  No, I have to drive 15

10         minutes.  They push --- I don't

11         have my calendar up, but I

12         think they did push it back at

13         1:00 today because of the snow,

14         so ---.

15                 ATTORNEY GRIESER:

16                 I mean, I --- I don't

17         --- can we go off the record

18         real quick?

19                 ATTORNEY MANSOUR:

20                 Sure.

21                        ---

22   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

23                        ---

24   BY ATTORNEY MANSOUR:

25   Q.    So I mean, the question of, to

193

1    ask, and this really is my final

2    question --- or my next to final

3    question, is what disruptions resulted

4    in the jail as a result of my client's

5    conversation with Attorney Zeiger?

6    Not him being fired and not this

7    lawsuit, but just his conversation.

8    The fact that he called Zeiger and

9    said what he said, how did that

10   disrupt the operations of the jail?

11                    ATTORNEY GRIESER:

12                    Objection.  Asked and

13         answered.  You can go ahead and

14         answer, Dave.

15                    THE WITNESS:

16                    Okay.

17                    Thanks.  Yeah.  So

18         again, you know, we didn't want

19         to rush to the door.  Myself

20         once I disclosed a couple days

21         after that with the warden and

22         the deputy director, obviously,

23         took up a lot of our time and

24         disrupted things.  Officers

25         hadn't found out about it yet.

194

1        I mean, so if they would have
2        found out about it, if we would
3        have locked him out that day,
4        the disruption would have
5        happened.
6                You know, it took ---
7        what'd you say, three weeks
8        before he was --- two weeks
9        before he was locked out, I
10       mean, as a result of his
11       behavior.  And again, I would
12       say I don't really see that as
13       a First Amendment issue when
14       you're talking about, you know,
15       the work stuff.
16               So, you know, it
17       continues to be a disruption as
18       a result of that.  You know,
19       things take time.  Like if
20       people didn't know about it,
21       there would be no disruption.
22       Right now there's a lot of
23       strife, and I'm sure, you know,
24       a lot of discussion amongst the
25       staff who are reluctant to get

195

1          involved or be down there now.

2          And quite frankly, there's no

3          leader in that area.  That's a

4          big loss.  Huge.  Huge.

5   BY ATTORNEY MANSOUR:

6   Q.     And the discussions that you're

7   referring to among staff and the loss

8   in terms of that particular unit that

9   you're talking about, all of that came

10  about as a result of my client being

11  suspended and then terminated.

12         Right?

13  A.     I would say it came about as a

14  result of that conversation.  The

15  suspension and termination are a

16  result of that violation, so ---.

17  Q.     Correct.  But had the county

18  not --- not suspended my client or

19  terminated him because of his

20  conversation, these disruptions would

21  likely not have happened.

22         Correct?

23              ATTORNEY GRIESER:

24              Objection.  Asked and

25  answered.  He said that it was

196

1          immediate as soon as he picked

2          up the phone.  There were

3          disruptions among the

4          administration.  He --- he

5          really needs to get to this ---

6          to this board.  So I --- I ---.

7                    THE WITNESS:

8                    Yeah, I can circle back.

9                    ATTORNEY MANSOUR:

10                   That's my last question.

11         So ---.

12                   THE WITNESS:

13                   Okay.

14                   ATTORNEY GRIESER:

15                   No, I will have follow

16         up questions.  So we'll need

17         you back, Director Kratz.

18                   THE WITNESS:

19                   Okay.

20                   So just let me know.

21         I'll be a prison board and then

22         I'll come back.  So let me

23         know.

24                   ATTORNEY GRIESER:

25                   And just keep in mind

197

1    that because you are

2    technically still on the stand

3    in quotes, you and I and Dara

4    cannot speak about your

5    testimony at all.

6              THE WITNESS:

7              Understood.  Very well.

8              ATTORNEY MANSOUR:

9              Okay.

10             Thank you, Mr. Kratz.

11             THE WITNESS:

12             Thank you.

13             ATTORNEY GRIESER:

14             Thanks.

15         *  *  *  *  *  *  *

16    DEPOSITION CONCLUDED AT 12:46 P.M.

17         *  *  *  *  *  *  *  *

18

19

20

21

22

23

24

25

198

```
 1    COMMONWEALTH OF PENNSYLVANIA  )

 2    COUNTY OF PHILADELPHIA        )

 3                    CERTIFICATE

 4          I, Emma Edwards, a Notary Public in

 5    and for the Commonwealth of Pennsylvania, do

 6    hereby certify:

 7          That the witness, David Kratz, whose

 8    testimony appears in the foregoing deposition,

 9    was duly sworn by me on February 12, 2025 and

10    that the transcribed deposition of said

11    witness is a true record of the testimony

12    given by said witness;

13          That the proceeding is herein recorded

14    fully and accurately;

15          That I am neither attorney nor counsel

16    for, nor related to any of the parties to the

17    action in which these depositions were taken,

18    and further that I am not a relative of any

19    attorney or counsel employed by the parties

20    hereto, or financially interested in this

21    action.

22    Dated the 17 day of February, 2025

23

24                            Emma Edwards,

25                              Court Reporter
```

Commonwealth of Pennsylvania - Notary Seal
Emma Edwards, Notary Public
Philadelphia County
My Commission Expires February 12, 2028
Commission Number 1443285