**EXHIBIT 4:**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

ARA KIMBROUGH,          *

    Plaintiff          *    Case No.

    vs.                *    2:24-cv-04470-KSM

BUCKS COUNTY, et    *

al.,                    *

    Defendants          *

* * * * * * * *


DEPOSITION OF

MARGARET MCKEVITT

February 12, 2025


Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

2

1                    D E P O S I T I O N

2                          O F

3       MARGARET MCKEVITT, taken on behalf of

4       the Plaintiff herein, pursuant to the

5       Rules of Civil Procedure, taken before

6       me, the undersigned, Emma Edwards, a

7       Court Reporter and Notary Public in

8       and for the Commonwealth of

9       Pennsylvania, Via Zoom, on Wednesday,

10      February 12, 2025 beginning at 1:15

11      p.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2

3    WILLIAM P. MANSOUR, ESQUIRE

4    Mansour Law, LLC

5    961 Marcon Boulevard, Suite 425

6    Allentown, PA  18109

7        COUNSEL FOR PLAINTIFF

8

9    DARA BURNS, ESQUIRE

10   JACLYN C. GRIESER, ESQUIRE

11   County of Bucks – Deputy Solicitor

12   55 East Court Street

13   Doylestown, PA  18901

14       COUNSEL FOR DEFENDANTS

15

16

17

18

19

20

21

22

23

24

25

4

1                    I N D E X

2

3    DISCUSSION AMONG PARTIES        7 - 8

4    WITNESS: MARGARET MCKEVITT

5    EXAMINATION

6        By Attorney Mansour          8 - 47

7    DISCUSSION AMONG PARTIES      47 - 48

8    CERTIFICATE                        49

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    <u>E X H I B I T   P A G E</u>

2

3                                           P A G E

4   <u>N U M B E R</u>    <u>D E S C R I P T I O N</u>      <u>I D E N T I F I E D</u>

5                    N O N E   O F F E R E D

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1               OBJECTION PAGE

2

3    ATTORNEY                              PAGE

4    Burns              16, 21, 22, 23, 28,

5                       32, 37, 38, 41, 43

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          S T I P U L A T I O N
2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
3    (It is hereby stipulated and agreed by
4    and between counsel for the respective
5    parties that reading, signing,
6    sealing, certification and filing are
7    not waived.)
8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
9          P R O C E E D I N G S
10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
11          MARGARET MCKEVITT,
12   CALLED AS A WITNESS IN THE FOLLOWING
13   PROCEEDING, AND HAVING FIRST BEEN DULY
14   SWORN, TESTIFIED AND SAID AS FOLLOWS:
15                - - -
16          ATTORNEY MANSOUR:
17          Usual stipulations in
18       the record, reserve all
19       objections for time of trial
20       except as to form and
21       privilege?
22          ATTORNEY BURNS:
23          Yes.  And my client
24       reserves the right to review
25       the transcript for any errors.

8

1          ATTORNEY MANSOUR:

2          Okay.

3          Very good.

4                    - - -

5          EXAMINATION

6                    - - -

7     BY ATTORNEY MANSOUR:

8     Q.     Ms. McKevitt, thank you for

9     being here and making yourself

10    available again today.  Even though

11    we've done this before, I do just want

12    to make sure that we are on the same

13    page with respect to the ground rules,

14    again, in terms of how this is going

15    to proceed.

16          So make sure all your answers

17    to my questions are in the form of

18    words.  No nodding the head, shaking

19    the head, shrugging the shoulders.

20    Nonverbal cues like uh-huh, uh-uh,

21    things like that don't come across

22    well in the transcript.

23          So can you confirm that all

24    your answers to my questions will be

25    with words?

9

1    A.      Yes.

2    Q.      Very good.  Thank you.  Don't

3    want us --- I don't want us talking

4    over each other.  So even if you know

5    where my question is going or if I

6    know where your answer is going, I

7    just ask that you wait until I'm done

8    asking my question before you answer

9    it.  And I will do the same with

10   respect to your answer, waiting until

11   you complete it before I ask my next

12   question.

13            Okay?

14   A.      Yes.

15   Q.      Okay.

16            I don't want you to speculate

17   or guess about any of your answers

18   here today.  Your answers are supposed

19   to be based on your personal

20   knowledge.  Do you understand that?

21   A.      Yes.

22   Q.      If you don't know the answer to

23   a question, I don't know is a

24   perfectly acceptable answer if it is

25   the truth.  You understand that?

                                                    10

1    A.     Yes.

2    Q.     If you --- if I ask you a

3    question that you don't understand,

4    just tell me that and I'll be happy to

5    reask it or rephrase it.  If you do

6    --- if I do ask a question and you do

7    answer it, I'm going to assume both

8    that you heard it and understood it.

9           Okay?

10   A.     Yes.

11   Q.     Very good.  If at any time we

12   need to take a break, just let us

13   know.  We'll be happy to do that.

14   Since we already got a little bit of

15   your deposition done the first time

16   around, I don't anticipate that we're

17   going to be here terribly long, but

18   nevertheless, if you do need to take a

19   break, just let us know.

20          The only thing I ask is that if

21   I have a pending question, you answer

22   it completely before we break.

23          Okay?

24   A.     Yes.

25   Q.     Very good.  You understand that

```
                                                      11
1    you were just placed under oath?

2    A.      Yes.

3    Q.      Okay.

4            And you understand that that

5    oath is the same oath that you would

6    take if you were testifying in a

7    courtroom?

8    A.      Yes.

9    Q.      And you understand that that

10   oath means that you promised to tell

11   the truth here today?

12   A.      Yes.

13   Q.      And that if you knowingly fail

14   to tell the truth, you could be

15   subject to criminal penalties?

16   A.      Yes.

17   Q.      Are you under the influence of

18   any drugs or alcohol that would impair

19   your ability to hear or understand any

20   of my questions?

21   A.      No.

22   Q.      Are you under the influence of

23   any drugs or alcohol that would impair

24   your ability to recall any of the

25   events I might ask you about?
```

12

1    A.    No.

2    Q.    Are you under the influence of

3    any drugs or medica --- alcohol ---

4    drugs or alcohol that would impair

5    your ability to see any of the

6    documents I might show you?

7    A.    No.

8    Q.    At the same --- I'm going to

9    ask the same question with respect to

10   any medications.  Are you taking any

11   medications that impair your ability

12   to hear or see ---

13   A.    No.

14   Q.    --- any of the questions or

15   documents that I might show you?

16   A.    No.

17   Q.    Okay.

18         So I'm going to kind of pick up

19   where we left off last time around.

20   I'm going to share with you my screen

21   and show you a document that we marked

22   at your deposition previously as P-1.

23   These are essentially two documents

24   that were attached to the exhibit ---

25   that were attached as exhibits to my

13

1    client's complaint. The July 29th

2    termination letter, accompanied by the

3    disciplinary action form for my client

4    on the same date.

5         Do you remember seeing these

6    documents at your earlier deposition?

7    A.    Yes.

8    Q.    Can you see them okay now?

9    A.    Yes.

10   Q.    Okay.

11         If at any time you have trouble

12   seeing any of the documents or the

13   text is too small or something, just

14   let me know and I'll blow it up or

15   ---.

16   A.    Sure.

17   Q.    Okay.

18         So I want to turn your

19   attention to the second page of P-1,

20   marked at the bottom, exhibit B, which

21   was exhibit B to our complaint. And

22   it says here that, quote, it was

23   brought to our attention that you ---

24   you being my client, Mr. Kimbrough ---

25   shared confidential information with

14

1    plaintiff's counsel.  A preliminary

2    interview was held 6/12/24, and a fact

3    finding meeting was held at 7/26/24.

4    During both of these meetings, you

5    admitted to contacting plaintiff's

6    attorney and sharing confidential

7    information which pertained to a

8    lawsuit against the DOC/County of

9    Bucks.

10          Did I read that correctly?

11   A.     Yes.

12   Q.     Okay.

13          And you've seen this document

14   not only at your last deposition, but

15   also prior to that.

16          Correct?

17   A.     Correct.  Yes.

18   Q.     And I believe you testified at

19   your first deposition that you had

20   seen this document prior to it being

21   provided to my client.

22          Correct?

23   A.     I don't recall that.

24   Q.     Okay.

25          So I just want to go over a few

15

1    things here and make sure we're on the

2    same page.  So it says here that my

3    client admitted to contacting

4    plaintiff's attorney and sharing

5    confli --- confidential information

6    which pertained to a lawsuit against

7    the County of Bucks.

8         Correct?

9    A.    Repeat that.  I'm sorry.

10   Q.    Sure.  So this last sentence

11   here on this page, exhibit B, says,

12   during both of these meetings, my

13   client admitted to contacting

14   plaintiff's attorney and sharing

15   confidential information which

16   pertained to a lawsuit against

17   DOC/County of Bucks.

18        Correct?

19   A.    Correct.

20   Q.    And that was the reason he was

21   discharged.

22        Correct?

23   A.    Correct.

24   Q.    Now, it does not say, you would

25   agree with me, that he shared

16

1      confidential information which

2      pertained to the security of the jail.

3           Correct?

4                    ATTORNEY BURNS:

5                    Objection to form.  You

6           can answer.

7                    THE WITNESS:

8                    What'd you say?

9                    ATTORNEY BURNS:

10                    You can answer.

11                    THE WITNESS:

12                    I can.

13                    ATTORNEY BURNS:

14                    You can, yeah.

15                    THE WITNESS:

16                    Okay.  Okay.

17                    Repeat the question

18           again.

19      BY ATTORNEY MANSOUR:

20      Q.    It does not say anywhere here

21      that my client shared confidential

22      information that pertained to the

23      security of the jail, the county

24      correctional facility.

25           Correct?

17

1    A.    The words are not there.  Yes.

2    Q.    Okay.

3          And it does not say here that

4    my client shared confidential

5    information regarding the operations

6    of the jail.

7          Correct?

8    A.    The words are not there.  Yes.

9    Q.    It says he shared information

10   --- confidential information that

11   pertains to a lawsuit against the

12   county.  That was a lawsuit that was

13   being filed on behalf of the estate of

14   Joshua Patterson.

15         Correct?

16   A.    Yes.

17   Q.    Okay.

18         And that lawsuit pertained to

19   Mr. Patterson's fatal drug overdose

20   while incarcerated at the county

21   correctional facility.

22         Correct?

23   A.    Yes.

24   Q.    Now, I will represent to you

25   that the phone call in question where

18

1    my client shared alleged confidential

2    information with plaintiff's attorney

3    occurred on May 30th, 2024.  Is that

4    your understanding as well?

5    A.    I don't know.

6    Q.    Okay.

7          And the plaintiff's attorney

8    we're referring to here, his name is

9    Brian Zeiger.  Are you familiar with

10   that name?

11   A.    I have heard his name, yes.

12   Q.    Okay.

13         And it's your understanding

14   that he was the attorney representing

15   the estate of Mr. Patterson in the

16   lawsuit referenced here?

17   A.    I believe so.

18   Q.    Now, the phone call that

19   occurred between my client and

20   Attorney Zeiger occurred on May 30th,

21   2024.  You were not present for that

22   phone call.

23         Correct?

24   A.    No.

25   Q.    How did you first learn what my

19

1    client said during that phone call

2    with Attorney Zeiger?

3    A.    I don't remember.

4    Q.    You did, at some point,

5    ultimately learn that my client had a

6    phone call with Attorney Zeiger.

7         Right?

8    A.    Yes.

9    Q.    Okay.

10        And that ---- and you learned

11   about that before he was discharged.

12        Correct?

13   A.    Yes.

14   Q.    Now, this termination letter

15   says that he was fired for contacting

16   plaintiff's attorney, Attorney Zeiger,

17   and sharing confidential information

18   which pertain to a lawsuit.  Can you

19   tell me what confidential information

20   my client shared with Attorney Zeiger?

21   A.    I cannot.

22   Q.    Is there a reason that you

23   cannot?  Is it just that you don't

24   remember or ---?

25   A.    I don't --- I don't remember.

20

1    Q.    Were you at one time or at any

2    time told what that information was?

3    A.    I don't --- I don't recall.  I

4    --- we received a package of

5    information.  I received the packets

6    of information him.  Read it at a

7    meeting, and we discharged.  And just

8    so you know, I do this just about

9    every other day, so ---.

10   Q.    Okay.

11         So we already established,

12   obviously, you were not present for

13   that phone call between my client and

14   Attorney Zeiger.  So it would be fair

15   to say that you learned that

16   information from somebody other than

17   my client or Attorney Zeiger.

18         Is that a yes?

19   A.    Yes.

20   Q.    Would it be fair to say that

21   after you learned about the phone call

22   between my client and Attorney Zeiger

23   that the county lost trust in my

24   client?

25   A.    What --- what do you mean by

21

1     that?

2     Q.     Did you believe that my

3     client's phone call to Attorney

4     Zeiger, along with the information

5     that he shared, was a breach of trust

6     that the county placed in him?

7     A.     I believe at the time it was a

8     violation of county policy or

9     corrections policy and/or both.

10    Q.     Okay.

11           And on what basis did you

12    arrive at that conclusion?

13    A.     Based on the information that

14    was provided to me at the time.

15    Q.     And that information being the

16    substance of his conversation --- my

17    client's conversation with Attorney

18    Zeiger?

19    A.     On the information that was

20    provided by human resources.

21    Q.     Do you believe that my client's

22    telephone conversation with Attorney

23    Zeiger was against the interests of

24    the county with respect to the

25    Patterson lawsuit?

22

1          ATTORNEY BURNS:

2              Objection.  Form.  You

3        can answer if you can.

4              THE WITNESS:

5              I don't --- it's not a

6        --- I don't have an answer for

7        that.

8    BY ATTORNEY MANSOUR:

9    Q.    Well, I mean, my client

10   apparently called Attorney Zeiger,

11   shared certain confidential

12   information or alleged confidential

13   information, and he was fired because

14   of that.  We all agree on that basic

15   set of facts.

16   A.    Yes, yes.

17   Q.    Okay.

18        Do you believe that

19   conversation he had with Attorney

20   Zeiger was against the county's

21   interests with respect to the

22   Patterson lawsuit?

23             ATTORNEY BURNS:

24             Objection.  Form.  You

25        can answer if you can.

23

```
 1              THE  WITNESS:

 2              I  believe  that  his  ---

 3         what  he  did  broke  county

 4         policies  and  correction

 5         policies.

 6    BY  ATTORNEY  MANSOUR:

 7    Q.      I  understand  that.   Do  you  also

 8    believe  it  went  against  the  county's

 9    interests  with  respect  to  the

10    Patterson  lawsuit?

11    A.      Yes.

12    Q.      Were  you  concerned  ---  upon

13    learning  that  my  client  had  this

14    conversation  with  Attorney  Zeiger,

15    were  you  concerned  that  he  might  share

16    additional  information  with  third

17    parties  in  the  future?

18    A.      When  we  made  this  decision,  it

19    was  based  on  what  he  did  at  the  time.

20    Q.      Are  you  saying  that  there  was

21    no  concern  that  he  might  do  the  same

22    thing  again?

23              ATTORNEY  BURNS:

24              Objection.   Form.   You

25         can  answer  if  you  understand
```

24

1        the question.
2                    THE WITNESS:
3                    Repeat the question
4        again.  I'm sorry.
5  BY ATTORNEY MANSOUR:
6  Q.    Sure.  Was there a concern by
7  you that Mr. Kimbrough might do
8  something similar again in terms of
9  contacting an attorney and sharing
10 alleged confidential information?
11 A.    I was concerned that he broke
12 county policy.
13 Q.    I understand.  So I guess maybe
14 I'll rephrase the question.  Were you
15 concerned that he might break those
16 same policies again in the same
17 manner?
18 A.    That factors into the decision
19 making.
20 Q.    Give me one moment if you can.
21                    ATTORNEY MANSOUR:
22                    The emergency motion
23        that was filed in the Corbin
24        matter, did we mark that as an
25        exhibit in one of the last

25

```
 1            depositions?  Is that right?
 2                  ATTORNEY BURNS:
 3                  I believe --- are you
 4         asking me that, Bill?
 5                  ATTORNEY MANSOUR:
 6                  I'm --- I'm asking
 7         anybody who might know.
 8                  ATTORNEY BURNS:
 9                  Yes, I believe it is
10         Exhibit --- give me one second
11         --- 4.
12     BY ATTORNEY MANSOUR:
13     Q.      Four.
14             Okay.
15             So I just --- the copy I have,
16     I didn't have it marked, and I didn't
17     know if we marked it before, so I'm
18     just going to mark it again.
19             Okay.
20             Ms. McKevitt, I have on the
21     screen a document that we've marked as
22     P-4.  This is the emergency motion
23     filed by Attorney Zeiger on behalf of
24     the Patterson estate in the Patterson
25     --- in the Corbin versus Bucks County
```

26

1    matter.  Have you --- can you see this

2    document okay?

3    A.    Yep.

4    Q.    Okay.

5          Have you seen this document

6    before today?

7    A.    I might have received it, but I

8    don't believe I've read it.

9    Q.    Okay.

10         I want to direct your attention

11   here to paragraph four.  Blow it up a

12   little bit, just so it's a little

13   easier to see.  Can you read --- take

14   a moment to read that to yourself and

15   just let me know when you're done

16   reading it?

17   A.    Okay.

18   Q.    Okay.

19         You said you've never read this

20   before today?

21   A.    I said I'd probably receive ---

22   I received it.  Probably received it,

23   but I haven't read it in its entirety

24   ---

25   Q.    Okay.

27

1   A.      --- before today.

2   Q.      So today is the first time

3   you're reading word for word this

4   paragraph four?

5   A.      Yes.  Well, no.  Didn't --- did

6   you show this to me last time?

7   Q.      No, because I think last time

8   --- the first time we met, that was

9   redacted.  I had not yet received an

10  unredacted.

11  A.      Okay.  Okay.

12  Q.      So if I did show it to you, it

13  was --- this paragraph was redacted.

14  A.      Okay.

15  Q.      So ---.

16          Okay.

17          The information that's alleged

18  here in this paragraph four, is that

19  the information that was shared with

20  you in terms of what my client told

21  Attorney Zeiger in their telephone

22  conversation?

23                  ATTORNEY BURNS:

24                  And I'm just going to

25          object to the extent that this

28

1          is confidential, that we might
2          claim later, but I am going to
3          instruct my client to answer
4          the question.
5                    THE WITNESS:
6          Okay.
7          And the --- repeat the
8          question.
9     BY ATTORNEY MANSOUR:
10    Q.    The question was based on what
11    you just read here in this paragraph
12    four, is that generally the
13    information you were told my client
14    shared with Attorney Zeiger?
15    A.    Generally, yes.
16    Q.    Okay.
17          Are you aware of any disruption
18    that occurred in the operations of the
19    county jail as a result of my client's
20    conversation with Attorney Zeiger?
21    A.    Not that I recall.
22    Q.    Were you ---?  Let me think of
23    how I want to phrase this question.
24    Who determined that the information my
25    client shared with Attorney Zeiger was

29

```
1     confidential or sensitive?
2     A.      Our team.
3     Q.      And who comprised that team?
4     A.      Representative ---
5     representatives from human resources,
6     law department and corrections.
7     Q.      And that's it?
8     A.      And myself.
9     Q.      And yourself.
10            Okay.
11            In terms of representatives
12    from human resources, would that
13    include Lauren Smith?
14    A.      Yes.
15    Q.      Would that also include Diane
16    Otto?
17    A.      Yes.
18    Q.      Okay.
19            Anybody else from HR
20    specifically that you can recall?
21    A.      I don't recall.
22    Q.      In terms of members of the law
23    department, would that include Shea
24    Randolph?
25    A.      I believe so.
```

30

1    Q.    Would that also include Jaclyn
2    Grieser?
3    A.    I believe so.
4    Q.    And would that include Dara
5    Burns?
6    A.    I don't recall.  I don't
7    recall.
8    Q.    Would that include Dan Greaser?
9    A.    I do believe so, yes.
10   Q.    Anybody else from the law
11   department you can recall that was
12   involved in the determination that
13   this information was allegedly
14   confidential?
15   A.    I don't recall.
16   Q.    David Kratz also involved in
17   that determination?
18   A.    Yes.
19   Q.    Anybody else from jail
20   administration, specifically, that was
21   involved in determining this was
22   confidential information?
23   A.    I don't recall.
24   Q.    Did you yourself believe that
25   this information was confidential?

31

1    A.      Yes.   And other information

2    that Mr. Kimbrough had access to.

3    Q.      Okay.

4            Had access to?   What do you

5    mean by had access to?

6    A.      He was a supervisor.   He had

7    access to all corrections systems.

8    Q.      Okay.

9            But he didn't share all of it

10   with Attorney Zeiger.

11           Right?

12   A.      I don't know what he shared

13   with Attorney Zeiger.

14   Q.      As far as you're aware, ---

15   A.      This is what he shared.

16   Q.      --- this is what he shared.

17           Okay.

18           Looking again at this paragraph

19   four, can you tell me what information

20   you personally believed was

21   confidential?

22   A.      The intake area.

23   Q.      What are you referring to

24   specific --- where it says the intake

25   area was grossly understaffed?

32

1    A.    Just the intake area itself.

2    Q.    Okay.

3          But I'm asking about the

4    information ---.

5    A.    He talks about --- he talks

6    about operations here.  Yes.

7    Q.    Okay.

8          So --- so let's just take a

9    look at this paragraph four, and I

10   guess point out for me, you know,

11   specifically which sentence or which

12   line there you believe was

13   confidential information.

14   A.    All of it.

15   Q.    Okay.

16         So the fact that he was a

17   supervisor in the intake area at the

18   time of the instant matter, that you

19   believe was confidential?

20                ATTORNEY BURNS:

21                Objection.  Form.  You

22         can answer, if you can.

23                THE WITNESS:

24                Repeat the question,

25         please.

33

1    BY ATTORNEY MANSOUR:

2    Q.    Sure.  So the first sentence

3    there, where my client told

4    plaintiff's counsel he was a

5    supervisor in the intake area at the

6    time of the instant matter, that fact

7    is confidential in your view?

8    A.    No.

9    Q.    Okay.

10         The intake area was grossly

11   understaffed.  You believe that

12   information was confidential?

13   A.    That's his opinion.

14         Right?

15   Q.    Sure.

16   A.    Right.  That's his opinion.  I

17   don't know that that's a fair question

18   to ask.

19   Q.    Okay.

20         I mean ---.

21   A.    You're asking me to --- to ---

22   to say whether something's

23   confidential based on his opinion.

24   Q.    Okay.

25         Do you think his opinion is

34

1    confidential, that it shouldn't have

2    been shared with anybody?

3    A.      I think --- I think what Ara

4    Kimbrough did was break county policy

5    by talking to someone other than his

6    --- the chain of command or someone in

7    human resources and controller's

8    office on this issue.

9    Q.      Well, the two or --- I think

10   two or three of the main policies that

11   he was discharged for and as it says

12   in the intake --- in the discharge was

13   that he shared confidential

14   information.  And then down here, as

15   you can see, it refers to County Work

16   Rule 59, giving confidential county

17   information to other individuals.

18   Number 60 --- I'm sorry, Number 15,

19   divulging any information of a

20   confidential or sensitive nature.

21           So what I'm trying to figure

22   out is what information was

23   confidential and thus violated those

24   policies --- allegedly violated those

25   policies.  So you're saying he was

35

1    fired for violating those policies?

2    Those policies say ---?

3    A.    He was --- right.  He was

4    violated for --- for speaking to

5    someone outside of his chain of demand

6    or county personnel on this issue.

7    Q.    And that's --- and that's, you

8    know, generally your view of why he

9    was discharged.

10         Right?

11   A.    Correct.

12   Q.    So not necessarily because of

13   what his opinions were, but the fact

14   that he shared this information with

15   somebody outside his chain of command.

16   A.    Correct.

17   Q.    Do you know whether Mr.

18   Kimbrough, prior to his conversation

19   with Attorney Zeiger, had complained

20   up the chain of command about what he

21   believed to be chronic understaffing

22   in the intake unit?

23   A.    I have not --- I did not

24   receive a complaint.

25   Q.    So Mr. Kimbrough, his lawsuit

36

1    against the county, two of his claims

2    are brought under what's called

3    Section 1983.  It's 42 United States

4    Code, Section 1983.  Are you familiar

5    with that statute at all?

6    A.      No.

7    Q.      That statute allows individuals

8    to sue government agents for violating

9    the individual's constitutional

10   rights.  Does any of that ring a bell?

11   A.      Yes.

12   Q.      Okay.

13           And I'm sure you know, I know,

14   anybody knows, you know, the county

15   has been sued, among other counties

16   for 1983 violations by prisoners.

17   People were being arrested for

18   violations of the Fourth Amendment,

19   the Eighth Amendment, all sorts of

20   different rights.

21           So you're familiar generally

22   with this idea of 1983 lawsuits or

23   lawsuits for violations of

24   constitutional rights.

25           Is that fair to say?

37

1    A.      Yes.

2    Q.      Okay.

3            Is it your understanding that

4    --- that public employees have certain

5    constitutional rights in the public

6    workplace?

7                    ATTORNEY BURNS:

8                    Objection.  Form.  You

9         can answer if you can.

10                   THE WITNESS:

11                   People have

12        constitutional rights.

13                   Right?

14   BY ATTORNEY MANSOUR:

15   Q.      Sure.

16   A.      Yes.

17   Q.      Including public employees.

18        Right?

19   A.      Public employees have work

20   policies in place to protect them.

21   Q.      Okay.

22           And you --- do you understand

23   that 1983 in some instances also

24   protects them in the workplace?

25   A.      Some instances, yes.

38

1    Q.    Are you familiar with what are

2    generally called First Amendment

3    retaliation claims?  So that is a

4    person claiming that they were

5    punished for exercising their First

6    Amendment rights.

7    A.    Yes, I have --- I'm familiar

8    with that.

9    Q.    Okay.

10         And that is what Mr. Kimbrough

11   is alleging in this case, that he was

12   punished by being suspended and then

13   discharged for exercising his First

14   Amendment right to free speech.  Do

15   you understand that?

16   A.    I do.

17   Q.    Before the decision was made to

18   discharge Mr. Kimbrough, did you

19   personally consider whether my

20   client's conversation with Attorney

21   Zeiger was protected by the First

22   Amendment?

23                    ATTORNEY BURNS:

24                    Objection.  To the

25              extent it would disclose

39

1      attorney/client communication.

2      However, you can answer his

3      question.

4              COURT REPORTER:

5              Attorney Burns, it's

6      just a little difficult to hear

7      you.  If you could raise your

8      voice or get closer to the mic,

9      that would be great.

10             ATTORNEY BURNS:

11             Yep.  I was just

12     objecting to the extent that it

13     would disclose attorney/client

14     communication.  But otherwise,

15     she can answer the question.

16             THE WITNESS:

17             Can you repeat the

18     question?

19  BY ATTORNEY MANSOUR:

20  Q.    Sure.  Before discharging my

21  client, did you personally consider or

22  think to yourself whether my client's

23  conversation with Attorney Zeiger was

24  protected by the First Amendment?

25  A.    Not at the time.

40

1    Q.    At what --- was there a time

2    where you --- before this lawsuit was

3    filed, was there a time where you

4    thought to yourself or considered

5    whether my client's conversation was

6    protected by the First Amendment?

7    A.    Yes.

8    Q.    But that was after he was

9    fired?

10   A.    I don't --- I don't recall

11   exactly when --- when I ---.  You're

12   asking what I thought about it.

13          Right?  Not when ---?  Yeah.

14   Q.    Correct.  What you thought

15   about it?

16   A.    Yeah, the thought probably

17   crossed my mind before, during, and

18   after.

19   Q.    Were you --- and just to

20   establish, I --- I know you --- you

21   testified to this the first time

22   around.  You were the person who

23   ultimately gave permission to

24   discharge Lieutenant Kimbrough,

25   subject, of course, to ratification by

41

1    the Board of Commissioners.

2    A.      Right.

3    Q.      Okay.

4            Did you believe or have any

5    hesitation at the time you made that

6    decision that by discharging Mr.

7    Kimbrough you may be violating his

8    First Amendment rights?

9    A.      No.

10   Q.      Did you personally do any sort

11   of legal research to determine what

12   kind of speech is protected in the

13   public workplace?

14   A.      No.

15   Q.      And without telling me any

16   discussions you had with any members

17   of the law department, did you at

18   least at any time seek their guidance

19   on whether or not Mr. Kimbrough's

20   conversation was protected by the

21   First Amendment?

22   A.      No, I did not seek their

23   guidance.  No.

24   Q.      Did you consult anybody ---

25   anybody about whether his conversation

42

1    was protected by the First Amendment?

2    A.    Yes.

3    Q.    Who --- whom did you consult?

4                   ATTORNEY BURNS:

5                   Objection to the extent

6          it would disclose

7          attorney/client communication.

8          You can answer.

9                   THE WITNESS:

10                  We had a discussion

11         about it as a team.

12   BY ATTORNEY MANSOUR:

13   Q.    Did that discussion come after

14   ---.  Strike that.

15         So at one point, I, on behalf

16   of Mr. Kimbrough, sent a letter to the

17   county trying to resolve this matter.

18   Are you familiar with that?

19   A.    Yes.

20   Q.    Did you personally review that

21   letter?

22   A.    Yes.

23   Q.    Did those discussions occur

24   after or before receipt of that

25   letter?

43

1    A.    I don't recall.

2    Q.    Give me just one moment. If my

3    client had disclosed the information

4    that he disclosed to Attorney Zeiger

5    to somebody other than Attorney

6    Zeiger, would you still have

7    authorized his discharge?

8                ATTORNEY BURNS:

9                Objection. Form. You

10          can answer if you can.

11                THE WITNESS:

12                I have no answer to

13          that. I --- I --- it's not ---

14          it's not something I would make

15          a decision on. I wouldn't have

16          enough information.

17    BY ATTORNEY MANSOUR:

18    Q.    Were you aware of the fact that

19    my client was suspended without pay

20    pending an investigation into his

21    conversation with Attorney Zeiger on

22    or about June 21st, 2024?

23    A.    I don't recall the dates, but I

24    do know that he was --- he was put out

25    without --- pending investigation.

44

1   Q.    Was that something you

2   authorized?

3   A.    I don't recall.  I remember

4   being on the email chain, yes.

5   Q.    Do you remember the county

6   offering my client or providing him

7   with a separation and release

8   agreement to sign?

9   A.    Yes.

10  Q.    The decision to provide him

11  with such an agreement, was that a

12  decision you authorized?

13  A.    Yes.

14  Q.    And ---.

15  A.    With permission of the county

16  commissioners.

17  Q.    So the county commissioners

18  were also involved in the decision to

19  offer him a separation agreement?

20  A.    When --- when folks are offered

21  a separation agreement, I --- I check

22  with each of the commissioners and

23  make sure that's okay.

24  Q.    And was --- did you confer with

25  them informally or was that like at an

45

1    executive session or something along
2    those lines?
3    A.    No, I do that individually.
4    Q.    With each commissioner?
5    A.    Yes.
6    Q.    And you did that in this case?
7    A.    I do that with every single one
8    of them.  So, yes, I would have had to
9    have done that.  It --- yes.
10   Q.    With respect to this case
11   specifically, Mr. Kimbrough, did those
12   communications occur in writing or
13   verbally?
14   A.    I don't recall.  Generally,
15   they're verbally.  Sometimes I'll
16   email them individually.
17   Q.    During those discussions with
18   the commissioners, did you make them
19   aware of my client's conversation with
20   Attorney Zeiger?
21   A.    I asked them just for
22   permission to --- for separation
23   agreement authority.  That's it.
24   Q.    So you did not give them the
25   context or the factual background that

46

1    led to that separation agreement?

2    A.    Generally.

3    Q.    Okay.

4          So you did not make them aware

5    why you wanted to separate from Mr.

6    Kimbrough?

7    A.    No, I give them a general ---

8    general information about the

9    separation agreement, why it's being

10   offered.  Yes.

11   Q.    And that is something that the

12   commissioners must authorize

13   themselves, or do you have authority

14   to do that unilaterally?

15   A.    I can do that.  And then we

16   ratify it on agenda after the fact.

17   Q.    But in this situation, you

18   sought their preapproval, so to speak?

19   A.    I generally do that with all of

20   them.  Any --- any --- because they're

21   going to see it on the --- on the

22   agenda anyway.

23   Q.    So that's your general practice

24   and that's the practice that you

25   followed with respect to Mr.

47

1    Kimbrough?

2    A.    Yes, I did.

3    Q.    Okay.

4         I don't have any more questions

5    for you, Ms. McKevitt.  Thank you for

6    your time.

7              ATTORNEY MANSOUR:

8              I don't know if Counsel

9         has any.

10             ATTORNEY BURNS:

11             I do not have any

12        questions.

13             COURT REPORTER:

14             Would Counsel like

15        copies of the transcript from

16        today?

17             ATTORNEY MANSOUR:

18             Yes.  A full one is

19        fine.  Just --- just one full

20        one.

21             ATTORNEY BURNS:

22             Same for the County.

23             ATTORNEY MANSOUR:

24             And electronic only.  I

25        don't need a hard copy.

48

1              ATTORNEY BURNS:

2              Same with the County.

3          *  *  *  *  *  *  *  *

4    DEPOSITION CONCLUDED AT 2:02 P.M.

5          *  *  *  *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

49

```
 1   COMMONWEALTH OF PENNSYLVANIA  )
 2   COUNTY OF PHILADELPHIA        )
 3                  CERTIFICATE
 4        I, Emma Edwards, a Notary Public in
 5   and for the Commonwealth of Pennsylvania, do
 6   hereby certify:
 7        That the witness, Margaret McKevitt,
 8   whose testimony appears in the foregoing
 9   deposition, was duly sworn by me on February
10   12, 2025 and that the transcribed deposition
11   of said witness is a true record of the
12   testimony given by said witness;
13        That the proceeding is herein recorded
14   fully and accurately;
15        That I am neither attorney nor counsel
16   for, nor related to any of the parties to the
17   action in which these depositions were taken,
18   and further that I am not a relative of any
19   attorney or counsel employed by the parties
20   hereto, or financially interested in this
21   action.
22   Dated the 17 day of February, 2025
23
24                         Emma Edwards,
25                           Court Reporter
```

Commonwealth of Pennsylvania - Notary Seal
Emma Edwards, Notary Public
Philadelphia County
My Commission Expires February 12, 2028
Commission Number 1443285