**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ARA KIMBROUGH. )<br><br>Plaintiff, )<br><br>v. )<br><br>BUCKS COUNTY; MARGARET )<br>McKEVITT, in her individual capacity, )<br>LAUREN SMITH, in her individual )<br>capacity; and DAVID KRATZ, in his )<br>individual capacity, )<br><br>Defendants. )<br> ) | Civil Action No. 2:24-cv-04470-KSM |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

Submitted by:

William P. Mansour, Esq.
Mansour Law, LLC
961 Marcon Blvd., Ste. 425
Allentown, PA 18109
Tel: (610) 321-3538
Fax: (610) 798-1345
Email: wpm@themansourfirm.com

Attorney for Plaintiff Ara Kimbrough

## Table of Contents

Table of Authorities..................................................................................................iii.

I.     INTRODUCTION.................................................................................................1

II.    STATEMENT OF UNDISPUTED FACTS..........................................................5

III.   QUESTIONS PRESENTED.................................................................................5

IV.   STANDARD OF REVIEW...................................................................................5

V.    ARGUMENT.........................................................................................................6

    A.   Viewing the Record in the Light Most Favorable to Them,
         Defendants McKevitt, Smith, and Kratz Violated 42 U.S.C. § 1983
         As a Matter of Law When They Discharged Plaintiff Because of His
         Telephone Conversation With Attorney Zeiger
         on May 30, 2024.................................................................................6

        1.   As a matter of law, Defendants McKevitt, Smith, and Kratz
             were all personally involved in Plaintiff's
             discharge...............................................................................6

        2.   As a matter of law, Plaintiff's telephone conversation with
             Attorney Zeiger was protected speech under the
             First Amendment...................................................................7

            a.   Plaintiff spoke as a citizen.............................................7

            b.   Plaintiff's speech related to matters of public concern......8

            c.   Plaintiff's interest in speaking outweighed
               Defendant County's interest in maintaining
               orderly and efficient operations.......................................14

               i.   Plaintiff had a significant interest in speaking
                    to Attorney Zeiger and the public had a
                     significant interest in knowing the
                     information Plaintiff shared.................................15

               ii.   Defendants have failed to produce any
                    evidence of actual or reasonably likely
                    disruption caused directly by Plaintiff's
                     speech...................................................................21

3.    As a matter of law, Defendants McKevitt, Smith, and Kratz discharged Plaintiff because of his telephone conversation with Attorney Zeiger.................................................................33

B.    Viewing the Record in the Light Most Favorable to it, Defendant Bucks County Violated 42 U.S.C. § 1983 As a Matter of Law When Its Board of Commissioners Ratified Defendant McKevitt's Final Decision to Discharge Plaintiff Because of His Telephone Conversation With Attorney Zeiger on May 30, 2024.................................................................................................34

VI.    CONCLUSION.................................................................................................35

## Table of Authorities

**Cases**

*Azzaro v. County of Allegheny*
    110 F.3d 968 (3d Cir. 1997) ................................................................................11, 12

*Baldassare v. State of N.J.*
    250 F.3d 188 (3d Cir. 2001) ............................................................ 12, 15, 20, 33

*Baloga v. Pittston Area Sch. Dist.*
    927 F.3d 742 (3d Cir. 2019) ........................................................................... 6

*Brennan v. Norton*
    350 F.3d 399 (3d Cir. 2003) ............................................................ 12, 20, 21, 33

*Connick v. Myers*
    461 U.S. 138 (1983)........................................................................... 16, 21

*Czurlanis v. Albanese*
    721 F.2d 98 (3d Cir. 1983) ............................................. 9, 14, 15, 21, 22, 26, 27, 30

*De Ritis v. McGarrigle*
    861 F.3d 444 (3d Cir. 2017) ................................................................11, 20

*Dougherty v. Sch. Dist. of Phila.*
    772 F.3d 979 (3d Cir. 2014) ............................................... 8, 15, 21, 22, 31

*Evancho v. Fisher*
    423 F.3d 347 (3d Cir. 2005) ........................................................................... 6

*Fenico v. City of Phila.*
    70 F.4th 151 (3d Cir. 2023) ................................................................ 9, 22, 28

*Flora v. Cnty. of Luzerne*
    776 F.3d 169 (3d Cir. 2015) ................................................................ 7, 8

*Garcetti v. Ceballos*
    547 U.S. 410 (2006).......................................................................... 7, 14

*Givhan v. W. Line Consol. Sch. Dist.*
    439 U.S. 410 (1979)........................................................................................11

*Hill v. Borough of Kutztown*
    455 F.3d 225 (3d Cir. 2006) ................................................................ 7, 34, 35

*Javitz v. Cnty. of Luzerne*
    940 F.3d 858 (3d Cir. 2019) ................................................................ 7, 9, 14

*Kennedy v. Bremerton Sch. Dist.*
    597 U.S. 507 (2022)........................................................................................11

*LaVerdure v. Cnty. of Montgomery*
    324 F.3d 123 (3d Cir. 2003). ........................................................................... 5

*Los Angeles Cnty., Cal. v. Humphries*
    562 U.S. 29 (2010)....................................................................... 34

*McGreevy v. Stroup*
  413 F.3d 359 (3d Cir. 2005) .................................................................. 21, 29, 33
*Miller v. Clinton Cnty.*
  544 F.3d 542 (3d Cir. 2008) ............................................................................ 8, 21
*Monell v. Dep't of Soc. Servs.*
  436 U.S. 658 (1978) ............................................................................................ 34
*Monsanto v. Quinn*
  674 F.2d 990 (3d Cir. 1982) ...................................................................... 14, 22
*Munroe v. Central Bucks Sch. Dist.*
  805 F.3d 454 (3d Cir. 2015) ......................................................................... 9, 21
*Palardy v. Twp. of Millburn*
  906 F.3d 76 (3d Cir. 2018) .................................................................................... 9
*Pickering v. Bd. of Ed.*
  391 U.S. 563 (1968) ........................................................................... 7, 15, 32
*Rankin v. McPherson*
  483 U.S. 378 (1987) .......................................................................................... 11
*Rode v. Dellarciprete*
  845 F.2d 1195 (3d Cir. 1988) ................................................................. 6, 21, 24
*Roseman v. Indiana Univ. of Pa.*
  520 F.2d 1364 (3d Cir. 1975) ......................................................................... 32
*Sprague v. Fitzpatrick*
  546 F.2d 560 (3d Cir.1976) .................................................................. 31, 32, 33
*Swineford v. Snyder Cnty.*
  15 F.3d 1258 (3d Cir. 1994) ............................ 13, 14, 15, 16, 18, 19, 20, 21, 31, 32
*Versarge v. Twp. of Clinton, N.J.*
  984 F.2d 1359 (3d Cir. 1993) .................................................. 16, 17, 18, 19, 20, 21
*Watters v. City of Phila.*
  55 F.3d 886 (3d Cir. 1995) .............................................. 15, 22, 24, 28, 31, 32
*Zamboni v. Stamler*
  847 F.2d 73 (3d Cir. 1988) .......................................................... 9, 10, 20, 22, 28

**Statutes**

42 U.S.C. § 1983 ..................................................................................................... 6

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................ 5

## I.     INTRODUCTION

At the risk of sounding hyperbolic, this really is an easy case. There is no need for the Court to waste time on a trial because there is nothing for a jury to decide. The material facts of record are undisputed, and they compel only one reasonable conclusion: Defendants violated 42 U.S.C. § 1983 (§ 1983) as a matter of law when they fired Plaintiff for his constitutionally protected speech.

First, some factual context. While incarcerated at the Bucks County Correctional Facility (BCCF) in July 2022, Joshua Patterson fatally overdosed on fentanyl that was smuggled into the jail by another inmate, Allen Rhoades, Jr. In July 2023, Attorney Brian Zeiger, on behalf of Patterson's estate, filed a civil rights and wrongful death lawsuit against Defendant County and several BCCF employees. On May 30, 2024, with the lawsuit still pending, Plaintiff, an Administrative Lieutenant in the BCCF's Intake Unit, voluntarily called Attorney Zeiger while off-duty. After identifying himself, Plaintiff proceeded to share his belief that Rhoades was able to smuggle drugs into the BCCF because the facility's Intake Unit was understaffed that day and because one of the only two officers assigned to the Unit failed to secure Rhoades's holding cell before leaving her post at the direction of another supervisor. He also told Attorney Zeiger that understaffing of the Intake Unit was a chronic, ongoing issue that he's been complaining to his supervisors about for the past three years. Defendants learned about Plaintiff's phone call the next day when Attorney Zeiger moved the court to reopen discovery. Three weeks later, Defendants suspended Plaintiff without pay. And about five weeks after that, on July 29, 2024, they fired him.

As an initial matter, it is undisputed that Defendants discharged Plaintiff because of his speech, that is, his telephone conversation with Attorney Zeiger. It is the only reason Defendants provided in Plaintiff's final Disciplinary Action Form and it is the only reason appearing in the record. Defendants cannot, in good faith, contest this fact. Although they try to cleverly argue that

they fired Plaintiff because his speech violated several jail and County policies, they fired him for his speech nonetheless, and no reasonable jury can conclude otherwise.

The central issue raised by this motion, then, is whether the record evidence, even when viewed in Defendants' favor, conclusively establishes that Plaintiff's speech was protected by the First Amendment. For three reasons, it does.

***First***, there is no genuine dispute that Plaintiff spoke as a citizen. On this point, Defendants have readily admitted that calling Attorney Zeiger was not a part of Plaintiff's duties and that he was acting outside "the course and scope of his job." Additionally, they claim his call violated several workplace policies, which justified his termination. Thus, because Plaintiff did not speak to Attorney Zeiger pursuant to his official job duties, he spoke as a citizen, not an employee.

***Second***, Plaintiff's speech related to matters of public concern. The parties do not dispute the content of Plaintiff's speech or that it occurred during a single telephone conversation with Attorney Zeiger. As to its content, Plaintiff's speech plainly pertained to, at the very least, issues of jail security, understaffing, and mismanagement, all of which are matters of obvious value and concern to the community. Furthermore, Plaintiff's conversation with Attorney Zeiger occurred within the context of the Patterson Estate's "high-profile" wrongful death lawsuit against Defendant County, a topic that attracted widespread media attention. In their totality, the content and context of Plaintiff's speech show that he was not merely airing mundane personal employment grievances, but rather seeking to expose fundamental safety and security problems in the BCCF that he hoped Attorney Zeiger would bring to light—problems he had been complaining about internally to no avail for at least three (3) years. There being no genuine dispute over these facts, Plaintiff's speech clearly implicated matters of substantial public concern.

***Third***, and finally, Plaintiff's interest in speaking outweighed Defendants' interest in maintaining orderly and efficient operations because, given the public import of Plaintiff's speech,

Defendants have failed to make the "vigorous showing" of workplace disruption necessary to justify his discharge. For starters, the limited information Plaintiff shared with Attorney Zeiger was not (as Defendants baselessly claim) "confidential" or "sensitive" since (1) Attorney Zeiger knew almost all of it, and (2) Defendant County, itself, *publicly* disclosed that same information (and more) in the Patterson Estate case. Besides repeating Plaintiff's opinions about understaffing and policy violations, Defendant County also publicly disseminated the existence of surveillance camera blind spots in Rhoades's holding cell, a step-by-step tutorial on how he snuck the drugs in, where certain officers were posted and their work hours, and even Rhoades's subsequent investigative statements to law enforcement. This is exactly the kind of information Defendants contend was "confidential" and "sensitive" when Plaintiff shared only a fraction of it with Attorney Zeiger. In short, Defendant County's own detailed public disclosures in the Patterson Estate case are the proverbial death knell of its claim that Plaintiff was fired for sharing "confidential" or "sensitive" information.

Aside from their baseless musings and unadorned speculation regarding jail safety and security, Defendants have produced no evidence that Plaintiff's speech caused any palpable disruption to the BCCF's operations. Indeed, Defendants Kratz and McKevitt deny being aware of any such disruption in the roughly three (3) weeks between Plaintiff's phone call and his unpaid suspension. It was only *after* Defendants suspended and discharged him that any arguable disruption occurred—mainly, that Defendant Kratz, the Superintendent, and the Deputy Superintendent must spend time doing his old job until they find a permanent replacement. In any event, to the extent this slight inconvenience constitutes operational disruption, it was not caused directly by Plaintiff's speech, but by Defendants' retaliatory response to it.

It is undisputed that Plaintiff was considered "middle management," with five (5) superiors above him. It is equally undisputed that during his call with Attorney Zeiger, he neither impugned

nor criticized any one of them. Plaintiff was not involved in any BCCF policymaking and there is no evidence that he ever acted as the "alter-ego" of Defendant Kratz or any other supervisor. In fact, in the course of his work, Plaintiff had minimal day-to-day contact with Defendant Kratz, the Deputy Director, or the Superintendent. From these undisputed facts, it necessarily follows that Plaintiff did not occupy a position of personal loyalty and confidence within the BCCF hierarchy, let alone one that was irreparably harmed by his speech. Following his conversation with Attorney Zeiger, moreover, Plaintiff continued to perform his job unimpeded until he was suspended. And since very few people within the BCCF even knew about Plaintiff's phone call, there is no evidence that his speech impaired workplace discipline or fostered disharmony among co-workers. Not only that, but Attorney Zeiger was subject to a protective order in the Patterson Estate case, which he *and* Defendants believed prevented him from disclosing Plaintiff's statements to others. This reality substantially mitigated not just the risks of impaired discipline and employee disharmony, but, indeed, of any disruption at all. Therefore, given the important public issues raised by Plaintiff's speech, there is no reasonable basis to conclude on this record that Defendants' interest in maintaining an orderly and efficient workplace justified his termination.

For these reasons, detailed more fully below, Defendants violated Plaintiff's First and Fourteenth Amendment rights as a matter of law. Accordingly, this Court must grant Plaintiff's motion for partial summary judgment with respect to Counts I and II of his Amended Complaint.

## II.    STATEMENT OF UNDISPUTED FACTS

Plaintiff will rely on his Statement of Undisputed Facts filed in support of his motion for partial summary judgment, which is incorporated herein by reference. All factual citations herein will be to the paragraphs of that Statement.

## III.    QUESTIONS PRESENTED

1.    Viewing the record in the light most favorable to them, did Defendants McKevitt, Smith, and Kratz violate 42 U.S.C. § 1983 as a matter of law when they discharged Plaintiff because of his telephone conversation with Attorney Zeiger on May 30, 2024?

**[Suggested Answer: Yes]**

2.    Viewing the record in the light most favorable to it, did Defendant Bucks County violate 42 U.S.C. § 1983 as a matter of law when its Board of Commissioners ratified Defendant McKevitt's final decision to discharge Plaintiff because of his telephone conversation with Attorney Zeiger on May 30, 2024?

**[Suggested Answer: Yes]**

## IV.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if he shows that "there is no genuine dispute as to any material fact" and he "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (West 2025). Summary judgment should be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find" in favor of the nonmovant. *LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003).

## V.    ARGUMENT

**A.    Viewing the Record in the Light Most Favorable to Them, Defendants McKevitt, Smith, and Kratz Violated 42 U.S.C. § 1983 As a Matter of Law When They Discharged Plaintiff Because of His Telephone Conversation With Attorney Zeiger on May 30, 2024.[1]**

Section 1983 creates a cause of action for federal constitutional violations caused by persons "acting under color of state law." 42 U.S.C. § 1983. A public employee may state a claim of First Amendment retaliation under § 1983 by showing that: (1) he engaged in activity protected by the First Amendment; (2) he suffered an adverse employment action; and (3) there is a causal connection between his constitutionally protected activity and the adverse employment action. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). On the record before the Court, Plaintiff has established each of these elements as a matter of law.

### 1.    As a matter of law, Defendants McKevitt, Smith, and Kratz were all personally involved in Plaintiff's discharge.

To be held liable under § 1983, an individual defendant "'must have personal involvement in the alleged wrongdoing.'" *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "'Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.'" *Id.*

In this case, the record evidence clearly demonstrates that Defendants McKevitt, Smith, and Kratz were all personally involved in Plaintiff's discharge. Defendant McKevitt, for starters, made the final decision to fire Plaintiff pursuant to her authority as COO. (Pl.'s Stmt. of Undisp. Facts, ¶¶ 102-103). For her part, Defendant Smith authored Plaintiff's termination letter *and* his final Disciplinary Action Form, the latter of which undergirded his discharge. (*Id.* at ¶¶ 93 and 105). As for Defendant Kratz, he was "consulted about the decision to terminate" Plaintiff and

---

[1] Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), Shae Randolph was dismissed as a defendant, with prejudice, by way of a stipulation filed on April 23, 2025. (Doc. 29).

"was involved in at least part of the decision-making process." (*Id.* at ¶ 104). When all was said and done, Defendants McKevitt, Smith, and Kratz "unanimously" agreed that Plaintiff should be fired. (*Id.* at ¶ 106).

In light of these undisputed facts, Defendants McKevitt, Smith, and Kratz were all personally involved in Plaintiff's termination. Therefore, as a matter of law, they may be held liable under § 1983.

> **2. As a matter of law, Plaintiff's telephone conversation with Attorney Zeiger was protected speech under the First Amendment.**

A public employee's speech is entitled to First Amendment protection if: (1) he spoke "as a citizen;" (2) his speech related to a "matter of public concern;" and (3) the employer "did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006)). For the reasons that follow, Plaintiff has satisfied each of these conditions as a matter of law.

> **a. Plaintiff spoke as a citizen.**

In *Garcetti v. Ceballos*, the Supreme Court held that a public employee must speak "as a citizen" for his speech to receive First Amendment protection. 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)). In expanding upon this rule, the Court explained that, when public employees speak "pursuant to their official duties," they "are not speaking as citizens for First Amendment purposes . . ." *Id.* at 421. The Third Circuit has since construed *Garcetti* as adopting an either/or proposition: either the plaintiff spoke "pursuant to his official duties" and, thus, as an employee, or he didn't and, thus, spoke as a citizen. Stated differently, under *Garcetti*, a public employee speaks as a citizen if he is *not* speaking pursuant to his official job duties. *See, e.g., Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 867 (3d Cir. 2019) (holding that

plaintiff spoke as a "citizen" because "she was not . . . acting within the primary functions of her employment"); *Flora*, 776 F.3d at 179 (stating that "the responsibility of a district court in evaluating whether a public employee's speech was made as a private citizen is to ask whether the speech at issue was 'outside the scope of his ordinary job responsibilities.'"); *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 988 (3d Cir. 2014) (holding that plaintiff's speech "was made as a citizen" because he "did not speak pursuant to his official duties").

The record evidence in this case indisputably establishes that Plaintiff was speaking as a citizen when he called Attorney Zeiger. To begin with, Plaintiff used his personal cell phone to make the call while off duty. (Pl.'s Stmt. of Undisp. Facts at ¶¶ 46). He was not directed by any of his superiors to contact Attorney Zeiger nor was it a part of his job duties as Administrative Lieutenant. (*Id.* at ¶¶ 46 and 58). Defendants insist, moreover, that his speech allegedly violated several County rules and policies, which justified his discharge. (*Id.* at ¶ 95); *see Dougherty*, 772 F.3d at 988 (concluding that plaintiff spoke as a "citizen," in part, because employer's confidentiality policy "appears to *discourage* such speech" and "is being used to justify [plaintiff's] termination in the instant case") (emphasis in original). In short, "nothing about [Plaintiff's] position compelled or called for him to" contact Attorney Zeiger. *Id.* Or, as Defendant Smith succinctly put it, Plaintiff was simply "not acting in the course and scope of his job." (*Id.* at ¶ 58).

From these undisputed facts, one can only conclude that Plaintiff was not speaking "pursuant to his official job duties." As such, this Court must find, as a matter of law, that Plaintiff spoke to Attorney Zeiger as a citizen.

### b.    Plaintiff's speech related to matters of public concern.

"Speech implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community." *Miller v.*

*Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008). As relevant here, the Third Circuit "has repeatedly found" that a public employee's "criticism of [his employer's] internal operations" is a matter of public concern. *Zamboni v. Stamler*, 847 F.2d 73, 77 (3d Cir. 1988) (alterations added); *see also Czurlanis v. Albanese*, 721 F.2d 98, 104 (3d Cir. 1983) ("Information concerning the functioning of a segment of the County government is of considerable public importance."). Speech also relates to matters of public concern "'when it is the subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Javitz*, 940 F.3d at 866 (quoting *Lane v. Franks*, 573 U.S. 228, 241 (2014)). On the other hand, "speech that relates solely to mundane employment grievances does not implicate a matter of public concern." *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 467 (3d Cir. 2015); *see also Fenico v. City of Phila.*, 70 F.4th 151, 164 (3d Cir. 2023) (stating that "purely private intraoffice grievance[s]" do not relate to matters of public concern); *Palardy v. Twp. of Millburn*, 906 F.3d 76, 83 (3d Cir. 2018) (observing that "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest . . . are matters more immediately concerned with the self-interest of the speaker as employee"). In a First Amendment retaliation case, it is the court's role to decide whether the subject speech relates to a matter of public concern. *Czurlanis*, 721 F.2d at 105.

There is no dispute in this case about what Plaintiff told Attorney Zeiger (or, at the very least, what Defendants *believed* Plaintiff told Attorney Zeiger). At the time of Plaintiff's discharge, Defendants McKevitt and Kratz only knew about his conversation with Attorney Zeiger based on what someone else told them concerning the Emergency Motion since neither of them actually read it until their depositions. (Pl.'s Stmt. of Undisp. Facts at ¶¶ 107, 110-111, and 130-132). While Defendant Smith first learned about Plaintiff's call from Defendant Kratz, she later "learned more details" during Plaintiff's interview with Mr. Grieser on June 12, 2024. (*Id.* at ¶ 117). According to Mr. Grieser's subsequent memorandum regarding that interview, the Emergency Motion

"accurately summarized" the substance of Plaintiff's conversation with Attorney Zeiger. (*Id.* at ¶ 80). Therefore, the Emergency Motion and Plaintiff's interview statements constitute the only sources of Defendants' knowledge regarding what he said.

According to the Emergency Motion, Plaintiff told Attorney Zeiger that: (1) he was a "supervisor in the intake area," (2) the "intake area was grossly understaffed," (3) "[h]e complained to his supervisors the intake area was grossly understaffed," (4) "three officers were supposed to be stationed in the area at all times," (5) "only two" officers "were routinely staffed at intake during the time in question due to gross understaffing," (6) Officer Ulmer "should never have been called away from intake," (7) after Officer Ulmer left, there was only "one officer on duty at intake," (8) Officer Ulmer "should have locked the 'dirty cell' after Rhoades was taken to be searched," and (9) her failure to do so was a "violation of BCCF policy." (*Id.* at ¶ 60; *see also id.* at ¶ 51). Later, in his interview with Plaintiff on June 12, 2024, Mr. Grieser asked him: "What did you tell [Attorney Zeiger]," to which Plaintiff responded, "Essentially that I felt some responsibility b/c drugs were able to get through my unit and Patterson died. I feel bad about that. It was 100% preventable and we failed on that." (*Id.* at ¶ 74). In a subsequent memorandum, Mr. Grieser concluded that Plaintiff's interview statements were consistent with what Attorney Zeiger recounted in the Emergency Motion. (*Id.* at ¶ 80).

On the record before the Court, the "public concern" nature of Plaintiff's speech is self-evident. For starters, the content of his speech plainly involved "criticism of [the BCCF's] internal operations," *Zamboni*, 847 F.2d at 77, specifically as it pertains to jail security, understaffing, and mismanagement, all of which are matters of obvious value and concern to the community. Furthermore, Plaintiff's conversation with Attorney Zeiger occurred within the context of the Patterson Estate's high-profile lawsuit against Defendant County, which was a topic of "legitimate news interest" widely covered by several local media outlets. (*Id.* at ¶ 32). Relatedly, the content

*and* context of Plaintiff's speech show that he was not merely airing "mundane employment grievances," but rather seeking to expose "fundamental problems" relating to staffing and security in the BCCF that he hoped Attorney Zeiger would bring to light— problems he had been complaining about internally to no avail for at least three (3) years. (*Id.* at ¶¶ 41-45 and 48-49); *see De Ritis v. McGarrigle*, 861 F.3d 444, 455 (3d Cir. 2017) (holding that "a discrete unit of speech addresses a matter of public concern if it discusses 'fundamental problems' reaching beyond the employee's 'day-to-day minutiae'"). In the end, Plaintiff derived no personal benefit from speaking to Attorney Zeiger and, in fact, was fully aware that he was risking retaliation by doing so. (*Id.* at ¶ 50).

Finally, although the form of Plaintiff's speech is relevant to the "public concern" inquiry, the fact that it occurred during a private phone call with Attorney Zeiger is of no moment since "privately expressed . . . complaints and opinions" are not beyond First Amendment protection. *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 413–16 (1979); *see also Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 531 (2022) (holding that the government must "prove that its interests as employer outweigh even an employee's private speech on a matter of public concern"); *Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) ("[I]f the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context."); *Rankin v. McPherson*, 483 U.S. 378, 388 n.13 (1987) (stating that "a purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee"). Accordingly, Plaintiff's conversation with Attorney Zeiger does not fall outside the confines of the First Amendment simply because it was private, especially since its content and context so clearly demonstrate its public value.

11

Defendants might contend that Plaintiff's speech involved limited public concern because it was motivated by personal animus towards Defendant County arising from his impending discipline for creating a "hostile work environment." As circumstantial evidence of this alleged animus, Defendants will likely point to the close temporal proximity between Plaintiff's receipt of the Notice of Fact-Finding Meeting and his call to Attorney Zeiger, both of which occurred on May 30, 2024. (Pl.'s Stmt. of Undisp. Facts at ¶¶ 39 and 46). Using this rationale, Defendants may try to argue that Plaintiff's firing was warranted because *he* retaliated against Defendant County *first*.

But as the Third Circuit has made clear, when it comes to the First Amendment, two wrongs don't make a right. While it is true that "[a] public employee's motivations may be relevant to determining the impact of his/her speech upon the public . . . those motivations will rarely, by themselves, justify silencing speech that otherwise addresses matters concerning the public." *Brennan v. Norton*, 350 F.3d 399, 413 (3d Cir. 2003). As the *Brennan* Court explained:

> Common sense suggests that public employees, no less than other employees, will be more likely to speak out when they are disgruntled or personally dissatisfied with some aspect of their employment or employer. Nevertheless, the harm that results from silencing or chilling public speech is neither negated nor mitigated merely because the speaker may have harbored motivations that were less than altruistic.

*Id.* Thus, "'the speaker's motive, while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern.'" *Id.* (quoting *Azzaro*, 110 F.3d at 978). Rather, the court must "concentrate on the value of the speech itself." *Baldassare v. State of N.J.*, 250 F.3d 188, 197 (3d Cir. 2001).

Plaintiff vigorously denies that his call to Attorney Zeiger was motivated by retaliatory animus. On the contrary, he insists he made the call because he "felt there was a very dangerous situation that wasn't being addressed" and "was hoping . . . these situations would stop happening."

12

(*Id.* at ¶ 48). Plaintiff's genuine concern about the dangers posed by understaffing the Intake Unit is evidenced by his years of internal complaints regarding the same. (*Id.* at ¶¶ 41-44). He believed nobody "was listening to [him] about this issue" and, even worse, that Defendant County was trying to punish him for holding sergeants accountable when they pulled staff without his knowledge. (*Id.* at ¶¶ 40 and 45). To Plaintiff, Attorney Zeiger "was in the best position to effect (sic) the change of the pulling [of] staff, the undermanning (sic) of the unit" and, because he was suing Defendant County, the understaffing problem "would be brought to light for people outside the DOC to see." (*Id.* at ¶ 49).

While Defendants may genuinely dispute Plaintiff's motivation for speaking to Attorney Zeiger, that dispute is immaterial. Even if this Court draws Defendants' preferred inference that Plaintiff was motivated by personal animus, it does not follow that his speech was necessarily devoid of public value. This becomes evident when one considers the content and overarching context of Plaintiff's speech. For instance, Plaintiff never told Attorney Zeiger about his Fact-Finding Notice or about Defendant County's investigation into his alleged creation of a "hostile work environment." (Pl.'s Stmt. of Undisp. Facts at ¶¶ 51 and 60). He never bad-mouthed or impugned any of his colleagues or superiors nor did he ask Attorney Zeiger to take any specific action against Defendants or any other County employee. (*Id.*); *compare Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1273 (3d Cir. 1994) (noting negatively plaintiff's "relentless efforts to get criminal indictments against her superiors"). Most revealing, perhaps, are Plaintiff's expressions of remorse over Patterson's overdose and his willingness to "do anything to avoid another similar death." (Pl.'s Stmt. of Undisp. Facts at ¶¶ 51 and 74). Part of that "anything," it seems, was telling Attorney Zeiger about his prior understaffing complaints, how BCCF management ignored them, and how understaffing of the Intake Unit was a chronic problem that likely contributed to Patterson's death. (*Id.* at ¶¶ 51 and 60). He also shared his opinion that Rhoades was able to smuggle drugs into the

13

jail because the Intake Unit was short-staffed and because Officer Ulmer violated policy by failing to secure his holding cell. (*Id.*). Certainly, jail security and understaffing are issues about which the public and its elected officials might rightfully be concerned.

Contextually, all the information Plaintiff disclosed pertained to the Patterson Estate's highly publicized lawsuit against Defendant County, which Plaintiff knew about. (*Id.* at ¶¶ 32-33). That is the whole reason he contacted Attorney Zeiger and not someone else—because he hoped that, through the lawsuit, the understaffing problem "would be brought to light for people outside the DOC to see." (*Id.* at ¶ 49). Defendant Smith insists that Plaintiff knew speaking to Attorney Zeiger could "cause harm" to Defendant County. (*Id.* at ¶¶ 115-116). To be sure, a public employer is almost always liable to suffer some reputational, legal, or other harm when one of its employees "blows the whistle," but that "'is the price the First Amendment exacts in return for an informed citizenry.'" *Czurlanis*, 721 F.2d at 105 (quoting *Monsanto v. Quinn*, 674 F.2d 990, 1001 (3d Cir. 1982)). Defendants cannot cry "retaliation" just because Plaintiff desired to publicly expose the County's wrongdoing. That's called "whistleblowing," not "retaliation."

In their totality, then, the content and context of Plaintiff's call doubtlessly gave it "a public mien" that kept it well within the realm of "public concern" speech, regardless of his alleged motives for speaking. *Swineford*, 15 F.3d at 1272. For these reasons, this Court has no choice but to hold, as a matter of law, that Plaintiff's speech related to matters of public concern.

### c.    Plaintiff's interest in speaking outweighed Defendant County's interest in maintaining orderly and efficient operations.

If "'employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.'" *Javitz*, 940 F.3d at 864 (quoting *Garcetti*, 547 U.S. at 419). To that end, this Court must "'balance . . . the interests of the [employee], as a citizen, in commenting upon matters of

public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Dougherty*, 772 F.3d at 991 (quoting *Pickering*, 391 U.S. at 568). Importantly, the employer (*not* the employee) "bears the burden of justifying the discharge" by showing that its interests in "promoting workplace efficiency and avoiding workplace disruption" outweigh the employee's interest in speaking. *Baldassare*, 250 F.3d at 198 (citing *Watters v. City of Phila.*, 55 F.3d 886, 895 (3d Cir. 1995)).

**i.   Plaintiff had a significant interest in speaking to Attorney Zeiger and the public had a significant interest in knowing the information Plaintiff shared.**

On Plaintiff's side of the *Pickering* scale, this Court "must consider the interests of both [Plaintiff] and the public in the speech at issue." *Dougherty*, 772 F.3d at 991. The weight of Plaintiff's interest is measured by the extent to which his speech "involved matters of substantial interest to the public." *Czurlanis*, 721 F.2d at 107. At the same time, the public has an interest in fostering "free and unhindered debate on an issue of public importance" and "encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of public officials." *Watters*, 55 F.3d at 895 (internal quotations and citations omitted).

In this case, Plaintiff had a significant interest in speaking to Attorney Zeiger. Endeavoring to expose Defendant County's wrongdoing, Plaintiff told him that BCCF officials ignored his complaints about chronic understaffing in the Intake Unit, which he believed played a role in Patterson's death. Plaintiff's speech, therefore, can be fairly characterized as alleging "government impropriety," which "'occupies the highest rung of First Amendment protection.'" *Dougherty*, 772 F.3d at 991 (quoting *Swineford.*, 15 F.3d at 1274). As the Third Circuit has observed, "whether County officials . . . were 'discharging their governmental responsibilities'" is a matter that "falls squarely within the core public speech" protected by the First Amendment. *Czurlanis*, 721 F.2d at

15

104 (quoting *Connick v. Myers*, 461 U.S. 138, 148 (1983)). For like reasons, the public had an equally significant interest in Plaintiff's "legitimate whistleblowing" and in knowing what Plaintiff had to say about "alleged abuses of public officials." *Watters*, 55 F.3d at 895.

In reliance on cases like *Swineford* and *Versarge v. Twp. of Clinton, N.J.*, 984 F.2d 1359 (3d Cir. 1993), Defendants may argue that because Plaintiff's speech was allegedly retaliatory, his interest in speaking should be "'accord[ed] little weight.'" *Swineford*, 15 F.3d at 1274 (quoting *Versarge*, 984 F.2d at 1366). But both of those cases are easily distinguishable from this one. In *Swineford*, the plaintiff—a clerk in the Snyder County Commissioner's Office—embarked on a near seven-month crusade against her supervisors and two (2) county commissioners during which she made at least half a dozen complaints about their alleged "electoral malfeasance" to the Snyder County's Board of Commissioners, the County District Attorney, the State Attorney General, the FBI, the press, and the ACLU. 15 F.3d at 1262-64. Each step of the way, the plaintiff failed to substantiate her allegations of wrongdoing despite being asked to. *Id.* at 1274. While all this was occurring, her "work performance slipped," she "grew increasingly moody and uncooperative," and "[o]ffice conditions became intolerable." *Id.* Almost seven (7) months after her first complaint, she was fired. *Id.* at 1264-65.

She then sued for First Amendment retaliation and lost at the district court level. On appeal, the Third Circuit credited the district court's finding that the plaintiff's actions "were motivated in part by personal animus and self-interest." *Id.* at 1272. In support of this finding, the Court cited her "relentless efforts to get criminal indictments against her superiors—despite the repeated rejection of her allegations by those charged with investigating [them]." *Id.* at 1273. While acknowledging the plaintiff's initial "interest in publicizing alleged wrongdoing by public officials" and the public's "interest in hearing such allegations," the Court reasoned that her First Amendment interests "faded" once her allegations "were aired in the public, investigated and

16

rejected by law enforcement agencies at various levels of government." *Id.* At that point, her continued pursuit of her claims "became solely a personal grievance," *id.*, and her "continued failure to verify and substantiate her allegations is a strong indication of self-interest, not public spirit." *Id.* at 1274. As a result of all this, her working relationship with the defendants was "destroyed" and the office's "efficiency," "discipline," and "morale" were all "adversely affected." *Id.* at 1273. "On this record," the Court concluded, "after the plaintiff brought her grievances to the attention of the public and the proper law enforcement authorities who rejected them, her personal interest in continuing to seek a criminal indictment against the defendants was outweighed by the defendants' interest in efficiently meeting their obligations to the public." *Id.* at 1274-75.

A somewhat similar, but more abbreviated, story unfolded in *Versarge.* There, the plaintiff, a member of his township's volunteer fire department, petitioned the Mayor and Council to close a local street to traffic. 984 F.2d at 1361. In response to the petition, the Fire Chief submitted a letter opposing the closure due to safety concerns. *Id.* Over the next several weeks, the plaintiff set out on a campaign of retaliation against the Fire Chief, including threatening to "get him," making unsolicited calls to his employer, protesting his use of a Township-owned vehicle, and accusing him and the department of wrongdoing such as stealing furniture from his employer, improperly using a U.S.P.S. mail bag, and remodeling the firehouse without permits. *Id.* at 1362. Eventually, twenty-four out of twenty-eight members of the fire department voted to expel the plaintiff for threatening the Fire Chief and for disclosing that remodeling work was performed without permits. *Id.* at 1362.

After losing on his First Amendment retaliation claim in the district court, the plaintiff appealed. Initially, the Third Circuit determined that the plaintiff's statements regarding the unpermitted remodeling work "implicate[ed] public concern" even though he was "motivated by

a 'personal grudge' against" the Chief and the department. *Id.* at 1365. When it came to balancing the parties' competing interests, however, the Court accorded "little weight" to the plaintiff's interest in "'getting back'" at the Fire Chief "and giving his fellow firefighters 'a hard time.'" *Id.* at 1366. This interest was attested to by affidavits from other firefighters, who stated that, "shortly before writing his letter on the remodeling, plaintiff told them that he was going to make trouble for the [fire department] because he was angry about the [department's] position on the street-closure issue." *Id.* at 1365. On the other side of the scale, the Court noted "major disruption" resulting from the plaintiff's speech, including "impaired harmony among the volunteer firefighters" and a detrimental impact on "close working relationships" requiring "personal loyalty and confidence." *Id.* at 1367. Having found that the plaintiff's speech "involved, at most, limited public concern under *Pickering*," it went on to conclude that the Township's interests in maintaining order and efficiency outweighed the plaintiff's interest in speaking. *Id.* at 1366-67. But the Court cautioned that "we do not wish to denigrate the value of 'speech' driven by more significant public concerns." *Id.* at 1367.

On its facts, this case is readily distinguishable from both *Swineford* and *Versarge* in several ways such that neither controls the outcome. First off, as opposed to those cases, Defendants have produced no evidence here that Plaintiff held a "personal grudge" against anybody, much less one that prompted an extended campaign of personal threats, criminal accusations, character attacks, and overall troublemaking. Rather, Plaintiff had *one* discreet conversation with *one* person during which he never even mentioned the Individual Defendants or any of his superiors. (Pl.'s Stmt. of Undisp. Facts at ¶ 51). Contrast this with the multiple criminal complaints against her supervisors lodged by the "relentless" plaintiff in *Swineford* or the numerous letters and phone calls concerning the Fire Chief by the plaintiff in *Versarge.* In those cases, the plaintiffs' prolonged and abusive courses of conduct are what rendered their "speech" unprotected. So like the plaintiff in *Swineford*,

Plaintiff here clearly had an "interest in publicizing alleged wrongdoing by public officials." 15 F.3d at 1273. But because he only spoke once, his interest in informing the public did not "fade" into a "personal grievance." *Id.*

Next, despite according "little weight" to the plaintiffs' speech interests, the Court in *Swineford* and *Versarge* still proceeded to conduct a *Pickering* balance. And in both cases, unlike this one, there was overwhelming evidence of substantial workplace disruption caused by the plaintiffs' speech. In *Swineford*, the Court found that the plaintiff's "work performance slipped," her working relationship with the defendants was "destroyed," and the office's "efficiency," "discipline," and "morale" were all "adversely affected." 15 F.3d at 1273. Similarly, in *Versarge*, the defendants were able to show that the plaintiff's speech "impaired harmony among the volunteer firefighters" and had a detrimental impact on "close working relationships" requiring "personal loyalty and confidence." 984 F.2d at 1367. In this case, however, as explained more fully later, Defendants have produced no evidence of any actual or threatened disruption, let alone the magnitude of disruption present in *Swineford* and *Versarge*. Consequently, even if the Court "accord[s] little weight" to Plaintiff's interest in speaking, *id.* at 1366, Defendants' interests would still weigh less.

In addition to their common factual distinctions, both cases have unique differences that set them apart from this one. In *Swineford*, for instance, the plaintiff's initial complaints of electoral malfeasance were investigated and dismissed by two (2) separate bodies, yet she continued to pursue them. *Swineford*, 15 F.3d at 1273. Here, however, there is no evidence that Plaintiff's prior internal complaints about understaffing were investigated or acknowledged by anyone. That's what prompted him to contact Attorney Zeiger in the first place—he believed no one "was listening to [him] about this issue and . . . [he] wanted it to stop." (Pl.'s Stmt. of Undisp. Facts at ¶ 45). This is not a case where Plaintiff refused to take "no" for an answer.

19

The facts in *Versarge* are equally divergent. In that case, the plaintiff's letter to the Mayor and Council disclosing unpermitted work at the firehouse "involved, at most, limited public concern under *Pickering*." 984 F.2d at 1366. In this case, though, Plaintiff's speech directly involved "criticism of [the BCCF's] internal operations," *Zamboni*, 847 F.2d at 77, and addressed "fundamental problems" far more consequential to public and employee safety than a local fire department's failure to obtain renovation permits. *De Ritis*, 861 F.3d at 455. Moreover, despite knowing about the unpermitted work for "sometime," the plaintiff in *Versarge* waited "until after [his] dispute arose with [the Fire Chief]" to first report it, and he "offered no reason for his delay." 984 F.2d at 1365. His lack of a good reason strongly suggested to the Court that his speech "was of less significant public concern." 984 F.2d at 1365. Here, on the other hand, Plaintiff made *numerous* internal complaints about understaffing in the three years prior to May 30, 2024, including a contemporaneous one to Defendant Kratz (and others) specifically pertaining to the Rhoades incident. (Pl.'s Stmt. of Undisp. Facts at ¶¶ 41-44). Thus, in contrast to the plaintiff in *Versarge*, Plaintiff had a good "reason for his delay" in contacting Attorney Zeiger: he wasted years complaining internally. And while his conversation with Attorney Zeiger was not his first complaint about understaffing of the Intake Unit, Defendants made sure it was his last.

Together, *Swineford* and *Versarge* stand for two (2) non-controversial propositions: (1) speech motivated mainly by personal animus has little public value, and (2) speech of little public value is afforded little weight by courts. In both cases, the Third Circuit's emphasis was on the *value* of the speech to the public, and the plaintiffs' "less than altruistic" motives, *Brennan*, 350 F.3d at 413—evidenced by their abusive courses of conduct—only served to reduce that value. The outcomes in *Swineford* and *Versarge* are thus in accord with the well-established principle that the speaker's motive for speaking "is not dispositive." *Id*. The focus, instead, must be "on the value of the speech itself." *Baldassare*, 250 F.3d at 197.

20

Simply put, there is no evidence here that Plaintiff was trying to "get[] back" at anyone, *Versarge*, 984 F.2d at 1365, such that his speech devolved from expressing a "public concern" into pursuing a "personal grievance." *Swineford*, 15 F.3d at 1273. Far from resembling the relentless and vindictive plaintiffs in *Swineford* and *Versarge*, Plaintiff is more akin to the "disgruntled employees" in *Rode*, *Connick*, and *Czurlanis*. *See Rode*, 845 at 1201. Like their interests in speaking, Plaintiff's interest should not be discounted simply because he might have been "personally dissatisfied with some aspect of [his] employment or employer." *Brennan*, 350 F.3d at 413. Only "rarely" will an employee's motivations alone "justify silencing speech that otherwise addresses matters concerning the public." *Id.* Unlike the speech in *Swineford* and *Versarge*, the strong public value of Plaintiff's speech here was not diminished in any significant way by how he spoke or his reasons for doing so.

Therefore, even after drawing every possible inference in favor of Defendants, only one conclusion remains: Plaintiff had a significant interest in speaking under the First Amendment as a matter of law.

> ii.     **Defendants have failed to produce any evidence of actual or reasonably likely disruption caused directly by Plaintiff's speech.**

Naturally, "[s]ome disruption" to the employer's operations "is almost certainly inevitable" when public employees speak on matters of public concern. *Dougherty*, 772 F.3d at 993. For this reason, courts employ a "sliding scale" approach to *Pickering* balancing whereby "'the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public.'" *Munroe*, 805 F.3d at 454 (quoting *Miller*, 544 F.3d at 549 n. 2). Accordingly, when the First Amendment "more tightly . . . embraces the employee's speech," public employers must make a "more vigorous . . . showing of disruption." *Dougherty*, 772 F.3d at 991 (citing *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005)); *see also Czurlanis*, 721 F.2d

at 107 ("[I]t would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office."). And while a "reasonable likelihood" of disruption may suffice in some cases to justify the employer's actions, the employer "must still establish likely disruption through record support, and courts have long required more than unadorned speculation as to the impact of speech." *Fenico,* 70 F.4th at 166 (internal quotations and citations omitted). Finally, and perhaps most importantly, "[d]isruption caused by actions independent of the speech at issue cannot be equated with disruption caused by the speech itself." *Watters*, 55 F.3d at 897. The court, therefore, must determine whether the disruption was caused directly by the employee's speech *or* by the actions of others, including the employer. *See, e.g., Zamboni*, 847 F.2d at 79 (remanding and directing district court to "consider whether any unrest was caused directly by [the plaintiff's] speech or whether it was exacerbated by defendants' actions"); *Czurlanis*, 721 F.2d at 107 (observing that "the disruption, if any, was primarily the result, not of the plaintiff's exercise of speech, but of his superiors' attempts to suppress it"); *Monsanto*, 674 F.2d at 999 (finding that disruption was not "specifically caused by" employee's speech).

While the test for disruption varies depending upon the nature of the speech, courts typically consider whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Dougherty*, 772 F.3d at 991 (internal quotations and citations omitted). As discussed above, because Plaintiff's speech "occupies the highest rung of First Amendment protection," *id.*, Defendants bear a "truly heavy burden" in this case to make a "more vigorous showing of disruption." *McGreevy*, 413 F.3d at 365. For the following reasons, Defendants have fallen far short of satisfying that burden.

22

From the outset, Defendants have maintained that they discharged Plaintiff for sharing with Attorney Zeiger alleged "confidential information" that "pertained to" the Patterson Estate's lawsuit, which they claim violated several County policies prohibiting disclosure of "confidential" and "sensitive" information. (Pl.'s Stmt. of Undisp. Facts at ¶¶ 93-95). But the undisputed facts of record show that Plaintiff did no such thing. Although the terms "confidential" and "sensitive" are not defined in any County policies, (*id.* at ¶ 101), we don't need Noam Chomsky to tell us what they mean. In its ordinary usage, the word "confidential" simply means "secret or private, often in a formal, business, or military situation."[2] Similarly, the word "sensitive" is commonly understood as "needing to be treated with care or secrecy."[3]

With these definitions in mind, Defendants' contention that Plaintiff was fired for sharing "confidential" or "sensitive" information with Attorney Zeiger is fatally undermined by two (2) undisputed facts: (1) except for Plaintiff's opinions regarding understaffing and policy violations, Attorney Zeiger already knew all the facts Plaintiff shared with him from information Defendant County provided during discovery, (*id.* at ¶¶ 22-25 and 55), and, even more importantly, (2) Defendant County, itself, publicly disclosed the *same* information in the Patterson Estate case. (*Id.* at ¶¶ 26-30 and 65-66). For example, like Plaintiff, Defendant County disclosed in its unsealed Answer to the Patterson Estate's Amended Complaint that Officers Atiles and Ulmer were working

---

[2] *Cambridge Adv. Learner's Dictionary & Thesaurus*, "confidential," https://dictionary.cambridge.org/us/dictionary/english/confidential; *see also Cambridge Bus. Eng. Dictionary*, "confidential," https://dictionary.cambridge.org/us/dictionary/english/confidential ("private, and intended to be kept secret"); *Dictionary.com*, "confidential," https://www.dictionary.com/browse/confidential ("spoken, written, acted on, etc., in strict privacy or secrecy; secret") ; *see also Merriam-Webster Online*, "confidential," https://www.merriam-webster.com/dictionary/confidential ("intended for or restricted to the use of a particular person, group, or class").

[3] *Cambridge Academic Content Dictionary*, "sensitive," https://dictionary.cambridge.org/us/dictionary/english/sensitive; *see also Merriam-Webster Online*, "sensitive," https://www.merriam-webster.com/dictionary/sensitive ("concerned with highly classified government information or involving discretionary authority over important policy matters");

the Intake Unit during Rhoades's processing, that Officer Atiles performed a pat-down and strip-search on Rhoades, and that Rhoades smuggled drugs into the jail. (*Id.* at ¶¶ 28-29). Unlike Plaintiff, however, Defendant County also disclosed precisely *how* Rhoades smuggled drugs into the jail, including how he was able to exploit surveillance camera blind spots in his holding cell and how he hid the drugs in his prison-issued lunch bag and clothing. (*Id.* at ¶¶ 23 and 26-27). Defendant County even went as far as to reveal that, in subsequent statements to law enforcement, Rhoades denied delivering drugs to Patterson and, instead, blamed another inmate named Mallet Clark, despite surveillance footage showing Rhoades placing an "item" under Patterson's cell door. (*Id.* at ¶ 27).

Then, about six (6) months later, Defendant County's Law Department publicly filed an unsealed Response to the Emergency Motion, in which it repeated verbatim much of what Plaintiff told Attorney Zeiger, including his belief that "the intake unit was chronically understaffed" and that "[Officer] Ulmer should have locked the 'dirty cell' after Rhoades was taken to be searched, and that her not locking the door is in violation of BCCF policy." (*Id.* at ¶¶ 65-66). Thus, between its Answer to the Amended Complaint and its Response to the Emergency Motion, Defendant County publicly disseminated all the supposedly "confidential" and "sensitive" information it fired Plaintiff for sharing with Attorney Zeiger—and then some. But Defendants' pretense doesn't stop there. To make matters worse, Plaintiff's own allegations about what he told Attorney Zeiger remain publicly available in his unsealed original and amended complaints in this case, neither of which Defendants have moved to shield from public view. (*Id.* at ¶¶ 150-153). The point is, "merely *saying* that the [information is 'confidential' and 'sensitive'] does not make it so." *Watters*, 55 F.3d at 897-98 (emphasis added). And in this case, more than any, Defendants' actions speak louder than their words. *Cf. Rode*, 845 F.2d at 1202 (observing that "the defendants apparently did

not consider the disruption caused by [the speech] serious, because the defendants themselves reproduced and disseminated the [speech] in the workplace").

Defendants' obvious hypocrisy in this regard might explain why none of them can articulate what specific "confidential" or "sensitive" information Plaintiff revealed. Defendant Kratz, for example, claims that the entire extent of his knowledge about Plaintiff's call with Attorney Zeiger comes from the Emergency Motion. (Pl.'s Stmt. of Undisp. Facts at ¶ 128). Yet in the next breath, he readily concedes that he didn't read the Emergency Motion until just before his deposition, although he "may have gotten a copy" of it before Plaintiff was fired. (*Id.* at ¶ 131). If he did get a copy of it then, he merely "glanced at it. I mean, had I known we were going to end up in litigation over a termination, I probably would have read it a little closer." (*Id.* at ¶ 132). Still, he was certainly "aware" of the Emergency Motion, but "didn't review it at that point in time" because, instead, someone "explained to [him] what had happened." (*Id.* at ¶ 130). Defendant Kratz, therefore, necessarily admits that he doesn't know "exactly" or "specifically" or "fully" what Plaintiff told Attorney Zeiger. (*Id.* at ¶¶ 125-127). Despite this, he insists that the information Plaintiff shared was "absolutely security sensitive, depending on how much detail he drilled down into. I don't know." (*Id.* at ¶ 134). In other words, the information was "absolutely security sensitive" to Defendant Kratz even though he doesn't know "exactly" or "specifically" what Plaintiff said or "how much detail he drilled down into" because he never read the Emergency Motion. If that's the case, the *only* thing Defendant Kratz can be "absolutely" sure of is that he makes no sense.

From what little he does know, Defendant Kratz "believes" Plaintiff disclosed "confidential" information regarding "the plans of the day," "the essence of posts," "how the contraband may have gotten in," and "how searches are conducted." (*Id.* at ¶ 135). Now, had Defendant Kratz not just "glanced" at the Emergency Motion but actually *read* it before agreeing

to fire Plaintiff, he would have realized that Plaintiff did not say *anything* about "plans of the day," "how the contraband may have gotten in," or "how searches are conducted." (*Id.* at ¶ 60). As for "the essence of posts" (whatever that means), all Plaintiff said about "posts" was that three (3) people were supposed to be posted on the Intake Unit, but only Officers Atiles and Ulmer were present—information Defendant County had already publicly disclosed. (*Id.* at ¶¶ 28 and 60). Apparently, when it comes to revealing details about "how the contraband may have gotten in" or "how searches are conducted" or "the essence of posts," Defendant Kratz must be confusing Plaintiff with Defendant County. (*Id.* at ¶¶ 26-30). Nevertheless, he admits that other people besides BCCF personnel (such as inmates) might be able to learn where officers are posted or how Rhoades smuggled drugs into the jail. (*Id.* at ¶¶ 137-138). Couple this with Defendant County's own detailed public disclosures in the Patterson Estate case and it becomes clear that Defendants weren't trying to keep that alleged "sensitive" information "confidential" at all.

For her part, Defendant McKevitt also doesn't know what "confidential" information Plaintiff disclosed other than what was contained in the Emergency Motion, which she learned about from either Defendant Smith or Defendant Kratz and which she also didn't read until her deposition. (*Id.* at ¶¶ 107 and 110-111). That means when she decided to fire Plaintiff, she, like Defendant Kratz, really had no idea what he told Attorney Zeiger. To get around this inconvenient fact, she claims that Plaintiff was not fired specifically because of what he said, but because he said it to someone "outside his chain of command." (*Id.* at ¶ 112). Defendant Kratz seems to agree. (*Id.* at ¶ 148). The trouble with this excuse is that Defendant County's "chain-of-command" policy "cannot be used to justify the retaliatory action against [Plaintiff] under the rubric of the County's interest in promoting the efficiency of public service." *Czurlanis*, 721 F.2d at 105. "A policy which would compel public employees to route complaints about poor departmental practices to the very officials responsible for those practices would impermissibly chill [speech on public issues],"

"deter 'whistle blowing' by public employees on matters of public concern," and "deprive the public in general and its elected officials in particular of important information about the functioning of government departments." *Id.* at 106. This reasoning applies with equal force in this case.

Of all the people involved in Plaintiff's discharge, Defendant Smith gives the greatest insight into the true rationale behind it. According to her, the reason the information Plaintiff shared was "confidential" is because it could have "cause[d] harm" to Defendant County in the Patterson Estate case. (*Id.* at ¶¶ 115-116). The fact that Plaintiff tried to "make trouble for" Defendant County by going "out of his way to contact" Attorney Zeiger "in an open lawsuit definitely contributes to why . . . the information was confidential." (*Id.* at ¶¶ 118 and 121). Defendant Smith believes Plaintiff "[knew] that could cause harm to" Defendant County and that he called Attorney Zeiger "to help [Patterson's Estate] and hurt [Defendant County]." (*Id.* at ¶¶ 115-116). She, therefore, states that Plaintiff "was terminated because it's a black and white issue that he did not have the employer's best interests at heart, and he was sharing information that was private." (*Id.* at ¶ 119).

But wait, there's more. Even if Attorney Zeiger already knew the information Plaintiff told him, Defendant Smith maintains that it was still "confidential" because Plaintiff "shouldn't have sought [him] out" and "had a discussion the way he did." (*Id.* at ¶ 122). Then, in a surprising twist that even she never saw coming, she proceeds to claim that if Plaintiff had disclosed the same information to Attorney Zeiger in a deposition, it would *not* have been "confidential." (*Id.* at ¶ 121). Defendant Kratz apparently concurs. (*Id.* at ¶ 139). Yet by drawing what she thinks is a principled distinction between voluntary and compulsory speech, Defendant Smith unwittingly confirms what the evidence in this case makes increasingly clear: the information Plaintiff shared was "confidential" to Defendants only because he "went out of his way" to share it with Attorney Zeiger, *not* because it was inherently sensitive. (*Id.* at ¶ 121). It is in this sense that Defendant

27

Smith asserts the "context" of Plaintiff's speech "[was] a factor" in Defendants' decision to discharge him, that is, in their determination that what he said was "confidential." (*Id.* at ¶¶ 121 and 123-124).

Taken together, Defendants' vague and borderline incoherent explanations ironically provide some meaningful clarity. The reason none of them know exactly what "confidential" information Plaintiff told Attorney Zeiger is because, for the most part, none of them cared. By itself, the fact that Defendants McKevitt and Kratz were both on-board with terminating Plaintiff based on allegations in a document they didn't even bother to read should really shock the conscience of anybody who has one. (*Id.* at ¶¶ 110-111 and 130-132). But logically speaking, the only information Plaintiff disclosed that Defendants could possibly classify as "confidential" is the information Attorney Zeiger didn't already know—namely, Plaintiff's opinions and prior complaints about chronic understaffing. *That* is the information Defendants cared most about because *that* is the information that was "against the County's interests," (*id.* at ¶¶ 113, 116, and 118-119); *that* is the information that could have "helped" Patterson's Estate and "hurt" Defendant County, (*id.* at ¶¶ 115-116); and *that* is the information that is arguably most concerning to the public. What that information is clearly *not*, however, is "security sensitive," and so the only thing that made it "confidential" to Defendants was their desire to keep it secret from Attorney Zeiger. The fact of the matter is that Defendants fired Plaintiff because he went "outside his chain of command" and tried to "make trouble for" the County "in an open lawsuit" by sharing his "criticism" of the BCCF's "internal operations" with Attorney Zeiger. (*Id.* at ¶¶ 112 and 118); *Zamboni*, 847 F.2d at 77. In a nutshell, Plaintiff was fired for "legitimate whistleblowing," *Watters*, 55 F.3d at 895, not for sharing "confidential" information that undermined jail security. Even Helen Keller could see that. Defendants' contrary claim is, at best, their own "unadorned speculation," *Fenico*, 70 F.4th at 166, and, at worst, a flat out lie.

But assuming for argument's sake that Plaintiff technically violated County policies by disclosing "confidential" or "sensitive" information, that is not the end of the matter. To prevail, Defendants must still make a "vigorous showing" of actual or reasonably likely disruption resulting directly from Plaintiff's speech. *McGreevy*, 413 F.3d at 365. As the record here reflects, Defendants come nowhere close to carrying that "truly heavy burden." *Id.*

Beyond their own "unadorned speculation," Defendants have produced no evidence that Plaintiff's speech directly caused any likely disruption to the BCCF's operations. Defendant Kratz, who as Director of Corrections is best positioned to know about the jail's operations, "[doesn't] believe anybody really knew" about Plaintiff's conversation with Attorney Zeiger because it "wasn't widely known in the jail." (*Id.* at ¶¶ 144-145). According to him, "there are very few other people that know anything about" the details of Plaintiff's call, mainly "the law department, myself, human resources, you, and your client. That's pretty much, you know, who knows what's going on." (*Id.* at ¶ 146). That makes sense considering Attorney Zeiger was subject to a protective order in the Patterson Estate case and neither he nor Plaintiff told anyone outside Defendant County what they discussed. (*Id.* at ¶¶ 31 and 56-57). In fact, when asked how Plaintiff's conversation with Attorney Zeiger could have compromised jail security given the protective order, Defendant Kratz candidly replied: "I don't know." (*Id.* at ¶ 149). To be sure, the protective order all but eliminated any risk that the information Plaintiff disclosed would end up in the "wrong hands" (other than Attorney Zeiger's, of course) because Attorney Zeiger believed it was subject to the protective order. (*Id.* at ¶ 154). Consequently, since no one outside County management knew the details of Plaintiff's call with Attorney Zeiger, and since Attorney Zeiger, himself, believed he was legally precluded from disclosing those details to anyone else, Defendants simply cannot show *any* likelihood of disruption caused by Plaintiff's speech, much less a *reasonable* one.

In terms of showing actual disruption, Defendants fare no better. Defendant Kratz believes that Plaintiff's *absence* has created "a lot of chaos" in the Intake Unit as well as "a lot of disruption, a lot of disharmony between the staff, and a lot of extra work for us." (*Id.* at ¶ 142). But despite his unbridled use of these magic keywords, which he seemingly plucked right out of the relevant case law, the only "chaos," "disruption," or "disharmony" Defendant Kratz can identify is that he, the warden, and the deputy warden have had to work in the Intake Unit since Plaintiff's suspension because the County has not yet named a permanent replacement. (*Id.* at ¶ 141). Naturally, then, Defendant Kratz admits that if Defendants had not suspended and discharged Plaintiff, it "goes without saying" there would not have been any "chaos" or "disharmony" or "disruption" in the Intake Unit or BCCF's overall operations. (*Id.* at ¶ 143). He further concedes that, prior to Plaintiff's suspension and discharge, he "doesn't believe" there was any "disharmony" among BCCF employees resulting from Plaintiff's call with Attorney Zeiger nor was there any "chaos or disruption in the jail." (*Id.* at ¶ 144). Defendant Kratz likewise acknowledges that in the roughly three weeks between Plaintiff's call and his suspension, no employees told him they could not work with Plaintiff nor was he aware of any breaches in jail security. (*Id.* at ¶¶ 85-86). Indeed, aside from him having to "spend a lot more time observing what was going on in" the Intake Unit, Defendant Kratz is not aware of *any* disruption to jail operations resulting from Plaintiff's speech during that three week stretch. (*Id.* at ¶ 84). Neither, for what it's worth, is Defendant McKevitt. (*Id.* at ¶ 114). That's because Plaintiff's call to Attorney Zeiger "wasn't widely known in the jail, and he was at his desk for the most part supervising." (*Id.* at ¶ 144). Simply put, the "chaos," "disruption," and "disharmony" Defendant Kratz refers to (such as it is) was not caused directly by Plaintiff's speech, but by "[Defendants'] attempts to suppress it." *Czurlanis*, 721 F.2d at 107. And regardless of its cause, it certainly does not rise to the level of disruption necessary to justify Plaintiff's discharge given the public value of his speech.

Aside from the foregoing, Defendants have not produced any other evidence of actual or reasonably likely disruption. For example, there is no record evidence that Plaintiff's speech directly "impair[ed] discipline by superiors or harmony among co-workers." *Dougherty*, 772 F.3d at 991. Again, "very few" people in the BCCF even knew about Plaintiff's speech prior to his suspension and discharge. (*Id.* at ¶¶ 144-146). Nor is there any evidence that Plaintiff's speech "imped[ed] the performance of" his job duties. *Id.* On the contrary, Defendant Kratz states that in the three weeks between his call with Attorney Zeiger and his suspension, Plaintiff continued to perform his job duties and "was at his desk for the most part supervising." (*Id.* at ¶¶ 81 and 144).[4]

Equally absent from the record is any evidence that Plaintiff's speech had a "detrimental impact on close working relationships for which personal loyalty and confidence are necessary."[5] *Dougherty*, 772 F.3d at 991. Whether such a "close working relationship" existed in this case requires the Court to consider, above all, Plaintiff's "hierarchical proximity" to BCCF policymakers, including his "level of authority," "degree of responsibility," and ability "to make independent policy judgments." *Watters*, 55 F.3d at 898; *see also Sprague v. Fitzpatrick*, 546 F.2d 560, 566 (3d Cir.1976) (noting the "crucial variant" in *Pickering* balancing is "hierarchical proximity"); *Swineford*, 15 F.3d at 1272-73 (stating that "[p]roximity within an organizational hierarchy is a significant factor in the employer's demonstration that a public employee's speech had a detrimental impact on a necessarily close working relationship"). As for any "detrimental

---

[4] Defendants allege in their Answer to Plaintiff's Amended Complaint that "the Administrative Lieutenant of Records position calls for an exceedingly high degree of trustworthiness" and that Plaintiff's "decision to disclose information under protective order . . . irreparably damaged his supervisors' trust in his judgment" such that they "no longer had faith in [his] ability to perform the functions of his job." (Doc. 22 at ¶ 57). Now, if the Court determines that the aforementioned "information under protective order" is actually "information of public concern," Defendants will most assuredly be kicking themselves for making this claim, which would amount to an outright admission of First Amendment retaliation. But to be fair, they probably weren't thinking that far ahead, and it sounded pretty good at the time. In any event, as discussed earlier, Plaintiff wasn't subject to the protective order nor did he damage his "trustworthiness" by sharing any "confidential" or "sensitive" information.

[5] *See* n. 4, *supra*.

impact" on such a relationship, whether Plaintiff's speech "impugned the integrity" of his superiors is a critical factor courts often rely upon. *See, e.g., Watters*, 55 F.3d at 898 (significant that "nothing [the plaintiff] was reported to have said impugned the integrity of his superiors") (internal quotations and citations omitted); *Sprague*, 546 F.2d at 565 (finding "breach of confidence" between plaintiff and his superior where plaintiff "impugn[ed] his integrity in public"); *Roseman v. Indiana Univ. of Pa.*, 520 F.2d 1364, 1368 (3d Cir. 1975) (concluding that "plaintiff's attacks upon [her superior's] integrity in a faculty meeting would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and co-workers"); *cf. Pickering*, 391 U.S. at 569-70 (noting that plaintiff's statements were "in no way directed towards any person with whom he would normally be in contact in the course of his daily work as a teacher").

In this case, the record makes clear that Plaintiff did not have a "close working relationship" with any BCCF policymaker, let alone one requiring "personal loyalty and confidence." According to Defendants, Plaintiff was considered "middle management" with five (5) superiors above him: (1) the Captain of Security, (2) the Deputy Superintendent, (3) the Superintendent, (4) the Deputy Director, and (5) the Director. (Pl.'s Stmt. of Undisp. Facts at ¶ 3). As an Administrative Lieutenant, Plaintiff was responsible for overseeing the Intake Unit, which is where inmate processing is conducted and where inmate and other jail records are kept. (*Id.* at ¶¶ 4-5). His only subordinates were the staff assigned to the Intake Unit. (*Id.* at ¶ 4). He did not have any policy-making authority and did not work directly or indirectly with Defendant Kratz or anyone else to develop or promulgate BCCF policies. (*Id.* at ¶ 6). What is more, in the performance of his daily duties, Plaintiff seldomly interacted with Defendant Kratz or any other BCCF policymakers. (*Id.* at ¶¶ 7-12). Moreover, unlike in *Sprague*, there is no evidence here that Plaintiff ever acted as the "alter ego" of any of his superiors, including Defendant Kratz—he was nobody's "right-hand man." And

to top it all off, Plaintiff's statements to Attorney Zeiger did not "impugn the integrity" of Defendants or any of his superiors such that this Court can confidently conclude his speech had a "detrimental impact" on any working relationship he may have had with them, close or otherwise. (*Id.* at ¶¶ 51 and 60).

At the end of the day, Defendants have failed to meet their "truly heavy burden" of making a "vigorous showing" of actual or likely disruption to the jail's operations resulting from Plaintiff's speech. *McGreevy*, 413 F.3d at 365. Accordingly, this Court is constrained to conclude that, as a matter of law, Plaintiff's interest in speaking outweighed Defendants' interest in maintaining an orderly and efficient workplace.

### 3. As a matter of law, Defendants McKevitt, Smith, and Kratz discharged Plaintiff because of his conversation with Attorney Zeiger.

Besides establishing that his speech was protected by the First Amendment, Plaintiff must also prove that his protected speech "'was a substantial or motivating factor'" in his discharge. *Brennan*, 350 F.3d at 414 (quoting *Baldassare*, 250 F.3d at 195).

The record here is abundantly clear that Plaintiff's protected speech was not just a "substantial" or "motivating" factor in his discharge—it was the *only* factor. In Plaintiff's final Disciplinary Action Form, Defendant Smith expressly stated that Defendants were firing him for "contacting plaintiff's attorney and sharing confidential information which pertained to a lawsuit against the DOC/County of Bucks." (Pl.'s Stmt. of Undisp. Facts. at ¶ 93). In this context, the words "contacting" and "sharing" clearly denote "speech," more specifically, what Plaintiff said during his telephone call with Attorney Zeiger on May 30, 2024. Every Defendant has since confirmed this as the sole reason for Plaintiff's discharge and there is no record evidence he was fired for any other reason. (*Id.*). In the absence of such evidence, there is no genuine dispute that Defendants McKevitt, Smith, and Kratz discharged Plaintiff because of his constitutionally

protected speech. Therefore, this Cout must grant partial summary judgment as to liability with respect to Count I of Plaintiff's Amended Complaint.

> **B.** **Viewing the Record in the Light Most Favorable to it, Defendant Bucks County Violated 42 U.S.C. § 1983 As a Matter of Law When Its Board of Commissioners Ratified Defendant McKevitt's Final Decision to Discharge Plaintiff Because of His Telephone Conversation With Attorney Zeiger on May 30, 2024.**

"A municipality may not be held liable under § 1983 for the constitutional torts of its employees by virtue of *respondeat superior*." *Hill*, 455 F.3d at 245. Instead, municipal liability will only attach when "an individual employee or officer . . . implements an official policy or practice." *Id.* (citing *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690 (1978)); *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010) (holding that a municipality may be held liable under § 1983 "when execution of a government's policy or custom" inflicts constitutional harm). A municipal employee or officer "implements an official policy or practice" when: "(1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred." *Id.*

When it comes to holding Defendant County liable in this case, there is more than one way to skin that cat. Start with the fact that Defendant County's Board of Commissioners endowed Defendant McKevitt with the authority to discharge employees. (Pl.'s Stmt. of Undisp. Facts at ¶ 102). Pursuant to that "delegated" authority, Defendant McKevitt made the "official" decision to fire Plaintiff. (*Id.* at ¶ 103); *Hill*, 455 F.3d at 245. Her decision, moreover, was the result of a familiar and long-standing process within Defendant County. "The way that [it] works" is the COO (Defendant McKevitt) consults with the relevant Department Head (Defendant Kratz) and Human

Resources representatives (Defendant Smith) who then "make a decision" that is later presented to the Board of Commissioners for ratification. (Pl.'s Stmt. of Undisp. Facts at ¶ 102). That's the process that was followed here, which means that when she fired Plaintiff, Defendant McKevitt was acting "pursuant to . . . a standard operating procedure long accepted within" Defendant County. *Hill*, 455 F.3d at 245. And if that's not enough, Defendant County's Board of Commissioners sealed Plaintiff's fate by subsequently ratifying his termination, thereby rendering Defendant McKevitt's decision "official for liability purposes." *Id*.

Given these undisputed facts, Defendant County is liable for First Amendment retaliation under § 1983 as a matter of law. The Court, therefore, must grant summary judgment as to liability on Count II of Plaintiff's Amended Complaint.

## VI.  CONCLUSION

For the reasons detailed above, this Court must **GRANT** Plaintiff's Motion for Partial Summary Judgment as to liability with respect to Counts I and II of his Amended Complaint.

*Respectfully Submitted*,

Date: May 16, 2025      BY:    */s/ William P. Mansour*
                                  William P. Mansour, Esquire
                                  **Mansour Law, LLC**
                                  *Attorney for Plaintiff Ara Kimbrough*