**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **ARA KIMBROUGH,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 24-4470-KSM** |
| **BUCKS COUNTY, et al.,** | |
| Defendants. | |

**<u>MEMORANDUM</u>**

**Marston, J.**                                                                **March 30, 2026**

Plaintiff Ara Kimbrough is a former employee of the Bucks County Correctional Facility ("BCCF"), where he worked as an administrative lieutenant overseeing BCCF's Record and Reception Unit (the "R&R Unit" or the "Intake Unit"). In 2023, Bucks County was sued by the administrator of the estate of an inmate who overdosed while incarcerated at BCCF. More than a year later, Kimbrough, while off duty, called the administrator's lawyer, who was still in active litigation against the County, and shared that he believed both the R&R Unit's chronic understaffing and the County's refusal to correct it contributed to the fatal overdose. Once County officials learned about this phone call, they investigated and then fired Kimbrough. Kimbrough now sues Defendants Bucks County, Director of Corrections David Kratz, Chief Human Resources Officer ("CHRO") Lauren Smith, and Chief Operations Officer ("COO") Margaret McKevitt for First Amendment retaliation under 42 U.S.C. § 1983. (Doc. No. 1.) The parties have filed cross motions for summary judgment as to liability. (*See* Doc. Nos. 31, 32.) For the reasons discussed below, Defendants' motion is granted, and Plaintiff's motion is denied.

## I.    BACKGROUND

The material facts, most of which are not in dispute,[1] are as follows.

### A.    *Kimbrough's Position at BCCF*

Bucks County hired Kimbrough as a BCCF correctional officer in 2008.  (Doc. No. 38-1 at ¶ 3.)  He spent his first two years working as a module officer, where he staffed the facility's inmate-housing module, before being promoted to the records office.  (*Id.*)  In 2013, Kimbrough began serving as BCCF's administrative hearing officer.  (*Id.* at ¶ 4.)  In that position, he oversaw hearings for inmate institutional misconduct and administrative appeals of employee discipline matters.  (*Id.*)  As a result, he became "well-versed in BCCF's policies and procedures."  (*Id.*; *see also* Doc. No. 32-14 ("Kimbrough Dep. Tr.") at 14:15–19.)  In 2018, Kimbrough was again promoted, this time to administrative lieutenant of the R&R Unit, the unit tasked with processing incoming and outgoing inmates and keeping inmate and jail records.  (Doc. No. 35-4 at ¶ 5; *see also* Kimbrough Dep. Tr. at 10:7–24.)  In that role, Kimbrough supervised approximately a dozen employees and was responsible for "all new commitments, all discharges, court movement, transfers, bail acceptances, sexual offender registrations, [and] sentencing computation orders," in addition to handling property and cash.  (Doc. No. 38-1 at ¶ 5 (quoting Doc. No. 32-4 (Shae Randolph, Esq., Dep. Tr., hereinafter, "Randolph Dep. Tr.") at 10:7–16); *see also id.* at ¶¶ 6–7 (Kimbrough conceding that in his roles as hearing officer and administrative lieutenant, he was exposed to inmate criminal records, employee files, and employees' discipline records).)  Throughout his career with BCCF, Kimbrough received

---

[1] To the extent there is a material dispute about a given fact, the Court notes as much in an accompanying footnote.

positive feedback from his supervisors, and he enjoyed the confidence of Director Kratz. (*Id.* at ¶ 8.)[2]

Despite Kimbrough's positive reputation among supervisors, on February 29, 2024, Bucks County's Human Resources ("HR") Department received an anonymous harassment complaint against Kimbrough, which alleged he was creating a toxic and hostile work environment by harassing sergeants with verbal attacks and public threats. (Doc. No. 38-1 at ¶ 13; Doc. No. 31-10 (February 29, 2024 Email from "Anon Anon" to Diane Otto re: Bucks County Corrections—Hostile Work Environment).) The HR and Law Departments investigated the complaint (Doc. No. 32-4 at 11:1–20) and found that in most cases, Kimbrough's challenged comments were related to either (1) perceived delays in sergeants staffing the R&R Unit, or (2) sergeants reassigning reception staff to higher acuity areas in the facility (Doc. No. 38-1 at ¶ 6; *see also* Doc. No. 32-4 at 17:9–19:9 (employee describing the investigation and her opinion that Kimbrough's reactions toward sergeants was related to the fact that he was "unhappy with the sergeants either not making sure there was no gap or no delay [in staffing the R&R Unit] or not communicating that to [Kimbrough]").)[3] For example, one of the allegations against

---

[2] There were multiple supervisors between Kimbrough and Director Kratz, including the Captain of Security, the Deputy Superintendent, the Superintendent, and the Deputy Director. (Doc. No. 35-4 at ¶ 3; *see also* Doc. No. 32-5 (organizational flowchart).) The parties dispute the extent to which Kimbrough and Director Kratz interacted. (*Compare* Doc. No. 32-6 at ¶¶ 9–12 ("Kimbrough Aff.") (Kimbrough attesting that he "did not regularly interact or have contact with Director Kratz," "rarely ever met with him in person to discuss work-related issues," and instead, "spoke with Defendant Kratz over the phone about work-related issues"), *with* Doc. No. 32-8 ("Kratz Dep. Tr. II") at 15:2–3 (testifying that if "there was ever an issue [Kimbrough] would come to [Director Kratz] directly").) But there is no dispute that in his position as administrative lieutenant overseeing the R&R Unit, Kimbrough enjoyed the confidence and trust of Director Kratz and his other supervisors. (Doc. No. 38-1 at ¶ 8 (Kimbrough agreeing it was "[u]ndisputed" that Kimbrough received positive feedback from supervisors and "enjoyed the confidences of" Director Kratz).

[3] At BCCF, sergeants are tasked with "ensur[ing] that officers are in the correct staffing locations and that each location has the correct number of officers and that the facility plan of the day is followed." (Doc. No. 32-4 at 17:4–13.)

Kimbrough was brought by a sergeant who claimed that after he pulled an officer from the R&R Unit to respond to a use of force incident in another area of BCCF, Kimbrough called him and asked if he was "fucking stupid."  (Doc. No. 35-4 at ¶ 36.)

Kimbrough had previously complained to Department of Corrections ("DOC") administration about sergeants pulling staff from the Intake Unit.  (Doc. No. 38-1 at ¶ 16; *see also* Doc. No. 32-17 (Kimbrough's email communications about use of R&R Unit staff in other areas on May 21, 2021, March 2, 2022, July 27, 2022, August 1, 2022, August 26, 2022, October 27, 2022, April 19, 2023, June 1, 2023, February 27, 2024, March 8, 2024, and May 13, 2024).) And when Kimbrough was initially interviewed in April 2024 by HR Manager Diane Otto and Assistant County Solicitor Shae Randolph about the harassment complaint against him, he reiterated his concerns about the lack of adequate staffing in the R&R Unit.  (Kimbrough Aff. at ¶ 17; Kimbrough Dep. at 47:15–23.)  Kimbrough concedes, however, that before this interview, he did not mention his staffing concerns to the County's HR or Law Departments, nor did he raise the issue with the County Board of Commissioners.  (Kimbrough Dep. Tr. at 42:20–23.)

Following this initial interview, on May 30, 2024, the County sent Kimbrough a Notice of Fact-Finding Meeting.  (Doc. No. 38-1 at ¶ 18; Doc. No. 35-4 at ¶ 39; *see also* Doc. No. 31-12 (Notice of Fact-Finding Meeting).)  The purpose of the meeting was to give Kimbrough "an opportunity to speak for himself before any disciplinary action" was taken.  (Randolph Dep. Tr. at 22:9–13.)  The meeting was set for the following week, on June 3, 2024.  (Doc. No. 38-1 at ¶ 19.)

### B.    *Kimbrough Contacts Attorney Brian Zeiger*

Hours after receiving the notice, and while off work, Kimbrough contacted Attorney Brian Zeiger.  (Doc. No. 38-1 at ¶ 20.)  Attorney Zeiger represented the Administrator of the Estate of Joshua Patterson (the "Estate") in a wrongful death lawsuit against the County, Director

Kratz, and numerous DOC employees[4] (the "Patterson Action"). (*Id.* at ¶ 21.) Patterson, a former inmate at BCCF, overdosed in July 2022 after another inmate (identified by the parties simply as, "Inmate Rhoades") smuggled narcotics into BCCF and gave them to Patterson. (*Id.*) Kimbrough was not on duty the night that Patterson overdosed, but the next day, he reviewed the security footage related to the incident and emailed a copy of it to Director Kratz and other DOC employees. (Doc. No. 32-17 at 11.) In his email, Kimbrough noted that Inmate Rhoades was subject to a clothed search[5] when he entered the R&R Unit at BCCF, but unbeknownst to the two officers on duty at the time, he hid fentanyl in a paper lunch bag in the holding cell before being taken out by one of the officers for an unclothed search. (*Id.*) While the unclothed search was being conducted, the second officer was pulled from R&R to cover a different area at BCCF, and she failed to secure the holding cell before leaving. (*Id.*) So, when the first officer sent Inmate Rhoades back to the front of the R&R Unit, Rhoades was alone and able to go back into the holding cell and retrieve the fentanyl he had hidden there. (*Id.*) In the July 27, 2022 email, Kimbrough emphasized that Patterson's death was due in part to the lack of adequate staffing in the R&R Unit. (*Id.* ("Nobody asked or told me" that the second officer was being pulled to another area at BCCF, "and I certainly would have said no since we were already down to two in Reception. I have constantly told/warned supervisors not to pull people without my knowledge or permission and it continues to happen. This situation led to a perfect circumstance for this event to happen.").)

---

[4] Specifically, the Estate sued Bucks County, Director Kratz, James Coyne, Carl Metellus, David Galione, Kelly Reed, Daniel Onisick, Julio Atiles, Stephanie Ulmer, Tony Dowdy, Luis Ventureira, Kaitlyn McGinley, Connor Wilcox, and Zach Sherman. *Corbin v. Bucks County*, No. 23cv2784, Doc. No. 1 (E.D. Pa.)

[5] It is unclear from the record what constitutes a "clothed search." But from context, the Court assumes it resembles an over clothes pat down and is less invasive than the "unclothed" strip search, which was later performed.

Nearly two years later, when Kimbrough called Attorney Zeiger, he remained adamant that Patterson's death was due at least in part to staffing failures in the R&R Unit.[6]  During the call with Attorney Zeiger, Kimbrough shared his personal knowledge of the events leading up to Patterson's death.  (Doc. No. 38-1 at ¶¶ 22–24; *see also* Kimbrough Dep. Tr. at 43:11–45:2.)  And he explained that Inmate Rhoades was able to sneak drugs into the jail and share them with Patterson because the R&R Unit was understaffed.  (Doc. No. 38-1 at ¶¶ 22–24; *see also* Kimbrough Dep. Tr. at 43:11–45:2.)  Specifically, he shared that a correctional officer was pulled off the R&R Unit, which allowed an inmate who had just been searched to return to his prior holding cell and retrieve drugs that he had smuggled into the jail.  (Doc. No. 38-1 at ¶¶ 22–24; *see also* Kimbrough Dep. Tr. at 43:11–45:2; Doc. No. 32-18 at 4–5 (Kimbrough's interrogatory responses) ("Plaintiff also said it was standard practice for the person conducting the strip search to send the inmate up to the front of Reception so that the other officers can finish the booking process if necessary and place them in a holding cell.").)  Kimbrough also told Attorney Zeiger that he had made several complaints about the R&R Unit's chronic understaffing, but Bucks County had taken no steps to address the staffing problem.  (Kimbrough Dep. Tr. at 43:11–45:2.)

Based on Kimbrough's call, Attorney Zeiger filed an emergency motion to reopen discovery in the Patterson Action.  (*Id.* at ¶ 26 & n.4; Doc. No. 35-4 at ¶ 59.)  In the motion, Attorney Zeiger summarized his conversation with Kimbrough:

> [Kimbrough] told [Attorney Zeiger] he was a supervisor in the intake area at the time of the instant matter. The intake area was grossly understaffed. He complained to his supervisors [that] the intake area was grossly understaffed. He said three officers were

---

[6] Like many at BCCF, Kimbrough was aware of the Patterson Action because it was widely covered by local news outlets.  (Doc. No. 38-1 at ¶ 22 n.3; Doc. No. 35-4 at ¶¶ 32–33; Kimbrough Aff. at ¶ 16; Kimbrough Dep. Tr. at 30:19–23.)

6

> supposed to be stationed in the area at all times, but that only two were routinely staffed at intake during the time in question due to gross understaffing. Further, [one of the officers in the Intake Unit that night] should never have been called away from intake, leaving only one officer on duty at intake. Also, [the officer] should have locked the "dirty cell" after Rhoades was taken to be searched, and her not locking the door is in violation of BCCF policy. [Kimbrough] also mentioned various other facts pertaining to staffing, the incident, the investigation, and his complaints to his supervisors.

*Corbin v. Bucks County*, No. 23cv2784, Doc. No. 48 at ¶ 4 (E.D. Pa.); (*see also* Doc. No. 32-22 at ¶ 4 (copy of emergency motion); Doc. No. 32-11 ("Zeiger Dep. Tr.") at 28:9–11 ("The conversation was about Ulmer and Atiles [the officers staffing the Intake Unit during Inmate Rhoades's search] screwing up and the Bucks County Jail not having adequate staff at intake.").)

### C.    BCCF Investigates Kimbrough's Call to Attorney Zeiger

The emergency motion alerted County officials to the fact that Kimbrough had contacted Attorney Zeiger, and those officials informed Director Kratz. (Doc. No. 35-4 at ¶¶ 61–63.) The County then opened a second investigation into Kimbrough, this time considering whether the call amounted to the unauthorized disclosure of confidential information. (Doc. No. 38-1 at ¶ 29; *see also, generally*, Doc. No. 32-19 ("Grieser Dep. Tr.") (discussing his investigation and interview with Kimbrough about the incident).) While that investigation was ongoing, the HR Department concluded its investigation into the harassment complaint against Kimbrough, found it "substantiated," and issued a "Step 1"[7] discipline to Kimbrough. (Doc. No. 35-4 at ¶ 68 (concluding that Kimbrough "created a toxic and hostile work environment, especially for Sergeants"); *see also* Doc. No. 32-24 (Disciplinary Action Form).) Prior to this discipline, the

---

[7] The Disciplinary Action Form does not specify what constitutes a Step 1, other than to note that it is something more than a warning and less than termination. (Doc. No. 32-24.)

7

County had never formally disciplined Kimbrough for any work-related offense. (Doc. No. 35-4 at ¶ 69.)

As for the investigation into Kimbrough's call with Attorney Zeiger, the County considered Attorney Zeiger's emergency motion, which outlined Kimbrough's disclosures. (Doc. No. 38-1 at ¶ 29.) Deputy Solicitor Dan Grieser and CHRO Smith also interviewed Kimbrough about the call on June 12, 2024. (Doc. No. 35-4 at ¶ 70.) During that interview, Kimbrough confirmed that he had called Attorney Zeiger to share how he believed the drugs were smuggled into BCCF and how he had previously made numerous complaints about the lack of adequate staffing in the R&R Unit. (Doc. No. 35-4 at ¶¶ 72–76; Doc. No. 32-20 at 2–3 (Smith's June 12, 2024 interview notes).) When Kimbrough was asked why he shared this information with Attorney Zeiger, he told Grieser and Smith that he was "just venting" and noted that he had told "everyone how bad [he] feel[s]" about Patterson's death. (Doc. No. 32-20 at 3.) He also brought up the harassment investigation, reiterating that the complaint and the resulting discipline in that case were made because Kimbrough was "holding Sgts accountable for not staffing units." (*Id.*)

The next day, Deputy Solicitor Grieser prepared a memorandum documenting the interview, which concluded:

> The description of the Rhoades Incident made by Lt. Kimbrough to [Attorney Zeiger] contained in the motion is an accurate summary of the report Lt. Kimbrough made to [Attorney Zeiger] on May 30, 2024. I make no finding regarding what actually happened during the Rhoades incident. This finding only confirms that Lt. Kimbrough's report of the incident to [Attorney Zeiger] was accurately summarized by [Attorney Zeiger] in his motion.

(Doc. No. 35-4 at ¶ 80; *see also* Doc. No. 32-25 at 4 (July 13, 2024 Memorandum from Dan Grieser to Amy Fitzpatrick).)

8

During this initial stage of the confidential disclosures investigation, Kimbrough had continued to report to work as scheduled.  (Doc. No. 35-4 at ¶ 81.)[8]  But following his interview with Deputy Solicitor Grieser and CHRO Smith, Kimbrough was placed on unpaid administrative leave pending further investigation into his conversation with Attorney Zeiger.  (Doc. No. 38-1 at ¶ 36; Doc. No. 35-4 at ¶ 82.)[9]  Kimbrough was simultaneously given the opportunity to voluntarily resign and receive a lump sum payment in exchange for his release of all legal claims against the County.  (Doc. No. 35-4 at ¶ 36; Doc. No. 32-35 at 5 (COO McKevitt's responses to interrogatories) (explaining that she spoke with each of the Bucks County Commissioners before offering Kimbrough a separation agreement on June 21, 2024).)  Kimbrough declined.  (Doc. No. 35-4 at ¶ 37.)

---

[8] Director Kratz testified that between May 31 and June 21, 2024, no BCCF employees refused to work with Kimbrough because of his conversation with Attorney Zeiger.  (Doc. No. 35-4 at ¶ 85.)  Indeed, Director Kratz did not believe there was any "disharmony" among BCCF employees because of Kimbrough's call with Attorney Zeiger, because it "wasn't widely known in the jail, and he was at his desk for the most part supervising" while the investigation was pending.  (*Id.* at ¶ 144; *id.* at ¶ 145 ("Defendant Kratz 'doesn't believe anybody really knew' about Plaintiff's conversation with Attorney Zeiger." (alteration adopted) (quoting Kratz Dep. Tr. II at 54:22–23)).  *But see* Doc. No. 32-23 ("Kratz Dep. Tr. I") at 164:21–165:11 (testifying that "lower level staff were shaken by this" and "somebody was talking" about what happened; "you know, there's a rumor mill").)  Likewise, Director Kratz was not aware of any breaches of jail security during this time that were caused by Kimbrough's conversation with Attorney Zeiger.  (*Id.* at ¶ 86; Kratz Dep. Tr. I at 177:22–178:19 ("Q. . . . [B]etween those two dates of May 30th and June 21st, approximately three weeks, was there any disruption in the operations of the jail as a result of my client's conversation with Attorney Zeiger?  A. I really can't speak to that.  None that I'm aware of.").)  However, Director Kratz did view Kimbrough's conversation as a breach of the trust that BCCF's administration placed in him and as a result, Director Kratz and other supervisors were required to divert time and resources to increased oversight of the R&R Unit.  (Kratz Dep. Tr. I at 177:8–12 (describing need for increased oversight); *id.* at 178:19–179:5 (describing conversations among supervisors about lack of trust); *see also id.* at 88:24–89:17 (testifying that Kimbrough's statements to Attorney Zeiger "created a lot of disorder and disruption of our facility" and noting the "lack of trust from the administrative team"); *id.* at 163:1–165:2 (testifying that Kimbrough was "exposed to a lot of confidential information during his tenure with [BCCF]," including having "access to employee files" and to "everybody's disciplines," and that this incident "was big" and "hurt professionally amongst the staff, the administrative staff, because, you know, we rely on a lot of trust").)

[9] Kimbrough's last day at work was June 12, 2024.  He was out of the office on a preplanned vacation from June 13 to June 21.  (Doc. No. 38-1 at ¶ 5; *see also* Randolph Dep. Tr. at 34:10–20.)

On July 25, 2024, CHRO Smith provided Kimbrough with a Notice of Fact-Finding Meeting related to his conversation with Attorney Zeiger, which was scheduled to occur virtually the next day.  (Doc. No. 35-4 at ¶ 87; *see also* Doc. No. 32-26 (Notice of Fact-Finding Meeting).)  The purpose of the meeting was to give Kimbrough an opportunity to explain his conduct before the County made any decision as to his continued employment.  (Doc. No. 35-4 at ¶ 88.)  During the meeting, Kimbrough was forthcoming about his conversation with Attorney Zeiger and reiterated much of what he had said during his initial interview with Deputy Solicitor Grieser and CHRO Smith.  (*Id.* at ¶¶ 90–91.)

On July 29, 2024, Director Kratz, COO McKevitt, CHRO Smith, and other County HR and Law Department officials met to discuss the matter and unanimously agreed to Kimbrough's discharge.  (Doc. No. 35-4 at ¶ 92; Doc. No. 32-21 ("Smith Dep. Tr.") at 17:9–18, 18:17–25; *see also* Doc. No. 35-4 at ¶ 102 ("Defendant McKevitt has authority as COO to discharge employees.").)  Later that afternoon, Smith sent Kimbrough a termination letter and Disciplinary Action Form which stated that Kimbrough's employment was being terminated because he "contact[ed] plaintiff's attorney and shar[ed] confidential information which pertained to a lawsuit against the DOC/County of Bucks."  (Doc. No. 35-4 at ¶ 93; Doc. No. 32-29 (copy of letter and Disciplinary Action Form).)  The letter referenced five County/BCCF policies that Kimbrough purportedly violated by speaking to Attorney Zeiger.  (Doc. No. 35-4 at ¶ 95.)[10]  The decision to terminate Kimbrough's employment was ratified by the County's Board of Commissioners.  (*Id.* at ¶ 103; *see also* Doc. No. 32-3 at ¶ 9 ("[P]ersonnel actions are approved

---

[10] Specifically, Kimbrough is cited as having violated:  (1) County Work Rule No. 59, (2) County Work Rule No. 63, (3) Human Resources Policy 32, (4) DOC Table of Offenses No. 15, and (5) DOC Table of Offenses No. 17.  (Doc. No. 35-4 at ¶ 95; *see also id.* at ¶¶ 96–100 (quoting relevant language of each rule).)

by the County Commissioners based on recommendations, vetted through the County's Chief Operating Officer ('COO'), from Human Resources, which are included on a public agenda and addressed during bi-monthly meetings."); Kratz Dep. Tr. I at 20:14–19 ("Q. And the decision to terminate Mr. Kimbrough was subsequently ratified by the Board of Commissioners.  Is that correct?  A. That is correct.").)

### D.      Procedural History

On August 26, 2024, Kimbrough filed this action against Bucks County, Director Kratz, COO McKevitt, and CHRO Smith, asserting four counts.  (Doc. No. 1.)[11]  After initial motion practice, only two counts remain.  (*See* Doc. Nos. 12, 13, 17.)  Count One is a First Amendment retaliation claim against Director Kratz, COO McKevitt, and CHRO Smith (collectively, the "Individual Defendants").  (Doc. No. 1 at 10–11.)  And Count Two is a First Amendment retaliation claim against Bucks County.  (*Id.* at 11–13.)  The parties have filed cross motions for summary judgment as to Defendants' liability.  (Doc. Nos. 31, 32.)[12]

## II.      STANDARD OF REVIEW

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[11] Kimbrough also sued Assistant County Solicitor Shae Randolph (Doc. No. 1), but the parties have since stipulated to Randolph's dismissal (Doc. No. 29).

[12] Before turning to the substance of the motions, the Court pauses for a moment to issue a warning to Plaintiff's counsel for the unprofessional language and discourteous tone used throughout his briefs.  The Court does not repeat every insensitive remark here, and instead, merely highlights the most concerning statements with the expectation that such comments will never again appear in a brief before this Court.  (*See* Doc. No. 38 at 5 ("In case the Court dozed off or went cross-eyed while reading Defendants' motion for summary judgment . . . .  To anyone with a remedial understanding of the First Amendment, these are not very sound or persuasive arguments."); Doc. No. 32-36 at 33 ("Even Helen Keller could see that."); Doc. No. 39 at 4 ("After discovery didn't go as planned, [Defendants] commissioned a so-called 'corrections expert' to help them concoct a new excuse . . . .").)

11

law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage the judge's function is not [themselves] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008); *see also Manetas v. Int'l Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir. 1976) ("It is well settled that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed."). "Courts are permitted to resolve cross-motions for summary judgment concurrently," but "[w]hen doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018).

## III.  DISCUSSION

As noted above, Kimbrough's only remaining claims are for First Amendment retaliation. "To establish a First Amendment retaliation claim, a public employee must show that his speech is protected by the First Amendment and that the speech was a substantial or motivating factor in

what is alleged to be the employer's retaliatory action." *Flora v. County of Luzerne*, 776 F.3d

169, 174 (3d Cir. 2015) (citing *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)).  Because

the Court finds that Kimbrough's speech is not protected by the First Amendment, we need not

consider whether it was a substantial or motivating factor in his termination.[13]

"A public employee's speech is constitutionally protected when (1) the employee 'spoke

as a citizen'; (2) the statement involved a 'matter of public concern'; and (3) the government

employer lacked 'an adequate justification for treating the employee differently from any other

member of the general public based on its needs as an employer.'" *Evangelista v. Hous. Auth. of

Camden*, No. 20-cv-16824, 2024 WL 4553679, at *10 (D.N.J. Oct. 22, 2024) (quoting *Baloga v.

Pittston Area Sch. Dist.*, 927 F.3d 742, 753 (3d Cir. 2019)).  Here, Defendants concede that

Kimbrough was speaking as a citizen when he called Attorney Zeiger.  (*See* Doc. No. 31-3 at 15

n.7.)[14]  But they dispute the remaining two elements, both of which present questions of law for

the Court to decide.  *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the

protected status of speech is one of law, not fact."); *Czurlanis v. Albanese*, 721 F.2d 98, 105 (3d

---

[13] Although the Court does not rule on this issue, we nevertheless question how Defendants can reasonably argue that Kimbrough's speech was not a motivating factor in his termination.  (*See* Doc. No. 32-30 at 2–3 ("This letter is to inform [Kimbrough] that . . . [he] will be separated from the County from [his] position of Lieutenant Corrections . . . for the reasons listed on the enclosed Disciplinary Action Form," which references Kimbrough "contacting plaintiff's attorney and sharing confidential information which pertained to a lawsuit against the DOC/County of Bucks."); *see also* Mar. 17, 2026 Hr'g. Rough Tr. at 56:12–23 ("So yes, Judge, I mean it's hard to describe.  The fact that Ara Kimbrough called somebody that then led to the investigation which then led to the County determining that he violated a policy.  Of course, you know, superficially he was terminated because of his speech.  But again, it was the fact that he violated policy which then led to his termination, if that makes sense.").)

[14] This Court also previously found, albeit at the motion to dismiss stage, that Kimbrough was speaking as a citizen when he spoke with Attorney Zeiger.  *See Kimbrough v. Bucks County*, 763 F. Supp. 3d 700, 708–10 (E.D. Pa. 2025) ("[T]he Court finds that the factual allegations in the Complaint, taken as true and viewed in the light most favorable to Kimbrough, show that he spoke as a citizen when he called Attorney Zeiger.  For one, Kimbrough alleges that he spoke to Attorney Zeiger voluntarily, while off duty, and without any direction from any of his superiors . . . .  For another, the '*mode and manner* of his speech were not possible only as an ordinary corollary to his position as a government employee.'" (quoting *De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017)) (alterations adopted)).

13

Cir. 1983) ("As the Supreme Court made clear in *Connick*, it is the role of the court in a case alleging retaliatory action which violates the First Amendment to decide not only whether the speech at issue related to a matter of public concern, but also to conduct the necessary *Pickering* balancing."). The Court considers first whether the speech was on a matter of public concern, and—finding that it was—next conducts the *Pickering* balancing. As discussed below, the Court finds the *Pickering* balancing weighs in favor of Defendants and will grant their motion for summary judgment.

### A.    *Matter of Public Concern*

First, the parties dispute whether Kimbrough's call with Attorney Zeiger was on a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotations omitted). But if speech "addresses only the employee's own problems," it is "merely a personal grievance"; this is so even if "those problems brush against a matter of public concern by virtue of that employee's public employment." *De Ritis v. McGarrigle*, 861 F.3d 444, 455 (3d Cir. 2017) (internal quotations omitted). To decide where on the public-private spectrum the contested speech falls, courts look at the speech's "content, form, and context." *Lane*, 573 U.S. at 241. At the motion to dismiss stage, the Court found that Kimbrough had adequately alleged that his call with Attorney Zeiger involved a matter of public concern; the evidence adduced during discovery confirms this conclusion.

**Content.** Kimbrough's speech touched on issues of prison security and understaffing— matters generally recognized as being of interest to the public. *See Zamboni v. Stamler*, 847 F.2d 73, 77 (3d Cir. 1988) ("This court has repeatedly found that public employees' criticism of the

14

internal operations of their places of employment is a matter of public concern."); *see also Czurlanis*, 721 F.2d at 104 (finding the employee spoke on a matter of public concern where his speech "challenged practices of the Division of Motor Vehicles and of the County government generally that he considered inefficient, wasteful, and possibly fraudulent"); *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1303 (10th Cir. 2009) ("Ms. Dixon's conversations with Dr. Stock regarding the supposedly improper use of OBVME resources to investigate the dogfighting ring involved matters of public concern.").[15]

**Form**.  The form of Kimbrough's communication is a closer call.  Tellingly, Kimbrough chose to raise his concerns not with the County's HR Department, Law Department, Board of Commissioners, or even the media, but instead, during a private call with opposing counsel in active litigation against the County and numerous BCCF employees.  *See Connick*, 461 U.S. at 148 (finding it relevant that the employee "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases").  The form of his speech is thus distinguishable from cases where the employee spoke in a public forum.  *See Czurlanis*, 721 F.2d at 104 (emphasizing that the

---

[15] Indeed, defense counsel previously conceded that the issues discussed on the call are matters of public concern.  (Jan. 23, 2025 Hr'g Draft Tr. at 32:22–33:2.)  And in their briefing here, Defendants acknowledge that "it is undeniable that chronic understaffing at BCCF is a legitimate matter of public concern."  (Doc. No. 31-3 at 16.)  Defendants nevertheless argue that the "internal methods and operational decisions by which the administration addresses those staffing challenges are not" of public concern.  (*Id.*)  The Court is not convinced.  If the problem (understaffing) is of public concern, then so is the potential solution (BCCF administration's staffing decisions).  Because the thrust of Kimbrough's call to Attorney Zeiger involved his allegations of understaffing, the Court views the entire discussion as being on a matter of public concern and declines to parse out different statements in the manner suggested by defense counsel at oral argument.  (Mar. 17, 2026 Hr'g. Rough Tr. at 45:14–46:4.)  The Court likewise rejects Defendants' suggestion (*see* Doc. No. 31-3 at 17; Mar. 17, 2026 Hr'g. Rough Tr. at 41:2–6, 45:25–46:4) that certain statements by Kimbrough do not involve matters of public concern because they relay information that is confidential or security sensitive.  *See Dennison v. Pa. Dep't of Corr.*, 268 F. Supp. 2d 387, 398 (M.D. Pa. 2003) ("[W]e have no hesitation in ruling that Dennison's speech, as pressed through the dissemination of confidential prison records, was on a matter of public concern.").

employee raised his concerns at a "public meeting" and "before the Board, which was the body with legislative power and investigative power germane thereto" and noting that "participation in a public meeting of elected representatives is a classic form of communicating" concerns about the functioning of a segment of the County government); *Zamboni*, 847 F.2d at 78 (finding it "relevant" that the employee's comments "were made not only in a private meeting with Stamler but also to the appropriate officials who were in a position to redress the actions of the prosecutor that Zamboni challenged").

That said, the mere private nature of the communication does not render it beyond First Amendment protection. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 413–16 (1979) (holding that "privately expressed . . . complaints and opinions" are not beyond First Amendment protection); *Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) ("[I]f the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context."); *Trent,* 2024 WL 4144403, at *2 (stating that "speech need not be public" to "address a matter of public concern").  And it was not unreasonable for Kimbrough to believe that by raising his staffing concerns in the context of a wrongful death case based in part on claims of understaffing, his speech could have a meaningful effect.  Accordingly, the Court finds the form of Kimbrough's speech does not undermine the public nature of its content.

*Context.*  Last, the Court looks to the context of Kimbrough's speech.  Here, Kimbrough's motivation for speaking would seem to weigh against a finding that he spoke on a matter of public concern.  *See Jackson v. Del. River & Bay Auth.*, 220 F. Supp. 2d 344, 351 (D.N.J. 2002) (explaining that although not controlling, "[a]n employee's motivation for

16

speaking" is "'one factor to be considered . . . in assessing the character of the employee's speech'" (quoting *Zamboni*, 847 F.2d at 78) (alterations adopted)).  Kimbrough independently contacted opposing counsel in active litigation against the County and numerous County officials.  He cannot reasonably dispute that the information he shared, if not already known to Attorney Zeiger, might have, at minimum, been harmful to the County's litigation position.  And it is telling that Kimbrough initiated the contact; he was not responding to a subpoena or even informal questioning from Attorney Zeiger.  *See id.* at 352 (emphasizing that the employee "was not specifically asked to speak" at the town council hearing and "had no knowledge of the dispute and no view of the matter that the Town Council had to decide").  It is also telling that Kimbrough waited *more than two years* after Patterson's death and *more than one year* after the Patterson Action was filed to speak out, choosing to contact Attorney Zeiger only after he was being investigated for harassment—and indeed, on *the same day* that he received a Notice of Fact-Finding Meeting in connection with that investigation.  *See id.* ("[T]he tone of Mr. Jackson's speech indicates that his primary motivation in speaking, although not dispositive of the issue here, was to vent his distrust toward the DRBA on the issues of safety and wages," even though he admittedly "did not make specific reference to his personal problems at the DRBA" in his speech.); *see also Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir. 1993) ("To be sure, corruption in an internal affairs department is a matter of public concern.  Gillum's focus was, however, on this issue only insofar as it impacted his wish to continue his investigation.").  These facts show that Kimbrough was motivated, at least in part, by an intent to harm the County.[16]

---

[16] Defense counsel argues the timing of Kimbrough's speech is evidence of *causation*, not *retaliation*, contending that Kimbrough spoke with Attorney Zeiger because he viewed the harassment investigation as his superiors' attempt to "silence" him for complaining about understaffing and disciplining sergeants for moving officers out of the Intake Unit.  (Mar. 17, 2026 Rough Hr'g. Tr. at

As with the speech's form, however, the Court does not find that any retaliatory motive by Kimbrough moves his speech outside the realm of public concern given its content. *See Connick*, 461 U.S. at 148–49 (finding part of the employee's speech involved a matter of public concern, even though it appeared in the context of a questionnaire, which was distributed only to her colleagues and which primarily reflected the "employee's dissatisfaction with a transfer"); *Czurlanis*, 721 F.2d at 104 ("But *more important* than the motivations underlying Czurlanis' participation in the Board meetings is the content of his speech, which falls squarely within the core public speech delineated in *Connick*."); *Zamboni*, 847 F.2d at 78 ("While it is uncontested that Zamboni had a personal stake in the speech at issue, our opinion in *Rode* makes clear that Zamboni's motivation is 'merely one factor to be considered, but not necessarily controlling, in assessing the character of the employee's speech.'" (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1201 (3d Cir. 1988)) (alterations adopted)); *see also Allen v. Heath*, 2016 WL 7633991, at *4–5 (E.D. Tex. Nov. 21, 2016) (finding the employee's speech was on a matter of public concern even though it "took place over the phone as the result of a call she initiated to" a private rental company and even though her neighbor's "residence and sex offender status" were "personal" to the employee; "Her conversation would inform the public beyond her personal grievances with her neighbor, informing the identity and residence of a sex offender").

---

7:21–8:4, 37:14–38:1.)  The Court would be more inclined to credit this argument if Kimbrough had raised his concerns with the Board of Commissioners or even the media—fora where his concerns could be broadly raised and hopefully, addressed.  But, instead, Kimbrough waited until two years after the incident, one year after the lawsuit was filed, and by his own account, years after he first thought his staffing concerns were being ignored.  It was only when he was first threatened with discipline that he finally chose to speak, and then, it was to a third party who served as opposing counsel in active litigation against the County.  It may be that Kimbrough spoke in part because he hoped for change at BCCF, but the only reasonable inference from the context of Kimbrough's speech is that he also spoke, at least in part, with personal animus for the County's decision to consider imposing discipline in the harassment investigation.  (*See, e.g.*, Doc. No. 32-20 at 3 (Kimbrough telling Deputy Solicitor Grieser that he was "just venting" when he called Attorney Zeiger).)

18

* * *

Viewing the record as a whole and with due consideration to Third Circuit precedent that emphasizes the importance of the speech's *content* even when the speech is private and there is evidence of personal animus or self-interest, *see Azzaro*, 110 F.3d at 978; *Czurlanis*, 721 F.2d at 104, the Court concludes that Kimbrough was speaking on a matter of public concern when he contacted Attorney Zeiger about understaffing at BCCF.

### B.        Pickering *Balancing*

Because Kimbrough's speech involved matters of public concern, the Court must determine whether the County had an "adequate justification for treating" Kimbrough "differently than the general public based on its needs as an employer under the *Pickering* balancing test." *Munroe v. Cnt'l Bucks Sch. Dist.*, 805 F.3d 454, 474 (3d Cir. 2015).  Under this test, the Court must balance Kimbrough's interest "as a citizen, in commenting upon matters of public concern" with "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 466 (cleaned up).  "If the Government's interest is 'significantly greater' than [Kimbrough's] interest in contributing to public debate, then [Kimbrough's] speech is not protected." *De Ritis*, 861 F.3d at 456–57 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968)).  The *Pickering* balancing test is a "fact-intensive inquiry that requires consideration of the entire record." *Munroe*, 805 F.3d at 472 (internal quotations omitted).

Beginning with Kimbrough's interest in speaking, at the motion to dismiss stage the Court found that Kimbrough's speech occupied "the highest rung of First Amendment protection" because his phone call exposed "government impropriety." *Dougherty*, 772 F.3d at 991 (internal quotations omitted).  And therefore, Defendants bore "a truly heavy burden" of demonstrating that BCCF had a greater interest in "promoting workplace efficiency and avoiding

19

workplace disruption." *Id.*  However, with the benefit of a full record, and considering the

"manner, time, and place" of Kimbrough's speech, *Connick*, 461 U.S. at 152, the Court can no

longer say that his call to Attorney Zeiger is the "archetype of speech deserving the highest rung

of First Amendment protection," *Dougherty*, 772 F.3d at 991.

First, it is noteworthy that Kimbrough's speech was not about "government misconduct"

in the strictest sense, but rather, his own disagreement with how the BCCF administrators, who

were Kimbrough's supervisors, were addressing staffing shortages outside of their control.  *See*

*Dixon*, 553 F.3d at 1309 (finding it "inform[ative]" that the employee's "disclosures did not

involve criminal misconduct or other serious wrongdoing, but at worst the employee's

disagreement about the use of agency resources"); *cf. Feldman*, 43 F.3d at 830 (noting that

speech which exposes "waste, fraud, and corruption within an agency will likely cause

disruption," but nevertheless, an employee's interest "in exposing governmental wrongdoing of

the nature and magnitude that Feldman's reports exposed is very strong").[17]  Second, and more

importantly, Kimbrough waited years to take his concerns to someone other than subordinates

and immediate supervisors, and when he did speak, it was with a third party whose interests were

in direct opposition to those of the County.  *See De Ritis*, 861 F.3d at 457 ("De Ritis's speech

here is more a private grievance than an instance of legitimate whistleblowing, and thus we

accord De Ritis's side of the scale lesser weight. . . .  De Ritis's continued failure to verify and

substantiate his allegations points up his self-interest.  Although De Ritis was not necessarily

---

[17] The Court does not, however, go so far as to adopt Defendants' view that Kimbrough's concerns about understaffing were a "blatant mischaracterization" that reflected Kimbrough's "ignoran[ce] of [BCCF's] institutional needs," including the need to "prioritize high-acuity areas to mitigate the impact of understaffing *across the facility*."  (Doc. No. 31-3 at 17 (emphasis added).)  This is not, for instance, a case where Defendants can show that Kimbrough's concerns were formally investigated and rejected.  *Cf. Swineford*, 15 F.3d at 1274 ("By continuing her crusade after her allegations had been investigated by the press and the proper authorities, Swineford demonstrated she was concerned with her own interest, not the public's.").

required to discuss his complaints with his supervisor, Roger, he waited six months or eight months before approaching Maddren and McGarrigle about his concerns, and he could have taken that step much sooner." (quotation marks and citations omitted)); *Dixon*, 553 F.3d at 1309 (finding it "inform[ative]" to the *Pickering* balancing test that the employee's disclosures "were made to an interested outside party and not to a public body with authority to investigate or redress her employers' wrongdoing if there were any"); *cf. Dougherty*, 772 F.3d at 991 (emphasizing that the employee spoke with media).

Of course, this does not mean that Kimbrough's speech is entitled to little or no protection; it merely affects the weight of the County's burden to show that its interests as an employer outweighed Kimbrough's interests in speaking and the public's interest in hearing. *See Munroe*, 905 F.3d at 472 (emphasizing that the inquiry "involves a sliding scale," with the "amount of disruption which a public employer has to tolerate" being "directly proportional to the importance of the disputed speech to the public"). On this side of the scale, the Court considers whether Kimbrough's speech caused "disruption" in the workplace. *Swineford v. Snyder County*, 15 F.3d 1258, 1272 (3d Cir. 1994) (discussing various employer interests, which are "referred to collectively as 'disruption'" (quoting *Versage v. Township of Clinton*, 984 F.2d 1359, 1366 (3d Cir. 1993))). "While the test for disruption varies depending upon the nature of the speech, the factors a court typically considers include whether the speech 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationship for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

21

There is no dispute that Kimbrough, as the administrative lieutenant of the R&R Unit, was responsible for a significant amount of confidential information, including all inmate criminal records.  (Doc. No. 38-1 at ¶¶ 6–7); *see also Zamboni*, 847 F.2d at 79 ("In considering whether any disruption was, in fact, material and substantial, consideration of Zamboni's role in the office will be important.").  As an employee at BCCF, he also knew sensitive safety information related to BCCF's operations, including BCCF policies on use of force, staffing, and inmate searches.  Consistent with this knowledge and his responsibilities, there was a level of trust that the facility's upper administration needed to have in Kimbrough, whose position made him a repository for many of the types of information BCCF has a strong interest in keeping private.  And the record shows that Kimbrough tarnished that trust when he voluntarily contacted Attorney Zeiger—opposing counsel in active litigation against the County—to share potentially damaging information about BCCF and its internal workings.  (*See* Kratz Dep. Tr. I at 178:19–179:5 (describing conversations among Kimbrough's supervisors about lack of trust); *see also id.* at 88:24–89:17 (testifying that Kimbrough's statements to Attorney Zeiger "created a lot of disorder and disruption" and noting the "lack of trust from the administrative team"); *id.* at 163:1–165:2 (testifying that Kimbrough was "exposed to a lot of confidential information during his tenure with [BCCF]," including having "access to employee files" and to "everybody's disciplines," and that this incident "was big" and "hurt professionally amongst . . . the administrative staff, because, you know, we rely on a lot of trust.").)[18]

---

[18] Defendants also argue that Kimbrough's disclosures violated Pennsylvania's Criminal History Record Information Act ("CHRIA"), and those violations affected the trust that supervisors placed in Kimbrough.  (Mar. 17, 2026 Rough Hr'g. Tr. at 48:4–12, 49:19–21.)  This is the first time Defendants have argued that Kimbrough's disclosures violate the CHRIA; this issue was not mentioned by any decisionmaker, on Kimbrough's Disciplinary Action Form, or even in Defendants' prior papers in this action.  Accordingly, even if Kimbrough's disclosures violated the CHRIA, there is no basis in the record for finding those purported violations caused administrators to have less trust in Kimbrough or to terminate his employment.

Kimbrough's counsel spends much time and ink analyzing whether the information that Kimbrough shared was in fact confidential, i.e., not known to anyone outside of the County, and whether the BCCF policies cited in Kimbrough's Discipline Action Form give adequate notice of what information the prison considers to be "confidential." (*See, e.g.*, Doc. No. 32-36 at 28–33.) But it is of little moment whether the details Kimbrough shared with Attorney Zeiger were, for instance, known by Inmate Rhoades or disclosed on the public docket for the Patterson Action. The County reasonably expects all BCCF employees not to casually divulge sensitive information, like typical staffing numbers and search procedures used in the Intake Unit. *See Dixon*, 553 F.3d at 1306–07 ("[T]he salient point, we believe, is that she as an employee who had *access* to confidential information, and was repeatedly discussing an ongoing investigation with an interested party outside her office. The (presumed) fact that she did not disclose any specific confidential information is less important than that that she *could* and *might* have . . . . Having unauthorized employees taking it upon themselves to open up alternative channels of inside information about the organization and its practices plausibly constitutes a 'disruption' in the operation of the organization"). Contrary to Kimbrough's argument, the specific information about staffing numbers and prison procedures that he shared with Attorney Zeiger could result in safety breaches if widely known. For example, an inmate who knows that there are "routinely" only two guards on duty in the Intake Unit (and even at full capacity, only three officers), may use that knowledge to plan an escape, challenge the officers, or create a diversion in the facility.

And regardless, as noted above, whether Kimbrough's disclosures violated the confidentiality policies cited in his Disciplinary Action Form or the Individual Defendants merely thought they did, the Individual Defendants were reasonably concerned that Kimbrough, who held a position where confidence and trust were paramount, was willing to casually disclose

23

sensitive information to a third party whose interests were directly opposed to the County's, seemingly in retaliation for being disciplined.  As even Kimbrough acknowledges, he was fired not merely because of *what* he said, but with *whom* he spoke (opposing counsel in active litigation against the County) and *why* he spoke (seemingly in retaliation for the County moving forward with disciplinary proceedings related to the harassment complaint).  (*See* Doc. No. 32-29 at 3 ("It was brought to our attention that you shared confidential information *with plaintiff's counsel* . . . .  [Y]ou admitted to contacting *plaintiff's attorney* and sharing *confidential information* which pertained to *a lawsuit against the DOC/County of Bucks*." (emphases added)); Doc. No. 35-4 at ¶ 118 ("Plaintiff's presumed intent was a factor in his discharge insofar as [CHRO Smith] believed 'he was trying to create trouble for the employer by contacting Plaintiff's counsel in an ongoing lawsuit against the employer.'" (quoting Smith Dep. Tr. at 71:17–21, 72:4–8, 72:19–23); Doc. No. 32-20 at 3 (Kimbrough telling Deputy Solicitor Grieser that he was "just venting" when he called Attorney Zeiger hours after receiving the notice regarding the harassment investigation into him); Mar. 17, 2026 H'rg. Rough Tr. at 63:23–64:6, 67:8–25); *see also Jackson*, 220 F. Supp. 2d at 353 n.6 ("As part of [*Pickering*] balancing, the Court may consider the accuracy of the employee's statements and the employee's motivation in making the statements."); *cf. Connick*, 461 U.S. at 153 (explaining that the "context in which the dispute arose is also significant . . . .  When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office").

Given the context of Kimbrough's disclosures, the Court finds that Kimbrough's speech significantly disrupted BCCF operations.  *See Connor v. Clinton Cnty Prison*, 963 F. Supp. 442,

450 (M.D. Pa. May 2, 1997) ("In the context of a prison, where security concerns and an adversarial relationship with inmates are inherent, mistrust among employees would be a special problem."); *Dillman v. Chaffinch*, 313 F. Supp. 2d 415, 419–20 (D. Del. 2004) ("[C]lose and confidential relationships with the leadership of the DSP was significantly undermined by the Plaintiff's leaking of still confidential information.  Under those circumstances, maintaining the Plaintiff in his position as the Director of Human Resources for the DSP could reasonably have been viewed by the Defendants as being wholly impracticable."); *see also Dixon*, 553 F.3d at 1308 ("Certainly having to worry about the possibility that Ms. Dixon would leak confidential information counts as disruptive of the everyday operations of OBVME.").[19]

Although a close call, the Court finds that, on balance, the County had an "adequate justification for treating" Kimbrough "differently than the general public based on its needs as an employer under the *Pickering* balancing test."  *Munroe*, 805 F.3d at 474; *see Jackson*, 220 F. Supp. 2d at 353 ("Upon this record, the DRBA has demonstrated that its concern with the effective and efficient fulfillment of its responsibilities to the public in matters of maritime safety and police performance outweigh employee Jackson's interest in venting his grievances against his employer through the oblique method of the Smyrna Town Council, under these

---

[19] During oral argument, plaintiff's counsel argued that a loss of trust is not enough to override Kimbrough's interest in speaking because "an employer would say in almost every whistleblower case that [it] do[es]n't trust [the employee] any more." (Mar. 17, 2026 Hr'g. Rough Tr. at 13:15–21; *accord, e.g.*, *id.* at 22:22–23:3, 28:23–25.)  Counsel is correct that a government employer cannot avoid liability simply by claiming a "lack of trust," but neither can an employee avoid the consequences of his speech simply by labeling himself a "whistleblower."  Indeed, the point of the *Pickering* balancing test is to weigh these competing interests.  *See Dougherty*, 772 F.3d at 991 (weighing the "public's significant interest in Dougherty's act of whistleblowing" against the "government's legitimate and countervailing interest, as an employer, in promoting workplace efficiency and avoiding workplace disruption" (quotation marks omitted)); *cf. Czurlanis*, 721 F.2d at 107 ("[I]t would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.  The point is simply that the balancing test articulated in *Pickering* is truly a balancing test, with office disruption or breached confidences being only weights on the scales." (quoting *Porter v. Califano*, 592 F.2d 770, 773–74 (5th Cir. 1979)) (alterations adopted)).

circumstances."); *Dennison*, 268 F. Supp. 2d at 398 (holding that "Dennison's interest in distributing inmate psychological records in an effort to reveal racial discrimination in parole determinations does not outweigh SCI-Mahanoy's interest in keeping such records confidential."); *see also, e.g.*, *Dixon*, 553 F.3d at 1308 (finding "the balance . . . clearly tips towards" the government employer even though the employee's speech "sought to expose what she perceived to be the misuse of public funds" because her speech involved the "leak of confidential information" which "risked compromising" the employer's investigation).

* * *

Because *Pickering* balancing weighs in favor of Defendants, Kimbrough has not shown that his speech is protected by the First Amendment, and both his retaliation claims fail.[20]

## IV.    CONCLUSION

This case places the Court in the unenviable position of weighing a government employee's valid interest in speaking, against the government employer's valid interest in regulating that speech.  On balance, given the factual circumstances of this case, the Court finds that even when the evidence is viewed in the light most favorable to Kimbrough, his speech is not protected by the First Amendment.  *See Pickering*, 391 U.S. at 569 (emphasizing the "enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal" and finding it neither "appropriate [n]or feasible to lay down a general standard against which all statements may be

---

[20] As stated previously, because the Court finds Kimbrough's speech is not protected by the First Amendment, we need not consider the parties arguments on whether Kimbrough's speech was a motivating or substantial factor in his termination, nor does the Court consider the parties' arguments on municipal liability and qualified immunity.

judged"); *Munroe*, 805 F.3d at 472 (noting that *Pickering* balancing is a "fact-intensive inquiry that requires consideration of the entire record" (internal quotations omitted)).

Accordingly, summary judgment is granted in Defendants' favor.  Kimbrough's motion for summary judgment is denied.  An appropriate order follows.

27